1  James C. Bastian, Jr. - Bar No. 175415
   Melissa Davis Lowe – Bar No. 245521
2  **SHULMAN HODGES & BASTIAN LLP**
   100 Spectrum Center Drive, Suite 600
3  Irvine, California 92618
   Telephone:    (949) 340-3400
4  Facsimile:    (949) 340-3000
   E-mail:    jbastian@shbllp.com; mlowe@shbllp.com
5
   Attorneys for Petitioning Creditors D&A Daily
6  Mortgage Fund III, L.P.;D&A Semi-Annual Mortgage
   Fund III, L.P.; and D&A Intermediate-Term Mortgage Fund III, L.P.
7

8                    **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

10

11

12  In re                                    Case No. 8:15-bk-10721-SC

13  **AMERICAN SPECTRUM REALTY, INC.,**      Chapter  11

                   Debtor.                   **REQUEST FOR JUDICIAL NOTICE IN
14                                            SUPPORT OF PETITIONING
                                             CREDITORS' EMERGENCY MOTION
15                                            FOR A COURT ORDER APPOINTING AN
                                             INTERIM CHAPTER 11 TRUSTEE**
16
                                             **Hearing:**
17                                           Date:    February 19, 2015
                                             Time:    2:00 p.m.
18                                           Ctrm.:  5C
                                                        Ronald Reagan Federal Building
19                                                      and United States Courthouse
                                                        411 West Fourth Street
20                                                      Santa Ana, California 92701

21

22

23

24

25

26

27

28

Z:\A-B\American Spectrum Realty\Pld\Appoint Trustee Mtn_RJN.doc
4936-000/56

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR AND ITS COUNSEL AND ALL INTERESTED PARTIES:**

     **PLEASE TAKE NOTICE** that the petitioning creditors of American Spectrum Realty, inc. ("Debtor"), through their attorneys, Shulman Hodges & Bastian LLP, hereby request, pursuant to Federal Rule of Evidence 201 made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 9017, that this Honorable Court take judicial notice of the following documents and their contents to be considered in connection with their Motion to Appoint an Interim Chapter 11 Trustee ("Motion").

**JUDICIALLY NOTICED DOCUMENTS**

1.     Debtor's 10-K for the year ending December 31, 2013,  a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "1."**

2.     Debtor's 10-K for the year ending December 31, 2012,  a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "2."**

3.     Debtor's 10-K for the year ending December 31, 2011,  a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "3."**

4.     Debtor's 8-K dated November 14, 2014, including exhibits, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "4."**

5.     Debtor's 8-K dated April 7, 2014, including exhibits, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "5."**

6.     Debtor's 8-K dated February 12, 2015, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "6."**

7.     Quitclaim deed transferring the real property located at 3600 N. Verdugo Road, Glendale, CA from American Spectrum Dunham Properties, LLC to Verdugo, LLC, a true and correct copy of which is attached hereto and incorporated herein as **Exhibit "7."**

///

///

///

1

SHULMAN HODGES &
BASTIAN LLP
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

Z:\A-B\American Spectrum Realty\Pld\Appoint Trustee Mtn_RJN.doc
4936-000/56

1      8.      Chapter 11 bankruptcy petition filed by Verdugo, LLC on February 12, 2015 in

2   the United States Bankruptcy Court for the Central District of California, Santa Ana Division,

3   commencing Case No. 8:15-bk-10701-SC, a true and correct copy of which  is attached hereto

4   and incorporated here as **Exhibit "8."**

5      Federal courts may take judicial notice of facts which are "capable of accurate and ready

6   determination by resort to sources whose accuracy cannot reasonably be questioned."   Federal

7   Rule of Evidence 201(c)(2).   Specifically, they may take notice of materials in their own files.

8   *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980) (court may take judicial notice of its

9   own records in other cases); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277-78 n. 33 (5th

10   Cir. 1978) ("courts are particularly apt to take notice of material in court files").

**SHULMAN HODGES & BASTIAN LLP**

Dated: February 13, 2015      */s/ Melissa Davis Lowe*
                             James C. Bastian, Jr.
                             Melissa Davis Lowe
                             Counsel to Petitioning Creditors

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SHULMAN HODGES &
BASTIAN LLP**
8105 Irvine Center Drive
Suite 600
Irvine, CA 92618

2

# EXHIBIT 1

10-K 1 a2013-10kxasr.htm 10-K

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549
### FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the year ended December 31, 2013**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**COMMISSION FILE NUMBER 001-16785**

**American Spectrum Realty, Inc.**

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **State of Maryland** | **52-2258674** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2401 Fountain View, Suite 750 Houston, Texas** | **77057** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 706-6200**

(Registrant's telephone number, including area code)

Securities registered under Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | NYSE Amex |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "accelerated filer", "large accelerated filer" and "small reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐     Accelerated filer ☐

Non-accelerated filer ☐     Smaller reporting company ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

As of June 30, 2013, the last business day of the Registrant's most recent completed second quarter, the aggregate market value of the voting stock held by non-affiliates of the Registrant was approximately 2,389,355. The aggregate market value was computed with reference to the price on the American Stock Exchange at which the voting stock was last sold as of such date. For this purpose, 1,313,787 shares of common stock held by officers and directors are deemed to be held by affiliates but exclusion of shares held by any person should not be construed to indicate that such person is an affiliate of the Registrant for any other purpose.

As of October 24, 2014, 3,703,142 shares of common stock ($.01 par value) were outstanding.

---

## TABLE OF CONTENTS

|  |  | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 2 |
| Item 1A | Risk Factors | 4 |
| Item 2 | Properties | 9 |
| Item 3 | Legal Proceedings | 14 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 16 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 17 |
| Item 6 | Selected Financial Data | 20 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations Overview | 20 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 32 |
| Item 8 | Financial Statements and Supplementary Data | 32 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 69 |
| Item 9A | Controls and Procedures | 69 |
| Item 9B | Other Information | 70 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 71 |
| Item 11 | Executive Compensation | 72 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 76 |
| Item 14 | Principal Accountant Fees and Services | 76 |
| **PART IV** | | |

EXHIBIT "1"

Item 15    Exhibits and Financial Statement Schedules                                    77

1

---

## PART I

**NOTE ABOUT FORWARD LOOKING STATEMENTS**

Certain statements either contained in or incorporated by reference into this report, other than purely historical statements, including estimates, projections, statements relating to our business plans, objectives and expected operating results, and the assumptions upon which those statements are based, are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These forward looking statements generally include statements that are predictive in nature and depend upon or refer to future events or conditions, and include words such as "believes," "plans," "anticipates," "projects," "estimates," "expects," "intends," "strategy," "future," "opportunity," "may," "will," "should," "could," "potential," or similar expressions. Forward looking statements are based on current expectations and assumptions that are subject to risks and uncertainties which may cause actual results to differ materially from the forward looking statements. A detailed discussion of these and other risks and uncertainties that could cause actual results and events to differ materially from such forward-looking statements is included in this report in the sections entitled "Risk Factors" (Part I, Item 1A) and "Management's Discussion and Analysis of Financial Condition and Results of Operations" (Part II, Item 7). The reader is cautioned not to unduly rely on these forward looking statements. We expressly disclaim any intent or obligation to update or revise publicly these forward looking statements except as required by law.

**ITEM 1. BUSINESS**

**General**

American Spectrum Realty, Inc. is a value add real estate investor looking to acquire properties which require operational attention, physical improvement or capital restructuring. Our investment strategy is to acquire, improve and hold real estate/real property while we look for an opportunistic exit that will enable us to achieve our risk/return objectives. Our property portfolio consists of income producing properties and land held for development including properties in which we have a controlling interest or where we are the primary beneficiary of a variable interest entity (a "VIE"). Our income producing properties include commercial office, industrial, retail, self-storage, multi-family residential and student housing. In addition to our real estate portfolio, we offer our market expertise and integrated real estate solutions to select third parties for a fee. Our service offering includes property and asset management, insurance procurement, syndication services, receivership management and brokerage services.

We were incorporated in Maryland in August of 2000, and are headquartered in Houston, Texas. We conduct business operations in the continental United States primarily through American Spectrum Realty Operating Partnership, L.P., a Delaware limited partnership (the "Operating Partnership"). We are the sole general partner of the Operating Partnership, and hold limited partnership interests representing approximately 94% at December 31, 2013. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and direct the operating activities of the Operating Partnership. In general, the Operating Partnership units that are not held by us (approximately 6% of the outstanding units) are exchangeable for shares of our common stock on a one-to-one basis, or for cash equal to the value of such stock at our sole discretion.

EXHIBIT "1"

Unless expressly stated or the context otherwise requires, the terms "we," "our," "us", "the Company" and "ASR" refer to American Spectrum Realty, Inc. and its consolidated subsidiaries.

**Corporate Background**

Our principal offices are located at 2401 Fountain View, Suite 750, Houston, Texas 77057 and our telephone number is 713-706-6200. Our Annual Reports on Form 10-K, our Code of Ethics, and our Audit Committee, Compensation Committee and Nominating Committee Charters are available free of charge at http://www.americanspectrum.com/investor-relations. The following filings are available free of charge at www.sec.gov after we electronically file them with the Securities and Exchange Commission (SEC): Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended.

**Description of Business**

During the first quarter of 2013, the Company reassessed its application of segment guidance, and based on the expected performance of our operating segments, determined that it would be more appropriate to present our reporting units as two reportable segments: (i) real estate portfolio operations and (ii) integrated real estate services provided to third parties.In conjunction with this reassessment, we have revised our prior period presentation. The following is a summary of the percentage of our net revenues by revenue source within our two segments:

2

|  | Year ended December 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (in thousands) | |
| Rental revenue | 92% | 93% |
| Third party management and leasing revenue | 8% | 7% |
| Interest and other income | —% | —% |
|  | 100% | 100% |

At December 31, 2013, we consolidated 53 properties (including 33 properties owned primarily by us and 20 properties owned by VIEs in which we were deemed the primary beneficiary), which consisted of 9 office properties, 12 self-storage facilities, 8 commercial/industrial properties, 7 multi-family properties, 3 retail properties, 2 recreational vehicle resorts and 12 vacant land properties. We have a management presence in 15 states. We are committed to expanding the scope of our products and services, and believe this expansion will help us meet our own portfolio property needs as well as the needs of our third party clients. In addition to management of our portfolio assets, we offer our market expertise and integrated real estate solutions to select third parties. These services include property, facility, asset, business and engineering management services. We offer customized programs that focus on tenant retention through cost-efficient operations.

**Industry, Competition and Strategy**

The availability of real estate financing has greatly diminished due mostly to the collapse of the market for commercial mortgage backed securities several years ago. The absence of a suitable alternative source of financing has made the financing of acquisitions and refinancing of existing mortgage obligations more difficult and more expensive even when alternatives are available. The relative scarcity of available sources

EXHIBIT "1"

of financing has greatly contributed to the overall decline in the real estate values as the cost to finance those assets has increased. Additionally, the scarcity of available financing has increased the time and marketing costs necessary to sell properties, and has adversely impacted our liquidity and capital resources. We are currently focused on a strategy to reduce the amount of debt on our balance sheet and to improve liquidity through the following strategic initiatives:

- Sales of selected properties
- Fees from new syndication and joint venture acquisitions
- New management contracts
- Receivership management fees
- Reduction of annual operating costs

We believe that stabilizing our portfolio and improving our liquidity will provide us with an opportunity to acquire interests in or ownership of undervalued and under-managed properties, as well as allow us to expand our services to additional third party clients. There are many properties currently priced below their replacement costs, and these present potentially attractive opportunities. A stable portfolio and greater liquidity, our presence in 15 states, and our local market knowledge and management expertise will position us better to capitalize on these opportunities.

We face competition from other regional and national service providers. Many of our competitors are local or regional firms that are similarly sized; some competitors are substantially larger than we are on a local, regional, national and/or international basis. In most of the markets in which we do business, both institutional and private, investors and developers of properties compete vigorously for the acquisition, development and leasing of space. Many of these competitors have greater resources and more experience than we do.

**Employees**

As of December 31, 2013, we employed a total of 165 individuals.

**Environmental Matters**

We are subject to certain requirements and potential liabilities under various federal, state and local environmental laws and regulations, and may incur costs in complying with such regulations. These laws and regulations govern actions including the disposal of hazardous and toxic substances, such as lead paint or materials containing asbestos. In addition to investigation and remediation liabilities that could arise under such laws, we may also face personal injury or property damage claims by third parties

3

concerning environmental compliance or contamination. These factors could adversely impact earnings and the value of our shares.

The environmental condition of our investment properties may be adversely affected by our tenants, conditions of nearby properties, or by unrelated third parties. Generally, our investment properties have been subjected to Phase I environmental audits at the time they were acquired. These audits, performed by independent consultants, generally involve a review of records and visual inspection of the property. These audits do not include soil sampling or ground water analysis. These audits have not revealed, nor are we aware of, any environmental liability that we believe will have a material adverse effect on our operations. We may acquire a property with environmental contamination, depending on the level of risk and potential cost of remediation. These audits may not, however, reveal all potential environmental liabilities.

**Item 1A . RISK FACTORS**

EXHIBIT "1"

In general, an investment in our stock involves the assumption of risk, which can be characterized as the potential for the value of our stock to deviate from expected outcomes. The risks described below could materially and adversely affect our business, financial condition, results of operations, cash flows, and capital investment and financing plans. We also may be adversely affected by risks not currently known or risks that we do not currently consider material to our business.

**General Investment Risk**

**Changes in global, national and regional economic conditions, as well as volatility in financial markets, can create circumstances where our stock price deviates from expected outcomes. Such deviations, positive or negative, can be significant. Changes in government regulation can also affect our operations, which could adversely impact cash flows, asset values and the value of our shares. The following are some of the more important general business and investment risk factors that could affect our business and the value of our shares.**

- **General Market Disruption.** Disruptions in the financial and investment markets where our stock trades can result from geopolitical turmoil, elections, political events, social unrest or changing societal attitudes. These disruptions can be characterized by changing or volatile market conditions, which can include large and rapid declines in market indices and investment values. At times, these disruptions create disorderly market conditions and can lead to loss of investment capital. These market disruptions may result in your not being able to affect purchase or sales transactions at desired prices or to determine a fair price for your investment in our shares. Placing contingent orders, such as "stop-loss" orders, will not necessarily limit your losses, because your "stop-loss" orders may be impossible to execute under adverse market conditions.

- **Electronic Exchange Trading.** Our shares are traded on markets which are supported by computer-based systems for the order-routing, execution, matching, registration or clearing of trades. As with all computer-based systems, there is potential for temporary disruption or failure, including disruptions from physical threats to the stock exchange, or unusual trading in derivative markets. The result of any system disruption may be that your order is either not executed according to your instructions, or not executed at all. Some exchanges utilize trading rules designed to govern rapid fluctuation in share value; for example, the rules of a particular exchange may provide for "circuit breakers" where trading is restricted at times of rapid price movements. The effects of system interruptions and exchange-specific trading rules may cause disruptions which could adversely impact your investment in our shares.

- **Monetary Policy Initiatives.** Central banks around the world have adopted monetary policy initiatives aimed at creating financial stability in support of their respective economies. Such policy initiatives include the increase of liquidity in the banking sector to support lending and mortgage loan activity, asset purchases to lower long-term interest rates, and other market intervention to support financial stability. All of these activities are believed to benefit financial investments, including real estate investments, but the benefits are often segment-specific based on the particular monetary policy initiatives. Future adjustments in central banks' policies will impact local and global financial markets and these policy changes could adversely impact your investment in our shares.

- **Government Regulation.** Government regulation and uncertainty about proposed regulation

EXHIBIT "1"

significantly impact private sector investment decisions and outcomes. For example, government initiatives designed to address global climate change could negatively impact the anticipated cash flows from investment in new power generation facilities. The result of such regulation could adversely impact the cost and availability of electricity needed to operate our buildings. As such, pending and unforeseen changes in government regulation could adversely impact the value of our shares.

**Real Estate Investment Risks**

4

**We are in a highly competitive business with numerous competitors and are subject to the risks related to the ownership and operation of real estate. The following are some of the more important industry risk factors that could affect our business and financial condition.**

- **Competitive Industry.** We compete in a variety of service disciplines within the real estate industry, each highly competitive on a national, regional and local level. Our competitors include:

  o        Multi-national firms with U.S.-based operations

  o        National, regional and local real estate service providers

  o        Institutional lenders

  o        Insurance companies

  o        Investment banking firms

  o        Investment managers

  o        Accounting firms

Many of our competitors are larger than we are, with substantially greater financial resources and a lower cost of capital. Consequently, there can be no assurance that we will be able to continue to compete

EXHIBIT "1"

effectively in our established markets, either on an overall basis or in our respective business segments. Our inability to compete effectively could adversely impact current fee levels, market share, or the ability to grow our business in new markets.

- **High Rate of Employee Turnover.** We operate in an industry that has historically been highly competitive in securing qualified personnel with the required technical skills and experience. As a result, we may not be able to find qualified labor, which could limit our growth ability. We expect labor costs will continue to increase in the foreseeable future. Our inability to cost effectively recruit, train and retain necessary personnel could harm our business, our ability to compete in our markets, and our ability to obtain new customers.

- **Success Dependant on Properties Managed**. We could be adversely affected by the nonperformance or the deteriorating financial condition of certain of our clients. The revenue we generate from our property management fees is generally a percentage of aggregate rent collections from the properties. The performance of these properties will depend on factors that are partially or completely outside of our control.

- **Company Liability.** We face significant legal risks in our businesses, and the volume of claims and amount of damages and penalties claimed in litigation against us remains high. At any time we could become subject to claims by participants in real estate sales, as well as building owners and companies for whom we provide management services, claiming that we did not fulfill our contractual or statutory obligations. In addition, we hire and supervise third party contractors to provide construction and engineering services for our properties and the properties owned by our third party clients. We may be subject to claims from others for the actions or failures of third party contractors hired by us.

- **Insurance Coverage**. We currently carry comprehensive insurance, including liability, fire and extended coverage in amounts we reasonably estimate will substantially cover the replacement value of our buildings and improvements, and to protect against the kinds of liability that owners and developers of real estate properties are likely to confront. We may become jointly and severally liable for any uninsured or underinsured personal injury, death or property damage claims associated with our properties. We believe our properties are adequately insured, but there are certain losses for which insurance may not be available or, if available, not economically viable. If an uninsured loss occurs, or a loss is not paid due to insurer insolvency, we could experience a significant loss of invested capital and potential revenue from these properties, and could potentially remain obligated under any recourse debt associated with the property.

- **Catastrophic Loss Coverage**. Many of our properties are located in areas of the United States that have increased risk of catastrophic losses and natural disasters, including earthquakes, hurricanes, high winds and floods. Such an event could cause significant damage or complete destruction to our properties. Because these types of losses are uncertain, they can be uninsurable or prohibitively expensive. Due to the cost of such catastrophic loss coverage and the high deductibles associated with most policies, we do not carry such insurance unless required by a lender.

EXHIBIT "1"

5

---

- **New Markets.** Properties that we acquire may be located in new areas where we may face risks associated with investing in an unfamiliar market.

- **Illiquidity of Real Estate Investments.** Real estate investments are relatively illiquid, and therefore we have limited ability to vary our portfolio quickly in response to changes in economic or other conditions.

- **Expiration of Leases.** Upon expiration of leases for space located in our properties, the premises may not be re-let or the terms of re-letting (including the cost of concessions to tenants) may be less favorable than current lease terms. If we cannot obtain another tenant with comparable needs, we may need to modify the property for a different use, which could involve a significant capital expenditure and a delay in releasing the property. There can be no assurance that we will be able to retain tenants in any of our properties upon the expiration of their leases.

- **Vacancy.** We may have difficulty obtaining a new tenant for any vacant space we have in our properties. If the vacancy continues for a long period of time, we may suffer reduced revenues resulting in less cash available to meet our operational needs. In addition, the resale value of a property could be diminished because the market value will depend principally upon the value of the leases of such property.

**Company-Specific Risks**

**Certain factors unique to the operations and reputation of our company can have a significant impact on our business and the value of our shares. The following are some of the important company-specific risks associated with our business.**

- **Hiring and Retention.** Our success is dependent upon our ability to retain our executive officers and other key employees, and to attract and retain highly skilled personnel. Competition for these personnel is intense, and we may not be able to successfully recruit or retain sufficiently qualified personnel, which could harm our business.

- **Internal Controls.** Failure to maintain effective disclosure controls and procedures and internal controls over financial reporting could have an adverse effect on our operations and the trading price of our common stock. Effective internal controls are necessary for us to provide reliable financial reports, effectively prevent fraud, and operate successfully as a public company.

We have developed internal control improvement initiatives to remediate weaknesses and deficiencies identified and to enhance the overall financial control environment. Our management is actively committed to and engaged in the implementation and execution of remediation efforts. There can, however, be no assurance that our remediation efforts will be successful.

- **Nonpayment of Cash Dividends on Common Stock.** We have no plans to pay dividends on our common stock, and, therefore, investors will have to look to stock appreciation for return on investments. We currently intend to retain all future earnings to fund the development and growth of our business and to meet current debt obligations. Investors must rely on sales of common stock held after price appreciation (which may never occur) in order to realize a return on their investment.

- **NYSE Notices of Non-compliance.** We have received notices from the NYSE MKT ("Exchange") advising us of non-compliance with the following sections of the Exchange's Company Guide:

  ○ Sections 134 and 1101 require us to timely file our Annual Report on Form 10-K for the year ended December 31, 2013 and our Quarterly Reports on Form10-Q for the three months ended March 31, 2014 and June 30, 2014. Based upon our correspondence and communication with the Exchange, we have received an extension of time until October 31, 2014 for the filing of our 2013 Form 10-K, and if that deadline is met, an extension to December 31, 2014 to file our 2014 quarterly reports for the quarters ended March 31, June 30 and September 30, 2014. Additionally, the late filing of reports with the SEC could result in a technical default of the Company's various debt obligations.
  ○ Due to the losses incurred during our five most recent fiscal years, we are in violation of Section 1003 (a) (iii) which requires us to maintain stockholders' equity of at least $6,000,000.
  ○ We are in violation of Section 1003(f)(iv) for unpaid listing fees totaling $42,000. Our continued listing on the exchange is predicated on us paying all outstanding listing fees to the Exchange no later than November 3, 2014.

6

---

As a result of these non-compliance issues, we could lose our common shares listing on the Exchange depending on a number of factors, including, but not limited to, our failure to comply with the plans of compliance which have been submitted to the Exchange outlining our objectives to correct the noted deficiencies and pay the fees due by the deadlines. The loss of our listing on the Exchange could have an adverse impact on the liquidity and market price of the Company's common stock.

Delisting our common stock could negatively impact us by:

○ reducing the liquidity and market price of our common stock
○ reducing the number of investors willing to hold or acquire our common stock, and correspondingly impact our ability to raise equity financing
○ decreasing the amount of news and analyst coverage
○ loss of confidence by current and prospective suppliers, and customers
○ inability to attract and retain personnel by means of equity compensation

As of January 1, 2014 through April 15, 2014, the average daily trading volume for our common shares was approximately 32,000 shares with an average daily closing price of $1.68. The average daily trading

EXHIBIT "1"

volume and daily closing average price per share of our common shares during the annual periods 2012 and 2013 was 3,038 shares and $4.52, and 6,864 shares and $2.37, respectively. We cannot guarantee the value of our shares will return nor have any value should trading of our shares be reestablished. As a result, it may be difficult for holders of our listed securities to sell their securities at prices they find attractive, or at all.

- **Personal Interest and Conflict.** Certain of our officers and members of our board of directors may have personal interests that conflict with the interests of our stockholders with respect to business decisions affecting us and our Operating Partnership, such as interests in the timing and pricing of property sales, or refinancing to obtain favorable tax treatment. As a result, the effect of certain transactions on these members of management may influence our decisions affecting these properties.

- **Impairment of Intangible Assets.** Under current accounting guidelines, we must assess whether the value of our goodwill and other intangible assets has been impaired. Any impairment of goodwill or other intangible assets as a result of such analysis would result in a non-cash charge against earnings, which charge could materially adversely affect our reported results of operations, stockholders' equity and our stock price. A significant and sustained decline in our future cash flows, a significant adverse change in the economic environment, slower growth rates, or our stock price falling below our net book value per share for a sustained period could all result in the need to perform additional impairment analysis in future periods. If we were to conclude that a future write-down of goodwill or other intangible assets is necessary, then we would record such additional charges, which could materially adversely affect our results of operations.

- **History of Loss.** We have recognized losses for the years ended December 31, 2013 and 2012, respectively. Our operations are subject to the risks and competition inherent in the establishment of a business enterprise. We cannot assure that we can achieve or sustain profitability on a quarterly or annual basis in the future.

- **Joint venture investments.** We may from time to time enter into joint venture transactions for portions of our existing or future real estate assets. This subjects us to certain risks, among them:

o    We will not exercise sole decision making authority regarding the joint ventures business and assets.

o    We may be required to accept liability for obligations of the joint venture (such as recourse carve-outs on mortgage loans beyond our economic interest).

o    Our returns on joint venture assets may be adversely affected if the assets are not held for the long term.

**Financing Risks**
**Our portfolio is highly leveraged, which subjects us to financing risk that could cause us to become insolvent and lead to the loss of properties in the event of a foreclosure. The following are some of the important financing risks associated with our business.**

EXHIBIT "1"

In general, financing risk relates to interruptions in debt markets, asset values and cash flows, which may adversely impact our ability to meet our financial obligations when they come due and could cause us to become insolvent. Our organizational documents contain no limitation on the amount or percentage of indebtedness which we may incur. Our board of directors, without a vote of

7

the stockholders, establishes our policies on borrowings and leverage, and they are subject to change from time to time. Outlined below are various additional risks associated with our financing strategies which could adversely impact our cash flows, asset values and your investment in our shares.

- **Availability of Financing and Market Conditions**. Fluctuations in the market for real estate loans may affect the availability and cost of loans needed to finance and refinance our properties. Credit availability continues to be restricted for certain classes of real estate assets and there is no assurance that we will be able to obtain the required financing to acquire, develop, hold, refinance and sell our properties, which could adversely impact our operations and the value of our shares.

- **Variable Interest Rates and Interest-Only Loans**. Many of the available loans, particularly bank loans, have interest rates which are determined by a margin over a floating rate index (such as LIBOR or the Prime Rate). In the event that the floating rate index on any loan increases significantly, we may not have sufficient operating cash flows to pay the required loan payments. In such event, our ownership of the underlying asset may be threatened if we cannot sell the asset or modify the loan terms with the lender.

- **Loan Terms**. The terms of our existing credit facilities and loan agreements contain debt covenants requiring us to comply with a number of financial and other covenants. These covenants may limit our operational flexibility, and our non-compliance could result in defaults under the applicable covenants even if we have satisfied our payment obligations. When obtaining new loans or refinancing our existing loans, the financial terms of the loans we may be able to obtain or assume continue to fluctuate with market conditions. Financing terms associated with available loans cannot be predicted with any degree of certainty, and could have a negative impact on our investment outcomes and your investment in our shares.

- **Leverage**. Although there can be no assurance, we anticipate loans to support the acquisition and development of our properties as a means of reducing our equity investment requirement. Due to limitations in the availability of loans originated through the commercial mortgage-backed securities market, we anticipate using seller carry-back financing, private debt capital, and, when available, conventional bank loans. The use of leverage to support our acquisition and development activities exposes us to losses resulting from a decline in the market value for our properties. Similarly, a significant increase in operating expenses which cannot be offset by increases in rental revenues exposes us to losses if our properties do not generate enough

EXHIBIT "1"

cash to repay the principal and interest on our debts. A decline in values or cash flows could potentially result in lender foreclosure and a loss of our investment.

- **Balloon Payments**. Our loans have principal amortization periods that exceed the termination date and require us to make large balloon payments at maturity. If we are unable to make a balloon payment, extend the maturity date, or refinance the loan obligation, we could face foreclosure proceedings and the loss of our investment.

- **Recourse Liability and Cross-Collateralization**. Some of our loans are full recourse loans or may contain cross-collateralization clauses. In situations where we have invested using special purpose entities we have been required to provide loan guarantees or cross-collateralize one property with another. The failure of one of our properties to meet its loan obligations could adversely impact our operations and our other assets.

- **Restriction on Transfer**. Most of our loans have restrictions on our ability to transfer the loan at the time of sale. Some of our loans also include prepayment penalties or yield maintenance agreements that require loan pay-off premiums, which restrict our ability to dispose of our properties or equity interests and could result in diminished values or sales proceeds for our investments.

- **Potential Adverse Effect of Indebtedness on Future Operations**. The degree to which we are leveraged could have an adverse impact on us as the result of:

  ◦ increased vulnerability to adverse general economic and market conditions

  ◦ impaired ability to expand and to respond to increased competition

  ◦ impaired ability to obtain additional financing for future working capital, capital expenditures; general corporate or other purposes

8

---

  ◦ requiring that a significant portion of cash provided by operating activities be used for the payment of debt obligations, thereby reducing funds available for operations and future business opportunities.

**Tax Risks**

**Our business is impacted by federal, state and local tax regulation. Interpretation and compliance with these complex and continually changing regulations is time-consuming, expensive and involves risks that affect our business and the value of our shares. The following are some of the important tax risks associated with our business.**

- **General Tax Risks**. The cost of compliance, as well as any potential penalties and fines for non-compliance, has increased substantially over the last several years. Examination of our tax returns by regulatory agencies such as the IRS can be time consuming and costly, regardless of the outcome. The Company's tax and information returns may be audited at any time, and an audit may result in the challenge and disallowance of some of the deductions described in the returns. No assurance or warranty of any kind can be made with respect to the deductibility of any such items in the event of either an audit or any litigation resulting from an audit.

- **Tax Classification of Partnerships and Limited Liability Companies.** Many of our investments, whether wholly-owned or held in VIEs, are held through interests in limited partnerships and limited liability companies that have elected to be taxed as partnerships for federal income tax purposes. If these entities were to be treated for tax purposes as a corporation, the tax benefits associated with an investment in these partnerships and limited liability companies may not be available to us. As a corporation, our subsidiary entities could be required to pay income tax on some or all of their earnings in the same manner and at the same rate as a corporation.

- **Possible Disallowance of Various Deductions**. The availability, timing and amount of our deductions or allocation of our income and expense items depends not only on the written text of laws and regulations, but also upon various determinations that are subject to potential controversy on factual or other grounds. Additional issues could arise regarding the allocation of acquisition costs to buildings, land, leaseholds and personal property. If a regulatory agency were successful, in whole or in part, in challenging our position on these issues, we could be required to file amended tax returns and incur penalties, fines and interest, which could adversely impact earnings and the value of our shares.

- **Allocation of Net Income and Net Loss**. In order for the allocations of income, gains, deductions, losses and credits under the various partnership and limited liability membership agreements to be recognized for tax purposes, such allocations must possess substantial economic effect. No assurance can be given that the IRS, or any other regulatory agency, will not claim that such allocations lack substantial economic effect. If any such challenge to the allocation of losses were upheld, the determination of our taxable income for one or more tax years could be adversely affected.

- **Alternative Minimum Tax**. The alternative minimum tax applies to designated items of tax preference. Although we may have losses for any one year, we may still be required to pay the alternative minimum tax due to alternative minimum tax adjustments, which could adversely impact our cash flows during the periods in which such taxes are paid.

EXHIBIT "1"

## Item 2. PROPERTIES

Our properties are held in wholly-owned subsidiaries, subsidiaries in which we have a majority interest, and in VIEs for which we hold a beneficial interest.

### Location and Type

The following table sets forth the location, type and size of the properties (by rentable square feet) along with annualized net rent, rented square feet, occupancy, and rent per square foot consolidated by us as of December 31, 2013. All properties listed below are encumbered by debt.

9

| Properties Owned Primarily by ASR | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Name | % Owned | City/State | Total Gross Leasable Square Footage/Land Acreage | % Of Gross Leasable Area Occupied (1) | Rented Square Feet | Annualized Net Rent In ($) (2) | Rent per Square Feet In ($) (3) |
| 2640-2650 Fountain View (4) | 100 | Houston, TX | 176,624 | 90 | 159,085 | 2,464,808 | 15.49 |
| 5450 Northwest Central | 100 | Houston, TX | 56,111 | 72 | 40,506 | 521,304 | 12.87 |
| 800 & 888 Sam Houston Pkwy | 100 | Houston, TX | 88,292 | 68 | 60,216 | 852,083 | 14.15 |
| 8100 Washington (4) | 100 | Houston, TX | 45,781 | 100 | 45,781 | 645,734 | 14.10 |
| Atrium 6430 (4) | 100 | Houston, TX | 44,177 | 75 | 32,983 | 441,005 | 13.37 |
| FMC Technology | 100 | Houston, TX | 93,912 | 100 | 93,912 | 850,000 | 9.05 |
| Fountain View Office Tower | 50 | Houston, TX | 173,814 | 82 | 142,260 | 3,263,546 | 22.94 |
| Gray Falls Center / 12000 Westheimer | 100 | Houston, TX | 99,207 | 94 | 93,407 | 1,429,491 | 15.30 |
| Verdugo Medical Office | 100 | Glendale, CA | 26,802 | 97 | 25,943 | 811,856 | 31.29 |
| *Office Properties* | | | 804,720 | 86 | 694,093 | 11,279,827 | 16.25 |
| Wilmington Industrial | 100 | Wilmington, CA | 15,795 | — | — | — | — |
| *Industrial/Commercial Properties* | | | 15,795 | — | — | — | — |
| Northwest Spectrum Plaza | 100 | Houston, TX | 48,000 | 91 | 43,440 | 381,384 | 8.78 |
| Windrose Plaza (4) | 100 | Houston, TX | 28,315 | 100 | 28,315 | 468,644 | 16.55 |
| Murrieta Plaza (4) | 100 | Murrieta, CA | 24,648 | 69 | 16,948 | 193,200 | 11.40 |
| *Retail Properties* | | | 100,963 | 88 | 88,703 | 1,043,228 | 11.76 |
| Sabo Road Self Storage | 55 | Houston, TX | 76,231 | 91 | 69,196 | 506,828 | 7.32 |
| Tampa Self Storage | 100 | Tampa, FL | 61,655 | 82 | 50,605 | 337,033 | 6.66 |

EXHIBIT "1"

| Property Name | % Owned | City/State | Total Gross Leasable Square Footage/Land Acreage | % Of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent In ($) | Rent per Square Feet In ($) |
|---|---|---|---|---|---|---|---|
| Ocala Self Storage | 100 | Ocala, FL | 44,591 | 62 | 27,606 | 176,380 | 6.39 |
| ***Self-Storage Properties*** | | | 182,477 | 81 | 147,407 | 1,020,241 | 6.92 |
| | | | | | | | |
| Florida Condominium Apartments (4) | 100 | Imperial Beach, CA | 29,328 | 94 | 27,686 | 570,300 | 20.60 |
| San Ysidro (4) | 100 | San Ysidro, CA | 4,445 | 100 | 4,445 | 68,700 | 15.46 |
| Quail Run Estate | 100 | Aptos, CA | 10,000 | 100 | 10,000 | 108,000 | 10.80 |
| ***Residential / Multi-Family*** | | | 43,773 | 96 | 42,131 | 747,000 | 17.73 |
| | | | | | | | |
| ***Total ASR Properties*** | | | 1,147,728 | 85 | 972,334 | 14,090,295 | 14.49 |
| | | | | | | | |
| Club Royal Oak (4) | 100 | Kingsburg, CA | 32 Acres | N/A | N/A | N/A | N/A |
| Nevada Treasure (4) | 100 | Pahrump, NV | 24 Acres | N/A | N/A | N/A | N/A |
| ***Recreational Vehicle Resort*** | | | 56 Acres | N/A | N/A | N/A | N/A |
| | | | | | | | |
| NW Spectrum Land | 100 | Houston, TX | 12 Acres | N/A | N/A | N/A | N/A |
| Perris (4) | 100 | Perris, CA | 13 Acres | N/A | N/A | N/A | N/A |
| Encinitas | 100 | Encinitas, CA | 3 Acres | N/A | N/A | N/A | N/A |
| Pierson (4) | 100 | Desert Hot Springs, CA | 13 Acres | N/A | N/A | N/A | N/A |
| Imperial Beach | 100 | Imperial Beach, CA | 1 Acres | N/A | N/A | N/A | N/A |
| Karen & Mission Lakes (4) | 100 | Desert Hot Springs, CA | 160 Acres | N/A | N/A | N/A | N/A |
| El Toro Road (4) | 100 | Perris, CA | 5 Acres | N/A | N/A | N/A | N/A |
| Calimesa | 100 | Calimesa, CA | 53 Acres | N/A | N/A | N/A | N/A |
| Ramona Blvd (4) | 100 | San Jacinto, CA | 49 Acres | N/A | N/A | N/A | N/A |
| Castaic (4) | 75 | Castaic, CA | 320 Acres | N/A | N/A | N/A | N/A |
| Varner Road (4) | 53 | Thousand Palms, CA | 41 Acres | N/A | N/A | N/A | N/A |
| Salton (4) | 71 | Salton Sea, CA | 3,298 Acres | N/A | N/A | N/A | N/A |
| ***Land*** | | | 3,968 Acres | N/A | N/A | N/A | N/A |

10

| ***Properties Owned by VIEs*** | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Name | % Owned | City/State | Total Gross Leasable Square Footage/Land Acreage | % Of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent In ($) | Rent per Square Feet In ($) |
| | | | | | | | |
| Commerce Distributions Center | 1 | Commerce, CA | 200,000 | 100 | 200,000 | 1,098,662 | 5.49 |

EXHIBIT "1"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Dixon & 51st Logistics Center | — | Des Moines, IA | 731,169 | 100 | 731,169 | 2,128,026 | 2.91 |
| Ohio Commerce Center | — | Strongsville, OH | 204,592 | 100 | 204,592 | 2,391,907 | 11.69 |
| Springs Commerce Center I | — | OK,GA,SC,VA,PA | 1,006,993 | 100 | 1,006,993 | 2,414,566 | 2.40 |
| Springs Commerce Center II | — | GA,AL | 1,439,300 | 71 | 1,026,450 | 2,151,405 | 2.10 |
| Springs Office | — | Fort Mill/Lancaster, SC | 265,493 | 100 | 265,493 | 2,033,647 | 7.66 |
| Strongsville Corporate Center | 2 | Strongsville, OH | 125,006 | 100 | 125,006 | 2,076,643 | 16.61 |
| ***Industrial/Commercial Properties*** | | | 3,972,553 | 90 | 3,559,703 | 14,294,856 | 4.02 |
| | | | | | | | |
| Campus Court Student Housing | 11 | Cedar Falls, IA | 71,700 | 72 | 51,385 | 564,420 | 10.98 |
| Muirwood Village | — | Zanesville, OH | 157,864 | 96 | 150,933 | 1,563,060 | 10.36 |
| Ohio II - Residences at Newark & Sheffield | — | Newark/Circleville, OH | 203,453 | 94 | 191,738 | 1,847,945 | 9.64 |
| University Springs San Marcos | — | San Marcos, TX | 176,944 | 92 | 162,491 | 2,336,748 | 14.38 |
| ***Multi-Family/Student Housing Properties*** | | | 609,961 | 91 | 556,547 | 6,312,173 | 11.34 |
| | | | | | | | |
| Loop 1604 Self Storage | 38 | San Antonio, TX | 241,235 | 89 | 214,980 | 1,035,816 | 4.82 |
| Aldine Westfield Self Storage | — | Houston, TX | 64,530 | 94 | 60,655 | 507,971 | 8.37 |
| Attic Space Self Storage - Blanco Rd | — | San Antonio, TX | 51,805 | 88 | 45,595 | 507,971 | 11.14 |
| Attic Space Self Storage - Laredo Road | — | San Antonio, TX | 57,706 | 93 | 53,531 | 524,736 | 9.80 |
| Ft. Worth Northwest Self Storage | — | Fort Worth, TX | 63,025 | 81 | 51,200 | 487,185 | 9.52 |
| Ft. Worth River Oaks Self Storage | — | River Oaks, TX | 105,063 | 93 | 97,764 | 643,056 | 6.58 |
| Grissom Road Self Storage | — | San Antonio, TX | 262,180 | 78 | 203,426 | 651,003 | 3.20 |
| Houston South Mason (Patrick's) | — | Katy, TX | 56,850 | 94 | 53,350 | 502,236 | 9.41 |
| San Antonio 3 -Self Storage | — | San Antonio, TX | 264,840 | 89 | 234,756 | 1,632,761 | 6.96 |
| ***Self-Storage Properties*** | | | 1,167,234 | 87 | 1,015,257 | 6,492,735 | 6.40 |
| | | | | | | | |
| ***Total Variable Interest Entity Properties*** | | | 5,749,748 | 89 | 5,131,507 | 27,099,764 | 5.28 |
| | | | | | | | |
| ***Total Consolidated Properties*** | | | 6,897,476 | 88 | 6,103,841 | 41,190,060 | 6.75 |

[1] Includes gross leasable area for leases that have been executed and have commenced as of December 31, 2013.

[2] Represents base rent at December 31, 2013 for occupied square footage.

[3] Represents annualized net rent divided by rented square feet.

[4] These properties were sold during 2014.

11

For the year ended December 31, 2013, no tenant contributed 10% or more of our total rental revenue. We had one of the properties listed above classified as held for sale at December 31, 2013.

We classify assets as held for sale when: a) management approves the plan to sell the asset(s); b) the asset(s) are subject to a legally binding purchase and sale agreement; c) the buyer's due diligence period has expired; d) all other contingencies and conditions precedent to closing have been satisfied; and e) the sale and transfer is probable and expected within one year. When we classify an asset as held for sale we carry at the lower of (i) net book value, or (ii) fair value less costs to sell.

**Lease Expirations**

The following table sets forth, for the periods specified, the number of expiring leases by property category (excluding multi-family, student housing and self-storage due to their prevailing month-to-month nature), the total rented area subject to expiring leases, annual base rent represented by expiring leases, and percentage of total annual base rent represented by expiring leases for our consolidated properties.

### LEASE EXPIRATION

| Year [2] | Number of Expiring Leases | Rented Square Footage Subject to Expiring Leases [3] | Annual Base Rent Under Expiring Leases ($ in thousands) [4] | Percentage of Total Annual Base Rent Represented By Expiring Leases (%) [1] |
|---|---|---|---|---|
| **For Office Properties** | | | | |
| 2014 | 69 | 190,018 | 8,087 | 34 |
| 2015 | 66 | 169,827 | 5,811 | 25 |
| 2016 | 50 | 113,000 | 3,805 | 16 |
| 2017 | 23 | 58,348 | 2,069 | 9 |
| 2018 | 12 | 26,017 | 1,297 | 5 |
| thereafter | 14 | 38,968 | 2,598 | 11 |
| | 234 | 596,178 | 23,667 | 100 |
| **For Industrial/Commercial Properties** | | | | |
| 2014 | — | — | 14,220 | 9 |
| 2015 | 1 | 131,169 | 14,273 | 9 |
| 2016 | 3 | 725,006 | 12,031 | 8 |
| 2017 | — | — | 10,470 | 7 |
| 2018 | 1 | 204,592 | 10,626 | 7 |

EXHIBIT "1"

| | | | | |
|---|---|---|---|---|
| thereafter | 11 | 2,358,936 | 89,667 | 59 |
| | 16 | 3,419,703 | 151,287 | 100 |
| **For Retail Property** | | | | |
| 2014 | 9 | 40,715 | 406 | 18 |
| 2015 | — | — | 397 | 18 |
| 2016 | 2 | 8,000 | 368 | 16 |
| 2017 | 1 | 13,440 | 306 | 14 |
| 2018 | — | — | 262 | 12 |
| thereafter | 2 | 22,948 | 479 | 22 |
| | 14 | 85,103 | 2,218 | 100 |

(1) Annual base rent expiring during each period, divided by total annual base rent (both adjusted for contractual increases).

(2) 2014 includes leases that have initial terms of less than one year.

(3) This figure is based on square footage actually occupied (which excludes vacant space), which accounts for the difference between this figure and total gross leasable area (which includes vacant space).

(4) This figure is based on square footage actually occupied and incorporates contractual rent increases arising after 2013, and thus differs from annualized net rent in the table under ITEM 2. PROPERTIES- Location and Type, which is based on 2013 rents.

12

### Office Properties

At December 31, 2013, we owned nine office properties with total rentable square footage of 804,720. The office properties range in size from 26,802 square feet to 176,624 square feet, and have remaining lease terms ranging from less than one to 10 years. Most of the leases are for one to three years, requiring us to renew leases on a continuing basis. Of the approximately 190,000 square feet of leases expiring in the next 12 months, we are currently working on renewing the expiring leases or attracting new tenants. If the tenants elect not to renew, we can make no guarantees that we will be able to lease the space timely or at historic rent levels.

The office leases generally require the tenant to reimburse us for increases in building operating costs over a base amount.  Certain of the leases provide for rent increases that are either fixed or based on a consumer price index. As of December 31, 2013, the weighted average occupancy of the office properties was 86%.  The weighted average base rent per square foot (calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2013) was $16.25.

We are currently actively marketing our empty square footage but do not know if we will be able to lease the vacant office spaces.

### Industrial/Commercial Properties

At December 31, 2013, we consolidated eight industrial properties (one owned by us and seven owned by VIEs) with total rentable square footage of 3,988,348.  The industrial properties are primarily designed for warehouse, distribution and light manufacturing usage and range in size from 15,795 square feet to 1,439,300 square feet.  As of December 31, 2013, the weighted average occupancy of the industrial properties was 89%.  The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2013, was $4.02.

The industrial properties have leases with remaining terms from 21 months to 17 years. There are no leases expiring in the next 12 months. Most of the leases are industrial gross leases, meaning the tenant pays as additional rent, a pro rata share of common area maintenance and repair costs, and a share of the increase in

EXHIBIT "1"

taxes and insurance over a base amount. Certain of these leases call for fixed or consumer-price-index-based rent increases. Some of the leases are triple net leases, whereby the tenants are required to pay their pro rata share of the properties' operating costs, common area maintenance, property taxes, insurance and non-structural repairs.

### Retail Properties

At December 31, 2013, we owned three retail properties with total rentable square footage of 100,963. The leases require the tenants to reimburse us for certain building operating costs. As of December 31, 2013, the occupancy of the retail property was 88%. The average base rent per square foot (calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2013) was $11.76.

### Residential / Multi-Family Properties

At December 31, 2013, we consolidated seven residential/multi-family properties (three we own and four are owned by VIEs) with total rentable square footage of 653,734. These properties are typically leased for one year or on a month-to-month basis. As of December 31, 2013, multiple tenants occupied all of these properties. The weighted average occupancy of the residential/multi-family properties was 92%. The weighted average base rent per square foot was $11.79. Although these properties are leased on a short-term basis, we do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

### Self-Storage Properties

At December 31, 2013, we consolidated 12 self-storage properties (three we own and nine are owned by VIEs) with total rentable square footage of 1,349,711. The self-storage properties are primarily month-to-month lease terms. As of December 31, 2013, the weighted average occupancy of the self-storage properties was 86%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2013, was $6.46. We do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

### Recreational Vehicle Resort

At December 31, 2013, we consolidated two recreational vehicle resort properties totaling 56 acres. The recreational vehicle resort properties are located in California and Nevada.

### Development Land

The Company owns 3,968 acres of vacant land in Houston, Texas and throughout California.

### Item 3. LEGAL PROCEEDINGS

We are involved in various legal proceedings that arise in the ordinary course of our business, as well as proceedings that we have considered to be material under SEC regulations.

*Cause No. 2013-60712; Bammelbelt, L.P. and Stava Partners, LLC vs. American Spectrum Realty, Inc. et al.; In the 125th Judicial District Court of Harris County, Texas*

American Spectrum Realty, Inc., American Spectrum Realty Operating Partnership, L.P., ASR 2620-2630 Fountainview, L.P., and William J. Carden are named as defendants in this matter, which was filed on October 9, 2013. We filed an answer on February 25, 2014. This matter is the result of a dispute with the

EXHIBIT "1"

seller of the property located at 2620-2630 Fountainview Dr., Houston, Texas. Plaintiff's motion for a summary judgment against us is scheduled for hearing on December 1, 2014. Plaintiff has demanded $545,670 from us, and we are diligently seeking to resolve this matter before trial.

*Cause No. 2013-47710; Bank of Houston v. American Spectrum Realty, Inc. and William J. Carden; In the 11th Judicial District Court of Harris County, Texas*

American Spectrum Realty, Inc. and William J. Carden are named as defendants in this matter, which was filed against us on August 14, 2013. On January 13, 2014, we filed an answer to the complaint. The plaintiff was demanding $198,678. This action was brought by a bank for non-payment on a note payable. Subsequent to December 31, 2013, we settled the lawsuit.

*Cause No. 2013-51646; Casa Bandera TIC LLC, et at v. Casa Bandera Leasing, Inc., Evergreen Realty Group, LLC, Evergreen Realty Property Managements, LLC and American Spectrum Realty Management, LLC; In the 80th Judicial District Court of Harris County, Texas*

This action relates to a management contract which we acquired from Evergreen Realty Property Management, LLC in January of 2010. The acquired contract involved the management of a residential apartment building located in Las Cruces, New Mexico, which was owned by a group of tenant-in-common owners. In May of 2013, the tenant-in-common owners of the property filed suit against the Company. In July of 2013, the Company entered into a stand-still and settlement agreement with the tenant-in-common owners. The agreement included, as a material term of the settlement, a provision calling for the ultimate dismissal of the lawsuit. Notwithstanding the terms of the stand-still and settlement agreement, and unbeknownst to the Company, the tenant-in-common owners moved forward with the action against the Company and obtained a default judgment against the Company in August of 2013. As discussed above, we successfully had the default judgment set-aside in the New Mexico court; however, the New Mexico Court ordered us to provide a $1.4 million bond pending re-trial of the matter. Because of the stand-still and settlement agreement, the Company believes it will prevail in the upcoming re-trial. In the event that the Company is not successful, the Company's potential loss exposure is estimated to range from $0.15 million to $1.0 million.

Plaintiffs in this case are judgment creditors who initiated this action in Texas on September 3, 2013 by filing a Notice of Filing of a Foreign Judgment and Enforcement of Foreign Judgment in the amount of $1,129,728.00. This action was intended to seek enforcement of a New Mexico default judgment in Texas. We were successful in our motion for reconsideration of the default judgment in New Mexico, which resulted in the New Mexico judgment being voided along with the enforcement proceedings in Texas.

*Cause No. 2013-25806; ASR 2620-2630 Fountainview LP, Fountainview Park Plaza, LLC, ASRP Investments, LLC v. ASR 2620-2630 Fountainview GP, LLC, American Spectrum Realty Operating Partnership LP, American Spectrum Realty, Inc. and American Spectrum Realty Management LLC; in the 270th District Court of Harris County, Texas*

This action was filed against us on April 30, 2013 by our partner in a partnership which owned the building known as 2620-2630 Fountainview Dr. located in Houston, Texas. Plaintiffs seek recovery of approximately $1,000,000. We sold the property owned by the partnership in July of 2013. Partnership sales proceeds totaling $2.8 million were deposited into a court escrow account. We continue to negotiate with our partner in an attempt to find a mutually agreeable settlement.

14

EXHIBIT "1"

*Case No. 14-30174; In the United States Bankruptcy Court, Southern District of Texas, Houston Division (Parkway I & II)*

ASR-8 Centre LP, ASR Parkway One and Two LP, and ASR Fountainview, LP filed for Bankruptcy on January 16, 2014. The parties began negotiations and came to a settlement. A plan for reorganization and an Order Confirming Joint Plan of Reorganization were filed and entered on July 17, 2014. The Final Decree was signed on September 22, 2014, and the case was closed on that date.

*Cause No. 417-01968-2014; PPC Irvine Center Investment, LLC vs. American Spectrum Realty Management, LLC; Seventy Seven, LLC; American Spectrum Realty Operating Partnership, L.P. and American Spectrum Realty, Inc.; In the 417th Judicial District Court of Collin County, Texas*

On May 22, 2014, PPC Irvine Center Investment, LLC filed a Petition for Foreign Judgment as to American Spectrum Realty, Inc., American Spectrum Realty Management, LLC, Seventy Seven, LLC, and American Spectrum Realty Operating Partnership, L.P. for a $300,000.00 judgment they obtained against us on January 16, 2014, in the Superior Court of California, County of Orange, for Case No. 30-2012-00595567-CU-BC CJC. We are in settlement discussions with the plaintiff, and although there can be no assurance, we believe that we will be successful in settling this matter.

*Cause No. 2012-59293; Kurt Sabatasso and Donna Sabatasso vs. American Spectrum Realty, Inc., John N. Galardi; In the 80th Judicial District Court of Harris County, Texas*

On October 8, 2012, Plaintiffs' filed an action against us for the non-payment of a promissory note, which matured in May 2012. A Judgment was awarded against ASR and the Co-Executors of Galardi Estate for $1,000,000.00 principal, $227,740 of unpaid interest accrued through April 23, 2014, additional interest in the amount of $260 per day from April 24, 2014, to the date upon which the principal and interest are paid in full, and attorney's fees in the amount of $225,000. The total amount of the judgment as of April 23, 2014 was $1,452,740. The Sabatassos are currently pursuing collection action against us on the court awarded judgment. We are in discussions with the Sabatassos to resolve the claim and discharge this obligation.

The Co-Executors of Galardi Estate have filed a cross complaint against us for unpaid guarantee fees and indemnity under the provisions of the guarantee agreement between us and Mr. Galardi. The cross-complaint has been settled and we have agreed to pay the guarantee fees and to reimburse the Galardi Estate for their legal defense costs (see Item 13).

*Preferred Income Cause No. DC-14-02281; Preferred Income Partners IV, LLC v. ASR 2401 Fountainview, LP, American Spectrum Realty Operating Partnership, LP, ASR 2401 Fountainview, LLC, William J. Carden, American Spectrum Realty, Inc., Patrick D. Barrett, David B. Wheless, James L. Hurn, American Spectrum Beltway, LLC and ASR Washington, LP; 44th Judicial District Court of Dallas County, Texas*

This is action was filed against us on March 6, 2014, by our partner in ownership of the building known as 2401 Fountainview Dr., located in Houston Texas. Plaintiff seeks to take control of the management of ASR 240 I Fountainview, LP and further seeks preferred return payments of $375,453, increasing at the rate of $690 per day. On September 30, 2014, ASR Fountainview, LP and ASR Fountain view, LLC filed for bankruptcy. An automatic stay is imposed on this case, prohibiting the commencement of judicial proceedings against us.

*Cause No. 12SL-CC03562; GSMS 2004-GG2 Phantom Road, LLC vs. McDonnell Associates, LLC and American Spectrum Realty, Inc.; In the Circuit Court of the County of St. Louis, State of Missouri, Division 5*

This lawsuit was filed against us on September 14, 2012 with a demand for $750,000 which the lender/plaintiff claims is the result of a deficiency relating to a foreclosed property. The plaintiff has not been able to prove their losses in this matter, and we have filed a motion the Entry of a Take Nothing Final Judgment. We are waiting for a final ruling on our motion.

*Cause No. 2011-22531; NextEra Retail of Texas, LP v. America Spectrum Real(v, Inc.; In the 164th Judicial District Court of Harris County, Texas*

NextEra, the judgment creditor in this case sought the enforcement of a $2.8 million judgment. On February 14, 2014, a receiver was appointed by the Court. We settled the case on February 20, 2014, paid the plaintiff a total of $1,650,000, and the Court rescinded the receivership appointment.

15

---

*Cause No. 2014-24363 American Spectrum et al. v. Dunham & Associates Holdings, Inc. et al., District Court of Harris County, Texas*

On December 30, 2013 in conjunction with the acquisition of the 19 properties from Dunham & Associates Holdings, Inc. and affiliates ("Dunham"), Dunham committed to loan or arrange for loans from third parties in the aggregate amount of $6.0 million. The loan commitment was to be funded in two tranches of $3.0 million each with simple interest at 8.0% until the first anniversary, and 12.0% thereafter. The first $3.0 million was advanced in January, 2014 with the second tranche be advanced within 90 days. The second tranche was never funded.

The Company filed the above referenced lawsuit against Dunham and in June 2014, a settlement was reached. Under the terms of the settlement, Dunham agreed to buy back 14 of the original 19 properties acquired from Dunham on December 30, 2013. On July 25, 2014, Dunham completed the reacquisition of the 14 properties for the same net contribution value at which such properties were sold to the Company in 2013. The repurchased properties were valued at approximately $55.5 million, including the related secured debt of approximately $8.1 million. At the closing, Dunham surrendered shares of the Company's Series B Preferred with an aggregate liquidation preference of approximately $47.4 million. At the closing, the Company was required to pay the transfer, escrow and title costs which totaled approximately $0.65 million. As part of the settlement agreement, the Company was required to pay its own legal fees which totaled approximately $0.20 million.

In addition to canceling the second tranche of the loan commitment for $3.0 million, the Company reduced the number of warrants issued to Dunham for the purchase of the Company's common stock from 600,000 to 300,000 shares.

In conjunction with the settlement agreement, the Company also restructured the mandatory redemption provisions of the Series B Preferred issued to Dunham in December 2013. Pursuant to the restated Articles Supplementary for the Series B Preferred, the mandatory redemption requirements for the remaining Series B Preferred with an aggregate liquidation preference of approximately $20.1 million are as follows: (i) approximately $3.011 million, less any "Adjustments" (see definition of "Adjustments"in Part II, Item 8, Note 14 - Capital Structure, Series B Preferred) received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before December 1, 2014, (ii) approximately $7.025 million, less any Adjustments received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before June 1, 2015, and (iii) the remainder of the liquidation

EXHIBIT "1"

preference less any Adjustments will be paid to fully redeem all the remaining outstanding share of the Company's Series B Preferred on or before December 1, 2015. Excluding any reductions for Adjustments and increases for unpaid accruing dividends, the anticipated final liquidation payment due to holders of the Company's Series B Preferred will be approximately $10.035 million. The final redemption price payable to holders of the Company's Series B Preferred will be increased for any accrued and unpaid dividends with respect to such shares.

### Item 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

There was no submission of matters to a vote of security holders during the quarter ended December 31, 2013.

16

---

## PART II

### Item 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

**Market Information**

Our common stock trades on the NYSE Amex under the symbol AQQ. The following table sets forth the high and low closing prices per share of our common stock for the periods indicated, as reported by the NYSE Amex.

|  | High: | Low: |
|---|---|---|
| Year ended December 31, 2013 | | |
| First Quarter | $3.75 | $ 1.44 |
| Second Quarter | $3.39 | $ 1.55 |
| Third Quarter | $2.90 | $ 2.02 |
| Fourth Quarter | $2.40 | $ 1.78 |
| Year ended December 31, 2012 | | |
| First Quarter | $6.97 | $ 4.96 |
| Second Quarter | $5.60 | $ 3.79 |
| Third Quarter | $5.40 | $ 2.90 |
| Fourth Quarter | $4.25 | $ 3.25 |

As of October 24, 2014, there were approximately 1,029 holders of record of our common stock.

**Halting of Trading of our Common Stock**

Until April 16, 2014, our common shares were traded on the NYSE MKT LLC (the "Exchange") under the ticker "AQQ." On April 16, 2014, the Exchange halted trading of our stock due to our failure to comply with various provisions of the Exchange's Company Guide. We have been in communication with the Exchange and are working on the areas of noncompliance in an effort to regain compliance with Exchange requirements. Notwithstanding our efforts to regain compliance, there can be no assurance that trading of our shares will be reestablished, or if they do, the value of our shares will return, or have any value.

**Common Shares**

We are authorized to issue up to 100 million shares of common stock with a par value of $.01 per share. As of December 2013, we had 3,703,142 shares of our common stock outstanding. Our Board of Directors has

EXHIBIT "1"

a policy of meeting on or about the 40th day after the end of each calendar quarter to consider the declaration and payment of dividends on common stock. We declared and paid cash dividends to the common shareholders in 2003. No dividends have since been declared or paid, and we have no plan to pay dividends to holders of our common stock in the foreseeable future.

Prior to 2011, we repurchased 471,350 shares of our common stock. Common stock held by us and not retired is treated as treasury stock under the cost method. As of December 31, 2013 and 2012, we held 475,350 shares at an average cost of $6.57 per share. We have no current plan to acquire additional shares of our common stock.

### Warrants

In conjunction with the acquisition of the Dunham Properties, we issued Dunham warrants to purchase up to 600,000 shares of our common stock at a price of $2.00 per share. We use a Black-Scholes valuation methodology to assess the fair value of our warrants and stock options. Based upon the results of the Black-Scholes analysis performed as of December 31, 2013, the fair value of the warrants we issued to Dunham is considered to be zero.

### Preference Shares

We are authorized to issue up to 25.0 million shares of one or more classes or series of preferred stock with a par value of $.01 per share. Our Board of Directors has the right to classify and designate preference shares which are authorized but unissued. In conjunction with the designation and issuance of preference shares, our Board of Directors establishes the share preferences and rights of the holders including (i) conversion and other rights, (ii) voting powers, (iii) restrictions, (iv) limitations as to dividends

and other distributions, (v) qualifications, and (vi) terms and conditions of redemption. As of December 2013, we had three classes of preferred stock outstanding.

### Series B Preferred Stock

On December 27, 2013, our Board of Directors authorized the issuance of up to 17,000,000 shares of Series B Preferred Stock (Series B Preferred). On December 30, 2013, we issued 16,810,609 shares of the Series B Preferred to Dunham in exchange for a 100% ownership in the equity of ASDP. Each share of Series B Preferred has a liquidation value of $4.00. The Series B Preferred shares earn a dividend, calculated as simple interest, at a rate of 8% from issue date through December 31, 2014, and thereafter at a rate of 12%. Fifty percent of the dividends accruing on or before December, 31, 2014 are payable monthly and the unpaid portion becomes payable in one lump sum on December 1, 2015 plus any additional dividends attributable to such unpaid amounts as described below. Holders of Series B Shares are entitled to receive additional dividends equal to the amount of the unpaid fifty percent dividends beginning on the date such dividend should have been paid at a rate of 8% through December 31, 2014, and thereafter at a rate of 12% until such dividends are paid in full. All earned dividends are payable on the first business day of the following month.

Pursuant to Series B Preferred designation and the Dunham agreements, we are obligated to redeem the Series B Preferred pro rata as follows: (i) $17,000,000 (approximately 25% of the outstanding Series B Preferred), less any "Adjustments" (defined below as Sale Payments and Debt Payments) received by the Series B Preferred holders, is payable to holders of our Series B Preferred on or before December 1, 2014, (ii) $17,000,000, less any Adjustments received by the Series B Preferred holders, is payable to holders of our Series B Preferred on or before June 1, 2015, and (iii) the remainder of the liquidation preference less any Adjustments will be paid to fully redeem all the remaining outstanding share of our Series B Preferred

EXHIBIT "1"

on or before December 1, 2015. The redemption price payable to holders of our Series B Preferred will be adjusted for all accrued and unpaid dividends with respect to such shares.

For purposes of determining the redemption amounts payable as described above, the term "Adjustments" as used in the preceding paragraph and refers to proceeds we received as follows:

1. Sale Payments. A Sale Payment includes proceeds we received as the result of the sale of a property previously acquired from Dunham (see Note 4 - Acquisition Activities). At the time of such sale, we are obligated to pay, pro rata to the holders of our outstanding Series B Preferred, additional amounts which are determined with reverence to the gross selling price of the Property and the amount paid to Dunham. If the gross selling price exceeds the amount paid to Dunham, then the Adjustment payable to holders of our Series B Preferred is equal to 50% of the difference between the amount paid to Dunham for the property and any existing secured indebtedness on the property being sold. If the gross selling price is less than the amount paid to Dunham, then the Adjustment payable to holders of our Series B Preferred is equal to 50% of the difference between the gross selling price and any existing secured indebtedness on the property being sold. Adjustments paid to holders of our Series B Preferred, will reduce, on a dollar-for-dollar basis the amounts payable to redeem shares of our Series B Preferred. To the extent that one or more properties are sold for less than the amount paid to Dunham on December 30, 2013, such "Deficit" shall accumulate and be payable 100% pro rata to holders of our Series B Preferred from the proceeds payable to us resulting from future sales of Dunham Properties whenever such gross selling price exceeds the purchase price paid to Dunham.

2. Debt Payments. An Adjustment also includes any increase in indebtedness in excess of $250,000 on any property in which ASR owns 25% or more of the equity. The proceeds of any borrowings in excess of $250,000 are required to be paid pro rata to the holders of Series B Preferred and Series C Preferred under the terms of the Series B Preferred Articles Supplementary and the Dunham agreements.

In addition to the redemption amounts described above, we are obligated to pay, pro rata to the holders of our outstanding Series B Preferred, additional amounts which are described in the Dunham agreements as "Participation Payments". Participation Payments are equal to 25% of any excess of the gross selling price over the purchase price paid to Dunham after reducing such excess selling price for any capital improvements and selling expenses. Amounts paid as Participation Payments are in addition to any dividends and redemption amounts due to holders of our Series B Preferred shares. Such Participation Payments are agreed to survive the redemption of our Series B Preferred and shall be payable until such time as all Dunham Properties have been sold notwithstanding the full redemption of all outstanding shares of our Series B Preferred.

Payment of dividends and redemption of the Series B Preferred shares are mandatory under the terms of the Dunham agreements and our Articles Supplementary for the designation and issuance of the Series B Preferred. To the extent that we do not declare and pay the dividends and does not provide for the timely redemption of the Series B Preferred as described above, holders of our Series B Preferred shares are entitled to receive default dividends at a rate 15% from the date of such default to the date of such payment or redemption.

18

---

**Series C Preferred Stock**

On December 27, 2013, our Board of Directors authorized the issuance of up to 55,170 shares of Series C Preferred Stock (Series C Preferred). On December 30, 2013 and in connection with our issuance of the

EXHIBIT "1"

Series B Preferred, we converted 36,780 shares of our Series A Preferred shares on a one-for-one basis for Series C Preferred shares with a liquidation value equal to $41.87 per share. The liquidation value of Series C Preferred was determined based upon the $29 liquidation preference for the Series A Preferred plus the accumulating and unpaid Series A Preferred dividends which at the time of conversion were equal to $12.87 per share. Mr. William Carden, our President, CEO and holder of 16,140 shares of Series A Preferred converted all of his Series A Preferred into shares of our newly issued Series C Preferred.

The Series C Preferred shares earn a dividend, calculated as simple interest, at a rate of 8% from issue date through December 31, 2014, and thereafter at a rate of 12%. Fifty percent of the dividends accruing on or before December, 31, 2014 are payable monthly and the unpaid portion becomes payable in one lump sum on December 1, 2015 plus any additional dividends attributable to such unpaid amounts as described below. Holders of Series C shares are entitled to receive additional dividends equal to the amount of the unpaid fifty percent dividends beginning on the date such dividend should have been paid at a rate of 8% through December 31, 2014, and thereafter at a rate of 12% until such dividends are paid in full. All earned dividends are payable on the first business day of the following month.

Pursuant to Articles Supplementary for the designation of the Series C Preferred, we are obligated to redeem the liquidation preference of $41.87 per share as follows: (i) approximately $10.47 per share less any Debt Payments received by the holders of Series C Preferred will be paid payable on December 1, 2014; (ii) approximately $10.47 per share less any Debt Payments on June 1, 2015; and (iii) the remainder of the $41.87 liquidation preference on December 1, 2015 in redemption of the remaining amount of any outstanding Series C Preferred.

Debt Payments referred to in the paragraph above with respect to redemption of the Series C Preferred includes the proceeds from Company borrowings in excess of $250,000 which are required to be paid pro rata to the holders of Series B Preferred and Series C Preferred under the terms of the Series B Preferred Articles Supplementary and the Dunham agreements. Pursuant to ASC 480, the provisions of the Series B Preferred and Series C Preferred which place an unconditional obligation on us to redeem the shares for a sum certain on a specific date has the primary characteristics of a debt instrument and therefore we have classified these shares on the Statement of Financial Position as debt rather than equity. Amounts payable as dividends are accordingly reflected in our Statement of Operations as an item of interest expense rather than being treated as a preferred dividend. There are no conversion rights available to holders of Series B Preferred or Series C Preferred.

The Series B Preferred and Series C Preferred shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

**Unregistered Sales of Equity Securities**

In 2012, we issued 41,910 shares of common stock to a law firm as payment for legal services in the amount of $0.2 million. The issuance of common stock was exempt from the registration requirements pursuant to section 4(2) of the Securities Act of 1933, as amended.

**Issuer Purchases of Equity Securities**

Neither we nor any affiliated purchaser bought any of our equity securities during the year ended December 31, 2013.

**Securities Authorized for Issuance under Equity Compensation Plan**

Information regarding securities authorized for issuance under our equity compensation plans is available in Part III, Item 12 of this report, "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

During the years ended December 31, 2013 and 2012 we issued 145,000 and 7,000 shares of restricted stock, respectively, to certain employees and board members under our equity compensation plan. The recipient has the right to vote all shares, to receive all cash dividends payable to holders of shares of record on or after the date of issuance, and to exercise all other rights, powers and privileges of a holder of our

EXHIBIT "1"

shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to five years. The issuances of common stock were exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

19

Equity Compensation Plan information as of December 31, 2013 is as follows:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted-average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | — | — | — |
| Equity compensation plans not approved by security holders | 360,000 | — | 227,220 |
| Total | 360,000 | — | 227,220 |

**Item 6. SELECTED FINANCIAL DATA**

Not applicable.

20

**Item 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OVERVIEW**

EXHIBIT "1"

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and related notes included elsewhere in Item 8 of this Annual Report on Form 10-K.

**Our Business**

We are a value add real estate investor looking to acquire properties which require operational attention, physical improvement or capital restructuring. Our investment strategy is to acquire, improve and hold real estate while we look for an opportunistic exit that will enable us to achieve our risk/return objectives. Our income producing properties include commercial office, industrial, retail, self-storage, multi-family residential, student housing and land for development.

In addition to our real estate portfolio, we offer our market expertise and integrated real estate solutions to select third parties for a fee. Our service offering includes property and asset management, insurance procurement, syndication services, receivership management and brokerage services. We conduct our business in the continental United States.

We conduct our business through an Operating Partnership in which we are the sole general partner, and a limited partner with a total equity interest of 94% at December 31, 2013. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the partnership. We periodically examine our corporate structure in order to evaluate if we are positioned to take advantage of the most favorable tax treatments for our shareholders, our clients and ourselves. It is our objective to consider all applicable tax laws that legally reduce the tax consequences and maximize the tax benefits associated with real estate transactions

A Real Estate Investment Trust ("REIT") is a designation for tax purposes that enables a qualifying corporation to take a tax deduction for dividend payments to its shareholders. The ability to qualify as a REIT requires the corporation to meet certain ownership, distribution, income and asset tests established under the Internal Revenue Code of 1986, as amended. As of December 31, 2013, our ownership structure does not allow the Company to qualify as a REIT for federal income tax purposes.

Our primary business objective is to acquire and manage multiple tenant real estate in strategically located areas where our cost-effective enhancements, combined with effective leasing and management strategies, can improve the long-term values and economic returns of those properties. We focus on the following fundamentals to achieve this objective:

- An opportunistic and disciplined disposition strategy that enhances investment performance and takes advantage of realized gains. We typically dispose of properties when the return from selling is higher than the projected return from holding the property.

- Organic (internally developed opportunities) and inorganic (acquisition-generated opportunities) growth of our third party property management contracts and transaction service fees, coupled with;

- An opportunistic yet disciplined acquisition strategy that focuses on mid-tier multi-tenant real estate in locations that allow us to capitalize on existing management infrastructure servicing our properties and those of our third party clients.

As of December 31, 2013, the properties that we manage were as follows:

| Property type | ASR owned [1] | | Consolidated VIE's [1] | | Third Party | | Total | |
|---|---|---|---|---|---|---|---|---|
| | # of Properties | Square footage | # of Properties | Square footage | # of Properties | Square footage | # of Properties | Square footage |
| Office | 9 | 804,720 | — | — | 1 | 29,428 | 10 | 834,148 |
| Industrial / Commercial | 1 | 15,795 | 7 | 3,972,553 | — | — | 8 | 3,988,348 |
| Retail | 3 | 100,963 | — | — | 2 | 40,636 | 5 | 141,599 |

EXHIBIT "1"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Residential / Multi-family | 3 | 43,773 | 4 | 609,961 | 3 | 148,146 | 10 | 801,880 |
| Self-Storage | 3 | 182,477 | 9 | 1,167,234 | 27 | 1,937,840 | 39 | 3,287,551 |
| Total | 19 | 1,147,728 | 20 | 5,749,748 | 33 | 2,156,050 | 72 | 9,053,526 |

21

| Property type | ASR owned [1] | | Consolidated VIE's [1] | | Third Party | | Total | |
|---|---|---|---|---|---|---|---|---|
| | # of Properties | Acres | # of Properties | Acres | # of Properties | Acres | # of Properties | Acres |
| Recreational vehicle | 2 | 56 | — | — | — | — | 2 | 56 |
| Land | 12 | 3,968 | — | — | — | — | 12 | 3,968 |
| Total | 14 | 4,024 | — | — | — | — | 14 | 4,024 |

[1] See Part I, Item 2. Properties for additional property details.

In August 2013, the lender for Morenci Professional Park foreclosed on the asset. Prior to the foreclosure, we elected to discontinue payments on the $1.6 million mortgage as we believed that the balance of the mortgage exceeded the market value of the property. The property securing the debt was held in one of our wholly-owned subsidiaries, and we had not guaranteed the mortgage note payable. Our subsidiary recorded a loss of $0.2 million as a result of the foreclosure.

In August 2013, we ceased to be the primary beneficiary of the VIE that owned the property known as University Fountains at Lubbock (a student housing property). Inasmuch as we no longer manage or have a continuing involvement with this property, we have deconsolidated this VIE from our Consolidated Financial Statements. We did not record a gain or loss as a result of the deconsolidation.

On July 2013, we sold an office property located at 2620/2630 Fountain View in Houston, Texas, which we held in a partnership with another investor. We sold the property for approximately $8.9 million, and generated proceeds of approximately $3.1 million after selling expenses and repayment of the secured note payable in the amount of approximately $5.2 million.  The transaction generated a gain of approximately $1.2 million.

In July 2013, the lender for 1501 Mockingbird foreclosed on the asset. Prior to the foreclosure we elected to discontinue payments on the $3.1 million mortgage as we believed that the balance of the mortgage exceeded the market value of the property. The debt was secured by the property, which was held in one of our wholly-owned, consolidated subsidiaries, and we had not guaranteed the mortgage obligation. We recognized a loss of $0.2 million as a result of the foreclosure.

In June 2013, the lender for the 11500 Northwest Freeway property foreclosed on the asset. ASR chose to discontinue paying the $3.9 million unpaid debt as it exceeded the market value of the property. The property securing the debt was held by a consolidated, wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a loss of $0.1 million. No proceeds were received as a result of the transaction.

During the first quarter of 2013, the Company deconsolidated two VIEs after determining that it was no longer the primary beneficiary. The entities were Fishers Indiana and College Park. ASR no longer manages or has a continuing involvement with properties owned by these entities. There was no gain nor loss associated with these deconsolidations.

**Revenues:**

EXHIBIT "1"

*Rental Revenues.* We derive rental revenues from tenants who occupy space in our portfolio of consolidated properties. There are three key drivers for rental revenue:

- *Occupancy rate* - Rental revenues are dependent on our ability to lease spaces to quality tenants.
- *Rental rate* – Increased vacancy in the marketplace tends to drive down rental rates. As leases expire, we replace the existing leases with new leases at the current market rental rate.
- *Tenant retention* - High customer retention leads to increased occupancy, less downtime between leases, and reduced leasing costs. We believe in and strive to create open communication with our customers and provide superior customer service.

22

---

**Occupancy Rate**

| Property Type | Weighted Average Occupancy as of December 31, | |
|---|---|---|
| | 2013 | 2012 |
| Office properties | 86% | 82% |
| Industrial properties | 89% | 76% |
| Retail properties | 88% | 79% |
| Residential / Multi-family properties | 92% | 88% |
| Self storage properties | 86% | 86% |

In 2013, we were able to increase the weighted average occupancy rate for all property types over 2012, except for self-storage properties, for which the occupancy rate remained the same. We are currently in the process of aggressively marketing all vacated spaces, but cannot make any guarantees as to when we will find quality tenants or if we will experience a reduction in rental rates.

**Rental Rate**

| Property Type | Weighted Average Base Rent Per Occupied Square Foot as of December 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| Office properties | $ | 16.25 | $ | 14.82 |
| Industrial properties | $ | 4.02 | $ | 4.04 |
| Retail properties | $ | 11.76 | $ | 10.04 |
| Residential / Multi-family properties | $ | 11.79 | $ | 10.66 |
| Self storage properties | $ | 6.46 | $ | 5.78 |

In 2013, we were able to increase the weighted average base rent per occupied square foot for all property types over 2012, except for industrial properties, whose base rate decreased slightly year over year. We do not anticipate rent rates to decline in the near term for these properties, and anticipate that our weighted average base rent will remain at its present level in the coming year. We are currently actively marketing our empty square footage but do not know when or at what rental rates we will be able to lease the vacant spaces.

**Tenant Retention Rate**

*Third party management and leasing revenue.* We derive these revenues from the fees charged to our third party clients for management services, tenant acquisition fees, leasing fees and loan advisory fees for

EXHIBIT "1"

arranging financing related to managed properties. If our third party clients elect to sell a property we manage, we will receive transaction fees and commissions relating to the sale of the property.

**Expenses**

*Property operating expenses.* Property operating expenses consist primarily of property taxes, insurance, repairs, maintenance, personnel costs and building service contracts.

*General and administrative expenses.* General and administrative expenses consist primarily of personnel expenses for accounting, human resources, information technology, and corporate administration, as well as professional fees, including audit and legal fees.

*Depreciation and amortization expenses.* Depreciation and amortization expenses consist primarily of depreciation associated with our real estate held for investment, amortization of purchased intangibles, depreciation of additional capital improvements, and the amortization of lease costs associated with consolidated properties.

*Interest expenses.* Interest expenses consist primarily of the interest owed to creditors for debt associated with our consolidated portfolio of properties.

23

---

**CRITICAL ACCOUNTING POLICIES**

The preparation of our consolidated financial statements in accordance with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the consolidated financial statements, and the reported amounts of revenues and expenses during the reporting periods and the related disclosures in the consolidated financial statements and accompanying notes.

On an ongoing basis, we evaluate these estimates and judgments based on historical experiences and various other factors that are believed to reflect the current circumstances. While we believe our estimates, assumptions and judgments are reasonable, they are based on information presently available. Actual results may differ significantly from these estimates due to changes in judgments, assumptions and conditions as a result of unforeseen events or otherwise, which could have a material effect on our financial position or results of operations. We believe the following critical accounting policies reflect our most significant estimates, judgments and assumptions used in the preparation of our consolidated financial statements:

• Variable Interest Entity (VIE) accounting
• Business combinations
• Investment in real estate assets
• Assets held for sale
• Discontinued operations
• Sales of real estate assets
• Fair value measurements
• Impairment or assets
• Income taxes.

**Variable Interest Entity Accounting**

Our determination of the appropriate accounting method with respect to our VIEs is based on Accounting Standards Update (ASU) 2009-17, *"Consolidations (Topic 810): Improvements to Financial Reporting by*

*Enterprises Involved with Variable Interest Entities.*" This ASU incorporates Statement of Financial Accounting Standards (SFAS) No. 167, "*Amendments to FASB Interpretation No. 46(R),*" issued by the Financial Accounting Standards Board, (FASB) in June 2009. The amendments in this ASU replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity. This primarily qualitative approach focused on identifying which reporting entity has both (1) the power to direct the activities of a variable interest entity that most significantly impact such entity's economic performance and (2) the obligation to absorb losses or the right to receive benefits from such entity that could potentially be significant to such entity. The entity which satisfies these criteria is deemed to be the primary beneficiary of the VIE.

We analyze our interests in VIEs to determine if we are the primary beneficiary. We consider a variety of factors in identifying the entity that holds the power to direct matters that most significantly impact the VIE's economic performance, including, but not limited to: (a) sign and enter into leases; set, distribute, and implement the capital budgets, the authority to refinance or sell the property within contractually defined limits, (b) the ability to receive fees that are significant to the property and (c) a necessity of funding any deficit cash flows.

We consolidate any VIE of which we are the primary beneficiary. We determine whether an entity is a VIE and, if so, whether it should be consolidated, a judgment that is inherently subjective. We deconsolidate a VIE when we determine that we are no longer the primary beneficiary. For VIEs in which we own an insignificant interest, we deconsolidate the VIE by eliminating the accounts from the balance sheet with a corresponding offset to the equity of the non-controlling interest. Operations are recognized through the date of deconsolidation.

**Business Combinations**

We apply the provisions of FASB ASC Topic 805 to all transactions or events in which we obtain control of one or more businesses, including those effected without the transfer of consideration, for example, by contract or through a lapse of minority veto rights. These provisions require the acquiring entity in a business combination to recognize the full fair value of assets acquired and liabilities assumed in the transaction (whether a full or partial acquisition); establish the acquisition-date fair value as the measurement objective for all assets acquired and liabilities assumed; and require expensing of most transaction and restructuring costs.

We determine and allocate the purchase price of an acquired company to the tangible and intangible assets acquired and liabilities assumed as of the business combination date. The purchase price allocation process requires us to use significant estimates and assumptions, including fair value estimates, as of the business combination date. We utilize third-party valuation companies to help us determine certain fair value estimates used for assets and liabilities.

24

Additionally, the purchase price of the applicable property is allocated to the above or below market value of in-place leases and the value of in-place leases and related tenant relationships. The value allocable to the above or below market component of the acquired in-place leases is determined based upon the present value (using a discount rate which reflects the risks associated with the acquired leases) of the difference between (i) the contractual amounts to be paid pursuant to the lease over its remaining term, and (ii) our estimate of the amounts that would be paid using fair market rates over the remaining term of the lease. The amounts allocated to below market lease values are included in accrued and other liabilities in the

EXHIBIT "1"

accompanying consolidated balance sheets and are amortized to rental income over the remaining non-cancelable lease term plus any below market renewal options of the acquired leases with each property.

While we use our best estimates and assumptions as a part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, our estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the purchase price allocation period, which is generally one year from the business combination date, we record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill.

### Investment in Real Estate Assets

Rental properties are stated at cost net of accumulated depreciation unless circumstances indicate that cost, net of accumulated depreciation, cannot be recovered.

Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

We evaluate each of our real estate assets on a quarterly basis in order to determine the classification of each asset in our consolidated balance sheet. This evaluation requires judgment by us in considering certain criteria that must be evaluated under Topic 360: Property, Plant and Equipment, such as the estimated timeframe in which we expect to sell our real estate assets. The classification of real estate assets determines which real estate assets are to be depreciated as well as what method is used to evaluate and measure impairment. Had we evaluated our assets differently, the balance sheet classification of such assets, depreciation expense and impairment losses could have been different.

### Assets Held for Sale

We classify assets as held for sale when: a) management approves the plan to sell the asset(s); b) the asset(s) are subject to a legally binding purchase and sale agreement; c) the buyer's due diligence period has expired; d) all other contingencies and conditions precedent to closing have been satisfied; and e) the sale and transfer is probable and expected within one year. If all of the required criteria are met, we discloses the property as properties held for sale and include the revenues and expenses from property operations in our Consolidated Statements of Operations as discontinued operations. Assets held for sale are carried at the lower of (i) net book value, or (ii) fair value less costs to sell.

### Discontinued Operations

Topic 360 extends the reporting of a discontinued operation to a "component of an entity," and further requires that a component be classified as a discontinued operation if the operations and cash flows of the component have been or will be eliminated from the ongoing operations of the entity in the disposal transaction and the entity will not have any significant continuing involvement in the operations of the component after the disposal transaction. As defined in Topic 360, a "component of an entity" comprises operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. Because each of our real estate assets is generally accounted for in a discrete subsidiary, many constitute a component of an entity under Topic 360, increasing the likelihood that the disposition of assets are required to be recognized and reported as operating profits and losses on discontinued operations in the periods in which they occur. The evaluation of whether the component's cash flows have been eliminated and the level of our continuing involvement require judgment by us and a different assessment could result in items not being reported as discontinued operations.

### Sales of Real Estate Assets

Gains on property sales are recognized in full when real estate is sold, provided (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured or the amount that will not be collectible

can be estimated, and (ii) the earnings process is virtually complete, that is, we are not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

25

---

**Fair Value Measurements**

Our acquisitions require the application of purchase accounting, which results in tangible and identifiable intangible assets and liabilities of the acquired entity being recorded at fair value. The difference between the purchase price and the fair value of net assets acquired is recorded as goodwill. In determining the fair values of assets and liabilities acquired in a business combination, we use a variety of valuation methods including present value, depreciated replacement cost, market values (where available) and selling prices less costs to dispose. We are responsible for determining the valuation of assets and liabilities and for the allocation of purchase price to assets acquired and liabilities assumed.

Assumptions must often be made in determining fair values, particularly where observable market values do not exist. Assumptions may include discount rates, growth rates, cost of capital, royalty rates, tax rates and remaining useful lives. These assumptions can have a significant impact on the value of identifiable assets and accordingly can impact the value of goodwill recorded. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of annual depreciation and amortization expense, different assumptions could also impact our statement of operations and could impact the results of future impairment reviews.

**Impairment of Assets**

Goodwill is assessed for impairment annually when events or changes in circumstances indicate potential impairment. We may first assess qualitative factors to determine whether it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value. If this assessment indicates that it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value, a two-step quantitative assessment will be completed. The first step used to identify potential impairment involves comparing each reporting unit's estimated fair value to its carrying value, including goodwill. We use a discounted cash flow approach to estimate the fair value of our reporting units. Management judgment is required in developing the assumptions for the discounted cash flow model. These assumptions include revenue growth rates, profit margin percentages, discount rates, etc. If the estimated fair value of a reporting unit exceeds its carrying value, goodwill is considered to not be impaired. If the carrying value exceeds estimated fair value, there is an indication of potential impairment and the second step is performed to measure the amount of impairment. The second step of the process involves the calculation of an implied fair value of goodwill for each reporting unit for which step one indicated impairment. The implied fair value of goodwill is determined similar to how goodwill is calculated in a business combination, by measuring the excess of the estimated fair value of the reporting unit as calculated in step one, over the estimated fair values of the individual assets, liabilities and identifiable intangibles as if the reporting unit was being acquired in a business combination. Due to the many variables inherent in the estimation of a business's fair value and the relative size of our goodwill, if different assumptions and estimates were used, it could have an adverse effect on our impairment analysis.

Impairment indicators for our rental properties are assessed by property and include, but is not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. When these indicators of impairment are present, real estate held for investment is evaluated for impairment and losses are recorded when undiscounted cash flows estimated to be generated by an asset or market comparisons are less than the asset's carrying amount. The amount of the impairment loss is

EXHIBIT "1"

calculated as the excess of the asset's carrying value over its fair value, which is determined using a discounted cash flow analysis, management estimates or market comparisons.

**Income Taxes**

We account for income taxes under the liability method whereby deferred tax asset or liability account balances are calculated at the balance sheet date using current tax laws and rates in effect for the year in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized. Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. We have assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income.

An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (i) the more positive evidence is necessary and (ii) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion, or all, of the deferred tax asset. Among the more significant types of evidence that we considered are: that future anticipated property sales will produce more than enough taxable income to realize the deferred tax asset; taxable income projections in future years; and whether the carry-forward period is so brief that it would limit realization of tax benefits.

Historically, we have incurred taxable losses in years in which we do not sell any real estate assets for gains. We expect to sell real estate assets in the future and have determined that it is more likely than not that future taxable income, primarily from gains on the sales of real estate assets, will be sufficient to enable us to realize all of net deferred tax assets, as adjusted.

26

The Company evaluates tax positions that have been taken or are expected to be taken in its tax returns, and records a liability for uncertain tax positions in accordance with ASC Topic 740, Income Taxes. Benefits from tax positions may only be recognized in the financial statements when it is more likely than not that the tax position will be sustained under examination by the appropriate taxing authority having full knowledge of all relevant information. When a tax position meets the more-likely-than-not recognition threshold it is measured at the largest amount of benefit that exceeds the fifty percent probability threshold for realization upon ultimate settlement. We account for interest and penalties related to uncertain tax positions as part of our provision for federal and state income taxes.

**Segments**

Operating segments are defined as components of an enterprise that engage in business activities that earn revenue, incur expenses and prepare financial information that is evaluated regularly by our chief operating decision maker in order to allocate resources and assess performance. In 2012, we operated as one segment that provided comprehensive real estate services to all geographic regions.

During the first quarter of 2013, the Company reassessed its application of segment guidance and based on the expected performance of our operating segments, determined that it would be more appropriate to present our reporting units as two reportable segments: (i) real estate portfolio operations and (ii) integrated real estate services provided to third-parties. All inter-segment sales pricing is based on current market conditions. Unallocated corporate amounts include general expenses associated with managing our two reportable operating segments.

EXHIBIT "1"

In conjunction with this reassessment, we have revised our prior period presentation to present information for our segments.

27

## RESULTS OF OPERATIONS

### Revenues by Period

The following table sets forth revenues for years ending December 31, 2013 and 2012, respectively and the change between periods:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | (in thousands, except percentages) | | | |
| | 2013 | 2012 | Change ($) | Change (%) |
| Rental revenue | $ 39,226 | $ 39,050 | $ 176 | 0.5 |
| Third party management and leasing revenue | 3,441 | 3,060 | 381 | 12.5 |

The changes in revenues during 2013 as compared to 2012 were primarily due to the following:

- Rental revenue increased by approximately $0.2 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. Increases in the weighted average occupancy rate and the weighted average base rent per occupied square foot for most property types in 2013 over 2012 contributed to the increase in rental revenue.

- Third party management and leasing revenue increased by approximately $0.4 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The increase was primarily due to an increase in the number of third party contracts to 33 units in 2013 from 21 units in 2012.

### Operating Expenses by Period

The following table sets forth expenses for years ending December 31, 2013 and 2012, respectively and the percentage and dollar change between periods (in thousands, except for percentages):

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2013 | 2012 | Favorable (Unfavorable) Change ($) | Favorable (Unfavorable) Change (%) |
| Property operating expense | 13,944 | 10,505 | (3,439) | (32.7) |
| Corporate general and administrative | 15,192 | 10,204 | (4,988) | (48.9) |
| Depreciation and amortization | 15,909 | 16,265 | 356 | 2.2 |
| Interest expense | 14,938 | 16,508 | 1,570 | 9.5 |
| Impairment expense | 1,844 | 982 | (862) | (87.8) |

The changes in operating expenses during the years ending December 31, 2013 and 2012, respectively were primarily due to the following:

- For the year ended December 31, 2013, our property operating expenses increased $3.4 million or 33% from $10.5 million in 2012 to $13.9 million during the fiscal year ended December 31, 2013. The

EXHIBIT "1"

increase in operating expense was due to late fees and penalties on our notes payable ($0.8 million), higher repairs and maintenance costs ($0.7 million), late fees and premiums to vendors ($0.7 million), increases in insurance and property taxes ($0.4 million), higher legal and professional fees at the property level ($0.4 million), and increased payroll and other operating expenses( $0.4 million).

- Corporate general and administrative expenses increased by $5.0 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The increase was primarily attributable to attorney fees and settlements related to 2013 litigation cases, (see Item 3 - Legal Proceedings) and higher insurance and payroll costs.

- Depreciation and amortization expense decreased by $0.4 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The decrease in this expense is due to the reduction in property held for investment from 2012 to 2013.

- During the year ended December 31, 2013 our interest expense declined approximately $1.6 million or 9.5% from $16.5 million in 2012 to $14.9 million during the same period in 2013. As of December 31, 2013, our notes payable totaled $263.4 million which represented a 15.8% decline from December 31, 2013. The $1.6 million decline in interest expense for our fiscal year ending in 2013 when compared to the same period in 2012 is due primarily to the reduction in notes payable which occurred from 2012 to the end of 2013.

28

---

- Impairment expense increased by approximately $0.9 million. This increase was primarily attributable to the write-off of management contracts due to deconsolidation of VIE's.

All of our expenses are significantly influenced by the properties we own and the number of VIEs which are consolidated.

**Other Income Statement Items by Period**

The following table sets forth our other income statement items for the years ending December 31, 2013 and 2012, respectively and the dollar and percentage change between periods (in thousands, except for percentages):

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2013** | **2012** | **Favorable (Unfavorable) Change ($)** | **Favorable (Unfavorable) Change (%)** |
| Interest income | 6 | 125 | (119) | (95.2) |
| Income (loss) from discontinued operations | (654) | 6,494 | (7,148) | (110.1) |
| Net loss attributable to noncontrolling interests | 1,414 | 3,199 | (1,785) | 55.8 |

EXHIBIT "1"

| | | | |
|---|---|---|---|
| Gain (loss) on extinguishment of debt | 10,327 | 682 | 9,645 | 100.0 |
| Loss on litigation settlement | (3,928) | — | (3,928) | N/A |

The changes in other income statement items during the year ending December 31, 2013 as compared to the year ending December 31, 2012 were primarily due to the following:

- Income (loss) from discontinued operations for the the year ending December 31, 2013 includes the net gain from the disposition of four owned properties (Morenci Professional Park , 1501 Mockingbird, 2620/2630 Fountain View and 11500 NW Freeway), their net of tax operating results through the date of disposition as well as the operating results of University Fountains at Lubbock. Income (loss) for the year ended December 31, 2012 includes the net gain from the 11 properties disposed of in 2012 and the net operating loss from properties disposed or deconsolidated in 2012 and 2013.

- Non-controlling interests consist of operating partnership unit holders other than us, the non-controlling interests in our partially owned properties, and the non-controlling interests in our VIEs held by others. The decrease in non-controlling interest was in large part attributable to a decrease in loss from our VIE's held by others between periods.

- The gain on extinguishment of debt and loss on litigation settlement in 2013 were the result of an agreement to settle all outstanding disputes and litigation related to the 2010 acquisition of assets and business interests from Evergreen Realty Group, LLC and affiliate (see Item 3. - Legal Proceedings).

## LIQUIDITY AND CAPITAL RESOURCES

The Company's business model is to acquire properties that require operational attention, physical improvement, repositioning or capital restructuring. The stated investment strategy is to acquire, improve and hold assets while looking for an opportunistic exit, enabling the Company to achieve its risk/return objectives. This business model relies on the acquisition, repositioning and sale of properties that require operational attention, physical improvement or capital restructuring. The process of repositioning acquired assets sometimes results in near-term operating losses until the individual assets can be stabilized and brought to an optimal operating level. Once this is achieved, the asset may be targeted as needed for disposition to recycle the Company's capital. This process places an operational emphasis on asset dispositions to demonstrate profitability.

In preparing our financial statements, we perform an assessment of available resources in relation to our near-term liquid resources, maturing debt instruments and currently due obligations. Given our current financial position, we believe that there is a potential risk that we may not meet our existing and maturing obligations. Accordingly, we have performed an operational review, looking for areas where we could improve operating performance and have done an analysis of our portfolio to look for assets that could be liquidated as a means of generating liquidity to meet our obligations. Although there can be no assurances, we have developed a plan which is designed to address our liquidity issues in the short and long-term. (see Part II, Item 8. Consolidated Financial Statements and Supplementary Data, Note. 3 - Going Concern.)

As of December 31, 2013, we had cash and cash equivalents of $2.6 million; our accounts payable and accrued liabilities totaled $8.9 million and $13.3 million, respectively. Approximately $53.69 million of our $263.39 million on notes payable which are outstanding as of December 31, 2013 will come due in 2014. In response to our liquidity challenges, we have developed a set of strategic objectives designed to increase cash flows from operating activities through the following initiatives:

- Increased revenues through new syndication or joint venture acquisitions

- Additional receivership assignments

- Increased third-party management services

- Reduced staffing and related operational expenses

Since we began these initiatives in 2014, we anticipate a partial impact on 2014 earnings and the full impact to be reflected thereafter.

As a means of generating additional liquidity in 2014 to meet our maturing debt obligations, management has increased the pace of asset sales and expects to continue the process into 2015. The current plan is to dispose of properties that will generate aggregate net sales revenue of approximately $57 million, reduce consolidated secured obligations by approximately $34 million, and provide liquidity to the Company. During 2014, we have completed the following dispositions:

In January 2014, we sold Windrose Plaza for $5.75 million and received net sales proceeds of $5.42 million after selling expenses. In conjunction with the sale, we paid off the notes payable secured by Windrose Plaza, and other obligations, totaling approximately $5.1 million. We used the remaining proceeds to fund operations.

In June 2014, we sold the property known as 2640/2650 Fountain View for $17.35 million. We received $4.58 million after payments to creditors totaling $12.67 million, and selling expenses of approximately $0.11 million.

In October 2014, we sold our property located at 8100 Washington in Houston, Texas for $4.10 million and received net sales proceeds of $4.01 million. At the time of the sale, we also paid off the secured note payable in the amount of $1.49 million. Including closing adjustments for prorations and operating expense, we realized net proceeds of $2.33 million.

In addition to planned sales of our properties, we continue to negotiate refinancing of properties allowing for reduced interest and monthly payments, as well as refinancing that will allow us to access funds from appreciated property values. The implementation of our management initiatives, the forecasted sales of real estate and the refinancing of loans are expected to address our liquidity needs in the near-term, and allow us to generate cash flows from operations to reduce our accounts payable and vendor obligations. We believe that our current operating plan is achievable given our demonstrated track record of property refinancing and sales at times when additional liquidity was required.

We have taken the following additional steps to meet our liquidity needs:

- We continually review the fair value of our assets in relation to market value and cash flows. Where we are unable to generate positive cash flows from property operations, and the achievable value of the property is less than the balance on the mortgage, we will consider a strategic default on the property's mortgage.

- We will continue to focus on increasing occupancy rates and managing our cost structure.

- We will continue to negotiate with our creditors for extended terms in order to manage our cash resources.

EXHIBIT "1"

During the first half of 2014, we obtained a $3.0 million loan to assist with liquidity needs. We intend to repay the loan upon the sale of our properties held for sale, however, we cannot assure the proceeds ultimately generated from the sale of any assets held for sale will meet our short-term or long-term cash needs.

In conjunction with our settlement agreement with Dunham (see Item 3), we restructured the mandatory redemption provisions of the Series B Preferred issued to Dunham in December 2013 (see Note 14 - Capital Structure, Series B Preferred and Note 20 - Subsequent Events, Acquisition Litigation). Pursuant to the restated Articles Supplementary for the Series B Preferred, we are required to redeem the remaining $20.1 million shares of Series B Preferred held by Dunham as follows: (i) approximately $3.011 million, less any "Adjustments" (see definition of Adjustments in Note 14 - Capital Structure, Series B Preferred) received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before December 1, 2014, (ii) approximately $7.025 million, less any Adjustments received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before June 1, 2015, and (iii) the remainder of the liquidation preference less any Adjustments will be paid to fully redeem all the remaining outstanding share of the Company's Series B Preferred on or before December 1, 2015. Excluding any reductions for Adjustments and increases for unpaid accruing dividends, the anticipated final liquidation payment due to holders of the Company's Series B Preferred will be approximately $10.035 million on December 1, 2015.

30

As of December 31, 2013 we are in default on the notes listed below. The balances disclosed in the table below exclude additional fees that may be the result of non-payment, (in thousands):

| Property Secured by: | ASR Ownership Percentage (%) | Balance at December 31, 2013 |
|---|---|---|
| | | (in thousands) |
| Atrium 6430 | 100% | $ 2,074 |
| 2640/2650 Fountain View | 100% | 12,632 |
| 800/888 Sam Houston Parkway | 100% | 4,223 |
| 2401 Fountain View Office Tower | 50% | 11,446 |
| Northwest Spectrum Plaza | 100% | 4,490 |
| Corporate - Unsecured [1] | 100% | 1,125 |
| Total | | $ 35,990 |

[1] Comprised of a $1.0 million Corporate unsecured note - lender had initiated legal proceedings to collect; as of October 29, 2014, negotiation are in progress to settle this debt; and a $0.13 million Corporate unsecured note which matured in May 2012 and paid during October 2014.

All of the properties securing the debt in default are held by consolidated, wholly-owned subsidiaries or consolidated VIEs. We do not guarantee these mortgages. All of the notes in default have payment acceleration clauses, and the lenders holding these notes could demand payment in full, including additional fees and interest.

In January 2014, the Company filed voluntary petitions for reorganization under Chapter 11, Title 11 of the US Bankruptcy Code for three subsidiaries: ASR-8 Center LP (Northwest Spectrum Plaza), ASR-Parkway

One & Two LP (800/888 Sam Houston Parkway), and ASR-Fountain View Place LP (2640/2650 Fountain View). The Company sought protection from the secured creditors in bankruptcy court as a means of preserving the Company's equity in the properties held by these subsidiaries since the creditors were seeking to foreclosure on the assets.

Subsequently, in June 2014, the property held and ASR-Fountain View Place LP (2640/2650 Fountain View) was sold for $17.35 million and all creditors were paid in full. In addition, ASR-Parkway One & Two LP and ASR-8 Center LP filed plans of reorganization with the US Bankruptcy Court, which provided for the creditors of these two subsidiaries to be paid the full amount they were owed. ASR-Parkway One & Two LP entered into a new note with the existing secured creditor in the amount of $4.6 million, maturing June 30, 2015 at a fixed rate of interest of 4.25%. Similarly, the property held by ASR-8 Center LP entered into a new note with the lender for $4.9 million, maturing December 31, 2015, at a fixed interest rate of 4.25%.

In July 2014, the secured lender foreclosed the property known as 6430 Richmond. The $2.05 million note payable secured by the property had matured in May of 2012 and could not be replaced under terms that were economically viable. The property and the corresponding note payable were held by a consolidated, wholly-owned subsidiary, and the Company did not guarantee the note payable.

On September 30, 2014, the Company filed voluntary petitions for reorganization under Chapter 11, Title 11 of the US Bankruptcy Code for ASR 2401 Fountainview, LP, a subsidiary of the Company. The action was taken by the Company in response to foreclosure proceedings instituted by the secured creditor. The Company's management believes that the value of the property known as 2401 Fountainview can be preserved through either a plan of reorganization or orderly marketing and sale of the asset. Although there can be no assurances, the Company believes that the subsidiary will continue to operate as a "debtor in possession" in the ordinary course under the jurisdiction of the Bankruptcy Court.

On February 14, 2014, at the request of Nextera Retail of Texas, LP ("Nextera"), the District Court of Harris County, Texas (the "Court") appointed a receiver in connection with a judgment against the Company. The action was the result of a vendor dispute that was settled by the Court in favor of Nextera, in the amount of $2.8 million. On February 20, 2014, the Company satisfied in full all obligations to Nextera, with a payment of $1.5 million and receivership costs of $0.15 million, and the District Court rescinded the order appointing the receiver. Day-to-day operations of the Company were not impacted, and satisfaction of the Nextera obligation did not have a material adverse effect on the operations or financial condition of the Company.

**DISCUSSION OF THE CONSOLIDATED STATEMENT OF CASH FLOWS**

31

*Cash Flows from Operations*

During 2013, net cash used in operating activities totaled $1.5 million. Net cash provided by operating activities was $8.7 million in 2012. Consolidated net loss for 2013 totaled $15.2 million, compared to consolidated net loss of $1.8 million for 2012.

Noncash items recognized in 2013 totaled $14.1 million, consisting primarily of depreciation and amortization expense ($17.2 million), loss on litigation settlement ($3.9 million), impairment ($1.9 million) and income tax expense ($1.9 million) partially offset by gain on extinguishment of debt ($10.3 million) and deferred rental income ($0.5 million).

EXHIBIT "1"

Noncash items recognized in 2012 totaled $8.8 million, consisting primarily of depreciation and amortization expense ($22.6 million), impairment ($1.0 million) and income tax expense ($1.0 million) partially offset by gain on disposition of real estate assets ($15.1 million) and deferred rental income ($0.7 million).

During 2013 changes in working capital used $0.4 million in cash, primarily consisting of changes in restricted cash ($3.5 million) and higher prepaid and other assets ($1.6 million) and higher receivables ($0.9 million), partially offset by higher accounts payables ($3.4 million) and higher accrued and other liabilities ($2.2 million).

During 2012 changes in working capital provided $1.7 million million in cash, primarily consisting of higher accounts payables ($1.8 million) and higher accrued and other liabilities ($2.8 million), partially offset by higher prepaid and other assets ($2.7 million), changes in restricted cash ($0.1 million)and higher receivables ($0.1 million).

*Cash Flows from Investing Activities*

During 2013 and 2012, investing activities provided cash of $7.9 million and $41.4 million respectively. Proceeds from the sale of real estate assets were $8.9 million and $42.9 million, respectively. Cash flows from investing activities in 2013 and 2012 were partially offset by capital expenditures of $1.0 million and $1.5 million, respectively.

*Cash Flows from Financing*

During 2013, financing activities used net cash of $8.0 million, primarily consisting of payments on borrowings of ($26.1 million) and distributions to noncontrolling interests ($8.2 million), partially offset by proceeds from borrowings ($26.3 million).

During 2012, financing activities used net cash of $50.4 million. The primary uses of cash for financing activities were the payments on borrowings of $64.6 million and distributions to noncontrolling interests of $7.7 million. Cash outflows for financing activities were partially offset by proceeds from borrowings of $19.9 million and contributions from noncontrolling interests of $2.0 million

**INFLATION**

Inflation has not had a significant impact on our financial results because of the relatively low inflation rate in our geographic areas of operation. Additionally, most of our leases require the customers to pay their pro rata share of operating expenses, including common area maintenance, real estate taxes, utilities and insurance, thereby reducing our exposure to increases in operating expenses resulting from inflation.

**Item 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**
Not applicable.

**Item 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**
**AMERICAN SPECTRUM REALTY, INC.**

---

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 32 |
| Consolidated Balance Sheets at December 31, 2013 and 2012 | 34 |

EXHIBIT "1"

| | |
|---|---|
| Consolidated Statements of Operations for the years ended December 31, 2013 and 2012 | 36 |
| Consolidated Statements of Equity (Deficit) for the years ended December 31, 2013 and 2012 | 37 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2013 and 2012 | 38 |
| Notes to Consolidated Financial Statements | 40 |

33

---

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders

American Spectrum Realty, Inc.

Houston, Texas

We have audited the accompanying consolidated balance sheets of American Spectrum Realty, Inc. as of December 31, 2013 and 2012, and the related consolidated statements of operations, equity, and cash flows for the periods ended December 31, 2013 and 2012. American Spectrum's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of American Spectrum Realty, Inc. as of December 31, 2013 and 2012, and the results of its operations and its cash flows for the periods ended December 31, 2013and 2012 in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 3 to the consolidated financial statements, the Company has recurring losses from continuing operations and relative low levels of cash and cash equivalents. These conditions raise substantial doubt about its ability to continue as a going concern. Management's plans regarding those matters are also described in Note 3. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to that matter.

EEPB, PC

Houston, Texas

October 30, 2014

EXHIBIT "1"

34

---

## AMERICAN SPECTRUM REALTY, INC
## CONSOLIDATED BALANCE SHEET
### (Dollars in thousands, except per share amounts)

| | December 31, | |
|---|---|---|
| | **2013** | **2012** |
| **ASSETS** | | |
| Real estate held for investment (includes $253,928 and $327,676 from consolidated Variable Interest Entities ("VIE's"), respectively) | $ 416,982 | $ 438,675 |
| Accumulated depreciation (includes $39,828 and $37,127 from consolidated VIE's, respectively) | (70,208) | (71,775) |
| Real estate held for investment, net (includes $214,100 and $290,549 from consolidated VIE's, respectively) | 346,774 | 366,900 |
| Cash and cash equivalents (includes $2,475 and $3,724 from consolidated VIE's, respectively) | 2,587 | 4,216 |
| Restricted cash | 2,805 | — |
| Tenant and other receivables (includes $970 and $784 from consolidated VIE's, respectively), net of allowance for doubtful accounts of $417 and $673 (includes $236 and $473 from consolidated VIE's, respectively) | 1,687 | 1,281 |
| Assets held for sale, net of accumulated depreciation of $1,485 | 2,870 | |
| Deferred rents receivable (includes $2,811and $2,204 from consolidated VIE's, respectively) | 3,546 | 3,269 |
| Purchased intangibles subject to amortization, net of accumulated amortization of $5,417 and $3,114, respectively | 2,920 | 5,946 |
| Deferred tax assets | 9,340 | 11,308 |
| Goodwill | 12,756 | 6,687 |
| Investment in unconsolidated real estate assets from related parties | 389 | 332 |
| Receivables from Evergreen | — | 1,686 |
| Prepaid and other assets, net (includes $7,668 and $8,600 from consolidated VIE's, respectively) | 12,981 | 15,753 |
| Total Assets | $ 398,655 | $ 417,378 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Liabilities:** | | |
| Notes payable (includes $168,433 and $221,899 from consolidated VIE's, respectively) | $ 259,600 | $ 312,662 |
| Notes payable on assets held for sale | 3,794 | — |
| Accounts payable (includes $284 and $398 from consolidated VIE's, respectively) | 8,868 | 7,458 |
| Accrued and other liabilities (includes $5,773 and $6,759 from consolidated VIE's, respectively) | 13,357 | 15,241 |
| Long-term liabilities - Series B Preferred and Series C Preferred | 69,022 | — |
| **Total liabilities** | 354,641 | 335,361 |

**Commitments and Contingencies (Note 19):**

EXHIBIT "1"

**Stockholders' Equity:**

| | | |
|---|---:|---:|
| American Spectrum Realty, Inc, stockholders' equity (deficit): | | |
| Preferred Stock, par value $.01 per share, 25,000,000 shares authorized: | | |
| Series A Preferred, 15% cumulative, par value $.01 per share, 68,965 authorized shares, 18,390 and 55,170 shares issued and outstanding at December 31, 2013 and December 31, 2012, respectively | — | 1 |
| Series B Preferred, 8% cumulative, par value $.01 per share, 17,000,000 authorized shares, 16,870,609 shares issued and outstanding at December 31, 2013 | — | — |
| Series C Preferred, 8% cumulative, par value $.01 per share, 55,170 authorized shares, 36,780 shares issued and outstanding at December 31, 2013 | — | — |
| Common Stock, par value $.01 per share, 100,000,000 authorized shares, 4,174,492 and 4,039,191 shares issued at December 31, 2013 and December 31, 2012, respectively; 3,703,142 and 3,567,779 shares outstanding at December 31, 2013 and December 31, 2012, respectively | 42 | 34 |
| Additional paid-in capital | 60,412 | 61,158 |
| Accumulated deficit | (68,865) | (55,096) |
| Treasury stock, at cost, 471,350 shares at December 31, 2013 and December 31, 2012 | (3,095) | (3,095) |
| Total American Spectrum Realty, Inc. stockholders' equity (deficit) | (11,506) | 3,002 |
| | | |
| Noncontrolling interest | 55,520 | 79,015 |
| | | |
| **Total Equity** | 44,014 | 82,017 |
| **Total Liabilities and Equity** | $ 398,655 | $ 417,378 |

The accompanying notes are an integral part of these consolidated financial statements

35

## AMERICAN SPECTRUM REALTY, INC
## CONSOLIDATED STATEMENTS OF OPERATIONS

(In thousands, except per share amounts)

| | Year Ended December 31, | |
|---|---:|---:|
| | **2013** | **2012** |
| **Revenues:** | | |
| Rental revenue | $ 39,226 | $ 39,050 |
| Third party management and leasing revenue | 3,441 | 3,060 |
| Interest income | 6 | 125 |
| **Total revenues** | 42,673 | 42,235 |
| **Expenses:** | | |
| Property operating expense | 13,944 | 10,505 |
| Corporate general and administrative | 15,192 | 10,204 |
| Depreciation and amortization | 15,909 | 16,265 |
| Interest expense | 14,938 | 16,508 |
| Impairment expense | 1,844 | 982 |
| **Total expenses** | 61,827 | 54,464 |
| **Other income:** | | |

EXHIBIT "1"

| | | |
|---|---:|---:|
| Gain (loss) on extinguishment of debt | 10,327 | 682 |
| Loss on litigation settlement | (3,928) | — |
| **Total other income** | 6,399 | 682 |
| Loss from continuing operations before income taxes | (12,755) | (11,547) |
| Income tax (expense) benefit | (1,774) | 3,268 |
| **Loss from continuing operations** | (14,529) | (8,279) |
| **Discontinued operations:** | | |
| Loss from discontinued operations | (899) | (4,505) |
| Gain on disposition of discontinued operations | 439 | 15,082 |
| Income tax expense | (194) | (4,083) |
| **Income (loss) from discontinued operations** | (654) | 6,494 |
| | | |
| Net loss, including noncontrolling interests | (15,183) | (1,785) |
| | | |
| Net loss attributable to noncontrolling interests | 1,414 | 3,199 |
| | | |
| Net income (loss) attributable to American Spectrum Realty, Inc. | (13,769) | 1,414 |
| | | |
| Preferred stock dividends | (240) | (240) |
| | | |
| **Net income (loss) attributable to American Spectrum Realty, Inc. common stockholders** | $ (14,009) | $ 1,174 |
| | | |
| **Basic and diluted per share data:** | | |
| Loss from continuing operations attributable to American Spectrum Realty, Inc. common stockholders | $ (3.68) | $ (1.60) |
| Income (loss) from discontinued operations attributable to American Spectrum Realty, Inc. common   stockholders | (0.20) | 1.93 |
| **Net income (loss) attributable to American Spectrum Realty, Inc. common stockholders** | $ (3.88) | $ 0.33 |
| | | |
| Basic and diluted weighted average shares | 3,610,243 | 3,569,032 |
| | | |
| **Amounts attributable to American Spectrum Realty, Inc. common stockholders:** | | |
| Loss from continuing operations | $ (13,286) | $ (5,715) |
| Income (loss) from discontinued operations | (723) | 6,889 |
| Net income (loss) | $ (14,009) | $ 1,174 |

The accompanying notes are an integral part of these consolidated financial statements

36

---

**AMERICAN SPECTRUM REALTY, INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**

(Dollars in thousands, except share amounts)

| Number Preferre | Number Commo | Non controlli | Preferre d | Commo n | Addition al | Accumulat ed | Treasur y | Total ASR, | Total Equity |
|---|---|---|---|---|---|---|---|---|---|

| | d Shares | n Shares | ng Interests | Stock | Stock | Paid-In Capital | Deficit | Stock | Inc. Equity | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balance January 1, 2012** | 55,170 | 3,816,016 | $ 96,612 | $ 1 | $ 34 | $ 51,923 | $ (56,510) | $(3,095) | $(7,647) | **88,96 5** $ |
| Preferred stock dividends | — | — | — | — | — | (240) | — | — | (240) | **(240)** |
| Stock-based compensation | — | — | — | — | — | 205 | — | — | 205 | **205** |
| Restricted stock forfeitures | — | (17,004) | — | — | — | — | — | — | — | |
| Conversion of OP units to common stock | — | 191,269 | (1,711) | — | — | 1,711 | — | — | 1,711 | **—** |
| Repurchase of OP units | — | — | (8,013) | — | — | 8,013 | — | — | 8,013 | **—** |
| Issuance of Common Stock | — | 48,910 | — | — | — | 203 | — | — | 203 | **203** |
| Acquisition of VIE properties | — | — | 657 | — | — | (657) | — | — | (657) | **—** |
| Deconsolidation of VIE's | — | — | 377 | — | — | — | — | — | — | **377** |
| Noncontrolling interests share of income | — | — | (3,199) | — | — | — | — | — | — | **(3,199)** |
| Repurchase of preferred partnership interest | — | — | — | — | — | — | — | — | — | **—** |
| Distributions | — | — | (7,680) | — | — | — | — | — | — | **(7,680)** |
| Contributions | — | — | 1,972 | — | — | — | — | — | — | **1,972** |
| Net income | — | — | — | — | — | — | 1,414 | — | 1,414 | **1,414** |
| **Balance January 1, 2013** | 55,170 | 4,039,191 | $ 79,015 | $ 1 | $ 34 | $ 61,158 | $ (55,096) | $(3,095) | $ 3,002 | **82,01 7** $ |
| Preferred stock dividends | — | — | — | — | — | 360 | — | — | 360 | **360** |
| Series A Preferred conversion to Series C Preferred | (36,780) | — | — | (1) | — | (1,539) | — | — | (1,540) | **(1,540)** |
| Stock-based compensation | — | 145,000 | — | — | — | 420 | — | — | 420 | **420** |
| Restricted stock forfeitures | — | (11,068) | — | — | — | — | — | — | — | |
| Conversion of OP units to common stock | — | 1,369 | (21) | — | — | 21 | — | — | 21 | **—** |
| Deconsolidation of VIE's | — | — | (13,789) | — | — | — | — | — | — | **(13,78 9)** |
| Adjust | — | — | — | — | 8 | (8) | — | — | — | **—** |

EXHIBIT "1"

common stock to par value

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Noncontrolling interests share of loss | — | — | (1,414) | — | — | — | — | — | — | (1,414) |
| Distributions | — | — | (8,282) | — | — | — | — | — | — | (8,282) |
| Contributions | — | — | 11 | — | — | — | — | — | — | 11 |
| Net loss | — | — | — | — | — | — | (13,769) | — | (13,769) | (13,769) |
| Balance December 31, 2013 | 18,390 | 4,174,492 | $ 55,520 | $ — | $ 42 | $ 60,412 | $ (68,865) | $(3,095) | $ (11,506) | 44,014 |

The accompanying notes are an integral part of these consolidated financial statements

37

## AMERICAN SPECTRUM REALTY, INC
## CONSOLIDATED STATEMENTS OF CASH FLOWS
### (in thousands)

| | Year Ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss, including noncontrolling interests | $ (15,183) | $ (1,785) |
| Adjustment to reconcile net loss to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 17,252 | 22,572 |
| Impairment expense | 1,844 | 982 |
| Income tax expense | 1,968 | 815 |
| Gain on extinguishment of debt | (10,327) | (682) |
| Loss on litigation settlement | 3,928 | — |
| Gain on disposition of real estate assets | (439) | (15,082) |
| Stock-based compensation | 420 | 205 |
| Deferred rental income | (587) | (753) |
| Changes in operating assets and liabilities: | | |
| Increase in tenant and other receivables | (902) | (75) |
| Increase in prepaid and other assets | (1,642) | (2,720) |
| Increase in accounts payable | 3,446 | 1,815 |
| Increase in accrued and other liabilities | 2,188 | 2,823 |
| Change in restricted cash | (3,490) | (103) |
| Net cash (used in) provided by operating activities: | (1,524) | 8,012 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Proceeds received from sales of real estate assets | 8,913 | 42,881 |
| Capital improvements to real estate assets | (1,043) | (1,521) |
| Investments in unconsolidated real estate assets | — | — |
| Net cash provided by investing activities: | 7,870 | 41,360 |

EXHIBIT "1"

**CASH FLOWS FROM FINANCING ACTIVITIES:**

| | | |
|---|---:|---:|
| Proceeds from borrowings | 26,361 | 19,877 |
| Repayment of borrowings-property sales | (5,236) | (37,761) |
| Repayment of borrowings-scheduled payments | (5,526) | (11,639) |
| Repayment of borrowings-other | (15,303) | (14,555) |
| Contributions from noncontrolling interests | 11 | 1,972 |
| Distributions to noncontrolling interests | (8,282) | (7,680) |
| Net cash used in financing activities: | **(7,975)** | **(49,786)** |
| | | |
| Increase (decrease) in cash and cash equivalents | (1,629) | (414) |
| | | |
| Cash and cash equivalents, beginning of period | 4,216 | 4,630 |
| | | |
| Cash and cash equivalents, end of period | **$    2,587** | **$    4,216** |

**Supplemental Disclosure of Non-Cash Investing and Financing Activities:**

| | | |
|---|---:|---:|
| Conversion of operating partnership units to common stock | 21 | 1,711 |
| Conversion of accounts payable to note payable | 1,295 | 1,417 |
| Conversion of accounts payable to common stock | — | 203 |
| Debt assumed in connection with real estate acquisition | 17,167 | — |
| Issuance of Series B Preferred in connection with real estate acquisition | 67,481 | — |
| Conversion of Series A Preferred to Series C Preferred | 1,540 | — |

**SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:**

| | | |
|---|---:|---:|
| Cash paid for interest | 17,114 | 21,126 |
| Cash paid for income taxes | — | 62 |

38

The accompanying notes are an integral part of these consolidated financial statements

39

# NOTE 1. BUSINESS OVERVIEW

American Spectrum Realty, Inc. (ASR, the Company) is a value add real estate investor looking to acquire properties which require operational attention, physical improvement or capital restructuring. The Company's investment strategy is to acquire, improve and hold while looking for an opportunistic exit enabling the Company to achieve its risk/return objectives. The Company's property portfolio consists of income-producing properties and land held for development, including properties in which ASR has a controlling interest, or where the Company is the primary beneficiary of a variable interest entity (a "VIE").

EXHIBIT "1"

ASR's income-producing properties include commercial office, industrial, retail, self-storage, multi-family residential, and student housing. In addition to the Company's real estate portfolio, ASR offers market expertise and integrated real estate solutions to select third parties for a fee. ASR's service offering includes property and asset management, insurance procurement, syndication services, receivership management, and brokerage services.

ASR was incorporated in Maryland in August of 2000, and is headquartered in Houston, Texas. The Company conducts business operations in the continental United States primarily through American Spectrum Realty Operating Partnership, L.P., a Delaware limited partnership (the "Operating Partnership"). ASR is the sole general partner of the Operating Partnership, and holds limited partnership interests representing approximately 94% of the equity interests at December 31, 2013. As the sole general partner of the Operating Partnership, the Company has the exclusive power to manage and direct the business activities of the Operating Partnership. In general, the Operating Partnership units that are not held by ASR (approximately 6% of the outstanding units) are exchangeable for shares of the Company's common stock on a two-for-one basis, or for cash equal to the value of such stock at ASR's sole discretion (see Note 13 - Noncontrolling Interest and Operating Partnership Units).

## NOTE 2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Principles of Consolidation

The accompanying consolidated financial statements are prepared in conformity with U.S. generally accepted accounting principles (GAAP) and include the accounts of the Company, its subsidiaries, and those VIEs in which the Company is the primary beneficiary. All material intercompany transactions and balances are eliminated in consolidation.

Under GAAP accounting rules, there is an inherent presumption that the Company will be able to continue its operating activities, realize its assets and meet its obligations in the ordinary course of business. Due to risks and uncertainties surrounding the Company's ability to meet its ongoing obligations as they come due, the Company has provided additional disclosure under Note 3 - Going Concern.

### Use of Estimates

Preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and reported amounts of revenues and expenses during the reporting period. Critical estimates include (i) determining the value of financial instruments, (ii) revenue recognition including future minimum rents, tenant expense recoveries and collectability, (iii) determining the fair values of the Company's investment properties, and (iv) the estimates and assumptions used to determine impairment of goodwill and other intangibles. In determining the fair values and when conducting impairment tests, the Company makes estimates of future cash flows, useful lives over which such cash flows will occur, their amount, and the asset's residual value. Estimates used by the Company inherently involve significant judgment and a degree of uncertainty. Because future events rarely develop exactly as forecasted, the use of estimates routinely requires adjustment and actual results could differ from the estimates provided by the Company and such differences could be significant.

### Reclassifications

Certain balance sheet amounts in the 2012 financial statements have been reclassified to conform to the 2013 presentation.

### Cash and Cash Equivalents

Cash and cash equivalents consist of all highly liquid investment instruments with an original maturity of three months or less. As of December 31, 2013 and 2012, the Company held cash and cash equivalents in checking accounts, money market accounts and investment accounts with several financial institutions. Some accounts exceeded FDIC insurance limits. As of December 31, 2013 and 2012, the consolidated

EXHIBIT "1"

amounts of cash and cash equivalents included $2.5 million and $3.7 million, respectively of cash and cash equivalents held inside of VIEs. Funds held in VIEs are used to fund operations of the respective VIEs and are not available for general corporate purposes.

40

---

**Restricted Cash**

As of December 31, 2013, the Company had restricted cash of $2.8 million which was held in a court trust account pending a court ruling on the final distribution (see Note 19 - Commitments and Contingencies).

**Fair Value of Financial Instruments**

ASR's financial instruments, including cash, restricted cash, tenant and other receivables, prepaid expenses and other current assets, accrued liabilities, and accounts payable are carried at cost, which approximates fair value due to the short-term nature of those instruments.

**Deferred Financing and Other Fees**

Fees paid in connection with the financing and refinancing of properties are included in other assets, and amortized to interest expense using the effective interest method over the term of the related debt instrument.

**Rental Revenue**

The Company records rental income to be received over the full term of each lease on a straight-line basis. Any rent concessions due tenants as part of their lease are included in the deferred rent receivable. For the purposes of this calculation, existing leases for acquired properties commence on the date of acquisition.

Many of the leases require the tenant to reimburse ASR for their pro rata share of operating expenses, insurance costs and property taxes, or an amount equal to the tenant's share of the increases in these expenses over a fixed amount. ASR records these reimbursements as additional rental revenue. Tenants are billed an estimated charge for the reimbursable expenses based on the budgeted operating expenses for the year. Within 90 days following year-end, a reconciliation is performed based on actual operating expenses and the tenants are provided with a charge or credit based upon the results of the reconciliation process.

For each of the two years ended December 31, 2013 and 2012 no tenant represented 10% or more of the Company's rental revenue.

**Allowance for Doubtful Accounts**

ASR maintains an estimated allowance for accounts receivable that ultimately may not be collected. The allowance balance maintained is based on historical collection experience, current aging of amounts due, and specific evaluations of the collectability of individual balances. All tenant account balances over 90 days past due are fully reserved. Accounts are written off against the reserve when they are deemed uncollectible, usually after a tenant vacates the property.

**Goodwill**

Goodwill is calculated as the difference between the purchase price and the fair value of net assets acquired. ASR assesses goodwill for impairment annually and whenever events or circumstances make it more likely than not that an impairment may have occurred, such as a significant adverse change in the business climate or a decision to sell or dispose of the related assets. Determining whether an impairment has occurred requires the use of cash flow and discounted cash flow methodologies. In applying this methodology, we rely on a number of factors, including actual operating results, future business plans, economic projections and market data. If the carrying amount of goodwill exceeds the implied fair value,

EXHIBIT "1"

an impairment loss is recognized. Such loss is equal to the excess carrying amount of the goodwill over the its fair value and the recorded loss is not subject to reversal thereafter.

**Intangible Assets**

Intangible assets are amortized on a straight-line basis over their estimated lives. Such assets are evaluated for impairment whenever events or changes in circumstances indicate that the recoverability of their carrying value may be impaired.

**Variable Interest Entity (VIE) Accounting**

ASR consolidates its interests in a VIE when the Company is considered the primary beneficiary with (1) the power to direct the activities of a VIE that most significantly impact such entity's economic performance, and (2) the obligation to absorb losses or the right to receive benefits from the entity that could potentially be significant to the VIE.  When determining if the Company is the primary beneficiary, ASR considers a variety of inherently subjective factors and estimates to identify the entity that holds the power to direct matters that most significantly impact the VIE's economic performance. The primary factors used to make this determination include, but are not limited to, key contractual arrangements which enable or require ASR to (a) sign and enter into leases, establish and implement capital budgets, refinance or sell significant assets held by the entity, (b) receive fees that are significant to the entity, and (c) fund any deficit cash flows.  The Company deconsolidates a VIE when it no longer qualifies as the primary beneficiary. Operations are recognized through the date of deconsolidation.

41

**Assets Held for Sale**

The Company classifies assets as held for sale when: a) management approves the plan to sell the asset(s); b) the asset(s) are subject to a legally binding purchase and sale agreement; c) the buyer's due diligence period has expired; d) all other contingencies and conditions precedent to closing have been satisfied; and e) the sale and transfer is probable and expected within one year. When an asset meets all of the required criteria. it is classified as an asset held for sale within the consolidated balance sheet. Assets held for sale are carried at the lower of (i) net book value, or (ii) fair value less costs to sell.

**Discontinued Operations**

For both current and prior periods, the Company reports the assets, results of operations, and liabilities of any component of the Company that has been disposed of, or is classified as held for sale, as discontinued operations.

**Sales of Real Estate Assets**

Gains on property sales are recognized in full when real estate is sold, provided that (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured, or the amount that will not be collectible can be estimated, and (ii) the earnings process is virtually complete, that is, the Company is not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

**Real Estate Held for Investment**

Rental properties are stated at cost, net of accumulated depreciation, unless circumstances indicate that cost cannot be recovered, in which case the carrying value of the property is reduced to estimated fair value. Estimated fair value is based on the Company's plans for the continued operation of each property and is determined using a combination of a) the estimated sales price, which is derived from sales of comparable properties with consideration given to location, age, construction materials and use, or (b) a combination of

EXHIBIT "1"

annualized cash flows and capitalization rates applied to annualized net operating income. The fulfillment of the Company's plans related to each property depends on, among other things, the presence of economic conditions that will enable ASR to achieve its investment strategy as outlined in Note 1 - Business Overview. Due to uncertainties inherent in the valuation process and in the local economy where a property is located, actual results could materially differ from expectations.

Depreciation is based on estimated useful lives of properties using the straight-line method. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

Rental properties are individually evaluated for impairment when conditions indicate the sum of future undiscounted cash flows expected for a property is less than its carrying amount. Impairment indicators for ASR's rental properties are assessed by property and include significant change in estimated net operating income, occupancy, rental rates and other market factors. The Company assesses the expected undiscounted cash flows based on numerous factors, including, but not limited to: appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property, and assumptions about the use of the asset. Upon determination that impairment has occurred and that the future undiscounted cash flows are less than the carrying amount, a write-down will be recorded to reduce the carrying amount to its estimated fair value.

**Treasury Stock**

Subject to market conditions, normal trading restrictions, and limitations on liquidity and debt covenants, the Company may, from time to time, make purchases of its common stock in the open market or through privately negotiated transactions. When the Company acquires shares of its common stock but does not retire them, the shares are treated as treasury stock and are accounted for under the cost method. When the Company resells such shares, any increase or decrease in the price received compared to the acquisition price is treated as an adjustment in the related paid-in-capital account.

**Recent Accounting Pronouncements**

In February 2013, the FASB issued amendments to provide guidance on the recognition, measurement and disclosure of obligations resulting from joint and several liability arrangements for which the total amount of obligation within the scope of this guidance is fixed at the reporting date, except for obligations previously addressed by GAAP. The amendments are effective for fiscal years beginning after December 15, 2013 and interim periods within those years. The Company does not believe the adoption of this guidance will have a material impact on our financial statements.

In July 2013, the FASB issued Accounting Standards Update No. 2013-11, "Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists." The amendments in this update require an entity to present an unrecognized tax benefit in the financial statements as a reduction to a deferred tax asset for those instances described above, except in certain situations described in the update. The provisions of this standard are effective for us on January 1, 2014, and should be applied prospectively to all unrecognized tax benefits that exist at the effective date. Early adoption and retrospective application are permitted. We are currently still evaluating

this impact of the update, but currently do not expect the adoption of this guidance to have a material impact on our consolidated financial statements.

In August 2014, the FASB issued Accounting Standards Update No. 2014-15, "Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern" requiring management to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern and to provide related footnote disclosures in certain circumstances. ASU 2014-15 is effective for annual and interim periods beginning after December 15, 2016 with early adoption permitted. The Company has provided additional financial statement disclosure in Note 3 - Going Concern and does not believe the adoption of this guidance will have a material impact on our consolidated financial statements.


**NOTE 3. GOING CONCERN**

As stated in Note 2, the Company's consolidated financial statements are prepared in conformity with U.S. GAAP, which contemplate continuation of the Company as a going concern. As of December 31, 2013, the Company had an accumulated deficit of $68.9 million, stockholders' equity of negative $11.5 million, and cash and cash equivalents of $2.6 million. These conditions, in addition to operating losses incurred, create uncertainty about the Company's ability to meet its ongoing obligations without the sale of its real estate assets.

Given the matters described above, recoverability of a major portion of the recorded asset amounts shown in the accompanying balance sheets depends on continued operations, the ability to succeed in future operations, and the timely sale of real estate assets. The financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classification of liabilities that might be necessary should the Company be unable to continue in business.

The Company's business model is to acquire properties that require operational attention, physical improvement, repositioning or capital restructuring. The stated investment strategy is to acquire, improve and hold assets while looking for an opportunistic exit, enabling the Company to achieve its risk/return objectives.  This business model relies on the acquisition, repositioning and sale of properties that require operational attention, physical improvement or capital restructuring.  The process of repositioning acquired assets sometimes results in near-term operating losses until the individual assets can be stabilized and brought to an optimal operating level.  Once this is achieved, the asset is targeted for disposition to recycle the Company's capital.  This process places an operational emphasis on asset dispositions to demonstrate profitability.

As of December 31, 2013, we had cash and cash equivalents of $2.6 million; our accounts payable and accrued liabilities totaled $8.9 million and $13.4 million, respectively. Approximately $53.69 million of our $263.39 million on notes payable which are outstanding as of December 31, 2013 will come due in 2014. In response to our liquidity challenges, we have developed a set of strategic objectives designed to increase cash flows from operating activities through the following initiatives:


• Increased revenues through new syndication activities


• Additional receivership assignments


• Increased third-party management services

• Reduced staffing and related operational expenses

Although there can be no assurances, management anticipates a partial impact on 2014 earnings and the full impact to be reflected thereafter.

As a means of generating liquidity to meet the Company's maturing debt obligations, management is increasing the pace of asset sales in 2014, and expects to continue the process into 2015. The current plan is to dispose of properties that will generate aggregate net sales revenue of approximately $57 million, reduce consolidated secured obligations by approximately $34 million, and provide liquidity to the Company.

Based upon the consolidated portfolio at the end of 2013, the Company had consolidated real estate assets with a recorded cost of $417.0 million before accumulated depreciation and amortization. The comparable cost of these dispositions, excluding any

43

reductions for depreciation and amortization, is anticipated to approximate $57.4 million, or 13.8% of the Company's real estate assets. Including the July 25, 2014 Dunham transaction ($59.9 million), the Company estimates dispositions in 2014 and 2015 totaling approximately $117.3 million, leaving gross consolidated assets of $299.7 million ($45.8 excluding VIE assets), or 71.9% (28.1% excluding VIE assets) of the Company's portfolio at the end of 2013, on a consolidated, gross cost basis.

Based on the Company's business model, the nature of the assets it has acquired, and its operations, management does not consider any of the actions described above to be outside the ordinary course of business. Although there can be no assurance that the Company's management will be successful in achieving any or all of these objectives, management believes that the steps outlined above will be effective in reducing the level of risk regarding the Company's ability to meet its ongoing obligations.

**NOTE 4. ACQUISITION ACTIVITIES**

During the fourth quarter of 2013, the Company entered into agreements with various third parties including Asset Managers, Inc., D&A Daily Mortgage Fund III, L.P., D&A Semi-Annual Mortgage Fund III, L.P., and D&A Intermediate-Term Mortgage Fund III, L.P. (collectively, "Dunham") to acquire a real estate portfolio consisting of 19 properties in California and Nevada ("Dunham Properties") for consideration, totaling approximately $84.8 million.

Under the the agreements, Dunham contributed the Dunham Properties to a newly formed Delaware limited liability company known as American Spectrum Dunham Properties, LLC (ASDP). The properties were contributed to ASDP on December 30, 2013 subject to existing indebtedness of approximately $17.2 million. In exchange for a 100% ownership interest in ASDP, the Company issued Dunham $67.5 million, or 16,870,609 shares (redemption value $4.00 per share) of 8% Cumulative Preferred Stock, Series B (the "Series B Preferred") (see Note 14 - Capital Structure, Series B Preferred).

In conjunction with this acquisition, Dunham agreed to loan the Company up to $6.0 million, and the Company issued warrants granting Dunham the right to acquire up to 600,000 shares of the Company's common stock at $2.00 per share (See Note 14 - Capital Structure, Warrants).

Subsequent to year-end, the Company initiated legal proceedings against Dunham for Dunham's non-performance under the loan commitment (see Note 20 - Subsequent Events, Acquisition Litigation). Pursuant to a settlement agreement reached in June of 2014, the Company sold back 14 of the original 19 Dunham Properties to Dunham, retaining a medical office building in Southern California, a single family

EXHIBIT "1"

residence in Northern California and three vacant parcels of land in San Diego County, California. Dunham's loan commitment was reduced from $6.0 million to $3.0 million, and the number of warrants issued was reduced from 600,000 to 300,000. The acquisition price for the five retained Dunham Properties is approximately $29.2 million, based upon the $20.1 million or 5,017,811 shares of Series B Preferred retained by Dunham, and the $9.1 million of existing debt secured by the medical office building. Under the terms of the amended agreement with Dunham, ASR has agreed that it will not finance or refinance any of the Properties acquired from Dunham if such financing or refinancing will result in outstanding secured debt which exceeds 40% of the allocated purchase price of such property.

The following is a summary of the Company's accounting for the 19 Dunham Properties:

- The 14 properties repurchased by Dunham in July 2014 have been recorded at their net realizable value, which is equal to the purchase price assigned in the December 30, 2013 transaction less disposition and legal costs of $0.85 million. As a result, there is no gain or loss to report upon the disposition of these assets in 2014.
- The single family residence and the three land parcels were recorded based upon the purchase price assigned in the December 30, 2013 transaction, which the Company believes approximates the respective fair values of these assets.
- The medical office building is treated as a separate business unit and is accounted for under ASC 805, which relates to the accounting and reporting of acquired business units. Based upon valuation guidelines established under ASC 820, the fair value of the medical office building was assessed to be $10.5 million at the time of the acquisition. The Company used a Level 3 valuation technique to determine the fair value utilizing cash flows and capitalization rates supported by third party pricing information. Inasmuch as the allocated purchase price exceeded the assessed fair value of the asset at the time of acquisition, such excess over the buildings associated fair value has been accounted for as goodwill in the amount of $6.1 million.

The Company's consideration for these assets included the assumption of mortgages and the issuance of shares of the Company's Series B Preferred shares (see Note 14 - Capital Structure, Series B Preferred). As a result of the mandatory redemption provisions, the Company has accounted for the Series B Preferred shares as debt rather than equity, as required under guidance from ASC 480.

44

Due to the short-term duration of the assumed notes payable, all assumed debt was recorded based upon the remaining principal amount of the debt at the transaction date. Secured notes payable related to the 14 repurchased assets were transferred back to Dunham in July 2014 under identical terms as the original purchase transaction in December of 2013. The remaining two notes payable were secured by the medical office building and had maturity dates of November 2014 and May 2015 for the $6.6 million and $2.5 million notes, respectively.

Consistent with the Company's practice of measuring stock option grants to employees and others (see Note 15- Share-Based Compensation), the fair value of the 600,000 warrants issued to Dunham was

determined using a Black-Scholes valuation methodology. Based upon the valuation model, the value of the warrants at the date of the Dunham transaction was zero.

## NOTE 5. ASSETS HELD FOR SALE

As of December 31, 2013, ASR had one wholly-owned property classified as held for sale in the amount of $2.87 million (net of accumulated depreciation of $1.49 million). The property, known as Windrose Plaza in Spring, Texas, was under a contract for sale as of December 31, 2013 and sold during January 2014 (see Note 20 - Subsequent Events, Asset Dispositions).

## NOTE 6. VARIABLE INTEREST ENTITIES

When the Company is considered the primary beneficiary of a VIE, the Company consolidates the VIE in its Consolidated Financial Statements after eliminating intercompany transactions and presenting interests the Company does not own as non-controlling interests in the consolidated balance sheets. The entities consolidated as of December 31, 2013 include 9 self-storage properties, 2 multifamily properties, 2 student housing properties and 7 commercial properties. The entities are generally financed through cash flows from property operations.

45

---

The Variable Interest Entities at December 31, 2013 were:

| Variable Interest Entity | | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Name | Percentage owned (%) | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied (%) | Rented Square Feet | Annualized Net Rent | Rent per Square Feet |
| Commerce Distributions Center | 1 | Commerce, CA | 200,000 | 100 | 200,000 | 1,098,662 | 5.49 |
| Dixon & 51st Logistics Center | — | Des Moines, IA | 731,169 | 100 | 731,169 | 2,128,026 | 2.91 |
| Ohio Commerce Center | — | Strongsville, OH | 204,592 | 100 | 204,592 | 2,391,907 | 11.69 |
| Springs Commerce Center I | — | OK,GA,SC,VA,PA | 1,006,993 | 100 | 1,006,993 | 2,414,566 | 2.40 |
| Springs Commerce Center II | — | GA,AL | 1,439,300 | 71 | 1,026,450 | 2,151,405 | 2.10 |
| Springs Office | — | Fort Mill/Lancaster, SC | 265,493 | 100 | 265,493 | 2,033,647 | 7.66 |
| Strongsville Corporate Center | 2 | Strongsville, OH | 125,006 | 100 | 125,006 | 2,076,643 | 16.61 |
| *Industrial/Commercial Properties* | | | 3,972,553 | 90 | 3,559,703 | 14,294,856 | 4.02 |
| | | | | | | | |
| Campus Court Student Housing | 11 | Cedar Falls, IA | 71,700 | 72 | 51,385 | 564,420 | 10.98 |
| Muirwood Village | — | Zanesville, OH | 157,864 | 96 | 150,933 | 1,563,060 | 10.36 |
| Ohio II - Residences at Newark & Sheffield | — | Newark/Circleville, OH | 203,453 | 94 | 191,738 | 1,847,945 | 9.64 |
| University Springs San Marcos | — | San Marcos, TX | 176,944 | 92 | 162,491 | 2,336,748 | 14.38 |
| *Multi-Family/Student Housing Properties* | | | 609,961 | 91 | 556,547 | 6,312,173 | 11.34 |
| | | | | | | | |
| Loop 1604 Self Storage | 38 | San Antonio, TX | 241,235 | 89 | 214,980 | 1,035,816 | 4.82 |
| Aldine Westfield Self Storage | — | Houston, TX | 64,530 | 94 | 60,655 | 507,971 | 8.37 |

EXHIBIT "1"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Attic Space Self Storage - Blanco Rd | — | San Antonio, TX | 51,805 | 88 | 45,595 | 507,971 | 11.14 |
| Attic Space Self Storage - Laredo Road | — | San Antonio, TX | 57,706 | 93 | 53,531 | 524,736 | 9.80 |
| Ft. Worth Northwest Self Storage | — | Fort Worth, TX | 63,025 | 81 | 51,200 | 487,185 | 9.52 |
| Ft. Worth River Oaks Self Storage | — | River Oaks, TX | 105,063 | 93 | 97,764 | 643,056 | 6.58 |
| Grissom Road Self Storage | — | San Antonio, TX | 262,180 | 78 | 203,426 | 651,003 | 3.20 |
| Houston South Mason (Patrick's) | — | Katy, TX | 56,850 | 94 | 53,350 | 502,236 | 9.41 |
| San Antonio 3 -Self Storage | — | San Antonio, TX | 264,840 | 89 | 234,756 | 1,632,761 | 6.96 |
| *Self-Storage Properties* | | | 1,167,234 | 87 | 1,015,257 | 6,492,735 | 6.40 |
| **Total Variable Interest Entity Properties** | | | 5,749,748 | 89 | 5,131,507 | 27,099,764 | 5.28 |

During the first quarter of 2013, the Company deconsolidated two VIEs after determining that ASR was no longer the primary beneficiary. The entities were Fishers Indiana, owner of a commercial property, and College Park, owner of a student housing property. The Company no longer manages or has continuing involvement with the properties owned by these entities.

During the third quarter of 2013, the Company deconsolidated one VIE after determining that ASR was no longer the primary beneficiary following the cancellation of the management contract for University Fountains Lubbock, a VIE-owned student housing entity. The Company no longer manages or has continuing involvement with this property.

During the first quarter of 2012, the Company deconsolidated one VIE due to the sale of Foxborough Business Park Center, a VIE-owned commercial property. ASR no longer manages or has continuing involvement with this property.

During the third quarter of 2012, the Company acquired two self-storage properties from Central Florida Self Storage Acquisitions, LLC, a previously consolidated VIE. The properties were acquired in lieu of foreclosure on related mortgage

notes ASR held. As the properties were under common control, they were recorded at their carryover basis. The differences between the carryover basis and the carrying amounts of the mortgages were recorded in stockholders' equity. Post-acquisition, the Company deconsolidated the remaining balances in the VIE after determining ASR was no longer the primary beneficiary. The Company no longer manages or has continuing involvement with this entity.

During the fourth quarter of 2012, the Company deconsolidated one VIE, due to the foreclosure of Charleston Blvd, a VIE-owned self-storage facility. The Company no longer manages or has continuing involvement with this property.

The impact of VIEs deconsolidated during 2013 on our 2013 Consolidated Financial Statements included a decrease in total assets of $68.8 million, a decrease in total liabilities of $55.0 million, and a decrease in noncontrolling interest of $13.8 million. The net income (loss) from operations attributable to non-controlling interests from VIEs deconsolidated was $0.1 million in income for 2013, and $1.3 million loss for 2012. The deconsolidation of the VIEs did not result in a gain or loss in the Consolidated Statement of Operations, as the carrying amount of the non-controlling interest in the former subsidiaries was the same as the carrying amount of the former subsidiary's assets minus liabilities at the date of the deconsolidation.

The Company owns an insignificant interest in most of the VIEs, and therefore all operations are included in the net income attributable to non-controlling interests.

The carrying amounts associated with the VIEs, after eliminating the effect of intercompany transactions, were as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2013** | **2012** |
| *Assets* | | |
| Cash and cash equivalents | $ 2,475 | $ 3,724 |
| Receivables | 3,781 | 2,988 |
| Fixed Assets, net | 214,100 | 290,549 |
| Other Assets | 7,668 | 8,600 |
| Total Assets | $ 228,024 | $ 305,861 |
| *Liabilities* | | |
| Accounts payable | 284 | 398 |
| Notes payable | 168,433 | 221,899 |
| Other liabilities | 5,773 | 6,759 |
| Total liabilities | $ 174,490 | $ 229,056 |
| | | |
| Variable interest entity net carrying amount | $ 53,534 | $ 76,805 |

At December 31, 2013, the liabilities in the above table are solely obligations of the VIEs and are not guaranteed by the Company. In addition, ASR does not have the ability to leverage the assets identified above for the purpose of generating additional liquidity for the Company. Because the notes payable are solely secured by the property of the respective VIEs, and the Company has not provided any guarantees, the Company does not believe it has significant exposure to losses related to the VIEs.

## NOTE 7. REAL ESTATE

47

The cost and accumulated depreciation of rental property held for investment as of December 31, 2013 and 2012 is as follows (in thousands):

| **2013** | **Land** | **Building and Improvements** | **Total Cost** | **Accumulated Depreciation** | **Net Recorded Value** |
|---|---|---|---|---|---|
| **ASR Owned** | | | | | |
| Office | $ 21,578 | $ 61,223 | $ 82,801 | $ (27,577) | $ 55,224 |
| Industrial | 883 | 1,303 | 2,186 | — | 2,186 |
| Retail | 4,022 | 4,416 | 8,438 | (1,195) | 7,243 |
| Self-Storage | 1,789 | 5,390 | 7,179 | (996) | 6,183 |
| Residential | 8,170 | 7,563 | 15,733 | — | 15,733 |
| Recreational Vehicle Resort | 3,573 | 5,412 | 8,985 | — | 8,985 |
| Land | 37,036 | — | 37,036 | — | 37,036 |

| | | Land | Building and Improvements | Total Cost | Accumulated Depreciation | Net Recorded Value |
|---|---|---|---|---|---|---|
| Other | | — | 696 | 696 | (612) | 84 |
| **Total ASR Owned** | | $ 77,051 | $ 86,003 | $ 163,054 | $ (30,380) | $ 132,674 |
| **VIE Properties** | | | | | | |
| Industrial | | $ 28,773 | $ 133,732 | $ 162,505 | $ (27,707) | $ 134,798 |
| Residential | | 5,424 | 47,283 | 52,707 | (8,533) | 44,174 |
| Self-Storage | | 17,171 | 21,545 | 38,716 | (3,588) | 35,128 |
| **Total VIE Properties** | | $ 51,368 | $ 202,560 | $ 253,928 | $ (39,828) | $ 214,100 |
| **TOTAL** | | $ 128,419 | $ 288,563 | $ 416,982 | $ (70,208) | $ 346,774 |

| **2012** | Land | Building and Improvements | Total Cost | Accumulated Depreciation | Net Recorded Value |
|---|---|---|---|---|---|
| **ASR Owned** | | | | | |
| Office | $ 28,500 | $ 62,787 | $ 91,287 | $ (28,881) | $ 62,406 |
| Industrial | 790 | 2,933 | 3,723 | (2,134) | 1,589 |
| Retail | 2,811 | 5,268 | 8,079 | (2,293) | 5,786 |
| Self-Storage | 1,789 | 5,390 | 7,179 | (770) | 6,409 |
| Other | — | 731 | 731 | (570) | 161 |
| Total ASR Owned | $ 33,890 | $ 77,109 | $ 110,999 | $ (34,648) | $ 76,351 |
| **VIE Properties** | | | | | |
| Industrial | 31,578 | 156,750 | 188,328 | (23,226) | 165,102 |
| Residential | 16,187 | 84,445 | 100,632 | (11,244) | 89,388 |
| Self-Storage | 17,171 | 21,545 | 38,716 | (2,657) | 36,059 |
| Total VIE Properties | $ 64,936 | $ 262,740 | $ 327,676 | $ (37,127) | $ 290,549 |
| **TOTAL** | $ 98,826 | $ 339,849 | $ 438,675 | $ (71,775) | $ 366,900 |

48

*Future Minimum Rents*

As of December 31, 2013, estimated future minimum rental income is as follows (in thousands):

| Year Ending December 31, | Future Minimum Rents | | |
|---|---|---|---|
| | ASR | VIE | Total |
| 2014 | $ 8,817 | $ 20,533 | $ 29,350 |
| 2015 | 6,313 | 14,273 | 20,586 |
| 2016 | 4,297 | 12,031 | 16,328 |
| 2017 | 2,360 | 10,469 | 12,829 |
| 2018 | 1,465 | 10,626 | 12,091 |
| Thereafter | 1,986 | 89,667 | 91,653 |
| **Total** | $ 25,238 | $ 157,599 | $ 182,837 |

*Acquired Lease Intangibles*

The Company allocates the purchase price of acquired properties to land, buildings and improvements, identifiable intangible assets, and to the assumed liabilities based on their respective fair values at the time

EXHIBIT "1"

of purchase. ASR also considers an allocation of purchase price of other acquired intangibles, including the value of the tenant relationships and the associated in-place leases.

When the Company allocates the purchase price of an acquired asset, a portion of the acquisition cost may be allocated to in-place lease costs. In-place lease costs include the value of tenant relationships and the costs to procure the existing leases. In determining the value of tenant relationships, the Company considers the expectation of lease renewals, nature and extent of the existing relationship with the tenant, prospects for developing new business with the tenant and the tenant's credit quality, among other factors. Amounts allocated to the value of in-place leases intangibles also include lease procurement costs such as the estimated carrying costs of the property during a hypothetical lease-up period, current market conditions and costs to execute similar leases such as commissions and legal costs to the extent that such costs are not already incurred with a new lease that has been negotiated in connection with the purchase of the property. Any intangible value associated with an in-place lease is amortized over the remaining term of the respective tenant leases, which currently range from one month to six years, and is charged to amortization expense.

The Company evaluates acquired "above and below" market leases at their fair value (using a discount rate which reflects the risks associated with the leases acquired), equal to the difference between: (i) the contractual amounts to be paid pursuant to each in-place lease, and (ii) management's estimate of fair market lease rates for each corresponding in-place lease. Estimates are measured over a period equal to the remaining term of the lease for above-market leases, and the initial term plus the term of any below-market fixed rate renewal options for below-market leases. Intangibles related to above-market leases are amortized over the remaining term of the respective tenant leases and recorded as a reduction of rental income. The Company currently has no intangible lease costs related to above-market leases. Acquired lease intangible liabilities related to below-market leases are accreted on a straight-line basis over the leases' remaining term including renewal options and such accretion is recorded as an increase to rental income. Accretion of below-market leases was approximately $0.3 million each for the years ended December 31, 2013 and 2012.

Intangibles for above-market and below-market leases and in-place lease intangibles are amortized/accreted over their estimated useful lives. In the event that a lease is terminated, the unamortized portion of each intangible, including market rate adjustments and in-place lease values are charged to expense.

The estimated aggregate rental income to be accreted for each of the next five years are as follows (in thousands):

| Year Ending December 31, | Accretion of Rental Income |
|---|---|
| 2014 | $    172 |
| 2015 | — |
| 2016 | — |
| 2017 | — |
| 2018 | — |
| Total | $    172 |

49

---

**NOTE 8. DISCONTINUED OPERATIONS**
**2013 Dispositions**

In August 2013, the lender for Morenci Professional Park foreclosed on the asset after the Company defaulted on the debt secured by the property. ASR chose to discontinue paying the $1.6 million debt as it exceeded the market value of the property. The property securing the debt was held by a consolidated, wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $0.2 million. No proceeds were received as a result of the transaction.

In August 2013, the Company deconsolidated the VIE that owned University Fountains at Lubbock (a student housing property) after determining ASR was no longer the primary beneficiary. The Company no longer manages or has a continuing involvement with this property. No loss or proceeds were recorded as a result of the transaction.

In July 2013, the lender for 1501 Mockingbird foreclosed on the asset after the Company defaulted on the debt secured by the property. ASR chose to discontinue paying the $3.1 million unpaid debt as it exceeded the market value of the property. The debt was held by a consolidated, wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a loss of $0.2 million. No proceeds were received as a result of the transaction.

In July 2013, 2620/2630 Fountain View, an office property located in Houston, Texas, was sold for approximately $8.9 million. The sale generated net proceeds of approximately $3.1 million to the property's partnership, in which the Company owns a 50% interest. The transaction generated a gain of $1.2 million. A portion of the total net proceeds is currently held in escrow due to a distribution dispute with the minority owner of the property. As a result, the Company holds the $2.8 million as restricted cash. Negotiations continue, but there can be no assurance that a favorable resolution will be obtained. The lawsuit is set for trial in December 2014.

In June 2013, the lender for the 11500 Northwest Freeway property foreclosed on the asset. ASR chose to discontinue paying the $3.9 million unpaid debt as it exceeded the market value of the property. The property securing the debt was held by a consolidated, wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a loss of $0.1 million. No proceeds were received as a result of the transaction.

During the first quarter of 2013, the Company deconsolidated two VIEs after determining that it was no longer the primary beneficiary. The entities were Fishers Indiana and College Park. ASR no longer manages or has a continuing involvement with properties owned by these entities. There was no gain nor loss associated with these deconsolidations.

**2012 Dispositions**

In November 2012, the lender for Charleston Boulevard Self-Storage foreclosed on the asset after the Company chose to discontinue paying the $2.6 million unpaid debt as it exceeded the market value of the property. The property securing the debt was held by a consolidated VIE which had not guaranteed the debt. The transaction generated a gain upon disposition of $0.5 million. No proceeds were received as a result of the transaction.

In October 2012, the Company sold Beltway Industrial Park for $20.7 million. The transaction generated a gain on sale of approximately $5.6 million. Net proceeds received from the sale amounted to approximately $1.8 million. The proceeds were primarily used to reduce debt.

In October 2012, ASR sold a property in receivership located at 8300 Bissonnet. In exchange for the sale, the Company was released from all liability on the note. The transaction generated a gain on sale of approximately $1.4 million. No proceeds were received as a result of the transaction.

The Company's preferred equity partner on 2855 Mangum acquired the mortgage loan from the property's lender and foreclosed on the asset in July 2012. The Company had elected to sell the property to its preferred equity partner in 2011. ASR chose not to pay debt as the mortgage balance exceeded the market value of the property. The property securing the debt was held by a consolidated subsidiary that had not

guaranteed the debt. The transaction generated a gain of approximately $0.01 million. No proceeds were received as a result of the transaction.

In April and May of 2012, lenders for the Bristol Bay and Pacific Spectrum properties notified the Company that they had foreclosed on the assets. The properties securing the debt were each held by consolidated, wholly-owned subsidiaries that had not guaranteed the debts. The transactions generated a gain upon disposition of approximately $2.9 million. No proceeds were received as a result of these transactions.

In March 2012, the Company sold Park Ten Place I and II for $10.7 million and Sierra Southwest Pointe for $3.9 million. These transactions generated a gain on sale of approximately $4.4 million. Net proceeds received from the sales amounted to approximately $3.0 million. The proceeds were used to reduce corporate bank debt by $2.0 million and other debt by $1.0 million.

50

---

In March 2012, the Company sold VIE-owned property Foxborough Business Park Center for $4.9 million. The transaction generated a loss of approximately $0.7 million. ASR had less than 1% ownership interest in the VIE. Net proceeds received from the sale amounted to $0.9 million, which was distributed to non-controlling interests.

In March 2012, the lender for the Atrium 6420 property foreclosed on the asset. The Company chose to discontinue paying the $6.3 million unpaid debt as the balance exceeded the market value of the property. The property securing the debt was held by a consolidated, wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain upon disposition of $0.9 million. No proceeds were received as a result of the transaction.

The consolidated statements of discontinued operations for the years ending December 31, 2013 and 2012 are summarized below:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In thousands) | |
| Rental Revenue | $ 4,798 | $ 16,503 |
| Operating Expenses (1) | (5,697) | (21,008) |
| Loss from discontinued operations before gain on dispositions and income tax expense | (899) | (4,505) |
| Gain on dispositions of real estate assets | 439 | 15,082 |
| Income tax expense | (194) | (4,083) |
| Income/(loss) from discontinued operations | $ (654) | $ 6,494 |

(1) Includes interest expense of approximately $1.3 million and $6.2 million for the years ending December 31, 2013 and December 31, 2012, respectively. Mortgage debt related to the property and included in discontinued operations was individually secured, and as such, interest expense is based on the property's debt.

Loss from discontinued operations for the year ended December 31, 2013 includes: the net gain from the dispositions of Morenci Professional Park, 1501 Mockingbird, 2620/2630 Fountain View and 11500 Northwest Freeway and the operating results of these properties through the date of disposition.

Income from discontinued operations for the year ending December 31, 2012 includes: the net gain resulting from the dispositions of Beltway Industrial Park, Park Ten Place I and II, Sierra Southwest Pointe,

Bristol Bay, Pacific Spectrum, 8300 Bissonnet, 2855 Mangum, 6420 Richmond, Foxborough Business Center Park, and Charleston Blvd, and the operating results of properties disposed of in 2012 and 2013.

## NOTE 9. ASSET IMPAIRMENTS

### Purchased Intangibles Subject to Amortization

During the years ended December 31, 2013 and 2012, contractual relationships were terminated or modified by entities that owned third party properties we manage. Based on this triggering event, we evaluated the management contracts associated with some of our purchased intangibles and determined that impairment had occurred. We recorded impairment charges of $1.8 million and $1.0 million for years ended December 31, 2013 and 2012, respectively, which reduced the fair value of the impaired contracts to zero (see Note 6 – Variable Interest Entities).

### Goodwill

In the fourth quarter of 2013, we performed an assessment of goodwill that indicated the carrying value of goodwill did not exceeded the related fair values. As a result of this assessment, the Company determined no impairment adjustment was required for the year ended December 31, 2013.

In conjunction with the acquisition of the Dunham Properties (see Note 4 - Acquisition Activities), the Company recorded goodwill totaling $6.1 million. Pursuant to the Company's policy for measuring goodwill impairment, the Company will perform an annual review of the goodwill associated with that acquisition.

### Real Estate Held for Investment

The Company's investments in real estate are carried at cost less accumulated depreciation and amortization, except when such values are determined by the Company's management to be impaired. Rental properties are individually evaluated for impairment when conditions indicate the carrying amount exceeds the sum of expected future undiscounted cash flows. Impairment indicators

51

---

for our rental properties are assessed by project and include significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. ASR assesses expected undiscounted cash flows based on numerous factors and estimates, including appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property, and our assumptions about the use of the asset. If multiple outcomes are under consideration, the Company includes a probability-weighted approach. Upon determination that impairment has occurred and the carrying amount exceeds future undiscounted cash flows, a write-down will be recorded to reduce the carrying amount to its estimated fair value (see Note 2 - Summary of Significant Accounting Policies, Assets Held for Investment).

During each of the years ended December 31, 2013 and 2012, the Company performed a quantitative analysis to test for the impairment on real estate held for investment, which indicated that no adjustments were required for either year.

## NOTE 10. FAIR VALUE MEASUREMENTS

The "*Fair Value Measurements and Disclosures*" Topic of the FASB ASC (Topic 820) defines fair value as the price to hypothetically sell an asset or transfer a liability in an orderly manner in the principle market for that asset or liability. Accounting standards prioritize the use of observable inputs in measuring fair

EXHIBIT "1"

value. Topic 820 also establishes a three-level fair value hierarchy that requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair value are:

Level 1—Quoted prices in active markets for identical assets or liabilities;

Level 2—Observable inputs other than quoted market prices in active markets for identical assets and liabilities, which include quoted prices for similar assets or liabilities in an active market and market-corroborated inputs; and

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

**Assets Measured at Fair Value on a Non-Recurring Basis**

The Company measures both goodwill and real estate assets held for investment for impairment of fair value using an income approach on a non-recurring basis. Using the income approach requires management to estimate the gross probable income for the reporting unit associated with the asset. Management then estimates and deducts from the gross probable income the estimated probable expenses required to generate such income. After the estimated probable expenses were deducted from the estimated gross probable income, the resulting estimated probable net income was discounted to determine the present value using a factor that management believes is reasonable. The assumptions used by management can have a significant impact on the value of identifiable assets, and can impact the value recorded. These assumptions are based on management's internal analysis and are not derived from an observable market. The assumptions would be considered Level 3 assumptions in the Fair Value Hierarchy. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of impairment expense, different assumptions could impact our statement of operations and the results of future impairment reviews.

During the twelve months ended December 31, 2013 and December 31, 2012, we performed quantitative analysis evaluations for impairment on goodwill and real estate held for investment. The evaluation showed no additional impairment charges were required.

**NOTE 11. RELATED PARTY TRANSACTIONS**

In January 2013, William J. Carden, president and a principal shareholder, loaned the Company $0.1 million at an annual interest rate of 10%. The Company's obligation to Mr. Carden was subsequently repaid in January of 2014, in conjunction with the sale of Windrose Plaza. The Company also pays a guarantee fee to Mr. Carden for his guarantee of certain obligations of the Company.  The guarantee fees range from an annual rate of 0.25% to 0.75% (depending on the nature of the guarantee) of the outstanding balance of the underlying guaranteed obligations.  As of December 31, 2013, Mr. Carden guaranteed a total of $11.2 million in notes on the Windrose, 2640/2650 Fountain View, and Northwest Spectrum Plaza properties, as well as multiple corporate notes. Guarantee fees earned by Mr. Carden for the year ended December 31, 2013 totaled approximately $0.08 million, of which $0.02 million was unpaid at December 31, 2013. During the year ended December 31, 2012, Mr. Carden provided loan guarantees for approximately $8.8 million in loans and received $0.16 million in loan guarantee fees.

During the years ended December 31, 2013 and 2012, ASR made credit card payments to American Express for Mr. Carden's personal expenses totaling $0.05 million and $0.03 million, respectively. Mr. Carden has agreed to repay the Company for personal expenses paid on his behalf. As of December 31, 2013, the net amount due from Mr. Carden after application of the unpaid guarantee fees was $0.06 million, which will continue to be offset by guarantee fees payable to Mr. Carden in 2014.

EXHIBIT "1"

As of December 31, 2012, Mr. Carden was the holder of 16,140 shares of the Company's 15% Cumulative Preferred Series A. Holders of the Company's Series A Preferred are entitled to receive all accumulated unpaid dividends plus a liquidation preference of $29 per share at the time of redemption. In conjunction with the purchase of the Dunham properties and the issuance of Series B Preferred shares on December 30, 2013 (see Note 4 - Acquisition Activities), the Company redeemed Mr. Carden's Series A Preferred on a one-for-one basis for 16,140 newly issued Series C Preferred shares. As of December 30, 2013, the date of the Dunham transaction, there were unpaid cumulative preferred dividends totaling $12.87 per share due on Mr. Carden's Series A Preferred Shares. The Series C Preferred issued to Mr. Carden have a liquidation preference of $41.87 per share, which represents the original Series A preference of $29 per share plus the associated unpaid dividends of $12.87 (see Note 14 - Capital Structure).

Mr. Carden also serves as president and a director of American Spectrum REIT I, Inc. For the years ended December 31, 2013 and 2012, the Company earned asset management and other fees for services rendered to American Spectrum REIT I, Inc. totaling $0.19 million and $0.20 million, respectively. As of December 31, 2013 and 2012, American Spectrum REIT I, Inc. owed ASR $0.42 million and $0.46 million, respectively, for unpaid asset management and other fees.

## NOTE 12. NOTES PAYABLE

We had the following outstanding notes payable, secured by the following properties, as of the periods indicated:

| Property (unless otherwise noted) | Maturity Date | December 31, | | | |
| | | 2013 | | 2012 | |
| | | Principal Balance | Interest Rate | Principal Balance | Interest Rate |
| | | (dollars in thousands) | | | |
| **ASR Owned - Fixed Rate:** | | | | | |
| Atrium 6430 (2) | 5/11/2012 | 2,074 | 7.45% | 2,050 | 7.45% |
| Corporate – Unsecured (2)(3)(20) | 5/31/2012 | 1,000 | 9.50% | 1,000 | 9.50% |
| 2640/2650 Fountain View (2)(3) | 8/29/2012 | 718 | 10.00% | 726 | 10.00% |
| Corporate - Secured by NW Spectrum Plaza (4) | 3/28/2013 | — | 5.50% | 1,145 | 5.50% |
| Corporate – Secured by Management Contracts (2)(3) | 6/5/2013 | 362 | 5.50% | 463 | 5.50% |
| 11500 Northwest Freeway (10) | 6/1/2014 | — | 5.93% | 3,861 | 5.93% |
| 11500 Northwest Freeway (10) | 6/1/2014 | — | 5.93% | 279 | 5.93% |
| Morenci Professional Park (1) | 7/1/2014 | — | 7.25% | 1,578 | 7.25% |
| FMC Technology | 9/1/2014 | 8,176 | 5.32% | 8,309 | 5.32% |
| Verdugo (16) | 11/1/2014 | 6,600 | 4.50% | * | * |
| Corporate – Secured | 1/1/2015 | 1,778 | 8.00% | 1,500 | 8.00% |
| Corporate – Secured (5)(17) | 1/1/2015 | 4,160 | 12.00% | * | * |
| 8100 Washington (19) | 2/22/2015 | 2,041 | 5.59% | 2,005 | 5.59% |
| Verdugo (16) | 5/22/2015 | 2,477 | 4.00% | * | * |
| 2620 - 2630 Fountain View (14) | 6/30/2015 | — | 7.00% | 5,341 | 7.00% |
| 1501 Mockingbird Lane (12) | 7/1/2015 | — | 5.28% | 3,089 | 5.28% |
| 5450 Northwest Central | 9/1/2015 | 2,432 | 5.38% | 2,499 | 5.38% |
| Ocala Self Storage | 10/3/2015 | 1,412 | 4.25% | 1,412 | 4.25% |
| Tampa Self Storage | 10/3/2015 | 1,451 | 4.25% | 1,504 | 4.25% |
| 800 & 888 Sam Houston Parkway (3) | 12/29/2015 | 4,223 | 6.25% | 4,289 | 6.25% |

| | | | | | |
|---|---|---|---|---|---|
| 2401 Fountain View Office Tower | 3/1/2016 | 11,446 | 5.82% | 11,540 | 5.82% |
| Florida (16) | 1/15/2016 | 5,906 | 4.50% | * | * |
| Florida (16) | 1/15/2016 | 999 | 5.75% | * | * |
| Gray Falls and 12000 Westheimer | 1/1/2017 | 7,012 | 5.70% | 7,077 | 5.70% |
| 2640 - 2650 Fountain View (2) | 4/29/2018 | 11,914 | 6.50% | 12,010 | 6.50% |
| Murrieta Plaza (16) | 6/1/2018 | 1,185 | 4.50% | * | * |
| Sabo Road Self Storage | 7/1/2022 | 1,977 | 5.55% | 2,015 | 5.55% |
| Corporate – Unsecured | Various | 3,779 | Various | 1,514 | Various |
| Corporate - Secured | Various | 1,030 | Various | 1,163 | Various |
| | Subtotal | $ 84,152 | | $ 76,369 | |

53

| | | December 31, | | | |
|---|---|---|---|---|---|
| | | **2013** | | **2012** | |
| **Property (unless otherwise noted)** | **Maturity Date** | **Principal Balance** | **Interest Rate** | **Principal Balance** | **Interest Rate** |
| **ASR Owned - Variable Rate** | | (dollars in thousands) | | | |
| Corporate – Unsecured (3)(21) | 12/12/2013 | 125 | 6.00% | 175 | 6.00% |
| Corporate – Secured by Management Contracts (15) | 12/31/2015 | 2,400 | 3.25% | 9,380 | 5.00% |
| Northwest Spectrum Plaza (3)(6) | 3/29/2018 | 4,490 | 5.00% | 2,381 | 2.66% |
| Windrose Plaza (3)(7) (18) | 2/27/2023 | 3,794 | 5.50% | 2,458 | 2.66% |
| | Subtotal | $ 10,809 | | $ 14,394 | |
| ASR Principally Owned Properties | | 94,961 | | 90,763 | |
| **Consolidated VIEs** | | | | | |
| Fishers Indiana Distribution Center (8) | 10/1/2012 | — | 5.42% | 17,058 | 5.42% |
| University Springs San Marcos | 12/1/2015 | 9,204 | 5.55% | 9,359 | 5.55% |
| University Fountains Lubbock (13) | 1/1/2016 | — | 5.57% | 20,828 | 5.57% |
| Dixon & 51st Logistics Center | 1/1/2016 | 16,959 | 5.69% | 17,258 | 5.69% |
| Campus Court Student Housing | 5/11/2016 | 4,405 | 5.78% | 4,617 | 5.78% |
| Houston South Mason (11) | 6/25/2016 | 2,796 | 5.96% | 2,817 | 5.25% |
| San Antonio III - AAA Stowaway / FOE (17) | 4/5/2017 | 1,435 | 14.00% | * | * |
| Grissom Road Self Storage | 6/1/2017 | 2,281 | 8.00% | 2,308 | 7.00% |
| Loop 1604 Self Storage | 9/11/2017 | 4,195 | 6.70% | 4,249 | 6.70% |
| College Park Student Apartments (8) | 11/6/2017 | — | 6.35% | 14,283 | 6.35% |
| Ohio II Residences at Newark & Sheffield | 1/1/2018 | 9,232 | 6.74% | 9,334 | 6.74% |
| Muirwood Village | 2/1/2018 | 7,614 | 6.58% | 7,708 | 6.58% |
| Aldine Westfield Self Storage | 10/31/2018 | 1,002 | 4.76% | 1,031 | 4.76% |
| Aldine | 8/14/2019 | 1,141 | 6.07% | 1,171 | 6.07% |
| Attic Space Self Storage - Blanco Rd. | 4/1/2021 | 1,300 | 6.63% | 1,300 | 6.63% |
| Attic Space Self Storage - Laredo Rd. | 4/1/2021 | 1,668 | 6.63% | 1,721 | 6.63% |
| Ft. Worth River Oaks Self Storage | 7/1/2021 | 2,078 | 6.00% | 2,118 | 6.00% |
| Ft. Worth Northwest Self Storage | 4/1/2022 | 2,086 | 5.82% | 2,125 | 5.82% |

EXHIBIT "1"

| | | | | | |
|---|---|---|---|---|---|
| San Antonio III - AAA Stowaway / FOE | 11/1/2022 | 9,454 | 5.50% | 9,635 | 5.50% |
| Commerce Distribution Center (9) | 5/7/2023 | 9,732 | 4.68% | 9,402 | 6.12% |
| Strongsville Corporate Center | 11/11/2034 | 13,542 | 5.50% | 13,882 | 5.50% |
| Ohio Commerce Center | 6/11/2035 | 18,075 | 5.64% | 18,412 | 5.64% |
| Springs Commerce Center 1 | 5/11/2036 | 16,226 | 5.75% | 16,548 | 5.75% |
| Springs Office | 6/11/2036 | 14,025 | 5.75% | 14,301 | 5.75% |
| Spring Commerce Center II | 7/11/2036 | 19,729 | 6.00% | 20,100 | 6.00% |
| Other Unsecured Notes | Various | 254 | Various | 334 | Various |
| Subtotal VIE | | $168,433 | | $ 221,899 | |
| | | | | | |
| **Grand Total** | | $263,394 | | $ 312,662 | |

* Notes originated during the year ended December 31, 2013

(1) Lender foreclosed on the property in August 2013.

(2) As of December 31, 2013 the Company was in negotiations with the lender; however, in April 2014, Atrium 6430 was foreclosed on, and in June 2014, 2640/2650 Fountain View was sold.

(3) Loan or certain indemnification obligations are guaranteed by the Company, and in some cases by Mr. Carden.

(4) Loan was paid in March 2013.

(5) Represents new loan obtained in March 2013.

(6) Loan was refinanced in March 2013.

(7) Loan was refinanced in February 2013.

(8) The VIE that owned the property was deconsolidated during the first quarter of 2013.

(9) Loan was refinanced in May 2013; the new loan, of $9.9 million, is for a 10-year term at an interest rate of 4.68%.

(10) Lender foreclosed on the property in June 2013.

(11) Lender extended maturity for an additional three-year term in June 2013.

(12) Lender foreclosed on the property in July 2013.

(13) The VIE that owned the property was deconsolidated in the third quarter of 2013.

(14) Loan was paid in connection with the sale of the property in July 2013.

(15) Represents new loan obtained through a settlement agreement with Evergreen, effective December 2013.

(16) Represents assumed debt associated with the acquisition of Dunham properties in December 2013 for an aggregate amount of $17.2 million.

(17) March 2013, $1.8 million loan was increased to $5.6 million in the fourth quarter of 2013 for - $4.2 million of which is for Dansk Investment Group, and $1.4 million is for San Antonio III - AAA Stowaway.

(18) Classified as 'Note Payable on Assets Held for Sale' within the Consolidated Balance Sheet as of December 31, 2013; loan was paid in connection with the sale of the property in January 2014.

(19) Loan was paid in connection with the sale of the property in October 2014.

(20) Lender had initiated legal proceedings to collect; as of October 24, 2014, negotiation are in progress to settle this debt.

(21) Loan was paid in October 2014.

The notes payable within the table above are classified within the Consolidated Balance Sheets as follows (in thousands):

| | Year ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| Notes payable | $        259,600 | $        312,662 |
| Notes payable on assets held for sale | 3,794 | — |
| | $        263,394 | $        312,662 |

Notes payable on assets held for sale represents debt on a single property, Windrose Plaza, which was under a contract for sale as of December 31, 2013 (see Note 5. - Assets Held For Sale). Such debt was paid upon the sale of the property in January 2014.

As of December 31, 2013, the required principal payments on our consolidated debt for the next five years and thereafter are as follows (in thousands):

| Year | ASR | VIE | Total |
|------|----:|----:|------:|
| 2014 | $ 39,071 | $ 14,614 | $ 53,685 |
| 2015 | 10,235 | 12,437 | 22,672 |
| 2016 | 5,054 | 25,456 | 30,510 |
| 2017 | 11,442 | 8,961 | 20,403 |
| 2018 | 529 | 10,429 | 10,958 |
| Thereafter | 28,630 | 96,536 | 125,166 |
| Total | $ 94,961 | $ 168,433 | $ 263,394 |

As of December 31, 2013, we were in default on the notes listed below:

| Property Secured by: | ASR Ownership Percentage (%) | Amount |
|------|----:|----:|
| | | (in thousands) |
| Atrium 6430 (1) | 100 | $ 2,074 |
| 2640/2650 Fountain View (1) | 100 | 12,632 |
| 800/888 Sam Houston Parkway (2) | 100 | 4,223 |
| 2401 Fountain View Office Tower (2) | 50 | 11,446 |
| Northwest Spectrum Plaza (2) | 100 | 4,490 |
| Corporate - Unsecured (3) | 100 | 1,125 |
| Total (4) | | $ 35,990 |

(1) Refer to Note 20 - Subsequent Events - Asset Dispositions.

(2) Refer to Note 20 - Subsequent Events - Actions Affecting Creditors.

(3) Comprised of a $1.0 million Corporate unsecured note - lender had initiated legal proceedings to collect; as of October 29, 2014, negotiation are in progress to settle this debt; and a $0.13 million Corporate unsecured note which matured in May 2012 and paid during October 2014.

(4) Excludes additional fees and interest that may be occurred as a result of non-payment.

All of the properties securing debt which is in default are held by consolidated wholly owned subsidiaries. These mortgages are not guaranteed by the Company. All of the notes which are in default have acceleration clauses which require payment in full, including additional fees and interest, payable to the lenders holding these notes.

During September 2013, the Company negotiated with certain vendors and creditors for extended payment terms and discounted amounts on certain accounts payable. The negotiations resulted in three promissory notes in the aggregate amount of $1.1 million with an annual interest rates of 6%. As of October 24, 2014, such promissory notes have been paid in full.

On January 14, 2014, the Company entered into an agreement to settle all outstanding disputes and litigation related to the 2010 acquisition of assets and business interests from Evergreen Realty Group, LLC and affiliates ("Evergreen"). Under the terms of the settlement, made retroactive to December 31, 2013, the Company agreed to:

- Pay cash in the amount of $0.25 million at the time of the settlement;

- Replace the existing note payable in the amount of $9.38 million with a new note payable in the amount of $2.15 million with $0.03 million installment payments due on the first of each month beginning in February 2014 with interest at the prime rate as published in the Wall Street Journal on the last day of the prior month. The note is due in full on December 31, 2015; and

- In addition, the Company agreed to pay to Evergreen 50% of any net disposition fees received by the Company resulting from the sale of properties which the Company manages as a result of the 2010 Evergreen acquisition transaction. Such net disposition fees are payable to Evergreen as a reduction of the outstanding principal on the $2.15 million note may not be used by the Company to reduce the monthly payments due under the Note until all principal is repaid in full.

The net gain on the Evergreen settlement was computed as follows:

|  | Year ended December 31, 2013 |
| --- | --- |
|  | (dollars in thousands) |
| Notes Payable | $ 9,380 |
| Accrued Interest | 947 |
| Due from Evergreen | (1,428) |
| Legal and other costs | (291) |
| Total | $ 8,608 |
|  |  |
| Settlement amount: |  |
| Cash | $ 250 |
| Note Payable | 2,150 |
| Total | 2,400 |
|  |  |
| Net gain (1) | $ 6,208 |

(1) Reflected in the Consolidated Statement of Operations for the year ended December 31, 2013 within gain on extinguishment of debt, $10,327; loss on litigation settlement, $3,928; and corporate general and administrative (legal expenses), $191.

Unamortized financing costs at December 31, 2013 and December 31, 2012 were $1.4 million and $0.8 million, respectively.

## NOTE 13. NONCONTROLLING INTERESTS AND OPERATING PARTNERSHIP UNITS

The Company primarily conducts business operations through American Spectrum Realty Operating Partnership, L.P., a Delaware limited partnership (the "Operating Partnership") (see Note 1 - Business

Overview). ASR is the sole general partner of the Operating Partnership, and holds the majority of the limited partnership interests (units). As the sole general partner of the Operating Partnership, the Company exclusively manages and directs the operating activities of the Operating Partnership. Operating Partnership units ("OP Units") that are not owned by the Company are exchangeable for shares of common stock on a two-for-one basis, or for cash equal to the value of such stock at our sole discretion.

56

---

The following table summarizes the activity for the operating partnership units, (in thousands):

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | (shares in thousands) | | | |
| **Balance, beginning of period** | $ | 3,819 | $ | 4,588 |
| Issuances | | 145 | | 49 |
| Redemptions | | (13) | | (818) |
| **Balance, end of period** | $ | 3,951 | $ | 3,819 |

| **Ownership of Operating Partnership Units** | | | | | |
|---|---|---|---|---|---|
| ASR | $ | 3,703 | 94% | $ 3,568 | 93% |
| All others | | 248 | 6% | 251 | 7% |
| | $ | 3,951 | 100% | 3,819 | 100% |

In 2010, the Company acquired certain assets and business interests from Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen"). A portion of the consideration paid to Evergreen included 800,000 OP Units. During the second quarter of 2012, the Operating Partnership redeemed and retired the 800,000 OP Units issued to Evergreen for $1.

The following represents the effects of changes in the Company's equity related to noncontrolling interests:

| | Year ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (shares in thousands) | |
| Net income (loss) attributable to the Company | (13,769) | 1,414 |
| Increase in the Company's paid-in-capital on exchange of OP Units for shares of common stock | 21 | 1,711 |
| Increase in the Company's paid-in-capital on redemption of OP Units for cash | — | 8,013 |
| Change from net income (loss) attributable to the Company related to noncontrolling interest transactions | (13,748) | 11,138 |

57

---

**NOTE 14. CAPITAL STRUCTURE**

**Common Shares**

The Company is authorized to issue up to 100.0 million shares of common stock with a par value of $.01 per share. As of December 2013, the Company had 3,703,142 shares of its common stock outstanding. The Company's initial dividend was declared and paid to the common shareholders in 2003. No dividends have since been declared or paid, and the Company has no plan to pay dividends to holders of the Company's common stock in the foreseeable future.

The Company's Board of Directors has a policy of meeting on or about the 40th day after the end of each calendar quarter to consider the declaration and payment of dividends on common stock.

Prior to 2011, the Company repurchased 471,350 shares of its common stock. Common stock held by the Company and not retired, is treated as treasury stock under the cost method. As of December 31, 2013 and 2012, the Company was holding 471,350 shares at an average cost of $6.57 per share. The Company has no current plan to acquire additional shares of its common stock.

**Warrants**

In conjunction with the acquisition of the Dunham Properties (see Note 4 - Acquisition Activities), the Company issued Dunham warrants to purchase up to 600,000 shares of the Company's common stock at a price of $2.00 per share. The Company uses a Black-Scholes valuation methodology to assess the fair value of its warrants and stock options. Based on the results of the Black-Scholes analysis performed as of December 31, 2013, the fair value of the warrants is zero.

**Preference Shares**

The Company is authorized to issue up to 25.0 million shares of one or more classes or series of preferred stock with a par value of $.01 per share. The Company's Board of Directors has the right to classify and designate preference shares which are authorized but unissued. In conjunction with the designation and issuance of preference shares, the Board of Directors establishes the share preferences and rights of the holders including (i) conversion and other rights, (ii) voting powers, (iii) restrictions, (iv) limitations as to dividends and other distributions, (v) qualifications, and (vi) terms and conditions of redemption. As of December 2013, the Company had three classes of preferred stock outstanding.

**Series A Preferred Stock**

On December 30, 2008, the Company's Board of Directors authorized the issuance of up to 68,965 shares of Series A Preferred Stock (Series A Preferred). On December 31, 2008, the Company issued 55,170 shares of the Series A Preferred in a private transaction exempt from registration pursuant to Section 4(2) of the Securities Act of 1933, as amended. Each share of Series A Preferred was sold for $29 and the holders are entitled to annual dividends, payable quarterly, at an annual rate of 15%, and to a preference on liquidation equal to the following: (a) if on or prior to December 31, 2011, the sum of $29 and any accrued and unpaid dividends or (b) if after December 31, 2011, the greater of (x) the sum of $29 and any accrued and unpaid dividends or (y) the amount which would be paid on account of each share of common stock upon liquidation if each share of Series A Preferred had been converted into one share of common stock. The Series A Preferred is not required to be redeemed by the Company and the holders will have no right to require redemption. The Series A Preferred is redeemable at the option of the Company at any time after December 31, 2011. As of December 2013 and 2012, the number of outstanding shares of Series A Preferred was 18,390 and 55,170, respectively. Dividends in arrears on Series A Preferred at December 31, 2013 totaled $0.24 million.

**Series B Preferred Stock**

On December 27, 2013, the Company's Board of Directors authorized the issuance of up to 17,000,000 shares of Series B Preferred Stock (Series B Preferred). On December 30, 2013, the Company issued 16,870,609 shares of the Series B Preferred to Dunham (see Note 4 - Acquisition Activities) in exchange for a 100% ownership in the equity of ASDP. Each share of Series B Preferred has a liquidation value of

EXHIBIT "1"

$4.00. The Series B Preferred shares earn a dividend, calculated as simple interest, at a rate of 8% from issue date through December 31, 2014, and thereafter at a rate of 12%. Fifty percent of the dividends accruing on or before December, 31, 2014 are payable monthly and the unpaid portion becomes payable in one lump sum on December 1, 2015 plus any additional dividends attributable to such unpaid amounts as described below. Holders of Series B Shares are entitled to receive additional dividends equal to the amount of the unpaid 50% dividends beginning on the date such dividend should have been paid at a rate of 8% through December 31, 2014, and thereafter at a rate of 12% until such dividends are paid in full. All earned dividends are payable on the first business day of the following month.

Pursuant to Series B Preferred designation and the Dunham agreements, the Company is obligated to redeem the Series B Preferred pro rata as follows: (i) $17,000,000 (approximately 25% of the outstanding Series B Preferred), less any "Adjustments" (defined below as Sale Payments and Debt Payments) received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before December 1, 2014, (ii) $17,000,000, less any Adjustments received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before June 1, 2015, and (iii) the remainder of the liquidation preference less any Adjustments will be paid to fully redeem all the remaining outstanding share of the Company's

58

---

Series B Preferred on or before December 1, 2015. The redemption price payable to holders of the Company's Series B Preferred will be adjusted for all accrued and unpaid dividends with respect to such shares.

For purposes of determining the redemption amounts payable as described above, the term "Adjustments" as used in the preceding paragraph and refers to proceeds received by the Company as follows:

1. Sale Payments. A Sale Payment includes proceeds received by the Company as the result of the sale of a property previously acquired from Dunham (see Note 4 - Acquisition Activities). At the time of such sale, the Company is obligated to pay, pro rata to the holders of the Company's outstanding Series B Preferred, additional amounts which are determined with reverence to the gross selling price of the Property and the amount paid to Dunham. If the gross selling price exceeds the amount paid to Dunham, then the Adjustment payable to holders of the Company's Series B Preferred is equal to 50% of the difference between the amount paid to Dunham for the property and any existing secured indebtedness on the property being sold. If the gross selling price is less than the amount paid to Dunham, then the Adjustment payable to holders of the Company's Series B Preferred is equal to 50% of the difference between the gross selling price and any existing secured indebtedness on the property being sold. Adjustments paid to holders of the Company's Series B Preferred, will reduce, on a dollar-for-dollar basis the amounts payable to redeem shares of the Company's Series B Preferred. To the extent that one or more properties are sold for less than the amount paid to Dunham on December 30, 2013, such "Deficit" shall accumulate and be payable 100% pro rata to holders of the Company's Series B Preferred from the proceeds payable to the Company resulting from future sales of Dunham Properties whenever such gross selling price exceeds the purchase price paid to Dunham.

2. Debt Payments. An Adjustment also includes any increase in indebtedness in excess of $250,000 on any property in which ASR owns 25% or more of the equity. The proceeds of any borrowings in excess of $250,000 are required to be paid pro rata to the holders of Series B Preferred and Series C Preferred under the terms of the Series B Preferred Articles Supplementary and the Dunham agreements.

EXHIBIT "1"

In addition to the redemption amounts described above, the Company is obligated to pay, pro rata to the holders of the Company's outstanding Series B Preferred, additional amounts which are described in the Dunham agreements as "Participation Payments". Participation Payments are equal to 25% of any excess of the gross selling price over the purchase price paid to Dunham after reducing such excess selling price for any capital improvements and selling expenses. Amounts paid as Participation Payments are in addition to any dividends and redemption amounts due to holders of the Company Series B Preferred shares. Such Participation Payments are agreed to survive the redemption of the Company's Series B Preferred and shall be payable until such time as all Dunham Properties have been sold notwithstanding the full redemption of all outstanding shares of the Company's Series B Preferred.

Payment of dividends and redemption of the Series B Preferred shares are mandatory under the terms of the Dunham agreements and the Company's Articles Supplementary for the designation and issuance of the Series B Preferred. To the extent that the Company does not declare and pay the dividends and does not provide for the timely redemption of the Series B Preferred as described above, holders of the Company's Series B Preferred shares are entitled to receive default dividends at a rate of 15% from the date of such default to the date of such payment or redemption. In addition, uncured defaults allow the holders of the Series B Preferred shares to gain a majority of the members of the Board of Directors.

**Series C Preferred Stock**

On December 27, 2013, the Company's Board of Directors authorized the issuance of up to 55,170 shares of Series C Preferred Stock (Series C Preferred). On December 30, 2013 and in connection with the Company's issuance of the Series B Preferred, the Company converted 36,780 shares of the Series A Preferred shares on a one-for-one basis into Series C Preferred shares with a liquidation value equal to $41.87 per share. The liquidation value of Series C Preferred was determined based upon the $29 liquidation preference for the Series A Preferred plus the accumulating and unpaid Series A Preferred dividends which at the time of conversion were equal to $12.87 per share. Mr. William Carden, the Company's President, CEO and holder of 16,140 shares of Series A Preferred converted all of his Series A Preferred into shares of the Company's newly issued Series C Preferred.

The Series C Preferred shares earn a dividend, calculated as simple interest, at a rate of 8% from issue date through December 31, 2014, and thereafter at a rate of 12%. Fifty percent of the dividends accruing on or before December 31, 2014 are payable monthly and the unpaid portion becomes payable in one lump sum on December 1, 2015 plus any additional dividends attributable to such unpaid amounts as described below. Holders of Series C shares are entitled to receive additional dividends equal to the amount of the unpaid fifty percent dividends beginning on the date such dividend should have been paid at a rate of 8% through December 31, 2014, and thereafter at a rate of 12% until such dividends are paid in full. All earned dividends are payable on the first business day of the following month.

59

Pursuant to Articles Supplementary for the designation of the Series C Preferred, the Company is obligated to redeem the liquidation preference of $41.87 per share as follows: (i) approximately $10.47 per share less any Debt Payments received by the holders of Series C Preferred will be paid payable on December 1, 2014; (ii) approximately $10.47 per share less any Debt Payments on June 1, 2015; and (iii) the remainder of the $41.87 liquidation preference on December 1, 2015 in redemption of the remaining amount of any outstanding Series C Preferred.

EXHIBIT "1"

Debt Payments referred to in the paragraph above with respect to redemption of the Series C Preferred includes the proceeds from Company borrowings in excess of $250,000 which are required to be paid pro rata to the holders of Series B Preferred and Series C Preferred under the terms of the Series B Preferred Articles Supplementary and the Dunham agreements.

Pursuant to ASC 480, the provisions of the Series B Preferred and Series C Preferred which place an unconditional obligation on the Company to redeem the shares for a sum certain on a specific date, have the primary characteristics of a debt instrument and therefore the Company has classified these shares on the Consolidated Balance Sheet as debt rather than equity. Amounts payable as dividends are accordingly reflected in the Company's Consolidated Statement of Operations as an item of interest expense rather than being treated as a preferred dividend. There are no conversion rights available to holders of Series B Preferred or Series C Preferred.

The Series B Preferred and Series C Preferred shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

**NOTE 15. SHARE-BASED COMPENSATION**

The Company grants nonqualified incentive and stock options and restricted stock awards (RSAs) to employees, consultants and directors under the Omnibus Stock Incentive Plan ("the Plan"). Stock options expire 10 years from the date they are granted and generally vest over service periods that range over three to four years. New shares are issued for options exercised and RSAs released. RSAs give the recipient the right to vote all shares, to receive and retain all cash dividends payable to holders of shares of record on or after the date of issuance, and to exercise all other rights, powers and privileges of a holder of our shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to three years. The Company has reserved 360,000 shares under the Plan. As of December 31, 2013, the Company had issued 132,780 shares under the Plan.

The Company measures share-based compensation based on the fair value of the option or RSA at the grant date. The fair value associated with share-based grants is recognized as expense over the requisite service/vesting period.

- The fair value of each option award is estimated on the date of grant using the Black-Scholes valuation model, consistent with the provisions of ASC 718. The Black-Scholes option-pricing model was developed for use in estimating the fair value of short-lived exchange traded options that have no vesting restrictions and are fully transferable. The determination of fair value using the Black-Scholes valuation model is affected by the Company's stock price, the price volatility of the Company's stock as well as by the input of highly subjective assumptions, including the option's expected life and a combination of other highly complex and subjective variables. No stock options were granted during the twelve month periods ending December 31, 2013 and 2012. All of the issued and outstanding stock options at December 31, 2011 expired during 2012, therefore, no options were outstanding at December 31, 2013.

- The fair value of each RSA is estimated based on the closing price of our stock on the grant date. Share-based compensation expense related to RSAs is recognized over the requisite service period. The RSAs had no intrinsic value as of December 31, 2013.

During the years ended December 31, 2013 and 2012, the Company granted 145,000 and 7,000 RSAs to certain officers and employees, respectively. The value of the restricted stock awards was based on the closing market price of the Company's common stock on the date of each award. The aggregate fair value

EXHIBIT "1"

of the RSAs granted during the year ended December 31, 2013 and 2012 was approximately $0.4 million and $0.03 million, respectively. The stock compensation expense related to the awards issued during the year ended December 31, 2013 was recognized entirely during the 2013 fiscal year as the awards were immediately vested upon the date of grant or, at a later date, upon the election of the award recipient. The stock compensation expense related to the RSAs issued during the year ended December 31, 2012 will be recognized over the vesting periods ranging from three to five years from the date of grant. The expense recorded for the years ended December 31, 2013 and 2012 was approximately $0.4 million and $0.2 million, respectively. As of December 31, 2013, unrecognized share-based compensation totaled approximately $0.1 million and related to non-vested RSAs which are expected to be recognized over the remaining respective vesting periods with a weighted average of approximately 1.6 years.

The following table summarizes the combined activity under the equity incentive plans for the indicated periods:

60

| | Number of Options Outstanding | Weighted Average Exercise Price per Share ($) | Number of Unvested RSAs | Weighted Average Grant-date Fair Value per Share ($) |
|---|---|---|---|---|
| Balances at December 31, 2011 | 17,500 | 7.03 | 49,008 | 15.96 |
| Granted | — | — | 7,000 | 3.68 |
| Options Exercised | — | — | | — |
| RSA Releases | — | — | (16,934) | 15.01 |
| Forfeited/Expired | (17,500) | 5.58 | (17,004) | 14.98 |
| Balances at December 31, 2012 | — | — | 22,070 | 13.54 |
| Granted | — | — | 145,000 | 2.25 |
| RSA Releases | — | — | (149,328) | 2.47 |
| Forfeited/Expired | — | — | (11,068) | 16.20 |
| Balances at Dec 31, 2013 | — | — | 6,674 | 10.37 |

**Awards to Non-Employees**

In January 2012, we issued 41,910 shares of common stock to a firm as consideration for legal services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $0.2 million in services. No other shares were awarded to non-employees during the year ended December 31, 2013.

**NOTE 16. NET LOSS PER SHARE**

Net income (loss) per share is calculated based on the weighted average number of common shares outstanding. Stock options outstanding, OP Units and preferred shares have not been included in the net loss per share calculation, as their effect on the losses would be antidilutive. Net income (loss) per share for each of the two years ended December 31, 2013 and 2012 is as follows (in thousands, except for shares and per share amounts):

| | Year ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| Loss from continuing operations | $ (14,529) | $ (8,279) |
|     Loss attributable to noncontrolling interests from continuing operations | 1,482 | 2,804 |
| Loss from continuing operations, including noncontrolling interest | (13,047) | (5,475) |
| Discontinued operations: | | |
|     Loss from discontinued operations | (899) | (4,505) |
|     Gain on disposition discontinued operations | 439 | 15,082 |
|     Income tax expense | (194) | (4,083) |
|     Income attributable to noncontrolling interests from discontinued operations | (69) | 395 |
|     Income (loss) from discontinued operations, including noncontrolling interest | (723) | 6,889 |
| | | |
| Preferred stock dividend | (240) | (240) |
| | | |
| Net Income (loss) attributable to ASRealty, Inc. common stockholders | $ (14,009) | $ 1,174 |
| | | |
| Basic and diluted per share data: | | |
| Loss from continuing operations attributable to ASR, Inc. common stockholders | $ (3.68) | $ (1.60) |
| Income from discontinued operations attributable to ASR, Inc. common stockholders | (0.20) | 1.93 |
| Net income attributable to ASR, Inc. common stockholders | $ (3.88) | $ 0.33 |
| | | |
| Basic and diluted weighted average shares used | 3,610,243 | 3,569,032 |

The earnings per share for the year ended December 31, 2012 differs from what was previously reported for that period. Prior disclosures for the year ended December 31, 2012 erroneously reflected net income per share of $0.40. The current presentation corrects the computational error.

The following weighted average preferred shares, stock options and OP units outstanding that can be converted into shares of common stock were excluded from the computation of diluted net income per share as they had an anti-dilutive effect:

| | Year ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| Series A Preferred | 54,970 | 55,170 |
| Stock options | — | 16,042 |
| OP Units | 249,263 | 518,982 |

| | | | |
|---|---|---|---|
| Total | | 304,233 | 590,194 |

In 2013, 36,780 shares of the Preferred Series A stock were converted into Preferred Series C stock, which is classified as a long-term liability, with no conversion feature. As of December 31, 2013 the Company had 18,390 shares of Preferred Series A outstanding (see Note 14. - Captial Structure for additional details related to the conversion of certain Series A Preferred stock).

**NOTE 17. INCOME TAXES**

For the years ended December 31, 2013 and 2012, the provision for income taxes from consolidated operations consists of the following (in thousands):

62

| | Year ended December 31, | |
|---|---|---|
| | **2013** | **2012** |
| Current expense : | | |
|    Federal | $ — | $ — |
|    State | — | 151 |
| | $ — | $ 151 |
| Deferred expense: | | |
|    Federal | $ 1,734 | $ 485 |
|    State | 234 | 179 |
| | $ 1,968 | $ 664 |
| Income tax expense | $ 1,968 | $ 815 |

For the years ended December 31, 2013 and 2012, the effective tax rate used by the Company was 36.63% which is a blended federal and state tax rate, taking into account certain non-deductible expenses for federal and state tax purposes.

For the year ended December 21, 2013, the tax benefit associated with the Company's pre-tax losses was approximately $4.51 million. In reviewing the resulting deferred tax assets and liabilities as of December 31, 2013, the Company determined that an adjustment was required to take into account the future benefit to the Company. The review included an analysis of the current fair value of each of the Company's assets and the potential net taxable gains to be realized from the sale of these assets. The gains to be realized were compared to recorded value of the Company's net deferred tax asset, including federal and state net operating loss carry-forwards of approximately $23.0 million and $6.6 million, respectively, as of December 31, 2013. As a result of the analysis, the Company made an adjustment in the amount of $6.48 million to reduce the carrying amount of the net deferred tax asset. This adjustment took into account the future realizability of the Company's tax loss carry-forwards, the future value of its temporary timing differences and its probable future realizable gains from asset sales. For the year ended December 31, 2013, the company netted the current tax benefit of $4.51 million and the reduction in the net deferred tax asset of $6.48 million and recorded tax expense of $1.97 million.

| | Year ended December 31, |
|---|---|
| | |

|  | 2013 | 2012 |
|---|---|---|
|  | (in thousands) | |
| Expected income tax expense at statutory federal rate | $ (3,864) | $ 955 |
| Permanent differences: | | |
| Non-controlling interest | 53 | (109) |
| Meals and entertainment | 6 | 11 |
| Penalties | (33) | — |
| Return to provision | (212) | (153) |
| State income tax expense | (460) | 218 |
| Subtotal | $ (4,510) | $ 922 |
| Write-down to realizable value | 6,478 | (107) |
| Income tax expense | $ 1,968 | $ 815 |

63

Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. The Company has assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income. As of December 31, 2013 and 2012, the components of the Company's deferred tax assets and liabilities (following the effects of the 6.48 million adjustment in 2013) were as follows:

|  | Year ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (in thousands) | |
| **Deferred tax assets:** | | |
| Net operating losses | $ 8,560 | $ 9,037 |
| Built in gains | — | 2,246 |
| Intangible assets | 1,960 | 132 |
| Allowance for bad debts | 40 | 73 |
| Share-based compensation | 283 | 129 |
| Charitable contributions | 1 | 1 |
| Accrued expenses | 1,596 | — |
| Alternative minimum tax | — | 85 |
| Total deferred tax asset | $ 12,440 | $ 11,703 |
| **Deferred tax liabilities:** | | |
| Straight-line rents receivable | $ (269) | $ (395) |
| Built in gains | (2,831) | — |
| Total deferred tax liabilities | $ (3,100) | $ (395) |
| **Net deferred tax asset** | $ 9,340 | $ 11,308 |

The Company believes that it has the appropriate support for the income tax positions taken and to be taken on our tax returns, and that accruals for tax liabilities are adequate for all open years based on an assessment of many factors, including past experience and interpretations of tax law applied to the facts of each matter. The Company's federal and state tax returns open to audit generally include all years from

EXHIBIT "1"

2010 and beyond. The examination of the Company's 2012 tax return by the Internal Revenue Service was closed with no changes and the tax return was consequently accepted as originally submitted.

The Company evaluates tax positions that have been taken or are expected to be taken in its tax returns, and records a liability for uncertain tax positions in accordance with ASC Topic 740, Income Taxes. Benefits from tax positions may only be recognized in the financial statements when it is more likely than not that the tax position will be sustained under examination by the appropriate taxing authority having full knowledge of all relevant information. When a tax position meets the more-likely-than-not recognition threshold it is measured at the largest amount of benefit that exceeds the fifty percent probability threshold for realization upon ultimate settlement. We account for interest and penalties related to uncertain tax positions as part of our provision for federal and state income taxes. The Company had no known uncertain tax positions for the reporting periods ended December 31, 2013 and 2012.

ASR is a loss corporation as defined in Section 382 of the Internal Revenue Code. Therefore, if certain changes in ownership should occur, there could be a significant annual limitation on the amount of loss carry-forwards and future recognized losses that can be utilized, and ultimately some amount of loss carry-forwards may not be available. Such changes could result in additional tax provision. The net operating loss carry-forwards expire in 2024 through 2031.

**NOTE 18. OPERATING SEGMENTS**

Operating segments are defined as components of an enterprise that engage in business activities that earn revenue, incur expenses and prepare financial information that is evaluated regularly by our chief operating decision maker in order to allocate resources and assess performance. In 2012, we operated as one segment that provided comprehensive real estate services to all geographic regions.

During the first quarter of 2013, the Company reassessed its application of segment guidance and based on the expected performance of our operating segments, determined that it would be more appropriate to present our reporting units as two reportable segments: (i) real estate portfolio operations and (ii) integrated real estate services provided to third-parties.

64

In conjunction with this re-assessment, we have revised our prior period presentation to report comparative segment performance.

The following table sets forth comparative segment information for the periods presented (in thousands):

| | As of and for the year ended December 31, | | | |
|---|---|---|---|---|
| **2013** | **Portfolio Operations** | **Integrated Services** | **Corporate** | **Total Consolidated** |
| Revenues from external customers | $ 39,226 | $ 3,441 | $ — | $ 42,667 |
| Intersegment revenues | 476 | 1,845 | (2,321) | — |
| Interest income | — | — | 6 | 6 |
| Total revenue | $ 39,702 | $ 5,286 | $ (2,315) | $ 42,673 |
| | | | | |
| Loss from continuing operations | $ (2,936) | $ (3,997) | (7,596) | $ (14,529) |
| Loss from discontinued operations | — | — | (654) | (654) |
| Net loss attributable to non-controlling interest | — | — | 1,414 | 1,414 |

EXHIBIT "1"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net loss attributable to ASR, Inc. | $ | (2,936) | $ | (3,997) | $ | (6,836) | $ | (13,769) |
| | | | | | | | |
| Total segment assets | $ | 374,739 | $ | 14,632 | $ | 9,284 | $ | 398,655 |

| 2012 | As of and for the year ended December 31, | | | |
|---|---|---|---|---|
| | Portfolio Operations | Integrated Services | Corporate | Total Consolidated |
| Revenues from external customers | $ 39,050 | $ 3,060 | $ — | $ 42,110 |
| Intersegment revenues | 450 | 3,153 | (3,603) | — |
| Interest income | — | — | 125 | 125 |
| Total revenue | $ 39,500 | $ 6,213 | $ (3,478) | $ 42,235 |
| | | | | |
| Loss from continuing operations | $ (1,112) | $ (1,701) | (5,466) | $ (8,279) |
| Income from discontinued operations | — | — | 6,494 | 6,494 |
| Net loss attributable to non-controlling interest | — | — | 3,199 | 3,199 |
| Net (loss) income attributable to ASR, Inc. | $ (1,112) | $ (1,701) | $ 4,227 | $ 1,414 |
| | | | | |
| Total segment assets | $ 389,762 | $ 15,167 | $ 12,449 | $ 417,378 |

**NOTE 19. COMMITMENTS AND CONTINGENCIES**

As disclosed in Note 8 - Discontinued Operations, July 2013, the office property located at 2620/2630 Fountain View in Houston, Texas, and held in a partnership with another investor, was sold for approximately $8.9 million. The sale generated proceeds of approximately $3.1 million after repayment of the note payable secured by the property in the amount of approximately $5.2 million, selling expenses and payment of other obligations. As the result of on-going litigation with the Company's partner, $2.8 million of the $3.1 million sales proceeds were deposited into a court escrow account and is reflected on the Company's Consolidated Statement of Financial Position as restricted cash at December 31, 2013. The Company continues to negotiate with its partner and counter party in the legal proceedings to find a mutually agreeable settlement which would enable the release and final distribution of the remaining $2.8 million in sale proceeds. There can be no assurance that the Company will be successful in its attempts to negotiate or that a favorable resolution will be obtained through the courts.

In conjunction with the purchase of certain Dunham Properties (See Note 4 - Acquisition Activities) the Company is obligated to pay, pro rata to the holders of the Company's Series B Preferred, additional amounts based on the price received from the sale of the Dunham Properties. Such payments are described as Sale Payments and Participation Payments. Sale Payments (as the term is described in Note 14 - Capital Structure, Series B Preferred), if any, are effectively treated as prepayments applied against the

mandatory redemption amounts and reduce the amounts payable to holders of the Series B Preferred on the various redemption dates. Participation Payments (as the term is described in Note 17 - Capital Structure, Series B Preferred), if any, are payments required under the terms of the Dunham agreements requiring the

EXHIBIT "1"

Company to share the excess of certain sales proceeds over the December 30, 2013 acquisition price paid to Dunham. Participation Payments are payable to holders of the Company's Series B Preferred whenever such excess sales proceeds are realized, do not reduce the redemption amounts payable, and are due even if all shares of the Company's Series B Preferred have been redeemed in full.

In January of 2010, the Company acquired from Evergreen, the rights to various management contracts, including a contract for the management of a residential apartment building located in Las Cruces, New Mexico which was owned by a group of tenant-in-common owners. In May of 2013, the tenant-in-common owners of the property filed suit against the Company. In July of 2013, the Company entered into a stand-still and settlement agreement with the tenant-in-common owners. The agreement included, as a material term of the settlement, a provision calling for the ultimate dismissal of the lawsuit. Notwithstanding the terms of the stand-still and settlement agreement and unbeknownst to the Company, the tenant-in-common owners moved forward with the action against the Company and obtained a default judgment against the Company in August of 2013. The Company's legal counsel has successfully had the default judgment set-aside however the Company was ordered to provide a $1.4 million bond pending re-trial of the matter. Because of the stand-still and settlement agreement, the Company believes it will prevail in the upcoming re-trial of the matter. In the event that the Company is not successful, the Company's potential loss exposure is estimated to range from $0.15 million to $1.0 million.

The Company is subject to legal proceedings, claims, and litigation arising in the ordinary course of business, including lawsuits by vendors and other creditors with respect to past due obligations. The Company routinely reviews all pending and threatened claims to assess the likelihood of an unfavorable outcome. When the Company's management believes that a loss relating to such claim is probable, and the amount of such loss is able to be estimated, the Company records a liability for the expected amount of the loss. When the Company's management is unable to assess the possibility of an adverse outcome, but there is a reasonable possibility of a material adverse outcome, the Company will disclose the a loss range whenever such adverse outcome could adversely impact the Company's consolidated financial position, results of operations, or cash flows.

The Company has received various notices from the NYSE MKT (the "Exchange") advising the Company of its non-compliance with the following sections of the Exchange's Company Guide:

- Sections 134 and 1101 requires the Company to timely file its Annual Report on Form 10-K for the year ended December 31, 2013 and Quarterly Reports on Form10-Q for the three months ended March 31, 2014 and June 30, 2014. Based upon correspondence and communication with the Exchange, the Company has received an additional extension of time, until October 31, 2014, to file its 2013 Form 10-K. If that deadline is met, the Exchange has agreed to allow the Company an extension to December 31, 2014 to file its 2014 quarterly reports for each of the quarters ended March 31, June 30 and September 30, 2014. As of December 31, 2013, the Company has reserved $15.8 million for probable losses from pending litigation.

- Due to the losses incurred by the Company in its five most recent fiscal years, the Company is in violation of Section 1003 (a) (iii) which requires listed companies to maintain stockholders' equity of at least $6,000,000.

- The Company has past due listing fees due to the Exchange totaling approximately $0.04 million,

EXHIBIT "1"

which is a violation of Section 1003(f)(iv). The Company's ability to continue listing its stock on the Exchange is predicated on payment of these past due obligations.

## NOTE 20. SUBSEQUENT EVENTS

### Asset Dispositions

In January 2014, the Company disposed of Windrose Plaza for $5.75 million and received net sales proceeds of $5.42 million after selling expenses. In conjunction with the sale, the Company paid off the notes payable secured by Windrose Plaza, and other obligations, totaling approximately $5.1 million. The remaining proceeds were used to fund operations. The Company's estimated gain on sale will be $2.1 million in 2014.

In June 2014, the property known as 2640/2650 Fountain View was sold for $17.35 million. The company received $4.34 million after payments to creditors totaling $12.67 million, and selling expenses of approximately $0.11 million. The Company expects to report a gain on the sale of approximately $4.2 million in 2014.

In July 2014, the property known as 6430 Richmond was foreclosed by the secured lender. The $2.05 million note payable secured by the property had matured in May of 2012 and could not be replaced under terms that were economically viable. The property and the corresponding note payable were held by a consolidated wholly owned subsidiary, and the Company did not guarantee the note payable. Previously, the Company recorded an impairment reserve in the amount of $1.40 million which, when added

66

---

to the accumulated depreciation, reduced the Company's net book value to approximately $1.76 million. Due primarily to the impairment reserve, the Company is not anticipated to record a loss in 2014 as a result of the lender foreclosure.

In October 2014, the Company sold its property located at 8100 Washington in Houston, Texas for $4.10 million and received net sales proceeds of $4.01 million. At the time of the sale, the secured note payable in the amount of $1.49 million was paid off. Including closing adjustments for prorations and operating expense, the Company received net proceeds of $2.33 million. The Company anticipates recording a gain of $2.0 million in 2014.

### Acquisition Litigation

On December 30, 2013 in conjunction with the acquisition of the Dunham Properties (see Note 4 - Acquisition Activities), Dunham committed to loan or arrange for loans from third parties in the aggregate amount of $6.0 million. The loan commitment was to be funded in two tranches of $3.0 million each with simple interest at 8.0% until the first anniversary, and 12.0% thereafter. The first $3.0 million was advanced in January, 2014 with the second tranche to be advanced within 90 days. The second tranche was never funded.

The Company filed a lawsuit against Dunham (District Court of Harris County, Texas, Case No. 2014-24363) and in June 2014, a settlement was reached. Under the terms of the settlement, Dunham agreed to repurchase 14 of the original 19 properties acquired from Dunham on December 30, 2013. On July 25, 2014, Dunham completed the reacquisition of the 14 properties for the same net contribution value at which such properties were sold to the Company in 2013. The repurchased properties were valued at approximately $55.5 million, including the related secured debt of approximately $8.1 million. At the closing, Dunham surrendered shares of the Company's Series B Preferred with an aggregate liquidation preference of approximately $47.4 million. At the closing, the Company was required to pay the transfer,

EXHIBIT "1"

escrow and title costs which totaled approximately $0.65 million. As part of the settlement agreement, the Company was required to pay its own legal fees which totaled approximately $0.20 million.

In addition to canceling the second tranche of the loan commitment for $3.0 million, the Company reduced the number of warrants issued to Dunham for the purchase of the Company's common stock from 600,000 to 300,000 shares (see Note 14 - Capital Structure, Warrants Issued).

In conjunction with the settlement agreement, the Company also restructured the mandatory redemption provisions of the Series B Preferred issued to Dunham in December 2013 (see Note 14 - Capital Structure, Series B Preferred). Pursuant to the restated Articles Supplementary for the Series B Preferred, the mandatory redemption requirements for the remaining Series B Preferred with an aggregate liquidation preference of approximately $20.1 million are as follows: (i) approximately $3.011 million, less any "Adjustments" (see definition of Adjustments in Note 14 - Capital Structure, Series B Preferred) received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before December 1, 2014, (ii) approximately $7.025 million, less any Adjustments received by the Series B Preferred holders, is payable to holders of the Company's Series B Preferred on or before June 1, 2015, and (iii) the remainder of the liquidation preference less any Adjustments will be paid to fully redeem all the remaining outstanding share of the Company's Series B Preferred on or before December 1, 2015. Excluding any reductions for Adjustments and increases for unpaid accruing dividends, the anticipated final liquidation payment due to holders of the Company's Series B Preferred will be approximately $10.035 million. The final redemption price payable to holders of the Company's Series B Preferred will be increased for any accrued and unpaid dividends with respect to such shares.

**Actions Affecting Creditors**

In January 2014, the Company filed voluntary petitions for reorganization under Chapter 11, Title 11 of the US Bankruptcy Code for three subsidiaries: ASR-8 Center LP (Northwest Spectrum Plaza), ASR-Parkway One & Two LP (800/888 Sam Houston Parkway), and ASR-Fountain View Place LP (2640/2650 Fountain View). The Company sought protection from the secured creditors in bankruptcy court as a means of preserving the Company's equity in the properties held by these subsidiaries since the creditors were seeking to foreclosure on the assets. Subsequently, in June 2014, the property held and ASR-Fountain View Place LP (2640/2650 Fountain View) was sold for $17.35 million and all creditors were paid in full. In addition, ASR-Parkway One & Two LP and ASR-8 Center LP filed plans of reorganization with the US Bankruptcy Court which provided for the creditors of these two subsidiaries to be paid the full amount of what they were owed. ASR-Parkway One & Two LP entered into a new note with the existing secured creditor in the amount of $4.6 million, maturing June 30, 2015 at a fixed rate of interest of 4.25%. Similarly, the property held by ASR-8 Center LP entered into a new note with the lender for $4.9 million, maturing December 31, 2015 at a fixed rate of interest of 4.25%.

On September 30, 2014, the Company filed voluntary petitions for reorganization under Chapter 11, Title 11 of the US Bankruptcy Code for ASR 2401 Fountainview, LP, a subsidiary of the Company. The action was taken by the Company in response to foreclosure proceedings being instituted by the secured creditor. The Company's management believes that the value of the property known as 2401 Fountainview can be preserved through either a plan of reorganization or orderly marketing and sale of the asset. Although there can be no assurances, the Company believes that the subsidiary will continue to operate as a "debtor in possession" in the ordinary course under the jurisdiction of the Bankruptcy Court.

EXHIBIT "1"

On February 14, 2014, at the request of Nextera Retail of Texas, LP ("Nextera"), the District Court of Harris County, Texas (the "Court") appointed a receiver in connection with a judgment against the Company. The action was the result of a vendor dispute which was settled by the Court in favor of Nextera, in the amount of $2.8 million. On February 20, 2014, the Company satisfied in full all obligations to Nextera, with a payment of $1.5 million and receivership costs of $0.15 million, and the District Court rescinded the order appointing the receiver.  Day-to-day operations of the Company were not impacted and satisfaction of the Nextera obligation did not have a material adverse effect on the operations or financial condition of the Company.

68

## Item 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### Item 9A. Controls and Procedures

Our principal executive officer and principal financial officers, or persons performing similar functions, are responsible for evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 (Exchange Act) Rules 13a-15(e) or 15d-15(e)) as of the year ended December 31, 2013.

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports filed under the Securities Exchange Act is accumulated and communicated to management, including our principal executive officer and principal financial officers, or persons performing similar functions, to allow timely decisions regarding required disclosure.

The Company's management, under the supervision and with the participation of our principal executive officer and principal financial officers, or persons performing similar functions, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures for the year ended December 31, 2013. Based upon and as of the date of the evaluation, our principal executive officer and principal financial officers, or persons performing similar functions, concluded that our disclosure controls and procedures are not effective as to the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act of 1934, as of December 31, 2013, to ensure information required to be disclosed in the reports our Company files and submits under the Securities Exchange Act is recorded, processed, summarized and reported as and when required, identifying the significant deficiencies constituting material weaknesses as described below.

### Management's Report on Internal Control over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act of 1934, which is a process designed by, or under the supervision of the Company's management, under the supervision of our principal executive, principal financial officer, or person performing similar functions, and effected by the

EXHIBIT "1"

Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted.

The Company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records, that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect all misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management, including the Company's principal executive officer and principal financial officers, or persons performing similar functions, assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2013, based upon the framework in "Internal Control - Integrated Framework" promulgated by the Committee of Sponsoring Organizations of the Treadway Commission, commonly referred to as the "COSO" criteria. Based on the assessment performed, management and the Company's principal executive officer and principal financial officers, or persons performing similar functions, believe as of December 31, 2013, the Company's internal control over financial reporting was not effective based upon the COSO criteria. Based on management's and the Company's principal executive officer and principal financial officers, or persons performing similar functions assessment, it was determined there were significant deficiencies constituting material weaknesses in its internal control over financial reporting as of December 31, 2013, regarding (a) proper maintenance and timely reconciliation of financial accounting records within the Company's ERP system required to carry out the financial close process, (b) adherence

to Company accounting review and monitoring controls over financial disclosure controls and procedures to ensure timely preparation of information required for disclosure by the Company, thereby inhibiting the Company from timely identification and preparation of disclosure and reports, as required to be filed and submitted under the Exchange Act, and (c) an absence of experienced and knowledgeable personnel familiar with accounting principles generally accepted in the United States, reporting requirements of the SEC, criteria issued by COSO related to proper maintenance, and monitoring and reporting of internal controls over financial reporting.

**Remediation Plan and Status**

Since identifying the deficiencies, the Company has engaged accounting and financial reporting consultants to assist in the remediation of reconciliations of financial accounting records, preparation of reports required for proper disclosures and reports required to be filed and submitted to the Exchange and has hired an interim Chief Accounting Officer with the knowledge and experience to begin the remediation process regarding the deficiencies in the Company disclosure controls and procedures, and internal controls over financial reporting.

EXHIBIT "1"

The Company's management is actively committed to and engaged in the implementation and execution of remediation efforts to resolve the material weaknesses and to pro-actively manage any other areas of risk that may be identified. The Company's executive management team and Board of Directors are committed to achieving and maintaining a strong control environment, high ethical standards, and financial reporting integrity.

**Changes in Internal Controls**

During the three months ended December 31, 2013, the Company identified significant deficiencies related to (a) reconciliation and maintenance of financial accounting records within the Company's ERP system, (b) adherence to Company accounting review and monitoring controls over financial disclosure controls and procedures, and (c) an absence of experienced and knowledgeable personnel familiar with accounting principles generally accepted in the United States, reporting requirements of the SEC, and criteria issued by COSO, as described above.

**Attestation Report of Independent Registered Public Accounting Firm**

This Annual Report does not include an attestation report of the Company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant Section 989G of the Dodd-Frank Wall Street and Consumer Protection Act and Section 404(c) of the Sarbanes-Oxley Act of 2002, as adopted and amended by the SEC, which provides that Section 404(b) of the Sarbanes-Oxley Act is not applicable with respect to any audit report prepared for an issuer that is neither an accelerated filer nor a large accelerated filer as defined in Rule 12b-2 under the Exchange Act. Pursuant to Rule 12b-2 the Company is a smaller reporting company and not subject to the internal control over financial reporting attestation requirements by the Company's registered independent public accounting firm.

**Item 9B. OTHER INFORMATION**

None.

70

---

**PART III**

**Item 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The following table sets forth certain information concerning the directors and executive officers of the Company and its principal subsidiaries:

| NAME | POSITION | AGE | TIME IN OFFICE |
|------|----------|-----|----------------|
| William J. Carden | Chairman of the Board | 69 | Since 2000 |
| | Chief Executive Officer and President | | Since 2002 |
| Matthew Thornton | President, American Spectrum Risk and Insurance Services, Inc. | 43 | Since October 2011 |
| Quentin Thompson | Chief Financial Officer | 58 | Since July 2014 |
| G. Wayne Reyes | President, American Spectrum Management Group | 64 | Since April 2013 |
| Patrick D. Barrett | Director | 60 | Since October 2012 |
| D. Brownell Wheless | Director | 65 | Since July 2011 |

*William J. Carden* - Mr. Carden is Chairman of the Board, Chief Executive Officer and President. Mr. Carden has served as Chairman of the Board and Chief Executive Officer since the formation of the

EXHIBIT "1"

Company and as President since 2002. Mr. Carden has also served as President of American Spectrum Realty Management, LLC ("ASRM"), a wholly-owned subsidiary of the Company, since November 2011. Mr. Carden also serves as President and a director of American Spectrum REIT, Inc. and Evergreen Income & Growth REIT, Inc. Mr. Carden has been a director of CGS Real Estate Company, Inc. since 1989. He received an accounting degree from California State University, in Long Beach, California. Mr. Carden brings real estate development and management, investment, business development, and executive leadership expertise to the Board.

*Matthew Thornton:* Mr. Thornton was appointed President of American Spectrum Risk and Insurance Services, Inc.in October 2011. Mr. Thornton brings finance, management, investment, business development, and executive leadership expertise to the Company. Mr. Thornton has over 20 years experience in strategic planning, business development and management and insurance related activities. Additionally, Mr. Thornton has seven years experience serving as a financial adviser, and four years as a marketing and business development specialist. In January of 2012, Mr. Thornton was promoted to President of American Spectrum Risk Insurance Services, LLC with responsibility for managing over one billion dollars in Company assets. Mr. Thornton was promoted to Vice President of Risk Management in 2010, overseeing all insurance related issues for the corporate entity and subsidiaries of the Company and all of the owned and managed assets across the United States. In addition, Mr. Thornton was responsible for identifying, developing and promoting additional revenue streams throughout the Company's portfolio of assets. Mr. Thornton joined the Company in 2009 as a risk asset manager, managing a portfolio consisting of over 80 assets. He attended California State University, in Long Beach, California.

*Quentin Thompson* - Mr. Thompson began working with the Company as interim Chief Accounting Officer effective July 28, 2014. He was appointed Chief Financial Officer ("CFO") in October, 2014. Mr. Thompson has over 20 years experience as chief financial officer and vice president of finance for privately held and publicly traded real estate companies. His real estate experience includes acquisition, disposition, development, and asset management, involving single and multifamily residential, retail, commercial, industrial properties as well as land development and construction of single family homes. He recently served as Chief Financial Officer for Airports Worldwide, an airport operator and investor affiliated with the Houston Airports having airport investments and management operations in the United States, Western Europe and Central America. Prior to that, Mr. Thompson worked as a subcontractor for Colliers International in their government solutions group which was involved in the management, operations and disposition of real estate assets in 33 states for the Dallas office of the Federal Deposit Insurance Corporation ("FDIC"). Mr Thompson has a Bachelors degree from University of California, Santa Barbara, in Business Economics. Mr. Thompson obtained his CPA license in California while working for Deloitte LLP. Mr. Thompson's license is currently inactive.

*G. Wayne Reyes* - Mr. Reyes was appointed President of American Spectrum Realty Management Group, Inc. ("ASMG") in April 2013. ASMG is a wholly-owned subsidiary of the Company. Mr. Reyes has over 25 years of experience in management, leasing, construction, and allied accounting for portfolios of office, industrial, retail, and multi-family properties. Mr. Reyes' career involvement in the commercial real estate market includes having twice served as President of the Houston Chapter of the Institute of Real Estate Management, IREM. Mr. Reyes holds a Texas Real Estate Broker's License and the designation of Certified Property Manager (CPM®). Mr. Reyes attended Texas State University.

EXHIBIT "1"

*Patrick D. Barrett* - Mr. Barrett is a director of the Company. Mr. Barrett is a real estate investor owner/operator through his company Capstone Realty Partners, LLC, which he founded in 2002. Mr. Barrett is an experienced real estate executive and principal with more than 25 years of expertise in the acquisition and operation of all categories of investment properties. Mr. Barrett, from 1990 - 2002, was a co-founding partner and the chief operating officer of a vertically integrated real estate owner/operator and its wholly-owned management company. Under Mr. Barrett's 12 direction, the Company acquired and repositioned over 30 apartment, office, retail, and hotel properties located throughout the United States and Canada, with a total acquisition value in excess of $325 million. Mr. Barrett began his career working in corporate finance in the investment banking industry. Mr. Barrett obtained a Bachelor's degree from the University of Kansas and an MBA from the Stanford Graduate School of Business. Mr. Barrett also attended law school at the University of Kansas. Mr. Barrett is Chairman of the Company's Nominating/Corporate Governance Committee and serves as a member of the Company's Investment Committee. Mr. Barrett brings real estate acquisition, operations, finance, management and leadership expertise to the Board.

*D. Brownell Wheless* - Mr. Wheless is a director of the Company. Mr. Wheless is a partner in NuSource Financial Group, LLP and is a Certified Public Accountant. He holds an undergraduate degree in Economics from Rice University and has performed post graduate work at the University of Texas in Austin with a concentration in accounting. Mr. Wheless is Chairman of the Company's Audit and Compensation Committees. Mr. Wheless is also a member of the Company's Nominating/Corporate Governance Committees. Mr. Wheless brings accounting, financial services and executive leadership expertise to the Board.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's directors, executive officers and persons who own more than 10% of the Company's common stock, to file reports of ownership of, and transactions in, the Company's securities with the SEC. Based solely on the review of copies of such filings received by the Company or any written representations from certain reporting persons, the Company believes that its directors, officers timely filed all reports required of them during 2013 under Section 16(a)

### Code of Business Conduct and Ethics

We have adopted a Standards of Business Conduct policy that applies to our directors and executive officers and is available on our website (*www.americanspectrum.com*). Additionally, we will provide a copy to any stockholder who requests it by writing our secretary at 2401 Fountain View, Suite 750, Houston, Texas 77057. In the event that an amendment to, or a waiver from, a provision of our Code of Business Conduct and Ethics is necessary, we intend to post such information on our website.

### Nominating Committee

The Nominating/Corporate Governance Committee (the "Nominating Committee") was established by the Board in 2003 and is composed of Mr. Barrett and Mr. Wheless, each of whom is independent within the meaning of the listing standards of the Exchange. Mr. Barrett is Chairman of the Nominating Committee. The Nominating Committee has a charter, a copy of which can be found on the Company's website at *www.americanspectrum.com.*

The Nominating Committee selects or recommends that the Board select all candidates for all directorships and will consider candidates put forward by stockholders, who should follow the procedures set forth below under "Stockholder Proposals for the Company's 2014 Annual Meeting." In identifying candidates for membership on the Board of Directors, the Nominating Committee takes into account all factors it considers appropriate, which may include ensuring that the Board of Directors, as a whole, consists of individuals with various and relevant career experience, relevant technical skills, industry knowledge and

EXHIBIT "1"

experience, financial expertise, local or community ties and minimum individual qualifications, including strength of character, mature judgment, familiarity with the Company's business and industry, independence of thought and an ability to work collegially. The Nominating Committee also may consider the extent to which the candidate would fill a particular need on the Board. Currently there are no changes being made to the procedures by which security holders may recommend nominees to the registrant's board of directors nor have there been changes since previously provided in the Company's 2012 Annual Proxy Information.

**Audit Committee**

The Audit Committee is composed of Mr. Barrett and Mr. Wheless who is the Chairman. Members of the Audit Committee are independent within the meaning of the listing standards of the Exchange. The Board has determined that Mr. Wheless is an audit committee financial expert within the meaning of the rules of the SEC. The Board has adopted a charter for the Audit Committee, a copy of which is available on our website (*www.americanspectrum.com*). Additionally, we will provide a copy to any stockholder who requests it in writing from our corporate secretary at 2401 Fountain View, Suite 750, Houston, Texas 77057.

**Item 11. EXECUTIVE COMPENSATION**

**Summary Compensation Table**

The following table sets forth the compensation paid by the Company to its named executive officers.

72

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards (a) ($) | Other Comp ($) | Total ($) |
|---|---|---|---|---|---|---|
| William J. Carden, Chairman of the Board, Chief Executive Officer | 2013 | 587,171 | — | 112,500 | 10,658 | 710,329 |
| and President | 2012 | 612,700 | — | 3,750 | 15,077 | 631,527 |
| Matthew Thornton, President, | 2013 | 252,300 | — | — | | 252,300 |
| American Spectrum Risk and Insurance Services, LLC | 2012 | 124,481 | — | — | — | 124,481 |
| G. Wayne Reyes, President, | 2013 | 150,128 | — | — | | 150,128 |
| American Spectrum Management Group | | | | | | |
| William H. McGrath, President, | 2013 | 110,088 | — | — | | 110,088 |
| American Spectrum Management Group | 2012 | 196,000 | — | — | | 196,000 |
| G. Anthony Eppolito, Chief Financial Officer | 2013 | 131,334 | — | — | | 131,334 |
| | 2012 | 165,000 | — | — | | 165,000 |

**Significant Terms of Executive Officer Compensation**

*William J. Carden:* Mr. Carden currently does not have an employment agreement in place with the Company. Mr. Carden receives a base salary plus share based equity compensation, as part of his compensation package. During 2013 and 2012, Mr. Carden received restricted stock grants of 50,000

EXHIBIT "1"

shares and 1,000 shares for the given year, respectively. The 50,000 shares vested immediately upon the date of grant. The 1,000 share received in 2012 vest over a three year period, with one-third of the shares vesting equally on the anniversary date of grant beginning one year from the grant date. Other compensation consists of reimbursed personal automobile expenses.

*Matthew Thornton:* Mr. Thornton currently does not have an employment agreement in place with the Company. Mr. Thornton receives an annual base salary, as the only part of his compensation package with the Company.

*G. Wayne Reyes:* Mr. Reyes currently does not have an employment agreement in place with the Company. Mr. Reyes receives an annual base salary, as the only part of his compensation package with the Company.

*William H. McGrath:* Mr. McGrath did not have an employment agreement with the Company. Mr. McGrath received an annual base salary, as the only part of his compensation package with the Company. Mr. McGrath resigned his employment with the Company in April 2013. Mr. McGrath, upon his discontinuation of employment with the Company forfeited 8,668 shares of restricted stock awards granted to him during 2010 and 2011 of his employment. No shares were granted to Mr. McGrath during 2012.

*G. Anthony Eppolito:* Mr. Eppolito did not have an employment agreement with the Company. Mr. Eppolito received an annual base salary, as the only part of his compensation package with the Company. Mr. Eppolito, upon his resignation, received acceleration of 4,667 restricted stocks awards granted to him in 2010 and 2011. No shares were awarded to Mr. Eppolito in 2012. Mr. Eppolito's resigned his employment with the Company in October 2013.

**Stock Incentive Plan**

The Company has in effect Omnibus Stock Incentive Plan (the "Plan"), which was established by the Board in 2001, is administered by the Compensation Committee and provides for the granting of options, stock appreciation rights, restricted stock and performance units and shares, as may be determined by the Board. The dollar values are based on the fair market value on the date of grant. A discussion of the assumptions used to value restricted stock grants is contained in the notes to the Company's financial statements. The restricted shares are subject to repurchase by the Company upon termination or resignation of the individual's employment for a price of $.02 per share. The recipients of restricted stock paid no consideration to the Company for their shares, have the right to vote their shares, to receive and retain all

73

---

cash dividends payable to the Company's stockholders and to exercise all rights, powers and privileges of a stockholder, with the exception that the recipient may not transfer the common stock during the restricted period.

Under the Plan, up to a total of 360,000 shares of the Company's common stock may be issued to executive officers, directors or other key employees of the Company. Options to acquire common stock are expected to be in the form of incentive and non-qualified stock options and are exercisable for up to ten years following the date of the grant. The Board sets the exercise price of each option, but the Plan requires that the exercise price per share equal or exceed the fair market value of the Company's common stock on the grant date. As of December 31, 2013, the Plan had 52,661 shares available for issuance.

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END**

The following table sets forth information regarding stock awards as of December 31, 2013 by the named executive officers.

| | Stock Awards | |
|---|---|---|
| Name | Number of shares of stock not vested (a) | Market value of shares of stock not vested (b) |
| William J. Carden | 1,002 | $ 1,824 |

(a) Represents unvested shares of restricted stock.

(b) The market value of shares was determined by multiplying the $1.82 closing price of the Company's stock as of December 31, 2013 by the number of shares.

**Executive Officer Equity Compensation**

*William J. Carden:* Shares presented in table represents two grants of 1,000 restricted shares granted each in 2011 and 2012, respectively, with each grant vesting equally in three installments on the anniversary date of grant. On September 25, 2013, Mr. Cardin was granted 25,000 shares of restricted stock, all of which were fully vested on the date of issuance. With respect to Mr. Carden, the repurchase restriction for the shares granted lapses in three equal installments with the first investment lapsing on the first anniversary of the grant date.

**Director Compensation**

Each non-employee director receives $12,000 annually for serving on the Board, $1,000 for each meeting attended in person and $500 for each telephonic meeting in which the director participates, including any committee meetings. Mr. Wheless also received a total of $50,000 in 2013 for serving as Chairman of the Audit Committee. A director may elect to receive the fee in cash or in common stock valued at its then fair market value. Each director is also reimbursed for travel expenses for attending meetings. During 2012, each non-employee director was also granted 1,000 shares of restricted stock, which vest in three equal installments on the first, second and third anniversary of the grant date.

The following table sets forth information regarding director compensation for the fiscal year ended December 31, 2013 (excludes named executive officers).

| | ($) | ($) | ($) |
|---|---|---|---|
| Name | Fees Earned or Paid In Cash | Stock Awards (a) | Total |
| D. Brownell Wheless | 54,000 | 78,750 | 132,750 |
| Patrick D. Barrett | 23,500 | 78,750 | 102,250 |
| Stacey F. Speier | 31,000 | 56,250 | 87,250 |

(a) Represents the number of restricted shares granted to each member during 2013 was: Mr. Wheless - 35,000; Mr. Barrett - 35,000; and Mr. Speier 25,000, respectively. The value presented in the table immediately above reflects the dollar amount recognized for financial statement reporting purposes in accordance with FAS 123R. At December 31, 2013, the aggregate number of unvested restricted stock awards for each member of the board was: Mr. Wheless 667; Mr. Barrett 667; and Mr. Speier 667, respectively.

**Item 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table provides information regarding the beneficial ownership of common stock as of October 24, 2014, by (i) each of the Company's directors and nominees, (ii) each of the Company's executive officers, (iii) all directors, nominees and executive officers as a group and (iv) each person known by the Company to be the beneficial owner of more than 5% of the outstanding shares of common

stock. This table is based on information provided to the Company or filed with the SEC by the Company's directors, nominees, executive officers and principal stockholders. Except as otherwise indicated, the Company believes that the beneficial owners of the common stock listed below, based on information furnished by such owners, have sole investment and voting power with respect to such shares, subject to community property laws where applicable.

| NAME OF BENEFICIAL OWNER(1) | NUMBER OF SHARES OF COMMON STOCK(2) | PERCENTAGE OF OUTSTANDING COMMON STOCK(3) |
|---|---|---|
| William J. Carden(4) | 1,241,787 | 33.3 % |
| D. Brownell Wheless(5) | 36,000 | * |
| Patrick D. Barrett(5) | 36,000 | * |
| All Directors, Nominees and Executive Officers as a Group (3 persons) | 1,313,787 | 35.9 % |
| Estate of John N. Galardi(6) | 616,523 | 16.5 % |
| Cynthia L. Galardi(7) | 202,130 | 5.4 % |

* Less than 1%

(1)   Except as specifically noted in the footnotes below, the address of each of the named beneficial owners is c/o American Spectrum Realty, Inc., 2401 Fountain View, Suite 750, Houston, Texas 77057.

(2)   For each beneficial owner, includes common stock subject to options or conversion rights exercisable, respectively, within 60 days of October 24 2014. Includes, as to Mr. Galardi's estate, common stock issuable upon exchange of Operating Partnership Units.

(3)   The percentage ownership is based on 3,703,142 outstanding shares of common stock as of October 24, 2014, as well as shares deemed outstanding pursuant to Rule 13d-3(d)(1) under the Exchange Act.

(4)   Includes shares of common stock owned by Mr. Carden and the persons or entities listed as follows: (i) 976,291 shares of common stock directly owned by Mr. Carden (ii) 217,576 shares of common stock owned by Mr. Carden's spouse, (iii) 22,764 shares of Common stock owned by a company controlled by Mr. Carden, (iv) 25,156 shares of common stock owned by a company controlled by Mr. Carden in which Mr. Galardi's children trusts a 5.28% interest , (v) 2,268 shares issuable upon exchange of Operating Partnership units owned by Mr. Galardi's estate, (vi) 1,000 shares of restricted stock granted May 12, 2010, 1,000 shares of restricted stock granted July 1, 2011, and 1,000 shares of restricted stock granted August 9, 2012 (all of which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant) and (vii) 50,000 shares of restricted stock granted September 25, 2013 (which vest immediately on the date of grant). Certain shares referenced above may be deemed to be beneficially owned by Mr. Carden and may also be deemed to be beneficially owned by Mr. Galardi's estate. Mr. Carden disclaims beneficial ownership of the shares held by his spouse. .

(5)   Represents restricted shares granted in 2013 and in 2012. Mr. Wheless and Mr. Barrett, received 1,000 shares each granted in 2012 which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant. Mr. Wheless and Mr. Barrett received 35,000, and 35,000 shares each, respectively, granted in 2013 which vested immediately on the date of grant.

(6)   The Estate of John Galardi includes: (i) 2,268 shares issuable upon exchange of Operating Partnership Units, (ii) 25,156 shares of common stock owned by a company in which Mr. Galardi's children trusts a 5.28% interest, (iii) 125,097 shares owned jointly with Timothy R. Brown, a former director of the Company, (iv) 1,000 shares of restricted stock granted on May 12, 2010, 1,000 shares of restricted stock granted on July 1, 2011 and 1,000 shares of restricted stock granted on August 9, 2012 (all of which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant). Certain shares referenced above may be deemed to be beneficially owned by Mr. Galardi's estate and may also be deemed to be beneficially owned by Mr. Carden.

(7)   Information is based upon the most recent filing by the "beneficial owner or their estate" pursuant to Section 13(d) or 13(g). The Company has no knowledge or basis , or other information indicating the information has changed since previously reported. Rule Ms. Galardi's address is 3511 Race St., Portsmouth, Virginia, 23707.

## SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's directors, executive officers and persons who own more than 10% of the Company's common stock to file reports of ownership of, and transactions in, the Company's securities with the SEC. Based solely on the review of copies of such filings received by the Company or any written representations from certain reporting

EXHIBIT "1"

persons, the Company believes that its directors, officers and 10% or more stockholders, unless noted otherwise, timely filed all reports required of them during 2013 under Section 16(a). The Estate of John Galardi and Ms. Galardi did not report any filings pursuant Section 13(d) or 13(g) pursuant of the Exchange Act of 1934.

75

---

### Item 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

In December 2011, Mr. Galardi loaned $0.3 million to us and pledged $0.4 million in certificates of deposit to additionally secure another one of our loans. The estate of Mr. Galardi, who died in April 2013, is one of our principal shareholders.

We agreed to pay a guarantee fee to Mr. Carden and Mr. Galardi ("the Guarantors"), in consideration for their agreement to guarantee certain of our loans. The Guarantors are paid a guarantee fee based upon the principal amount guaranteed at a rate ranging between .25% and .75% (depending on the nature of the guarantee) as of December 31 ("Guarantee Fee").

During the year ended December 31, 2013, Mr. Carden guaranteed a total of $11.2 million in notes on the Windrose, 2640/2650 Fountain View, and Northwest Spectrum Plaza properties, as well as multiple corporate notes. Guarantee fees earned by Mr. Carden for the year ended December 31, 2013 totaled approximately $0.08 million, of which $0.02 million was unpaid at December 31, 2013. During the year ended December 31, 2012, Mr. Carden provided loan guarantees for approximately $8.8 million in loans and received $0.16 million in loan guarantee fees.

No amounts have been paid to Mr. Galardi for the years ending December 31, 2012 and 2013. In conjunction with a cross-complaint filed by the Estate of John N. Galardi against us in the matter of *Kurt Sabatasso and Donna Sabatasso vs. American Spectrum Realty, Inc., John N. Galardi* (See Item 3), the Co-trustees of the Estate made a claim for Mr. Galardi's unpaid Guarantee fees. The cross-complaint has been settled and we have agreed to pay the Guarantee Fees and to reimburse the Galardi Estate for their legal defense costs.

Except in circumstances where a comparable body of the Board of Directors has been appointed for such purpose, the Company's Audit Committee reviews transactions between the Company and any person who may be deemed to control the Company. The members of the Audit Committee are independent within the meaning of the listing standards of the Exchange. The Board has determined that Mr. Wheless is an audit committee financial expert within the meaning of the rules of the SEC.

### Item 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

EEPB, P.C. has been selected by the Audit Committee as the Company's independent auditors for the year ended December 31, 2013. EEPB, P.C. has served as the Company's independent auditors since August 2010.

The Audit Committee reviewed and pre-approved all audit and permissible non-audit services performed by EEPB, P.C. as well as the fees paid for such services. Fees billed by EEPB, P.C. in 2013 and 2012 were as follows:

| Year | Audit Fees | Audit-Related Fees | Tax Fees | All Other Fees |
| --- | --- | --- | --- | --- |

EXHIBIT "1"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2013 | $ | 199,200 | $ | — | $ | — | $ | — |
| 2012 | $ | 194,000 | $ | — | $ | — | $ | — |

76

---

# PART IV

## Item 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) The following financial statements are included herein as part of this report:

| | | Page No. |
|---|---|---|
| (1) | Financial Statements | |
| | Report of Independent Registered Public Accounting Firm | 30 |
| | Consolidated Balance Sheets at December 31, 2013 and 2012 | 31 |
| | Consolidated Statements of Operations for the years ended December 31, 2013 and 2012 | 32 |
| | Consolidated Statements of Equity (Deficit) for the years ended December 31, 2013 and 2012 | 33 |
| | Consolidated Statements of Cash Flows for the years ended December 31, 2013 and 2012 | 34 |
| | Notes to Consolidated Financial Statements | 36 |
| (2) | Financial Statement Schedules Required by Item 8 of Form 10-K | |
| | Schedule III — Real Estate Investments and Accumulated Depreciation | 62 |
| (3)(b) | Exhibits | 66 |
| | The Exhibit Index attached hereto is hereby incorporated by reference to this Item. | 66 |

77

---

## SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIATION

Changes in real estate investments and accumulated depreciation for the years ended December 31 were as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| | (in thousands) | | | |
| ***ASR owned properties*** | | | | |
| **Rental Property:** | | | | |
| Balance at beginning of year | $ | 110,999 | $ | 181,996 |
| Additions during year: | | | | |
| Property acquisitions and additions | | 78,678 | | 4,969 |
| Retirements | | (22,268) | | (75,966) |
| Impairments | | — | | — |
| **Balance at end of year (1)** | $ | 167,409 | $ | 110,999 |
| **Accumulated Depreciation:** | | | | |
| Balance at beginning of year | $ | 34,648 | $ | 59,173 |

EXHIBIT "1"

| | | | |
|---|---:|---:|---:|
| Additions during year: | | | |
| Depreciation | | 3,477 | 5,238 |
| Retirements | | (6,260) | (29,763) |
| **Balance at end of year (2)** | $ | **31,865** | $ **34,648** |
| *Variable Interest Entities* | | | |
| **Rental Property:** | | | |
| Balance at beginning of year | $ | 327,676 | $ 338,845 |
| Additions during year: | | | |
| Property acquisitions and additions | | 467 | 640 |
| Retirements | | (74,215) | (11,809) |
| **Balance at end of year** | $ | **253,928** | $ **327,676** |
| **Accumulated Depreciation:** | | | |
| Balance at beginning of year | $ | 37,127 | $ 22,484 |
| Additions during year: | | | |
| Depreciation | | 12,032 | 15,392 |
| Retirements | | (9,331) | (749) |
| **Balance at end of year** | $ | **39,828** | $ **37,127** |

(1) Includes costs of $4,355 for Windrose Plaza property which is classified as Assets Held For Sale within the Consolidated Balance Sheet at December 31, 2013.

(2) Includes accumulated depreciation of $1,485 on the Windrose Plaza property which is netted against Assets Held For Sale within the Consolidated Balance Sheet at December 31, 2013.

### SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIA

| Property Name | % Owned | Location | Encumb. | Initial cost (1) | | Subsq. Costs Capitalized (2) | Gross amount carried at Dec. 31, 2 (3) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Land | Bldgs. & Improv. | | Land | Bldgs. & Improv. | Tota |
| *ASR OWNED* | | | | | | | | | |
| 2640-2650 Fountain View (4) | 100% | Houston, TX | 12,632 | 6,900 | 9,575 | 558 | 6,900 | 10,133 | 17 |
| 5450 Northwest Central | 100% | Houston, TX | 2,432 | 854 | 2,410 | 1,051 | 854 | 3,461 | 4 |
| 800 & 888 Sam Houston Pkwy | 100% | Houston, TX | 4,223 | 1,500 | 1,335 | 1,990 | 1,500 | 3,325 | 4 |
| 8100 Washington (4) | 100% | Houston, TX | 2,041 | 600 | 2,279 | 705 | 600 | 2,984 | 3 |
| Atrium 6430 (4) | 100% | Houston, TX | 2,074 | 1,645 | 1,765 | 705 | 1,645 | 2,470 | 4 |
| FMC Technology | 100% | Houston, TX | 8,176 | 2,375 | 9,502 | 5 | 2,375 | 9,507 | 11 |
| Fountain View Office Tower | 50% | Houston, TX | 11,446 | 3,500 | 13,269 | 1,527 | 3,500 | 14,795 | 18 |
| Gray Falls / 12000 Westheimer | 100% | Houston, TX | 7,012 | 2,548 | 4,350 | 2,004 | 2,548 | 6,354 | 8 |
| Verdugo Medical Office | 100% | Glendale, CA | 9,077 | 1,656 | 8,194 | — | 1,656 | 8,194 | 9 |

EXHIBIT "1"

| | % Owned | Location | Encumb. | Land | Bldgs. & Improv. | Subsq. Costs Capitalized | Land | Bldgs. & Improv. | Total |
|---|---|---|---|---|---|---|---|---|---|
| *Total Office Properties* | | | $59,113 | $21,578 | $52,679 | $8,545 | $21,578 | $61,223 | $82... |
| Wilmington Industrial (4) | 100% | Wilmington, CA | — | 883 | 1,303 | — | 883 | 1,303 | 2... |
| *Total Industrial/Commercial Properties* | | | — | $883 | $1,303 | — | $883 | $1,303 | $2... |
| Northwest Spectrum Plaza | 100% | Houston, TX | 4,490 | 1,711 | 2,044 | 372 | 1,711 | 2,416 | 4... |
| Windrose Plaza (4)(8) | 100% | Spring, TX | 3,794 | 1,100 | 2,429 | 826 | 1,100 | 3,255 | 4... |
| Murrieta Plaza (4) | 100% | Murrieta, CA | 1,185 | 2,311 | 2,000 | — | 2,311 | 2,000 | 4... |
| *Total Retail Properties* | | | 9,469 | $5,122 | $6,473 | 1,198 | $5,122 | $7,671 | $12... |
| Sabo Road Self Storage | 55% | Houston, TX | 1,977 | 535 | 1,696 | 743 | 535 | 2,439 | 2... |
| Tampa Self Storage | 100% | Tampa, FL | 1,451 | 669 | 1,575 | — | 669 | 1,575 | 2... |
| Ocala Self Storage | 100% | Ocala, FL | 1,412 | 585 | 1,376 | — | 585 | 1,376 | 1... |
| *Total Self-Storage Properties* | | | $4,840 | $1,789 | $4,647 | $743 | $1,789 | $5,390 | $7... |

79

## SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIA

| Property Name | % Owned | Location | Encumb. | Initial cost (1) | | Subsq. Costs Capitalized (2) | Gross amount carried at Dec. 31 (3) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Land | Bldgs. & Improv. | | Land | Bldgs. & Improv. | T |
| Florida Condominium Apartments (4) | 100% | Imperial Beach, CA | 6,905 | 5,371 | 4,512 | — | 5,371 | 4,512 | |
| San Ysidro (4) | 100% | San Ysidro, CA | — | 793 | 105 | — | 793 | 105 | |
| Quail Run Estate | 100% | Aptos, CA | — | 2,006 | 2,946 | — | 2,006 | 2,946 | |
| *Total Residential / Multi-Family* | | | $6,905 | $8,170 | $7,563 | — | $8,170 | $7,563 | $ |
| Club Royal Oak (4) | 100% | Kingsburg, CA | — | 2,615 | 380 | — | 2,615 | 380 | |
| Nevada Treasure (4) | 100% | Pahrump, NV | — | 958 | 5,032 | — | 958 | 5,032 | |
| *Total Recreational Vehicle Resort* | | | — | $3,573 | $5,412 | — | $3,573 | $5,412 | |
| Perris (4) | 100% | Perris, CA | — | 921 | — | — | 921 | — | |
| Encinitas | 100% | Encinitas, CA | — | 1,251 | — | — | 1,251 | — | |
| Pierson (4) | 100% | Desert Hot Springs, CA | — | 654 | — | — | 654 | — | |
| Imperial Beach | 100% | Imperial Beach, CA | — | 3,601 | — | — | 3,601 | — | |
| Karen & Mission Lakes (4) | 100% | Desert Hot Springs, CA | — | 3,594 | — | — | 3,594 | — | |
| El Toro Road (4) | 100% | Perris, CA | — | 359 | — | — | 359 | — | |
| Calimesa | 100% | Calimesa, CA | — | 2,861 | — | — | 2,861 | — | |
| Castaic (4) | 75% | Castaic, CA | — | 8,582 | — | — | 8,582 | — | |
| Varner Road (4) | 53% | Thousand Palms, CA | — | 1,797 | — | — | 1,797 | — | |
| Salton (4) | 71% | Salton Sea Area, CA | — | 5,796 | — | — | 5,796 | — | |

EXHIBIT "1"

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ramona Blvd (4) | 100% | San Jacinto, CA | — | 7,620 | — | — | 7,620 | — | |
| *Total Land* | | | — | $37,036 | — | — | $37,036 | — | $ |
| | | | | | | | | | |
| ASR, Inc. | N/A | Houston, TX | 12,576 | — | 129 | 566 | — | 696 | |
| *Total Corporate Properties* | | | $12,576 | — | $129 | $566 | — | $696 | |

80

**SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIA**

| Property Name | % Owned | Location | Encumb. | Initial cost (1) | | Subsq. Costs Capitalized (2) | Gross amount carried at Dec. 31, 2013 (3) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Land | Bldgs. & Improv. | | Land | Bldgs. & Improv. | Total | Acc. Depre. |
| **TOTAL ASR OWNED** | | | $92,903 | $78,151 | $78,206 | $11,052 | $78,151 | $89,258 | $167,409 | $31,865 |
| **VARIABLE INTEREST ENTITIES** | | | | | | | | | | |
| Commerce Distributions Center | 1% | Commerce, CA | 9,732 | 8,628 | 12,537 | 57 | 8,628 | 12,594 | 21,222 | 2,588 |
| Dixon & 51st Logistics Center | —% | Des Moines, IA | 16,959 | 3,682 | 19,128 | — | 3,682 | 19,128 | 22,810 | 3,927 |
| Ohio Commerce Center | —% | Strongsville, OH | 18,075 | 1,917 | 24,585 | — | 1,917 | 24,585 | 26,502 | 5,047 |
| Springs Commerce I (1) | —% | OK, GA, SC, VA, PA | 16,226 | 3,009 | 22,550 | — | 3,009 | 22,550 | 25,559 | 4,629 |
| Springs Commerce II (2) | —% | GA, AL | 19,729 | 1,709 | 21,356 | 85 | 1,709 | 21,441 | 23,150 | 4,444 |
| Springs Office (3) | —% | Fort Mill/Lancaster, SC | 14,025 | 2,288 | 19,197 | — | 2,288 | 19,197 | 21,485 | 3,941 |
| Strongville Corporate Center | 2% | Strongsville, OH | 13,542 | 7,540 | 14,236 | 1 | 7,540 | 14,237 | 21,777 | 3,131 |
| *Total Industrial/Commercial Properties* | | | $108,288 | $28,773 | $133,589 | $143 | $28,773 | $133,732 | $162,505 | $27,707 |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 4,405 | 320 | 7,056 | — | 320 | 7,056 | 7,376 | 817 |
| Muirwood Village | —% | Zanesville, OH | 7,614 | 1,043 | 13,380 | 206 | 1,043 | 13,586 | 14,629 | 2,329 |
| Ohio II - Residences at Newark & Sheffield | —% | Newark/Circleville, OH | 9,232 | 2,530 | 11,136 | 446 | 2,530 | 11,582 | 14,112 | 2,404 |
| University Springs San Marcos | —% | San Marcos, TX | 9,204 | 1,531 | 14,683 | 376 | 1,531 | 15,059 | 16,590 | 2,983 |
| *Total Multi-Family/Student Housing Properties* | | | $30,455 | $5,424 | $46,255 | $1,028 | $5,424 | $47,283 | $52,707 | $8,533 |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 4,195 | 4,897 | 3,132 | 515 | 4,897 | 3,647 | 8,544 | 443 |
| Aldine Westfield Self Storage | —% | Houston, TX | 2,143 | 112 | 2,284 | 5 | 112 | 2,289 | 2,401 | 437 |

EXHIBIT "1"

81

## SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIA

| Property Name | % Owned | Location | Encumb. | Initial cost (1) | | Subsq. Costs Capitalized (2) | Gross amount carried at Dec. 31, (3) | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Land | Bldgs. & Improv. | | Land | Bldgs. & Improv. | Tot |
| Attic Space Self Storage - Blanco Rd | —% | San Antonio, TX | 1,300 | 203 | 1,516 | — | 203 | 1,516 | |
| Attic Space Self Storage - Laredo Road | —% | San Antonio, TX | 1,668 | 455 | 2,902 | — | 455 | 2,902 | |
| Ft. Worth Northwest Self Storage | —% | Forth Worth, TX | 2,086 | 1,356 | 1,238 | — | 1,356 | 1,238 | |
| Ft. Worth River Oaks Self Storage | —% | River Oaks, TX | 2,078 | 355 | 2,273 | | 355 | 2,273 | |
| Grissom Road Self Storage | —% | San Antonio, TX | 2,281 | 2,224 | 1,765 | — | 2,224 | 1,765 | |
| Houston South Mason (Patrick's) | —% | Katy, TX | 2,796 | 899 | 1,380 | | 899 | 1,380 | |
| San Antonio 3 - Self Storage | —% | San Antonio, TX | 10,889 | 6,670 | 4,535 | — | 6,670 | 4,535 | |
| *Total Self-Storage Properties* | | | $29,436 | $17,171 | $21,025 | $520 | $17,171 | $21,545 | $3 |
| Other | | | 2,312 | — | — | — | — | — | |
| *Total Corporate Properties* | | | $254 | — | — | — | — | — | |
| *TOTAL VIE OWNED* | | | $168,433 | $51,368 | $200,869 | $1,691 | $51,368 | $202,560 | $25 |
| *TOTAL CONSOLIDATED PROPERTIES (9)* | | | $263,394 | $129,519 | $279,075 | $12,743 | $129,519 | $291,818 | $42 |

(1) Initial cost and date acquired, where applicable.

(2) Costs are offset by retirements and write-offs.

(3) The aggregate cost for federal income tax purposes is $140,716

(4) Properties were sold in 2014.

(5) Includes properties at: Industrial Blvd., Bartlesville, OK; South Erwin St., Cartersville, GA; Catawba River Rd., Fort Lawn, SC; Beaver Creek Dr., Martinsville, VA; Route 405 S., Montgomery, PA

(6) Includes properties at: North Industrial Blvd., Calhoun, GA; Cleveland Hwy, Dalton, GA; Springs Dr., Piedmont, AL

(7) Includes properties at: N. White St., Fort Mill, SC; White St., Fort Mill, SC; Grace Ave., Lancaster, SC

(8) As of December 31, 2013, the Windrose Plaza property was classified as 'Assets Held for Sale, Net' within the Consolidated Balance Sheet.

(9) As of December 31, 2013, total consolidated properties are reflected within the Consolidated Balance Sheet in 'Real Estate Held for Investment, Net' and 'Assets Held for Sale, Net'

82

EXHIBIT "1"

**SIGNATURES**

Pursuant to the requirements of Section l3 or 15(d) of the Securities Exchange Act of l934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**AMERICAN SPECTRUM REALTY INC**

By: American Spectrum Realty Inc.,

| | |
|---|---|
| Date: October 31, 2014 | /s/ William J. Carden |
| | William J. Carden |
| | Chairman of the Board, President and Chief Executive Officer |
| | (Principal Executive Officer) |
| Date: October 31, 2014 | /s/ Quentin Thompson |
| | Quentin Thompson |
| | Chief Financial Officer |
| | (Principal Finance Officer) |
| Date: October 31, 2014 | /s/ Patrick D. Barrett |
| | Patrick D. Barrett |
| | Director |
| Date: October 31, 2014 | /s/ David Brownell Wheless |
| | David Brownell Wheless |
| | Director |

83

(b) Exhibits

| Exhibit No. | Exhibit Title |
|---|---|
| 2.1 | Confirmation Order, dated July 17, 2014 incorporate by reference to Exhibit 2.1 to the Company's Form 8-K filed June 25, 2014. |
| 2.2 | Third Amendment Joint Plan of Reorganization, as attached to the Confirmation Order incorporated by reference to the Company Form 8-K filed June 25, 2014. |
| 3.1 | Form of Amended and Restated Articles of Incorporation of the Company (1) |
| 3.2 | Bylaws of the Company (1) |
| 3.3 | Amended and Restated Bylaws of the Company are incorporated herein by reference to Exhibit 3.01 to the Company's Form 10-Q for the quarter ended June 30, 2002 |
| 3.4 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003 |
| 3.5 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Form 10-Q for the quarter ended March 31, 2006 |
| 3.6 | Articles Supplementary for 15% Cumulative Preferred Stock, Series A of the Company dated December 30, 2008 are incorporated herein by reference to the Company's Form 8-K filed January 8, 2009 |

EXHIBIT "1"

| | |
|---|---|
| 3.7 | Articles Supplementary for 8% Cumulative Preferred Stock, Series B of American Spectrum Realty, Inc. incorporated by reference to Exhibit 3.1(i) to the Company's Form 8-K filed on January 7, 2014. |
| 3.8 | Articles Supplementary for 8% Cumulative Preferred Stock, Series C of American Spectrum Realty, Inc. incorporated by reference to Exhibit 3.2(i) to the Company's Form 8-K filed on January 7, 2014. |
| 3.9 | Articles Supplementary for 8% Cumulative Preferred Stock, Series B of American Spectrum Realty, Inc. incorporated by reference to Exhibit 3.1(i) of the Company's Form 8-K filed on June 16, 2014. |
| 3.10 | Bylaws of American Spectrum Realty, Inc., as amended and restated as of July 18, 2014 incorporated by reference to Exhibit 3.1(ii) to the Company's Form 8-K filed on June 25, 2014. |
| 4.1 | Form of Stock Certificate (1) |
| 10.1 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund (1) |
| 10.2 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund II (1) |
| 10.3 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund III (1) |
| 10.4 | Form of Agreement and Plan of Merger of Sierra Pacific Pension Investors '84 (1) |
| 10.5 | Form of Agreement and Plan of Merger of Sierra Pacific Institutional Properties V (1) |
| 10.6 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.7 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.8 | Form of Agreement and Plan of Merger of Nooney Real Property Investors – Two, L.P. (1) |
| 10.9 | Omnibus Stock Incentive Plan (1) |
| 10.10 | Agreement of Limited Partnership of American Spectrum Realty Operating Partnership, L.P. (1) |
| 10.11 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and CGS Properties (Mkt./Col.), L.P. (1) |
| 10.12 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Creekside/Riverside, L.L.C. (1) |
| 10.13 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and McDonnell Associates, L.L.C. (1) |
| 10.14 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pacific Spectrum, L.L.C. (1) |
| 10.15 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pasadena Autumn Ridge L.P. (1) |
| 10.16 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Seventy Seven, L.L.C. (1) |
| 10.17 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Villa Redondo L.L.C. (1) |
| 10.18 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Third Coast L.L.C. (1) |

84

| | |
|---|---|
| 10.19 | Agreement and Plan of Contribution, dated August 6, 2000, between the Company and No.-So., Inc. (1) |
| 10.20 | Form of Restricted Stock Agreement (1) |
| 10.21 | Form of Stock Option Agreement (Incentive Stock Options) (1) |
| 10.22 | Form of Stock Option Agreement (Directors) (1) |
| 10.23 | Form of Stock Option Agreement (Non-Qualified Options) (1) |
| 10.24 | Form of Indenture Relating to Notes (1) |
| 10.25 | Contribution Agreement, dated May 31, 2000, between the Company and CGS Real Estate Company, Inc. (1) |
| 10.26 | Contribution Agreement, dated May 31, 2000, between the Company and American Spectrum Real Estate Services, Inc. (1) |
| 10.27 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Lindbergh Boulevard Partners (Lindbergh), L.P. (1) |

EXHIBIT "1"

| 10.28 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Nooney Rider Trail L.L.C. (1) |
| 10.29 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Back Bay L.L.C. (1) |
| 10.30 | Contribution Agreement, dated May 31, 2001, between American Spectrum Realty Management, Inc. and CGS Real Estate Company, Inc., American Spectrum — Midwest, American Spectrum — Arizona, American Spectrum — California and American Spectrum — Texas, Inc. (1) |
| 10.31 | Amendment of Agreement Plan of Merger between the Company and Villa Redondo L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.32 | Amendment of Agreement Plan of Merger between the Company and Pasadena Autumn Ridge, L.P. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.33 | Amendment of Agreement Plan of Merger between the Company and Third Coast L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.34 | Registration Right's Agreement between the Company, the Operating Partnership, and other parties is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.35 | Employment Agreement dated October 15, 2001 between the Company and Harry A. Mizrahi is incorporated herein by reference to Exhibit 10.01 to the Company's Form 10-Q for the quarter ended March 31, 2002 |
| 10.36 | Employment Agreement dated April 3, 2002 between the Company and Paul E. Perkins is incorporated herein by reference to Exhibit 10.02 to the Company's Form 10-Q for the quarter ended March 31, 2002 |
| 10.37 | Employment Agreement dated April 16, 2002 between the Company and Patricia A. Nooney is incorporated herein by reference to Exhibit 10.03 to the Company's Form 10-Q for the quarter ended March 31, 2002 |
| 10.38 | Employment Agreement dated September 1, 2002 between the Company and Thomas N. Thurber is incorporated herein by reference to Exhibit 10.04 to the Company's Form 10-Q for the quarter ended June 30, 2002 (Exhibits pursuant to the Agreement have not been filed by the Company, who hereby undertakes to file such exhibits upon the request of the SEC) |
| 10.39 | Employment Agreement dated October 15, 2001 between the Company and William J. Carden is incorporated herein by reference to Exhibit 10.5 to the Company's Form 10-Q for the quarter ended September 30, 2002 |
| 10.40 | Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002 |
| 10.41 | Letter Agreement dated February 25, 2003 between the Company and CGS Real Estate Company, Inc. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002 |
| 10.42 | Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002 |

| 10.43 | Amendment No. 1 to Employment Agreement dated October 6, 2003 between the Company and Patricia A. Nooney incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003 |
| 10.44 | Purchase Agreement dated December 15, 2009 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |
| 10.45 | Letter Agreement to Purchase Agreement dated December 18, 2009 between the Company and Evergreen Parties (First Amendment to Purchase Agreement) incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |
| 10.46 | Second Amendment to Purchase Agreement dated January 17, 2010 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |

EXHIBIT "1"

| 10.47 | Employment Agreement dated January 1, 2012 between the Company and Anthony Eppolito and Amendment thereto dated March 30, 2012 is incorporated herein by reference to the Company's Form 10-Q for the quarter ended March 31, 2012 |
|---|---|
| 10.48 | Contribution Agreement dated and Joint Escrow Instructions by and among the Company, American Spectrum Realty Operating Partnership, L.P., American Spectrum Dunham Properties LLC, Asset Managers, Inc., D&A Daily Mortgage Fund III, L.P., D&A Semi-Annual Mortgage Fund III, L.P., and D&A Intermediate-Term Mortgage Fund III, L.P. incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on January 7, 2014. |
| 10.49 | Form of Exchange Agreement by and between the Company and holders of Series A Preferred incorporated by reference to Exhibit 10.2 to the Company's Form 8-K filed on Janaury 7, 2014. |
| 10.50 | Letter Agreement by and among the Company, American Spectrum Dunham Properties, L.L.C. and Dunham&Associates Holdings, Inc. incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on Janaury 7, 2014. |
| 10.51 | Form of Warrant issued to Dunham&Associates Holdings, Inc. incorporated by reference to Exhibit 10.2 to the Company's Form 8-K filed on January 7, 2014. |
| 10.52 | Settlement Agreement by and among the Company, American Spectrum Realty Management, LLC, American Spectrum Realty Advisors, LLC, American Spectrum Realty Operating Partnership, L.P., American Spectrum REIT I, Inc., American Spectrum Management Group, Inc., American Spectrum Management Co., American Spectrum Asset Co., and Evergreen Income & Growth REIT, Inc., and New West Realty, Inc., Real Property Systems, Inc., Real Property Systems - Indiana, LLC, Real Property Systems - Texas, LP, and Michael Palmer incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on January 21, 2014. |
| 10.53 | Settlement Agreement by and among the Company, American Spectrum Realty Operating Partnership, L.P., American Spectrum Dunham Properties, LLC, and Dunham & Associates Holdings, Inc., D&A Daily Mortgage Fund III, L.P., D&A Semi-Annual Mortgage Fund III, L.P. and D&A Intermediate-Term Mortgage Fund III, L.P. incorporated by reference to Exhibit 10.1 to the Company's Form 8-K filed on June 16, 2014. |
| 21 | Significant Subsidiaries of the Company |
| 23.1 | Consent of Independent Registered Public Accounting Firm - EEPB, PC |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| EX-101.INS | XBRL INSTANCE DOCUMENT |
| EX-101.SCH | XBRL TAXONOMY EXTENSION SCHEMA |
| EX-101.PRE | XBRL TAXONOMY EXTENSION PRESENTATION LINKBASE |
| EX-101.LAB | XBRL TAXONOMY EXTENSION LABEL LINKBASE |
| EX-101.CAL | XBRL TAXONOMY EXTENSION CALCULATION LINKBASE |
| EX-101.DEF | XBRL TAXONOMY EXTENSION DEFINITION LINKBASE |

_____

(1)  Incorporated herein by reference to the Company's Registration Statement on Form S-4 (Registration No. 333-43686), which became effective August 8, 2001.

EXHIBIT "1"

86

87

# EXHIBIT 2

10-K 1 americanspectrum_10k.htm ANNUAL REPORT

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**FORM 10-K**

**(Mark One)**

☒·☐·‥**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the year ended December 31, 2012**

**OR**

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**COMMISSION FILE NUMBER 001-16785**

**American Spectrum Realty, Inc.**
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **State of Maryland** | **52-2258674** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2401 Fountain View, Suite 750 Houston, Texas** | **77057** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 706-6200**
(Registrant's telephone number, including area code)
Securities registered under Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock, $.01 par value | NYSE Amex |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

EXHIBIT "2"

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "accelerated filer", "large accelerated filer" and "small reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer                     Accelerated filer

Non-accelerated filer                       Smaller reporting company ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes  No ☒

As of June 30, 2012, the last business day of the Registrant's most recent completed second quarter, the aggregate market value of the voting stock held by non-affiliates of the Registrant was approximately $6,866,835. The aggregate market value was computed with reference to the price on the American Stock Exchange at which the voting stock was last sold as of such date. For this purpose, 1,804,056 shares of Common Stock held by officers and directors are deemed to be held by affiliates but exclusion of shares held by any person should not be construed to indicate that such person is an affiliate of the Registrant for any other purpose.

As of March 29, 2013, 3,564,783 shares of Common Stock ($.01 par value) were outstanding.

1

---

## TABLE OF CONTENTS

|         |                                                                                          | Page No. |
|---------|------------------------------------------------------------------------------------------|----------|
|         | PART I                                                                                   |          |
| Item 1  | Business                                                                                 | 3        |
| Item 1A | Risk Factors                                                                             | 5        |
| Item 1B | Unresolved Staff Comments                                                                | 11       |
| Item 2  | Properties                                                                               | 12       |
| Item 3  | Legal Proceedings                                                                        | 16       |
| Item 4  | Submission of Matters to a Vote of Security Holders                                      | 16       |
|         | PART II                                                                                  |          |
| Item 5  | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 17       |

EXHIBIT "2"

| Item 6 | Selected Financial Data | 18 |
|---|---|---|
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | |
| | Overview | 18 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 29 |
| Item 8 | Financial Statements and Supplementary Data | 29 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 59 |
| Item 9A(T) | Controls and Procedures | 59 |
| Item 9B | Other Information | 60 |
| | **PART III** | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 60 |
| Item 11 | Executive Compensation | 60 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder | |
| | Matters | 60 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 60 |
| Item 14 | Principal Accountant Fees and Services | 60 |
| | **PART IV** | |
| Item 15 | Exhibits and Financial Statement Schedules | 61 |

2

---

PART I

**NOTE ABOUT FORWARD LOOKING STATEMENTS**

Certain statements either contained in or incorporated by reference into this report, other than purely historical information, including estimates, projections, statements relating to our business plans, objectives and expected operating results, and the assumptions upon which those statements are based, are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These forward-looking statements generally include statements that are predictive in nature and depend upon or refer to future events or conditions, and include words such as "believes," "plans," "anticipates," "projects," "estimates," "expects," "intends," "strategy," "future," "opportunity," "may," "will," "should," "could," "potential," or similar expressions. Forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties which may cause actual results to differ materially from the forward-looking statements. A detailed discussion of these and other risks and uncertainties that could cause actual results and events to differ

EXHIBIT "2"

materially from such forward-looking statements is included in this report in the sections entitled "Risk Factors" (Part I, Item 1A) and "Management's Discussion and Analysis of Financial Condition and Results of Operations" (Part II, Item 7). The reader is cautioned not to unduly rely on these forward-looking statements. We expressly disclaim any intent or obligation to update or revise publicly these forward-looking statements except as required by law.

## ITEM 1. BUSINESS

### General

We provide comprehensive integrated real estate solutions for our own property portfolio (properties in which we own a controlling interest or in properties where we are the primary beneficiary of a variable interest entity ("a VIE")) and the portfolios of our third party clients. We own and/or manage commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States. American Spectrum Realty, Inc. was incorporated in Maryland in August of 2000.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 93% at December 31, 2012. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. In general, except as noted below, the Operating Partnership units that are not held by us (approximately 7% of the outstanding units) are exchangeable for either common stock on a one-to-one basis or cash equal to the value of such stock at our sole discretion.

Unless expressly stated or the context otherwise requires, the terms "we," "our," "us", "the Company" and "ASR" refer to American Spectrum Realty, Inc. and its consolidated subsidiaries.

## Corporate Background

Our principal offices are located at 2401 Fountain View, Suite 750, Houston, Texas 77057 and our telephone number is (713) 706-6200. Our Annual Reports on Form 10-K, as well as our Code of Ethics, Corporate Governance Guidelines, and Audit Committee, Compensation Committee and Nominating Committee Charters are available through our website, www.americanspectrum.com, under the "Investor Relations" section, free of charge. Our filings with the Securities and Exchange Commission, or SEC, are posted as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Our Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at www.sec.gov.

### Description of Business

We operate as one segment that encompasses all geographic regions. We provide one group of comprehensive real estate services. The following is a summary of the percentage of our net revenues by revenue source within our single segment:

|  | Years ended December 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
| Rental revenue | 94% | 93% |

EXHIBIT "2"

| | | |
|---|---|---|
| Third party management and leasing revenue | 6% | 6% |
| Interest and other income | - | 1% |
| | 100% | 100% |

3

---

At December 31, 2012, we consolidated 41 properties(including 18 properties owned primarily by us and 23 properties owned by VIEs in which we were deemed the primary beneficiary), which consisted of 11 office properties, 12 self-storage facilities, 9 commercial/industrial properties, 6 multi-family, two retail properties, and a parcel of land. The properties are located in 15 states.

We deliver integrated property, facility, asset, business and engineering management services to a host of third party clients as well as to our own properties. We offer customized programs that focus on tenant retention through cost-efficient operations.

We are committed to expanding the scope of products and services offered. We believe this expansion will help us meet our own portfolio property needs as well as the needs of our third party clients. During 2013, we intend to expand the number of third party properties that we manage.

We have a management presence in 18 states.

**Industry, Competition and Strategy**

The availability of real estate financing has greatly diminished over the past few years as a result of the global credit crisis and overall decline in the real estate market. These events have had an adverse impact on our liquidity and capital resources. These economic conditions have increased the complexity in obtaining real estate loans and have reduced the number of loans available to finance new real estate opportunities and refinance existing real estate. These factors have increased the time and marketing costs necessary to sell properties.

We are currently focused on a strategy that includes;

- Disposing of properties in our portfolio to lower our total debt, and improve our liquidity.
  - During 2012 we sold six properties, including five owned primarily by us and one owned by a VIE, which generated $5.7 million in net proceeds after repayment of $37.8 million of debt and related obligations. The proceeds were substantially used to reduce corporate and other debt. Lenders also foreclosed on five properties, including one property owned by a VIE, as a result of our election to strategically default on the approximately $26.2 million of non-recourse debt associated with them.
  - Currently we have five of our consolidated properties listed for sale, from which we will receive approximately $7.7 million of the net proceeds after repayment of debt and other obligations.
  - Currently we are strategically defaulting on the debt of three additional consolidated properties including two ASR properties and one VIE property, as a result of the properties' sustained and significant negative cash flows. We are in negotiations with the lenders of these three properties in an effort to restructure and or modify the debt. All three of the properties have had foreclosure

EXHIBIT "2"

proceedings initiated by the lender. Our efforts to work with the lenders may fail. If we cannot successfully negotiate new terms, the properties will eventually return to the lender. Substantially all of the debt is non-recourse. See Note 11. Notes Payable.

- Concentrating our leasing and management efforts on those portfolio properties where we can improve the cash flows, economic returns and long term values.

We believe that stabilizing our portfolio and improving our liquidity, if we are successful in doing so, will provide us with an opportunity to acquire interests in or ownership of undervalued and undermanaged properties as well as allow us to expand our transaction services to additional third party clients. We believe that there are many properties currently priced below their replacement costs. We believe that with a stable portfolio and greater liquidity, our presence in 18 states, coupled with our local market knowledge and management expertise, will allow us to capitalize on these opportunities.

4

We face competition from other regional and national service providers. Many of our competitors are local or regional firms that are similarly sized; some competitors are substantially larger than we are on a local, regional, national and/or international basis. In most of the markets in which we do business, both institutional and private investors and developers of properties compete vigorously for the acquisition, development and leasing of space. Many of these competitors have greater resources and more experience than we do.

**Employees**

As of December 31, 2012, the Company employed a total of 180 individuals.

**Environmental Matters**

Federal, state and local laws and regulations impose environmental restrictions, use controls, disclosure obligations and other restrictions that impact the management, development, use, and/or sale of real estate. Such laws and regulations tend to discourage sales and leasing activities, as well as the willingness of mortgage lenders to provide financing, with respect to some properties. These laws and regulations could cause transactions that we are involved in to be delayed or abandoned as a result of these restrictions. In addition, if we fail to disclose known environmental concerns in connection with a real estate transaction we may be subject to liability.

We generally undertake a third party Phase I investigation of potential environmental risks when evaluating an acquisition. A Phase I investigation is an investigation for the presence or likely presence of hazardous substances or petroleum products under conditions that indicate an existing release, a post release or a material threat of a release. A Phase I investigation does not typically include any sampling. We may acquire a property with environmental contamination, subject to a determination of the level of risk and potential cost of remediation.

Various environmental laws and regulations also can impose liability for the costs of investigating or remediation of hazardous or toxic substances at sites currently or formerly owned or operated by a party, or at off-site locations to which such party sent wastes for disposal. In addition, an increasing number of federal, state, local and foreign governments have enacted

EXHIBIT "2"

various treaties, laws and regulations that apply to environmental and climate change, in particular seeking to limit or penalize the discharge of materials such as green house gas into the environment or otherwise relating to the protection of the environment. As a property manager, we could be held liable as an operator for any such contamination or discharges; even if the original activity was legal and we had no knowledge of, or did not cause, the release or contamination. Further, because liability under some of these laws is joint and several, we could be held responsible for more than our share, or even all, of the costs for such contaminated site if the other responsible parties are unable to pay. We could also incur liability for property damage or personal injury claims alleged to result from environmental contamination or discharges, or from asbestos-containing materials or lead-based paint present at the properties that we manage. Insurance for such matters may not always be available, or sufficient to cover our losses. Certain requirements governing the removal or encapsulation of asbestos-containing materials, as well as recently enacted local ordinances obligating property managers to inspect for and remove lead-based paint in certain buildings, could increase our costs to comply and could potentially subject us to violations or claims. Although such costs have not had a material impact on our financial results in 2012, the enactment of additional regulations, or more stringent enforcement of existing regulations, could cause us to incur significant costs in the future, and/or adversely impact our business.

## ITEM 1A. RISK FACTORS

### Risks Related to Our Business in General

***The recent economic downturn in the general economy and its continuing effects on the real estate market have negatively impacted and could continue to negatively impact our business and financial results.***

Periods of economic slowdown or recession, significantly reduced access to credit, declining employment levels, decreasing demand for real estate, declining real estate values or the perception that any of these events may occur, can reduce transaction volumes or demand for our services. The recent recession and the downturn in the real estate market could result in:

- a decline in acquisition, disposition and leasing activity;
- a decline in the supply of capital invested in commercial and residential real estate; and
- a decline in the value of real estate and in rental rates, which would cause us to realize lower revenue from:
    - property management and transaction fees, which in certain cases are calculated as a percentage of the revenue of the property under management; and
    - rental revenue, respectively.

5

The fragile state of the credit markets, the fear of a global recession for an extended period and the current economic environment have impacted real estate services and management firms like ours through reduced transaction volumes, falling transaction values, lower real estate valuations, liquidity restrictions, market volatility, and the loss of consumer confidence.

Due to the continuing economic uncertainty and the instability in credit markets, it may take us longer to sell real estate assets and investments and the selling prices may be lower than originally anticipated. In addition, the performance of certain properties in our management

EXHIBIT "2"

portfolio may be negatively impacted, which would likewise affect our fees. As a result, the carrying value of certain of our real estate investments may become impaired and we could record losses as a result of such impairment or we could experience reduced profitability related to declines in real estate values.

We are not able to predict the severity or duration of the disruption in the financial markets. The real estate market tends to be cyclical and related to the condition of the overall economy and to the perceptions of investors, developers and other market participants as to the economic outlook. The ongoing uncertainty in the credit and real estate markets has negatively impacted and could continue to negatively impact our business and our results of operations.

***The ongoing adverse conditions in the credit markets and the risk of continued market deterioration have adversely affected our revenues, expenses and operating results and may continue to do so.***

We are sensitive to credit cost and availability as well as market place liquidity. We anticipate needing to borrow funds to meet our operating cash flow needs. In addition, the revenues in our business are dependent to some extent on overall volume of activity and pricing in the real estate market.

Disruptions in the credit markets could adversely affect our business of providing services to owners, purchasers, sellers, investors and occupants of real estate in connection with acquisitions, dispositions and leasing of real property. If we and/or our clients are unable to obtain credit on favorable terms, there will be fewer completed acquisitions, dispositions and leases of property. In addition, if purchasers of real estate are not able to obtain favorable financing resulting in a lack of disposition opportunities for funds, our property management fee revenues will decline and we may also experience losses on real estate held for investment.

The difficulty in obtaining financing has either eliminated or severely reduced the availability of our historical funding sources and to the extent credit remains available, it is currently more expensive. We may not be able to continue to access sources of funding for our needs, or, if sources are available to us, those sources may not be available with favorable terms. Any decision by lenders to make additional funds available to us in the future for our operational or investment needs will depend upon a number of factors, such as industry and market trends in our business, the lenders' own resources and policies concerning loans and investments, and the relative attractiveness of alternative investment or lending opportunities.

The depth and duration of credit market disruptions are impossible to predict. In fact, the magnitude of the 2010 credit market disruption exceeded the expectations of most if not all market participants. This uncertainty limits our ability to develop future business plans and we believe that it limits the ability of other participants in the credit markets and the real estate markets to do so as well. This uncertainty may lead market participants to act more conservatively than in recent history, which may continue to depress demand and pricing in our markets.

***A potential change in U.S. accounting standards regarding operating leases may make the leasing of our properties less attractive to our potential tenants, which could reduce overall demand for our leasing services.***

Under current authoritative accounting guidance for leases, a lease is classified by a tenant as a capital lease if the significant risks and rewards of ownership are considered to reside with the tenant. Under capital lease accounting for a tenant, both the leased asset and liability are reflected on their balance sheet. If the lease does not meet any of the criteria for a capital lease, the lease is considered an operating lease by the tenant, and the obligation does not appear on

EXHIBIT "2"

the tenant's balance sheet; rather, the contractual future minimum payment obligations are only disclosed in the footnotes thereto. Thus, entering into an operating lease can appear to enhance a tenant's balance sheet in comparison to direct ownership. The Financial Accounting Standards Board, or the FASB, and the International Accounting Standards Board, or the IASB, conducted a joint project to re-evaluate lease accounting. In August 2010, the FASB and the IASB jointly released exposure drafts of a proposed accounting model that would significantly change lease accounting. The final standards have yet to be released. Changes to the accounting guidance could affect both our accounting for leases as well as that of our current and potential tenants. These changes may affect how our real estate leasing business is conducted. For example, if the accounting standards regarding the financial statement classification of operating leases are revised, then companies may be less willing to enter into leases with us in general or desire to enter into leases with us with shorter terms because the apparent benefits to their balance sheets could be reduced or eliminated.

6

---

***We are in a highly competitive business with numerous competitors; some competitors may have greater financial and operational resources than we do.***

We compete in a variety of service disciplines within the real estate industry. Each of these areas is highly competitive on a national as well as on a regional and local level. We face competition not only from national real estate service providers, but also from global real estate service providers and boutique real estate firms. Depending on the service, we also face competition from other real estate service providers, institutional lenders, insurance companies, investment banking firms, investment managers and accounting firms, some of which may have greater financial resources than we do. We are also subject to competition from other large national firms and from multi-national firms that have similar service competencies to us. Although many of our competitors are local or regional firms that are similarly sized, many of our competitors are substantially larger than us on a local, regional, national or international basis. In general, there can be no assurance that we will be able to continue to compete effectively with respect to any of our business or on an overall basis, or to maintain current fee levels, or maintain or increase our market share.

***As a service-oriented company, we depend upon the retention of senior management and key personnel, and the loss of our current personnel or our failure to hire and retain additional personnel could harm our business.***

Our success is dependent upon our ability to retain our executive officers and other key employees and to attract and retain highly skilled personnel. We believe that our future success in developing our business and maintaining a competitive position will depend in large part on our ability to identify, recruit, hire, train, retain and motivate highly skilled executive, managerial, sales, marketing and customer service personnel. Competition for these personnel is intense, and we may not be able to successfully recruit, assimilate or retain sufficiently qualified personnel. We use equity incentives to attract and retain our key personnel. Poor performance of our stock may diminish our ability to offer attractive incentive awards to new hires. Our failure to recruit and retain necessary executive, managerial, sales, marketing and customer service personnel could harm our business and our ability to obtain new customers.

***If we fail to manage any future growth effectively, we may experience a material adverse effect on our financial condition and results of operations.***

EXHIBIT "2"

The future integration of acquisitions and additional growth may place a significant strain upon management, administrative, operational and financial infrastructure. Our ability to grow also depends upon our ability to successfully hire, train, supervise and manage additional executive officers and new employees, obtain financing for our capital needs, expand our systems effectively, allocate our human resources optimally, maintain clear lines of communication between our transactional and management functions and our finance and accounting functions, and manage the pressures on our management and administrative, operational and financial infrastructure. Additionally, managing future growth may be difficult due to the new geographic locations and service offerings. There can be no assurance that we will be able to accurately anticipate and respond to the changing demands we will face as we integrate and continue to expand our operations, and we may not be able to manage growth effectively or to achieve growth at all. Any failure to manage our future growth effectively could have a material adverse effect on our business, financial condition and results of operations.

### Risks Related to Property Management

***If the properties that we manage fail to perform, then our business and results of operations could be harmed.***

Our success partially depends upon the performance of the properties we manage. We could be adversely affected by the nonperformance of, or the deteriorating financial condition of, certain of our clients. The revenue we generate from our property management fees is generally a percentage of aggregate rent collections from the properties. The performance of these properties will depend upon the following factors, among others, many of which are partially or completely outside of our control:

- our ability to attract and retain creditworthy tenants;
- the magnitude of defaults by tenants under their respective leases;
- our ability to control operating expenses;
- governmental regulations, local rent control or stabilization ordinances which are in, or may be put into, effect;
- various uninsurable risks;
- financial condition of certain clients;
- the nature and extent of competitive properties; and
- the general real estate market.

7

These or other factors may negatively impact the properties that we manage, which could have a material adverse effect on our business and results of operations.

***We may have liabilities in connection with property and facilities management activities.***

We could become subject to claims by participants in real estate sales, as well as building owners and companies for whom we provide management services, claiming that we did not fulfill our statutory obligations as a broker.

In addition, with regard to our property and facilities management services, we hire and supervise third party contractors to provide construction and engineering services for our properties and our third party clients properties. While our role is limited to that of a supervisor,

EXHIBIT "2"

we may be subject to claims for construction defects or other similar actions. Adverse outcomes of property and facilities management litigation could have a material adverse effect on our business, financial condition and results of operations.

Third party management contracts can be terminated. Loss of a significant number of contracts and fees could have a material adverse effect on our business, results of operations and financial condition.

***Environmental regulations may adversely impact our business and/or cause us to incur costs for cleanup of hazardous substances or wastes or other environmental liabilities.***

Federal, state and local laws and regulations impose various environmental restrictions, use controls, and disclosure obligations which impact the management, development, use, and/or sale of real estate. Such laws and regulations tend to discourage sales and leasing activities, as well as mortgage lending availability, with respect to some properties. A decrease or delay in such transactions may adversely affect our results of operations and financial condition. In addition, a failure by us to disclose environmental concerns in connection with a real estate transaction may subject us to liability to a buyer or lessee of property.

In addition, in our role as a property manager, we could incur liability under environmental laws for the investigation or remediation of hazardous or toxic substances or wastes at properties we currently or formerly managed, or at off-site locations where wastes from such properties were disposed. Such liability can be imposed without regard for the lawfulness of the original disposal activity, or our knowledge of, or fault for, the release or contamination. Further, liability under some of these laws may be joint and several, meaning that one liable party could be held responsible for all costs related to a contaminated site. We could also be held liable for property damage or personal injury claims alleged to result from environmental contamination, or from asbestos-containing materials or lead-based paint present at the properties we manage. Insurance for such matters may not be available or sufficient.

Certain requirements governing the removal or encapsulation of asbestos-containing materials, as well as recently enacted local ordinances obligating property managers to inspect for and remove lead-based paint in certain buildings, could increase our cost to comply with the law and potentially subject us to violations or claims. Although such costs have not had a material impact on our financial results or competitive position during fiscal year 2012 or 2011, the enactment of additional regulations, or more stringent enforcement of existing regulations, could cause us to incur significant costs in the future, and/or adversely impact our management services fees.

**Risks Related to Investment in Properties**

***We are subject to the risks related to the ownership and operation of real estate that can adversely impact our business and financial condition.***

*The value of our investments may be reduced by general risks of real estate ownership:* Since we derive income from real estate operations, we are subject to the general risks of acquiring and owning real estate-related assets, including:

- changes in the national, state and local economic climate and real estate conditions, such as oversupply of or reduced demand for real estate space and changes in market rental rates;
- how prospective tenants perceive the attractiveness, convenience and safety of our properties;

EXHIBIT "2"

- difficulties in consummating and financing acquisitions and/or enhancements on advantageous terms and the failure of properties to perform as expected;
- our ability to provide adequate management, maintenance and insurance;
- natural disasters, such as earthquakes, hurricanes and floods, which could exceed the aggregate limits of our insurance coverage;
- the expense of periodically renovating, repairing and re-letting spaces;
- the impact of environmental protection laws;
- compliance with federal, state, and local laws and regulations;
- increasing operating and maintenance costs, including property taxes, insurance and utilities, if these increased costs cannot be passed through to tenants;
- adverse changes in tax, real estate and zoning laws and regulations;
- increasing competition from other properties in our market;
- tenant defaults and bankruptcies;
- tenants' right to sublease space; and
- concentration of properties leased to non-rated private companies with uncertain financial strength.

8

Certain significant costs, such as mortgage payments, real estate taxes, insurance and maintenance, generally are not reduced even when a property's rental income is reduced. In addition, environmental and tax laws, interest rate levels, the availability of financing and other factors may affect real estate values and property income. Furthermore, the supply of space fluctuates with market conditions.

If our properties do not generate sufficient income to meet operating expenses, including any debt service, tenant improvements, lease commissions and other capital expenditures, we may have to borrow additional amounts to cover fixed costs, we may elect to not service the debt and attempt to negotiate different terms with the bank, or we may sell the property, or the property may be repossessed by the lender.

***Properties that we acquire may be located in new markets where we may face risks associated with investing in an unfamiliar market.***

We may acquire or accept management responsibilities for properties in markets that are new to us. When we acquire or manage properties located in these markets, we may face risks associated with a lack of market knowledge or understanding of the local economy, forging new business relationships in the area and unfamiliarity with local government and local procedures.

***Because real estate investments are generally illiquid, and various factors limit our ability to dispose of assets, we may not be able to sell properties when appropriate.***

Real estate investments are relatively illiquid and, therefore, we have limited ability to vary our portfolio quickly in response to changes in economic or other conditions.

***Climate change and weather pattern shifts may adversely affect our profitability.***

We consider our largest risk related to climate change to be legislative and regulatory changes intended to slow or prevent it, and the potential costs to us to implement these changes. We are also subject to physical risks inherent in owning real property that include but are not limited to;

severe weather events such as hurricanes, tornadoes, and wildfires. To the extent that changes in climate effect changes in weather patterns (such as more severe weather events) or changes in sea level where we have properties, we could be adversely affected. To the extent that climate change results in changes in sea level, we would expect such effects to be gradual and amenable to structural mitigation during the useful life of our buildings. However, if this is not the case it is possible that we would be impacted in an adverse way, potentially materially so. We could experience both risks and opportunities as a result of related physical impacts. For example, more extreme weather patterns – namely, a warmer summer or a cooler winter – could increase demand for our properties in areas that are not as adversely impacted as other areas. However, we also could experience more difficult operating conditions in that type of environment. We maintain various types of insurance in amounts we consider appropriate for risks associated with weather events.

Should an uninsured loss or a loss in excess of insured limits occur, we could lose our capital invested in the property, as well as the anticipated future revenues from the property and, in the case of debt which has recourse provisions, we would remain obligated for any mortgage debt or other financial obligations related to the property. Any such loss would adversely affect us. We will generally be liable for any unsatisfied obligations other than non-recourse obligations. We believe that our properties are adequately insured. No assurance can be given that material losses in excess of insurance proceeds will not occur in the future.

***Joint venture investments will expose us to certain risks.***

We may from time to time enter into joint venture transactions for portions of our existing or future real estate assets. Investing in this manner subjects us to certain risks, among them the following:

- we will not exercise sole decision making authority regarding the joint ventures business and assets and, thus, we may not be able to take actions that we believe are in our company's best interests;
- we may be required to accept liability for obligations of the joint venture (such as recourse carve-outs on mortgage loans beyond our economic interest;
- our returns on joint venture assets may be adversely affected if the assets are not held for the long-term.

9

***Our ability to renew leases or re-lease space on favorable terms as leases expire significantly affects our business.***

We are subject to the risks that, upon expiration of leases for space located in our properties, the premises may not be re-let or the terms of re-letting (including the cost of concessions to tenants) may be less favorable than current lease terms. If a tenant does not renew its lease or if a tenant defaults on its lease obligations, there is no assurance we could obtain a substitute tenant on acceptable terms. If we cannot obtain another tenant with comparable needs, we may be required to modify the property for a different use, which may involve a significant capital expenditure and a delay in releasing the property. Further, if we are unable to re-let promptly all or a substantial portion of our space or if the rental rates upon such re-letting were significantly lower than expected rates, our revenues and ability to provide cash for our operations would be

EXHIBIT "2"

adversely affected. There can be no assurance that we will be able to retain tenants in any of our properties upon the expiration of their leases.

***A property that incurs a vacancy could be difficult to sell or re-lease.***

A property may incur a vacancy either by the continued default of a tenant under its lease or the expiration of one of our leases. Certain of our properties may be specifically suited to the particular needs of a tenant. We may have difficulty obtaining a new tenant for any vacant space we have in our properties. If the vacancy continues for a long period of time, we may suffer reduced revenues resulting in less cash available to meet our operational needs. In addition, the resale value of a property could be diminished because the market value of a particular property will depend principally upon the value of the leases of such property.

***Leveraging our portfolio subjects us to increased risk of loss, including loss of properties in the event of a foreclosure.***

Our portfolio is highly leveraged. The use of leverage presents an additional element of risk in the event that;

- the cash flow from lease payments on our properties is insufficient to meet debt obligations;
- we are unable to refinance our debt obligations as necessary or on as favorable terms; or
- there is an increase in interest rates.

If a property is mortgaged to secure payment of indebtedness and we are unable to meet mortgage payments, the property could be foreclosed upon with a consequent loss of income and asset value to us.

Our organization documents contain no limitation on the amount or percentage of indebtedness which we may incur. Therefore, our board of directors, without a vote of the stockholders, could alter the general policy on borrowings at any time. If our debt capitalization policy were changed, we could become more highly leveraged, resulting in an increase in debt service that could adversely affect our operating cash flow and our ability to make expected cash distributions for our operating needs, and could result in an increased risk of default on our obligations. See Item 8 – Consolidated Financial Statements Note 11. Notes Payable for additional information on our debt.

***Covenants in our credit agreements could limit our flexibility and adversely affect our financial condition.***

The terms of our credit facilities and other indebtedness require us to comply with a number of customary financial and other covenants**.** These covenants may limit our flexibility in our operations, and breaches of these covenants could result in defaults under the instruments governing the applicable indebtedness even if we have satisfied our payment obligations. If our properties were foreclosed upon, or if we are unable to refinance our indebtedness at maturity or meet our payment obligations, the amount of our cash flows and our financial condition could be adversely affected. See Item 8 – Consolidated Financial Statements and Supplementary Date Note 11. Notes Payable, for additional information regarding our debt.

10

EXHIBIT "2"

**Other Risks**

***Certain officers and directors may have interests that conflict with the interests of stockholders.***

Certain of our officers and members of our board of directors may have personal interests that conflict with the interests of our stockholders with respect to business decisions affecting us and our Operating Partnership, such as interests in the timing and pricing of property sales or refinancing in order to obtain favorable tax treatment. As a result, the effect of certain transactions on these members of management may influence our decisions affecting these properties.

***Our goodwill and other intangible assets could become further impaired, which may require us to take significant non-cash charges against earnings.***

Under current accounting guidelines, we must assess, at least annually and potentially more frequently, whether the value of our goodwill and other intangible assets has been impaired. Any impairment of goodwill or other intangible assets as a result of such analysis would result in a non-cash charge against earnings, which charge could materially adversely affect our reported results of operations, stockholders' equity and our stock price. A significant and sustained decline in our future cash flows, a significant adverse change in the economic environment, slower growth rates or if our stock price falls below our net book value per share for a sustained period, all could result in the need to perform additional impairment analysis in future periods. If we were to conclude that a future write-down of goodwill or other intangible assets is necessary, then we would record such additional charges, which could materially adversely affect our results of operations.

**We have a history of losses which may continue, which may negatively impact our ability to achieve our business objectives.**

We cannot assure you that we can achieve or sustain profitability on a quarterly or annual basis in the future. Our operations are subject to the risks and competition inherent in the establishment of a business enterprise. There can be no assurance that future operations will be profitable. Revenues and profits, if any, will depend upon various factors, including whether we will be able to continue expansion of our revenue. We may not achieve our business objectives and the failure to achieve such goals would have an adverse impact on us.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

Not applicable.

11

---

## ITEM 2. PROPERTIES

**The Location and Type**

EXHIBIT "2"

The following table sets forth the location, type and size of the properties (by rentable square feet) along with annualized net rent, rented square feet, occupancy, and rent per square foot consolidated by us as of December 31, 2012. All properties listed below are encumbered by debt.

| Property Name | Percentage owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent | Rent per Square Feet |
|---|---|---|---|---|---|---|---|
| | | | (1) | | | (2) | (3) |
| *Properties Owned Primarily by ASR* | | | | | | | |
| *Office Properties* | | | | | | | |
| 11500 Northwest Freeway | 100% | Houston, TX | 81,422 | 83% | 67,256 | 871,260 | 12.95 |
| 1501 Mockingbird Lane | 100% | Victoria, TX | 70,255 | 92% | 64,288 | 924,407 | 14.38 |
| 2620-2630 Fountain View | 51% | Houston, TX | 124,738 | 65% | 80,900 | 1,076,887 | 13.31 |
| 2640-2650 Fountain View | 100% | Houston, TX | 175,423 | 85% | 149,420 | 2,275,590 | 15.23 |
| 5450 Northwest Central | 100% | Houston, TX | 56,111 | 69% | 38,448 | 515,966 | 13.42 |
| 800 & 888 Sam Houston Pkwy | 100% | Houston, TX | 88,292 | 81% | 71,900 | 976,707 | 13.58 |
| 8100 Washington | 100% | Houston, TX | 44,080 | 96% | 42,157 | 630,965 | 14.97 |
| Atrium 6430 | 100% | Houston, TX | 44,177 | 74% | 32,766 | 400,334 | 12.22 |
| FMC Technology | 100% | Houston, TX | 93,912 | 100% | 93,912 | 850,000 | 9.05 |
| Fountain View Office Tower | 100% | Houston, TX | 174,327 | 77% | 134,400 | 2,882,827 | 21.45 |
| Gray Falls Center & 12000 Westheimer | 100% | Houston, TX | 98,411 | 91% | 90,040 | 1,419,092 | 15.76 |
| *Office Properties* | | | 1,051,148 | 82% | 865,487 | 12,824,035 | 14.82 |
| *Industrial/Commercial Properties* | | | | | | | |
| Morenci Professional Park | 100% | Indianapolis, IN | 105,600 | 48% | 50,400 | 302,008 | 5.99 |
| *Industrial/Commercial Properties* | | | 105,600 | 48% | 50,400 | 302,008 | 5.99 |
| Northwest Spectrum Plaza | 100% | Houston, TX | 48,000 | 92% | 44,000 | 345,720 | 7.86 |
| Windrose Plaza | 100% | Spring, TX | 28,315 | 57% | 16,115 | 258,070 | 16.01 |
| *Retail Properties* | | | 76,315 | 79% | 60,115 | 603,790 | 10.04 |

EXHIBIT "2"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sabo Road Self Storage | 55% | Houston, TX | 76,230 | 86% | 65,605 | 448,800 | 6.84 |
| Tampa Self Storage | 100% | Tampa, FL | 61,530 | 72% | 44,415 | 275,928 | 6.21 |
| Ocala Self Storage | 100% | Ocala, FL | 44,591 | 49% | 21,703 | 130,596 | 6.02 |
| *Self-Storage Properties* | | | 182,351 | 72% | 131,723 | 855,324 | 6.49 |
| | | | | | | | |
| | | | **11** | | | | |
| Land | 100% | Houston, TX | Acres | N/A | N/A | N/A | N/A |
| *Land* | | | 11 Acres | N/A | N/A | N/A | N/A |

12

| Property Name | Percenta ge owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasabl e Area Occupie d | Rented Square Feet | Annualize d Net Rent | Rent per Square Feet |
|---|---|---|---|---|---|---|---|
| | | | | (1) | | (2) | (3) |
| *Properties Owned by VIEs* | | | | | | | |
| | | | | | | | |
| Commerce Distributions Center | 1% | Commerce, CA | 200,000 | 100% | 200,000 | 1,077,120 | 5.39 |
| Dixon & 51st Logistics Center | 0% | Des Moines, IA | 731,169 | 100% | 731,169 | 2,128,0 26 | 2.91 |
| Fishers Indiana Distribution Center | 1% | Fishers, IN | 637,531 | 0% | 0 | - | - |
| Ohio Commerce Center | 0% | Strongsville, OH | 204,592 | 100% | 204,592 | 2,333,567 | 11. 41 |
| Springs Commerce Center I | 0% | OK,GA,SC,VA,PA | 1,006,993 | 100% | 1,006,9 93 | 2,390,659 | 2.37 |
| Springs Commerce Center II | 0% | GA, AL | 1,439,300 | 69% | 986,450 | 2,088,401 | 2.12 |
| Springs Office | 0% | Fort Mill/Lancaster, SC | 265,493 | 100% | 265,493 | 2,013,512 | 7.58 |
| Strongsville Corporate Center | 2% | Strongsville, OH | 125,006 | 100% | 125,006 | 2,080,896 | 16.65 |
| *Industrial/Commercial Properties* | | | 4,610,0 84 | 76% | 3,519,703 | 14,112,181 | 4.01 |
| | | | | | | | |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 72,480 | 98% | 71,272 | 774,804 | 10.87 |
| Muirwood Village | 0% | Zanesville, OH | 157,864 | 94% | 148,391 | 1,516,560 | 10.22 |

EXHIBIT "2"

| | | | | | | |
|---|---|---|---|---|---|---|
| Ohio II - Residences at Newark & Sheffield | 0% | Newark/Circleville, OH | 202,525 | 95% | 191,738 | 1,900,404 | 9.91 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 563,040 | 77% | 432,240 | 2,327,240 | 5.38 |
| University Fountains Lubbock | 0% | Lubbock, TX | 284,022 | 94% | 267,926 | 4,527,828 | 16.90 |
| University Springs San Marcos | 0% | San Marcos, TX | 176,944 | 97% | 171,265 | 2,625,348 | 15.33 |
| *Multi-Family/Student Housing Properties* | | | 1,456,875 | 88% | 1,282,832 | 13,672,184 | 10.66 |
| | | | | | | |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 236,875 | 91% | 215,575 | 915,288 | 4.25 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 64,530 | 79% | 50,983 | 420,948 | 8.26 |
| Attic Space Self Storage - Blanco Rd | 0% | San Antonio, TX | 51,805 | 91% | 47,160 | 369,888 | 7.84 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 57,706 | 95% | 54,631 | 485,988 | 8.90 |
| Ft. Worth Northwest Self Storage | 0% | Fort Worth, TX | 63,025 | 74% | 46,500 | 468,384 | 10.07 |
| Ft. Worth River Oaks Self Storage | 0% | River Oaks, TX | 104,914 | 91% | 95,575 | 595,008 | 6.23 |
| Grissom Road Self Storage | 0% | San Antonio, TX | 250,618 | 88% | 219,816 | 570,648 | 2.60 |
| Houston South Mason (Patrick's) | 0% | Katy, TX | 56,850 | 94% | 53,450 | 429,000 | 8.03 |
| San Antonio 3 | 0% | San Antonio, TX | 267,260 | 89% | 239,091 | 1,557,720 | 6.52 |
| *Self-Storage Properties* | | | 1,153,583 | 89% | 1,022,781 | 5,812,872 | 5.68 |
| | | | | | | |
| Total ASR Properties | | | 1,415,414 | 78% | 1,107,725 | 14,585,155 | 13.17 |
| Total Variable Interest Entity Properties | | | 7,220,542 | 81% | 5,825,316 | 33,597,237 | 5.77 |
| Total Consolidated Properties | | | 8,635,956 | 80% | 6,933,041 | 48,182,392 | 6.95 |

---

(1)    Includes gross leasable area for leases that have been executed and have commenced as of December 31, 2012.

(2)    Represents base rent at December 31, 2012 for occupied square footage.

(3)    Represents annualized net rent divided by rented square feet.

For the year ended December 31, 2012, no tenant contributed 10% or more of our total rental revenue. A complete listing of properties consolidated by us at December 31, 2012, is included as part of Schedule III in Item 15. Five of the properties listed above are held for sale at December 31, 2012; please see Part II, Item 8 Financial Statements and Supplementary Data, Note 4. Assets Held for Sale.

13

---

**Lease Expirations**

EXHIBIT "2"

The following table sets forth, for the periods specified, the number of expiring leases by property category (excluding multi-family, student housing and self-storage due to their prevailing month to month nature), the total rented area subject to expiring leases, annual base rent represented by expiring leases, and percentage of total annual base rent represented by expiring leases for our consolidated properties.

## LEASE EXPIRATION

| Expiration Year (2) | Number of expiring leases | Rented square footage subject to expiring leases (3) | Annual base rent under expiring leases (in thousands) (4) | Percentage of total annual base rent represented by expiring leases (1) |
|---|---|---|---|---|
| **For Office Properties** | | | | |
| 2013 | 197 | 280,005 | $ 10,847 | 42% |
| 2014 | 94 | 240,074 | 7,007 | 27% |
| 2015 | 66 | 174,223 | 4,226 | 16% |
| 2016 | 36 | 96,876 | 2,267 | 9% |
| 2017 | 15 | 52,765 | 934 | 4% |
| thereafter | 14 | 21,544 | 488 | 2% |
| | 422 | 865,487 | $ 25,769 | 100% |
| **For Industrial/Commercial Properties** | | | | |
| 2013 | 3 | 42,000 | $ 14,137 | 9% |
| 2014 | 3 | 6,000 | 14,263 | 9% |
| 2015 | 3 | 133,569 | 14,277 | 9% |
| 2016 | 3 | 725,006 | 12,031 | 7% |
| 2017 | 0 | 0 | - | 0% |
| thereafter | 12 | 2,663,528 | 110,762 | 66% |
| | 24 | 3,570,103 | $ 165,470 | 100% |
| **For Retail Property** | | | | |
| 2013 | 0 | 0 | $ - | 0% |
| 2014 | 3 | 16,000 | 639 | 15% |
| 2015 | 0 | 0 | - | 0% |
| 2016 | 2 | 8,000 | 579 | 14% |
| 2017 | 2 | 13,440 | 476 | 11% |
| thereafter | 8 | 22,675 | 2,568 | 60% |
| | 15 | 60,115 | $ 4,262 | 100% |

_____

**Footnotes**

(1)    Annual base rent expiring during each period, divided by total annual base rent (both adjusted for contractual increases).

(2)    2013 includes leases that have initial terms of less than one year.

(3)   This figure is based on square footage actually occupied (which excludes vacant space), which accounts for the difference between this figure and total gross leasable area (which includes vacant space).

(4)   This figure is based on square footage actually occupied and incorporates contractual rent increases arising after 2012, and thus differs from annualized net rent in the table under "The Location and Type of the Company's Properties", which is based on 2012 rents.

**Office Properties**

At December 31, 2012, we owned eleven office properties with total rentable square footage of 1,051,148. The office properties range in size from 44,080 square feet to 175,423 square feet, and have remaining lease terms ranging from less than one to ten years. Most of the leases are for one to three years, thus requiring us to renew leases on a continuing basis. Of the approximately 280,000 square feet of leases expiring in the next twelve months, we are currently working on renewing the expiring leases or attracting new tenants. If the tenants elect not to renew we can make no guarantees that we will be able to lease the space timely or at historic rent levels.

14

The office leases generally require the tenant to reimburse us for increases in building operating costs over a base amount. Certain of the leases provide for rent increases that are either fixed or based on a consumer price index. As of December 31, 2012, the weighted average occupancy of the office properties was 82%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2012, was $14.82.

We are currently actively marketing our empty square footage but do not know if, when or at what rent rates we will be able to lease the vacant office spaces.

**Industrial/Commercial Properties**

At December 31, 2012, we consolidated nine industrial properties (one owned by us and eight owned by VIEs) with total rentable square footage of 4,715,684. The industrial properties are primarily designed for warehouse, distribution and light manufacturing usage and range in size from 105,600 square feet to 1,439,000 square feet. As of December 31, 2012, the weighted average occupancy of the industrial properties was 76%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2012, was $4.04.

The industrial properties have leases whose remaining terms range from less than one to ten years. Of the approximately 42,000 square feet of leases expiring in the next twelve months, we are currently working on renewing the expiring leases or attracting new tenants. If the tenants elect not to renew we can make no guarantees that we will be able to lease the space timely or at historic rent levels. Most of the leases are industrial gross leases whereby the tenant pays as additional rent its pro rata share of common area maintenance and repair costs and its share of

EXHIBIT "2"

the increase in taxes and insurance over a base amount. Certain of these leases call for fixed or consumer-price-index-based rent increases. Some of the leases are triple net leases whereby the tenants are required to pay their pro rata share of the properties' operating costs, common area maintenance, property taxes, insurance and non-structural repairs.

**Retail Properties**

At December 31, 2012, we owned two retail properties in Houston, Texas with rentable square footage of 76,315. The leases require the tenants to reimburse us for certain building operating costs. As of December 31, 2012, the occupancy of the retail property was 79%. The average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2012, was $10.04.

**Multi-Family, Student Housing Properties**

At December 31, 2012, we consolidated six multi-family/student housing properties (all owned by VIEs) with total rentable square footage of 1,456,875. These properties are typically leased for one year or on a month to month basis. As of December 31, 2012, multiple tenants occupied all of these properties. As of December 31, 2012, the weighted average occupancy of the multi-family/student housing properties was 88%. The weighted average base rent per square foot, was $10.66. Although these properties are leased on short-term basis, we do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

**Self-Storage Properties**

At December 31, 2012, we consolidated twelve self-storage properties (three owned by us and nine owned by VIEs) with total rentable square footage of 1,335,934. The self-storage properties are primarily month-to-month lease terms. Due to the economy, our rental rates for these properties have dropped from last year in our effort to maintain and increase our occupancy percentages. As of December 31, 2012, the weighted average occupancy of the self-storage properties was 86%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2012, was $5.78. We do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

**Development Land**

The Company owns an 11.86 acre parcel of land in Houston, Texas. The land is adjacent to a retail property owned by the Company.

15

## ITEM 3. LEGAL PROCEEDINGS

On March 2, 2011, we filed an action against Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") relating to our acquisition of assets from Evergreen in January 2010. The purchase price of the assets was $18.0 million, subject to adjustment as provided in the purchase agreement, and was paid in the form of (a) the assumption of $500,000 of payables, (b) the issuance of a $9.5 million promissory note and (c) the issuance of operating partnership units

EXHIBIT "2"

which would be redeemable by Evergreen after June 30, 2011 for a number of shares of our common stock (or, at our option, the cash equivalent) equal to the quotient obtained by dividing $8.0 million by the greater of our share price or net asset value as of December 31, 2010. (Our share price as of December 31, 2010 was $17.52; our net asset value as of December 31, 2010 has not been definitively determined.) In our action, we are alleging various offsets and adjustments to the purchase price, as well as defaults by Evergreen, and are seeking damages and a declaration that the principal amount of the promissory note should be reduced to zero, that the operating partnership units should be cancelled and that Evergreen should refund to us payments of at least $578,000 which have been made on the promissory note. On March 7, 2011, New West Realty, Inc. ("New West"), an affiliate of Evergreen, filed a complaint for damages in Orange County Superior Court against ASR and other related entities. New West alleges in the complaint that ASR had failed to pay amounts then due under a $9.5 million promissory note held by New West. We have subsequently paid all amounts currently due and payable under the note and therefore dispute the claim and deny that any payment is now due under the note, and we have filed a separate lawsuit against New West and others seeking damages in excess of the amount of New West's claim.

During the second quarter of 2012, we repurchased all of the operating partnership units ("OP Units") issued to Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") in 2010. We had issued the OP Units to Evergreen in connection with the acquisition of assets from Evergreen on January 17, 2010. The OP Units issued to Evergreen were repurchased by the Company for one dollar as provided in the purchase and sell agreement.

In January 2013, we came to terms with Evergreen to settle the $9.5 million promissory note. The proposed terms of the settlement agreement have been formalized. We have agreed to pay $4.6 million in a combination of cash, a new note, and nonconvertible preferred stock as settlement of the note. The new debt will mature in 2017. The required documentation and approval by all parties of the settlement agreement is anticipated to be completed in the second quarter of 2013.

We are in default on a $1.0 million unsecured note, which matured in May 2012. The loan is guaranteed by John N. Galardi, a principal shareholder of the Company. The lender on the note has initiated legal proceedings to collect on the debt. Negotiations are in progress to settle this debt.

Certain other claims and lawsuits have arisen against us in our normal course of business, including lawsuits by creditors with respect to past due accounts payable. We believe that such claims and lawsuits will not have a material adverse effect on our financial position, cash flows or results of operations.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

There was no submission of matters to a vote of security holders during the quarter ended December 31, 2012.

16

---

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

EXHIBIT "2"

**Market Information**

The Company's Common Stock trades on the NYSE Amex under the symbol AQQ. The following table sets forth the high and low closing prices per share of the Company's Common Stock for the periods indicated, as reported by the NYSE Amex.

|  | High: | Low: |
|---|---|---|
| Year Ended December 31, 2012 | | |
| First Quarter | $ 6.97 | $ 4.96 |
| Second Quarter | $ 5.60 | $ 3.79 |
| Third Quarter | $ 5.40 | $ 2.90 |
| Fourth Quarter | $ 4.25 | $ 3.25 |
| Year Ended December 31, 2011 | | |
| First Quarter | $ 20.00 | $ 16.36 |
| Second Quarter | $ 18.94 | $ 16.05 |
| Third Quarter | $ 17.25 | $ 13.11 |
| Fourth Quarter | $ 13.04 | $ 4.82 |

As of February 28, 2013, there were approximately 2,100 holders of record of our common stock.

**Dividend Policy**

*Common Stock*

Cash dividends were last declared to holders of the Company's Common Stock in 2003.

The Company's Board of Directors has a policy of meeting on or about the 40th day after the end of each calendar quarter to consider the declaration and payment of dividends on Common Stock.

*Preferred Stock*

Series A Preferred Stock holders are entitled to cumulative dividends at a rate of 15% per year. These dividends are payable quarterly. Dividends of $0.2 million were paid during the year ended December 31, 2011. No dividends were paid during the year ended December 31, 2012. As of December 31, 2012 there were accrued and unpaid dividends on the outstanding preferred stock of $0.4 million. The shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

*Securities Authorized for Issuance under Equity Compensation Plan*

See the information incorporated by reference into Part III, Item 12 Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters of this report for information regarding securities authorized for issuance under our equity compensation plans.

During the years ended December 31, 2012 and 2011 we issued 7,000 and 34,500 shares of restricted stock, respectively, to certain employees and board members under our equity

EXHIBIT "2"

compensation plan. The recipient has the right to vote all shares, to receive and retain all cash dividends payable to holders of shares of record on or after the date of issuance and to exercise all other rights, powers and privileges of a holder of our shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to five years. The issuances of Common Stock were exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

### Unregistered Sales of Equity Securities

In 2012, the Company issued 41,910 shares of common stock to a law firm as consideration for legal services in the amount of $0.2 million. The issuance of common stock was exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to section 4(2) and Rule 506 of Regulation D promulgated thereafter.

17

---

### Issuer Purchases of Equity Securities

Neither we nor any affiliated purchaser of ours purchased any of our equity securities during the year ended December 31, 2012.

## ITEM 6. SELECTED FINANCIAL DATA

Not applicable.

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OVERVIEW

*The following Management's Discussion and Analysis ("MD&A") is intended to help the reader understand the results of operations and financial condition of American Spectrum Realty, Inc. MD&A is provided as a supplement to, and should be read in conjunction with, our consolidated financial statements and the accompanying notes to the consolidated financial statements ("Notes").*

### Business Overview

We provide comprehensive integrated real estate solutions for our own property portfolio and the portfolios of our third party clients. We own and manage; commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 93% at December 31, 2012. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. We periodically examine our corporate structure in order to evaluate if we are positioned to take advantage of the most favorable tax treatments for ourselves, our shareholders and our clients. We evaluate the potential tax benefits

EXHIBIT "2"

and consequences of a variety of business models that include but are not limited to: joint ventures, partnerships, limited liability companies (LLC), limited liability partnerships (LLP) and real estate investment trusts (REIT) for ourselves and our investors. It is our objective to consider all applicable tax laws that legally reduce the tax consequences and maximize the tax benefits associated with real estate transactions.

The REIT structure has many specific requirements that must be met and maintained in order to qualify. As of December 31, 2012 our ownership structure does not allow us to elect REIT status.

Our primary business objective is to acquire and manage multiple tenant real estate in strategically located areas where our cost effective enhancements combined with effective leasing and management strategies, can improve the long term values and economic returns of those properties. We focus on the following fundamentals to achieve this objective:

-An opportunistic and disciplined disposition strategy that enhances investment performance and takes advantage of realized gains. We typically dispose of properties when the return from selling is higher than the projected return from holding the property,

-Organic (internally developed opportunities) and in-organic (acquisition generated opportunities) growth of our third party property management contracts and transaction service fees. We intend to focus on the acquisition of third party management contracts in 2013 coupled with;

-An opportunistic yet disciplined acquisition strategy that focuses on mid-tier multi-tenant real estate in locations that allow us to capitalize on our existing management infrastructure currently servicing our own properties and that of our third party clients.

18

As of December 31, 2012, the properties that we manage were as follows:

| Property type | ASR owned | | Consolidated VIE's | | Third Party | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Number | Square footage | Number | Square footage | Number | Square footage | Number | Square footage |
| Office | 11 | 1,051,148 | - | - | 1 | 29,428 | 12 | 1,080,576 |
| Industrial/Commercial | 1 | 105,600 | 8 | 4,610,084 | - | - | 9 | 4,715,684 |
| Retail | 2 | 76,315 | - | - | 7 | 218,278 | 9 | 294,593 |
| Residential/Multi-family | - | - | 6 | 1,456,875 | 5 | 380,450 | 11 | 1,837,325 |
| Self-Storage | 3 | 182,351 | 9 | 1,153,583 | 6 | 590,332 | 18 | 1,926,266 |
| Land | 1 | - | - | - | 2 | - | 3 | - |

EXHIBIT "2"

| Total | 18 | 1,415,414 | 23 | 7,220,542 | 21 | 1,218,488 | 62 | 9,854,444 |
|-------|----|-----------|----|-----------|----|-----------|----|-----------|

During the year ended December 31, 2012, we sold six properties, one of which was owned by a VIE. We also strategically defaulted on the non-recourse debt of five properties, including one of which was owned by a VIE, that were foreclosed by the lender.

During the second quarter of 2012, we repurchased all of the operating partnership units ("OP Units") issued to Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") in 2010. We had issued the OP Units to Evergreen in connection with the acquisition of assets from Evergreen on January 17, 2010. The OP Units issued to Evergreen were repurchased by the Company for one dollar as provided in the purchase and sell agreement.

**Financial Operations Overview**

*Revenues:*

*Rental Revenues.* We derive rental revenues from tenants that occupy space in our portfolio of consolidated properties. There are three key drivers to rental revenue;

*1. Occupancy* - Rental revenues are dependent on our ability to lease spaces to quality tenants.

| Property Type | Weighted Average Occupancy as of December 31, | |
|---------------|------|------|
| | 2012 | 2011 |
| Office properties | 82% | 77% |
| Industrial properties | 76% | 87% |
| Retail properties | 79% | 56% |
| Multi-family/Student Housing properties | 88% | 96% |
| Self storage properties | 86% | 77% |

We were able to achieve occupancy increases in our portfolio's office, self-storage and retail properties in comparison to the prior year. Our multi-family/Student Housing properties experienced a decline in occupancy, primarily due to lower occupancy at College Park Student Apartments. With regard to our industrial properties, we saw a reduction in the number of buildings in our consolidated portfolio over last year by three buildings which on average had higher occupancies. We are currently in the process of aggressively marketing all vacated spaces but cannot make any guarantees as to the speed at which we will be able to find quality tenants or what, if any, reduction in rental rates we might experience.

*2.Rental rates* – Market rental rates are often inversely related to vacancy rates. Increased vacancy in the market place tends to drive down rental rates. Our leases typically have one to ten year terms based on property type. As leases expire, we replace the existing leases with new leases at the current market rental rate.

19

EXHIBIT "2"

| Property Type | Weighted Average Base Rent per occupied square foot as of December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| Office properties | $ 14.82 | $ 15.51 |
| Industrial properties | $ 4.04 | $ 4.29 |
| Retail properties | $ 10.04 | $ 10.84 |
| Multi-family/Student Housing properties | $ 10.66 | $ 9.53 |
| Self storage properties | $ 5.78 | $ 7.57 |

We were able to achieve higher base rents at our Multi-family/Student Housing properties in comparison to the prior year.

We experienced a decrease in the weighted average base rent of our office, industrial, retail and self-storage properties in comparison to the prior year. The decrease was primarily related to pressures on rent as a result of the economy. We do not anticipate rent rates to continue to decline in the near term for these properties and anticipate that our weighted average base rent will be consistent in the coming year with its present level. We are currently actively marketing our empty square footage but do not know if, when or at what rent rates we will be able to lease the vacant spaces.

3. *Tenant retention* - Retaining existing tenants is essential, as high customer retention leads to increased occupancy, less downtime between leases, and reduced leasing costs. We believe in providing superior customer service; hiring, training, retaining and empowering our employees. We strive to create an environment of open communication both internally and externally with our customers.

Of the leases that expired during 2012, we were able to retain tenants leasing approximately 55% of the expiring square footage. We continue to aggressively pursue high quality tenants for all of our vacant square footage. We can make no guarantees as to our ability to fill vacant space in a timely manner or at the same or higher rents than historically charged.

*Third party management and leasing revenue.* We derive these revenues from the fees charged to our third party clients for management services, tenant acquisition fees, leasing fees and loan advisory fees for arranging financing related to properties under management. When and if our third party clients elect to sell a property we manage for them, we will receive transaction fees and commissions relating to the sale of the property. Our same core skill set that influences our rental income also drives our third party client revenue. Many of the fees we charge our third party clients are linked to occupancy, rental rates and customer retention.

**Expenses:**

*Property operating expenses.* Property operating expenses consist primarily of property taxes, insurance, repairs and maintenance, personnel costs and building service contracts.

*General and administrative expenses.* General and administrative expenses consist primarily of personnel expenses for accounting, human resources, information technology and corporate administration, and professional fees, including audit and legal fees.

EXHIBIT "2"

*Depreciation and amortization expenses.* Depreciation and amortization expenses consist primarily of depreciation associated with our real estate held for investment, amortization of purchased intangibles, depreciation of additional capital improvements and the amortization of lease costs associated with consolidated properties.

*Interest expenses.* Interest expenses consist primarily of the interest owed to creditors for debt associated with our consolidated properties.

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, we re-evaluate our judgments and estimates. We base our estimates and judgments on our historical experience, knowledge of current conditions and our belief of what could occur in the future considering available information, including assumptions that are believed to be reasonable under the circumstances. By their nature, these estimates and judgments are subject to an inherent degree of uncertainty and actual results could differ materially from the amounts reported based on these policies.

20

---

We believe the following critical accounting policies reflect our most significant estimates, judgments and assumptions used in the preparation of our consolidated financial statements:

- Variable Interest Entity (VIE) accounting;
- Business combinations;
- Investment in real estate assets;
- Assets held for sale;
- Discontinued operations;
- Sales of real estate assets;
- Fair value measurements;
- Impairment or assets; and
- Income taxes.

*Variable Interest Entity Accounting*

Our determination of the appropriate accounting method with respect to our VIEs is based on Accounting Standards Update, or ASU, 2009-17, "*Consolidations (Topic 810): Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities.*" This ASU incorporates Statement of Financial Accounting Standards, or SFAS, No. 167, "*Amendments to FASB Interpretation No. 46(R),*" issued by the Financial Accounting Standards Board, or FASB, in June 2009. The amendments in this ASU replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with a primarily qualitative approach focused on identifying which reporting entity has both (1) the power to direct the activities of a variable interest entity that most significantly impact such entity's economic performance and (2) the obligation to absorb losses or

the right to receive benefits from such entity that could potentially be significant to such entity. The entity which satisfies these criteria is deemed to be the primary beneficiary of the VIE.

We analyze our interests in VIEs to determine if we are the primary beneficiary. We consider a variety of factors in identifying the entity that holds the power to direct matters that most significantly impact the VIE's economic performance including, but not limited to, (a) sign and enter into leases; set, distribute, and implement the capital budgets, the authority to refinance or sell the property within contractually defined limits and, (b) the ability to receive fees that are significant to the property and (c) a necessity of funding any deficit cash flows.

We consolidate any VIE of which we are the primary beneficiary (see Note 5 of the Notes to Consolidated Financial Statements set forth in Item 8 of this Annual Report). We determine whether an entity is a VIE and, if so, whether it should be consolidated by utilizing judgments and estimates that are inherently subjective. If we made different judgments or utilized different estimates in these evaluations, it could result in differing conclusions as to whether or not an entity is a VIE and whether or not to consolidate such entity. We deconsolidate a VIE when we determine that we are no longer the primary beneficiary. For VIEs in which we own an insignificant interest in, we deconsolidate the VIE by eliminating the accounts from the balance sheet with a corresponding offset to the equity of the non-controlling interest. Operations are recognized through the date of deconsolidation.

*Business Combinations*

We apply the provisions of FASB ASC Topic 805 to all transactions or events in which we obtain control of one or more businesses, including those effected without the transfer of consideration, for example, by contract or through a lapse of minority veto rights. These provisions require the acquiring entity in a business combination to recognize the full fair value of assets acquired and liabilities assumed in the transaction (whether a full or partial acquisition); establish the acquisition-date fair value as the measurement objective for all assets acquired and liabilities assumed; and require expensing of most transaction and restructuring costs.

We determine and allocate the purchase price of an acquired company to the tangible and intangible assets acquired and liabilities assumed as of the business combination date. The purchase price allocation process requires us to use significant estimates and assumptions, including fair value estimates, as of the business combination date. We utilize third-party valuation companies to help us determine certain fair value estimates used for assets and liabilities.

Additionally, the purchase price of the applicable property is allocated to the above or below market value of in-place leases and the value of in-place leases and related tenant relationships. The value allocable to the above or below market component of the acquired in-place leases is determined based upon the present value (using a discount rate which reflects the risks associated with the acquired leases) of the difference between (i) the contractual amounts to be paid pursuant to the lease over its remaining term, and (ii) our estimate of the amounts that would be paid using fair market rates over the remaining term of the lease. The amounts allocated to below market lease values are included in accrued and other liabilities in the accompanying consolidated balance sheets and are amortized to rental income over the remaining non-cancelable lease term plus any below market renewal options of the acquired leases with each property.

21

EXHIBIT "2"

While we use our best estimates and assumptions as a part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, our estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the purchase price allocation period, which is generally one year from the business combination date, we record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill.

*Investment in Real Estate Assets*

Rental properties are stated at cost net of accumulated depreciation unless circumstances indicate that cost, net of accumulated depreciation, cannot be recovered.

Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

We evaluate each of our real estate assets on a quarterly basis in order to determine the classification of each asset in our consolidated balance sheet. This evaluation requires judgment by us in considering certain criteria that must be evaluated under Topic 360: Property, Plant and Equipment, such as the estimated timeframe in which we expect to sell our real estate assets. The classification of real estate assets determines which real estate assets are to be depreciated as well as what method is used to evaluate and measure impairment. Had we evaluated our assets differently, the balance sheet classification of such assets, depreciation expense and impairment losses could have been different.

*Assets Held for Sale*

We classify assets as held for sale when management a) approves the action and commits to a plan to sell the asset(s); b) the asset(s) are available for immediate sale in its present condition customary for sales of those types of assets; c) an active program to locate a buyer and other actions required to complete the plan to sell the asset(s) have been initiated; d) the sale of the asset(s) is probable, and transfer of the asset(s) is expected to within one year; e) the asset(s) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and; f) actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. We disclose operating properties as properties held for sale in the period in which all of the required criteria are met.

Assets held for sale are recorded at the lower of cost or estimated fair value less cost to sell. If an asset's fair value less cost to sell, based on discounted future cash flows, management estimates or market comparisons, is less than its carrying amount, an impairment is recorded against the asset. Determining an asset's fair value and the related allowance to record requires us to utilize judgment and estimates.

*Discontinued Operations*

Topic 360 extends the reporting of a discontinued operation to a "component of an entity," and further requires that a component be classified as a discontinued operation if the operations and

cash flows of the component have been or will be eliminated from the ongoing operations of the entity in the disposal transaction and the entity will not have any significant continuing involvement in the operations of the component after the disposal transaction. As defined in Topic 360, a "component of an entity" comprises operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. Because each of our real estate assets is generally accounted for in a discrete subsidiary, many constitute a component of an entity under Topic 360, increasing the likelihood that the disposition of assets are required to be recognized and reported as operating profits and losses on discontinued operations in the periods in which they occur. The evaluation of whether the component's cash flows have been eliminated and the level of our continuing involvement require judgment by us and a different assessment could result in items not being reported as discontinued operations.

22

*Sales of Real Estate Assets*

Gains on property sales are recognized in full when real estate is sold, provided (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured or the amount that will not be collectible can be estimated, and (ii) the earnings process is virtually complete, that is, we are not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

*Fair Value Measurements*

Our acquisitions require the application of purchase accounting, which results in tangible and identifiable intangible assets and liabilities of the acquired entity being recorded at fair value. The difference between the purchase price and the fair value of net assets acquired is recorded as goodwill. In determining the fair values of assets and liabilities acquired in a business combination, we use a variety of valuation methods including present value, depreciated replacement cost, market values (where available) and selling prices less costs to dispose. We are responsible for determining the valuation of assets and liabilities and for the allocation of purchase price to assets acquired and liabilities assumed.

Assumptions must often be made in determining fair values, particularly where observable market values do not exist. Assumptions may include discount rates, growth rates, cost of capital, royalty rates, tax rates and remaining useful lives. These assumptions can have a significant impact on the value of identifiable assets and accordingly can impact the value of goodwill recorded. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of annual depreciation and amortization expense, different assumptions could also impact our statement of operations and could impact the results of future impairment reviews.

*Impairment of Assets*

Goodwill is assessed for impairment annually or more frequently if events or changes in circumstances indicate potential impairment. We may first assess qualitative factors to determine whether it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value. If this assessment indicates that it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value, a two-step quantitative assessment will be completed. The first step

EXHIBIT "2"

used to identify potential impairment involves comparing each reporting unit's estimated fair value to its carrying value, including goodwill. We use a discounted cash flow approach to estimate the fair value of our reporting units. Management judgment is required in developing the assumptions for the discounted cash flow model. These assumptions include revenue growth rates, profit margin percentages, discount rates, etc. If the estimated fair value of a reporting unit exceeds its carrying value, goodwill is considered to not be impaired. If the carrying value exceeds estimated fair value, there is an indication of potential impairment and the second step is performed to measure the amount of impairment. The second step of the process involves the calculation of an implied fair value of goodwill for each reporting unit for which step one indicated impairment. The implied fair value of goodwill is determined similar to how goodwill is calculated in a business combination, by measuring the excess of the estimated fair value of the reporting unit as calculated in step one, over the estimated fair values of the individual assets, liabilities and identifiable intangibles as if the reporting unit was being acquired in a business combination. Due to the many variables inherent in the estimation of a business's fair value and the relative size of our goodwill, if different assumptions and estimates were used, it could have an adverse effect on our impairment analysis.

Impairment indicators for our rental properties are assessed by property and include, but is not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. When these indicators of impairment are present, real estate held for investment is evaluated for impairment and losses are recorded when undiscounted cash flows estimated to be generated by an asset or market comparisons are less than the asset's carrying amount. The amount of the impairment loss is calculated as the excess of the asset's carrying value over its fair value, which is determined using a discounted cash flow analysis, management estimates or market comparisons.

When we performed our impairment review, we determined that impairment existed, refer to Part II Item 8 Financial Statements and Supplementary Data Note 8 Asset Impairments for additional information regarding our impairment charges taken during the year.

*Income Taxes*

We account for income taxes under the liability method whereby deferred tax asset or liability account balances are calculated at the balance sheet date using current tax laws and rates in effect for the year in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized. Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. We have assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income.

23

An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (i) the more positive evidence is necessary and (ii) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion, or all, of the deferred tax asset. Among the more significant types of evidence that we considered are: that future anticipated property sales will produce more than enough taxable income to realize the deferred

EXHIBIT "2"

tax asset; taxable income projections in future years; and whether the carry-forward period is so brief that it would limit realization of tax benefits.

Historically, we have incurred taxable losses in years in which we do not sell any real estate assets for gains. In 2012, we realized a gain $11.5 million on the sale of five of our owned properties. In 2011 a gain of $23.3 million was realized on the sale of another owned property. We expect to sell real estate assets in the future and have determined that it is more likely than not that future taxable income, primarily from gains on the sales of real estate assets, will be sufficient to enable us to realize all of our deferred tax assets. Therefore, for each of the two years ended December 31, 2012 and 2011, no valuation allowance has been recorded.

## RESULTS OF OPERATIONS

### *Revenues by Period*

The following table sets forth revenues for 2012 and 2011, and the change between periods.

| | Years ended, | | | |
| | December 31, | | Dollar | Percentage |
| | 2012 | 2011 | Change | Change |
| --- | --- | --- | --- | --- |
| | (in thousands, except percentages) | | | |
| Rental revenue | $ 51,927 | $ 55,630 | $ (3,703) | -7% |
| Third party management and leasing revenue | $ 3,060 | $ 3,859 | $ (799) | -21% |

The changes in revenues during 2012 as compared to 2011 were primarily due to the following:

- Rental revenue decreased by approximately $3.7 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease in rental revenue was primarily due the deconsolidation of VIEs, which resulted in a reduction in rental revenue of approximately $4.3 million. Rental revenue from our VIE properties consolidated for the full years 2012 and 2011 increased by approximately $0.6 million, primarily due to an increase in occupancy. Rental revenue for our owned properties was virtually unchanged. The weighted average occupancy of all properties consolidated was 80% at December 31, 2012.
- Third party management and leasing revenue decreased by approximately $0.8 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease was primarily due to a decrease in management, leasing and auxiliary service revenue resulting from lost contracts.

### *Operating Expenses by Period*

The following table sets forth expenses for 2012 and 2011, and the percentage and dollar change between periods.

EXHIBIT "2"

|  | Years ended December 31, | | Dollar | Percentage |
|  | 2012 | 2011 | Change | Change |
| --- | --- | --- | --- | --- |
|  | (in thousands, except percentages) | | | |
| Property operating expenses | $ 16,849 | $ 16,492 | $ 357 | 2% |
| Corporate general and administrative | $ 10,204 | $ 11,916 | $ (1,712) | -14% |
| Depreciation and amortization | $ 20,752 | $ 25,053 | $ (4,301) | -17% |
| Interest expense | $ 20,660 | $ 22,371 | $ (1,711) | -8% |
| Impairment of real estate assets | $ 982 | $ 3,782 | $ (2,800) | -74% |

24

The changes in operating expenses during 2012 as compared to 2011 were primarily due to the following:

- Property operating expenses increased by approximately $0.4 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. Property operating expenses for properties consolidated for the full year 2012 and 2011 increased by approximately $2.3 million. This increase was primarily due to increases in utilities, property taxes, personnel costs and repairs and maintenance. The increase was offset by the full year effect in 2012 of the deconsolidation of VIEs during 2011, which accounted for a decrease of approximately $1.9 million.
- Corporate general and administrative expenses decreased by approximately $1.7 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease was primarily attributable to a decrease in legal costs, in large part costs related to the Evergreen lawsuit incurred in 2011. The decrease was also attributable to a decrease in corporate personnel costs, principally due to the relocation of our accounting department from our Irvine office to our Houston office, in addition to other cost cutting measures implemented by management.
- Depreciation and amortization expense decreased by approximately $4.3 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease was in large part due to the full year effect in 2012 of the deconsolidation of VIEs during 2011, which accounted for approximately $2.0 million of this decrease. An increase in fully depreciated and amortized assets accounted for the remainder of the decrease.
- Interest expense decreased by approximately $1.7 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. This decrease was in large part due to the full year effect in 2012 of the deconsolidation of VIEs during 2011, which accounted for a decrease of approximately $1.4 million. Interest expense for properties consolidated for the full year 2012 and 2011 decreased by approximately $0.3 million, primarily due to a decrease in debt between periods.
- Impairment expense decreased by approximately $2.8 million. This decrease was primarily attributable to a decrease in impairment charges on real estate assets. Impairment charges on real estate assets totaled $2.5 million in 2011. No impairment charges on real estate assets were recorded in 2012. Impairment charges on purchased intangibles decreased by $0.3 million for the year ended December 31, 2012 compared to the year ended December 31, 2011.

EXHIBIT "2"

All of our expenses are significantly influenced by the number of VIEs which are consolidated. We expect all our operating expenses to remain relatively the same over the next year for the properties consolidated as of December 31, 2012.

***Other Income Statement Items by Period***

The following table sets forth our other income statement items for the fiscal years ending 2012 and 2011, and the dollar and percentage change between periods.

| | Years Ended December 31, | | Dollar Change | Percentage Change |
| | 2012 | 2011 | | |
|---|---|---|---|---|
| | | (in thousands) | | |
| Interest income | $    125 | $    345 | $    (220) | -64% |
| Discontinued operations | $  8,321 | $  12,577 | $  (4,256) | -34% |
| Non-controlling interest | $  3,199 | $  4,215 | $  (1,016) | -24% |
| Gain on litigation settlement | $    - | $  4,076 | $  (4,076) | -100% |
| Other Income | $    718 | $    485 | $    233 | 48% |

The changes in other income statement items during 2012 as compared to 2011 were primarily due to the following:

- Income from discontinued operations for the year ended December 31, 2012 includes the net gain from properties disposed of in 2012 of $15.0 million, the net operating loss from these properties through the date of disposition of $2.4 million and income tax expense of $4.3 million. Income from discontinued operations for the year ended December 31, 2011 includes the net gain on properties disposed of in 2011 of $26.0 million, the net operating loss of properties disposed of in 2011 and 2012 of $8.9 million and income tax expense of $4.5 million.

25

- Non-controlling interests consist of operating partnership unit holders other than us, the non-controlling interests in our partially owned properties, and the non-controlling interests in our VIEs held by others. The decrease was primarily due to a decrease in non-controlling interest in the Operating Partnership, which decreased from 27% at December 31, 2011 to 7% at December 31, 2012. The decrease ownership interest was primarily due our repurchase of operating partnership units held by Evergreen Realty Group, LLC and certain of its affiliates in the second quarter of 2012. During the second quarter of 2012, we repurchased all of the operating partnership units ("OP Units") issued to Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") in 2010. We had issued the OP Units to Evergreen in connection with the acquisition of assets from Evergreen on January 17, 2010. The OP Units issued to Evergreen were repurchased by the Company for one dollar as provided in the purchase and sell agreement.
- Gain on litigation settlement for 2011 represents settlement of our lawsuit with our insurance carrier related to our Hurricane Ike claims.

EXHIBIT "2"

- Other income for 2012 primarily represents a discounted payoff made on our $1.7 million corporate loan with California Bank and Trust. We paid the bank $1.0 million for a complete satisfaction of the loan, which had a principal balance and accrued interest due of approximately $1.8 million. Other income for 2011 represents discounts negotiated with several of our accounts payable creditors.

We anticipate continuing to offer certain properties for sale and currently have five consolidated properties on the market. We can make no guarantees as to the timing of the sale of any of our consolidated properties or the cash that we will be able to receive as a result of those sales. See Part II Item 8 Financial Statements - Note 4.

## LIQUIDITY AND CAPITAL RESOURCES

We have a need for significant amounts of cash to fund our operations. Not all cash generated by our consolidated business is available to pay all liabilities presented on the balance sheet. We separately disclose on the face of the balance sheet (in parentheses) assets and liabilities relating to our consolidated VIEs. Those assets and liabilities are the exclusive responsibility of the VIEs, as our actual ownership percentage and the business structure of the VIEs does not allow the assets and liabilities to be comingled with those of ASR.

With regards to our wholly owned properties, our rental revenues remained relatively unchanged in 2012 compared to 2011. Third party management and leasing revenue declined by approximately $0.8 million for 2012 compared to 2011, primarily due to a decrease in management, leasing and auxiliary service revenues resulting from lost contracts. With regards to the properties in which we have a variable interest and the cash associated with these properties is available only to service their own debts, we experienced a decrease in rental in rental revenue of $3.7 million for the year ended December 31, 2012 in comparison to the year ended December 31, 2011. This decrease was primarily the result of the deconsolidation of VIEs.

We are in default on the notes listed below. The balances disclosed in the table below exclude additional fees that may be the result of non-payment.

| Property Secured by | ASR Ownership Percentage | Balance December 31, 2012 (in thousands) |
|---|---|---|
| Morenci Professional Park | 100% | $ 1,579 |
| 11500 Northwest Freeway | 100% | 3,861 |
| Fishers Indiana | 1% | 17,058 |
| 1501 Mockingbird | 100% | 3,089 |
| 8100 Washington | 100% | 2,005 |
| Gray Falls/12000 Westheimer | 100% | 7,077 |
| 6430 Richmond | 100% | 2,050 |
| 2640/2650 Fountain View | 100% | 726 |
| Corporate - Unsecured | 100% | 1,000 |
| TOTAL | | $ 38,445 |

We have elected not to make payments on the debt secured by Morenci, 11500 Northwest Freeway and Fishers Indiana due to operating deficiencies of the properties and/or the unpaid balances of the mortgages exceeding the market value of the properties. The debt on Fishers

EXHIBIT "2"

Indiana, a VIE property, is matured. The lenders holding the debt on these properties have placed these assets into receivership and have initiated foreclosure proceedings.

26

---

We are in default on our debt secured by 1501 Mockingbird, 8100 Washington and Gray Falls/12000 Westheimer due to past due debt service. We anticipate bringing these three loans current in the second quarter of 2013. In the case of 1501 Mockingbird, we currently have this property listed for sale and anticipate disposing of the property in the second quarter of 2013. We believe the market value of these properties is in excess of their current loan balances.

Two additional loans; one secured by 6430 Richmond and one by 2640/2650 Fountain View are matured. We are currently negotiating extensions with the lenders on these loans.

All of the properties securing the debt in default are held by consolidated wholly owned subsidiaries or consolidated VIE's. These mortgages are not guaranteed by us. All of the notes in default have payment acceleration clauses and payment in full, including additional fees and interest, could be demanded by the lenders holding these notes.

We have three mortgage loans that are cross-collateralized by a second property.

We also are in default on a $1.0 million corporate note, which matured in May 2012. The loan is guaranteed by Mr. Galardi, a former member of the Board of Directors. The lender on the note has initiated legal proceedings to collect on the debt. Negotiations are in progress to settle this debt.

We can make no guarantee as to the timing of the sale of any of these properties. We cannot guarantee that the lenders on the properties in some stage of foreclosure will not take back the properties before we can sell them or renegotiate the debt. All of the notes on which we have strategically defaulted have payment acceleration clauses, and payment in full could be demanded by the lenders holding these notes. The loans not being paid are secured only by the real estate assets. The disposal of these properties is not expected to have a material effect on our cash flows subsequent to the disposals.

See Notes 11 and 17 for additional details of notes payable and commitments and Note 19 for subsequent events.

As of December 31, 2012, we had accounts payable over 90 days totaling approximately $4.9 million (all of it relating to properties owned primarily by us and corporate). In addition, we have extended payment terms with creditors holding payables as of December 31, 2012, which total approximately $2.7 million. These payables are recorded as notes payable.

During the year ended December 31, 2012, we sold Park Ten Place I and II, Sierra Southwest Pointe, Beltway Industrial Park, 8300 Bissonnet and Foxborough. The sale of these properties generated net proceeds of approximately $5.7 million. These proceeds were primarily used to reduce debt and other liabilities and for working capital (See Note 7. Discontinued Operations).

EXHIBIT "2"

Our discontinued operations are not stated separately in the Statement of Cash Flows. Our discontinued operations used cash from operating activities of $0.6 million during the year ended December 31, 2012. In the future we do not anticipate that the absence of these properties will have a material effect on cash flow.

We have taken the following steps to meet our liquidity needs:

1. We reduced our overhead structure in 2012, primarily due to the relocation of our accounting department from Irvine, California to Houston, Texas.
2. We continue to strategically default on mortgages where we have determined that the market value of the property does not and will not exceed the balance of the notes payable securing the property in the foreseeable future and/or the property is in a severe and sustained negative cash flow position.
3. We are currently marketing properties for sale in an effort to generate cash for operations and debt reduction in the next year.
4. We will continue to focus on increasing occupancy rates and managing our cost structure.
5. We will continue to reduce our expenses, restructure our operations, and negotiate with our creditors for extended terms in order to meet our cash flow needs.

The liquidity matters discussed above are a continuation of the economic and market factors that have been affecting us and the overall real estate industry for several years. Although there are indicators of improvement and resurgence in the real estate industry, we continue to struggle with cashflow deficits from operations after debt service and capital expenditures, primarily related to office/commercial buildings. In order to meet our cash needs, we have been and will continue to sell properties that have appreciated values in addition to steps previously discussed above. Proceeds from the sale of assets were $42.9 million and $51.1 million for 2012 and 2011, respectively. These sales provided the net proceeds after repayment of related debt and other obligations that were sufficient to meet our ongoing cash deficits from operations. We are forecasting sales of real estate of $51.6 million in 2013 from which the net proceeds will exceed our forecasted cash deficit from operations.

As of year-end, we have five properties held for sale and are forecasting these to be sold in the second, third and fourth quarters of 2013. We forecast that the proceeds available from these sales after repayment of debt and other related obligations will generate approximately $7.7 million. This amount is in excess of our forecasted deficit from operations for 2013. We believe that our forecast is achievable due to our history of demonstrating our ability in consummating sales in prior years when we have been under the similar cash shortages. In addition to property sales, we continue to negotiate refinancing of properties allowing for reduced interest and monthly payments as well as refinancing that allow us to access funds from appreciated values. The combination of the forecasted sales of real estate and the refinancing of loans is expected to meet our cash needs in the short-term and allow us to reduce our accounts payable.

27

We have a number of properties that we believe have appreciated values in addition to the five held for sale, and we will continue this approach over the long-term until we meet our cash needs through profitable operations, infusion of cash from other investors allowing us to reduce debt and expand operations, or other strategies being considered.

EXHIBIT "2"

Through March 29, 2013, as forecasted, we have executed sale contracts on two of the five properties held for sale and have letters of intent on one other property. In addition, we have consummated the refinancing for one property, and we have negotiated a term sheet for refinancing of another property. The total 2013 forecasted net proceeds from these transactions are $4.3 million.

On March 27, 2013, we obtained a $1.8 million loan to assist with liquidity needs. We intend to repay the loan upon the sale of two of our properties held for sale.

There can be no assurance as to our ability to meet our short-term or long-term cash needs.

## DISCUSSION OF THE CONSOLIDATED STATEMENT OF CASH FLOWS

*FROM OPERATIONS:*

Historically and currently, our consolidated cash from operations has been provided by rent payments, management fees and transaction fees. Our historic and current uses of consolidated cash from operations have mainly been property operating costs, general and administrative costs and interest on debt service. During the year ended December 31, 2012, our consolidated operations provided $9.1 million in cash, of which $9.2 million was provided by our consolidated VIEs.

*FROM INVESTING ACTIVITIES:*

Historically and currently, our consolidated cash from investing activities has been provided by proceeds from the sale of assets. Our historic and current uses of consolidated cash from investing activities have primarily been property improvements. During the year ended December 31, 2012, our consolidated investing activities provided $41.4 million in cash, which consisted of proceeds from property sales of $42.9 million, partially offset by capital improvements to real estate assets of $1.5 million.

*FROM FINANCING ACTIVITIES:*

Historically and currently, our consolidated cash from financing activities has been provided by proceeds from borrowing money and proceeds from equity placements. Our historic and current uses of consolidated cash from financing activities have primarily been principal payments on borrowings and cash used to acquire assets. During the year ended December 31, 2012, our consolidated operations used $50.5 million in cash. We received proceeds from borrowings of $19.9 million and repaid borrowings of $64.7 million, in large part related to property dispositions. We made distributions to non-controlling interests of $7.7 million and received contributions from non-controlling interests of $2.0 million.

## FUNDS FROM OPERATIONS

We believe that Funds From Operations ("FFO") is a useful supplemental measure of our operating performance. We computed FFO in accordance with standards established by the White Paper on FFO approved by the Board of Governors of the National Association of Real Estate Investment Trusts ("NAREIT") in April 2002. The White Paper defines FFO as net income or loss computed in accordance with Generally Accepted Accounting Principles ("GAAP"), excluding extraordinary items, as defined by GAAP, and gains and losses from sales of depreciable operating property plus real estate-related depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures. We believe that FFO is helpful to

EXHIBIT "2"

investors as a measure of our performance because, along with cash flow from operating activities, FFO provides investors with an indication of our ability to incur and service debt, to make capital expenditures and to fund other cash needs. FFO is a non-GAAP financial measure. FFO does not represent net income or cash flows from operations, as defined by GAAP, and should not be considered as an alternative to net income (determined in accordance with GAAP) as an indicator of our operating performance or as an alternative to cash flows from operating, investing and financing activities (determined in accordance with GAAP) as a measure of liquidity. FFO does not necessarily indicate that cash flows will be sufficient to fund all of our cash needs, including principal amortization, capital improvements and distributions to stockholders. Further, FFO as disclosed by other companies may not be comparable to our calculation of FFO.

28

The following table sets forth our calculation of FFO for the year ending December 31, 2012 and December 31, 2011:

| | Years ended December 31, | | | |
|---|---|---|---|---|
| | **2012** | | **2011** | |
| | (in thousands) | | | |
| Net income attributable to ASR | $ | 1,414 | $ | 3,999 |
| Depreciation and amortization from discontinued operations | | 1,820 | | 6,057 |
| Gain from disposition of discontinued operations | | (13,243) | | (17,129) |
| Deferred income tax expense | | 815 | | 2,115 |
| Depreciation and amortization attributable to ASR properties | | 5,399 | | 7,067 |
| FFO | $ | (3,795) | $ | 2,109 |

**INFLATION**

Inflation has not had a significant impact on our results because of the relatively low inflation rate in our geographic areas of operation. Additionally, most of our leases require the customers to pay their pro rata share of operating expenses, including common area maintenance, real estate taxes, utilities and insurance, thereby reducing our exposure to increases in operating expenses resulting from inflation.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not applicable.

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**AMERICAN SPECTRUM REALTY, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

**Pag**

EXHIBIT "2"

| | e No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 30 |
| Consolidated Balance Sheets at December 31, 2012 and 2011 | 31 |
| Consolidated Statements of Operations for the years ended December 31, 2012 and 2011 | 32 |
| Consolidated Statements of Equity (Deficit) for the years ended December 31, 2012 and 2011 | 33 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2012 and 2011 | 34 |
| Notes to Consolidated Financial Statements | 36 |

29

---

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
American Spectrum Realty, Inc.
Houston, Texas

We have audited the accompanying consolidated balance sheets of American Spectrum Realty, Inc. as of December 31, 2012 and 2011, and the related consolidated statements of operations, equity, and cash flows for the periods ended December 31, 2012 and 2011. American Spectrum's management is responsible for these consolidated financial statements. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of American Spectrum Realty, Inc. as of December 31, 2012 and 2011, and the results of its operations and its cash flows for the periods ended December 31, 2012 and 2011 in conformity with accounting principles generally accepted in the United States of America.

We were not engaged to examine management's assertion about the effectiveness of American Spectrum Realty, Inc.'s internal controls over financial reporting as of December 31, 2012 and 2011 included in the accompanying Management's Report on Internal Control over Financial Reporting and, accordingly, we do not express an opinion thereon.

EEPB, PC

EXHIBIT "2"

Houston, Texas
March 29, 2013

30

**AMERICAN SPECTRUM REALTY, INC**
**CONSOLIDATED BALANCE SHEETS**
(Dollars in thousands, except per share amounts)

| | December 31, | |
|---|---|---|
| | **2012** | **2011** |
| **ASSETS** | | |
| Real estate held for investment (includes $327,676 and $338,845 from consolidated | | |
| | $  438,67 | $  520,84 |
| Variable Interest Entities ("VIEs"), respectively) | 5 | 1 |
| | (71,77 | (81,65 |
| Accumulated depreciation (includes $37,127 and $22,484 from consolidated VIEs, respectively) | 5) | 7) |
| Real estate held for investment, net (includes $290,549 and $316,361 from consolidated VIEs, | 366,90 | 439,18 |
| respectively) | 0 | 4 |
| Cash and cash equivalents | 492 | 473 |
| Restricted cash (includes $3,724 and $4,157 from consolidated VIEs, respectively) | 3,724 | 5,184 |
| Tenant and other receivables (includes $784 and $864 from consolidated VIEs, respectively), net of allowance | | |
| for doubtful accounts of $673 and $1,006 (includes $473 and $92 from consolidated VIEs, | | |
| respectively) | 1,281 | 1,338 |
| Deferred rents receivable (includes $2,204 and $1,501 from consolidated VIEs, respectively) | 3,269 | 3,459 |
| Purchased intangibles subject to amortization, net of accumulated amortization of $3,114 and | | |
| $1,447, respectively | 5,946 | 7,636 |
| Deferred tax assets | 11,308 | 12,123 |
| Goodwill | 6,687 | 6,687 |
| Investment in unconsolidated real estate assets from related parties | 332 | 245 |
| Notes receivable from Evergreen | 1,000 | 1,000 |
| Interest receivable from Evergreen | 272 | 272 |
| Accounts receivable from Evergreen | 414 | 414 |
| Prepaid and other assets, net (includes $8,600 and $8,123 from consolidated VIEs, respectively) | 15,753 | 17,752 |
| | 417,37 | 495,76 |
| Total Assets | 8 | 7 |
| **LIABILITIES AND EQUITY** | | |
| Liabilities: | | |
| | 312,66 | 383,02 |
| Notes payable (includes $221,899 and $237,276 from consolidated VIEs, respectively) | 2 | 2 |
| Accounts payable (includes $398 and $634 from consolidated VIEs, respectively) | 7,458 | 7,712 |

EXHIBIT "2"

| | | |
|---|---|---|
| Accrued and other liabilities (includes $6,759 and $7,144 from consolidated VIEs, respectively | 15,241 | 16,068 |
| Total Liabilities | 335,36 1 | 406,80 2 |
| | | |
| Commitments and Contingencies (Note 17): | | |
| | | |
| Equity: | | |
| American Spectrum Realty, Inc, stockholders' equity (deficit): | | |
| Preferred stock par value $.01 per share, 100,000,000 authorized shares, 55,172 issued at | | |
| December 31, 2012 and 2011, respectively | 1 | 1 |
| Common stock par value $.01 per share, 100,000,000 authorized shares, 4,039,191 issued at | | |
| December 31, 2012 and 3,816,016 issued at December 31, 2011, respectively; 3,567,779 | | |
| outstanding at | | |
| December 31, 2012 and 3,344,604 outstanding at December 31, 2011, respectively | 34 | 34 |
| Additional paid-in capital | 61,158 | 51,923 |
| Accumulated deficit | (55,09 6) | (56,51 0) |
| Treasury stock, at cost, 471,412 shares at December 31, 2012 and December 31, 2011, respectively | (3,095) | (3,095) |
| Total American Spectrum Realty, Inc. stockholders' equity (deficit) | 3,002 | (7,647) |
| Non-controlling interest | 79,015 | 96,612 |
| Total Equity | 82,017 | 88,965 |
| Total Liabilities and Equity | $ 417,37 8 | $ 495,76 7 |

The accompanying notes are an integral part of these consolidated financial statements

31

---

**AMERICAN SPECTRUM REALTY, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands, except per share amounts)

| | Year Ended December 31, | |
|---|---|---|
| | **2012** | **2011** |
| **REVENUES:** | | |
| | $ | $ |
| Rental revenue | 51,927 | 55,630 |
| Third party management and leasing revenue | 3,060 | 3,859 |
| Interest income | 125 | 345 |

EXHIBIT "2"

| | | |
|---|---:|---:|
| **Total revenues** | 55,112 | 59,834 |
| | | |
| **EXPENSES:** | | |
| Property operating expense | 16,849 | 16,492 |
| Corporate general and adminstrative | 10,204 | 11,916 |
| Depreciation and amortization | 20,752 | 25,053 |
| Interest expense | 20,660 | 22,371 |
| Impairment expense | 982 | 3,782 |
| **Total expenses** | 69,447 | 79,614 |
| | | |
| **OTHER INCOME:** | | |
| Gain on litigation settlement | - | 4,076 |
| Other income | 718 | 485 |
| **Total other income** | 718 | 4,561 |
| | | |
| Loss from continuing operation before deferred income tax | (13,617) | (15,219) |
| | | |
| Deferred income tax benefit | 3,511 | 2,426 |
| | | |
| Loss from continuing operations | (10,106) | (12,793) |
| | | |
| Discontinued operations: | | |
| Loss from operations | (2,428) | (8,898) |
| Gain on disposition of discontinued operations | 15,075 | 26,016 |
| Income tax (expense) benefit | (4,326) | (4,541) |
| Income from discontinued operations | 8,321 | 12,577 |
| | | |
| Net Loss, including non-controlling interests | (1,785) | (216) |
| | | |
| Net loss attributable to non-controlling interests | 3,199 | 4,215 |
| | | |
| Net Income attributable to American Spectrum Realty, Inc. | 1,414 | 3,999 |
| | | |
| Less: Preferred stock dividend | (240) | (240) |
| | | |
| Net Income attributable to American Spectrum Realty, Inc. common stockholders | $    1,174 | $    3,759 |
| | | |
| Basic and diluted per share data: | | |
| Loss from continuing operations attributable to American Spectrum Realty, Inc. common stockholders | ($1.65) | ($0.90) |
| | | |
| Income from discontinued operations attributable to American Spectrum Realty, Inc. common stockholders | 2.05 | 2.22 |
| Net Income attributable to American Spectrum Realty, Inc. common stockholders | $    0.40 | $    1.32 |

EXHIBIT "2"

| | | |
|---|---|---|
| | 3,569,032 | 3,008,836 |
| Basic and diluted weighted average shares used | | |
| | | |
| Amounts attributable to American Spectrum Realty, Inc. common stockholders: | | |
| Loss from continuing operations | $ (6,122) | $ (2,917) |
| Income from discontinued operations | 7,296 | 6,676 |
| Net Income | $ 1,174 | $ 3,759 |

The accompanying notes are an integral part of these consolidated financial statements

32

---

**AMERICAN SPECTRUM REALTY, INC.**
**CONSOLIDATED STATEMENTS OF EQUITY**
(Dollars in thousands, except share amounts)

| | Number Preferred Shares | Number Common Shares | Non-controlling Interests | Preferred Stock | Common Stock | Additional Paid-In Capital | Accumulated Deficit | Treasury Stock | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| **Balance January 1, 2011** | 55,172 | 3,422,706 | $ 121,313 | $ 1 | $ 34 | $ 49,067 | $ (60,509) | $ (3,095) | $ 106,811 |
| Preferred stock dividends | - | - | - | - | - | (240) | - | - | **(240)** |
| Stock-based compensation | - | 34,500 | - | - | - | 195 | - | - | **195** |
| Restricted stock forteitures | - | (10,338) | - | - | - | - | - | - | **-** |
| Conversion of OP units to common stock | - | 325,463 | (2,342) | - | - | 2,342 | - | - | **-** |
| Issuance of common stock | | 43,685 | | - | - | 559 | - | - | **559** |
| Acquisition of non-controlling interest | | | (200) | | | | | | **(200)** |
| Consolidation of VIE;s | - | - | 9,241 | - | - | - | - | - | **9,241** |
| Deconsolidation of VIE's | - | - | (18,111) | - | - | - | - | - | **(18,111)** |
| Noncontrolling interests | | | | | | | | | **-** |

EXHIBIT "2"

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| share of income | - | - | (4,215) | - | - | - | - | - | **(4,215)** |
| Repurchase of preferred partnership interest | | | (2,500) | - | - | - | - | - | **(2,500)** |
| Distributions | - | - | (7,555) | - | - | - | - | - | **(7,555)** |
| Contributions | - | - | 981 | - | - | - | - | - | **981** |
| Net income | - | - | - | - | - | - | 3,999 | - | **3,999** |
| **Balance December 31, 2011** | 55,172 | 3,816,016 | $ 96,612 | $ 1 | $ 34 | $ 51,923 | $ (56,510) | $ (3,095) | $ 88,965 |
| Preferred stock dividends | - | - | - | - | - | (240) | - | - | **(240)** |
| Stock-based compensation | - | - | - | - | - | 205 | - | - | **205** |
| Restricted stock forfeitures | - | (17,004) | - | - | - | - | - | - | **-** |
| Conversion of OP units to common stock | - | 191,269 | (1,711) | - | - | 1,711 | - | - | **-** |
| Repurchase of OP units | - | - | (8,013) | - | - | 8,013 | - | - | **-** |
| Issuance of common stock | - | 48,910 | | - | - | 203 | - | - | **203** |
| Acquisition of VIE properties | - | - | 657 | - | - | (657) | - | - | **-** |
| Deconsolidation of VIE's | - | - | 377 | - | - | - | - | - | **377** |
| Noncontrolling interests share of income | - | - | (3,199) | - | - | - | - | - | **(3,199)** |
| Distributions | - | - | (7,680) | - | - | - | - | - | **(7,680)** |
| Contributions | - | - | 1,972 | - | - | - | - | - | **1,972** |
| Net income | - | - | - | - | - | - | 1,414 | - | **1,414** |
| **Balance December 31, 2012** | 55,172 | 4,039,191 | $ 79,015 | $ 1 | $ 34 | $ 61,158 | $ (55,096) | $ (3,095) | $ 82,017 |

The accompanying notes are an integral part of these consolidated financial statements

33

---

**AMERICAN SPECTRUM REALTY, INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

EXHIBIT "2"

|  | Year Ended December 31, | |
|---|---|---|
|  | **2012** | **2011** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (1,785) | $ (216) |
| Adjustment to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 22,572 | 31,111 |
| Impairment expense | 982 | 4,485 |
| Income tax expense | 815 | 2,115 |
| Gain on disposition of real estate assets | (15,075) | (26,016) |
| Stock-based compensation | 205 | 195 |
| Deferred rental income | (753) | (1,446) |
| Changes in operating assets and liabilities: | | |
| (Increase) decrease in tenant and other receivables | (75) | 1,373 |
| Increase in prepaid and other assets | (2,720) | (2,730) |
| Increase (decrease) in accounts payable | 1,815 | (872) |
| Decrease in accounts payable related parties | - | (286) |
| Increase in related party receivables | - | 262 |
| Increase in accrued and other liabilities | 2,823 | 10,899 |
| Change in restricted cash | 330 | (541) |
| Net cash provided by operating activities: | 9,134 | 18,333 |
|  | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Proceeds received from sales of real estate assets | 42,881 | 51,080 |
| Capital improvements to real estate assets | (1,528) | (5,214) |
| Investments in unconsolidated real estate assets | - | (60) |
| Net cash provided by investing activities: | 41,353 | 45,806 |
|  | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | 19,877 | 5,750 |
| Repayment of borrowings-property sales | (37,761) | (45,000) |
| Repayment of borrowings-scheduled payments | (11,639) | (9,647) |
| Repayment of borrowings-other | (15,237) | (7,352) |
| Repurchase of preferred partnership interest | - | (2,500) |
| Acquisition of non-controlling interest in the operating partnership | - | (201) |
| Dividend payments to preferred stockholders | - | (145) |
| Contributions from non-controlling interests | 1,972 | 981 |
| Distributions to non-controlling interests | (7,680) | (7,555) |
| Net cash used in financing activities: | (50,468) | (65,669) |
|  | | |
| (Decrease) increase in cash and cash equivalents | 19 | (1,530) |
|  | | |
| Cash and cash equivalents, beginning of period | 473 | 2,003 |
|  | | |
| Cash and cash equivalents, end of period | $ 492 | $ 473 |

EXHIBIT "2"

The accompanying notes are an integral part of these consolidated financial statements

34

---

**SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES:**

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in thousands) | |
| Conversion of operating partnership units to common stock | 1,711 | 2,342 |
| Conversion of accounts payable to note payable | 1,417 | 4,671 |
| Conversion of accounts payable to common stock | 203 | 559 |
| **SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:** | | |
| Cash paid for interest | 21,126 | 25,250 |
| Cash paid for income taxes | 62 | 149 |

The accompanying notes are an integral part of these consolidated financial statements

35

---

## NOTE 1. Business Overview

### Business Overview

We provide comprehensive integrated real estate solutions for our own property portfolio and the portfolios of our third party clients. We own and manage; commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 93% at December 31, 2012. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. We periodically examine our corporate structure in order to evaluate if we are positioned to take advantage of the most favorable tax treatments for ourselves, our shareholders and our clients. We evaluate the potential tax benefits and consequences of a variety of business models that include but are not limited to: joint ventures, partnerships, limited liability companies (LLC), limited liability partnerships (LLP) and

EXHIBIT "2"

real estate investment trusts (REIT) for ourselves and our investors. It is our objective to consider all applicable tax laws that legally reduce the tax consequences and maximize the tax benefits associated with real estate transactions.

The REIT structure has many specific requirements that must be met and maintained in order to qualify. As of December 31, 2012 our ownership structure does not allow us to elect REIT status.

Our primary business objective is to acquire and manage multiple tenant real estate in strategically located areas where cost effective enhancements combined with effective leasing and management strategies, can improve the long term values and economic returns of those properties. We focus on the following fundamentals to achieve this objective:

-An opportunistic and disciplined disposition strategy that enhances investment performance and takes advantage of realized gains. We typically dispose of properties when the return from selling is higher than the projected return from holding the property;

-Organic (internally developed opportunities) and in-organic (acquisition generated opportunities) growth of our third party property management contracts and transaction service fees, coupled with;

-An opportunistic yet disciplined acquisition strategy that focuses on mid-tier multi-tenant real estate in locations that allow us to capitalize on our existing management infrastructure currently servicing our own properties and that of our third party clients.

**NOTE 2. Summary of Significant Accounting Policies**

**BASIS OF PRESENTATION**

The consolidated financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States of America.

*Principles of Consolidation and Basis of Presentation.*

The consolidated financial statements include the accounts of American Spectrum Realty, Inc., its subsidiaries and those variable interest entities in which American Spectrum Realty, Inc. is the primary beneficiary. Intercompany transactions and balances have been eliminated.

*Use of Estimates.*

Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimates affecting the financial statements were management's estimates used for the analyses of the possible impairment of goodwill and real estate assets. The analysis of impairment of goodwill is based on a discounted cash flow method of determining the fair value of the applicable reporting unit. The discounted cash flow method included assumptions concerning future net cash flows, discount rates and capitalization rates. The analysis of impairment of real estate assets is initially based on an undiscounted cash flow method. The undiscounted cash flow method included assumptions concerning future net cash flows including property absorption

EXHIBIT "2"

rates, rental rate growth, inflation, estimated sales prices and capitalization rates. Management has evaluated the key factors and assumptions used to develop the estimates in determining that it is reasonable in relation to the financial statements taken as a whole. Actual results could differ from those estimates.

36

---

*Reclassifications*

Certain balance sheet amounts in the 2011 financial statements have been reclassified to conform to the 2012 presentation.

**SIGNIFICANT ACCOUNTING POLICIES**

*Cash and Cash Equivalents*

We consider all highly-liquid investment instruments with an original maturity of three months or less to be cash equivalents. As of December 31, 2012 and 2011, we held our cash and cash equivalents in checking accounts, money market accounts and investment accounts with several financial institutions. Some accounts exceeded FDIC insurance limits.

*Restricted Cash*

We had restricted cash of $3.7 million as of December 31, 2012, all of which was related to consolidated VIEs.

*Fair Value of Financial Instruments*

Our financial instruments, including cash, prepaid expenses and other current assets, accrued liabilities and accounts payable are carried at cost, which approximates fair value because of the short term nature of those instruments.

*Deferred Financing and Other Fees*

Fees paid in connection with the financing and leasing of our properties are amortized to interest expense using the effective interest method over the term of the related note payable or lease and are included in other assets.

*Rental Revenue.*

We record rental income for the full term of each lease on a straight-line basis. Any rent holidays given to the tenant as part of their lease is recorded as a deferred rent receivable. When a property is acquired, the term of existing leases is considered to commence as of the acquisition date for purposes of this calculation.

Many of our leases provide for Common Area Maintenance Escalations ("CAM/ESC") as additional rental revenue. Each tenant is typically responsible for their prorated share of increases in operating expenses. Tenants are billed an estimated CAM/ESC charge based on the budgeted operating expenses for the year. Within 90 days after the end of each fiscal year, a reconciliation and true up billing of CAM/ESC charges is performed based on actual operating expenses.

For each of the two years ended December 31, 2012 and 2011 no tenant represented 10% or more of our rental revenue.

*Allowance for Doubtful Accounts*

We maintain an allowance for accounts receivable which may not be ultimately collected. The allowance balance maintained is based upon historical collection experience, current aging of amounts due and specific evaluations of the collectability of individual balances. All tenant account balances over 90 days past due are fully reserved. Accounts are written off against the reserve when they are deemed to be uncollectible.

*Goodwill and Intangible Assets*

Goodwill is assessed for impairment annually, or more frequently if events or changes in circumstances indicate potential impairment. We may first assess qualitative factors to determine whether it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value. If this assessment indicates that it is more-likely-than-not that the carrying value of a reporting unit exceeds its fair value, a two-step quantitative assessment will be completed. If the assessment indicates that the fair value of the goodwill is lower than its carrying amount, impairment is indicated and goodwill is written down to its implied fair value. Subsequent increases in goodwill are not recognized in the financial statements.

37

Intangible assets are amortized on a straight-line basis over their estimated lives. Such assets are evaluated for impairment whenever events or changes in circumstances indicate that the recoverability of their carrying value may be impaired.

*Variable Interest Entity ("VIE") Accounting*

Our determination of the appropriate accounting method with respect to our VIEs is based on Accounting Standards Update, or ASU, 2009-17, "*Consolidations (Topic 810): Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities.*" This ASU incorporates Statement of Financial Accounting Standards, or SFAS, No. 167, "*Amendments to FASB Interpretation No. 46(R),*" issued by the Financial Accounting Standards Board, or FASB, in June 2009. The amendments in this ASU replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with a primarily qualitative approach focused on identifying which reporting entity has both (1) the power to direct the activities of a variable interest entity that most significantly impact such entity's economic performance and (2) the obligation to absorb losses or the right to receive benefits from such entity that could potentially be significant to such entity. The entity which satisfies these criteria is deemed to be the primary beneficiary of the VIE.

EXHIBIT "2"

We analyze our interests in VIEs to determine if we are the primary beneficiary. We consider a variety of factors in identifying the entity that holds the power to direct matters that most significantly impact the VIE's economic performance including, but not limited to, (a) sign and enter into leases; set, distribute, and implement the capital budgets, the authority to refinance or sell the property within contractually defined limits and, (b) the ability to receive fees that are significant to the property and (c) a necessity of funding any deficit cash flows.

We consolidate any VIE of which we are the primary beneficiary (see Note 5 of the Notes to Consolidated Financial Statements set forth in Item 8 of this Annual Report). We determine whether an entity is a VIE and, if so, whether it should be consolidated by utilizing judgments and estimates that are inherently subjective. If we made different judgments or utilized different estimates in these evaluations, it could result in differing conclusions as to whether or not an entity is a VIE and whether or not to consolidate such entity. We deconsolidate a VIE when we determine that we are no longer the primary beneficiary. For VIEs in which we own an insignificant interest in, we deconsolidate the VIE by eliminating the accounts from the balance sheet with a corresponding offset to the equity of the non-controlling interest. Operations are recognized through the date of deconsolidation.

*Assets Held for Sale*

We classify assets as held for sale when management a) approves the action and commits to a plan to sell the asset(s); b) the asset(s) are available for immediate sale in its present condition customary for sales of those types of assets; c) an active program to locate a buyer and other actions required to complete the plan to sell the asset(s) have been initiated; d) the sale of the asset(s) is probable, and transfer of the asset(s) is expected to within one year; e) the asset(s) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and; f) actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn.

At the time a property is held for sale, the property is carried at the lower of (i) its carrying amount or (ii) fair value less costs to sell. We disclose operating properties as properties held for sale in the period in which all of the required criteria are met.

*Discontinued Operations*

We report, for both current and prior periods, the assets, liabilities and results of operations of any component of the Company which has either been disposed of, or is under contract with all contingencies removed, as discontinued operations.

*Sales of Real Estate Assets*

Gains on property sales are recognized in full when real estate is sold, provided (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured or the amount that will not be collectible can be estimated, and (ii) the earnings process is virtually complete, that is, we are not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

38

EXHIBIT "2"

*Real Estate Held for Investment*

Rental properties are stated at cost net of accumulated depreciation unless circumstances indicate that cost, net of accumulated depreciation, cannot be recovered, in which case the carrying value of the property is reduced to estimated fair value. Estimated fair value (i) is based upon the Company's plans for the continued operation of each property and (ii) is computed using estimated sales price, as determined by prevailing market values for comparable properties and/or the use of capitalization rates multiplied by annualized net operating income based upon the age, construction and use of the building. The fulfillment of the Company's plans related to each of its properties is dependent upon, among other things, the presence of economic conditions which will enable the Company to continue to hold and operate the properties prior to their eventual sale. Due to uncertainties inherent in the valuation process and in the economy, actual results could be materially different from current expectations.

Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

Rental properties are individually evaluated for impairment when conditions exist which may indicate it is probable that the sum of expected future undiscounted cash flows for each property is less than the carrying amount of that property. Impairment indicators for our rental properties are assessed by property and include, but are not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. The Company assesses the expected undiscounted cash flows based upon numerous factors, including, but not limited to, appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property and our assumptions about the use of the asset. Upon determination that impairment has occurred and that the future undiscounted cash flows are less than the carrying amount, a write-down will be recorded to reduce the carrying amount to its estimated fair value.

### Recent Accounting Pronouncements

In May 2011, the FASB issued ASU 2011-04, "Fair Value Measurement (Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS." These amendments were issued to provide a consistent definition of fair value and ensure that the fair value measurement and disclosure requirements are similar between GAAP and International Financial Reporting Standards (IFRS). ASU 2011-04 changes certain fair value measurement principles and enhances the disclosure requirements, particularly for Level 3 fair value measurements. This ASU is effective for interim and annual periods beginning after December 15, 2011. The adoption of this update did not have a material effect on our consolidated financial position or results of operations.

In September 2011, the FASB issued ASU 2011-08, "Intangibles-Goodwill and Other (Topic 350): Testing Goodwill for Impairment." This ASU gives companies the option to perform a qualitative assessment to first assess whether the fair value of a reporting unit is less than its carrying amount. If an entity determines it is not more likely than not that the fair value of the reporting unit is less than its carrying amount, then performing the two-step impairment test is unnecessary. ASU 2011-08 is effective for annual and interim goodwill impairment tests

EXHIBIT "2"

performed for fiscal years beginning after December 15, 2011. The adoption of this update did not have a material impact on the disclosure requirements for our consolidated financial statements.

In December 2011, the FASB issued ASU 2011-10, "Property, Plant, and Equipment (Topic 360): De-recognition of in Substance Real Estate—a Scope Clarification." This ASU requires that a reporting entity that ceases to have a controlling financial interest in a subsidiary that is in substance real estate as a result of default on the subsidiary's nonrecourse debt would apply FASB ASC Subtopic 360-20, Property, Plant, and Equipment—Real Estate Sales, to determine whether to derecognize assets and liabilities of that subsidiary. ASU 2011-10 is effective prospectively for a deconsolidation event that takes place in fiscal years, and interim periods within those years, beginning on or after June 15, 2012. The adoption of this update did not have a material effect on our consolidated financial condition or results of operations.

In July 2012, the FASB issued ASU 2012-02, "Intangibles, Goodwill, and Other (Topic 350): Testing Indefinite-Lived Intangibles for Impairment". This ASU adds new accounting guidance that simplifies how an entity tests indefinite-lived intangible assets other than goodwill for impairment. It permits an entity to first assess qualitative factors to determine whether further testing for impairment of indefinite-lived intangible assets other than goodwill is required. This accounting guidance will be effective for annual and interim impairment tests performed for fiscal years beginning after September 15, 2012. We believe that the adoption of this accounting guidance will not have a material effect on our financial condition or results of operations.

39

---

## NOTE 3. ACQUISITION ACTIVITIES

**Property Acquisitions**

The Company acquired the Tampa and Ocala self-storage properties during the third quarter of 2012 from a previously consolidated VIE. See Note 5.

## NOTE 4. ASSETS HELD FOR SALE

Below is a listing of the consolidated properties we have listed for sale. We can make no guarantees as to our ability to sell any of our consolidated properties. We further cannot assure you that we will achieve a sales price that allows us to receive cash to fund our operations.

For those consolidated properties listed for sale that we do not have an ownership percentage in (VIE properties), we will receive transaction fees if/when a sale is successfully executed.

| Property Name | Property Type | ASR ownership Percentage | Carrying Values of Properties | Carrying Value of Debt |
|---|---|---|---|---|
| | | | (in thousands) | |
| Fountain View Office | Office | 51% | 11,889 | 11,540 |

| Tower | | | | |
|---|---|---|---|---|
| 2620 & 2630 Fountain View | Office | 51% | 7,060 | 5,341 |
| 2640 & 2650 Fountain View | Office | 100% | 13,890 | 12,736 |
| 1501 Mockingbird | Office | 100% | 3,276 | 3,089 |
| 8100 Washington | Office | 100% | 1,888 | 2,005 |
| | | | $ 38,003 | $ 34,711 |

## NOTE 5. VARIABLE INTEREST ENTITIES

We have identified multiple Variable Interest Entities where we are the primary beneficiary for accounting purposes. As a result, these VIE entities were consolidated in the condensed consolidated financial statements, after eliminating intercompany transactions and presenting the interests that are not owned by us as non-controlling interests in the condensed consolidated balance sheets.

The entities being consolidated as of December 31, 2012 include 9 self-storage properties, 2 multifamily properties, 4 student housing properties and 8 commercial properties. The entities are generally financed through cash flows from property operations.

40

The Variable Interest Entities at December 31, 2012 were:

| Property Name | Percentage owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent | Rent per Square Feet |
|---|---|---|---|---|---|---|---|
| **_Variable Interest Entity_** | | | | | | | |
| **Commerce Distributions Center** | 1% | **Commerce, CA** | 200,000 | 100% | 200,000 | 1,077,120 | 5.39 |
| **Dixon & 51st Logistics Center** | 0% | **Des Moines, IA** | 731,169 | 100% | 731,169 | 2,128,026 | 2.91 |
| **Fishers Indiana Distribution Center** | 1% | **Fishers, IN** | 637,531 | 0% | 0 | - | - |
| **Ohio Commerce Center** | 0% | **Strongsville, OH** | 204,592 | 100% | 204,592 | 2,333,567 | 11.41 |

EXHIBIT "2"

| Property | | | | | | | |
|---|---|---|---|---|---|---|---|
| Springs Commerce Center I | 0% | OK,GA,SC,VA,PA | 1,006,993 | 100% | 1,006,993 | 2,390,659 | 2.37 |
| Springs Commerce Center II | 0% | GA, AL | 1,439,300 | 69% | 986,450 | 2,088,401 | 2.12 |
| Springs Office | 0% | Fort Mill/Lancaster, SC | 265,493 | 100% | 265,493 | 2,013,512 | 7.58 |
| Strongsville Corporate Center | 2% | Strongsville, OH | 125,006 | 100% | 125,006 | 2,080,896 | 16.65 |
| *Industrial/Commercial Properties* | | | 4,610,084 | 76% | 3,519,703 | 14,112,181 | 4.01 |
| | | | | | | | |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 72,480 | 98% | 71,272 | 774,804 | 10.87 |
| Muirwood Village | 0% | Zanesville, OH | 157,864 | 94% | 148,391 | 1,516,560 | 10.22 |
| Ohio II - Residences at Newark & Sheffield | 0% | Newark/Circleville, OH | 202,525 | 95% | 191,738 | 1,900,404 | 9.91 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 563,040 | 77% | 432,240 | 2,327,240 | 5.38 |
| University Fountains Lubbock | 0% | Lubbock, TX | 284,022 | 94% | 267,926 | 4,527,828 | 16.90 |
| University Springs San Marcos | 0% | San Marcos, TX | 176,944 | 97% | 171,265 | 2,625,348 | 15.33 |
| *Multi-Family/Student Housing Properties* | | | 1,456,875 | 88% | 1,282,832 | 13,672,184 | 10.66 |
| | | | | | | | |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 236,875 | 91% | 215,575 | 915,288 | 4.25 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 64,530 | 79% | 50,983 | 420,948 | 8.26 |
| Attic Space Self Storage - Blanco Rd | 0% | San Antonio, TX | 51,805 | 91% | 47,160 | 369,888 | 7.84 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 57,706 | 95% | 54,631 | 485,988 | 8.90 |
| Ft. Worth Northwest Self Storage | 0% | Fort Worth, TX | 63,025 | 74% | 46,500 | 468,384 | 10.07 |
| Ft. Worth River Oaks Self Storage | 0% | River Oaks, TX | 104,914 | 91% | 95,575 | 595,008 | 6.23 |
| Grissom Road Self Storage | 0% | San Antonio, TX | 250,618 | 88% | 219,816 | 570,648 | 2.60 |
| Houston South Mason (Patrick's) | 0% | Katy, TX | 56,850 | 94% | 53,450 | 429,000 | 8.03 |
| San Antonio 3 | 0% | San Antonio, TX | 267,260 | 89% | 239,091 | 1,557,720 | 6.52 |
| *Self-Storage Properties* | | | 1,153,583 | 89% | 1,022,781 | 5,812,872 | 5.68 |
| | | | | | | | |
| **Total Variable Interest Entity Properties** | | | 7,220,542 | 81% | 5,825,316 | 33,597,237 | 5.77 |

EXHIBIT "2"

During the fourth quarter of 2012, we deconsolidated one VIE. The deconsolidation was due to the foreclosure of Charleston Blvd, a self-storage facility owned by the VIE. We no longer manage or have a continuing involvement with this property.

During the third quarter of 2012, we acquired two self-storage properties from Central Florida Self Storage Acquisitions, LLC, a VIE previously consolidated. The properties were acquired in lieu of foreclosure on related mortgage notes held by the Company. As the properties were under common control, they were recorded at their carryover basis. The differences between the carryover basis and the carrying amounts of the mortgages were recorded in stockholders equity. Post-acquisition, we deconsolidated the remaining balances in the VIE after determining that we were no longer the primary beneficiary and no longer manage or have a continuing involvement with this entity.

During the first quarter of 2012, we deconsolidated one VIE. The deconsolidation was due to the sale of Foxborough Business Park Center, a commercial property owned by the VIE. We no longer manage or have a continuing involvement with this property.

41

The impact of the deconsolidation of VIE's on our 2012 Consolidated Financial Statements was a decrease in total assets of $1.1 million, a decrease in total liabilities of $1.4 million, and an increase in non-controlling interest of $0.3 million. Net loss attributable to non-controlling interests from the deconsolidated VIE's for 2012 was $0.6 million. The deconsolidation of the VIE's did not result in a gain or loss in the Consolidated Statement of Operations as the carrying amount of the non-controlling interest in the former subsidiaries at the deconsolidation dates were the same as the carrying amount of the former subsidiary's assets minus liabilities at the date of the deconsolidation.

We own an insignificant interest in most of the VIE's, and therefore, substantially all operations are included in the net income attributable to non-controlling interests.

The carrying amounts associated with the VIE's, after eliminating the effect of intercompany transactions, were as follows (in thousands):

|  | December 31, | |
|  | 2012 | 2011 |
| **Assets** | | |
| Restricted cash | $    3,724 | $    4,157 |
| Receivables | 2,988 | 2,365 |
| Fixed Assets, net | 290,549 | 316,361 |
| Other Assets | 8,600 | 8,123 |
| **Total Assets** | **$    305,861** | **$    331,006** |
| | | |
| **Liabilities** | | |
| Accounts payable | 398 | 634 |

| | | |
|---|---|---|
| Notes payable | 221,899 | 237,276 |
| Other liabilities | 6,759 | 7,144 |
| **Total liabilities** | **$ 229,056** | **$ 245,054** |
| | | |
| **Variable interest entity net carrying amount** | **$ 76,805** | **$ 85,952** |

At December 31, 2012, the liabilities in the above table are solely the obligations of the VIE's and are not guaranteed by us. In addition, we do not have the ability to leverage the assets of the above identified VIE's for the purpose of providing ourselves cash. The notes payable are solely secured by the property of the respective VIE's.

During the year ended December 31, 2012, we did not provide short term advances to any properties that have been consolidated or deconsolidated. A minimal balance is still owed to us as of December 31, 2012 relating to prior advances. We do not believe we have significant exposure to losses related to the VIE's.

42

## NOTE 6. REAL ESTATE

The cost and accumulated depreciation of rental property held for investment as of December 31, 2012 and 2011 are as follows (in thousands):

| 2012 | Land | Building and Improvements | Total Cost | Accumulated Depreciation | Net Recorded Value |
|---|---|---|---|---|---|
| **ASR Owned** | | | | | |
| **Office** | $ 29,754 | $ 65,738 | $ 95,492 | $ (29,227) | $ 66,265 |
| **Industrial** | 790 | 2,933 | 3,723 | (2,134) | 1,589 |
| **Retail** | 2,811 | 5,268 | 8,079 | (2,293) | 5,786 |
| **Self-Storage** | 535 | 2,439 | 2,974 | (424) | 2,550 |
| **Other** | - | 731 | 731 | (570) | 161 |
| | 33,890 | 77,109 | 110,999 | (34,648) | 76,351 |
| | | | | | |
| **VIE Properties** | | | | | |
| **Industrial** | $ 31,578 | $ 156,750 | $ 188,328 | $ (23,226) | $ 165,102 |
| **Residential** | 16,187 | 84,445 | 100,632 | (11,244) | 89,388 |
| **Self-Storage** | 17,171 | 21,545 | 38,716 | (2,657) | 36,059 |
| | 64,936 | 262,740 | 327,676 | (37,127) | 290,549 |
| | | | | | |
| **TOTAL** | **$ 98,82** | **$ 339,849** | **$ 438,675** | **$ (71,77)** | **$ 366,900** |

EXHIBIT "2"

| 6 | | | | 5 | |

| 2011 | Land | Building and Improvements | Total Cost | Accumulated Depreciation | Net Recorded Value |
|---|---|---|---|---|---|
| **ASR Owned** | | | | | |
| **Office** | $ 40,572 | $ 103,196 | $ 143,768 | $ (48,439) | $ 95,329 |
| **Industrial** | 6,419 | 20,160 | 26,579 | (7,738) | 18,841 |
| **Retail** | 2,811 | 5,077 | 7,888 | (2,074) | 5,814 |
| **Self-Storage** | 535 | 2,439 | 2,974 | (356) | 2,618 |
| **Other** | - | 787 | 787 | (566) | 221 |
| | 50,337 | 131,659 | 181,996 | (59,173) | 122,823 |
| | | | | | |
| **VIE Properties** | | | | | |
| **Industrial** | 32,272 | 161,525 | 193,797 | (14,330) | 179,467 |
| **Residential** | 16,187 | 83,930 | 100,117 | (6,367) | 93,750 |
| **Self-Storage** | 18,949 | 25,982 | 44,931 | (1,787) | 43,144 |
| | 67,408 | 271,437 | 338,845 | (22,484) | 316,361 |
| | | | | | |
| **TOTAL** | $ 117,745 | $ 403,096 | $ 520,841 | $ (81,657) | $ 439,184 |

**FUTURE MINIMUM RENTS**

The Company leases its office, industrial, retail center and self-storage property under non-cancelable operating lease agreements. Future minimum rents to be received as of December 31, 2012, are as follows (in thousands):

| Year Ending December 31, | Future Minimum Rents | | |
|---|---|---|---|
| | ASR | VIE | Total |
| **2013** | $ 11,314 | $ 27,752 | $ 39,066 |
| **2014** | 7,615 | 14,220 | 21,835 |
| **2015** | 4,722 | 14,273 | 18,995 |
| **2016** | 2,776 | 12,031 | 14,807 |
| **2017** | 1,351 | 10,469 | 11,820 |
| **Thereafter** | 1,404 | 100,293 | 101,697 |
| | $ 29,182 | $ 179,038 | $ 208,220 |

EXHIBIT "2"

**ACQUIRED LEASE INTANGIBLES**

Upon acquisitions of real estate, we assess the fair value of acquired tangible and intangible assets (including land, buildings, tenant improvements, above and below market leases, origination costs, acquired in-place leases, other identified intangible assets and assumed liabilities), and allocates the purchase price to the acquired assets and assumed liabilities. We also consider an allocation of purchase price of other acquired intangibles, including acquired in-place leases.

We evaluate acquired "above and below" market leases at their fair value (using a discount rate which reflects the risks associated with the leases acquired) equal to the difference between (i) the contractual amounts to be paid pursuant to each in-place lease and (ii) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed rate renewal options for below-market leases.

Acquired lease intangible assets (in-place leases and above-market leases) are amortized over the leases' remaining terms, which range from 1 month to 6 years. Amortization of above-market leases is recorded as a reduction of rental income and the amortization of in-place leases is recorded to amortization expense. We currently have no intangible lease costs related to above-market leases.

Acquired lease intangible liabilities (below-market leases) are accreted over the leases' remaining terms, which range from 1 month to 6 years. Accretion of below-market leases was approximately $0.3 million and $0.4 million for the two years ended December 31, 2012 and 2011, respectively. Such accretion is recorded as an increase to rental income.

The estimated aggregate amortization amounts from acquired lease intangibles for each of the next five years are as follows (in thousands):

| Year Ending December 31, | Amortization Expense (in-place lease value) |
|---|---|
| 2013 | $ 314 |
| 2014 | 289 |
| 2015 | 67 |
| 2016 | - |
| 2017 | - |
| | $ 670 |

**NOTE 7. DISCONTINUED OPERATIONS**

*2012 Dispositions*

In November 2012, the lender for Charleston Blvd. Self-Storage foreclosed on the asset. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $2.6 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated VIE which had not guaranteed the debt. The transaction generated a gain upon disposition of $0.5 million. No proceeds were received as a result of the transaction.

EXHIBIT "2"

In October 2012, we sold Beltway Industrial Park for $20.7 million. The transaction generated a gain on sale of approximately $5.6 million. Net proceeds received from the sale amounted to approximately $1.8 million. The proceeds were primarily used to reduce debt.

In October 2012, we sold 8300 Bissonnet. The property was in receivership. We consented to the sale of the property in exchange for being released from all liability on the note. The transaction generated a gain on sale of approximately $1.4 million. No proceeds were received as a result of the transaction.

Our preferred equity partner on 2855 Mangum acquired the mortgage loan from the property's lender and foreclosed on the asset in July 2012. We had elected to sell the property to our preferred equity partner in 2011. We chose not to make debt service payments due to the mortgage balance exceeding the market value of the property. The property securing the debt was held by a consolidated subsidiary that had not guaranteed the debt. The transaction generated a gain of approximately $0.01 million. No proceeds were received as a result of the transaction.

In April 2012 and May 2012, the lenders for our Bristol Bay and Pacific Spectrum properties notified us that they had foreclosed on the assets. The properties securing the debt were each held by consolidated wholly-owned subsidiaries that had not guaranteed the debt. The transactions generated a gain upon disposition of approximately $2.9 million. No proceeds were received as a result of these transactions.

In March 2012, we sold Park Ten Place I and II for $10.7 million and Sierra Southwest Pointe for $3.9 million. These transactions generated a gain on sale of approximately $4.4 million. Net proceeds received from the sales amounted to approximately $3.0 million. The proceeds were used to reduce corporate bank debt by $2.0 million and other debt by $1.0 million.

In March 2012, we sold Foxborough Business Park Center, owned by a VIE, for $4.9 million. The transaction generated a loss of approximately $0.7 million. Our ownership interest in the VIE was less than 1%. Net proceeds received from the sale amounted to $0.9 million, which was distributed to non-controlling interests.

In March 2012, the lender for our Atrium 6420 property foreclosed on the asset. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $6.3 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain upon disposition of $0.9 million. No proceeds were received as a result of the transaction.

*2011 Dispositions*

In December 2011, the lender for our Technology property foreclosed on the asset. The 118,413 square foot industrial property is located in Austin, Texas. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $7.1 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated

wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $1.7 million. No proceeds were received as a result of the transaction.

In November 2011, the lender for our Northwest Corporate Center property foreclosed on the asset. The 86,900 square foot office property is located in St. Louis, Missouri. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $5.3 million, due to the balance exceeding the market value of the debt. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $0.6 million. No proceeds were received as a result of the transaction.

In August 2011, the lender for our Creekside property foreclosed on the asset. The 47,810 square foot office property is located in San Ramon, California. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $5.7 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $0.4 million. No proceeds were received as a result of the transaction.

7700 Irvine Center, a 209,343 square foot office property, located in Irvine, California was sold on June 28, 2011 for $56.5 million, resulting in net proceeds of approximately $6.1 million. The transaction generated a gain on sale before income tax expense of $23.3 million. The gain on the sale of the property significantly diminished our federal net operating loss carry-forward. The proceeds from the sale were used to distribute $2.5 million to the non-controlling interest in 7700 Irvine Center, and to reduce debt, accrued liabilities and accounts payables.

45

The consolidated statements of operations of discontinued operations for the years ending December 31, 2012 and 2011 are summarized below:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (In thousands) | |
| Rental Revenue | $    3,627 | $   13,489 |
| Less Expenses (1) | (6,055) | (22,387) |
| Loss from discontinued operations before gain on dispositions and income tax expense | (2,428) | (8,898) |
| Gain on dispositions of real estate assets | 15,075 | 26,016 |
| Income tax expense | (4,326) | (4,541) |
| Income from discontinued operations | $    8,321 | $   12,577 |

(1)   Includes interest expense of approximately $2.0 million and $6.9 million for the years ending December 31, 2012 and December 31, 2011, respectively. Mortgage debt related to the property included in discontinued operations was individually secured, and as such, interest expense was based on the property's debt.

EXHIBIT "2"

Income from discontinued operations for the year ended December 31, 2012 includes the net gain resulting from the dispositions of Beltway Industrial Park, Park Ten Place I and II, Sierra Southwest Pointe, Bristol Bay, Pacific Spectrum, 8300 Bissonnet, 2855 Mangum, 6420 Richmond, Foxborough Business Center Park and Charleston Blvd, and the operating results of these properties through the date of disposition.

Income from discontinued operations for the year ending December 31, 2011 includes the gain resulting from the dispositions of 7700 Irvine Center, Creekside, Northwest Corporate Center and Technology, and the operating results of properties disposed of in 2011 and 2012. See Note 16 – Restructuring of Debt.

Our total assets and total liabilities decreased by $59.0 million and $69.4 million respectively, as a result of the 2012 dispositions.

## NOTE 8. ASSET IMPAIRMENTS

*Purchased Intangibles Subject to Amortization*

During the years ended December 31, 2012 and 2011, we had our contractual relationships terminated or modified by the entities that owned some of the third party properties we manage. Based on this triggering event we evaluated the management contracts associated with some of our purchased intangibles for impairment and determined that impairment had occurred. We recorded impairment charges of $1.0 million and $0.7 million for years ended December 31, 2012 and 2011, respectively, which reduced the fair value of the impaired contracts to zero. See Note 5 – Variable Interest Entities for additional information.

*Goodwill*

In the third quarter of 2011 we performed an assessment of goodwill that indicated the carrying value of goodwill exceeded the fair value requiring us to perform the second step of the impairment test. In the second step, we estimated the fair value of the goodwill using the income approach. Using the income approach required management to evaluate the factors associated with the goodwill. Management then estimated gross probable income, the probable expenses that would be incurred to generate the income. After the estimated expenses were deducted from the estimated gross income the resulting estimated probable net operating income was present valued using ranges that management believed was reasonable. Level 3 assumptions used by management can have a significant impact on the value of identifiable assets and accordingly can impact the value of goodwill recorded. Level 3 assumptions are based on management's internal analysis and are not completely derived from an observable market. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of impairment expense, different assumptions could impact our statement of operations and could impact the results of future impairment reviews.

46

As a result of this analysis, we recorded $1.3 million of impairment expense related to goodwill. The impairment reduced the beginning value of goodwill of $8.0 million to $6.7 million as of December 31, 2011.

A quantitative analysis was performed in the fourth quarter of 2012 resulting in no additional impairment charge.

*Real Estate Held for Investment*

Rental properties are individually evaluated for impairment when conditions exist which may indicate it is probable that the sum of expected future undiscounted cash flows is less than the carrying amount. Impairment indicators for our rental properties are assessed by project and include, but are not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. We assess the expected undiscounted cash flows based upon numerous factors and estimates, including, but not limited to, appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property and our assumptions about the use of the asset, including, if necessary, a probability-weighted approach if multiple outcomes are under consideration. Upon determination that impairment has occurred and that the future undiscounted cash flows are less than the carrying amount, a write-down will be recorded to reduce the carrying amount to its estimated fair value. During the year ended December 31, 2011, we determined that certain conditions existed that an evaluation for impairment was needed on certain of our properties and recorded impairment charges of $1.8 million on real estate held for investment. The impairment charges were primarily due a determination that the market value of two of our assets were lower than their carrying value as a result of an analysis of future undiscounted cash flows and market data.

## NOTE 9. FAIR VALUE MEASUREMENTS

The "*Fair Value Measurements and Disclosures*" Topic of the FASB ASC (Topic 820) defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants at the measurement date. Topic 820 also establishes a three-level fair value hierarchy that prioritizes the inputs used to measure fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair value are as follows:

Level 1—Quoted prices in active markets for identical assets or liabilities.

Level 2—Observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; or other inputs that are observable or can be corroborated by observable market data.

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. This includes certain pricing models, discounted cash flow methodologies and similar techniques that use significant unobservable inputs. The fair value measurements employed for our impairment evaluations were generally based on a discounted cash flow approach and/or review of comparable activities in the market place. Inputs used in these evaluations included risk-free rates of return, estimated risk premiums as well as other economic variables.

*Assets Measured at Fair Value on a Non-Recurring Basis.* We measure our goodwill and real estate assets on a non-recurring basis for impairment of fair value using an income approach. Using the income approach requires management to estimate the gross probable income for the reporting unit associated with the asset. Management then estimates and deducts from the gross probable income, the estimated probable expenses that would be incurred to generate the income. After the estimated probable expenses were deducted from the estimated gross probable

EXHIBIT "2"

income the resulting estimated probable net income was present valued using a factor that management believes is reasonable. The assumptions used by management can have a significant impact on the value of identifiable assets and accordingly can impact the value recorded. These assumptions are based on management's internal analysis and are not derived from an observable market. The assumptions would be considered Level 3 assumptions in the Fair Value Hierarchy. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of impairment expense, different assumptions could impact our statement of operations and could impact the results of future impairment reviews.

See Note 8. Asset Impairments for information relating to impairment expense recorded in prior interim periods in 2011 as the result of the assessment of impairment of goodwill and real estate assets using this approach.

47

## NOTE 10. RELATED PARTY TRANSACTIONS

In December 2011, John N. Galardi, a principal shareholder, loaned $0.3 million to the Company and pledged $0.4 million in certificates of deposit to additionally secure another loan of the Company.

We pay a guarantee fee to William J. Carden and Mr. Galardi ("the Guarantors"), in consideration for their guarantees of certain obligations of the Company. Mr. Carden is president, a principal shareholder and a director of the Company. The Guarantors are paid an annual guarantee fee equal to between .25% and .75% (depending on the nature of the guarantee) of the outstanding balance as of December 31 of the guaranteed obligations ("Guarantee Fee"). Guarantee fees for the year ended December 31, 2012 totaled approximately $0.2 million, all of which was paid to Mr. Carden. The following property notes are being guaranteed: 800/888 Sam Houston Parkway, 2620/2630 Fountain View, and 2640/2650 Fountain View. There are also five corporate notes being guaranteed. The guaranteed notes total $9.3 million at December 31, 2012.

48

## NOTE 11. NOTES PAYABLE

We had the following notes payable outstanding as of December 31, 2012 and 2011 secured by the following properties (dollars in thousands):

| | | December 31, | | | |
|---|---|---|---|---|---|
| | | 2012 | | 2011 | |
| Property (unless otherwise noted) | Maturity Date | Principal Balance | Interest Rate | Principal Balance | Interest Rate |

EXHIBIT "2"

**ASR Owned - Fixed Rate:**

| | | | | | |
|---|---|---|---|---|---|
| Pacific Spectrum (6) | 6/10/2010 | - | - | 5,191 | 8.02% |
| Bristol Bay (6) | 8/1/2011 | - | - | 6,687 | 7.58% |
| Corporate – Secured (3) | 3/18/2012 | - | - | 890 | 5.50% |
| Park Ten Place I (4) | 5/11/2012 | - | - | 4,314 | 7.45% |
| Park Ten Place II (4) | 5/11/2012 | - | - | 3,380 | 7.45% |
| 2855 Mangum (11) | 5/11/2012 | - | - | 2,495 | 7.45% |
| 2855 Mangum (11) | 5/11/2012 | - | - | 1,355 | 6.00% |
| Atrium 6430 (2) | 5/11/2012 | 2,050 | 7.45% | 2,094 | 7.45% |
| Corporate – Unsecured (8) | 5/31/2012 | - | - | 950 | 5.50% |
| Corporate – Unsecured (2)(3) | 5/31/2012 | 1,000 | 9.50% | 1,000 | 9.50% |
| Sierra Southwest Pointe (4) | 6/1/2012 | - | - | 2,620 | 7.33% |
| Corporate - Secured by Certificates of Deposits (10) | 6/15/2012 | - | - | 992 | 4.50% |
| Park Ten Place I (4) | 8/11/2012 | - | - | 476 | 7.45% |
| Park Ten Place II (4) | 8/11/2012 | - | - | 373 | 7.45% |
| 2640 - 2650 Fountain View (2)(3) | 8/29/2012 | 726 | 10.00% | 822 | 10.00% |
| Corporate – Secured (3) | 12/19/2012 | - | - | 250 | 5.50% |
| Corporate - Unsecured | 1/27/2013 | - | - | 250 | 6.00% |
| Corporate – Unsecured (18) | 2/1/2013 | - | - | 1,703 | 5.50% |
| Corporate - Secured by NW Spectrum Plaza (3)(9) | 3/28/2013 | 1,145 | 5.50% | - | - |
| Corporate – Secured by Management Contracts (3)(20) | 6/5/2013 | 463 | 5.50% | 697 | 8.75% |
| Corporate - Secured by NW Spectrum Plaza (9) | 4/19/2013 | - | - | 500 | 5.50% |
| Corporate – Secured (21) | 3/31/2014 | 1,500 | 8.00% | - | - |
| 11500 Northwest Freeway (1) | 6/1/2014 | 3,861 | 5.93% | 3,932 | 5.93% |
| 11500 Northwest Freeway | 6/1/2014 | 279 | 5.93% | 285 | 5.93% |
| Morenci Professional Park (1) | 7/1/2014 | 1,579 | 7.25% | 1,579 | 7.25% |
| FMC Technology | 9/1/2014 | 8,308 | 5.32% | 8,428 | 5.32% |
| 8100 Washington | 2/22/2015 | 2,005 | 5.59% | 2,117 | 5.59% |
| 8300 Bissonnet (16) | 5/1/2015 | - | 5.51% | 4,484 | 5.51% |
| 2620 - 2630 Fountain View (3) | 6/30/2015 | 5,341 | 7.00% | 5,350 | 7.00% |
| 1501 Mockingbird Lane | 7/1/2015 | 3,089 | 5.28% | 3,135 | 5.28% |
| 5450 Northwest Central | 9/1/2015 | 2,499 | 5.38% | 2,536 | 5.38% |
| Ocala Self Storage (14) | 10/3/2015 | 1,412 | 4.25% | - | - |
| Tampa Self Storage (14) | 10/3/2015 | 1,504 | 4.25% | - | - |
| 800 & 888 Sam Houston Parkway (3) | 12/29/2015 | 4,289 | 6.25% | 4,411 | 6.25% |
| Fountain View Office Tower | 3/1/2016 | 11,540 | 5.82% | 11,750 | 5.82% |
| Gray Falls and 12000 Westheimer | 1/1/2017 | 7,077 | 5.70% | 7,173 | 5.70% |
| Atrium 6420 (5) | 6/5/2017 | - | - | 6,262 | 5.87% |
| 2640 - 2650 Fountain View | 4/29/2018 | 12,010 | 6.50% | 12,191 | 6.50% |
| Corporate – Secured by Management Contracts | 12/31/2019 | 9,380 | 5.00% | 9,380 | 5.00% |
| Sabo Road Self Storage (9) | 7/1/2022 | 2,015 | 5.55% | 1,911 | 7.42% |

EXHIBIT "2"

| | | | | | |
|---|---|---|---|---|---|
| Corporate – Unsecured | Various | 1,514 | Various | 1,159 | Various |
| Corporate - Secured | Various | 1,163 | Various | 1,802 | Various |
| | $ | 85,74 | $ | 124,92 | |
| Subtotal | | 9 | | 4 | |

49

| Property (unless otherwise noted) | Maturity Date | December 31, | | | |
|---|---|---|---|---|---|
| | | **2012** | | **2011** | |
| | | **Principal Balance** | **Interest Rate** | **Principal Balance** | **Interest Rate** |
| **ASR Owned - Variable Rate** | | | | | |
| Northwest Spectrum Plaza (2) | 4/19/2013 | 2,381 | 2.66% | 2,585 | 2.90% |
| Windrose Plaza (19) | 4/19/2013 | 2,458 | 2.66% | 2,492 | 2.90% |
| Beltway Industrial Park (16) | 6/9/2013 | - | - | 16,282 | 7.00% |
| Beltway Industrial Park (16) | 6/9/2013 | - | - | 163 | 7.00% |
| Corporate – Unsecured (3) | 12/12/2013 | 175 | 6.00% | 300 | 6.00% |
| Subtotal | | $ 5,014 | | $ 21,822 | |
| Subtotal ASR Owned | | 90,763 | | 146,746 | |
| **Consolidated VIEs** | | | | | |
| Foxborough Business Park (4) | 3/1/2012 | - | - | 3,683 | 7.70% |
| Fishers Indiana Distribution Center (1) | 10/1/2012 | 17,058 | 5.42% | 17,331 | 5.42% |
| Commerce Distribution Center | 3/10/2013 | 9,402 | 6.12% | 9,598 | 6.12% |
| Houston South Mason (Patrick's) (15) | 6/25/2013 | 2,817 | 7.25% | 2,745 | 7.25% |
| Charleston Blvd. Self Storage (17) | 1/1/2015 | - | - | 2,526 | 5.77% |
| University Springs San Marcos | 12/1/2015 | 9,359 | 5.55% | 9,505 | 5.55% |
| Ocala Self Storage (14) | 12/22/2015 | - | - | 1,376 | 5.00% |
| Tampa Self Storage (14) | 12/22/2015 | - | - | 1,466 | 5.00% |
| University Fountains Lubbock | 1/1/2016 | 20,828 | 5.57% | 21,149 | 5.57% |
| Dixon & 51st Logistics Center | 1/1/2016 | 17,258 | 5.69% | 17,538 | 5.69% |
| Campus Court Student Housing | 5/11/2016 | 4,617 | 5.78% | 4,683 | 5.78% |
| Grissom Road Self Storage | 6/1/2017 | 2,308 | 7.00% | 2,336 | 7.00% |
| Loop 1604 Self Storage | 9/11/2017 | 4,249 | 6.70% | 4,298 | 6.70% |
| College Park Student Apartments | 11/6/2017 | 14,283 | 6.35% | 14,431 | 6.35% |
| Ohio II Residences at Newark & Sheffield | 1/1/2018 | 9,334 | 6.74% | 9,422 | 6.74% |
| Muirwood Village | 2/1/2018 | 7,708 | 6.58% | 7,790 | 6.58% |
| Aldine Westfield Self Storage | 10/31/2018 | 1,031 | 4.76% | 1,057 | 4.76% |
| Aldine | 8/14/2019 | 1,171 | 6.07% | 1,289 | 6.07% |
| Attic Space Self Storage - Blanco Rd. | 4/1/2021 | 1,300 | 6.63% | 1,316 | 6.63% |
| Attic Space Self Storage - Laredo Rd. | 4/1/2021 | 1,721 | 6.63% | 1,758 | 6.63% |

EXHIBIT "2"

| | | | | | |
|---|---|---|---|---|---|
| Ft. Worth River Oaks Self Storage | 7/1/2021 | 2,118 | 6.00% | 2,155 | 6.00% |
| Ft. Worth Northwest Self Storage (7) | 4/1/2022 | 2,125 | 5.82% | 1,936 | 6.23% |
| San Antonio III - AAA Stowaway / FOE (12) | 11/1/2022 | 9,635 | 5.50% | 10,504 | 6.05% |
| Strongsville Corporate Center | 11/11/2034 | 13,882 | 5.50% | 14,687 | 5.50% |
| Ohio Commerce Center | 6/11/2035 | 18,412 | 5.64% | 18,727 | 5.64% |
| Springs Commerce Center 1 | 5/11/2036 | 16,548 | 5.75% | 16,849 | 5.75% |
| Springs Office | 6/11/2036 | 14,301 | 5.75% | 14,560 | 5.75% |
| Spring Commerce Center II | 7/11/2036 | 20,100 | 6.00% | 20,512 | 6.00% |
| Other Unsecured Notes | Various | 334 | Various | 1,049 | Various |
| **Subtotal VIE** | | $  221,899 | | $  236,276 | |
| | | | | | |
| **Grand Total** | | $  312,662 | | $  383,022 | |

_____

(1)    We are currently electing not to pay monthly debt service and are negotiating term modifications with the lender. See additional information regarding this debt below.

(2)    We are currently negotiating extension terms with lender.

(3)    Loan or carve-out is guaranteed by us and in some cases by Mr. Carden and/or Mr. Galardi.

(4)    Loan was paid in connection with the sale of the property in March 2012.

(5)    Property was foreclosed upon by the lender in March 2012.

(6)    Property was foreclosed upon by the lender in April 2012.

50

_____

(7)    Loan was refinanced in March 2012.

(8)    Loan was paid in March 2012.

(9)    Loan was refinanced in June 2012.

(10)    Loan was paid in May 2012.

(11)    Property was foreclosed upon by lender in July 2012.

(12)    In October 2012, the debt was refinanced with a new loan in the amount of $9.7 million. A third party equity partner contributed $1.5 million in connection with the transaction.

(13)    Represents short-term loan obtained in September 2012. Loan was paid in October 2012 in connection with the sale of Beltway Industrial Park.

(14)    Represents loans assumed from a consolidated VIE in connection with the acquisition of Tampa and Ocala in September 2012.

(15)    Loan maturity was extended to June 2013.

EXHIBIT "2"

(16)    Loan was satisfied in connection with the sale of the property in October 2012.

(17)    Property was foreclosed upon by lender in November 2012.

(18)    Loan was satisfied for $1.0 million in September 2012. See additional information regarding this debt below.

(19)    Loan was refinanced in March 2013. The new loan in the amount of $3.5 million is for a 10-year term and bears interest at a fixed rate of 5.5% per annum.

(20)    Loan maturity was extended to June 2013.

(21)    Loan maturity was extended to March 2014.

In September 2012, we obtained a short-term loan in the amount of $1.2 million. The loan proceeds were primarily used to satisfy our $1.7 million corporate loan with California Bank and Trust. We paid the bank $1.0 million for a complete satisfaction of the loan, which had a principal balance and accrued interest due of approximately $1.8 million. A mutual release settled all issues regarding this loan for both parties. A gain of approximately $0.8 million was recognized on the transaction.

The required principal payments on our consolidated debt for the next five years and thereafter, as of December 31, 2012 are as follows (in thousands):

| Year | ASR | VIE | Total |
|------|------|--------|---------|
| 2013 | 15,788 | 33,065 | 48,853 |
| 2014 | 14,677 | 3,649 | 18,326 |
| 2015 | 20,108 | 12,782 | 32,890 |
| 2016 | 11,387 | 43,264 | 54,651 |
| 2017 | 7,041 | 18,488 | 25,529 |
| Thereafter | 21,762 | 110,651 | 132,413 |
| Total | 90,763 | 221,899 | 312,662 |

We are in default on the notes listed below. The balances disclosed on the table below exclude additional fees that may be the result of non-payment.

51

| Property Secured by | ASR Ownership Percentage | Balance December 31, 2012 (in thousands) |
|---------------------|--------------------------|------------------------------------------|
| Morenci Professional Park | 100% | $ 1,579 |
| 11500 Northwest Freeway | 100% | 3,861 |
| Fishers Indiana | 1% | 17,058 |
| 1501 Mockingbird | 100% | 3,089 |
| 8100 Washington | 100% | 2,005 |

EXHIBIT "2"

| | | |
|---|---|---|
| Gray Falls/12000 Westheimer | 100% | 7,077 |
| 6430 Richmond | 100% | 2,050 |
| 2640/2650 Fountain View | 100% | 726 |
| Corporate - Unsecured | 100% | 1,000 |
| TOTAL | | $ 38,445 |

We have elected not to make payments on the debt secured by Morenci, 11500 Northwest Freeway and Fishers Indiana due to operating deficiencies of the properties and/or the unpaid balances of the mortgages exceeding the market value of the properties. The debt on Fishers Indiana, a VIE property, is matured. The lenders holding the debt on these properties have placed these assets into receivership and have initiated foreclosure proceedings.

We are in default on our debt secured by 1501 Mockingbird, 8100 Washington and Gray Falls/12000 Westheimer due to past due debt service. We anticipate bringing these three loans current in the second quarter of 2013. In the case of 1501 Mockingbird, we currently have this property listed for sale and anticipate disposing of the property in the second quarter of 2013. We believe the market value of these properties is in excess of their current loan balances.

Two additional loans: one secured by 6430 Richmond and one by 2640/2650 Fountain View are matured. We are currently negotiating extensions with the lenders on these loans.

All of the properties securing the debt in default are held by consolidated wholly owned subsidiaries or consolidated VIE's. These mortgages are not guaranteed by us. All of the notes in default have payment acceleration clauses and payment in full, including additional fees and interest, could be demanded by the lenders holding these notes.

We also are in default on a $1.0 million corporate note, which matured in May 2012. The loan is guaranteed by Mr. Galardi. The lender on the note has initiated legal proceedings to collect on the debt. Negotiations are in progress to settle this debt.

Unamortized financing costs at December 31, 2012 and December 31, 2011 were $0.8 million and $1.2 million, respectively. Most of our mortgage debt is not cross-collateralized. We have three mortgage loans that are cross-collateralized with a second property.

## NOTE 12. NON-CONTROLLING INTERESTS AND OPERATING PARTNERSHIP UNITS

During the second quarter of 2012, we repurchased all of the operating partnership units ("OP Units") issued to Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") in 2010. We had issued the OP Units to Evergreen in connection with our acquisition of assets from Evergreen on January 17, 2010. OP Units issued to Evergreen were repurchased by the Company for a total of one dollar, in accordance with the purchase agreement.

To reflect the change in ownership in the operating partnership, we have adjusted the non-controlling interest by the approximate carrying amount of the OP Units.

See Note 17 – Commitments and Contingencies for additional information.

The following table summarizes the activity for the operating partnership units ("OP Units"):

EXHIBIT "2"

| Operating Partnership Units | Years ended, December 31, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in thousands) | |
| **Balance, beginning of period** | 4,588 | 4,554 |
| Issuances | 49 | 78 |
| Redemptions | (818) | (44) |
| **Balance, end of period** | 3,819 | 4,588 |
| | | |
| **Ownership of Operating Partnership Units** | | |
| ASR | 3,568 | 3,345 |
| All others | 251 | 1,243 |
| | 3,819 | 4,588 |

The following represents the effects of changes in the Company's equity related to non-controlling interests:

| | Years ended, December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2012 | | 2011 | |
| | (in thousands) | | | |
| Net income attributable to the Company | $ | 1,414 | $ | 3,999 |
| Increase in the Company's paid-in-capital on exchange of OP Units for shares of common stock | | 1,711 | | 2,342 |
| Increase in the Company's paid-in-capital on redemption of OP Units for cash | | 8,013 | | - |
| Change from net income attributable to the Company related to non-controlling interest transactions | $ | 11,138 | $ | 6,341 |

## NOTE 13. INCOME TAXES

The provision for income taxes from continuing operations on income consists of the following for the years ended December 31, 2012 and 2011 (in thousands):

| | 2012 | | 2011 | |
| --- | --- | --- | --- | --- |
| Current expense (benefit): | | | | |
| Federal | $ | - | $ | - |
| State | | 151 | | 155 |
| | $ | 151 | $ | 155 |

| Deferred expense (benefit): | | | | |
|---|---|---|---|---|
| Federal | $ | 485 | $ | 2,996 |
| State | | 179 | | (1,036) |
| | $ | 664 | $ | 1,960 |

We have federal and state net operating loss carry-forwards of approximately $25.0 million and $8.6 million, respectively, as of December 31, 2012.

We are a loss corporation as defined in Section 382 of the Internal Revenue Code. Therefore, if certain changes in our ownership should occur, there could be a significant annual limitation on the amount of loss carry-forwards and future recognized losses that can be utilized and ultimately some amount of loss carry-forwards may not be available. Such changes could result in additional tax provision. The net operating loss carry-forwards expire in 2024 through 2031.

53

For the two years ended December 31, 2012, the reported income tax benefit differs from the amount of benefit determined by applying the federal statutory rate of 34% before income taxes as a result of the following:

| | Years ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in thousands) | |
| Expected income tax expense at statutory federal rate | $ 955 | $ 414 |
| Permanent differences: | | |
| Non-controlling interest | (109) | 1,433 |
| Meals and entertainment | 11 | 19 |
| Share-based compensation | - | 4 |
| Return to provision | (153) | - |
| State income tax expense | 218 | 102 |
| Other | (107) | 143 |
| Income tax expense | $ 815 | $ 2,115 |

The components of deferred tax assets and liabilities consist of the following as of December 31, 2012 and December 31, 2011, respectively:

| | Years ended December 31, | |
|---|---|---|
| | 2012 | 2011 |
| | (in thousands) | |
| Deferred tax assets: | | |

EXHIBIT "2"

| | | | | | |
|---|---|---|---|---|---|
| Net operating losses | $ | 9,037 | $ | 9,765 |
| Built in gains | | 2,246 | | 2,067 |
| Intangible assets | | 132 | | 642 |
| Allowance for bad debts | | 73 | | 219 |
| Share-based compensation | | 129 | | 54 |
| Charitable contributions | | 1 | | 8 |
| Alternative minimum tax | | 85 | | 85 |
| Total deferred tax asset | $ | 11,703 | $ | 12,840 |
| | | | | |
| Deferred tax liabilities: | | | | |
| Straight-line rents receivable | | (395) | | (717) |
| Total deferred tax liabilities | | (395) | | (717) |
| | | | | |
| Net deferred tax asset | $ | 11,308 | $ | 12,123 |

Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. We have assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income.

An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (i) the more positive evidence is necessary and (ii) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion, or all, of the deferred tax asset. Among the more significant types of evidence that we considered are: that future anticipated property sales will produce more than enough taxable income to realize the deferred tax asset; taxable income projections in future years; and whether the carry-forward period is so brief that it would limit realization of tax benefits.

We had no unrecognized tax benefits as of December 31, 2012. We do not expect that this will change significantly within the next twelve months. Our policy is to recognize interest related to any unrecognized tax benefits as interest expense and penalties as operating expenses. There are no penalties or interest accrued at December 31, 2012 related to unrecognized tax benefits. We believe that we have the appropriate support for the income tax positions taken and to be taken on our tax returns and that our accruals for tax liabilities are adequate for all open years based on an assessment of many factors including past experience and interpretations of tax law applied to the facts of each matter. Our federal and state tax returns open to audit generally include all years from 2009 and beyond.

54

We expect to sell real estate assets in the future and have determined that it is more likely than not that future taxable income, primarily from gains on the sales of real estate assets, will be sufficient to enable us to realize all of our deferred tax assets. Therefore, for each of the two years ended December 31, 2012 and 2011, no valuation allowance has been recorded.

EXHIBIT "2"

**NOTE 14. NET INCOME PER SHARE**

Net income per share is calculated based on the weighted average number of common shares outstanding. Stock options outstanding, OP Units and preferred shares have not been included in the net loss per share calculation since their effect on the losses would be antidilutive. Net income per share for each of the two years ended December 31, 2012 and 2011 is as follows (in thousands, except for shares and per share amounts):

|  | Years ended December 31, | |
|---|---|---|
|  | **2012** | **2011** |
|  | $ | $ (12,79 |
| Loss from continuing operations | (10,106) | 3) |
| Net loss attributable to non-controlling interests from continuing operations | 4,224 | 10,116 |
| Loss from continuing operations attributable to American Spectrum Realty Inc. common stockholders | **(5,882)** | **(2,677)** |
| Discontinued operations: | | |
| Loss from discontinued operations | (2,428) | (8,898) |
| Gain on disposition discontinued operations | 15,075 | 26,016 |
| Income tax expense | (4,326) | (4,541) |
| Net income attributable to non-controlling interests from discontinued operations | (1,025) | (5,901) |
| Income from discontinued operations | 7,296 | 6,676 |
| Preferred stock dividend | (240) | (240) |
| Net Income attributable to American Spectrum Realty, Inc. common stockholders | **1,174** | **3,759** |
| Basic and diluted per share data: | | |
| Loss from continuing operations attributable to American Spectrum Realty, Inc. common stockholders | ($ 1.65) | $ (0.90) |
| Income from discontinued operations attributable to American Spectrum Realty, Inc. common stockholders | 2.05 | 2.22 |
| Net income attributable to American Spectrum Realty, Inc. common stockholders | $ 0.40 | $ 1.32 |
| Basic weighted average shares used | 3,569,032 | 3,008,836 |

The following weighted average preferred shares, stock options and OP units outstanding that can be converted into common stock on a one for one basis were excluded from the computation of diluted net income per share as they had an anti-dilutive effect:

Years ended,
December 31,

EXHIBIT "2"

|  | 2012 | 2011 |
|---|---|---|
| Preferred shares | 55,172 | 55,172 |
| Stock options | 16,042 | 51,563 |
| OP Units | 518,982 | 1,549,834 |
| Total | 590,196 | 1,656,569 |

## NOTE 15. SHARE-BASED COMPENSATION

Share-based compensation expense is measured at grant date, based on the fair value of the instrument, and is recognized as expense over the requisite service period.

55

The following table sets forth the total share-based compensation expense included in our Consolidated Statements of Operations:

|  | Years Ended | |
|---|---|---|
|  | 2012 | 2011 |
|  | (in thousands) | |
| General and administrative | 205 | 195 |
| Total | $   205 | $   195 |

As of December 31, 2012, approximately $0.2 million total unrecognized share-based compensation expense related to non-vested awards is expected to be recognized over the respective vesting terms of each award over the weighted average period of 3.4 years.

### Valuation Assumptions

Our determination of fair value of share-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as assumptions regarding a number of highly complex and subjective variables.

No options were granted during the twelve month periods ending December 31, 2012 and 2011.

The fair value of each option award is estimated on the date of grant using the Black-Scholes valuation model, consistent with the provisions of ASC 718. The Black-Scholes option-pricing model was developed for use in estimating the fair value of short-lived exchange traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions, including the option's expected life and the price volatility of the underlying stock.

EXHIBIT "2"

Our issued and outstanding stock options at December 31, 2012 and 2011 are fully vested and expensed.

We declared and paid cash dividends to common shareholders in 2003 but do not plan to pay cash dividends to common stock shareholders in the foreseeable future.

The fair value of each restricted stock award (RSA) is estimated on the date of grant based on the closing price of our stock on the grant date. Share-based compensation expense related to RSAs is recognized over the requisite service period.

### Equity Incentive Program and Restricted Stock Awards

We grant incentive and nonqualified stock options and RSA's to employees, consultants and directors under the Omnibus Stock Incentive Plan ("the Plan"). Stock options expire 10 years from the date they are granted and generally vest over service periods that range over three years. New shares are issued for options exercised and RSA's released. RSA's give the recipient the right to vote all shares, to receive and retain all cash dividends payable to holders of shares of record on or after the date of issuance and to exercise all other rights, powers and privileges of a holder of our shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to three years.

We have reserved 360,000 shares under the Plan. As of December 31, 2012, we had issued 132,780 shares under the Plan.

56

The following table summarizes the combined activity under the equity incentive plans for the indicated periods:

| | Number of Options Outstanding | Weighted Average Exercise Price per Share | | Number of RSAs | Weighted Average Grant-date fair value per Share | |
|---|---|---|---|---|---|---|
| Balances at December 31, 2010 | 58,750 | $ | 11.97 | 39,012 | | |
| | | | | | | |
| Granted | - | $ | - | 34,500 | $ | 17.09 |
| Options Exercised | - | $ | - | | | |
| RSA Releases | | | | (14,166) | $ | 12.45 |
| Forfeited/Expired | (41,250) | $ | 14.78 | (10,338) | $ | 12.87 |
| Balances at December 31, 2011 | 17,500 | $ | 7.03 | 49,008 | $ | 15.96 |
| | | | | | | |
| Granted | - | $ | - | 7,000 | $ | 3.68 |
| RSA Releases | - | | - | (16,934) | $ | 15.01 |
| Forfeited/Expired | (17,500) | $ | 5.58 | (17,004) | $ | 14.98 |

EXHIBIT "2"

| Balances at Dec 31, 2012 | - | $ | - | 22,070 | $ | 13.54 |
|---|---|---|---|---|---|---|

The RSA's had no intrinsic value as of December 31, 2012. No options were outstanding at December 31, 2012.

During the years ended December 31, 2012 and 2011, we granted 7,000 and 34,500 restricted stock awards to certain officers and employees, respectively. The value of the restricted stock awards was based on the closing market price of our common stock on the date of each award. The total grant date fair value of the restricted stock awards granted during the year ended December 31, 2012 and 2011 was approximately $0.03 million and $0.6 million, respectively, which will be recognized over the vesting periods ranging from three to five years from the date of grant. The expense recorded for the years ended December 31, 2012 and 2011 was approximately $0.2 million and $0.2 million, respectively.

***Awards to Non-Employees***

In January 2012, we issued 41,910 shares of Common Stock to a firm as consideration for legal services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $0.2 million in services.

In February 2011, we issued 15,000 shares of Common Stock to a firm as consideration for business advisory services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $0.2 million.

In July 2011, we issued 3,000 shares of Common Stock to a firm as consideration for consulting services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $0.1 million.

In November 2011, we issued 25,685 shares of Common Stock to a firm as consideration as consideration for utility services. The fair value of the stock was based on the closing market price of our common stock on the date of grant. The consideration for the shares amounted to $0.3 million

## NOTE 16. RESTRUCTURING OF DEBT

During the year ended December 31, 2012, we satisfied our $1.7 million corporate loan with California Bank and Trust. We paid the bank $1.0 million for a complete satisfaction of the loan, which had a principal balance and accrued interest due of approximately $1.8 million. A mutual release settled all issues regarding this loan for both parties. We recorded other income of approximately $0.8 million in connection with the transaction.

We recorded a net gain of $4.3 million on the foreclosure of five properties in 2012, which is included as a component of discontinued operations. The combined gain of $5.1 million, net of taxes, amounted to $0.91 per share. We also negotiated extended payment terms on approximately $1.4 million in accounts payable in 2012 with several vendors.

EXHIBIT "2"

During the year ended December 31, 2011, we have re-negotiated some of our accounts payable which resulted in extended payment terms and/or discounted amounts. Six agreements have promissory notes with interest rates that range between 5%-9% and the maturities of all fifteen arrangements range between July 2011 and December 2015. We settled certain accounts payable during the year ending December 31, 2011 with creditors on a discounted basis and recorded other income of $0.5 million. We also recorded a gain of $2.7 million on the foreclosure of three properties in 2011, which is included as a component of discontinued operations. The combined gain of $3.2 million, net of taxes, amounted to $0.67 per share.

57

---

## NOTE 17. COMMITMENTS AND CONTINGENCIES

On March 2, 2011, we filed an action against Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") relating to its acquisition of assets from Evergreen in January 2010. The purchase price of the assets was $18.0 million, subject to adjustment as provided in the purchase agreement, and was paid in the form of (a) the assumption of $500,000 of payables, (b) the issuance of a $9.5 million promissory note and (c) the issuance of 800,000 operating partnership units which would be redeemable by Evergreen after June 30, 2011 for a number of shares of our common stock (or, at our option, the cash equivalent) equal to the quotient obtained by dividing $8.0 million by the greater of our share price or net asset value as of December 31, 2010. (Our share price as of December 31, 2010 was $17.52; our net asset value as of December 31, 2010 has not been definitively determined.) In our action, we are alleging various offsets and adjustments to the purchase price, as well as defaults by Evergreen, and are seeking damages and a declaration that the principal amount of the promissory note should be reduced to zero, that the operating partnership units should be cancelled and that Evergreen should refund to us payments of at least $578,000 which have been made on the promissory note. On March 7, 2011, New West Realty, Inc. ("New West"), an affiliate of Evergreen, filed a complaint for damages in Orange County Superior Court against ASR and other related entities. New West alleges in the complaint that ASR had failed to pay amounts then due under a $9.5 million promissory note held by New West. We have subsequently paid all amounts currently due and payable under the note and therefore dispute the claim and deny that any payment is now due under the note, and we have filed a separate lawsuit against New West and others seeking damages in excess of the amount of New West's claim.

In January 2013, we came to terms with Evergreen to settle the $9.5 million promissory note. The proposed terms of the settlement agreement have been formalized. We have agreed to pay $4.6 million in a combination of cash, a new note, and nonconvertible preferred stock as settlement of the note. The new debt will mature in 2017. The required documentation and approval by all parties of the settlement agreement is anticipated to be completed in the second quarter of 2013.

During the second quarter of 2012, we repurchased all of the operating partnership units ("OP Units") issued to Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") in 2010. We had issued the OP Units to Evergreen in connection with the acquisition of assets from Evergreen on January 17, 2010. The OP Units issued to Evergreen were repurchased by the Company for one dollar as provided in the purchase and sell agreement. See Note 12 – Non-Controlling Interests and Operating Partnership Units for additional information.

EXHIBIT "2"

We are in default on a $1.0 million unsecured note, which matured in May 2012. The loan is guaranteed by Mr. Galardi. The lender on the note has initiated legal proceedings to collect on the debt. Negotiations are in progress to settle this debt.

Some of our notes payable require that we maintain minimum cash and tangible net worth. We believe we are in compliance with these requirements, except as to our loans in default.

Certain other claims and lawsuits have arisen against us in our normal course of business including lawsuits by creditors with respect to past due accounts payable. We believe that such claims and lawsuits will not have a material adverse effect on our financial position, cash flows or results of operations.

## NOTE 18. PREFERRED STOCK

We are authorized to issue up to 25.0 million shares of one or more classes or series of preferred stock with a par value of $.01 per share.

On December 30, 2008, we filed Articles Supplementary to our Articles of Incorporation, which authorized the issuance of 68,965 of Series A Preferred Stock ("Preferred Stock").

On December 31, 2008, we issued 55,172 shares of the Preferred Stock to Mr. Carden, Mr. Galardi and Timothy R. Brown. Each share of Preferred Stock was sold for $29.00 and is entitled to annual dividends, payable quarterly, at an annual rate of 15%, and to a preference on liquidation equal to the following: (a) if on or prior to December 31, 2011, the sum of $29.00 and any accrued and unpaid dividends or (b) if after December 31, 2011, the greater of (x) the sum of $29.00 and any accrued and unpaid dividends or (y) the amount which would be paid on account of each share of common stock upon liquidation if each share of Preferred Stock had hypothetically been converted into one share of common stock. The Preferred Stock is not required to be redeemed by us and the holders will have no right to require redemption. The Preferred Stock is redeemable at our option at any time after December 31, 2011. The shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

58

---

As of December 31, 2012 there were accrued and unpaid dividends on the outstanding preferred shares of $0.4 million, or $.10 per common share.

## NOTE 19. SUBSEQUENT EVENTS

During the first quarter of 2013, we deconsolidated the VIE which owns Fishers Indiana Distribution Center. The debt on the property is matured and the lender has placed the asset into receivership. We have determined that we are no longer the primary beneficiary of the VIE which owns the property

In March 2013, we obtained a $1.8 million loan secured by two real estate assets. The loan is for a 1-year term and bears interest at a fixed rate of 12% per annum. The loan proceeds will be used to reduce accounts payable and for other obligations.

EXHIBIT "2"

In March 2013, we refinanced our loan on Windrose Plaza. The new loan, in the amount of $3.5 million, is for a 10-year term and bears interest a fixed rate at 5.5% per annum.

In January 2013, we came to terms with Evergreen to settle the $9.5 million promissory note. The proposed terms of the settlement agreement have been formalized. We have agreed to pay $4.6 million in a combination of cash, a new note, and nonconvertible preferred stock as settlement of the note. The new debt will mature in 2017. The required documentation and approval by all parties of the settlement agreement is anticipated to be completed in the second quarter of 2013.

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### Item 9A. Controls and Procedures

Our Chief Executive Officer and Chief Financial Officer, are responsible for evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 (Exchange Act) Rules 13a-15(e) or 15d-15(e)) as of the end of the period covered by this annual report.

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports filed under the Securities Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. As of the date of this report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon and as of the date of that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports our Company files and submits under the Securities Exchange Act is recorded, processed, summarized and reported as and when required.

### Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. As defined in Rules 13a-15(f) under the Securities Exchange Act of 1934, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive, principal accounting and principal financial officers, or persons performing similar functions, and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

The Company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records, that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial

EXHIBIT "2"

statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

59

---

The Company's management, including the Company's Chief Executive Officer and Principal Financial Officer assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2012. In making this assessment, management used the framework in "Internal Control - Integrated Framework" promulgated by the Committee of Sponsoring Organizations of the Treadway Commission, commonly referred to as the "COSO" criteria. Based on the assessment performed, management believes that as of December 31, 2012, the Company's internal control over financial reporting was effective based upon the COSO criteria. Additionally, based on management's assessment, the Company determined that there were no material weaknesses in its internal control over financial reporting as of December 31, 2012.

This Annual Report does not include an attestation report of the Company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the SEC that permit the Company to provide only management's report in this Annual Report.

**Changes in Internal Controls**

There has not been any change in our internal control over financial reporting during the fourth quarter of 2012 that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The information required by Item 10 is incorporated by reference from the Company's definitive proxy statement to be filed on or before April 30, 2013 for its annual stockholder's meeting.

**ITEM 11. EXECUTIVE COMPENSATION**

EXHIBIT "2"

The information required by Item 11 is incorporated by reference from the Company's definitive proxy statement to be filed on or before April 30, 2013 for its annual stockholder's meeting.

## ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by Item 12 is incorporated by reference from the Company's definitive proxy statement to be filed on or before April 30, 2013 for its annual stockholder's meeting.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by Item 13 is incorporated by reference from the Company's definitive proxy statement to be filed on or before April 30, 2013 for its annual stockholder's meeting.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

The information required by Item 14 is incorporated by reference from the Company's definitive proxy statement to be filed on or before April 30, 2013 for its annual stockholder's meeting.

60

---

## PART IV

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

(a) 1. Consolidated Financial Statements and Supplementary Data

The following financial statements are included herein under Item 8 of this report:

|  | Page No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 30 |
| Consolidated Balance Sheets at December 31, 2012 and 2011 | 31 |
| Consolidated Statements of Operations for the years ended December 31, 2012 and 2011 | 32 |
| Consolidated Statements of Equity (Deficit) for the years ended December 31, 2012 and 2011 | 33 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2012 and 2011 | 34 |
| Notes to Consolidated Financial Statements | 36 |

(2)   Financial Statement Schedules

    Schedule II — Valuation and Qualifying Accounts                           62
    Schedule III — Real Estate Investments and Accumulated Depreciation        62

(3)   Exhibits to Financial Statements                                            66

    On November 16, 2012, a report on Form 8-K was filed with respect to Item 8.01.
    On November 15, 2012, a report on Form 8-K was filed with respect to Item 2.02.
    On November 13, 2012, a report on Form 8-K was filed with respect to Item 5.07.
    On October 4, 2012, a report on Form 8-K was filed with respect to Item 5.02.
    On October 2, 2012, a report on Form 8-K was filed with respect to Item 5.02.

(b)   Exhibits

    The Exhibit Index attached hereto is hereby incorporated by reference to this Item.   66

61

---

**AMERICAN SPECTRUM REALTY, INC.**
**SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS**
**(Dollars in thousands)**

| | Balance at Beginning of Period | Additions | Utilized | Balance at End of Period |
|---|---|---|---|---|
| **Allowance for Doubtful Accounts Year Ended:** | | (in thousands) | | |
| December 31, 2012 | $    1,006 | 523 | (856) | $    673 |
| December 31, 2011 | $    421 | 1583 | (998) | $    1,006 |

**NOTE TO SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIATION**

Changes in real estate investments and accumulated depreciation for the year ended December 31 were as follows:

| | December 31, | |
|---|---|---|
| | 2012 | 2011 |

EXHIBIT "2"

| | | (in thousands) | | |
|---|---|---:|---|---:|
| **ASR owned properties** | | | | |
| **Rental Property:** | | | | |
| Balance at beginning of year | $ | 181,996 | $ | 264,901 |
| Additions during year: | | | | |
| Property acquisitions and additions | | 4,969 | | 4,175 |
| Retirements | | (75,966) | | (84,553) |
| Impairments | | - | | (2,527) |
| **Balance at end of year** | **$** | **110,999** | **$** | **181,996** |
| | | | | |
| **Accumulated Depreciation:** | | | | |
| Balance at beginning of year | $ | 59,173 | $ | 85,644 |
| Additions during year: | | | | |
| Depreciation | | 5,238 | | 11,267 |
| Retirements | | (29,763) | | (37,738) |
| **Balance at end of year** | **$** | **34,648** | **$** | **59,173** |
| | | | | |
| **Variable Interest Entities** | | | | |
| **Rental Property:** | | | | |
| Balance at beginning of year | $ | 338,845 | $ | 381,354 |
| Additions during year: | | | | |
| Property acquisitions and additions | | 640 | | 32,231 |
| Retirements | | (11,809) | | (74,740) |
| **Balance at end of year** | **$** | **327,676** | **$** | **338,845** |
| | | | | |
| **Accumulated Depreciation:** | | | | |
| Balance at beginning of year | $ | 22,484 | $ | 8,446 |
| Additions during year: | | | | |
| Depreciation | | 15,392 | | 18,011 |
| Retirements | | (749) | | (3,973) |
| **Balance at end of year** | **$** | **37,127** | **$** | **22,484** |

62

---

### NOTE TO SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIATION

| Initial cost (1) | Gross amount carried at Dec. 31, 2012 (3) |
|---|---|
| | Subsequent |

EXHIBIT "2"

| Property Name | Percentage owned | Location | Encumb. | Land | Bldgs. & Improv. | costs capitalized(2) | Land | Bldgs. & Improv. | Total | Accum Depr | Date Constructed | Date Acq. | Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASR Owned** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| 11500 Northwest Freeway | 100% | Houston, TX | 4,140 | 2,278 | 3,602 | 675 | 2,278 | 4,277 | 6,555 | 2,235 | 1983 | 2004 | 40 |
| 1501 Mockingbird Lane | 100% | Victoria, TX | 3,089 | 1,000 | 3,583 | 126 | 1,000 | 3,709 | 4,709 | 1,432 | 1981 | 2006 | 40 |
| 2620-2630 Fountain View | 51% | Houston, TX | 5,341 | 5,300 | 1,868 | 19 | 5,300 | 1,887 | 7,187 | 127 | 1976 | 2010 | 40 |
| 2640-2650 Fountain View | 100% | Houston, TX | 12,736 | 6,900 | 9,575 | 530 | 6,900 | 10,105 | 17,005 | 3,115 | 1979 | 2008 | 40 |
| 5450 NW Central | 100% | Houston, TX | 2,499 | 854 | 2,410 | 1,022 | 854 | 3,432 | 4,286 | 2,003 | 1979 | 2003 | 40 |
| 800 & 888 Sam Houston Pkwy | 100% | Houston, TX | 4,289 | 1,500 | 1,335 | 2,133 | 1,500 | 3,468 | 4,968 | 2,205 | 1980 | 2004 | 40 |
| 8100 Washington | 100% | Houston, TX | 2,005 | 600 | 2,279 | 671 | 600 | 2,950 | 3,550 | 1,662 | 1980 | 2003 | 40 |
| Atrium 6430 (4) | 100% | Houston, TX | 2,050 | 1,645 | 1,765 | 684 | 1,645 | 2,449 | 4,094 | 2,331 | 1974 | 2006 | 40 |
| FMC Technology | 100% | Houston, TX | 8,305 | 2,375 | 9,502 | 5 | 2,375 | 9,507 | 11,882 | 3,703 | 1996 | 2006 | 40 |
| Fountain View Office Tower | 51% | Houston, TX | 11,540 | 3,500 | 13,269 | 1,400 | 3,500 | 14,669 | 18,169 | 6,280 | 1980 | 2006 | 40 |
| Gray Falls & 12000 Westheimer | 100% | Houston, TX | 7,077 | 2,548 | 4,350 | 1,984 | 2,548 | 6,334 | 8,882 | 3,788 | 1983 | 2006 | 40 |
| Ocala Self Storage | 100% | Ocala, FL | 1,412 | 585 | 1,376 | - | 585 | 1,376 | 1,961 | 161 | 1989 | 2010 | 40 |
| Tampa Self Storage | 100% | Tampa, FL | 1,504 | 669 | 1,575 | - | 669 | 1,575 | 2,244 | 185 | 1987 | 2010 | 40 |
| **Office Properties** | | | 65,991 | 29,754 | 56,489 | 9,249 | 29,754 | 65,738 | 95,492 | 29,227 | | | |
| | | | | | | | | | | | | | |
| Morenci Professional Park (4) | 100% | Indianapolis, IN | 1,578 | 790 | 2,680 | 253 | 790 | 2,933 | 3,723 | 2,134 | 1975-1979 | 2001 | 40 |
| **Industrial/Commercial Properties** | | | 1,578 | 790 | 2,680 | 253 | 790 | 2,933 | 3,723 | 2,134 | | | |
| | | | | | | | | | | | | | |
| Northwest Spectrum Plaza | 100% | Houston, TX | 3,526 | 1,711 | 2,044 | 372 | 1,711 | 2,416 | 4,127 | 1,087 | 2004 | 2007 | 25 |
| Windrose Plaza | 100% | Spring, | 2,454 | 1,106 | 2,422 | 423 | 1,106 | 2,855 | 3,956 | 1,206 | 2005 | 2007 | 25 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TX | 8 | 0 | 9 | | 0 | 2 | 2 | | | | 5 |
| | | 5,98 | 2,81 | 4,47 | | 2,81 | 5,26 | 8,07 | | | | |
| **Retail Properties** | | 4 | 1 | 3 | 795 | 1 | 8 | 9 | 2,293 | | | |
| | | | | | | | | | | | | |
| Sabo Road Self | Housto | 2,01 | | 1,69 | | | 2,43 | 2,97 | | | | 3 |
| Storage 55% | n, TX | 5 | 535 | 6 | 743 | 535 | 9 | 4 | 424 | 2006 | 2010 | 9 |
| **Self-Storage** | | 2,01 | | 1,69 | | | 2,43 | 2,97 | | | | |
| **Properties** | | 5 | 535 | 6 | 743 | 535 | 9 | 4 | 424 | | | |
| | | | | | | | | | | | | |
| | Housto | 15,1 | | | | | | | | | | |
| ASR, Inc. N/A | n, TX | 95 | - | 129 | 602 | - | 731 | 731 | 570 | | | |
| **Corporate** | | 15,1 | | | | | | | | | | |
| **Properties** | | 95 | - | 129 | 602 | - | 731 | 731 | 570 | | | |
| | | | | | | | | | | | | |
| | | 90,7 | 33,8 | 65,4 | | 33,8 | 77,1 | 110, | | | | |
| **Total ASR Owned** | | 63 | 90 | 67 | 11,642 | 90 | 09 | 999 | 34,648 | | | |

63

| Property Name | Perc entag e owne d | Location | Enc umb . | La nd | Imp rov. | Subse quent Bld gs. & costs capital ized(2) | La nd | Bld gs. & Imp rov. | Tot al | Accu m Depr | Date Constructed | Date Acq. | Li fe |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Variable Interest** | | | | | | | | | | | | | |
| **Entity** | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Commerce | | Commerce | 9,40 | 8,6 | 12,5 | | 8,6 | 12,5 | 21, | | | | 4 |
| Distributions Center | 1% | , CA | 2 | 28 | 37 | 57 | 28 | 94 | 222 | 1,849 | 1957 | 2010 | 0 |
| Dixon & Logistics | | Des | 17,2 | 3,6 | 19,1 | | 3,6 | 19,1 | 22, | | | | 4 |
| Center | 0% | Moines, IA | 58 | 82 | 28 | - | 82 | 28 | 810 | 2,805 | 1961 | 2010 | 0 |
| Fisher Indiana | | | 17,0 | 2,8 | 23,0 | | 2,8 | 23,0 | 25, | | | | 4 |
| Distribution Center | 1% | Fishers, IN | 58 | 05 | 18 | - | 05 | 18 | 823 | 3,375 | 1993 | 2010 | 0 |
| Ohio Commerce | | Strongsvill | 18,4 | 1,9 | 24,5 | | 1,9 | 24,5 | 26, | | | | 4 |
| Center | 0% | e, OH | 12 | 17 | 85 | - | 17 | 85 | 502 | 3,605 | 1968 | 2010 | 0 |
| | | OK, GA, SC, VA, | 16,5 | 3,0 | 22,5 | | 3,0 | 22,5 | 25, | | '95',[64'93'],98', | | 4 |
| Springs Commerce I | 0% | PA | 48 | 09 | 50 | - | 09 | 50 | 559 | 3,307 | [98',99'],[00',02'] | 2010 | 0 |
| Springs Commerce II | 0% | GA, AL | 20,1 | 1,7 | 21,3 | 85 | 1,7 | 21,4 | 23, | 3,174 | '1964,1955,197 | 2010 | 4 |

| Property | % | Location | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 00 | 09 | 56 | | 09 | 41 | 150 | | 3 | | 0 |
| Springs Office | 0% | Fort Mill/Lancaster, SC | 14,301 | 2,288 | 19,197 | - | 2,288 | 19,197 | 21,485 | 2,815 | '1971,1953,1998 | 2010 | 40 |
| Strongville Corporate Center | 2% | Strongville, OH | 13,882 | 7,540 | 14,236 | 1 | 7,540 | 14,237 | 21,777 | 2,296 | 1989 | 2010 | 40 |
| **Industrial/Commercial Properties** | | | 126,961 | 31,578 | 156,607 | 143 | 31,578 | 156,750 | 188,328 | 23,226 | | | |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 4,617 | 320 | 7,056 | - | 320 | 7,056 | 7,376 | 622 | 1998 | 2010 | 40 |
| Muirwood Village | 0% | Zanesville, OH | 7,708 | 1,043 | 13,380 | 94 | 1,043 | 13,474 | 14,517 | 1,519 | 2010 | 2010 | 40 |
| Ohio II - Residences at Newark & Sheffield | 0% | Newark/Circleville, OH | 9,334 | 2,530 | 11,136 | 312 | 2,530 | 11,448 | 13,978 | 1,717 | 2010 | 2010 | 40 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 14,283 | 2,788 | 13,486 | 72 | 2,788 | 13,558 | 16,346 | 1,748 | 2002 | 2010 | 40 |
| University Fountains | 0% | Lubbock, TX | 20,828 | 7,975 | 23,734 | 338 | 7,975 | 24,072 | 32,047 | 3,507 | 2005 | 2010 | 40 |
| University Springs | 0% | San Marcos, TX | 9,359 | 1,531 | 14,683 | 155 | 1,531 | 14,837 | 16,368 | 2,131 | 1998 | 2010 | 40 |
| **Multi-Family/Student Housing Properties** | | | 66,129 | 16,187 | 83,475 | 971 | 16,187 | 84,445 | 100,632 | 11,244 | | | |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 4,249 | 4,897 | 3,132 | 514 | 4,897 | 3,647 | 8,544 | 332 | 1985 | 2010 | 40 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 2,202 | 112 | 2,284 | 5 | 112 | 2,289 | 2,401 | 336 | 2006 | 2010 | 40 |
| Attic Space Self Storage - Blanco Rd | 0% | San Antonio, TX | 1,300 | 203 | 1,516 | - | 203 | 1,516 | 1,719 | 201 | 1982 | 2010 | 40 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 1,721 | 455 | 2,902 | - | 455 | 2,902 | 3,357 | 383 | 1998 | 2010 | 40 |
| Ft. Worth Northwest Self Storage | 0% | Forth Worth, TX | 2,125 | 1,356 | 1,238 | - | 1,356 | 1,238 | 2,594 | 163 | 1985 | 2010 | 40 |
| Ft. Worth River Oaks Self Storage | 0% | River Oaks, TX | 2,118 | 355 | 2,273 | - | 355 | 2,273 | 2,628 | 300 | 1985 | 2010 | 40 |
| Grissom Road Self Storage | 0% | San Antonio, TX | 2,308 | 2,224 | 1,765 | - | 2,224 | 1,765 | 3,989 | 233 | 1985 | 2010 | 40 |
| Houston South Mason (Patrick's) | 0% | Katy, TX | 2,817 | 899 | 1,380 | - | 899 | 1,380 | 2,279 | 182 | 2000 | 2010 | 40 |

EXHIBIT "2"

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| San Antonio 3 | 0% | San Antonio, TX | 9,635 | 6,670 | 4,535 | - | 6,670 | 4,535 | 11,205 | 527 | 2010 | 2010 | 40 |
| *Self-Storage Properties* | | | 28,475 | 17,171 | 21,025 | 519 | 17,171 | 21,545 | 38,716 | 2,657 | | | |
| Other Corporate Properties | | | 334 | - | - | - | - | - | - | - | | | |
| *Total VIE Owned* | | | 221,899 | 64,936 | 261,107 | 1,633 | 64,936 | 262,740 | 327,676 | 37,127 | | | |
| Total ASR Owned | | | 90,763 | 33,890 | 65,467 | 11,642 | 33,890 | 77,109 | 110,999 | 34,648 | | | |
| *Total Consolidated Properties* | | | 312,662 | 98,826 | 326,574 | 13,275 | 98,826 | 339,849 | 438,675 | 71,775 | | | |

_____

(1)  Initial cost and date acquired, where applicable.

(2)  Costs are offset by retirements and write-offs.

(3)  The aggregate cost for federal income tax purposes is $57,761.

(4)  Valuation allowance established in 2011 as the estimated fair value decline below book value; Atrium 6430 - $1,395 and Morenci Professional Park - $429.

64

---

### SIGNATURES

Pursuant to the requirements of Section l3 or l5(d) of the Securities Exchange Act of l934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

### AMERICAN SPECTRUM REALTY INC

By: American Spectrum Realty Inc.,

*Date: March 29, 2013*        */s/ William J. Carden*

EXHIBIT "2"

William J. Carden
Chairman of the Board, President and
Chief Executive Officer
    (Principal Executive Officer)

Date: March 29, 2013      */s/ G. Anthony Eppolito*
G. Anthony Eppolito
Vice President, Chief Financial Officer,
    (Principal Financial Officer and Accounting Officer)
Treasurer and Secretary

Date: March 29, 2013      */s/ Patrick D. Barrett*
Patrick D. Barrett
Director

Date: March 29, 2013      */s/ David Brownell Wheless*
David Brownell Wheless
Director

Date: March 29, 2013      */s/ James L. Hurn*
James L. Hurn
Director

Date: March 29, 2013      */s/ Stacey F. Speier*
Stacey F. Speier
Director

65

---

**EXHIBIT INDEX**

| Exhibit No. | Exhibit Title |
| --- | --- |
| 3.1 | Form of Amended and Restated Articles of Incorporation of the Company (1) |
| 3.2 | Bylaws of the Company (1) |
| 3.3 | Amended and Restated Bylaws of the Company are incorporated herein by reference to Exhibit 3.01 to the Company's Form 10-Q for the quarter ended June 30, 2002 |
| 3.4 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003 |

EXHIBIT "2"

| | |
|---|---|
| 3.5 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Form 10-Q for the quarter ended March 31, 2006 |
| 3.6 | Articles Supplementary for 15% Cumulative Preferred Stock, Series A of the Company dated December 30, 2008 are incorporated herein by reference to the Company's Form 8-K filed January 8, 2009 |
| 4.1 | Form of Stock Certificate (1) |
| 10.1 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund (1) |
| 10.2 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund II (1) |
| 10.3 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund III (1) |
| 10.4 | Form of Agreement and Plan of Merger of Sierra Pacific Pension Investors '84 (1) |
| 10.5 | Form of Agreement and Plan of Merger of Sierra Pacific Institutional Properties V (1) |
| 10.6 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.7 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.8 | Form of Agreement and Plan of Merger of Nooney Real Property Investors – Two, L.P. (1) |
| 10.9 | Omnibus Stock Incentive Plan (1) |
| 10.10 | Agreement of Limited Partnership of American Spectrum Realty Operating Partnership, L.P. (1) |
| 10.11 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and CGS Properties (Mkt./Col.), L.P. (1) |
| 10.12 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Creekside/Riverside, L.L.C. (1) |
| 10.13 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and McDonnell Associates, L.L.C. (1) |
| 10.14 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pacific Spectrum, L.L.C. (1) |
| 10.15 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pasadena Autumn Ridge L.P. (1) |

66

| | |
|---|---|
| 10.16 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and |

Seventy Seven, L.L.C. (1)

10.17    Agreement and Plan of Merger, dated August 6, 2000, between the Company and Villa Redondo L.L.C. (1)

10.18    Agreement and Plan of Merger, dated August 6, 2000, between the Company and Third Coast L.L.C. (1)

10.19    Agreement and Plan of Contribution, dated August 6, 2000, between the Company and No.-So., Inc. (1)

10.20    Form of Restricted Stock Agreement (1)

10.21    Form of Stock Option Agreement (Incentive Stock Options) (1)

10.22    Form of Stock Option Agreement (Directors) (1)

10.23    Form of Stock Option Agreement (Non-Qualified Options) (1)

10.24    Form of Indenture Relating to Notes (1)

10.25    Contribution Agreement, dated May 31, 2000, between the Company and CGS Real Estate Company, Inc. (1)

10.26    Contribution Agreement, dated May 31, 2000, between the Company and American Spectrum Real Estate Services, Inc. (1)

10.27    Agreement and Plan of Merger, dated May 31, 2001, between the Company and Lindbergh Boulevard Partners (Lindbergh), L.P. (1)

10.28    Agreement and Plan of Merger, dated May 31, 2001, between the Company and Nooney Rider Trail L.L.C. (1)

10.29    Agreement and Plan of Merger, dated May 31, 2001, between the Company and Back Bay L.L.C. (1)

10.30    Contribution Agreement, dated May 31, 2001, between American Spectrum Realty Management, Inc. and CGS Real Estate Company, Inc., American Spectrum — Midwest, American Spectrum — Arizona, American Spectrum — California and American Spectrum — Texas, Inc. (1)

10.31    Amendment of Agreement Plan of Merger between the Company and Villa Redondo L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001

10.32    Amendment of Agreement Plan of Merger between the Company and Pasadena Autumn Ridge, L.P. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001

10.33    Amendment of Agreement Plan of Merger between the Company and Third Coast L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001

EXHIBIT "2"

10.34    Registration Right's Agreement between the Company, the Operating Partnership, and other parties is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001

10.35    Employment Agreement dated October 15, 2001 between the Company and Harry A. Mizrahi is incorporated herein by reference to Exhibit 10.01 to the Company's Form 10-Q for the quarter ended March 31, 2002

10.36    Employment Agreement dated April 3, 2002 between the Company and Paul E. Perkins is incorporated herein by reference to Exhibit 10.02 to the Company's Form 10-Q for the quarter ended March 31, 2002

10.37    Employment Agreement dated April 16, 2002 between the Company and Patricia A. Nooney is incorporated herein by reference to Exhibit 10.03 to the Company's Form 10-Q for the quarter ended March 31, 2002

67

10.38    Employment Agreement dated September 1, 2002 between the Company and Thomas N. Thurber is incorporated herein by reference to Exhibit 10.04 to the Company's Form 10-Q for the quarter ended June 30, 2002 (Exhibits pursuant to the Agreement have not been filed by the Company, who hereby undertakes to file such exhibits upon the request of the SEC)

10.39    Employment Agreement dated October 15, 2001 between the Company and William J. Carden is incorporated herein by reference to Exhibit 10.5 to the Company's Form 10-Q for the quarter ended September 30, 2002

10.40    Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.41    Letter Agreement dated February 25, 2003 between the Company and CGS Real Estate Company, Inc. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.42    Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.43    Amendment No. 1 to Employment Agreement dated October 6, 2003 between the Company and Patricia A. Nooney incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003

10.44    Purchase Agreement dated December 15, 2009 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009

10.45    Letter Agreement to Purchase Agreement dated December 18, 2009 between the Company and Evergreen Parties (First Amendment to Purchase Agreement)

EXHIBIT "2"

| | |
|---|---|
| | incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |
| 10.46 | Second Amendment to Purchase Agreement dated January 17, 2010 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |
| 10.47 | Employment Agreement dated January 1, 2012 between the Company and Anthony Eppolito and Amendment thereto dated March 30, 2012 is incorporated herein by reference to the Company's Form 10-Q for the quarter ended March 31, 2012 |
| 21 | Significant Subsidiaries of the Company |
| 23.1 | EEPB, PC Consent – Form 10-K |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| EX-101.INS | XBRL INSTANCE DOCUMENT |
| EX-101.SCH | XBRL TAXONOMY EXTENSION SCHEMA |
| EX-101.PRE | XBRL TAXONOMY EXTENSION PRESENTATION LINKBASE |
| EX-101.LAB | XBRL TAXONOMY EXTENSION LABEL LINKBASE |
| EX-101.CAL | XBRL TAXONOMY EXTENSION CALCULATION LINKBASE |
| EX-101.DEF | XBRL TAXONOMY EXTENSION DEFINITION LINKBASE |

_____

(1)   Incorporated herein by reference to the Company's Registration Statement on Form S-4 (Registration No. 333-43686), which became effective August 8, 2001.

68

---

**SUBSIDIARIES OF THE COMPANY**

EXHIBIT "2"

| Corporations | State of Organization |
|---|---|
| American Spectrum Management Group, Inc. | American Spectrum Management Group, Inc. |
| Spectrum Lender Services, Inc. | Delaware |

| Limited Partnerships | |
|---|---|
| American Spectrum Realty Operating Partnership, L.P. | Delaware |
| ASR Park Ten 350, L.P. | Texas |
| ASR Park Ten 360, L.P. | Texas |
| ASR 2401 Fountainview, L.P | Delaware |
| ASR 2620-2630 Fountainview, LP | Delaware |
| ASR 5450 NW, L.P. | Delaware |
| ASR 6677 Gessner, L.P. | Delaware |
| ASR 11500 NW, L.P. | Delaware |
| ASR Washington, L.P. | Texas |
| ASR-8 Centre, L.P. | Delaware |
| ASR-1501 Mockingbird, L.P. | Delaware |
| ASR-2855 Mangum, L.P. | Delaware |
| ASR-6420 Richmond Atrium, L.P. | Delaware |
| ASR-6430 Richmond Atrium, L.P. | Delaware |
| ASR-Beltway Industrial, L.P. | Delaware |
| ASR-Fountain View Place, L.P. | Delaware |
| ASR-Parkway One & Two, L.P. | Delaware |
| ASR-West Gray, L.P. | Delaware |
| ASR-Windrose, L.P. | Delaware |
| Grissom Road Self Storage, LP | Delaware |
| Nooney Rider Trail, L.P. | Delaware |
| Sabo Road Acquisitions, LP | Delaware |

| Limited Liability Companies | |
|---|---|
| American Spectrum Asset Co., LLC | Delaware |
| American Spectrum Investments, LLC | Delaware |
| American Spectrum Realty Advisors, LLC | Delaware |
| American Spectrum Realty Management, LLC | Delaware |
| American Spectrum Realty-1501 Mockingbird, LLC | Delaware |
| American Spectrum Realty-2855 Mangum, LLC | Delaware |
| American Spectrum Realty-6420 Richmond Atrium, LLC | Delaware |
| American Spectrum Realty-6430 Richmond Atrium, LLC | Delaware |
| American Spectrum Realty 5450 NW, LLC | Delaware |
| American Spectrum Realty 11500 NW, LLC | Delaware |
| American Spectrum Realty-8 Centre, LLC | Delaware |
| American Spectrum Realty-1501 Mockingbird, LLC | Delaware |

EXHIBIT "2"

| | |
|---|---|
| American Spectrum Realty-6420 Richmond, LLC | Delaware |
| American Spectrum Realty-6430 Richmond, LLC | Delaware |
| American Spectrum Realty-Beltway Industrial, LLC | Delaware |
| American Spectrum Realty-Fountain View Place, LLC | Delaware |
| American Spectrum Realty-Parkway One & Two, LLC | Delaware |
| American Spectrum Realty-Windrose, LLC | Delaware |
| ASR 2401 Fountainview, LLC | Delaware |
| ASR 2620-2630 Fountainview GP, LLC | Delaware |
| ASR 6677 Gessner, LLC | Delaware |
| ASR Centennial Park, LLC | Delaware |
| ASR-Newport, L.L.C. | Delaware |
| ASR NRT, LLC | Delaware |
| ASR-Risk Management, L.L.C. | Delaware |
| ASR-Risk & Insurance Services, LLC | Delaware |

69

| | |
|---|---|
| ASR-West Gray, LLC | Delaware |
| Attic Self Storage Manager, LLC | Delaware |
| AQQ Commerce Distribution Center, LLC | Delaware |
| AQQ Florida, LLC | Delaware |
| AQQ Grissom, LLC | Delaware |
| AQQ San Antonio Self-Storage, LLC | Delaware |
| AQQ San Antonio Self-Storage TIC 24, LLC | Delaware |
| AQQ University Heights II TIC 17, LLC | Delaware |
| Back Bay, LLC | Delaware |
| B&R Services, LLC | Delaware |
| Centennial Park Kansas, LLC | Delaware |
| Commerce Distribution Center, LLC | Delaware |
| McDonnell Associates, LLC | Delaware |
| Nooney Real Property Investors Two, LLC | Delaware |
| Pacific Spectrum, LLC | Arizona |
| Rooftop Spectrum, LLC | Delaware |
| Sabo Road Manager, LLC | Delaware |
| San Antonio Self-Storage III, LLC | Delaware |
| Seventy Seven, LLC | Delaware |
| Sierra Creekside, LLC | Delaware |
| Sierra Southwest Pointe, LLC | Delaware |
| Solar Spectrum, LLC | Delaware |
| Tampa Ocala Acquisitions, LLC | Delaware |

70

EXHIBIT "2"

EXHIBIT "2"

# EXHIBIT 3

10-K 1 americanspectrum_10k.htm ANNUAL REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**
**FORM 10-K**

**(Mark One)**

☒·☐··**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the year ended December 31, 2011**

**OR**

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**
**COMMISSION FILE NUMBER 001-16785**

**American Spectrum Realty, Inc.**
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **State of Maryland** | **52-2258674** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| | |
| **2401 Fountain View, Suite 510** | **77057** |
| **Houston, Texas** | |
| (Address of principal executive offices) | (Zip Code) |

**(713) 706-6200**
(Registrant's telephone number, including area code)
Securities registered under Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value | NYSE Amex |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No

EXHIBIT "3"

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒    No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See definition of "accelerated filer", "large accelerated filer" and "small reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer                             Accelerated filer

Non-accelerated filer                               Smaller reporting company ☒

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes No ☒

As of June 30, 2011, the last business day of the Registrant's most recent completed second quarter, the aggregate market value of the voting stock held by non-affiliates of the Registrant was approximately $27,703,690. The aggregate market value was computed with reference to the price on the American Stock Exchange at which the voting stock was last sold as of such date. For this purpose, 1,328,826 shares of Common Stock held by officers and directors are deemed to be held by affiliates but exclusion of shares held by any person should not be construed to indicate that such person is an affiliate of the Registrant for any other purpose.

As of March 26, 2012, 3,577,783 shares of Common Stock ($.01 par value) were outstanding.

1

---

# TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 3 |
| Item 1A | Risk Factors | 5 |
| Item 1B | Unresolved Staff Comments | 11 |
| Item 2 | Properties | 12 |
| Item 3 | Legal Proceedings | 16 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 16 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 17 |

EXHIBIT "3"

| Item 6 | Selected Financial Data | 18 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations Overview | 18 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 28 |
| Item 8 | Financial Statements and Supplementary Data | 28 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 60 |
| Item 9A(T) | Controls and Procedures | 60 |
| Item 9B | Other Information | 61 |
| | PART III | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 61 |
| Item 11 | Executive Compensation | 64 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 66 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 68 |
| Item 14 | Principal Accountant Fees and Services | 69 |
| | PART IV | |
| Item 15 | Exhibits and Financial Statement Schedules | 70 |

2

---

# PART I

## NOTE ABOUT FORWARD LOOKING STATEMENTS

Certain statements either contained in or incorporated by reference into this report, other than purely historical information, including estimates, projections, statements relating to our business plans, objectives and expected operating results, and the assumptions upon which those statements are based, are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These forward-looking statements generally include statements that are predictive in nature and depend upon or refer to future events or conditions, and include words such as "believes," "plans," "anticipates," "projects," "estimates," "expects," "intends," "strategy," "future," "opportunity," "may," "will," "should," "could," "potential," or similar expressions. Forward-looking statements are based on current expectations and assumptions that are subject to risks and uncertainties which may cause actual results to differ materially from the forward-looking statements. A detailed discussion of these and other risks and uncertainties that could cause actual results and events to differ materially from such forward-looking statements is included in this report in the sections entitled

EXHIBIT "3"

"Risk Factors" (Part I, Item 1A) and "Management's Discussion and Analysis of Financial Condition and Results of Operations" (Part II, Item 7). The reader is cautioned not to unduly rely on these forward-looking statements. We expressly disclaim any intent or obligation to update or revise publicly these forward-looking statements except as required by law.

## ITEM 1. BUSINESS

### General

We provide comprehensive integrated real estate solutions for our own property portfolio (properties in which we own a controlling interest or in properties where we are the primary beneficiary of a variable interest entity, ("VIE")) and the portfolios of our third party clients. We own and manage commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States. American Spectrum Realty, Inc. was incorporated in Maryland in August of 2000.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 73% at December 31, 2011. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. In general, except as noted below, the Operating Partnership units that are not held by us (approximately 27% of the outstanding units) are exchangeable for either common stock on a one-to-one basis or cash equal to the value of such stock at our sole discretion.

We refer to ourselves throughout this report as the "the Company" or "ASR".

### Corporate Background

Our principal offices are located at 2401 Fountain View, Suite 510, Houston, Texas 77057 and our telephone number is (713) 706-6200. Our Annual Reports on Form 10-K, as well as our Code of Ethics, Corporate Governance Guidelines, and Audit Committee, Compensation Committee and Nominating Committee Charters are available through our website, www.americanspectrum.com, under the "Investor Relations" section, free of charge. Our filings with the Securities and Exchange Commission, or SEC, are posted as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. Our Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, are available free of charge at www.sec.gov.

3

---

### Description of Business

We operate as one segment that encompasses all geographic regions. We provide one group of comprehensive real estate services. The following is a summary of the percentage of our net revenues by revenue source within our single segment:

|  | Years ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
| Rental revenue | 93% | 91% |
| Third party management and leasing revenue | 6% | 8% |
| Interest and other income | 1% | 1% |
|  | 100% | 100% |

At December 31, 2011, we consolidated fifty-two properties(including properties owned by variable interest entities (VIE's) in which we were deemed the primary beneficiary), which consisted of eighteen office properties, thirteen self-storage facilities, twelve commercial/industrial properties, six multi-family, two retail property, and one parcel of land. The properties are located in sixteen states.

We deliver integrated property, facility, asset, business and engineering management services to a host of third party clients as well as to our own properties. We offer customized programs that focus on tenant retention through cost-efficient operations.

We are committed to expanding the scope of products and services offered. We believe this expansion will help us meet our own portfolio property needs as well as the needs of our third party clients. During 2012, we intend to expand the number of third party properties that we manage.

We have a management presence in 18 states.

**Industry, Competition and Strategy**

The availability of real estate financing has greatly diminished over the past few years as a result of the global credit crisis and overall decline in the real estate market. These events have had an adverse impact on our liquidity and capital resources. These economic conditions have increased the complexity in obtaining real estate loans, as well as, reduced the number of loans available to finance new real estate opportunities and refinance existing real estate. It has also increased the time and marketing costs necessary to sell properties.

We are currently focused on a strategy that includes;

- Disposing of properties in our portfolio to lower our total debt, and improve our liquidity. Starting in 2010 we took the following steps;
  - During 2010 we sold one property that generated $5.2 million in net proceeds.
  - During 2011 we sold one property generating $6.1 million in net proceeds that we used to reduce debt. We also had lenders foreclose on three properties as a result of our election to strategically default on the approximately $18.1 million of non recourse debt associated with them.
  - Currently we have thirteen of our consolidated properties listed for sale (from seven of which we will receive substantially all of the net proceeds and from six of which we will receive transaction fees when and if the sales are consummated).
  - Currently we are strategically defaulting on the debt of nine additional consolidated properties including two VIEs and seven ASR properties, as a result of the properties' sustained and significant negative cash flows. We are in

EXHIBIT "3"

negotiations with the lenders of these nine properties in an effort to restructure and or modify the debt. Five of the nine properties have had foreclosure proceedings initiated by the lender, and one property was foreclosed on in March 2012. Our efforts to work with the lenders may fail. If we cannot successfully negotiate new terms, the properties will eventually return to the lender. Substantially all of the debt is non-recourse. See Note 11 Notes Payable.

- Concentrating our leasing and management efforts on those portfolio properties where we can improve the cash flows, economic returns and long term values.

We believe that stabilizing our portfolio and improving our liquidity, if we are successful in doing so, will provide us with an opportunity to acquire interests in or ownership of undervalued and undermanaged properties as well as allow us to expand our transaction services to additional third party clients. We believe that there are many properties currently priced below their replacement costs. We believe that with a stable portfolio and greater liquidity, our presence in approximately 18 states, coupled with our local market knowledge and management expertise, will allow us to capitalize on these opportunities.

4

We face competition from other regional and national service providers. Many of our competitors are local or regional firms that are similarly sized; some competitors are substantially larger than we are on a local, regional, national and/or international basis. In most of the markets in which we do business, both institutional and private investors and developers of properties compete vigorously for the acquisition, development and leasing of space. Many of these competitors have greater resources and more experience than we do.

**Employees**

As of December 31, 2011, the Company employed a total of 183 individuals.

**Environmental Matters**

Federal, state and local laws and regulations impose environmental restrictions, use controls, disclosure obligations and other restrictions that impact the management, development, use, and/or sale of real estate. Such laws and regulations tend to discourage sales and leasing activities, as well as the willingness of mortgage lenders to provide financing, with respect to some properties. These laws and regulations could cause transactions that we are involved in to be delayed or abandoned as a result of these restrictions. In addition, if we fail to disclose known environmental concerns in connection with a real estate transaction we may be subject to liability.

We generally undertake a third party Phase I investigation of potential environmental risks when evaluating an acquisition. A Phase I investigation is an investigation for the presence or likely presence of hazardous substances or petroleum products under conditions that indicate an existing release, a post release or a material threat of a release. A Phase I investigation does not typically include any sampling. We may acquire a property with environmental contamination, subject to a determination of the level of risk and potential cost of remediation.

Various environmental laws and regulations also can impose liability for the costs of investigating or remediation of hazardous or toxic substances at sites currently or formerly owned

EXHIBIT "3"

or operated by a party, or at off-site locations to which such party sent wastes for disposal. In addition, an increasing number of federal, state, local and foreign governments have enacted various treaties, laws and regulations that apply to environmental and climate change, in particular seeking to limit or penalize the discharge of materials such as green house gas into the environment or otherwise relating to the protection of the environment. As a property manager, we could be held liable as an operator for any such contamination or discharges; even if the original activity was legal and we had no knowledge of, or did not cause, the release or contamination. Further, because liability under some of these laws is joint and several, we could be held responsible for more than our share, or even all, of the costs for such contaminated site if the other responsible parties are unable to pay. We could also incur liability for property damage or personal injury claims alleged to result from environmental contamination or discharges, or from asbestos-containing materials or lead-based paint present at the properties that we manage. Insurance for such matters may not always be available, or sufficient to cover our losses. Certain requirements governing the removal or encapsulation of asbestos-containing materials, as well as recently enacted local ordinances obligating property managers to inspect for and remove lead-based paint in certain buildings, could increase our costs to comply and could potentially subject us to violations or claims. Although such costs have not had a material impact on our financial results in 2011, the enactment of additional regulations, or more stringent enforcement of existing regulations, could cause us to incur significant costs in the future, and/or adversely impact our business.

## ITEM 1A. RISK FACTORS

**Risks Related to Our Business in General**

***The ongoing downturn in the general economy and the real estate market has negatively impacted and could continue to negatively impact our business and financial results.***

Periods of economic slowdown or recession, significantly reduced access to credit, declining employment levels, decreasing demand for real estate, declining real estate values or the perception that any of these events may occur, can reduce transaction volumes or demand for our services. The current recession and the downturn in the real estate market have resulted in and may continue to result in:

- a decline in acquisition, disposition and leasing activity;
- a decline in the supply of capital invested in commercial and residential real estate; and
- a decline in the value of real estate and in rental rates, which would cause us to realize lower revenue from:
  - property management and transaction fees, which in certain cases are calculated as a percentage of the revenue of the property under management; and
  - rental revenue, respectively.

5

---

The declining real estate market in the United States, the availability and cost of credit, increased unemployment, volatile oil prices, declining consumer confidence and the instability of United States banking and financial institutions, have contributed to increased volatility, an overall economic slowdown and diminished expectations for the economy and markets going forward. The fragile state of the credit markets, the fear of a global recession for an extended period and the current economic environment have impacted real estate services and management firms like

ours through reduced transaction volumes, falling transaction values, lower real estate valuations, liquidity restrictions, market volatility, and the loss of consumer confidence.

Due to the economic downturn, it may take us longer to sell real estate assets and investments and the selling prices may be lower than originally anticipated. In addition, the performance of certain properties in our management portfolio may be negatively impacted, which would likewise affect our fees. As a result, the carrying value of certain of our real estate investments may become impaired and we could record losses as a result of such impairment or we could experience reduced profitability related to declines in real estate values.

We are not able to predict the severity or duration of the current adverse economic environment or the disruption in the financial markets. The real estate market tends to be cyclical and related to the condition of the overall economy and to the perceptions of investors, developers and other market participants as to the economic outlook. The ongoing downturn in the general economy and the real estate market has negatively impacted and could continue to negatively impact our business and our results of operations.

***The ongoing adverse conditions in the credit markets and the risk of continued market deterioration have adversely affected our revenues, expenses and operating results and may continue to do so.***

We are sensitive to credit cost and availability as well as market place liquidity. We anticipate needing to borrow funds to meet our operating cash flow needs. In addition, the revenues in our business are dependent to some extent on overall volume of activity and pricing in the real estate market. In 2010, the credit markets experienced an unprecedented level of disruption and uncertainty. This disruption and uncertainty has continued to reduce the availability and significantly increased the cost of most sources of funding. In certain cases, sources of funding have been eliminated.

Disruptions in the credit markets have adversely affected, and may continue to adversely affect, our business of providing services to owners, purchasers, sellers, investors and occupants of real estate in connection with acquisitions, dispositions and leasing of real property. If we and/or our clients are unable to obtain credit on favorable terms, there will be fewer completed acquisitions, dispositions and leases of property. In addition, if purchasers of real estate are not able to obtain favorable financing resulting in a lack of disposition opportunities for funds, our property management fee revenues will decline and we may also experience losses on real estate held for investment.

The recent decline in real estate values and the inability to obtain financing has either eliminated or severely reduced the availability of our historical funding sources and to the extent credit remains available, it is currently more expensive. We may not be able to continue to access sources of funding for our needs, or, if sources are available to us, those sources may not be available with favorable terms. Any decision by lenders to make additional funds available to us in the future for our operational or investment needs will depend upon a number of factors, such as industry and market trends in our business, the lenders' own resources and policies concerning loans and investments, and the relative attractiveness of alternative investment or lending opportunities.

The depth and duration of the current credit market and liquidity disruptions are impossible to predict. In fact, the magnitude of the recent credit market disruption has exceeded the expectations of most if not all market participants. This uncertainty limits our ability to develop future business plans and we believe that it limits the ability of other participants in the credit markets and the real estate markets to do so as well. This uncertainty may lead market

EXHIBIT "3"

participants to act more conservatively than in recent history, which may continue to depress demand and pricing in our markets.

***A potential change in U.S. accounting standards regarding operating leases may make the leasing of our properties less attractive to our potential tenants, which could reduce overall demand for our leasing services.***

Under current authoritative accounting guidance for leases, a lease is classified by a tenant as a capital lease if the significant risks and rewards of ownership are considered to reside with the tenant. Under capital lease accounting for a tenant, both the leased asset and liability are reflected on their balance sheet. If the lease does not meet any of the criteria for a capital lease, the lease is considered an operating lease by the tenant, and the obligation does not appear on the tenant's balance sheet; rather, the contractual future minimum payment obligations are only disclosed in the footnotes thereto. Thus, entering into an operating lease can appear to enhance a tenant's balance sheet in comparison to direct ownership. The Financial Accounting Standards Board, or the FASB, and the International Accounting Standards Board, or the IASB, conducted a joint project to re-evaluate lease accounting. In August 2010, the FASB and the IASB jointly released exposure drafts of a proposed accounting model that would significantly change lease accounting. The final standards have yet to be released. Changes to the accounting guidance could affect both our accounting for leases as well as that of our current and potential tenants. These changes may affect how our real estate leasing business is conducted. For example, if the accounting standards regarding the financial statement classification of operating leases are revised, then companies may be less willing to enter into leases with us in general or desire to enter into leases with us with shorter terms because the apparent benefits to their balance sheets could be reduced or eliminated.

6

---

***We are in a highly competitive business with numerous competitors; some competitors may have greater financial and operational resources than we do.***

We compete in a variety of service disciplines within the real estate industry. Each of these areas is highly competitive on a national as well as on a regional and local level. We face competition not only from national real estate service providers, but also from global real estate service providers and boutique real estate firms. Depending on the service, we also face competition from other real estate service providers, institutional lenders, insurance companies, investment banking firms, investment managers and accounting firms, some of which may have greater financial resources than we do. We are also subject to competition from other large national firms and from multi-national firms that have similar service competencies to us. Although many of our competitors are local or regional firms that are similarly sized, many of our competitors are substantially larger than us on a local, regional, national or international basis. In general, there can be no assurance that we will be able to continue to compete effectively with respect to any of our business or on an overall basis, or to maintain current fee levels, or maintain or increase our market share.

***As a service-oriented company, we depend upon the retention of senior management and key personnel, and the loss of our current personnel or our failure to hire and retain additional personnel could harm our business.***

EXHIBIT "3"

Our success is dependent upon our ability to retain our executive officers and other key employees and to attract and retain highly skilled personnel. We believe that our future success in developing our business and maintaining a competitive position will depend in large part on our ability to identify, recruit, hire, train, retain and motivate highly skilled executive, managerial, sales, marketing and customer service personnel. Competition for these personnel is intense, and we may not be able to successfully recruit, assimilate or retain sufficiently qualified personnel. We use equity incentives to attract and retain our key personnel. Poor performance of our stock may diminish our ability to offer attractive incentive awards to new hires. Our failure to recruit and retain necessary executive, managerial, sales, marketing and customer service personnel could harm our business and our ability to obtain new customers.

***If we fail to manage any future growth effectively, we may experience a material adverse effect on our financial condition and results of operations.***

The future integration of acquisitions and additional growth may place a significant strain upon management, administrative, operational and financial infrastructure. Our ability to grow also depends upon our ability to successfully hire, train, supervise and manage additional executive officers and new employees, obtain financing for our capital needs, expand our systems effectively, allocate our human resources optimally, maintain clear lines of communication between our transactional and management functions and our finance and accounting functions, and manage the pressures on our management and administrative, operational and financial infrastructure. Additionally, managing future growth may be difficult due to the new geographic locations and service offerings. There can be no assurance that we will be able to accurately anticipate and respond to the changing demands we will face as we integrate and continue to expand our operations, and we may not be able to manage growth effectively or to achieve growth at all. Any failure to manage our future growth effectively could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Property Management**

***If the properties that we manage fail to perform, then our business and results of operations could be harmed.***

Our success partially depends upon the performance of the properties we manage. We could be adversely affected by the nonperformance of, or the deteriorating financial condition of, certain of our clients. The revenue we generate from our property management fees is generally a percentage of aggregate rent collections from the properties. The performance of these properties will depend upon the following factors, among others, many of which are partially or completely outside of our control:

- our ability to attract and retain creditworthy tenants;
- the magnitude of defaults by tenants under their respective leases;
- our ability to control operating expenses;
- governmental regulations, local rent control or stabilization ordinances which are in, or may be put into, effect;
- various uninsurable risks;
- financial condition of certain clients;
- the nature and extent of competitive properties; and
- the general real estate market.

7

EXHIBIT "3"

These or other factors may negatively impact the properties that we manage, which could have a material adverse effect on our business and results of operations.

***We may have liabilities in connection with property and facilities management activities.***

We could become subject to claims by participants in real estate sales, as well as building owners and companies for whom we provide management services, claiming that we did not fulfill our statutory obligations as a broker.

In addition, with regard to our property and facilities management services, we hire and supervise third party contractors to provide construction and engineering services for our properties and our third party clients properties. While our role is limited to that of a supervisor, we may be subject to claims for construction defects or other similar actions. Adverse outcomes of property and facilities management litigation could have a material adverse effect on our business, financial condition and results of operations.

Third party management contracts can be terminated. Loss of a significant number of contracts and fees could have a material adverse effect on our business, results of operations and financial condition.

***Environmental regulations may adversely impact our business and/or cause us to incur costs for cleanup of hazardous substances or wastes or other environmental liabilities.***

Federal, state and local laws and regulations impose various environmental restrictions, use controls, and disclosure obligations which impact the management, development, use, and/or sale of real estate. Such laws and regulations tend to discourage sales and leasing activities, as well as mortgage lending availability, with respect to some properties. A decrease or delay in such transactions may adversely affect our results of operations and financial condition. In addition, a failure by us to disclose environmental concerns in connection with a real estate transaction may subject us to liability to a buyer or lessee of property.

In addition, in our role as a property manager, we could incur liability under environmental laws for the investigation or remediation of hazardous or toxic substances or wastes at properties we currently or formerly managed, or at off-site locations where wastes from such properties were disposed. Such liability can be imposed without regard for the lawfulness of the original disposal activity, or our knowledge of, or fault for, the release or contamination. Further, liability under some of these laws may be joint and several, meaning that one liable party could be held responsible for all costs related to a contaminated site. We could also be held liable for property damage or personal injury claims alleged to result from environmental contamination, or from asbestos-containing materials or lead-based paint present at the properties we manage. Insurance for such matters may not be available or sufficient.

Certain requirements governing the removal or encapsulation of asbestos-containing materials, as well as recently enacted local ordinances obligating property managers to inspect for and remove lead-based paint in certain buildings, could increase our cost to comply with the law and potentially subject us to violations or claims. Although such costs have not had a material impact on our financial results or competitive position during fiscal year 2011 or 2010, the enactment of additional regulations, or more stringent enforcement of existing regulations, could cause us to incur significant costs in the future, and/or adversely impact our management services fees.

EXHIBIT "3"

---

**Risks Related to Investment in Properties**

***We are subject to the risks related to the ownership and operation of real estate that can adversely impact our business and financial condition.***

*The value of our investments may be reduced by general risks of real estate ownership:* Since we derive income from real estate operations, we are subject to the general risks of acquiring and owning real estate-related assets, including:

- changes in the national, state and local economic climate and real estate conditions, such as oversupply of or reduced demand for real estate space and changes in market rental rates;
- how prospective tenants perceive the attractiveness, convenience and safety of our properties;
- difficulties in consummating and financing acquisitions and/or enhancements on advantageous terms and the failure of properties to perform as expected;
- our ability to provide adequate management, maintenance and insurance;
- natural disasters, such as earthquakes, hurricanes and floods, which could exceed the aggregate limits of our insurance coverage;
- the expense of periodically renovating, repairing and re-letting spaces;
- the impact of environmental protection laws;
- compliance with federal, state, and local laws and regulations;
- increasing operating and maintenance costs, including property taxes, insurance and utilities, if these increased costs cannot be passed through to tenants;
- adverse changes in tax, real estate and zoning laws and regulations;
- increasing competition from other properties in our market;
- tenant defaults and bankruptcies;
- tenants' right to sublease space; and
- concentration of properties leased to non-rated private companies with uncertain financial strength.

Certain significant costs, such as mortgage payments, real estate taxes, insurance and maintenance, generally are not reduced even when a property's rental income is reduced. In addition, environmental and tax laws, interest rate levels, the availability of financing and other factors may affect real estate values and property income. Furthermore, the supply of space fluctuates with market conditions.

If our properties do not generate sufficient income to meet operating expenses, including any debt service, tenant improvements, lease commissions and other capital expenditures, we may have to borrow additional amounts to cover fixed costs, we may elect to not service the debt and attempt to negotiate different terms with the bank, or we may sell the property, or the property may be repossessed by the lender.

***Properties that we acquire may be located in new markets where we may face risks associated with investing in an unfamiliar market.***

EXHIBIT "3"

We may acquire or accept management responsibilities for properties in markets that are new to us. When we acquire or manage properties located in these markets, we may face risks associated with a lack of market knowledge or understanding of the local economy, forging new business relationships in the area and unfamiliarity with local government and local procedures.

***Because real estate investments are generally illiquid, and various factors limit our ability to dispose of assets, we may not be able to sell properties when appropriate.***

Real estate investments are relatively illiquid and, therefore, we have limited ability to vary our portfolio quickly in response to changes in economic or other conditions.

***Climate change and weather pattern shifts may adversely affect our profitability.***

We consider our largest risk related to climate change to be legislative and regulatory changes intended to slow or prevent it, and the potential costs to us to implement these changes. We are also subject to physical risks inherent in owning real property that include but are not limited to; severe weather events such as hurricanes, tornadoes, and wildfires. To the extent that changes in climate effect changes in weather patterns (such as more severe weather events) or changes in sea level where we have properties, we could be adversely affected. To the extent that climate change results in changes in sea level, we would expect such effects to be gradual and amenable to structural mitigation during the useful life of our buildings. However, if this is not the case it is possible that we would be impacted in an adverse way, potentially materially so. We could experience both risks and opportunities as a result of related physical impacts. For example, more extreme weather patterns – namely, a warmer summer or a cooler winter – could increase demand for our properties in areas that are not as adversely impacted as other areas. However, we also could experience more difficult operating conditions in that type of environment. We maintain various types of insurance in amounts we consider appropriate for risks associated with weather events.

9

Should an uninsured loss or a loss in excess of insured limits occur, we could lose our capital invested in the property, as well as the anticipated future revenues from the property and, in the case of debt which has recourse provisions, we would remain obligated for any mortgage debt or other financial obligations related to the property. Any such loss would adversely affect us. We will generally be liable for any unsatisfied obligations other than non-recourse obligations. We believe that our properties are adequately insured. No assurance can be given that material losses in excess of insurance proceeds will not occur in the future.

***Joint venture investments will expose us to certain risks.***

We may from time to time enter into joint venture transactions for portions of our existing or future real estate assets. Investing in this manner subjects us to certain risks, among them the following:

- we will not exercise sole decision making authority regarding the joint ventures business and assets and, thus, we may not be able to take actions that we believe are in our company's best interests;

EXHIBIT "3"

- we may be required to accept liability for obligations of the joint venture (such as recourse carve-outs on mortgage loans beyond our economic interest;
- our returns on joint venture assets may be adversely affected if the assets are not held for the long-term.

***Our ability to renew leases or re-lease space on favorable terms as leases expire significantly affects our business.***

We are subject to the risks that, upon expiration of leases for space located in our properties, the premises may not be re-let or the terms of re-letting (including the cost of concessions to tenants) may be less favorable than current lease terms. If a tenant does not renew its lease or if a tenant defaults on its lease obligations, there is no assurance we could obtain a substitute tenant on acceptable terms. If we cannot obtain another tenant with comparable needs, we may be required to modify the property for a different use, which may involve a significant capital expenditure and a delay in re-leasing the property. Further, if we are unable to re-let promptly all or a substantial portion of our space or if the rental rates upon such re-letting were significantly lower than expected rates, our revenues and ability to provide cash for our operations would be adversely affected. There can be no assurance that we will be able to retain tenants in any of our properties upon the expiration of their leases.

***A property that incurs a vacancy could be difficult to sell or re-lease.***

A property may incur a vacancy either by the continued default of a tenant under its lease or the expiration of one of our leases. Certain of our properties may be specifically suited to the particular needs of a tenant. We may have difficulty obtaining a new tenant for any vacant space we have in our properties. If the vacancy continues for a long period of time, we may suffer reduced revenues resulting in less cash available to meet our operational needs. In addition, the resale value of a property could be diminished because the market value of a particular property will depend principally upon the value of the leases of such property.

***Leveraging our portfolio subjects us to increased risk of loss, including loss of properties in the event of a foreclosure.***

Our portfolio is highly leveraged. The use of leverage presents an additional element of risk in the event that;

- the cash flow from lease payments on our properties is insufficient to meet debt obligations;
- we are unable to refinance our debt obligations as necessary or on as favorable terms; or
- there is an increase in interest rates.

If a property is mortgaged to secure payment of indebtedness and we are unable to meet mortgage payments, the property could be foreclosed upon with a consequent loss of income and asset value to us.

Our organization documents contain no limitation on the amount or percentage of indebtedness which we may incur. Therefore, our board of directors, without a vote of the stockholders, could alter the general policy on borrowings at any time. If our debt capitalization policy were changed, we could become more highly leveraged, resulting in an increase in debt service that could adversely affect our operating cash flow and our ability to make expected cash distributions for our operating needs, and could result in an increased risk of default on our obligations. See Item 8 – Consolidated Financial Statements and Supplementary Data Note 11. Notes Payable for additional information on our debt.

EXHIBIT "3"

*Covenants in our credit agreements could limit our flexibility and adversely affect our financial condition.*

The terms of our credit facilities and other indebtedness require us to comply with a number of customary financial and other covenants. These covenants may limit our flexibility in our operations, and breaches of these covenants could result in defaults under the instruments governing the applicable indebtedness even if we have satisfied our payment obligations. If our properties were foreclosed upon, or if we are unable to refinance our indebtedness at maturity or meet our payment obligations, the amount of our cash flows and our financial condition could be adversely affected. See Item 8 – Consolidated Financial Statements Note 11. Notes Payable, for additional information regarding our debt.

**Other Risks**

*Certain officers and directors may have interests that conflict with the interests of stockholders.*

Certain of our officers and members of our board of directors may have personal interests that conflict with the interests of our stockholders with respect to business decisions affecting us and our Operating Partnership, such as interests in the timing and pricing of property sales or refinancing in order to obtain favorable tax treatment. As a result, the effect of certain transactions on these members of management may influence our decisions affecting these properties.

*Our goodwill and other intangible assets could become further impaired, which may require us to take significant non-cash charges against earnings.*

Under current accounting guidelines, we must assess, at least annually and potentially more frequently, whether the value of our goodwill and other intangible assets has been impaired. Any impairment of goodwill or other intangible assets as a result of such analysis would result in a non-cash charge against earnings, which charge could materially adversely affect our reported results of operations, stockholders' equity and our stock price. A significant and sustained decline in our future cash flows, a significant adverse change in the economic environment, slower growth rates or if our stock price falls below our net book value per share for a sustained period, all could result in the need to perform additional impairment analysis in future periods. If we were to conclude that a future write-down of goodwill or other intangible assets is necessary, then we would record such additional charges, which could materially adversely affect our results of operations.

**We have a history of losses which may continue, which may negatively impact our ability to achieve our business objectives.**

We cannot assure you that we can achieve or sustain profitability on a quarterly or annual basis in the future. Our operations are subject to the risks and competition inherent in the establishment of a business enterprise. There can be no assurance that future operations will be profitable. Revenues and profits, if any, will depend upon various factors, including whether we will be able to continue expansion of our revenue. We may not achieve our business objectives and the failure to achieve such goals would have an adverse impact on us.

EXHIBIT "3"

**ITEM 1B. UNRESOLVED STAFF COMMENTS**

Not applicable.

11

---

**ITEM 2. PROPERTIES**

**The Location and Type**

The following table sets forth the location, type and size of the properties (by rentable square feet) along with annualized net rent, rented square feet, occupancy, and rent per square foot consolidated by us as of December 31, 2011. All properties listed below are encumbered by debt.

| Property Name | Percentage owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent | Rent per Square Feet |
|---|---|---|---|---|---|---|---|
| | | | (1) | | | (2) | (3) |
| *ASR Owned* | | | | | | | |
| 11500 Northwest Freeway | 100% | Houston, TX | 81,034 | 84% | 68,416 | 966,097 | 14.12 |
| 1501 Mockingbird Lane | 100% | Victoria, TX | 70,311 | 84% | 58,759 | 848,342 | 14.44 |
| 2620-2630 Fountain View | 51% | Houston, TX | 124,418 | 74% | 92,538 | 1,263,587 | 13.65 |
| 2640-2650 Fountain View | 100% | Houston, TX | 175,545 | 83% | 144,833 | 2,218,389 | 15.32 |
| 2855 Mangum | 100% | Houston, TX | 72,054 | 50% | 35,843 | 509,732 | 14.22 |
| 5450 Northwest Central | 100% | Houston, TX | 56,290 | 86% | 48,192 | 645,836 | 13.40 |
| 800 & 888 Sam Houston Pkwy | 100% | Houston, TX | 89,598 | 66% | 58,891 | 891,154 | 15.13 |
| 8100 Washington | 100% | Houston, TX | 44,060 | 93% | 40,878 | 877,179 | 21.46 |
| 8300 Bissonnet | 100% | Houston, TX | 91,871 | 49% | 44,797 | 477,220 | 10.65 |
| Atrium 6420 | 100% | Houston, TX | 77,328 | 74% | 57,228 | 812,423 | 14.20 |
| Atrium 6430 | 100% | Houston, TX | 44,884 | 72% | 32,417 | 420,292 | 12.97 |
| Bristol Bay | 100% | Newport Beach, CA | 50,073 | 71% | 35,414 | 1,130,209 | 31.91 |
| FMC Technology | 100% | Houston, TX | 93,912 | 100% | 93,912 | 850,000 | 9.05 |
| Fountain View Office Tower | 51% | Houston, TX | 175,15 | 89% | 155,66 | 3,138,292 | 20.16 |

EXHIBIT "3"

|  |  |  | 0 |  | 9 |  |  |
|---|---|---|---|---|---|---|---|
| **Gray Falls Center & 1200 Westheime** | 100% | Houston, TX | 99,314 | 79% | 78,892 | 1,067,894 | 13.54 |
| **Pacific Spectrum** | 100% | Phoenix, AZ | 71,112 | 53% | 37,473 | 446,802 | 11.92 |
| **Park Ten Place I** | 100% | Houston, TX | 73,210 | 72% | 53,065 | 1,036,527 | 19.53 |
| **Park Ten Place II** | 100% | Houston, TX | 68,599 | 85% | 58,085 | 938,681 | 16.16 |
| ***Office Properties*** |  |  | 1,558,763 | 77% | 1,195,302 | 18,538,656 | 15.51 |
|  |  |  |  |  |  |  |  |
| **Beltway Industrial Park** | 100% | Houston, TX | 389,720 | 84% | 327,720 | 1,659,096 | 5.06 |
| **Morenci Professional Park** | 100% | Indianapolis, IN | 105,600 | 43% | 45,600 | 256,584 | 5.63 |
| **Sierra Southwest Pointe** | 100% | Houston, TX | 101,056 | 91% | 92,423 | 715,659 | 7.74 |
| ***Industrial/Commercial Properties*** |  |  | 596,376 | 78% | 465,743 | 2,631,339 | 5.65 |
|  |  |  |  |  |  |  |  |
| **Northwest Spectrum Plaza** | 100% | Houston, TX | 48,000 | 64% | 30,560 | 342,720 | 11.21 |
| **Windrose Plaza** | 100% | Spring, TX | 28,000 | 43% | 12,115 | 120,000 | 9.91 |
| ***Retail Properties*** |  |  | 76,000 | 56% | 42,675 | 462,720 | 10.84 |
|  |  |  |  |  |  |  |  |
| **Sabo Road Self Storage** | 55% | Houston, TX | 54,975 | 82% | 45,080 | 450,252 | 9.99 |
| ***Self-Storage Properties*** |  |  | 54,975 | 82% | 45,080 | 450,252 | 9.99 |
|  |  |  |  |  |  |  |  |
| **Land** | 100% | Houston, TX | 11 Acres | N/A | N/A | N/A | N/A |
| ***Land*** |  |  | 11 Acres | N/A | N/A | N/A | N/A |

12

| Property Name | Percentage owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied (1) | Rented Square Feet (1) | Annualized Net Rent (2) | Rent per Square Feet (3) |
|---|---|---|---|---|---|---|---|

EXHIBIT "3"

*Variable Interest Entity*

| | | | | | | |
|---|---|---|---|---|---|---|
| **Commerce Distributions Center** | 1% | **Commerce, CA** | 200,000 | 100% | 200,000 | 1,056,000 | 5.28 |
| Dixon & 51st Logistics Center | 0% | Des Moines, IA | 731,160 | 100% | 731,169 | 2,128,026 | 2.91 |
| **Fishers Indiana Distribution Center** | 1% | **Fishers, IN** | 637,531 | 100% | 637,531 | 2,399,877 | 3.76 |
| Foxborough Business Park | 0% | Victorville, CA | 127,992 | 83% | 105,635 | 912,053 | 8.63 |
| **Ohio Commerce Center** | 0% | **Strongsville, OH** | 194,558 | 100% | 194,558 | 2,276,652 | 11.70 |
| Springs Commerce Center I | 0% | OK,GA,SC,VA,PA | 1,006,99 3 | 100% | 1,006,99 3 | 2,366,989 | 2.35 |
| **Springs Commerce Center II** | 0% | **GA, AL** | 1,439,30 0 | 62% | 886,450 | 1,960,793 | 2.21 |
| Springs Office | 0% | Fort Mill/Lancaster, SC | 265,493 | 100% | 265,493 | 1,993,576 | 7.51 |
| **Strongsville Corporate Center** | 2% | **Strongsville, OH** | 125,006 | 100% | 125,006 | 2,084,609 | 16.68 |
| *Industrial/Commercial Properties* | | | 4,728,03 3 | 88% | 4,152,83 5 | 17,178,57 5 | 4.14 |
| | | | | | | |
| **Campus Court Student Housing** | 11% | **Cedar Falls, IA** | 72,480 | 99% | 71,760 | 583,222 | 8.13 |
| Muirwood Village | 0% | Zanesville, OH | 157,600 | 88% | 138,601 | 1,504,192 | 10.85 |
| **Ohio II - Residences at Newark & Sheffield** | 0% | **Newark/Circleville, OH** | 203,740 | 92% | 187,574 | 1,872,106 | 9.98 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 485,720 | 100% | 485,720 | 1,557,681 | 3.21 |
| **University Fountains Lubbock** | 0% | **Lubbock, TX** | 284,436 | 93% | 265,655 | 4,544,911 | 17.11 |
| University Springs San Marcos | 0% | San Marcos, TX | 176,944 | 99% | 174,290 | 2,557,324 | 14.67 |
| *Multi-Family/Student Housing Properties* | | | 1,380,92 0 | 96% | 1,323,60 0 | 12,619,43 6 | 9.53 |
| | | | | | | |
| **Loop 1604 Self Storage** | 38% | **San Antonio, TX** | 164,325 | 91% | 149,655 | 891,560 | 5.96 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 64,975 | 64% | 41,313 | 384,718 | 9.31 |
| **Attic Space Self Storage - Blanco Rd** | 0% | **San Antonio, TX** | 48,130 | 79% | 38,135 | 313,222 | 8.21 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 47,870 | 100% | 47,870 | 472,388 | 9.87 |
| **Charleston Blvd Self Storage** | 0% | **Las Vegas, NV** | 55,600 | 72% | 40,275 | 219,725 | 5.46 |
| Florida 2 - Ocala Self Storage | 0% | Ocala, FL | 42,091 | 55% | 22,989 | 157,936 | 6.87 |
| **Florida 2 - Tampa Self Storage** | 0% | **Tampa, FL** | 60,900 | 70% | 42,350 | 252,505 | 5.96 |
| Ft. Worth Northwest Self Storage | 0% | Fort Worth, TX | 69,275 | 63% | 43,850 | 462,410 | 10.55 |
| **Ft. Worth River Oaks Self Storage** | 0% | **River Oaks, TX** | 104,265 | 50% | 51,749 | 583,457 | 11.27 |
| Grissom Road Self Storage | 0% | San Antonio, TX | 90,120 | 99% | 89,545 | 554,467 | 6.19 |
| **Houston South Mason (Patrick's)** | 0% | **Katy, TX** | 58,730 | 70% | 41,350 | 319,318 | 7.72 |
| San Antonio 3 | 0% | San Antonio, TX | 233,213 | 82% | 191,364 | 1,336,732 | 6.99 |
| *Self-Storage Properties* | | | 1,039,49 4 | 77% | 800,445 | 5,948,438 | 7.43 |
| | | | | | | |
| **Total ASR Properties** | | | 2,286,11 4 | 76% | 1,748,80 0 | 22,082,96 7 | 12.63 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Variable Interest Entity Properties** | 7,148,447 | 88% | 6,276,880 | 35,746,449 | 5.69 |
| **Total Consolidated Properties** | 9,434,561 | 85% | 8,025,680 | 57,829,416 | 7.21 |

_____

(1)    Includes gross leasable area for leases that have been executed and have commenced as of December 31, 2011.

_____

(2)    Represents base rent at December 31, 2011 for occupied square footage.

(3)    Represents annualized net rent divided by rented square feet.

For the year ended December 31, 2011, no tenant contributed 10% or more of our total rental revenue. A complete listing of properties consolidated by us at December 31, 2011, is included as part of Schedule III in Item 15. Thirteen of the properties listed above are held for sale at December 31, 2011, please see Part II, Item 8 Financial Statements and Supplementary Data, Note 4 Assets Held for Sale for the listing.

**Lease Expirations**

The following table sets forth, for the periods specified, the number of expiring leases by property category (excluding multi-family, student housing and self-storage due to their prevailing month to month nature), the total rented area subject to expiring leases, annual base rent represented by expiring leases, and percentage of total annual base rent represented by expiring leases for our consolidated properties.

### LEASE EXPIRATION

| Expiration Year (2) | Number of expiring leases | Rented square footage subject to expiring leases (3) | Annual base rent under expiring leases (in thousands) (4) | Percentage of total annual base rent represented by expiring leases (1) |
|---|---|---|---|---|
| **For Office Properties** | | | | |
| 2012 | 283 | 293,455 | $ 14,931 | 40% |
| 2013 | 139 | 206,506 | 9,802 | 26% |
| 2014 | 83 | 236,951 | 6,540 | 17% |
| 2015 | 41 | 148,897 | 3,439 | 9% |
| 2016 | 20 | 263,641 | 1,931 | 5% |
| thereafter | 20 | 45,852 | 1,077 | 3% |
| | 586 | 1,195,302 | $ 37,720 | 100% |
| **For Industrial/Commercial Properties** | | | | |
| 2012 | 52 | 846,284 | $ 19,008 | 10% |

| 2013 | 28 | 118,479 | | 15,997 | 8% |
|---|---|---|---|---|---|
| 2014 | 23 | 100,065 | | 15,655 | 8% |
| 2015 | 11 | 207,746 | | 15,013 | 8% |
| 2016 | 17 | 752,156 | | 12,541 | 7% |
| thereafter | 10 | 2,593,848 | | 111,841 | 59% |
| | 141 | 4,618,578 | $ | 190,055 | 100% |

| For Retail Property | | | | | |
|---|---|---|---|---|---|
| 2012 | - | - | $ | - | 0% |
| 2013 | 1 | 6,000 | | 485 | 29% |
| 2014 | 4 | 22,560 | | 363 | 22% |
| 2015 | - | - | | - | 0% |
| 2016 | 2 | 8,000 | | 230 | 14% |
| thereafter | 2 | 6,115 | | 585 | 35% |
| | 9 | 42,675 | $ | 1,663 | 100% |

_____

**Footnotes**

(1)     Annual base rent expiring during each period, divided by total annual base rent (both adjusted for contractual increases).

(2)     2012 includes leases that have initial terms of less than one year.

(3)     This figure is based on square footage actually occupied (which excludes vacant space), which accounts for the difference between this figure and total gross leasable area (which includes vacant space).

(4)     This figure is based on square footage actually occupied and incorporates contractual rent increases arising after 2011, and thus differs from annualized net rent in the table under "The Location and Type of the Company's Properties", which is based on 2011 rents.

14

**Office Properties**

    At December 31 2011, we owned eighteen office properties with total rentable square footage of 1,558,763. The office properties range in size from 44,060 square feet to 175,545 square feet, and have remaining lease terms ranging from less than one to ten years. Most of the leases are for one to three years. So we are constantly renewing leases. Of the approximately 293,000 square feet of leases expiring in the next twelve months, we are currently working on renewing the expiring leases or attracting new tenants. If the tenants elect not to renew we can make no guarantees that we will be able to lease the space timely or at historic rent levels.

EXHIBIT "3"

The office leases generally require the tenant to reimburse us for increases in building operating costs over a base amount. Certain of the leases provide for rent increases that are either fixed or based on a consumer price index. As of December 31, 2011, the weighted average occupancy of the office properties was 77%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2011, was $15.51.

The change in weighted average percentages over the prior year is due to the change in total office properties consolidated from twenty-three in 2010 to eighteen in 2011 and reduced occupancy in the remaining buildings. We compared the same eighteen properties performance year over year and found that in 2010 weighted average occupancy was 84% and the weighted average rent was $16.86 per square foot. Many of our tenants in our office buildings have been impacted by the economy. Some of our tenants have gone out of business, been acquired, or moved to smaller/lower cost spaces. We are currently actively marketing our empty square footage but do not know if, when or at what rent rates we will be able to lease the vacant office spaces.

**Industrial/Commercial Properties**

At December 31, 2011, we consolidated twelve industrial properties (three owned by us and nine relating to VIEs) with total rentable square footage of 5,324,409. The industrial properties are primarily designed for warehouse, distribution and light manufacturing usage and range in size from 101,000 square feet to 1,439,000 square feet. As of December 31, 2011, the weighted average occupancy of the industrial properties was 87%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2011, was $4.29.

The industrial properties have leases whose remaining terms range from less than one to five years. Of the approximately 846,000 square feet of leases expiring in the next twelve months, we are currently working on renewing the expiring leases or attracting new tenants. If the tenants elect not to renew we can make no guarantees that we will be able to lease the space timely or at historic rent levels. Most of the leases are industrial gross leases whereby the tenant pays as additional rent its pro rata share of common area maintenance and repair costs and its share of the increase in taxes and insurance over a base amount. Certain of these leases call for fixed or consumer-price-index-based rent increases. Some of the leases are triple net leases whereby the tenants are required to pay their pro rata share of the properties' operating costs, common area maintenance, property taxes, insurance and non-structural repairs.

**Retail Property**

At December 31, 2011, we owned two retail properties in Houston, Texas with rentable square footage of 76,000. The leases require the tenant to reimburse us for certain building operating costs. As of December 31, 2011, the occupancy of the retail property was 56%. The average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2011, was $10.84.

**Multi-Family, Student Housing Properties**

At December 31, 2011, we consolidated six multi-family/student housing properties (six relating to VIEs) with total rentable square footage of 1,380,920. These properties are typically leased for one year or on a month to month basis. Due to the economy, our rental rates for these properties have dropped from last year in our effort to maintain and increase our occupancy percentages. As of December 31, 2011, multiple tenants occupied all of these properties. As of

EXHIBIT "3"

December 31, 2011, the weighted average occupancy of the multi-family/student housing properties was 96%. The weighted average base rent per square foot, was $9.53. We do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

15

---

### Self-Storage Property

At December 31, 2011, we consolidated thirteen self-storage properties (one owned by us and twelve relating to VIEs) with total rentable square footage of 1,094,469. The self-storage properties are primarily month-to-month lease terms. Due to the economy, our rental rates for these properties have dropped from last year in our effort to maintain and increase our occupancy percentages. As of December 31, 2011, the weighted average occupancy of the self-storage properties was 77%. The weighted average base rent per square foot, calculated as total annualized base rents divided by gross leasable area actually occupied as of December 31, 2011, was $7.57. We do not anticipate a drop in occupancy or additional rental rate declines for these properties in the foreseeable future.

### Development Land

The Company owns an 11.86 acre parcel of land in Houston, Texas. The land is adjacent to an industrial property owned by the Company and is held for future development.

### ITEM 3. LEGAL PROCEEDINGS

In June 2011, we reached a settlement with our insurance carrier, ACE American Insurance Company, with respect to our Hurricane Ike claims. We received net proceeds of approximately $4.0 million as a result of the settlement, which was net of attorney fees, expert fees, consulting fees and other costs associated with the claims. We recognized a gain on the settlement of approximately $4.1, million which is included as a component of other income on our consolidated statement of operations for the year ended December 31, 2011.

On March 2, 2011, we filed an action against Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") relating to its acquisition of assets from Evergreen in January 2010. The purchase price of the assets was $18.0 million, subject to adjustment as provided in the purchase agreement, and was paid in the form of (a) the assumption of $500,000 of payables, (b) the issuance of a $9.5 million promissory note and (c) the issuance of operating partnership units which would be redeemable by Evergreen after June 30, 2011 for a number of shares of our common stock (or, at our option, the cash equivalent) equal to the quotient obtained by dividing $8.0 million by the greater of our share price or net asset value as of December 31, 2010. (Our share price as of December 31, 2010 was $17.52; our net asset value as of December 31, 2010 has not been definitively determined.) In our action, we are alleging various offsets and adjustments to the purchase price, as well as defaults by Evergreen, and are seeking damages and a declaration that the principal amount of the promissory note should be reduced to zero, that the operating partnership units should be cancelled and that Evergreen should refund to us payments of at least $578,000 which have been made on the promissory note. On March 7, 2011, New West Realty, Inc. ("New West"), an affiliate of Evergreen, filed a complaint for damages in Orange County Superior Court against ASR and other related entities. New West alleges in the complaint that ASR had failed to pay amounts then due under a $9.5 million

EXHIBIT "3"

promissory note held by New West. We have subsequently paid all amounts currently due and payable under the note and therefore dispute the claim and deny that any payment is now due under the note, and we have filed a separate lawsuit against New West and others seeking damages in excess of the amount of New West's claim.

The litigation is ongoing and we cannot give any assurances that we will obtain the declaration or the damages that it seeks.

Certain other claims and lawsuits have arisen against us in our normal course of business, including lawsuits by creditors with respect to past due accounts payable. We have renegotiated some of our accounts payable which resulted in extended payment terms or settlement with the issuance of common stock in lieu of cash (See Part II Item 8 Note 11 Notes Payable and Note 16 Restructuring of Debt). We believe that such claims and lawsuits will not have a material adverse effect on our financial position, cash flows or results of operations.

## ITEM 4. SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

There was no submission of matters to a vote of security holders during the quarter ended December 31, 2011.

16

---

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES

### Market Information

The Company's Common Stock trades on the NYSE Amex under the symbol AQQ. The following table sets forth the high and low closing prices per share of the Company's Common Stock for the periods indicated, as reported by the NYSE Amex.

|  | High: | Low: |
|---|---|---|
| Year Ended December 31, 2011 |  |  |
| First Quarter | $ 20.00 | $ 16.36 |
| Second Quarter | $ 18.94 | $ 16.05 |
| Third Quarter | $ 17.25 | $ 13.11 |
| Fourth Quarter | $ 13.04 | $ 4.82 |
| Year Ended December 31, 2010 |  |  |
| First Quarter | $ 11.56 | $ 9.12 |
| Second Quarter | $ 14.50 | $ 7.90 |
| Third Quarter | $ 14.05 | $ 10.00 |
| Fourth Quarter | $ 18.59 | $ 12.25 |

As of February 29, 2012, there were approximately 2,000 holders of record of our common stock.

**Dividend Policy**

### Common Stock

Cash dividends were last declared to holders of the Company's Common Stock in 2003.

The Company's Board of Directors has a policy of meeting on or about the 45th day after the end of each calendar quarter to consider the declaration and payment of dividends on Common Stock.

### Preferred Stock

Series A Preferred Stock holders are entitled to cumulative dividends at a rate of 15% per year. These dividends are payable quarterly. The Company has paid $180,000 and $240,000 in dividends during each of the years ended December 31, 2011 and 2010, respectively. As of December 31, 2011 there were accrued and unpaid dividends on the outstanding preferred stock of $60,000. The shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

### Securities Authorized for Issuance under Equity Compensation Plan

See the information incorporated by reference into Part III, Item 12 Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters of this report for information regarding securities authorized for issuance under our equity compensation plans.

During the years ended December 31, 2011 and 2010 we issued 34,500 and 28,500 shares of restricted stock to certain employees and board members, respectively, under our equity compensation plan. The recipient has the right to vote all shares, to receive and retain all cash dividends payable to holders of shares of record on or after the date of issuance and to exercise all other rights, powers and privileges of a holder of our shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to five years. The issuances of Common Stock were exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

### Unregistered Sales of Equity Securities

In 2011, the Company issued 43,685 shares of common stock to vendors in satisfaction of accounts payable for services in the amount of $559,650. The issuance of common stock was exempt from the registration requirements of the Securities Act of 1933, as amended, pursuant to section 4(2) and Rule 506 of Regulation D promulgated thereafter. See Part II, Item 8 – Note 11. Notes Payable for further discussion of the transaction.

EXHIBIT "3"

*Issuer Purchases of Equity Securities*

Neither we nor any affiliated purchaser of ours purchased any of our equity securities during the year ended December 31, 2011.

**ITEM 6. SELECTED FINANCIAL DATA**

Not applicable.

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS OVERVIEW**

*The following Management's Discussion and Analysis ("MD&A") is intended to help the reader understand the results of operations and financial condition of American Spectrum Realty, Inc. MD&A is provided as a supplement to, and should be read in conjunction with, our consolidated financial statements and the accompanying notes to the consolidated financial statements ("Notes").*

**Business Overview**

We provide comprehensive integrated real estate solutions for our own property portfolio and the portfolios of our third party clients. We own and manage; commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 73% at December 31, 2011. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. We periodically examine our corporate structure in order to evaluate if we are positioned to take advantage of the most favorable tax treatments for ourselves, our shareholders and our clients. We evaluate the potential tax benefits and consequences of a variety of business models that include but are not limited to; joint ventures, partnerships, limited liability companies (LLC), limited liability partnerships (LLP) and real estate investment trusts (REIT) for ourselves and our investors. It is our objective to consider all applicable tax laws that legally reduce the tax consequences and maximize the tax benefits associated with real estate transactions.

The REIT structure has many specific requirements that must be met and maintained in order to qualify. As of December 31, 2011 the company's ownership structure does not allow the company to elect REIT status.

Our primary business objective is to acquire and manage multiple tenant real estate in strategically located areas where our cost effective enhancements combined with effective leasing and management strategies, can improve the long term values and economic returns of those properties. We focus on the following fundamentals to achieve this objective:

-An opportunistic and disciplined disposition strategy that enhances investment performance and takes advantage of realized gains. We typically dispose of properties when the return from selling is higher than the projected return from holding the property;

EXHIBIT "3"

-Organic (internally developed opportunities) and in-organic (acquisition generated opportunities) growth of our third party property management contracts and transaction service fees coupled with;

-An opportunistic yet disciplined acquisition strategy that focuses on mid-tier multi-tenant real estate in locations that allow us to capitalize on our existing management infrastructure currently servicing our own properties and that of our third party clients.

18

As of December 31, 2011, the properties that we manage were as follows:

| Property type | ASR owned Number | ASR owned Square footage | Consolidated VIE's Number | Consolidated VIE's Square footage | Third Party Number | Third Party Square footage | Total Number | Total Square footage |
|---|---|---|---|---|---|---|---|---|
| Office | 18 | 1,558,763 | - | - | 3 | 196,872 | 21 | 1,755,635 |
| Industrial/Commercial | 3 | 596,376 | 9 | 4,728,033 | 1 | 16,000 | 13 | 5,340,409 |
| Retail | 2 | 76,000 | - | - | 9 | 304,752 | 11 | 380,752 |
| Residential/Multi-family | - | - | 6 | 1,380,920 | 7 | 1,050,595 | 13 | 2,431,515 |
| Self-Storage | 1 | 54,975 | 12 | 1,039,494 | 6 | 462,360 | 19 | 1,556,829 |
| Land | 1 | - | - | - | 2 | - | 3 | - |
| Total | 25 | 2,286,114 | 27 | 7,148,447 | 28 | 2,030,579 | 80 | 11,465,140 |

During the year ending 2011, we had strategically defaulted on the non recourse debt of three of our properties that were returned to the lender. We sold one property during 2011. We deconsolidated four VIE properties due to our determination that we ceased to be the primary beneficiary. During the year the net change in third party management contracts was an overall decrease of thirteen contracts. We anticipate that there will be fluctuation in the number of third party management contracts due to many circumstances, which include change of property ownership, change of management structure, change of properties ability/willingness to pay us for our management services. We continue to have policies in place to grow our total number of third party management contracts. We cannot guarantee that we will be able to grow the overall number of management contracts and our third party management revenues could be adversely affected.

**Financial Operations Overview**

***Revenues:***

EXHIBIT "3"

*Rental Revenues.* We derive rental revenues from tenants that occupy space in our portfolio of consolidated properties. There are three key drivers to rental revenue;

1. *Occupancy* - Rental revenues are dependent on our ability to lease spaces to quality tenants.

|  | Weighted Average Occupancy as of December 31, | |
| --- | --- | --- |
| **Property Type** | **2011** | **2010** |
| Office properties | 77% | 85% |
| Industrial properties | 87% | 96% |
| Retail properties | 56% | 48% |
| Multi-family/Student Housing properties | 96% | 94% |
| Self Storage properties | 77% | 71% |

We were able to achieve occupancy increases in our portfolio's self-storage, multi-family/student housing properties and retail properties. Our industrial properties experienced a decline in occupancy that we are attempting to reverse in the coming year through our initiatives to attract additional tenants. With regard to our office properties, we saw a reduction in the number of buildings in our consolidated portfolio over last year by five buildings which on average had higher occupancies. We are currently in the process of aggressively marketing all vacated spaces but cannot make any guarantees as to the speed at which we will be able to find quality tenants or what, if any, reduction in rental rates we might experience.

2. *Rental rates* – Market rental rates are often inversely related to vacancy rates. Increased vacancy in the market place tends to drive down rental rates. Our leases typically have one to ten year terms based on property type. As leases expire, we replace the existing leases with new leases at the current market rental rate.

19

|  | Weighted Average Base Rent per occupied square foot as of December 31, | | | |
| --- | --- | --- | --- | --- |
| **Property Type** | | **2011** | | **2010** |
| Office properties | $ | 15.51 | $ | 18.16 |
| Industrial properties | $ | 4.29 | $ | 5.07 |
| Retail properties | $ | 10.84 | $ | 11.59 |
| Multi-family/Student Housing properties | $ | 9.53 | $ | 13.02 |
| Self storage Properties | $ | 7.57 | $ | 8.92 |

We have experienced declines in our weighted average base rents across all sectors.

The change in weighted average base rent over the prior year in office properties is due to the change in total office properties consolidated from twenty-three in 2010 to eighteen in 2011 and

EXHIBIT "3"

reduced occupancy in the remaining buildings. The five properties no longer consolidated had higher average base rents, approximately $1.30 more per square foot than the remaining eighteen. Many of our tenants in our office buildings have been impacted by the economy. Some of our tenants have gone out of business, been acquired, or moved to smaller/lower cost spaces. We are currently actively marketing our empty square footage but do not know if, when or at what rent rates we will be able to lease the vacant office spaces.

The change in industrial properties is the result of a drop in occupancy. We are attempting to increase occupancy but do not know if, when or at what rent rates we will be able to lease the vacant space.

Retail, multi-family/student housing and self-storage declines are related to pressures on rent as a result of the economy. We have been able to increase the weighted average occupancy percentage over the prior year but have not been able to do so at historic rent levels. We do not anticipate rent rates to continue to decline in the near term for these properties and anticipate that our weighted average base rent will be consistent in the coming year with its present level.

3.  *Tenant retention* - Retaining existing tenants is essential, as high customer retention leads to increased occupancy, less downtime between leases, and reduced leasing costs. We believe in providing superior customer service; hiring, training, retaining and empowering our employees. We strive to create an environment of open communication both internally and externally with our customers.

Of the leases that expired during 2011, we were able to retain tenants leasing approximately 60% of the expiring square footage. Many of our tenants have experienced financial difficulties due to the economy. We continue to aggressively pursue high quality tenants for all of our vacant square footage. We can make no guarantees as to our ability to fill vacant space in a timely manner or at the same or higher rents than historically charged.

*Third party management and leasing revenue.* We derive these revenues from the fees charged to our third party clients for management services, tenant acquisition fees, leasing fees and loan advisory fees for arranging financing related to properties under management. When and if our third party clients elect to sell a property we manage for them, we will receive transaction fees and commissions relating to the sale of the property. Our same core skill set that influences our rental income also drives our third party client revenue. Many of the fees we charge our third party clients are linked to occupancy, rental rates and customer retention.

**Expenses:**

*Property operating expenses.* Property operating expenses consist primarily of property taxes, insurance, repairs and maintenance, personnel costs and building service contracts.

*General and administrative expenses.* General and administrative expenses consist primarily of personnel expenses for accounting, human resources, information technology and corporate administration, professional fees including audit and legal fees.

*Depreciation and amortization expenses.* Depreciation and amortization expenses consist primarily of depreciation associated with our real estate held for investment, amortization of purchased intangibles, depreciation of additional capital improvements and the amortization of lease costs associated with consolidated properties.

EXHIBIT "3"

*Interest expenses.* Interest expenses consist primarily of the interest owed to creditors for debt associated with our consolidated properties.

20

---

## CRITICAL ACCOUNTING POLICIES

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States requires us to make judgments, estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, we re-evaluate our judgments and estimates. We base our estimates and judgments on our historical experience, knowledge of current conditions and our belief of what could occur in the future considering available information, including assumptions that are believed to be reasonable under the circumstances. By their nature, these estimates and judgments are subject to an inherent degree of uncertainty and actual results could differ materially from the amounts reported based on these policies.

We believe the following critical accounting policies reflect our most significant estimates, judgments and assumptions used in the preparation of our consolidated financial statements:

- Variable Interest Entity (VIE) accounting;
- Business combinations;
- Investment in real estate assets;
- Assets held for sale;
- Discontinued operations;
- Sales of real estate assets;
- Fair value measurements;
- Impairment or assets; and
- Income taxes.

*Variable Interest Entity Accounting*

Our determination of the appropriate accounting method with respect to our VIEs is based on Accounting Standards Update, or ASU, 2009-17, " *Consolidations (Topic 810): Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities* ." This ASU incorporates Statement of Financial Accounting Standards, or SFAS, No. 167, "*Amendments to FASB Interpretation No. 46(R),*" issued by the Financial Accounting Standards Board, or FASB, in June 2009. The amendments in this ASU replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with a primarily qualitative approach focused on identifying which reporting entity has both (1) the power to direct the activities of a variable interest entity that most significantly impact such entity's economic performance and (2) the obligation to absorb losses or the right to receive benefits from such entity that could potentially be significant to such entity. The entity which satisfies these criteria is deemed to be the primary beneficiary of the VIE.

We analyze our interests in VIEs to determine if we are the primary beneficiary. We consider a variety of factors in identifying the entity that holds the power to direct matters that most significantly impact the VIE's economic performance including, but not limited to, (a) sign and

EXHIBIT "3"

enter into leases; set, distribute, and implement the capital budgets, the authority to refinance or sell the property within contractually defined limits and, (b) the ability to receive fees that are significant to the property and (c) a necessity of funding any deficit cash flows.

We consolidate any VIE of which we are the primary beneficiary (see Note 5 of the Notes to Consolidated Financial Statements set forth in Item 8 of this Annual Report). We determine whether an entity is a VIE and, if so, whether it should be consolidated by utilizing judgments and estimates that are inherently subjective. If we made different judgments or utilized different estimates in these evaluations, it could result in differing conclusions as to whether or not an entity is a VIE and whether or not to consolidate such entity.

*Business Combinations*

We apply the provisions of FASB ASC Topic 805 to all transactions or events in which we obtain control of one or more businesses, including those effected without the transfer of consideration, for example, by contract or through a lapse of minority veto rights. These provisions require the acquiring entity in a business combination to recognize the full fair value of assets acquired and liabilities assumed in the transaction (whether a full or partial acquisition); establish the acquisition-date fair value as the measurement objective for all assets acquired and liabilities assumed; and require expensing of most transaction and restructuring costs.

21

We determine and allocate the purchase price of an acquired company to the tangible and intangible assets acquired and liabilities assumed as of the business combination date. The purchase price allocation process requires us to use significant estimates and assumptions, including fair value estimates, as of the business combination date. We utilize third-party valuation companies to help us determine certain fair value estimates used for assets and liabilities.

Additionally, the purchase price of the applicable property is allocated to the above or below market value of in-place leases and the value of in-place leases and related tenant relationships. The value allocable to the above or below market component of the acquired in-place leases is determined based upon the present value (using a discount rate which reflects the risks associated with the acquired leases) of the difference between (i) the contractual amounts to be paid pursuant to the lease over its remaining term, and (ii) our estimate of the amounts that would be paid using fair market rates over the remaining term of the lease. The amounts allocated to below market lease values are included in accrued and other liabilities in the accompanying consolidated balance sheets and are amortized to rental income over the remaining non-cancelable lease term plus any below market renewal options of the acquired leases with each property.

While we use our best estimates and assumptions as a part of the purchase price allocation process to accurately value assets acquired and liabilities assumed at the business combination date, our estimates and assumptions are inherently uncertain and subject to refinement. As a result, during the purchase price allocation period, which is generally one year from the business combination date, we record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill.

EXHIBIT "3"

*Investment in Real Estate Assets*

Rental properties are stated at cost, net of accumulated depreciation, unless circumstances indicate that cost, net of accumulated depreciation, cannot be recovered.

Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

We evaluate each of our real estate assets on a quarterly basis in order to determine the classification of each asset in our consolidated balance sheet. This evaluation requires judgment by us in considering certain criteria that must be evaluated under Topic 360, such as the estimated timeframe in which we expect to sell our real estate assets. The classification of real estate assets determines which real estate assets are to be depreciated as well as what method is used to evaluate and measure impairment. Had we evaluated our assets differently, the balance sheet classification of such assets, depreciation expense and impairment losses could have been different.

*Assets Held for Sale*

We classify assets as held for sale when management a) approves the action and commits to a plan to sell the asset(s); b) the asset(s) are available for immediate sale in its present condition customary for sales of those types of assets; c) an active program to locate a buyer and other actions required to complete the plan to sell the asset(s) have been initiated; d) the sale of the asset(s) is probable, and transfer of the asset(s) is expected to within one year; e) the asset(s) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and; f) actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. We disclose operating properties as properties held for sale in the period in which all of the required criteria are met.

Assets held for sale is recorded at the lower of cost or estimated fair value less cost to sell. If an asset's fair value less cost to sell, based on discounted future cash flows, management estimates or market comparisons, is less than its carrying amount, an allowance is recorded against the asset. Determining an asset's fair value and the related allowance to record requires us to utilize judgment and estimates.

22

*Discontinued Operations*

Topic 360 extends the reporting of a discontinued operation to a "component of an entity," and further requires that a component be classified as a discontinued operation if the operations and cash flows of the component have been or will be eliminated from the ongoing operations of the entity in the disposal transaction and the entity will not have any significant continuing

EXHIBIT "3"

involvement in the operations of the component after the disposal transaction. As defined in Topic 360, a "component of an entity" comprises operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes, from the rest of the entity. Because each of our real estate assets is generally accounted for in a discrete subsidiary, many constitute a component of an entity under Topic 360, increasing the likelihood that the disposition of assets are required to be recognized and reported as operating profits and losses on discontinued operations in the periods in which they occur. The evaluation of whether the component's cash flows have been eliminated and the level of our continuing involvement require judgment by us and a different assessment could result in items not being reported as discontinued operations.

*Sales of Real Estate Assets*

Gains on property sales are recognized in full when real estate is sold, provided (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured or the amount that will not be collectible can be estimated, and (ii) the earnings process is virtually complete, that is, we are not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

*Fair Value Measurements*

Our acquisitions require the application of purchase accounting, which results in tangible and identifiable intangible assets and liabilities of the acquired entity being recorded at fair value. The difference between the purchase price and the fair value of net assets acquired is recorded as goodwill. In determining the fair values of assets and liabilities acquired in a business combination, we use a variety of valuation methods including present value, depreciated replacement cost, market values (where available) and selling prices less costs to dispose. We are responsible for determining the valuation of assets and liabilities and for the allocation of purchase price to assets acquired and liabilities assumed.

Assumptions must often be made in determining fair values, particularly where observable market values do not exist. Assumptions may include discount rates, growth rates, cost of capital, royalty rates, tax rates and remaining useful lives. These assumptions can have a significant impact on the value of identifiable assets and accordingly can impact the value of goodwill recorded. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of annual depreciation and amortization expense, different assumptions could also impact our statement of operations and could impact the results of future impairment reviews.

*Impairment of Assets*

We are required to test goodwill and other intangible assets deemed to have indefinite useful lives for impairment annually or more often if circumstances or events indicate a change in the impairment status. The goodwill impairment analysis is a two-step process. The first step used to identify potential impairment involves comparing each reporting unit's estimated fair value to its carrying value, including goodwill. We use a discounted cash flow approach to estimate the fair value of our reporting units. Management judgment is required in developing the assumptions for the discounted cash flow model. These assumptions include revenue growth rates, profit margin percentages, discount rates, etc. If the estimated fair value of a reporting unit exceeds its carrying value, goodwill is considered to not be impaired. If the carrying value exceeds estimated fair value, there is an indication of potential impairment and the second step is performed to measure the amount of impairment. The second step of the process involves the calculation of an implied fair value of goodwill for each reporting unit for which step one indicated impairment. The implied fair value of goodwill is determined similar to how goodwill is calculated in a business

EXHIBIT "3"

combination, by measuring the excess of the estimated fair value of the reporting unit as calculated in step one, over the estimated fair values of the individual assets, liabilities and identifiable intangibles as if the reporting unit was being acquired in a business combination. Due to the many variables inherent in the estimation of a business's fair value and the relative size of our goodwill, if different assumptions and estimates were used, it could have an adverse effect on our impairment analysis.

Impairment indicators for our rental properties are assessed by property and include, but is not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. When these indicators of impairment are present, real estate held for investment is evaluated for impairment and losses are recorded when undiscounted cash flows estimated to be generated by an asset or market comparisons are less than the asset's carrying amount. The amount of the impairment loss is calculated as the excess of the asset's carrying value over its fair value, which is determined using a discounted cash flow analysis, management estimates or market comparisons.

23

When we performed our impairment review, we determined that impairment existed, refer to Part II Item 8 Financial Statements and Supplementary Data Note 8 Asset Impairments for additional information regarding our impairment charges taken during the year.

*Income Taxes*

We account for income taxes under the liability method whereby deferred tax asset or liability account balances are calculated at the balance sheet date using current tax laws and rates in effect for the year in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts expected to be realized. Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. We have assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income.

An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (i) the more positive evidence is necessary and (ii) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion, or all, of the deferred tax asset. Among the more significant types of evidence that we considered are: that future anticipated property sales will produce more than enough taxable income to realize the deferred tax asset; taxable income projections in future years; and whether the carryforward period is so brief that it would limit realization of tax benefits.

Historically, we have incurred taxable losses in years in which we do not sell any real estate assets for gains. A property was sold during 2011 and a gain of $23.3 million was realized. In 2010 a gain of $4.3 million was realized on the sale of another property. We expect to sell real estate assets in the future and have determined that it is more likely than not that future taxable income, primarily from gains on the sales of real estate assets, will be sufficient to enable us to realize all of our deferred tax assets. Therefore, for each of the two years ended December 31, 2011 and 2010, no valuation allowance has been recorded. See Part II Item 8. Financial

EXHIBIT "3"

Statements and Supplementary Data, Note 19. Subsequent Events for additional information on the pending sale of a property.

**RESULTS OF OPERATIONS**

In January 2010, the Company acquired certain property management and asset management contracts from Evergreen that created Variable Interest relationships in which the Company is the primary beneficiary. The consolidation of VIE's significantly impacted our revenues and expenses as compared to the prior year.

*Revenues by Period*

The following table sets forth revenues for the years ending 2011 and 2010, and the change between periods.

| | Years ended, December 31, | | Dollar | Percentage |
|---|---|---|---|---|
| | 2011 | 2010 | Change | Change |
| | (in thousands, except percentages) | | | |
| Rental revenue | $ 65,146 | $ 45,185 | $ 19,961 | 44% |
| Third party management and leasing revenue | $ 3,859 | $ 3,692 | $ 167 | 5% |

The changes in revenues during 2011 as compared to 2010 were primarily due to the following:

- Rental revenue increased by approximately $20.0 million. This increase was due to the consolidation of VIE's which accounted for an increase of approximately $23.1 million. This increase was partially offset by a decrease in rental revenue attributable to our owned properties of approximately $3.1 million. The decrease in rental revenue attributable to our wholly-owned properties was primarily due to a decrease in weighted average occupancy. The decrease was also due to a decline in rental rates.
- The increased third party management and leasing revenue was primarily due to increased leasing commissions and transaction fees.

24

*Operating Expenses by Period*

The following table sets forth expenses for the fiscal years ending 2011 and 2010, and the percentage and dollar change between periods.

| | Years ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|
| | 2011 | 2010 | | |
| | (in thousands, except percentages) | | | |
| Property operating expenses | $ 22,789 | $ 18,337 | $ 4,452 | 24% |
| Corporate general and administrative | $ 11,916 | $ 9,659 | $ 2,257 | 23% |
| Depreciation and amortization | $ 29,189 | $ 18,937 | $ 10,252 | 54% |
| Interest expense | $ 27,096 | $ 17,754 | $ 9,342 | 53% |
| Impairment of real estate assets | $ 4,485 | $ 3,387 | $ 1,098 | 32% |

The changes in operating expenses during 2011 as compared to 2010 were primarily due to the following:

- Property operating expenses increased by approximately $4.5 million for all of 2011 versus a partial year in 2010. The increase was primarily due to the consolidation of VIE's, which accounted for an increase of approximately $8.3 million. This increase was partially offset by a decrease in property operating expenses attributable to our owned properties of approximately $3.8 million. This decrease was in large part attributable to a decrease in utilities and repairs and maintenance. The decrease was also attributable to a decrease in personnel costs and property taxes.
- General and administrative expenses increased by approximately $2.3 million. The increase was primarily due to higher accounting, consulting, legal and professional fees.
- Depreciation and amortization expense increased by approximately $10.3 million. The increase was primarily due to the consolidation of VIE's, which accounted for $9.6 million of this increase.
- Interest expense increased by approximately $9.3 million due to a full year of VIE consolidation. This increase was primarily due to the consolidation of VIE's, which accounted for an increase of approximately $9.5 million. This increase was partially offset by a decrease in interest expense attributable to our owned properties of $0.2 million.
- Impairment expense increased by $1.1 million. This increase was primarily due to impairment charges on real estate held for investment of $2.5 million and goodwill of $1.3 million for the year ended December 31, 2011. This increase was partially offset by a $2.7 million decrease in impairment charges recorded on purchased intangibles for the year ended December 31, 2011 compared to the year ended December 31, 2010. See Part II Item 8 Note 8 – Asset Impairments.

All of our expenses are significantly influenced by VIE consolidation activity. We expect all our operating expenses to remain relatively the same over the next year for our consolidated properties at December 31, 2011.

### *Other Income Statement Items by Period*

The following table sets forth our other income statement items for the fiscal years ending 2011 and 2010, and the dollar and percentage change between periods.

| | Years Ended December 31, | | Dollar Change | Percentage Change |
|---|---|---|---|---|
| | 2011 | 2010 | | |
| | (in thousands) | | | |
| Interest income | $ 345 | $ 324 | $ 21 | 6% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Discontinued operations | $ | 17,313 | $ | (784) | $ | 18,097 | 2309% |
| Non-controlling interest | $ | 4,215 | $ | 6,959 | $ | (2,744) | -39% |
| Gain on litigation settlement | $ | 4,076 | $ | - | $ | 4,076 | - |
| Other Income | $ | 485 | $ | - | $ | 485 | - |

25

---

The changes in other income statement items during 2011 as compared to 2010 were primarily due to the following:

- Discontinued operations for 2011 reflects the gain on the sale of the property at 7700 Irvine Center, the disposition of Sierra Creekside, Sierra Technology, Northwest Corporate Center and the results of operations of the properties. Discontinued operations for 2010 reflects results of operations of these properties and the gain on sale of 5850 San Felipe.
- Non-controlling interests consist of operating partnership unit holders other than us and, the non-controlling interests held in our VIE's and held by others. The decrease was primarily attributable to the gain on sale of the partially owned 7700 Irvine Center.
- Gain on litigation settlement for 2011 represents a settlement of our lawsuit with our insurance carrier related to our Hurricane Ike claims.
- Other income for 2011 represents discounts negotiated with several of our accounts payable creditors.

We anticipate continuing to offer certain properties for sale and currently have thirteen consolidated properties on the market. We can make no guarantees as to the timing of the sale of any of our consolidated properties or the cash that we will be able to receive as a result of those sales. See Part II Item 8 Financial Statements - Note 4. Assets Held for Sale

**LIQUIDITY AND CAPITAL RESOURCES**

We have a need for significant amounts of cash to fund our operations. Not all cash generated by our consolidated business is available to pay all liabilities presented on the balance sheet. We separately disclose on the face of the balance sheet (in parentheses) assets and liabilities relating to our consolidated VIE's. Those assets and liabilities are the exclusive responsibility of the VIE's as our actual ownership percentage and the business structure of the VIE's does not allow the assets and liabilities to be comingled with ASR.

With regards to our wholly owned properties, we experienced a decline in rental revenues of approximately $3.1 million dollars. This decline was partially offset by an increase in our transaction fees of $1.7 million. With regards to the properties in which we have a variable interest and the cash associated with these properties is only available to service their own debts, we experienced an increase in rental revenues of $23.1 million dollars. This increase was the result of having a full year of consolidated results in 2011 versus a partial year in 2010.

As of December 31, 2011, we had accounts payable over 90 days totaling $4.6 million (all of it relating to ASR properties). In addition, we have terms with creditors holding payables of

EXHIBIT "3"

approximately $4.4 million that were in excess of 90 days old; as of December 31, 2011, these payables are included as notes payable with a total principal of $3.2 million.

We currently have thirteen of our consolidated properties listed for sale (seven wholly owned by ASR and six VIE properties). In addition to these thirteen properties, another nine are in some stage of foreclosure (seven wholly owned by ASR and two relating to VIE's) with the debt holder, and we are strategically defaulting on the related debts totaling $37.1 million on these nine properties. We can make no guarantee as to the timing of the sale of any of the thirteen properties. In March 2012, one of the nine properties in some stage of foreclosure was taken back by the debt holder. We cannot guarantee that the lenders on the remaining eight properties in some stage of foreclosure will not take back the properties before we can sell them or renegotiate the debt.

All of the notes on which we have strategically defaulted have payment acceleration clauses, and payment in full could be demanded by the lenders holding these notes. The loans not being paid are secured only by the real estate assets with the exception of the one property. That property is Bristol Bay, that has a $1.7 million note that is guaranteed by the Company. We evaluated the impairment related to the long-lived assets of the properties secured by these loans and recorded $2.5 million of impairment due to the debt exceeding the respective carrying value of each of the properties. For further discussion, see Part II Item 8 Note 11 - Notes Payable. See Part II Item 8 Note 4 - Assets Held for Sale for a listing of all properties listed for sale.

The sale of 7700 Irvine Center and settlement of an insurance related lawsuit generated cash of $10.1 million during the second quarter of 2011 (See Note 7 – Discontinued Operations and Note 17 – Commitments and Contingencies). We spent $9.9 million of these proceeds in the second and third quarters to reduce payables and debt, and other accrued liabilities. Our discontinued operations are not stated separately in the Statement of Cash Flow. Our discontinued operations used cash of $0.7 million for their operations. In the future we anticipate that the absence of these properties will decrease our use of cash.

26

We have taken the following steps to meet our liquidity needs:

1. We have reduced our overhead structure in the third quarter of 2011, reducing annual overhead by $1.3 million.
2. We continue to strategically default on mortgages where we have determined that the market value of the property does not and will not exceed the balance of the notes payable securing the property in the foreseeable future and/or the property is in a severe and sustained negative cash flow position.
3. We are currently marketing properties for sale in an effort to generate cash for operations and debt reduction in the next year.
4. Through 2012, we will continue to focus on increasing occupancy rates and managing our cost structure.
5. Through 2012, we will continue to reduce our expenses, restructure our operations, and negotiate with our creditors for extended terms in order to meet our cash flow needs.

Most of our mortgage debt is not cross-collateralized. We have one mortgage loan that is cross-collateralized by a second property.

EXHIBIT "3"

Because of uncertainties caused by the current credit crisis, our current debt level and our historic losses, there can be no assurance as to our ability to obtain the funds necessary for the refinancing of our maturing debts. If refinancing transactions are not consummated, we will seek extensions and/or modifications from existing lenders. If these refinancing or extensions do not occur, we will not have sufficient cash to meet our obligations.

## DISCUSSION OF THE CONSOLIDATED STATEMENT OF CASH FLOWS

*FROM OPERATIONS:*

Historically and currently, our consolidated cash from operations has been provided by rent payments, management fees and transaction fees. Our historic and current uses of consolidated cash from operations have mainly been property operating costs, general and administrative costs and interest on debt service. During the year ending December 31, 2011, our consolidated operations provided $18.3 million in cash, $13.2 million from the VIE's.

*FROM INVESTING ACTIVITIES:*

Historically and currently, our consolidated cash from investing activities has been provided by proceeds from the sale of assets. Our historic and current uses of consolidated cash from investing activities have primarily been property improvements. During the year ending December 31, 2011, our consolidated investing activities provided $45.8 million in cash. This cash provided by investing activities was driven by the proceeds from the sale of real estate assets.

*FROM FINANCING ACTIVITIES:*

Historically and currently, our consolidated cash from financing activities has been provided by proceeds from borrowing money and proceeds from equity placements. Our historic and current uses of consolidated cash from financing activities have primarily been principal payments on borrowings and cash used to acquire assets. During the year ending December 31, 2011, our consolidated financing activities used $65.7 million in cash. This cash used by financing activities was driven by the use of cash to service debt.

## FUNDS FROM OPERATIONS

We believe that Funds From Operations ("FFO") is a useful supplemental measure of our operating performance. We computed FFO in accordance with standards established by the White Paper on FFO approved by the Board of Governors of the National Association of Real Estate Investment Trusts ("NAREIT") in April 2002. The White Paper defines FFO as net income or loss computed in accordance with Generally Accepted Accounting Principles ("GAAP"), excluding extraordinary items, as defined by GAAP, and gains and losses from sales of depreciable operating property plus real estate-related depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures. We believe that FFO is helpful to investors as a measure of our performance because, along with cash flow from operating activities, FFO provides investors with an indication of our ability to incur and service debt, to make capital expenditures and to fund other cash needs. FFO is a non-GAAP financial measure. FFO does not represent net income or cash flows from operations, as defined by GAAP, and should not be considered as an alternative to net income (determined in accordance with GAAP) as an indicator of our operating performance or as an alternative to cash flows from operating, investing and financing activities (determined in accordance with GAAP) as a measure of liquidity. FFO does not necessarily indicate that cash flows will be sufficient to fund all of our cash needs, including principal amortization, capital improvements and distributions to stockholders. Further, FFO as disclosed by other companies may not be comparable to our calculation of FFO.

EXHIBIT "3"

The following table sets forth our calculation of FFO for the year ending December 31, 2011 and December 31, 2010:

| | Years ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in thousands) | |
| | (restated) | |
| Net income (loss) attributable to ASR | $ 3,999 | $ (8,037) |
| Depreciation and amortization from discontinued operations | 1,921 | 4,878 |
| Gain from sale of discontinued operations | (17,129) | (4,315) |
| Deferred income tax expense (benefit) | 2,115 | (5,108) |
| Depreciation and amortization attributable to ASR properties | 11,203 | 8,456 |
| FFO | $ 2,109 | $ (4,126) |

The increase in FFO was primarily due to the gain recognized on the litigation settlement. See Item 3 - Legal Proceedings.

**INFLATION**

Inflation has not had a significant impact on our results because of the relatively low inflation rate in our geographic areas of operation. Additionally, most of our leases require the customers to pay their pro rata share of operating expenses, including common area maintenance, real estate taxes, utilities and insurance, thereby reducing our exposure to increases in operating expenses resulting from inflation.

**ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

Not applicable.

**ITEM 8. CONSOLIDATED FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

**AMERICAN SPECTRUM REALTY, INC.**
**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page No. |
|---|---|
| Report of Independent Registered Public Accounting Firm | 29 |
| Consolidated Balance Sheets at December 31, 2011 and 2010 | 30 |
| Consolidated Statements of Operations for the years ended December 31, 2011 and 2010 | 31 |
| Consolidated Statements of Equity (Deficit) for the years ended December 31, 2011 and | 32 |

EXHIBIT "3"

2010
Consolidated Statements of Cash Flows for the years ended December 31, 2011 and 2010    33
Notes to Consolidated Financial Statements    35

28

---

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
American Spectrum Realty, Inc.
Houston, Texas

We have audited the accompanying consolidated balance sheets of American Spectrum Realty,
Inc. as of December 31, 2011 and 2010, and the related consolidated statements of operations,
equity, and cash flows for the periods ended December 31, 2011 and 2010. American Spectrum's
management is responsible for these consolidated financial statements. Our responsibility is to
express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting
Oversight Board (United States). Those standards require that we plan and perform the audits to
obtain reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and
disclosures in the financial statements, assessing the accounting principles used and significant
estimates made by management, as well as evaluating the overall financial statement
presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all
material respects, the consolidated financial position of American Spectrum Realty, Inc. as of
December 31, 2011 and 2010, and the results of its operations and its cash flows for the periods
ended December 31, 2011 and 2010 in conformity with accounting principles generally accepted
in the United States of America.

We were not engaged to examine management's assertion about the effectiveness of American
Spectrum Realty, Inc.'s internal controls over financial reporting as of December 31, 2011 and
2010 included in the accompanying Management's Report on Internal Control over Financial
Reporting and, accordingly, we do not express an opinion thereon.

EEPB, PC

Houston, Texas
March 30, 2012

29

---

**AMERICAN SPECTRUM REALTY, INC**
**CONSOLIDATED BALANCE SHEETS**
(Dollars in thousands, except per share amounts)

| | December 31, | |
|---|---:|---:|
| | **2011** | **2010** |
| **ASSETS** | | |
| Real estate held for investment (includes $338,845 and $381,354 from consolidated Variable Interest Entities | | |
| ("VIE's"), respectively) | $ 520,841 | $ 646,255 |
| Accumulated depreciation (includes $22,484 and $8,446 from consolidated VIE's, respectively | (81,657) | (94,090) |
| | | |
| Real estate held for investment, net (includes $316,361 and $372,908 from consolidated VIE's, respectively) | 439,184 | 552,165 |
| | | |
| Cash and cash equivalents | 473 | 2,003 |
| Restricted cash (includes $4,157 and $4,016 from consolidated VIE's, respectively) | 5,184 | 5,008 |
| Tenant and other receivables, net of allowance for doubtful accounts of $1,006 and $421, respectively (includes | | |
| $864 and $1,515 from consolidated VIE's, respectively) | 1,338 | 2,403 |
| Deferred rents receivable (includes $1,501 and $0 from consolidated VIE's, respectively) | 3,459 | 2,331 |
| Purchased intangibles subject to amortization | 7,636 | 9,060 |
| Deferred tax assets | 12,123 | 14,083 |
| Goodwill | 2,687 | 4,003 |
| Investment in management company | 4,000 | 4,000 |
| Investment in unconsolidated real estate assets from related parties | 245 | 194 |
| Notes receivable from Evergreen | 2,000 | 2,000 |
| Interest receivable from Evergreen | 272 | 272 |
| Accounts receivable from related parties | - | 262 |
| Accounts receivable from Evergreen | 414 | 414 |
| Prepaid and other assets, net (includes $8,123 and $8,858 from consolidated VIE's, respectively) | 17,752 | 20,164 |
| Total Assets | 496,767 | 618,362 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| | | |
| Liabilities: | | |
| Notes payable (includes $237,276 and $268,776 from consolidated VIE's, respectively) | 384,022 | 482,819 |
| Accounts payable (includes $634 and $5,734 from consolidated VIE's, respectively) | 7,712 | 16,292 |
| Accounts payable to related parties | - | 286 |
| Accrued and other liabilities (includes $7,144 and $1,809 from consolidated VIE's, respectively) | 16,068 | 12,154 |
| Total Liabilities | 407,802 | 511,551 |
| | | |
| Commitments and Contingencies (Note 17): | | |

EXHIBIT "3"

| | 2011 | 2010 |
|---|---|---|
| Equity: | | |
| American Spectrum Realty, Inc, stockholders' deficit: | | |
| Preferred stock par value $0.01 per share, 100,000,000 authorized shares, 55,172 issued December 31, 2011 and | | |
| 2010 respectively | 1 | 1 |
| Common stock par value $0.01 per share, 100,000,000 authorized shares, 3,816,016 issued at December 31, | | |
| 2011, and 3,422,706 issued at December 31, 2010 respectively; 3,344,604 outstanding at December 31, 2011 | | |
| and 2,951,294 outstanding at December 31, 2010 respectively | 34 | 34 |
| Additional paid-in capital | 51,923 | 49,067 |
| Accumulated deficit | (56,510) | (60,509) |
| Treasury stock, at cost, 471,412 shares at December 31, 2011 and December 31, 2010, respectively | (3,095) | (3,095) |
| Total American Spectrum Realty, Inc. stockholders' deficit | (7,647) | (14,502) |
| Non-controlling interest | 96,612 | 121,313 |
| Total Equity | 88,965 | 106,811 |
| Total Liabilities and Equity | $ 496,767 | $ 618,362 |

The accompanying notes are an integral part of these consolidated financial statements

30

---

## AMERICAN SPECTRUM REALTY, INC
## CONSOLIDATED STATEMENTS OF OPERATIONS
### (In thousands, except per share amounts)

| | Year Ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| **REVENUES:** | | |
| Rental revenue | $ 65,146 | $ 45,185 |
| Third party management and leasing revenue | 3,859 | 3,692 |
| Interest income | 345 | 324 |
| **Total revenues** | 69,350 | 49,201 |
| | | |
| **EXPENSES:** | | |
| Property operating expense | 22,789 | 18,337 |
| Corporate general and administrative | 11,916 | 9,659 |

EXHIBIT "3"

| | | |
|---|---|---|
| Depreciation and amortization | 29,189 | 18,937 |
| Interest expense | 27,096 | 17,754 |
| Impairment expense | 4,485 | 3,387 |
| **Total expenses** | 95,475 | 68,074 |
| | | |
| **OTHER INCOME:** | | |
| Gain on litigation settlement | 4,076 | - |
| Other income | 485 | - |
| **Total other income** | 4,561 | - |
| | | |
| Loss from continuing operation before deferred income tax | (21,564) | (18,873) |
| | | |
| Deferred income tax benefit | 4,035 | 4,661 |
| | | |
| Loss from continuing operations | (17,529) | (14,212) |
| | | |
| Discontinued operations: | | |
| Loss from operations | (2,553) | (5,546) |
| Gain on sale and foreclosure of discontinued operations | 26,016 | 4,315 |
| Income tax (expense) benefit | (6,150) | 447 |
| Income (loss) from discontinued operations | 17,313 | (784) |
| | | |
| Net Loss, including non-controlling interests | (216) | (14,996) |
| | | |
| Net loss attributable to non-controlling interests | 4,215 | 6,959 |
| | | |
| Net Income (Loss) attributable to American Spectrum Realty, Inc. | 3,999 | (8,037) |
| | | |
| Less: Preferred stock dividend | (240) | (240) |
| | | |
| Net Income (Loss) attributable to American Spectrum Realty, Inc. common stockholders | $     3,759 | $     (8,277) |
| | | |
| Basic and diluted per share data: | | |
| Loss from continuing operations attributable to American Spectrum Realty, Inc. common stockholders | ($1.79) | $     (2.66) |
| Income (Loss) from discontinued operations attributable to American Spectrum Realty, Inc. common stockholders | 3.11 | (0.10) |
| Net Income (Loss) attributable to American Spectrum Realty, Inc. common stockholders | $     1.32 | $     (2.76) |
| | | |
| | 3,008,836 | 2,916,145 |
| Basic and diluted weighted average shares used | | |
| | | |
| Amounts attributable to American Spectrum Realty, Inc. common stockholders: | | |

EXHIBIT "3"

| | | |
|---|---|---|
| Loss from continuing operations | $ (5,605) | $ (7,998) |
| Income (Loss) from discontinued operations | 9,364 | (279) |
| Net Income (Loss) | $ 3,759 | $ (8,277) |

The accompanying notes are an integral part of these consolidated financial statements

31

## AMERICAN SPECTRUM REALTY INC.
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
### (In thousands, except share amounts)

| | Preferred Shares | Common Shares | Non-controlling Interests | Preferred Stock | Common Stock | Additional Paid-In in Capital | Accumulated Deficit | Treasury Stock | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|
| **Balance January 1, 2010** | 55,172 | 1,645,655 | $ 2,036 | $ 1 | $ 16 | $ 48,563 | $ (52,472) | $ (3,095) | $ (4,951) |
| Issuance of one-for-one stock split | | 1,645,655 | | | 18 | (18) | | | - |
| Preferred stock dividends | | | | | | (240) | | | (240) |
| Stock-based compensation | | | | | | 181 | | | 181 |
| Conversion of OP units to common stock | | 102,896 | (211) | | | 211 | | | - |
| Issuance of common stock | | 28,500 | | | | | | | - |
| Issuance of operating partnership units | | | 12,316 | | | | | | 12,316 |
| Noncontrolling interests in acquired properties | | | 1,386 | | | | | | 1,386 |
| Noncontrolling interests in consolidated VIE's | | | 108,973 | | | | | | 108,973 |
| Acquisition of non-controlling interest in the operating partnership | | | (21) | | | | | | (21) |
| Reclassification of non-controlling interest from temporary equity | | | 3,962 | | | | | | 3,962 |
| Reclassification of non-controlling interest | | | | | | | | | - |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| to additional paid-in capital | | | (370) | | | 370 | | | - |
| Repurchase of non-controlling interest in consolidated partnership | | | (1,785) | | | | | | (1,785) |
| Repurchase of preferred partnership interest | | | | | | | | | - |
| Distributions to non-controlling interests | | | (514) | | | | | | (514) |
| Non-controlling interests share of loss | | | (6,959) | | | | | | (6,959) |
| Preferred interest in consolidated subsidiary | | | 2,500 | | | | | | 2,500 |
| Net income | | | | | | | (8,037) | | (8,037) |
| **Balance December 31, 2010** | **55,172** | **3,422,706** | **121,313** | **1** | **34** | **49,067** | **(60,509)** | **(3,095)** | **106,811** |
| Preferred stock dividends | - | - | - | - | - | (240) | - | - | **(240)** |
| Stock-based compensation | - | 34,500 | - | - | - | 195 | - | - | **195** |
| Restricted stock forfeitures | - | (10,338) | - | - | - | - | - | - | **-** |
| Conversion of OP units to common stock | - | 325,463 | (2,342) | - | - | 2,342 | - | - | **-** |
| Issuance of common stock | | 43,685 | | - | - | 559 | - | - | **559** |
| Acquisition of non-controlling interest in the operating partnership | | | (200) | | | | | | **(200)** |
| Consolidation of VIE's | - | - | 9,241 | - | - | - | - | - | **9,241** |
| Deconsolidation of VIE's | - | - | (18,111) | - | - | - | - | - | **(18,111)** |
| Noncontrolling interests share of income | - | - | (4,215) | - | - | - | - | - | **(4,215)** |
| Repurchase of preferred partnership interest | | | (2,500) | - | - | - | - | - | **(2,500)** |
| Distributions | - | - | (7,555) | - | - | - | - | - | **(7,555)** |
| Contributions | - | - | 981 | - | - | - | - | - | **981** |
| Net income | - | - | | - | - | - | 3,999 | | **3,999** |
| **Balance December 31, 2011** | **55,172** | **3,816,016** | **$ 96,612** | **$ 1** | **$ 34** | **$ 51,923** | **$ (56,510)** | **$ (3,095)** | **$ 88,965** |

The accompanying notes are an integral part of these consolidated financial statements

EXHIBIT "3"

**AMERICAN SPECTRUM REALTY, INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | |
|---|---|---|
| | **2011** | **2010** |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (216) | $ (14,996) |
| Adjustment to reconcile net loss to net cash provided by (used in) operating activities: | | |
| Depreciation and amortization | 31,111 | 23,791 |
| Impairment expense | 4,485 | 3,387 |
| Income tax expense/(benefit) | 2,115 | (5,108) |
| Gain on sales and foreclosure of real estate assets | (26,016) | (4,315) |
| Stock-based compensation | 195 | 181 |
| Deferred rental income | (1,446) | (446) |
| Changes in operating assets and liabilities: | | |
| Decrease in tenant and other receivables | 1,373 | 280 |
| (Decease) increase in accounts payable | (872) | 4,944 |
| (Decrease) increase in accounts receivable from related parties | (286) | 317 |
| Decrease (increase) in related party receivables | 262 | (226) |
| (Increase) decrease in prepaid and other assets | (2,730) | 105 |
| Increase (decrease) in accrued and other liabilities | 10,899 | (246) |
| Change in restricted cash | (541) | (488) |
| Net cash provided by operating activities: | **18,333** | **7,180** |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Proceeds received from sales of real estate assets | 51,080 | 10,166 |
| Capital improvements to real estate assets | (5,214) | (3,567) |
| Real estate acquisition | - | (2,017) |
| Investments in unconsolidated real estate assets | (60) | (82) |
| Payments for damages related to insurance claims | - | (30) |
| Net cash provided by investing activities: | **45,806** | **4,470** |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings | 5,750 | 8,194 |
| Repayment of borrowings-property sales | (45,000) | (5,067) |
| Repayment of borrowings-scheduled payments | (9,647) | (6,537) |
| Repayment of borrowings-other | (7,352) | (1,260) |
| Repurchase of preferred partnership interest | (2,500) | (1,785) |
| Proceeds from partial sale of consolidated partnership interests | - | 2,500 |
| Proceeds from issuance of operating partnership units | - | 727 |
| Acquisition of non-controlling interest in the operating partnership | (201) | (21) |

EXHIBIT "3"

| | | |
|---|---:|---:|
| Acquisition of notes receivable | - | (2,905) |
| Dividend payments to preferred stockholders | (145) | (302) |
| Contributions from non-controlling interests | 981 | - |
| Distributions to non-controlling interests | (7,555) | (3,653) |
| Net cash used in financing activities: | **(65,669)** | **(10,109)** |
| | | |
| (Decrease) increase in cash and cash equivalents | (1,530) | 1,541 |
| | | |
| Cash and cash equivalents, beginning of period | 2,003 | 462 |
| | | |
| Cash and cash equivalents, end of period | **$ 473** | **$ 2,003** |

The accompanying notes are an integral part of these consolidated financial statements

33

---

**SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES:**

| | Year Ended December 31, | |
|---|---:|---:|
| | **2011** | **2010** |
| | (in thousands) | |
| Conversion of operating partnership units to common stock | 2,342 | 211 |
| Conversion of accounts payable to note payable | 4,671 | |
| Conversion of accounts payable to common stock | 559 | - |
| Issuance of operating partnership (OP) units in connection with Evergreen acquisition | - | 8,000 |
| Issuance of OP units in connection with notes receivable and account receivable acquisition | - | 3,081 |
| Issuance of OP units in connection with real estate acquisition | - | 2,586 |
| Issuance of OP units in connection with investment in unconsolidated real estate asset | - | 28 |
| Debt assumed in connection with real estate acquisition | - | 6,297 |
| Conversion of accounts payable to notes payable | | 498 |
| Financing in connection with investment in unconsolidated real estate asset | - | 33 |
| Financing in connection with Evergreen acquisition | - | 9,500 |

**SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:**

| | | |
|---|---:|---:|
| Cash paid for interest | 25,250 | 16,767 |
| Cash paid for income taxes | 149 | 70 |

The accompanying notes are an integral part of these consolidated financial statements

34

EXHIBIT "3"

**NOTE 1. Business Overview**

**Business Overview**

We provide comprehensive integrated real estate solutions for our own property portfolio and the portfolios of our third party clients. We own and manage; commercial, industrial, retail, self-storage and multi-family, student housing income properties, and offer our third party clients comprehensive integrated real estate solutions, including management and transaction services based on our market expertise. We conduct our business in the continental United States.

Our business is conducted through an Operating Partnership in which we are the sole general partner and a limited partner with a total equity interest of 73% at December 31, 2011. As the sole general partner of the Operating Partnership, we have the exclusive power to manage and conduct the business of the Operating Partnership. We periodically examine our corporate structure in order to evaluate if we are positioned to take advantage of the most favorable tax treatments for ourselves, our shareholders and our clients. We evaluate the potential tax benefits and consequences of a variety of business models that include but are not limited to; joint ventures, partnerships, limited liability companies (LLC), limited liability partnerships (LLP) and real estate investment trusts (REIT) for ourselves and our investors. It is our objective to consider all applicable tax laws that legally reduce the tax consequences and maximize the tax benefits associated with real estate transactions.

The REIT structure has many specific requirements that must be met and maintained in order to qualify. As of December 31, 2011 the company's ownership structure does not allow the company to elect REIT status.

Our primary business objective is to acquire and manage multiple tenant real estate in strategically located areas where cost effective enhancements combined with effective leasing and management strategies, can improve the long term values and economic returns of those properties. We focus on the following fundamentals to achieve this objective:

-An opportunistic and disciplined disposition strategy that enhances investment performance and takes advantage of realized gains. We typically dispose of properties when the return from selling is higher than the projected return from holding the property;

-Organic (internally developed opportunities) and in-organic (acquisition generated opportunities) growth of our third party property management contracts and transaction service fees, coupled with;

-An opportunistic yet disciplined acquisition strategy that focuses on mid-tier multi-tenant real estate in locations that allow us to capitalize on our existing management infrastructure currently servicing our own properties and that of our third party clients.

**NOTE 2. Summary of Significant Accounting Policies**

**BASIS OF PRESENTATION**

The consolidated financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States of America.

EXHIBIT "3"

*Principles of consolidation and basis of presentation.*

The consolidated financial statements include the accounts of American Spectrum Realty, Inc., its subsidiaries and those variable interest entities in which American Spectrum Realty, Inc. is the primary beneficiary. Intercompany transactions and balances have been eliminated.

*Use of Estimates.*

Accounting estimates are an integral part of the financial statements prepared by management and are based on management's knowledge and experience about past and current events and assumptions about future events. Certain accounting estimates are particularly sensitive because of their significance to the financial statements and because of the possibility that future events affecting them may differ significantly from those expected. The most sensitive estimate affecting the financial statements was management's estimate of the fair value of its real estate assets that is based on a discounted cash flow method of valuing the property. The discounted cash flow method included assumptions concerning future net cash flows and also capitalization rates. Management evaluated the key factors and assumptions used to develop the fair value in determining that it is reasonable in relation to the financial statements taken as a whole. Actual results could differ from those estimates.

35

*Reclassifications*

Certain balance sheet amounts in the 2010 financial statements have been reclassified to conform to the 2011 presentation.

**SIGNIFICANT ACCOUNTING POLICIES**

*Cash and Cash Equivalents*

We consider all highly-liquid investment instruments with an original maturity of three months or less to be cash equivalents. As of December 31, 2011 and 2010, we held our cash and cash equivalents in checking accounts, money market accounts and investment accounts with several financial institutions. Some accounts exceeded FDIC insurance limits.

*Restricted Cash*

We had restricted cash of $5.2 million as of December 31, 2011. The cash includes $4.2 million related to consolidated VIE's. The remaining cash of $0.9 million secures a bank loan, which matures in June 2012.

*Fair Value of Financial Instruments*

Our financial instruments, including cash, prepaid expenses and other current assets, accrued liabilities and accounts payable are carried at cost, which approximates fair value because of the short term nature of those instruments.

EXHIBIT "3"

*Deferred Financing and Other Fees*

Fees paid in connection with the financing and leasing of our properties are amortized to interest expense using the effective interest method over the term of the related note payable or lease and are included in other assets.

*Rental Revenue.*

We record rental income for the full term of each lease on a straight-line basis. Any rent holidays given to the tenant as part of their lease is recorded as a deferred rent receivable. When a property is acquired, the term of existing leases is considered to commence as of the acquisition date for purposes of this calculation.

Many of our leases provide for Common Area Maintenance Escalations ("CAM/ESC") as additional rental revenue. Each tenant is typically responsible for their prorated share of increases in operating expenses. Tenants are billed an estimated CAM/ESC charge based on the budgeted operating expenses for the year. Within 90 days after the end of each fiscal year, a reconciliation and true up billing of CAM/ESC charges is performed based on actual operating expenses.

For each of the two years ended December 31, 2011 and 2010 no tenant represented 10% or more of our rental revenue.

*Allowance for Doubtful Accounts*

We maintain an allowance for accounts receivable which may not be ultimately collected. The allowance balance maintained is based upon historical collection experience, current aging of amounts due and specific evaluations of the collectability of individual balances. All tenant account balances over 90 days past due are fully reserved. Accounts are written off against the reserve when they are deemed to be uncollectible.

*Goodwill and Intangible Assets*

Goodwill is tested for impairment at least annually or whenever events or changes in circumstances indicate that goodwill carrying amounts may be impaired. If the implied fair value of goodwill is lower than its carrying amount, impairment is indicated and goodwill is written down to its implied fair value. Subsequent increases in goodwill value are not recognized in the financial statements.

36

---

Intangible assets are amortized on a straight-line basis over their estimated lives. Such assets are evaluated for impairment whenever events or changes in circumstances indicate that the recoverability of their carrying value may be impaired.

*Variable Interest Entity Accounting*

EXHIBIT "3"

Our determination of the appropriate accounting method with respect to our VIEs is based on Accounting Standards Update, or ASU, 2009-17, "*Consolidations (Topic 810): Improvements to Financial Reporting by Enterprises Involved with Variable Interest Entities.*" This ASU incorporates Statement of Financial Accounting Standards, or SFAS, No. 167, "*Amendments to FASB Interpretation No. 46(R),*" issued by the Financial Accounting Standards Board, or FASB, in June 2009. The amendments in this ASU replace the quantitative-based risks and rewards calculation for determining which reporting entity, if any, has a controlling financial interest in a variable interest entity with a primarily qualitative approach focused on identifying which reporting entity has both (1) the power to direct the activities of a variable interest entity that most significantly impact such entity's economic performance and (2) the obligation to absorb losses or the right to receive benefits from such entity that could potentially be significant to such entity. The entity which satisfies these criteria is deemed to be the primary beneficiary of the VIE.

We analyze our interests in VIEs to determine if we are the primary beneficiary. We consider a variety of factors in identifying the entity that holds the power to direct matters that most significantly impact the VIE's economic performance including, but not limited to, (a) sign and enter into leases; set, distribute, and implement the capital budgets, the authority to refinance or sell the property within contractually defined limits and, (b) the ability to receive fees that are significant to the property and (c) a necessity of funding any deficit cash flows.

We consolidate any VIE of which we are the primary beneficiary (see Note 5 of the Notes to Consolidated Financial Statements set forth in Item 8 of this Annual Report). We determine whether an entity is a VIE and, if so, whether it should be consolidated by utilizing judgments and estimates that are inherently subjective. If we made different judgments or utilized different estimates in these evaluations, it could result in differing conclusions as to whether or not an entity is a VIE and whether or not to consolidate such entity.

*Assets Held for Sale*

We classify assets as held for sale when management a) approves the action and commits to a plan to sell the asset(s); b) the asset(s) are available for immediate sale in its present condition customary for sales of those types of assets; c) an active program to locate a buyer and other actions required to complete the plan to sell the asset(s) have been initiated; d) the sale of the asset(s) is probable, and transfer of the asset(s) is expected to within one year; e) the asset(s) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and; f) actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn.

At the time a property is held for sale, the property is carried at the lower of (i) its carrying amount or (ii) fair value less costs to sell. We disclose operating properties as properties held for sale in the period in which all of the required criteria are met.

*Discontinued Operations*

We report, for both current and prior periods, the assets, liabilities and results of operations of any component of the Company which has either been disposed of, or is under contract with all contingencies removed, as discontinued operations.

*Sales of Real Estate Assets*

Gains on property sales are recognized in full when real estate is sold, provided (i) the gain is determinable, that is, the collectability of the sales price is reasonably assured or the amount that

EXHIBIT "3"

will not be collectible can be estimated, and (ii) the earnings process is virtually complete, that is, we are not obligated to perform significant activities after the sale to earn the gain. Losses on property sales are recognized immediately.

*Real Estate Held for Investment*

Rental properties are stated at cost, net of accumulated depreciation, unless circumstances indicate that cost, net of accumulated depreciation, cannot be recovered, in which case the carrying value of the property is reduced to estimated fair value. Estimated fair value (i) is based upon the Company's plans for the continued operation of each property and (ii) is computed using estimated sales price, as determined by prevailing market values for comparable properties and/or the use of capitalization rates multiplied by annualized net operating income based upon the age, construction and use of the building. The fulfillment of the Company's plans related to each of its properties is dependent upon, among other things, the presence of economic conditions which will enable the Company to continue to hold and operate the properties prior to their eventual sale. Due to uncertainties inherent in the valuation process and in the economy, actual results could be materially different from current expectations.

37

Depreciation is provided using the straight-line method over the estimated useful lives of the respective assets. The useful lives are as follows:

| | |
|---|---|
| Building and Improvements | 5 to 40 years |
| Tenant Improvements | Term of the related lease |
| Furniture and Equipment | 3 to 5 years |

Rental properties are individually evaluated for impairment when conditions exist which may indicate it is probable that the sum of expected future undiscounted cash flows for each property is less than the carrying amount of that property. Impairment indicators for our rental properties are assessed by property and include, but are not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. The Company assesses the expected undiscounted cash flows based upon numerous factors, including, but not limited to, appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property and our assumptions about the use of the asset. Upon determination that impairment has occurred and that the future undiscounted cash flows are less than the carrying amount, a write-down will be recorded to reduce the carrying amount to its estimated fair value.

### Recent Accounting Pronouncements

In December 2010, the FASB issued ASU 2010-29, "Business Combinations (Topic 805): Disclosure of Supplementary Pro Forma Information for Business Combinations". ASU 2010-29 specifies that when a public company completes a business combination, the company should disclose revenue and earnings of the combined entity as though the business combination occurred as of the beginning of the comparable prior annual reporting period. The update also expands the supplemental pro forma disclosures under Topic 805 to include a description of the nature and amount of material, non-recurring pro forma adjustments directly attributable to the business combination included in the pro forma revenue and earnings. The requirements of ASU

2010-29 are effective for business combinations that occur on or after the beginning of the first annual reporting period beginning on or after December 15, 2010. We adopted this ASU during the year ended December 31, 2011 and do not believe the adoption of this update had a material impact on the disclosure requirements for our consolidated financial statements.

In April 2011, the FASB issued ASU 2011-03, "Transfers and Servicing (Topic 860): Reconsideration of Effective Control for Repurchase Agreements." ASU 2011-03 specifies when an entity may or may not recognize a sale upon the transfer of financial assets subject to repurchase agreements. That determination is based, in part, on whether the entity has maintained effective control over the transferred financial assets. The requirements of ASU 2011-03 will be effective for the first interim or annual period beginning on or after December 15, 2011, with early adoption prohibited. We do not believe the adoption of this update will have a material effect on our consolidated financial position or results of operations.

In May 2011, the FASB issued ASU 2011-04, "Fair Value Measurement (Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS." These amendments were issued to provide a consistent definition of fair value and ensure that the fair value measurement and disclosure requirements are similar between GAAP and International Financial Reporting Standards (IFRS). ASU 2011-04 changes certain fair value measurement principles and enhances the disclosure requirements, particularly for Level 3 fair value measurements. This ASU is effective for interim and annual periods beginning after December 15, 2011, with early adoption prohibited. We do not believe the adoption of this update will have a material effect on our consolidated financial position or results of operations.

In June 2011, the FASB issued ASU 2011-05, "Comprehensive Income (Topic 220): Presentation of Comprehensive Income." This ASU eliminates the option to report other comprehensive income and its components in the statement of changes in stockholders' equity and requires an entity to present the total of comprehensive income, the components of net income and the components of other comprehensive income either in a single continuous statement or in two separate but consecutive statements. In December 2011, the FASB issued ASU 2011-12, "Comprehensive Income (Topic 220): Deferral of the Effective Date for Amendments to the Presentation of Reclassification of Items Out of Accumulated Other Comprehensive Income in Accounting Standards Update No. 2011-05." This ASU defers indefinitely certain requirements from ASU 2011-05 that relate to the presentation of reclassification adjustments out of accumulated other comprehensive income. ASU 2011-05 and ASU 2011-12 are effective for fiscal years, and interim periods within those years, beginning after December 15, 2011, with early adoption permitted, and requires retrospective application for all periods presented. We do not believe the adoption of this update will have a material impact on the disclosure requirements for our consolidated financial statements.

38

In September 2011, the FASB issued ASU 2011-08, "Intangibles-Goodwill and Other (Topic 350): Testing Goodwill for Impairment" This ASU gives companies the option to perform a qualitative assessment to first assess whether the fair value of a reporting unit is less than its carrying amount. If an entity determines it is not more likely than not that the fair value of the reporting unit is less than its carrying amount, then performing the two-step impairment test is unnecessary. ASU 2011-08 is effective for annual and interim goodwill impairment tests performed for fiscal years beginning after December 15, 2011, with early adoption permitted. We do not believe the adoption of this update will have a material impact on the disclosure requirements for our consolidated financial statements.

EXHIBIT "3"

In December 2011, the FASB issued ASU 2011-10, "Property, Plant, and Equipment (Topic 360): Derecognition of in Substance Real Estate—a Scope Clarification." This ASU requires that a reporting entity that ceases to have a controlling financial interest in a subsidiary that is in substance real estate as a result of default on the subsidiary's nonrecourse debt would apply FASB ASC Subtopic 360-20, Property, Plant, and Equipment—Real Estate Sales, to determine whether to derecognize assets and liabilities of that subsidiary. ASU 2011-10 is effective prospectively for a deconsolidation event that takes place in fiscal years, and interim periods within those years, beginning on or after June 15, 2012. We do not believe the adoption of this update will have a material effect on our consolidated financial position or results of operations.

In December 2011, the FASB issued ASU 2011-11, "Balance Sheet (Topic 210): Derecognition of in Substance Real Estate—a Scope Clarification." This ASU adds certain additional disclosure requirements about financial instruments and derivative instruments that are subject to netting arrangements. ASU 2011-11 is effective for fiscal years, and interim periods within those years, beginning after January 1, 2013, with retrospective application required. We do not believe the adoption of this update will have a material impact on the disclosure requirements for our consolidated financial statements.

## NOTE 3. ACQUISITION ACTIVITIES

### Acquisition of Property Management and Asset Management Contracts

In January 2010, we acquired the property management and asset management contracts held by Evergreen Realty Group, LLC and affiliates ("Evergreen") as well as (i) Evergreen's interest as the manager of limited liability companies which have invested in 27 of the managed properties (in eight of which it has also acquired an equity interest); (ii) Evergreen's interest as the general partner of limited partnerships which have invested in four of the managed properties (in none of which it acquired an equity interest), and (iii) direct tenant-in-common interests in two properties. The total consideration for the acquisition was $18.0 million.

We completed the Evergreen acquisition by assuming $0.5 million of Evergreen payables, issuing 1.6 million OP units with redemption terms that are different from the Company's other OP units (the "Evergreen OP units") and issuing a $9.5 million promissory note. The promissory note is an obligation of American Spectrum Realty Management, LLC, a subsidiary, which matures on December 31, 2019 and bears an annual interest rate of 5.0%. Due to the litigation with Evergreen as more fully described in Note 17. Commitments and Contingencies, the purchase price adjustment and effect on the amount of the Evergreen OP units convertible into cash or stock cannot be determined at this time, although management believes that an adjustment is likely. Any adjustment made will influence the amount of debt, OP units and the assets those instruments were used to purchase including goodwill.

The fair value of the management contracts acquired in the Evergreen transaction was adjusted through the remainder of the year for impairment and amortization. Amortization expense was $0.8 million and $1.0 million for the years ended December 31, 2011 and 2010, respectively. Amortization expense associated with the acquisition will be $0.8 million per year for the next five years ending December 31.

EXHIBIT "3"

When acquired management contracts are terminated, the associated value with those contracts is considered impaired and written off in the period the contract terminates. We recorded $0.7 million and $3.4 million related to such impairments for the years ending December 31, 2011 and 2010, respectively. See Note 8. Asset Impairment, for additional discussion.

**Acquisition of Notes Receivable and Accounts Receivable**

In September 2010, the Company acquired two notes receivable, each with a face amount of $0.5 million from American Spectrum REIT I, Inc. ("ASRI"). The acquisition was funded by the issuance of 154,524 OP units. The two $0.5 million notes bear interest at a rate of 12% per annum and are payable on demand from Evergreen. The Company anticipates the notes receivable will be offset against either its note payable to Evergreen or through a reduction in OP units currently held by Evergreen. Please refer to Part I Item 3 Legal Proceedings.

In June 2010, the Company acquired a note receivable and an account receivable with a total face amount of approximately $1.6 million from Evergreen Income and Growth REIT, LP ("EIGRLP"), whose general partner is Evergreen Income and Growth REIT, Inc. ("EIGRI"). The acquisition was funded by the issuance of 334,789 OP units. The note, in the amount of approximately $1.0 million, bears interest at 12% per annum. The note and accrued interest is payable on demand from Central Florida Self Storage Acquisitions, LLC. Accrued and unpaid interest on the note totaled approximately $0.2 million as of December 31, 2011. The note was acquired to ultimately acquire certain real estate assets in which the obligors on the note have ownership interests. The Company is not recognizing interest income on the note.

The account receivable acquired, which totaled approximately $0.4 million is due from Evergreen. The account receivable is related to organizational and offering costs paid in excess of the amounts established in EIGRI's 2008 private placement agreement. The Company anticipates the receivable from Evergreen will be offset against either its note payable to Evergreen or through a reduction in OP units currently held by Evergreen in 2012.

**Property Acquisitions**

No properties were acquired in 2011.

During 2010, we incurred approximately $0.1 million in costs related to the acquisitions that were included in the consolidated statements of operations in general and administrative expenses. One of the properties was acquired from ASRI. See the disclosure related to the Sabo Road property in Note 10-Related Party Transactions for additional information.

During 2010, controlling interests were acquired in certain properties we managed. The total consideration for these controlling interests was $7.6 million. The consideration was a combination of cash $0.3 million, assumed debt $5.3 million, a third party equity contribution of $1.0 million and OP units valued at $1.0 million.

**INTANGIBLE ASSETS PURCHASED**

Upon acquisitions of real estate, we assess the fair value of acquired tangible and intangible assets (including land, buildings, tenant improvements, above and below market leases, origination costs, acquired in-place leases, other identified intangible assets and assumed liabilities), and allocates the purchase price to the acquired assets and assumed liabilities. We also consider an allocation of purchase price of other acquired intangibles, including acquired in-place leases.

EXHIBIT "3"

We evaluate acquired "above and below" market leases at their fair value (using a discount rate which reflects the risks associated with the leases acquired) equal to the difference between (i) the contractual amounts to be paid pursuant to each in-place lease and (ii) management's estimate of fair market lease rates for each corresponding in-place lease, measured over a period equal to the remaining term of the lease for above-market leases and the initial term plus the term of any below-market fixed rate renewal options for below-market leases.

Acquired lease intangible assets (in-place leases and above-market leases) are amortized over the leases' remaining terms, which range from 1 month to 6 years. Amortization of above-market leases is recorded as a reduction of rental income and the amortization of in-place leases is recorded to amortization expense. We currently have no intangible lease costs related to above-market leases.

40

Acquired lease intangible liabilities (below-market leases) are accreted over the leases' remaining terms, which range from 1 month to 6 years. Accretion of below-market leases was approximately $0.44 million and $0.4 million for the two years ended December 31, 2011 and December 31, 2010, respectively. Such accretion is recorded as an increase to rental income.

The estimated aggregate amortization amounts from acquired lease intangibles for each of the next five years are as follows (in thousands):

| Year Ending December 31, | Amortization Expense (in-place lease value) |
|---|---|
| 2012 | $ 343 |
| 2013 | 314 |
| 2014 | 289 |
| 2015 | 67 |
| 2016 | 0 |
| | $ 1,013 |

**NOTE 4. ASSETS HELD FOR SALE**

Below is a listing of the consolidated properties we have listed for sale. We can make no guarantees as to our ability to sell any of our consolidated properties. We further cannot assure you that we will achieve a sales price that allows us to receive cash to fund our operations.

For those consolidated properties listed for sale that we do not have an ownership percentage in (VIE properties), we will receive transaction fees if/when a sale is successfully executed.

| Property Name | Property Type | ASR Ownership Precentage | Carrying Value of Property | Carrying Value of debt |
|---|---|---|---|---|

EXHIBIT "3"

| | | | (in thousands) | |
|---|---|---|---|---|
| Beltway Industrial Park | Industrial | 100% | $  14,629 | $  16,445 |
| Foxborough Business Park | Industrial | 0% | 5,246 | 3,683 |
| Sierra Southwest Pointe | Industrial | 100% | 2,667 | 3,570 |
| 800 & 888 Sam Houston Parkway | Office | 100% | 3,238 | 4,411 |
| Fountain View Office Tower | Office | 51% | 12,817 | 11,750 |
| Park Ten Place I | Office | 100% | 3,775 | 4,790 |
| Park Ten Place II | Office | 100% | 3,132 | 3,753 |
| Attic self-storage - Blanco | Self Storage | 0% | 1,608 | 1,316 |
| Attic self-storage - Laredo | Self Storage | 0% | 3,144 | 1,758 |
| Florida 2 - Ocala Self Storage | Self Storage | 0% | 1,880 | 1,376 |
| Florida 2 - Tampa Self Storage | Self Storage | 0% | 2,151 | 1,466 |
| Grissom Road Self Storage | Self Storage | 0% | 3,860 | 2,336 |
| Sabo Road Self Storage | Self Storage | 55% | 2,618 | 1,911 |
| | | | $  60,765 | $  58,565 |

## NOTE 5. VARIABLE INTEREST ENTITIES

We have identified multiple Variable Interest Entities where we are the primary beneficiary for accounting purposes. As a result, these VIE were consolidated in the consolidated financial statements, after eliminating intercompany transactions and presenting the interests that are not owned by us as non-controlling interests in the condensed consolidated balance sheets.

41

The entities being consolidated as of December 31, 2011 include twelve self-storage properties, two multifamily properties, four student housing properties and nine commercial properties. This represents an increase of one self-storage property, one multifamily and one commercial property and a decrease of one assisted living facility, one multifamily, one commercial property and one student housing property as compared to the year ended December 31, 2010.

The Variable Interest Entities at December 31, 2011 were:

| Property Name | Percentage owned | City/State | Total Gross Leasable Square Footage | Percent of Gross Leasable Area Occupied | Rented Square Feet | Annualized Net Rent | Rent per Square Feet |
|---|---|---|---|---|---|---|---|

EXHIBIT "3"

| Property | % | Location | | % | | | |
|---|---|---|---|---|---|---|---|
| Commerce Distributions Center | 1% | Commerce, CA | 200,000 | 100% | 200,000 | 1,056,000 | 5.28 |
| Dixon & 51st Logistics Center | 0% | Des Moines, IA | 731,160 | 100% | 731,169 | 2,128,026 | 2.91 |
| Fishers Indiana Distribution Center | 1% | Fishers, IN | 637,531 | 100% | 637,531 | 2,399,877 | 3.76 |
| Foxborough Business Park | 0% | Victorville, CA | 127,992 | 83% | 105,635 | 912,053 | 8.63 |
| Ohio Commerce Center | 0% | Strongsville, OH | 194,558 | 100% | 194,558 | 2,276,652 | 11.70 |
| Springs Commerce Center I | 0% | OK, GA, SC, VA, PA | 1,006,993 | 100% | 1,006,993 | 2,366,989 | 2.35 |
| Springs Commerce Center II | 0% | GA, AL | 1,439,300 | 62% | 886,450 | 1,960,793 | 2.21 |
| Springs Office | 0% | Fort Mill/Lancaster, SC | 265,493 | 100% | 265,493 | 1,993,576 | 7.51 |
| Strongsville Corporate Center | 2% | Strongsville, OH | 125,006 | 100% | 125,006 | 2,084,609 | 16.68 |
| *Industrial/Commercial Properties* | | | 4,728,033 | 88% | 4,152,835 | 17,178,575 | 4.14 |
| | | | | | | | |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 72,480 | 99% | 71,760 | 583,222 | 8.13 |
| Muirwood Village | 0% | Zanesville, OH | 157,600 | 88% | 138,601 | 1,504,192 | 10.85 |
| Ohio II - Residences at Newark & Sheffield | 0% | Newark/Circleville, OH | 203,740 | 92% | 187,574 | 1,872,106 | 9.98 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 485,720 | 100% | 485,720 | 1,557,681 | 3.21 |
| University Fountains Lubbock | 0% | Lubbock, TX | 284,436 | 93% | 265,655 | 4,544,911 | 17.11 |
| University Springs San Marcos | 0% | San Marcos, TX | 176,944 | 99% | 174,290 | 2,557,324 | 14.67 |
| *Multi-Family/Student Housing Properties* | | | 1,380,920 | 96% | 1,323,600 | 12,619,436 | 9.53 |
| | | | | | | | |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 164,325 | 91% | 149,655 | 891,560 | 5.96 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 64,975 | 64% | 41,313 | 384,718 | 9.31 |
| Attic Space Self Storage - Blanco Rd | 0% | San Antonio, TX | 48,130 | 79% | 38,135 | 313,222 | 8.21 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 47,870 | 100% | 47,870 | 472,388 | 9.87 |
| Charleston Blvd Self Storage | 0% | Las Vegas, NV | 55,600 | 72% | 40,275 | 219,725 | 5.46 |
| Florida 2 - Ocala Self Storage | 0% | Ocala, FL | 42,091 | 55% | 22,989 | 157,936 | 6.87 |
| Florida 2 - Tampa Self Storage | 0% | Tampa, FL | 60,900 | 70% | 42,350 | 252,505 | 5.96 |
| Ft. Worth Northwest Self Storage | 0% | Fort Worth, TX | 69,275 | 63% | 43,850 | 462,410 | 10.55 |
| Ft. Worth River Oaks Self Storage | 0% | River Oaks, TX | 104,265 | 50% | 51,749 | 583,457 | 11.27 |

EXHIBIT "3"

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Grissom Road Self Storage** | 0% | **San Antonio, TX** | 90,120 | 99% | 89,545 | 554,467 | 6.19 |
| **Houston South Mason (Patrick's)** | 0% | **Katy, TX** | 58,730 | 70% | 41,350 | 319,318 | 7.72 |
| | | | | | | 1,336,73 | |
| **San Antonio Self Storage** | 0% | **San Antonio, TX** | 233,213 | 82% | 191,364 | 2 | 6.99 |
| | | | 1,039,4 | | | 5,948,43 | |
| *Self-Storage Properties* | | | 94 | 77% | 800,445 | 8 | 7.43 |

The pro forma information below is based on estimates and assumptions that have been made solely for purposes of developing such pro forma information by including the newly consolidated VIE's to the Company's results of operations during the year ending December 31, 2011. The pro forma financial information presented below also includes depreciation and amortization plus consolidation of the VIE's as if such consolidation had occurred as of January 1, 2010. The pro forma financial information does not include any synergies or operating cost reductions that may be achieved from the combined operations.

42

Proforma Results of Operations

| | Year ended December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in thousands) | |
| Total Revenue | $ 74,443 | $ 52,808 |
| Total Expense | (96,001) | (71,851) |
| Net loss before non-controling interest and tax | (21,558) | (19,043) |
| Deferred tax benefit | 4,035 | 4,661 |
| Income from discontinued operations | 17,313 | (784) |
| Non-controlling interest | 4,209 | 7,129 |
| Net income (loss) | $ 3,999 | $ (8,037) |

The accompanying financial statements include the operations of the newly consolidated VIE's in 2011 from the acquisition date and consolidation date in accordance with our business combination and VIE policies. A summary of the effect on operations follows:

**VIE component of the consolidated statement of operations
for the year ending December 31, 2011**
(in thousands)

| | |
|---|---|
| Total Revenue | $ 2,864 |
| Total Expenses | (3,665) |
| | |
| Net Loss before Noncontrolling Interest & Tax | (801) |

EXHIBIT "3"

| | |
|---|---|
| Deferred Tax Benefit | - |
| Non-Controlling Interest | 801 |
| **Net Loss** | **$          -** |

The deconsolidation of certain VIE's in 2011 was due to a change in our management relationship with the properties. We no longer manage or have a continuing involvement with three of these properties. We continue to manage the fourth property, which is a student housing property, although we no longer are the primary beneficiary because we no longer control the property. The impact on our year to date Consolidated Financial Statements was a decrease in total assets of $74.8 million, a decrease in total liabilities of $56.7 million and a decrease in non-controlling interest of $18.1 million. In addition, total net income attributable to non-controlling interests of $0.5 million was recorded from the deconsolidated properties. The de-consolidation of these entities did not result in a gain or loss in the Consolidated Statement of Operations as the carrying amount of the non-controlling interest in the former subsidiaries at the deconsolidation date was the same as the carrying amount of the former subsidiary's assets minus liabilities at the date of the deconsolidation.

We own an insignificant interest in most of the VIE's, and therefore, substantially all operations are included in the net income attributable to non-controlling interests.

43

The carrying amounts associated with the VIE's, after eliminating the effect of intercompany transactions, were as follows (in thousands):

| | December 31, | | | |
|---|---|---|---|---|
| | | 2011 | | 2010 |
| ***Assets*** | | | | |
| Restricted Cash | $ | 4,157 | $ | 4,016 |
| Receivables | | 2,365 | | 1,515 |
| Fixed Assets Net of depreciation | | 316,361 | | 372,908 |
| Other Assets | | 8,123 | | 8,858 |
| **Total Assets** | **$** | **331,006** | **$** | **387,297** |
| | | | | |
| ***Liabilities*** | | | | |
| Accounts payable | | 634 | | 5,734 |
| Notes payable | | 237,276 | | 268,776 |
| Other liabilities | | 7,144 | | 1,809 |
| **Total liabilities** | **$** | **245,054** | **$** | **276,319** |
| | | | | |
| **Variable interest entity net carrying amount** | **$** | **85,952** | **$** | **110,978** |

EXHIBIT "3"

At December 31, 2011, the liabilities in the above table are solely the obligations of the VIE's and are not guaranteed by us. We do not have the ability to leverage the assets of the above identified VIE's for the purpose of providing ourselves cash. The debt is solely secured by the property of the respective VIE's.

During the year ended December 31, 2011, we did not provide short term advances to any properties that have been consolidated or deconsolidated. A minimal balance is still owed to us as of December 31, 2011 relating to advances during 2010. We do not believe we have significant exposure to losses related to the VIE's.

## NOTE 6. REAL ESTATE

The cost and accumulated depreciation of rental property held for investment as of December 31, 2011 and 2010 are as follows (in thousands):

| 2011 | Land | Building and Improvements | Total Cost | Accumulated Depreciation | Net Recorded Value |
|---|---|---|---|---|---|
| **ASR Owned** | | | | $ | $ |
| **Office** | $ 40,572 | $ 103,196 | $ 143,768 | (48,439) | 95,329 |
| **Industrial** | 6,419 | 20,160 | 26,579 | (7,738) | 18,841 |
| Retail | 2,811 | 5,077 | 7,888 | (2,074) | 5,814 |
| **Self-Storage** | 535 | 2,439 | 2,974 | (356) | 2,618 |
| **Other** | - | 787 | 787 | (566) | 221 |
| | 50,337 | 131,659 | 181,996 | (59,173) | 122,823 |
| | | | | | |
| **VIE Properties** | | | | | |
| **Industrial** | 32,272 | 161,525 | 193,797 | (14,330) | 179,467 |
| **Residential** | 16,187 | 83,930 | 100,117 | (6,367) | 93,750 |
| **Self-Storage** | 18,949 | 25,982 | 44,931 | (1,787) | 43,144 |
| | 67,408 | 271,437 | 338,845 | (22,484) | 316,361 |
| | | | | | |
| **TOTAL** | $ 117,745 | $ 403,096 | $ 520,841 | $ (81,657) | $ 439,184 |

44

EXHIBIT "3"

| 2010 | Land | | Building and Improvements | | Total Cost | Accumulated Depreciation | | Net Recorded Value |
|---|---|---|---|---|---|---|---|---|
| **ASR Owned** | | | | | | | | |
| Office | $ 52,512 | $ | 155,785 | $ | 208,297 | $ (69,371) | $ | 138,926 |
| Industrial | 8,709 | | 31,866 | | 40,575 | (11,071) | | 29,504 |
| Retail | 2,650 | | 9,973 | | 12,623 | (4,716) | | 7,907 |
| Self-Storage | 536 | | 2,216 | | 2,752 | (38) | | 2,714 |
| Other | - | | 654 | | 654 | (448) | | 206 |
| | 64,407 | | 200,494 | | 264,901 | (85,644) | | 179,257 |
| | | | | | | | | |
| **VIE Properties** | | | | | | | | |
| Industrial | $ 37,959 | $ | 176,264 | $ | 214,223 | $ (5,374) | $ | 208,849 |
| Residential | 21,763 | | 112,072 | | 133,835 | (2,765) | | 131,070 |
| Self-Storage | 12,279 | | 21,017 | | 33,296 | (307) | | 32,989 |
| | 72,001 | | 309,353 | | 381,354 | (8,446) | | 372,908 |
| | | | | | | | | |
| **TOTAL** | $ 136,408 | $ | 509,847 | $ | 646,255 | $ (94,090) | $ | 552,165 |

## FUTURE MINIMUM RENTS

The Company leases its office, industrial, retail center and self-storage property under non-cancelable operating lease agreements. Future minimum rents to be received as of December 31, 2011, are as follows (in thousands):

### MINIMUM RENTS

| Year Ending December 31, | Future Minimum Rents | | |
|---|---|---|---|
| | ASR | VIE | Total |
| 2012 | $ 17,912 | $ 27,166 | $ 45,078 |
| 2013 | 11,842 | 14,514 | 26,356 |
| 2014 | 8,080 | 14,478 | 22,558 |
| 2015 | 4,335 | 14,370 | 18,705 |
| 2016 | 2,580 | 12,121 | 14,701 |
| Thereafter | 2,543 | 110,961 | 113,504 |
| | $ 47,292 | $ 193,610 | $ 240,902 |

EXHIBIT "3"

**NOTE 7. DISCONTINUED OPERATIONS**

In December 2011, the lender for our Technology property foreclosed on the asset. The 118,413 square foot industrial property is located in Austin, Texas. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $7.1 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $1.7 million. No proceeds were received as a result of the transaction.

In November 2011, the lender for our Northwest Corporate Center property foreclosed on the asset. The 86,900 square foot office property is located in St. Louis, Missouri. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $5.3 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $0.6 million. No proceeds were received as a result of the transaction.

In August 2011, the lender for our Creekside property foreclosed on the asset. The 47,810 square foot office property is located in San Ramon, California. We had elected to discontinue servicing the unpaid balance of the debt, which totaled $5.7 million, due to the balance exceeding the market value of the property. The property securing the debt was held by a consolidated wholly-owned subsidiary that had not guaranteed the debt. The transaction generated a gain of $0.4 million. No proceeds were received as a result of the transaction.

45

---

7700 Irvine Center, a 209,343 square foot office property, located in Irvine, California was sold on June 28, 2011 for $56.5 million, resulting in net proceeds of approximately $6.1 million. The transaction generated a gain on sale before income tax expense of $23.3 million. The gain on the sale of the property significantly diminished our federal net operating loss carry-forward. The proceeds from the sale were used to distribute $2.5 million to the non-controlling interest in 7700 Irvine Center, and to reduce debt, accrued liabilities and accounts payables.

During March 2010, we closed escrow on 5850 San Felipe Road and realized proceeds of $5.2 million. The proceeds allowed us to repurchase the preferred interest in the partnership that owned the property, reduce debt and payables. We recorded a gain on the sale of discontinued operations before income taxes in our consolidated statements of operations of $4.3 million.

The consolidated statements of operations of discontinued operations for the years ending December 31, 2011 and 2010 are summarized below:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (In thousands) | |
| Rental Revenue | $ 3,969 | $ 6,924 |
| Less Expenses (1) | (6,522) | (12,470) |
| Loss from discontinued operations before gain | | |

EXHIBIT "3"

| | | |
|---|---|---|
| on sale, foreclosure and income tax (expense)/benefit | **(2,553)** | **(5,546)** |
| Gain on sale of real estate asset | 23,299 | 4,315 |
| Gain on foreclosure of real estate asset | 2,717 | - |
| Income tax (expense)/benefit | (6,150) | 447 |
| Income/(loss) from discontinued operations | **$  17,313** | **$  (784)** |

_____

(1)  Includes interest expense of approximately $2.2 million and $4.2 million for the years ending December 31, 2011 and December 31, 2010, respectively. Mortgage debt related to the property included in discontinued operations was individually secured, and as such, interest expense was based on the property's debt.

Income from discontinued operations for the year ending December 31, 2011 includes the gain resulting from the sale of 7700 Irvine Center, the gain on the foreclosures of Creekside, Northwest Corporate Center and Technology and the operating results of these properties through the date of disposition. Loss from discontinued operations for the year ended December 31, 2010 represents the gain on sale of 5850 San Felipe, a 101,880 square foot office property sold in March 2010 and the operating results of 5850 San Felipe, 7700 Irvine Center, Creekside, Northwest Corporate Center and Technology. See Note 16 – Restructuring of Debt.

Our total assets and total liabilities decreased by $50.2 million and $70.2 million respectively, as a result of the 2011 dispositions.

**NOTE 8. ASSET IMPAIRMENTS**

*Goodwill*

During the year ending December 31, 2011, we performed an assessment of goodwill that indicated the carrying value of goodwill exceeded the fair value requiring us to perform the second step of the impairment test. In the second step, we estimated the fair value of the goodwill using the income approach. Using the income approach required management to estimate the gross probable income for the reporting unit associated with the goodwill. Management then estimated and deducted from the gross probable income, the estimated probable expenses that would be incurred to generate the income. After the estimated probable expenses were deducted from the estimated gross probable income the resulting estimated probable net income was present valued using a factor that management believed was reasonable. The assumptions used by management can have a significant impact on the value of identifiable assets and accordingly can impact the value of goodwill recorded. These assumptions are based on management's internal analysis and are not derived from an observable market. The assumptions would be considered Level 3 assumptions in the Fair Value Hierarchy. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of impairment expense, different assumptions could impact our statement of operations and could impact the results of future impairment reviews.

46

EXHIBIT "3"

As a result of the analysis, we determined the carrying value of the goodwill exceeded its fair value and recorded $1.3 million of impairment expense related to goodwill. The impairment reduced the beginning value of goodwill of $4.0 million to $2.7 million as of December 31, 2011.

The assessment was performed as a result of losing contracts acquired in the Evergreen acquisition and if we experience a significant or sustained decline in our future cash flows as a result of losing additional management contracts or if other events and/or circumstances occur, we may need to perform additional impairment analysis in the future which may result in additional expense.

*Purchased Intangibles Subject to Amortization*

During the year ending December 31, 2011, we had our contractual relationships terminated or modified by the entities that owned some of the third party properties we manage. Based on this triggering event we evaluated the management contracts associated with some of our purchased intangibles for impairment and determined that impairment had occurred. We recorded impairment charges of $0.7 and $3.4 million for the years ending December 31, 2011 and December 31, 2010, respectively, that reduced the fair value of the impaired contracts to zero.

*Real Estate Held for Investment*

Rental properties are individually evaluated for impairment when conditions exist which may indicate it is probable that the sum of expected future undiscounted cash flows is less than the carrying amount. Impairment indicators for our rental properties are assessed by project and include, but are not limited to, significant fluctuations in estimated net operating income, occupancy changes, rental rates and other market factors. We assess the expected undiscounted cash flows based upon numerous factors and estimates, including, but not limited to, appropriate capitalization rates, available market information, historical operating results, known trends and market/economic conditions that may affect the property and our assumptions about the use of the asset, including, if necessary, a probability-weighted approach if multiple outcomes are under consideration. Upon determination that impairment has occurred and that the future undiscounted cash flows are less than the carrying amount, a write-down will be recorded to reduce the carrying amount to its estimated fair value. During the year ending December 31, 2011, we determined certain conditions existed that an evaluation for impairment was needed on certain of our properties. For the year ending December 31, 2011, we recorded impairment charges of $2.5 million on real estate held for investment. The impairment charges were primarily due a determination that the market value of three of our assets were lower than their carrying value as a result of an analysis of future undiscounted cash flows and market data. Based on our evaluation as of December 31, 2011 we do not believe that any other properties in our portfolio should be impaired.

**NOTE 9. FAIR VALUE MEASUREMENTS**

The "*Fair Value Measurements and Disclosures*" Topic of the FASB ASC (Topic 820) defines fair value as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants at the measurement date. Topic 820 also establishes a three-level fair value hierarchy that prioritizes the inputs used to measure fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair value are as follows:

Level 1—Quoted prices in active markets for identical assets or liabilities.

EXHIBIT "3"

Level 2—Observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; or other inputs that are observable or can be corroborated by observable market data.

Level 3—Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. This includes certain pricing models, discounted cash flow methodologies and similar techniques that use significant unobservable inputs. The fair value measurements employed for our impairment evaluations were generally based on a discounted cash flow approach and/or review of comparable activities in the market place. Inputs used in these evaluations included risk-free rates of return, estimated risk premiums as well as other economic variables.

47

---

*Assets Measured at Fair Value on a Non-Recurring Basis.* We measure our goodwill and real estate assets on a non-recurring basis for impairment of fair value using an income approach. Using the income approach requires management to estimate the gross probable income for the reporting unit associated with the asset. Management then estimates and deducts from the gross probable income, the estimated probable expenses that would be incurred to generate the income. After the estimated probable expenses were deducted from the estimated gross probable income the resulting estimated probable net income was present valued using a factor that management believes is reasonable. The assumptions used by management can have a significant impact on the value of identifiable assets and accordingly can impact the value recorded. These assumptions are based on management's internal analysis and are not derived from an observable market. The assumptions would be considered Level 3 assumptions in the Fair Value Hierarchy. Different assumptions could result in different values being attributed to assets and liabilities. Since these values impact the amount of impairment expense, different assumptions could impact our statement of operations and could impact the results of future impairment reviews.

See Note 8. Asset Impairments for information relating to impairment expense recorded in prior interim periods in 2011 as the result of the assessment of impairment of goodwill and real estate assets using this approach.

## NOTE 10. RELATED PARTY TRANSACTIONS

The following transactions are related party transactions which may include amounts that were eliminated in the consolidation of VIE's and controlled entities.

In December 2011, John Galardi, a principal stockholder and director, loaned $0.25 million to the Company and pledged $0.4 million in certificates of deposit to additionally secure another loan of the Company.

In September 2010, the Company acquired two notes receivable, each with a face amount of $0.5 million, and interests in three apartment complexes (Centennial Park Investors, LLC, Town Center Investors, LLC and EP Investors LLC) and one student housing facility (Campus Court TIC 1, LLC). The acquisitions, which were acquired from American Spectrum REIT I, Inc. ("ASRI") for a total purchase price of $1.3 million, were funded by the issuance of 102,697 OP units. The number of units have been adjusted to effect a two- for one- reverse split of all OP units. William

J. Carden is a director and President of ASRI. Mr. Carden is Chief Executive Officer, Chairman of the Board, and a principal stockholder in the Company. The two $0.5 million notes bear interest at a rate of 12% per annum and are payable on demand from Evergreen Realty Group, LLC ("ERG").

In June 2010, the Company acquired a 55% interest in Sabo Road Acquisitions, LP, which owns a 57,850 square foot self-storage property located in Houston, Texas (A Plus Self Storage). The partnership interest acquired consists of the sole general partnership interest and a limited partnership interest. Also in June 2010, the Company acquired a 38.4% undivided interest in Loop 1604, a 178,595 square foot self-storage property located in San Antonio, Texas. The acquisitions were acquired from ASRI for a total purchase price of approximately $1.7 million, consisting of the 150,475 OP units and cash of $0.1 million. In June 2010, the Company acquired two notes receivable ($1.0 million and $0.4 million each) and an account receivable of $0.4 million from Evergreen Income & Growth REIT, LP ("EIGRLP") with a total carrying value of $2.1 million, including $0.3 million of accrued and unpaid interest. The acquisition was funded by the issuance of 214,340 OP units.

The note, in the amount of $1.0 million, has a stated interest rate of 12% per annum. The note and accrued interest is receivable on demand from Central Florida Self Storage Acquisitions, LLC, an entity in which the Company has a non-economic tenant in common interest. Accrued and unpaid interest on the note totaled approximately $0.2 million at December 31, 2011. The Company has not recognized interest income on the note since its acquisition. The note is secured by two properties in Florida. The Company has commenced foreclosure proceedings against these two properties. The note in the amount of $0.4 million, which was due from ASRI, bore interest at 10% per annum. This note and accrued interest of approximately $0.1 million, was paid to the Company in January 2011. The account receivable acquired, which totaled approximately $0.4 million, is due from ERG. The account receivable is related to organizational and offering costs paid in excess of the amounts established in EIGRI's 2008 private placement agreement.

In May 2010, the Company obtained financing for insurance premiums on both its owned and third party managed properties of which approximately $2.1 million was attributable to the Evergreen property portfolio. During 2010, the Company received approximately $2.0 million from these properties as payment on the premiums.

Mr. Carden is a director and President of Evergreen Income & Growth REIT, Inc. ("EIGRI"), the general partner of EIGRLP. The Company does not have an ownership interest in EIRGI or EIGRLP.

48

---

The Company pays a guarantee fee to Mr. Carden, Mr. Galardi and CGS Real Estate Company, Inc., a company owned indirectly by Messrs. Carden and Galardi ("the Guarantors"), in consideration for their guarantees of certain obligations of the Company. The Guarantors are paid an annual guarantee fee equal to between .25% and .75% (depending on the nature of the guarantee) of the outstanding balance as of December 31 of the guaranteed obligations ("Guarantee Fee"). The Guarantee Fee paid for the year ended December 31, 2010 was approximately $80,000. The Guarantee Fee paid for the year ended December 31, 2011 was approximately $165,000. The following property notes are being guaranteed: 800/888 Sam Houston Parkway, Beltway Industrial, 2620/2630 Fountain View, 2640/2650 Fountain View. There

are also six corporate notes being guaranteed. These guaranteed notes total $32.1 million. See Note 11. Notes Payable.

During 2007, the Company entered into a lease agreement with Galardi Group as a tenant for 15,297 square feet of office space at the Company's 7700 Irvine Center property. Mr. Galardi is a principal stockholder, director and officer of Galardi Group. The lease commenced March 1, 2008 and has a five-year term. The annual base rent due to the Company pursuant to the lease was approximately $0.5 million over the term of the lease. 7700 Irvine Center Drive was sold in June 2011. During the same year, the Company subleased back from the Galardi Group 2,396 square feet of office space. This sublease expires February 28, 2013. The annual base rent on this sublease is $79,000. As of December 31, 2011, $26,356 was due to the Galardi Group.

49

---

## NOTE 11. NOTES PAYABLE

We had the following notes payable outstanding as of December 31, 2011 and 2010 secured by the following properties (dollars in thousands):

| Property (unless otherwise noted) | Maturity Date | December 31, 2011 Principal Balance | 2011 Interest Rate | December 31, 2010 Principal Balance | 2010 Interest Rate |
|---|---|---|---|---|---|
| **ASR Owned - Fixed Rate:** | | | | | |
| Pacific Spectrum (1) | 6/10/2010 | 5,191 | 8.02% | 5,191 | 8.02% |
| Bristol Bay (1) | 8/1/2011 | 6,687 | 7.58% | 6,792 | 7.58% |
| Technology | 8/1/2011 | - | 7.44% | 7,091 | 7.44% |
| Creekside | 12/1/2011 | - | 7.17% | 5,747 | 7.17% |
| Corporate – Secured by 6430 Atrium, 1501 Mockingbird | | | | | |
| Lane & CD (7) (8) | 3/18/2012 | 890 | 5.50% | 890 | 8.75% |
| 2640 - 2650 Fountain View (5)(7) | 4/29/2012 | 822 | 10.00% | 1,031 | 10.00% |
| Sabo Road Self Storage | 4/30/2012 | 1,911 | 7.42% | 1,973 | 7.42% |
| Park Ten Place I | 5/11/2012 | 4,314 | 7.45% | 4,402 | 7.45% |
| Park Ten Place II | 5/11/2012 | 3,380 | 7.45% | 3,449 | 7.45% |
| 2855 Mangum (1) | 5/11/2012 | 2,495 | 7.45% | 2,535 | 7.45% |
| 2855 Mangum (1) | 5/11/2012 | 1,355 | 6.00% | 1,380 | 6.00% |
| Atrium 6430 (1) | 5/11/2012 | 2,094 | 7.45% | 2,127 | 7.45% |
| Corporate – Unsecured (7) | 5/31/2012 | 1,000 | 9.50% | 1,000 | 9.50% |
| Sierra Southwest Pointe | 6/1/2012 | 2,620 | 7.33% | 2,671 | 7.33% |
| Corporate – Secured by Sierra Southwest Point (6) (7) | 6/12/2012 | 950 | 5.50% | 950 | 8.75% |
| Corporate - Secured by Certificates of Deposits (7) | 6/15/2012 | 992 | 4.50% | 992 | 4.50% |
| Park Ten Place I | 8/11/2012 | 476 | 7.45% | 484 | 7.45% |
| Park Ten Place II | 8/11/2012 | 373 | 7.45% | 380 | 7.45% |

EXHIBIT "3"

Corporate - Secured by NW Spectrum Plaza & FMC

| Property | Maturity Date | Principal | Interest Rate | Principal | Interest Rate |
|---|---|---|---|---|---|
| Technology (4) (7) | 12/3/2012 | 500 | 5.50% | 750 | 8.75% |
| Corporate – Unsecured (8) | 1/27/2013 | 250 | 6.00% | - | 0.00% |
| Corporate – Secured by Bristol Bay (7) | 2/1/2013 | 1,703 | 5.50% | 1,736 | 5.50% |
| Corporate – Secured by Management Contracts (7) | 3/5/2013 | 697 | 5.50% | 863 | 8.75% |
| 11500 Northwest Freeway | 6/1/2014 | 3,932 | 5.93% | 4,008 | 5.93% |
| 11500 Northwest Freeway | 6/1/2014 | 285 | 5.93% | 290 | 5.93% |
| Morenci Professional Park (1) | 7/1/2014 | 1,579 | 7.25% | 1,632 | 7.25% |
| Northwest Corporate Center | 8/1/2014 | - | 6.26% | 5,312 | 6.26% |
| FMC Technology | 9/1/2014 | 8,428 | 5.32% | 8,545 | 5.32% |
| 8100 Washington | 2/22/2015 | 2,117 | 5.59% | 2,156 | 5.59% |
| 8300 Bissonnet (1) | 5/1/2015 | 4,484 | 5.51% | 4,484 | 5.51% |
| 2620 - 2630 Fountain View (7) | 6/30/2015 | 5,350 | 7.00% | 5,350 | 7.00% |
| 1501 Mockingbird Lane | 7/1/2015 | 3,135 | 5.28% | 3,189 | 5.28% |
| 5450 Northwest Central | 9/1/2015 | 2,536 | 5.38% | 2,585 | 5.38% |
| Corporate – Secured by Florida Tampa and Ocala (7) (9) | 12/22/2015 | - | 5.00% | 2,900 | 5.00% |
| 800 & 888 Sam Houston Parkway (7) | 12/29/2015 | 4,411 | 6.25% | 4,528 | 6.25% |
| Fountain View Office Tower | 3/1/2016 | 11,750 | 5.82% | 11,967 | 5.82% |
| Gray Falls and 12000 Westheimer | 1/1/2017 | 7,173 | 5.70% | 7,267 | 5.70% |
| Atrium 6420 (1)(11) | 6/5/2017 | 6,262 | 5.87% | 6,286 | 5.87% |
| 7700 Irvine Center | 8/1/2017 | - | 5.99% | 45,000 | 5.99% |
| 2640 - 2650 Fountain View (7) | 4/29/2018 | 12,191 | 6.50% | 12,361 | 6.50% |
| Corporate – Secured by management contracts | 12/31/2019 | 9,380 | 5.00% | 9,410 | 5.00% |
| Corporate – Unsecured (3) | Variable | 1,409 | (3) | 1,237 | (3) |
| Corporate - Secured by various (3) | Variable | 1,802 | (3) | - | (3) |
| Subtotal | | $ 124,924 | | $ 190,941 | |

50

| Property (unless otherwise noted) | Maturity Date | December 31, | | | |
|---|---|---|---|---|---|
| | | 2011 | | 2010 | |
| | | Principal Balance | Interest Rate | Principal Balance | Interest Rate |
| **Owned - Variable Rate** | | | | | |
| Northwest Spectrum Plaza | 4/19/2012 | 2,585 | 2.66% | 2,820 | 2.90% |
| Windrose Plaza | 4/19/2012 | 2,492 | 2.66% | 2,612 | 2.90% |

EXHIBIT "3"

| | | | | | |
|---|---|---|---|---|---|
| Beltway Industrial Park (2) (7) | 6/9/2013 | 16,282 | 7.00% | 17,170 | 7.00% |
| Beltway Industrial Park (7) | 6/9/2013 | 163 | 7.00% | - | 7.00% |
| Corporate – Unsecured (7) | 12/12/2013 | 300 | 6.00% | 500 | 6.00% |
| | | | | $ | |
| **Subtotal** | $ | **21,822** | | **23,102** | |
| | | | | | |
| **Subtotal ASR** | | **146,74** | | **214,04** | |
| **Owned** | | **6** | | **3** | |
| | | | | | |
| **Consolidated VIEs** | | | | | |
| Houston South Mason (Patrick's) (1) | 12/25/2011 | 2,745 | 7.25% | 2,898 | 7.25% |
| Redmond Commerce | | - | | 16,125 | 5.46% |
| Centennial Park | | - | | 12,320 | 5.06% |
| Foxborough Business Park (10) | 3/1/2012 | 3,683 | 7.70% | - | 7.70% |
| Ft. Worth Northwest Self Storage | 7/1/2012 | 1,936 | 6.23% | 2,049 | 6.23% |
| San Antonio 3 - AAA Stowaway / FOE | 8/1/2012 | 10,504 | 6.05% | - | 6.05% |
| Phoenix Assisted Living 51 | 9/1/2012 | - | 6.88% | 3,794 | 6.88% |
| Fishers Indiana Distribution Center | 10/1/2012 | 17,331 | 5.42% | 17,953 | 5.42% |
| Commerce Distribution Center | 12/1/2012 | 9,598 | 6.12% | 9,783 | 6.12% |
| Charleston Blvd. Self Storage (1) | 1/1/2015 | 2,526 | 5.77% | 2,570 | 5.77% |
| University Heights San Marcos | 8/1/2015 | - | 5.21% | 21,148 | 5.21% |
| University Springs San Marcos | 12/1/2015 | 9,505 | 5.55% | 9,644 | 5.55% |
| Florida 2 - Ocala Self Storage | 12/22/2015 | 1,376 | 5.00% | - | 5.00% |
| Florida 2 - Tampa Self Storage | 12/22/2015 | 1,466 | 5.00% | 653 | 5.00% |
| Campus Court Student Housing | 5/11/2016 | 4,683 | 5.78% | 4,747 | 5.78% |
| University Fountains Lubbock | 1/1/2016 | 21,149 | 5.57% | 21,456 | 5.57% |
| Dixon & 51st Logistics Center | 1/1/2016 | 17,538 | 5.69% | 17,805 | 5.69% |
| Grissom Road Self Storage | 6/1/2017 | 2,336 | 7.00% | 2,363 | 7.00% |
| Loop 1604 Self Storage | 9/11/2017 | 4,298 | 6.70% | 4,345 | 6.70% |
| College Park Student Apartments | 11/6/2017 | 14,431 | 6.35% | 14,610 | 6.35% |
| Ohio II Residences at Newark & Sheffield | 1/1/2018 | 9,422 | 6.74% | 9,532 | 6.74% |
| Muirwood Village | 2/1/2018 | 7,790 | 6.58% | - | 6.58% |
| Aldine Westfield Self Storage | 10/31/2018 | 1,057 | 4.76% | - | 4.76% |
| Attic Space Self Storage - Blanco Rd. | 4/1/2021 | 1,316 | 6.63% | 1,682 | 6.63% |
| Attic Space Self Storage - Laredo Rd. | 4/1/2021 | 1,758 | 6.63% | 1,549 | 6.63% |
| Aldine Westfield Self Storage | 8/14/2019 | 1,289 | 6.07% | 2,465 | 6.07% |
| Ft. Worth River Oaks Self Storage | 7/1/2021 | 2,155 | 6.00% | 2,419 | 6.00% |
| Strongsville Corporate Center | 11/11/2034 | 14,687 | 5.50% | 15,027 | 5.50% |
| Ohio Commerce Center | 6/11/2035 | 18,727 | 5.64% | 19,028 | 5.64% |
| Springs Commerce Center 1 | 5/11/2036 | 16,849 | 5.75% | 17,136 | 5.75% |
| Springs Office | 6/11/2036 | 14,560 | 5.75% | 14,806 | 5.75% |
| Spring Commerce Center II | 7/11/2036 | 20,512 | 6.00% | 20,773 | 6.00% |
| Other Unsecured Notes | | 2,049 | 6.00% | 96 | 6.00% |

EXHIBIT "3"

|  |  |  |  |
|---|---|---|---|
| **Subtotal VIE** | $ | 237,27 6 | $ | 268,77 6 |

|  |  |  |  |
|---|---|---|---|
| **Grand Total** | $ | 384,02 2 | $ | 482,81 9 |

_____

(1)    We are currently electing not to pay our monthly payments and negotiating extension terms with the lender. See additional information regarding these debts below.

51

(2)    In June 2011, we made a principal pay-down of approximately $0.5 million on the note and the lender extended the maturity date to June 9, 2013.

(3)    We have re-negotiated some of our accounts payable which resulted in extended payment terms and/or discounted amounts. Six agreements have promissory notes with interest rates that range between 5%-9% and the maturities of all fifteen arrangements vary between July 2011 to December 2015, of which some of these arrangements are past due.

(4)    In January 2011, we made a principal pay-down of approximately $0.25 million on the note and the lender extended the maturity date to December 3, 2012.

(5)    The loan was extended for one year and the note was reduced by $0.09 million.

(6)    The loan was extended for one year.

(7)    This debt is guaranteed by the Company and in some cases by at least one of our executive officers and/or board members.

(8)    In December 2011, John Galardi loaned $0.25 million to the Company and pledged $0.4 million in Certificate of Deposits to secure another loan.

(9)    This loan has been reclassified to the consolidated VIE section.

(10)   Foxborough Business Park was sold in March 2012.

(11)   Atrium 6420 was foreclosed upon by the lender in March 2012.

The required principal payments on our consolidated debt for the next five years and thereafter, as of December 31, 2011 are as follows (in thousands):

| Year | ASR | VIE | Total |
|---|---|---|---|
| 2012 | 58,945 | 47,997 | 106,942 |
| 2013 | 19,148 | 4,407 | 23,555 |
| 2014 | 13,076 | 3,546 | 16,622 |

EXHIBIT "3"

| | | | |
|---|---|---|---|
| 2015 | 17,358 | 22,256 | 39,614 |
| 2016 | 18,069 | 84,875 | 102,944 |
| Thereafter | 20,150 | 74,195 | 94,345 |
| Total | 146,746 | 237,276 | 384,022 |

We are in default on the notes listed below due to non-payment of scheduled debt service. The balances disclosed on the table below exclude additional fees that may be the result of non-payment. These notes have been marked with a (1) in the above table (in thousands):

| Property Secured by | ASR Ownership Percentage | Balance December 31, 2011 |
|---|---|---|
| Pacific Spectrum | 100% | 5,191 |
| 2855 Mangum | 100% | 3,850 |
| Atrium 6430 | 100% | 2,094 |
| Bristol Bay | 100% | 8,390 |
| Morenci Professional Park | 100% | 1,579 |
| 8300 Bissonnet | 100% | 4,484 |
| Atrium 6420 | 100% | 6,262 |
| Charleston Blvd Self Storage | 0% | 2,526 |
| Houston S Mason (Patricks) | 0% | 2,745 |
| TOTAL | | 37,121 |

52

We have elected not to make payments on debt of $37.1 million due to the unpaid balances of the mortgages exceeding the market value of the properties. We are actively negotiating with the lenders, but there can be no assurance that these negotiations, which may result in loan modifications or discounted pay-offs, will be successful, and the lenders could initiate foreclosure proceedings. The lenders holding the debt on 8300 Bissonnet, Pacific Spectrum 2855 Magnum, Bristol Bay and Morenci Professional Parke have placed these properties into receivership and have initiated foreclosure proceedings. In March 2012, Atrium 6420 was foreclosed upon.

All but one of the properties securing the debt in default is held by a consolidated wholly owned subsidiary and the mortgages are not guaranteed by us. One note for $1.7 million secured by Bristol Bay was guaranteed by us. Negotiations are in progress to settle this debt. All of the notes which we have elected not to pay have payment acceleration clauses and payment in full, including additional fees and interest, could be demanded by the lenders holding these notes. Certain of these properties currently have operating deficits. We evaluated the properties carrying value related to the long-lived assets of the properties secured by these loans and determined that impairment of $2.5 million should be recorded at December 31, 2011. For further discussion see Note 8. Asset Impairments.

We were able to negotiate new loan terms with several holders of our accounts payable. The outstanding balance of these notes is $3.3 million.

EXHIBIT "3"

During 2011, we issued 43,685 shares of common stock to three different creditors.

Unamortized financing costs at December 31, 2011 and December 31, 2010 were $1.2 million and $1.1 million, respectively. Most of our mortgage debt is not cross-collateralized. We have one mortgage loan that is cross-collateralized with a second property.

## NOTE 12. NON-CONTROLLING INTERESTS AND OPERATING PARTNERSHIP UNITS

The following table summarizes the activity for the operating partnership units ("OP Units"):

| Operating Partnership units | Years ended, December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in thousands) | |
| Balance, beginning of period | 4,554 | 3,208 |
| Issuance for Evergreen Acquisition | - | 800 |
| Issuance for other acquisitions | - | 518 |
| Other Issuances | 78 | 28 |
| Redemptions | (44) | - |
| Balance, end of period | 4,588 | 4,554 |
| | | |
| Ownership of Operating Partnership units | | |
| ASR | 3,345 | 2,968 |
| Non-controlling Interest | 1,243 | 1,586 |
| | 4,588 | 4,554 |

53

The following represents the effects of changes in the Company's equity related to non-controlling interests:

| | Years ended, December 31, | |
|---|---|---|
| | 2011 | 2010 |
| | (in thousands) | |
| Net income (loss) attributable to the Company | $ 3,999 | $ (8,037) |
| Increase in the Company's paid-in-capital on exchange of OP Units for shares of common stock | 2,342 | 211 |
| Increase in the Company's paid-in-capital on reclassification of preferred interest from temporary equity | - | 370 |
| Change from net income (loss) attributable to the Company related to non-controlling interest transactions | $ 6,341 | $ (7,456) |

EXHIBIT "3"

**NOTE 13. INCOME TAXES**

The provision for income taxes from continuing operations on income consists of the following for the years ended December 31, 2011 and 2010 (in thousands):

|  | 2011 | 2010 |
|---|---|---|
| Current expense (benefit): | | |
| Federal | $ - | $ - |
| State | 155 | 163 |
| | $ 155 | $ 163 |
| Deferred expense (benefit): | | |
| Federal | $ 2,996 | $ (4,608) |
| State | (1,036) | (663) |
| | $ 1,960 | $ (5,271) |

We have federal and state net operating loss carryforwards of approximately $26.7 million and $12.3 million, respectively, as of December 31, 2011.

We are a loss corporation as defined in Section 382 of the Internal Revenue Code. Therefore, if certain changes in our ownership should occur, there could be a significant annual limitation on the amount of loss carryforwards and future recognized losses that can be utilized and ultimately some amount of loss carryforwards may not be available. Such changes could result in additional tax provision. The net operating loss carryforwards expire in 2023 through 2031.

For the two years ended December 31, 2011, the reported income tax benefit differs from the amount of benefit determined by applying the federal statutory rate of 34% before income taxes as a result of the following:

|  | Years ended December 31, | |
|---|---|---|
|  | 2011 | 2010 |
|  | (in thousands) | |
| Expected income tax expense (benefit) at statutory federal rate | $ 414 | $ (6,959) |
| Permanent differences: | | |
| Non-controlling interest | 1,433 | 2,170 |
| Meals and entertainment | 19 | 14 |
| Share-based compensation | 4 | 22 |
| Return to provision | - | (20) |
| State income tax expense (benefit) | 102 | (335) |
| Other | 143 | - |
| Income tax expense (benefit) | $ 2,115 | $ (5,108) |

54

EXHIBIT "3"

The components of deferred tax assets and liabilities consist of the following as of December 31, 2011 and December 31, 2010, respectively:

| | Years ended December 31, | |
| | 2011 | 2010 |
| --- | --- | --- |
| | (in thousands) | |
| **Deferred tax assets:** | | |
| Net operating losses | $ 9,765 | $ 9,805 |
| Built in gains | 2,067 | 3,684 |
| Intangible assets | 642 | 1,151 |
| Allowance for bad debts | 219 | 154 |
| Share-based compensation | 54 | 50 |
| Charitable contributions | 8 | 8 |
| Alternative minimum tax | 85 | 85 |
| Total deferred tax asset | $ 12,840 | $ 14,937 |
| | | |
| **Deferred tax liabilities:** | | |
| Straight-line rents receivable | (717) | (854) |
| Total deferred tax liabilities | (717) | (854) |
| | | |
| Net deferred tax asset | $ 12,123 | $ 14,083 |

Deferred tax assets and liabilities are determined based on temporary differences between income and expenses reported for financial reporting and tax reporting. We have assessed, using all available positive and negative evidence, the likelihood that the deferred tax assets will be recovered from future taxable income.

An enterprise must use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence should be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists (i) the more positive evidence is necessary and (ii) the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion, or all, of the deferred tax asset. Among the more significant types of evidence that we considered are: that future anticipated property sales will produce more than enough taxable income to realize the deferred tax asset; taxable income projections in future years; and whether the carryforward period is so brief that it would limit realization of tax benefits.

We had no unrecognized tax benefits as of December 31, 2011. We do not expect that this will change significantly within the next twelve months. Our policy is to recognize interest related to any unrecognized tax benefits as interest expense and penalties as operating expenses. There are no penalties or interest accrued at December 31, 2011 related to unrecognized tax benefits. We believe that we have the appropriate support for the income tax positions taken and to be taken on our tax returns and that our accruals for tax liabilities are adequate for all open years based on an assessment of many factors including past experience and interpretations of tax law

EXHIBIT "3"

applied to the facts of each matter. Our federal and state tax returns open to audit generally include all years from 2008 and beyond.

We expect to sell real estate assets in the future and have determined that it is more likely than not that future taxable income, primarily from gains on the sales of real estate assets, will be sufficient to enable us to realize all of our deferred tax assets. Therefore, for each of the two years ended December 31, 2011 and 2010, no valuation allowance has been recorded.

55

## NOTE 14. NET INCOME (LOSS) PER SHARE

Net income (loss) per share is calculated based on the weighted average number of common shares outstanding. Stock options outstanding, OP Units and preferred shares have not been included in the net loss per share calculation since their effect on the losses would be antidilutive. Net income (loss) per share for each of the two years ended December 31, 2011 and 2010 is as follows (in thousands, except for shares and per share amounts):

| | Years ended December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | $ | $ |
| Loss from continuing operations | (17,529) | (14,212) |
| Net loss attributable to non-controlling interests from continuing operations | 12,164 | 6,454 |
| Loss from continuing operations attributable to American Spectrum Realty Inc. common stockholders | **(5,365)** | **(7,758)** |
| | | |
| Discontinued operations: | | |
| (Loss) income from discontinued operations | (2,553) | (5,546) |
| Gain on sale of discontinued operations | 26,016 | 4,315 |
| Income tax(expense) benefit | (6,150) | 447 |
| Net (income) loss attributable to non-controlling interests from discontinued operations | (7,949) | 505 |
| | | |
| Income (loss) from discontinued operations | 9,364 | (279) |
| Preferred stock dividend | (240) | (240) |
| Net Income (loss) attributable to American Spectrum Realty , Inc. common stockholders | **3,759** | **(8,277)** |
| | | |
| Basic and diluted per share data: | | |
| Income (loss) from continuing operations attributable to American Spectrum Realty, Inc. common stockholders | ($1.79) | $ (2.66) |
| Income (loss) from discontinued operations attributable to American Spectrum Realty, Inc. common | | |

| | | | |
|---|---|---|---|
| stockholders | | 3.11 | (0.10) |
| Net income (loss) attributable to American Spectrum Realty, Inc. common stockholders | $ | 1.32 | $ (2.76) |
| | | | |
| | | 3,008,83 | 2,916,14 |
| Basic weighted average shares used | | 6 | 5 |

The following outstanding preferred shares, employee stock options and OP units that can be converted into common stock on a one for one basis were excluded from the computation of diluted net income per share as they had an anti-dilutive effect:

| | Years ended, December 31, | |
|---|---|---|
| | 2011 | 2010 |
| Preferred shares | 55,172 | 55,172 |
| Stock Options | 17,500 | 58,750 |
| OP Units | 1,243,732 | 1,586,338 |
| Total | 1,316,404 | 1,700,260 |

## NOTE 15. SHARE-BASED COMPENSATION

Share-based compensation expense is measured at grant date, based on the fair value of the instrument, and is recognized as expense over the requisite service period.

The following table sets forth the total share-based compensation expense included in our Consolidated Statements of Operations:

| | Years Ended | |
|---|---|---|
| | 2011 | 2010 |
| | (in thousands) | |
| General and administrative | 195 | 181 |
| Total | $ 195 | $ 181 |

As of December 31, 2011, approximately $0.7 million total unrecognized share-based compensation expense related to non-vested awards is expected to be recognized over the respective vesting terms of each award over the weighted average period of 3.8 years.

56

*Valuation Assumptions*

Our determination of fair value of share-based payment awards on the date of grant using an option-pricing model is affected by our stock price as well as assumptions regarding a number of highly complex and subjective variables.

No options were granted during the twelve month periods ending December 31, 2011 and 2010.

The fair value of each option award is estimated on the date of grant using the Black-Scholes valuation model, consistent with the provisions of ASC 718. The Black-Scholes option-pricing model was developed for use in estimating the fair value of short-lived exchange traded options that have no vesting restrictions and are fully transferable. In addition, option-pricing models require the input of highly subjective assumptions, including the option's expected life and the price volatility of the underlying stock.

Our issued and outstanding stock options for the years ended December 31, 2011 and 2010 are fully vested and expensed.

We declared and paid cash dividends to common shareholders in 2003 but do not plan to pay cash dividends to common stock shareholders in the foreseeable future.

The fair value of each restricted stock award (RSA) is estimated on the date of grant based on the closing price of our stock on the grant date. Share-based compensation expense related to RSAs is recognized over the requisite service period.

### Equity Incentive Program and Restricted Stock Awards

We grant incentive and nonqualified stock options and RSA's to employees, consultants and directors under the Omnibus Stock Incentive Plan ("the Plan"). Stock options expire 10 years from the date they are granted and generally vest over service periods that range over three years. New shares are issued for options exercised and RSA's released. RSA's give the recipient the right to vote all shares, to receive and retain all cash dividends payable to holders of shares of record on or after the date of issuance and to exercise all other rights, powers and privileges of a holder of our shares, with the exception that the recipient may not transfer the shares during the restriction period that lapses over various periods ranging from one to three years.

We have reserved 360,000 shares under the Plan. As of December 31, 2011, we had issued 160,264 shares under the Plan.

The following table summarizes the combined activity under the equity incentive plans for the indicated periods:

| | Number of Options Outstanding | Weighted Average Exercise Price per Share | Number of RSAs | Weighted Average Grant-date fair value per Share |
|---|---|---|---|---|
| Balances at December 31, 2009 | 58,750 | $ 11.97 | 20,012 | |
| Granted | - | $ - | 28,500 | $ 13.76 |
| Options Exercised | - | $ - | | |

EXHIBIT "3"

| | | | | | |
|---|---|---|---|---|---|
| RSA Releases | | | | (9,500) | $  11.03 |
| Forfeited/Expired | - | $ | - | | |
| Balances at December 31, 2010 | 58,750 | $ | 11.97 | 39,012 | $  12.86 |
| | | | | | |
| Granted | - | $ | - | 34,500 | $  17.09 |
| Options Exercised | - | $ | - | | |
| RSA Releases | | | | (14,166) | $  12.45 |
| Forfeited/Expired | (41,250) | $ | 14.78 | (10,338) | $  12.87 |
| Balances at Dec 31, 2011 | 17,500 | $ | 7.03 | 49,008 | $  15.96 |

57

The intrinsic value of RSA's was approximately $0.2 million as of December 31, 2011. The intrinsic value of RSA's and the intrinsic value of exercisable in-the-money options was approximately $0.2 million as of December 31, 2011. The aggregate intrinsic value of the options and restricted stock awards outstanding at December 31, 2011 represents the total pretax intrinsic value, based on our closing stock price of $4.85 per share as of December 31, 2011, which would have been received by the grant holders, had all option holders with in-the-money options exercised their options as of that date and if all restricted stock awards were vested as of December 31, 2011.

Options outstanding, vested and currently exercisable by exercise price at December 31, 2011 are as follows:

| Range of Exercise Prices | | Number Outstanding and Exercisable | Weighted Average Remaining Contractual Term | Weighted Average Exercise Price | |
|---|---|---|---|---|---|
| | | | (in years) | | |
| $   4.05 | $   6.10 | 10,000 | 2.09 | $ | 5.46 |
| $   9.13 | $   9.13 | 7,500 | 4.35 | $ | 9.13 |
| $   4.05 | $   9.13 | 17,500 | | | |

During the years ended December 31, 2011 and 2010, we granted 34,500 and 28,500 restricted stock awards to certain officers and employees, respectively. The value of the restricted stock awards was based on the closing market price of our common stock on the date of each award. The total grant date fair value of the restricted stock awards granted during the year ended December 31, 2011 and 2010 was approximately $0.6 million and $0.4 million, respectively, which will be recognized over the vesting periods ranging from three to five years from the date of grant. The expense recorded for the years ended December 31, 2011 and 2010 was approximately $0.2 million and $0.2 million, respectively.

***Awards to Non-Employees***

In February 2011, we issued 15,000 shares of Common Stock to a firm as consideration for business advisory services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $209,650.

In July 2011, we issued 3,000 shares of Common Stock to a firm as consideration for consulting services. The fair value of the stock was based on the closing market price of our common stock on the date of the grant. The consideration for the shares amounted to $50,000.

In November 2011, we issued 25,685 shares of Common Stock to a firm as consideration as consideration for utility services. The fair value of the stock was based on the closing market price of our common stock on the date of grant. The consideration for the shares amounted to $300,000.

## NOTE 16. RESTRUCTURING OF DEBT

We have re-negotiated some of our accounts payable which resulted in extended payment terms and/or discounted amounts. Six agreements have promissory notes with interest rates that range between 5%-9% and the maturities of all fifteen arrangements occur between July 2011 and December 2015. We settled certain accounts payable during the year ending December 31, 2011 with creditors on a discounted basis and recorded other income of $0.5 million. We also recorded a gain of $2.7 million on the foreclosure of three properties, which is included as a component of discontinued operations. The combined gain of $3.2, million, net of taxes, amounts to $0.67 per share.

## NOTE 17. COMMITMENTS AND CONTINGENCIES

In June 2011, we reached a settlement with our insurance carrier, ACE American Insurance Company, with respect to our Hurricane Ike claims. We received net proceeds of approximately $4.0 million as a result of the settlement, which was net of attorney fees, expert fees, consulting fees and other costs associated with the claims. We recognized a gain on the settlement of approximately $4.1 million which is included as a component of other income on our consolidated statement of operations for the year ended December 31, 2011.

Certain other claims and lawsuits have arisen against us in our normal course of business including lawsuits by creditors with respect to past due accounts payable. We believe that such claims and lawsuits will not have a material adverse effect on our financial position, cash flows or results of operations.

58

---

Some of our notes payable require that we maintain minimum cash and tangible net worth. We believe we are in compliance with these requirements, except as to our loans in default.

On March 2, 2011, we filed an action against Evergreen Realty Group, LLC and certain of its affiliates ("Evergreen") relating to its acquisition of assets from Evergreen in January 2010. The purchase price of the assets was $18.0 million, subject to adjustment as provided in the purchase agreement, and was paid in the form of (a) the assumption of $500,000 of payables, (b) the

EXHIBIT "3"

issuance of a $9.5 million promissory note and (c) the issuance of operating partnership units which would be redeemable by Evergreen after June 30, 2011 for a number of shares of our common stock (or, at our option, the cash equivalent) equal to the quotient obtained by dividing $8.0 million by the greater of our share price or net asset value as of December 31, 2010. (Our share price as of December 31, 2010 was $17.52; our net asset value as of December 31, 2010 has not been definitively determined.) In our action, we are alleging various offsets and adjustments to the purchase price, as well as defaults by Evergreen, and are seeking damages and a declaration that the principal amount of the promissory note should be reduced to zero, that the operating partnership units should be cancelled and that Evergreen should refund to us payments of at least $578,000 which have been made on the promissory note. On March 7, 2011, New West Realty, Inc. ("New West"), an affiliate of Evergreen, filed a complaint for damages in Orange County Superior Court against ASR and other related entities. New West alleges in the complaint that ASR had failed to pay amounts then due under a $9.5 million promissory note held by New West. We have subsequently paid all amounts currently due and payable under the note and therefore dispute the claim and deny that any payment is now due under the note, and we have filed a separate lawsuit against New West and others seeking damages in excess of the amount of New West's claim.

## NOTE 18. PREFERRED STOCK

We are authorized to issue up to 25.0 million shares of one or more classes or series of preferred stock with a par value of $.01 per share.

On December 30, 2008, we filed Articles Supplementary to our Articles of Incorporation, which authorized the issuance of 68,965 of Series A Preferred Stock ("Preferred Stock").

On December 31, 2008, we issued 55,172 shares of the Preferred Stock to Messrs. Carden, Galardi, and Brown (Also see Note 10. Related Party Transactions). Each share of Preferred Stock was sold for $29.00 and is entitled to annual dividends, payable quarterly, at an annual rate of 15%, and to a preference on liquidation equal to the following: (a) if on or prior to December 31, 2011, the sum of $29.00 and any accrued and unpaid dividends or (b) if after December 31, 2011, the greater of (x) the sum of $29.00 and any accrued and unpaid dividends or (y) the amount which would be paid on account of each share of common stock upon liquidation if each share of Preferred Stock had hypothetically been converted into one share of common stock. The Preferred Stock is not required to be redeemed by us and the holders will have no right to require redemption. The Preferred Stock is redeemable at our option at any time after December 31, 2011. The shares were issued in a private transaction exempt from registration pursuant to Section 4(2) under the Securities Act of 1933, as amended.

As of December 31, 2011 there were accrued and unpaid dividends on the outstanding preferred shares of $60,000, or $.02 per share.

## NOTE 19. SUBSEQUENT EVENTS

In March 2012, we received a loan in the amount of $2.0 million. The loan, which matures in March 2013, is secured by several of the Company's assets. The loan will primarily be used for general corporate obligations and working capital.

In March 2012, Foxborough Business Park Center was sold for $4.9 million. In addition, Atrium 6420 was foreclosed on in March 2012. We anticipate recording a gain as a result of the foreclosure.

EXHIBIT "3"

In March 2012, we sold Park Ten Place I and II for $10.7 million and Sierra Southwest Pointe for $3.9 million. Net proceeds generated from the sales will be used to reduce corporate debt by approximately $2.0 million and accounts payable by approximately $1.0 million. We anticipate a gain will be recognized as a result of these sales.

59

## ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

### Item 9A. Controls and Procedures

Our Chief Executive Officer and Chief Financial Officer, are responsible for evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 (Exchange Act) Rules 13a-15(e) or 15d-15(e)) as of the end of the period covered by this annual report.

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time period specified in the rules and forms of the SEC. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports filed under the Securities Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure. As of the date of this report, we carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon and as of the date of that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports our Company files and submits under the Securities Exchange Act is recorded, processed, summarized and reported as and when required.

### Management's Report on Internal Control over Financial Reporting

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. As defined in Rules 13a-15(f) under the Securities Exchange Act of 1934, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive, principal accounting and principal financial officers, or persons performing similar functions, and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America.

The Company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records, that, in reasonable detail, accurately

EXHIBIT "3"

and fairly reflect the transactions and dispositions of the Company's assets; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of the Company's management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management, including the Company's Chief Executive Officer and Principal Financial Officer assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2011. In making this assessment, management used the framework in "Internal Control - Integrated Framework" promulgated by the Committee of Sponsoring Organizations of the Treadway Commission, commonly referred to as the "COSO" criteria. Based on the assessment performed, management believes that as of December 31, 2011, the Company's internal control over financial reporting was effective based upon the COSO criteria. Additionally, based on management's assessment, the Company determined that there were no material weaknesses in its internal control over financial reporting as of December 31, 2011.

This Annual Report does not include an attestation report of the Company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the SEC that permit the Company to provide only management's report in this Annual Report.

60

---

**Changes in Internal Controls**

There has not been any change in our internal control over financial reporting during the fourth quarter of 2011 that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

**ITEM 9B. OTHER INFORMATION**

None.

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

The following table sets forth certain information concerning the directors and executive officers of the Company and its principal subsidiaries:

EXHIBIT "3"

| NAME | POSITION | AGE | TIME IN OFFICE |
|---|---|---|---|
| William J. Carden | Chairman of the Board and Chief Executive Officer | 67 | Since 2000 |
| | President | | Since 2002 |
| | President, ASRM | | Since 2011 |
| G. Anthony Eppolito | Chief Financial Officer, | 44 | Since 2007 |
| | Vice President, Treasurer and Secretary | | Since 2006 |
| Elisa R. Grainger | Chief Accounting Officer and Vice President | 45 | Since 2011 |
| Paul E. Perkins | Managing Director, ASRA | 46 | Since 2010 |
| John N. Galardi | Director | 74 | Since 2003 |
| Presley E. Werlein, III | Director | 65 | Since 2006 |
| D. Brownell Wheless | Director | 63 | Since 2011 |

William J. Carden - Mr. Carden is Chairman of the Board, Chief Executive Officer and President. Mr. Carden has served as Chairman of the Board and Chief Executive Officer since the formation of the Company and as President since 2002. Mr. Carden has also served as President of American Spectrum Realty Management, LLC ("ASRM"), a wholly-owned subsidiary of the Company, since November 2011. Mr. Carden also serves as President and a director of American Spectrum REIT, Inc. and Evergreen Income & Growth REIT, Inc. Mr. Carden has been a director of CGS Real Estate Company, Inc. since 1989. He received an accounting degree from California State University, in Long Beach, California. Mr. Carden brings real estate development and management, investment, business development, and executive leadership expertise to the Board.

G. Anthony Eppolito – Mr. Eppolito was appointed Chief Financial Officer in March 2007. Mr. Eppolito has served as Vice President, Treasurer and Secretary since January 2006. Mr. Eppolito has been with the Company since inception. Mr. Eppolito holds a Bachelor of Business Administration in Accounting from Texas A&M University in College Station, Texas and is a Certified Public Accountant.

Elisa R. Grainger – Ms. Grainger was appointed Chief Accounting Officer and Vice President in May 2011. For over 15 years, Mrs. Grainger has held senior level financial positions that involved creating, managing and maintaining accounting and financial systems in public, private and entrepreneurial real estate companies. Ms. Grainger holds a Bachelor of Science and Administration in Accounting from California State University - Los Angeles. She became a Certified Public Accountant while working at KPMG.

Paul E. Perkins – Mr. Perkins was appointed Managing Director of American Spectrum Realty Advisors, LLC ("ASRA"), in January 2010. ASRA is a wholly-owned subsidiary of the Company. Mr. Perkins provides advisory services to owners and managers of real estate in the areas of finance, recapitalization, loan work outs, acquisitions, dispositions and all related matters. Mr. Perkins also served as interim President of ASRM from February 2011 to November 2011. Prior to returning to ASR (2000-2004) Mr. Perkins worked for CBRE Institutional Properties Investment Sales Group (2005-2008) and Red Mountain Development Group (2008-2010) as VP of Finance and Investments. Mr. Perkins holds an undergraduate degree in business and finance from the University of Southern California and a master's degree in real estate investments from New York University.

EXHIBIT "3"

John N. Galardi – Mr. Galardi is a director of the Company. Mr. Galardi has been the Chairman and Chief Executive Officer of Galardi Group, Inc., a privately-held franchising company encompassing more than 450 restaurants, including the Wienerschnitzel and Tastee Freez chains for more than the last five years. Mr. Galardi has been a director of CGS Real Estate Company, Inc. since 1989. Mr. Galardi has served on the Boards of BCT International, Inc. in Fort Lauderdale, Florida, and Renovar Energy Corporation in Midland, Texas. He has also served on the Board of Advisors of National Bank of Southern California and Marine National Bank. Mr. Galardi attended Southwest Baptist University in Missouri. Mr. Galardi brings investment, business development, real estate development and executive leadership expertise to the Board.

Presley E. Werlein, III – Mr. Werlein is a shareholder in Werlein & Harris, P.C., a certified public accounting firm in Houston, Texas. He serves as President and Chief Executive Officer of Verde Capital, LLC, which is involved with institutions energy retrofits. He also serves as President of Parismina Advisors, LLC, which provides consulting services with respect to New Market's Tax Credits. Mr. Werlein is a Certified Public Accountant and holds a Bachelor of Business Administration in Accounting from the University of Texas in Austin, Texas. Mr. Werlein is Chairman of the Company's Audit Committee and is a member of the Company's Compensation and Nominating/Corporate Governance Committees. Mr. Werlein brings accounting, financial services and business development expertise to the Board.

D. Brownell Wheless - Mr. Wheless is a partner in NuSource Financial Group, LLP and is a Certified Public Accountant. He holds an undergraduate degree in Economics from Rice University and has performed post graduate work at the University of Texas in Austin with a concentration in accounting. Mr. Wheless is a member of the Company's Audit, Compensation and Nominating/Corporate Governance Committees. Mr. Wheless brings accounting, financial services and executive leadership expertise to the Board.

The Company has adopted Standards of Business Conduct, a copy of which is available on the Company's website: www.americanspectrum.com, which are applicable to its executive officers and directors.

**Director Independence**

The Board has determined that each person who served as a director during 2011, other than Mr. Carden and Mr. Galardi, was and is "independent" under the standards of the NYSE Amex ("Exchange") applicable to the Company.

**The Structure of the Board of Directors**

The Board is structured to provide for an appropriate balance between the powers of the CEO and the independent directors such that the ability of the independent directors to be informed, to discuss and debate issues they deem important, and to act objectively on an informed basis is not compromised. In creating the structure of the Board, the Company believes that the objective is to strengthen the independence and role of the Board with appropriate checks and balances on the power, actions and performance of the CEO. The Company firmly believes that the board

EXHIBIT "3"

structure allows for appropriate oversight by the Board in fulfilling its duties to the Company and to its stockholders. The Board has not designated a lead director position.

The Board believes that having the same person serve as Chairman of the Board and CEO is in the best interests of its shareholders because it demonstrates for our employees, vendors, tenants, and other stakeholders that the Company is under strong leadership, with a single person setting the tone and having primary responsibility for managing our operations. The Board believes that separating the two positions could cause duplication of efforts or confusion among parties that deal with the Company on a daily basis. Like the Company, many real estate companies and U.S.-based companies believe that combining the positions of Chairman of the Board and CEO, when coupled with an independent Board, is an efficient and effective method in protecting the interests of stockholders and enhancing stockholder value.

Our Board of Directors is primarily responsible for overseeing the Company's risk management processes. This responsibility has been delegated by the Board to the Audit Committee, the Compensation Committee and the Investment Committee, each with respect to the assessment of the Company's risks and risk management in its respective areas of oversight. These committees and the full Board focus on the most significant risks facing the Company and the Company's general risk management strategy, and also ensure that risks undertaken by the Company are consistent with the Board's appetite for risk. While the Board oversees the Company's risk management, Company management is responsible for day-to-day risk management processes. The Company believes this division of responsibilities is the most effective approach for addressing the risks facing the Company and that the leadership structure of the Board supports this approach.

62

---

**Information on Meetings and Committees of the Board of Directors**

In 2002, the Board established an Audit Committee and a Compensation Committee and in 2003 established a Nominating/Corporate Governance Committee and an Investment Committee. During 2011, the Board held seven meetings. During 2011, the Audit Committee held four meetings, the Compensation Committee held two meetings and the Nominating/Corporate Governance Committee held one meeting. All directors attended at least 75% of the meetings of the Board and the committees of which they are members.

**Audit Committee**

The Audit Committee is composed of Mr. Werlein and Mr. Wheless. Each of the members of the Audit Committee is independent within the meaning of the listing standards of the Exchange. The Board has determined that Mr. Werlein is an audit committee financial expert within the meaning of the rules of the Securities and Exchange Commission ("SEC"). In 2011, the Audit Committee held regular and quarterly meetings throughout the year. The Audit Committee has the authority, among other things, to appoint and dismiss the Company's independent auditors, discuss the scope and results of the audit with the independent auditors, review with management and the independent auditors the Company's interim and year-end operating results, consider the adequacy of the Company's internal accounting controls and audit procedures and review non-audit services to be performed by the independent auditors.

**Report of the Audit Committee**

EXHIBIT "3"

The Audit Committee is composed of two directors, acts under the written charter adopted and approved by the Board, and is independent, within the meaning of the listing standards of the Exchange. A copy of the charter can be found on the Company's website at www.americanspectrum.com. The Audit Committee members do not serve as professional accountants or auditors and their functions are not intended to duplicate or to certify the activities of management and the independent auditors. The Committee assists the Board in its oversight of the Company's financial reporting process and selects the independent auditors. The Committee receives information from, consults with, and provides its views and direction to, management and the independent auditors on the basis of the information it receives and the experience of its members in business, financial and accounting matters.

Management has the primary responsibility for the financial statements and the reporting process. The independent auditors are responsible for expressing an opinion on the conformity of the Company's audited financial statements to generally accepted accounting principles. The Audit Committee reviews the Company's financial reporting process on behalf of the Board.

In this context, the Audit Committee (i) appointed the independent auditors and (ii) reviewed and discussed with management and EEPB, P.C. the Company's audited financial statements for 2011. The Audit Committee has also discussed with the independent auditors the matters required to be discussed by Statement on Auditing Standards No. 61 (Communication with Audit Committees) and has received from the independent auditors the written disclosures and the letter required by Independence Standards Board Standard No. 1 (Independence Discussion with Audit Committees) and discussed with them their independence from the Company and its management. Further, the Audit Committee has considered whether the independent auditors' provision of certain non-audit services, namely tax return preparation, to the Company is compatible with the auditor's independence.

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board that the audited financial statements be included in the Company's Annual Report filed with the Securities and Exchange Commission on Form 10-K for 2011.

Respectfully submitted,

**AUDIT COMMITTEE**
Presley E. Werlein III, Chairman
D. Brownell Wheless

63

---

**Nominating Committee**

The Nominating/Corporate Governance Committee (the "Nominating Committee") was established by the Board in 2003 and is composed of Mr. Werlein and Mr. Wheless, each of whom is independent within the meaning of the listing standards of the Exchange. The Nominating Committee has a charter, a copy of which can be found on the Company's website at www.americanspectrum.com. The Nominating Committee selects or recommends that the Board select all candidates for all directorships and will consider candidates put forward by stockholders, who should follow the procedures set forth below under "Stockholder Proposals for the Company's 2013 Annual Meeting." In identifying candidates for membership on the Board of

EXHIBIT "3"

Directors, the Nominating Committee takes into account all factors it considers appropriate, which may include ensuring that the Board of Directors, as a whole, consists of individuals with various and relevant career experience, relevant technical skills, industry knowledge and experience, financial expertise, local or community ties and minimum individual qualifications, including strength of character, mature judgment, familiarity with the Company's business and industry, independence of thought and an ability to work collegially. The Nominating Committee also may consider the extent to which the candidate would fill a particular need on the Board.

Diversity is an important strategic initiative at the Company and has relevance with respect to the Company's employees, clients, tenants and shareholders. Accordingly, the Nominating Committee also recognizes the importance of diversity in identifying its director nominees. The Nominating Committee does not currently have a policy in place regarding diversity in director nominations, but recognizes that "diversity" has several dimensions and is important for the Board of Directors.

**Compensation Committee**

The Compensation Committee was established by the Board in 2002 and is composed of Mr. Werlein and Mr. Wheless. No member of the Compensation Committee has served as an officer of the Company or any of its subsidiaries. The Compensation Committee has the authority to review and approve salary arrangements, including grants of annual incentive awards for the Company's directors, officers and other employees, adopt and amend employment agreements for its officers and other employees, and administer the Company's stock plan. The Compensation Committee has full authority to determine executive and director compensation. Management recommendations may be considered by the Compensation Committee. The Compensation Committee does not generally engage compensation consultants but may do so in the future. The Compensation Committee has a charter, a copy of which can be found on the Company's website at www.americanspectrum.com.

**SECTION 16(a)**
**BENEFICIAL OWNERSHIP REPORTING COMPLIANCE**

Section 16(a) of the Securities Exchange Act of 1934, as amended, requires the Company's directors, executive officers and persons who own more than 10% of the Company's Common Stock, to file reports of ownership of, and transactions in, the Company's securities with the SEC, the Exchange and the Company. Based solely on the review of copies of such filings received by the Company or any written representations from certain reporting persons, the Company believes that its directors, officers and 10% or more stockholders timely filed all reports required of them during 2011 under Section 16(a) except for one late Form 4 filing by Mr. Carden reporting three transactions.

**ITEM 11. EXECUTIVE COMPENSATION**

The following table sets forth the compensation paid by the Company to its named executive officers.

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($) (a) | Total ($) |
|---|---|---|---|---|---|
| William J. Carden | 2011 | 589,491 | -- | 17,090 | 606,581 |
| Chief Executive Officer | 2010 | 557,000 | -- | 11,550 | 568,550 |

| | | | | | |
|---|---|---|---|---|---|
| G. Anthony Eppolito | 2011 | 155,209 | -- | 85,450 | 240,659 |
| Chief Financial Officer | 2010 | 171,901 | -- | 23,100 | 195,001 |
| Paul E. Perkins | 2011 | 225,000 | -- | 170,900 | 395,900 |
| President, ASRA | 2010 | 146,920 | -- | 76,250 | 223,170 |

_____
(a)    For 2011, represents the following numbers of restricted shares granted on July 1, 2011: 1,000 shares to Mr. Carden, 5,000 shares to Mr. Eppolito and 10,000 shares to Mr. Perkins. For 2010, represents the following numbers of restricted shares granted on May 12, 2010: 1,000 shares to Mr. Carden and 2,000 shares to Mr. Eppolito; and on November 10, 2010: 5,000 shares to Mr. Perkins. The dollar values are based on the fair market value on the date of grant. The restricted shares are subject to repurchase by the Company upon termination of the individual's employment for a price of $.02 per share. With respect to Mr. Carden, the repurchase restriction for the shares granted in 2011 and 2010 lapses in three equal installments with the first investment lapsing on the anniversary of the grant date. With respect to Mr. Eppolito, the repurchase restriction for the shares granted in 2011 lapses in five equal annual installments with the first investment lapsing on the anniversary of the grant date; and for the shares granted in 2010 lapses in three equal annual installments with the first investment lapsing on the anniversary of the grant date. With respect to Mr. Perkins, the repurchase restriction for the shares granted in 2011 lapses in five equal annual installments with the first investment lapsing on the anniversary of the grant date; and for the shares granted in 2010 lapses in five equal annual installments with the first investment lapsing on January 1, 2011. The recipients of restricted stock paid no consideration to the Company for their shares, have the right to vote their shares, to receive and retain all cash dividends payable to the Company's stockholders and to exercise all rights, powers and privileges of a stockholder, with the exception that the recipient may not transfer the Common Stock during the restricted period.

64

**Stock Incentive Plan**

The Company has in effect Omnibus Stock Incentive Plan (the "Plan"), which was established by the Board in 2001, is administered by the Compensation Committee and provides for the granting of options, stock appreciation rights, restricted stock and performance units and shares, as may be determined by the Board. Under the Plan, up to a total of 360,000 shares of the Company's Common Stock may be issued to executive officers, directors or other key employees of the Company. Options to acquire Common Stock are expected to be in the form of incentive and non-qualified stock options and are exercisable for up to ten years following the date of the grant. The Board sets the exercise price of each option, but the Plan requires that the exercise price per share equal or exceed the fair market value of the Company's Common Stock on the grant date. As of December 31, 2011, the Plan had 199,716 shares available for issuance.

**Employment Agreements**

On January 1, 2012, Mr. Eppolito and the Company entered into a three month employment that provided for a monthly base salary of $9,000 and the accelerated vesting of Mr. Eppolito 6,834 unvested restricted shares. The agreement also provides for a three month severance in the event the agreement is not extended upon expiration.

Mr. Carden and Mr. Perkins do not have employment contacts.

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END**

The following table sets forth information regarding option award and stock awards as of December 31, 2011 by the named executive officers.

| Name | Option Awards | | | Stock Awards | |
| | Number of securities underlying unexercised options (#) | Option exercise price per share ($) | Option expiration date | Number of shares of stock that have not vested (#)(a) | Market value of shares of stock that have not vested ($)(b) |
| --- | --- | --- | --- | --- | --- |
| William J. Carden | -- | -- | -- | 2,002 | 28,352 |
| G. Anthony Eppolito | -- | -- | -- | 6,834 | 106,156 |
| Paul E. Perkins | -- | -- | -- | 14,000 | 231,900 |

_____

(a)   Represents unvested shares of restricted stock granted in 2009, 2010 and 2011. For 2009, represents the following numbers of restricted shares granted on May 8, 2009: 1,000 shares to Mr. Carden and 1,500 shares to Mr. Eppolito. For 2010, represents the following numbers of restricted shares granted on May 12, 2010: 1,000 shares to Mr. Carden and 2,000 shares to Mr. Eppolito; and on November 10, 2010: 5,000 shares to Mr. Perkins. For 2011, represents the following number of restricted shares granted on July 1, 2011: 1,000 shares to Mr. Carden; 5,000 shares to Mr. Eppolito and 10,000 shares to Mr. Perkins. With respect to Mr. Carden, the repurchase restriction for the shares granted in 2009, 2010 and 2011 lapses in three equal installments with the first investment lapsing on the anniversary of the grant date. With respect to Mr. Eppolito, the repurchase restriction for the shares granted in 2009 and 2010 lapses in three equal installments with the first investment lapsing on the anniversary of the grant date; and lapses for the shares granted in 2011 in five equal installments with the first investment lapsing on the anniversary of the grant date. With respect to Mr. Perkins, the repurchase restriction for the shares granted in 2010 lapses in five equal annual installments with the first investment lapsing on January 1, 2011; and for the shares granted in 2011 lapses in five equal installments with the first investment lapsing on the anniversary of the grant date. The restricted shares are subject to repurchase by the Company upon termination of the individual's employment for a price of $.02 per share.

(b)   The market value of shares is based on the fair market value on the date of grant.

_____

**Compensation of Directors**

Each non-employee director receives $12,000 annually for serving on the Board, $1,000 for each meeting attended in person and $500 for each telephonic meeting in which the director participates, including any committee meetings. Mr. Werlein also received a total of $52,000 in 2011 for serving as Chairman of the Audit Committee. A director may elect to receive the fee in cash or in Common Stock valued at its then fair market value. Each director is also reimbursed

EXHIBIT "3"

for travel expenses for attending meetings. During 2011, each non-employee director was also granted 1,000 shares of restricted stock, which vest in three equal installments on the first, second and third anniversary of the grant date.

The following table sets forth information regarding director compensation for the year ended December 31, 2011 (excludes named executive officers).

### DIRECTOR COMPENSATION

| Name | Fees earned or paid in cash ($) | Stock awards ($) (a) | Option awards ($) (b) | Total ($) |
|---|---|---|---|---|
| John N. Galardi | 17,000 | 17,090 | -- | 34,090 |
| Presley E. Werlein | 83,000 | 17,090 | -- | 100,090 |
| D. Brownell Wheless | 12,000 | -- | -- | 12,000 |
| Timothy R. Brown | 20,000 | 17,090 | -- | 37,090 |
| William W. Geary, Jr. | 13,000 | -- | -- | 13,000 |

(a)    Represents the following number of restricted shares granted on July 1, 2011: Mr. Galardi - 1,000; Mr. Werlein - 1,000; and Mr. Brown - 1,000. The market value of the shares is based on the fair market value on the date of grant. At December 31, 2011, the aggregate number of restricted stock awards outstanding was: Mr. Galardi - 2,002; and Mr. Werlein - 2,002.

(b)    At December 31, 2011, the aggregate number of option awards outstanding was: Mr. Galardi – 12,500; and Mr. Werlein – 5,000. All of these option awards were vested at December 31, 2011.

### ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

### SECURITY OWNERSHIP OF
### MANAGEMENT AND PRINCIPAL STOCKHOLDERS

The following table provides information regarding the beneficial ownership of Common Stock as of February 29, 2012, by (i) each of the Company's directors and nominees, (ii) each of the Company's executive officers, (iii) all directors, nominees and executive officers as a group and (iv) each person known by the Company to be the beneficial owner of more than 5% of the outstanding shares of Common Stock. This table is based on information provided to the Company or filed with the SEC by the Company's directors, nominees, executive officers and principal stockholders. Except as otherwise indicated, the Company believes that the beneficial owners of the Common Stock listed below, based on information furnished by such owners, have sole investment and voting power with respect to such shares, subject to community property laws where applicable.

66

---

| | NUMBER OF SHARES OF | PERCENTAGE OF OUTSTANDING |
|---|---|---|

EXHIBIT "3"

| NAME OF BENEFICIAL OWNER (1) | COMMON STOCK (2) | COMMON STOCK (3) |
|---|---|---|
| William J. Carden (4) | 873,750 | 24.4% |
| John N. Galardi (5) | 632,025 | 17.6% |
| Paul E. Perkins (6) | 15,000 | * |
| G. Anthony Eppolito (7) | 11,500 | * |
| Presley E. Werlein, III (8) | 9,668 | * |
| Elisa R. Grainger (9) | 5,000 | * |
| All Directors, Nominees and Executive Officers as a Group (6 persons) (10) | 1,521,787 | 42.3% |
| John V. Winfield (11) | 361,950 | 9.3% |
| Evergreen Income & Growth REIT, LP (12) | 214,340 | 6.0% |
| Cynthia L. Galardi (13) | 202,130 | 5.6% |

_____

\*     Less than 1%

(1)     Except as specifically noted in the footnotes below, the address of each of the named beneficial owners is c/o American Spectrum Realty, Inc., 2401 Fountain View, Suite 510, Houston, Texas 77057.

(2)     For each beneficial owner, includes Common Stock subject to options or conversion rights exercisable, respectively, within 60 days of February 29, 2012. Includes, as to Mr. Galardi, Common Stock issuable upon exchange of Operating Partnership Units.

(3)     The percentage ownership is based on 3,577,783 outstanding shares of Common Stock as of February 29, 2012 as well as shares deemed outstanding pursuant to Rule 13d-3(d)(1) under the Exchange Act.

(4)     Includes 603,259 shares of Common Stock owned by Mr. Carden and the persons or entities listed as follows: (i) 217,576 shares of Common Stock owned by Mr. Carden's spouse, (ii) 22,764 shares of Common stock owned by a company controlled by Mr. Carden, and (iii) 25,156 shares of Common Stock owned by a company controlled by Mr. Carden in which Mr. Galardi owns a significant interest. Certain shares referenced above may be deemed to be beneficially owned by Mr. Carden and may also be deemed to be beneficially owned by Mr. Galardi. Mr. Carden disclaims beneficial ownership of the shares held by his spouse. Includes 603,254 shares of Common Stock owned by Mr. Carden. Also includes 1,000 shares of restricted stock granted May 8, 2007, 1,000 shares of restricted stock granted May 13, 2008, 1,000 shares of restricted stock granted May 8, 2009, 1,000 shares of restricted stock granted May 12, 2010 and 1,000 shares of restricted stock granted July 1, 2011 to Mr. Carden, which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant.

(5)     Includes 462,004 shares of Common Stock and 2,268 shares issuable upon exchange of Operating Partnership Units owned by Mr. Galardi. Includes 25,156 shares of Common Stock owned by a company in which Mr. Galardi owns a significant interest. Certain shares referenced above may be deemed to be beneficially owned by Mr. Galardi and may also be deemed to be beneficially owned by Mr. Carden. Includes 125,097 shares owned jointly

with Timothy R. Brown, a former director of the Company. Also includes 12,500 shares, which Mr. Galardi has the right to acquire upon the exercise of stock options within sixty days of February 29, 2011. Also includes 1,000 shares of restricted stock granted May 8, 2007, 1,000 shares of restricted stock granted May 13, 2008, 1,000 shares of restricted stock granted May 8, 2009, 1,000 shares of restricted stock granted May 12, 2010 and 1,000 shares of restricted stock granted July 1, 2011, which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant.

(6)     Includes 5,000 restricted shares granted November 10, 2010, which vest in five equal annual installments with the first installment vesting on January 1, 2011. Also includes 10,000 restricted shares granted July 1, 2011 which vest in five equal installments with the first installment vesting on the anniversary of the date of grant.

(7)     Includes 1,500 restricted shares granted May 8, 2007, 1,500 restricted shares granted May 13, 2008, 1,500 restricted shares granted May 8, 2009 and 2,000 restricted shares granted on May 12, 2010, which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant. Also includes 5,000 restricted shares granted July 1, 2011 which vest in five equal installments with the first installment vesting on the anniversary of the date of grant.

67

---

(8)     Includes 5,000 shares of Common Stock which Mr. Werlein has the right to acquire upon the exercise of stock options within sixty days of February 29, 2012. Also includes 668 shares of restricted stock granted May 8, 2007, 1,000 shares of restricted stock granted May 13, 2008, 1,000 shares of restricted stock granted May 8, 2009, 1,000 shares of restricted stock granted on May 12, 2010 and 1,000 shares of restricted stock granted July 1, 2011, which vest in three equal annual installments with the first installment vesting on the anniversary of the date of grant.

(9)     Represents 5,000 restricted shares granted July 1, 2011, which vest in five equal annual installments with the first installment vesting on the anniversary of the date of grant.

(10)    Includes (i) 217,576 shares of Common Stock owned by Mr. Carden's spouse, (ii) 22,764 shares of Common Stock owned by a company controlled by Mr. Carden, (iii) 25,156 shares of Common Stock owned by a company controlled by Mr. Carden and in which Mr. Galardi owns a significant interest, (iv) 2,268 shares issuable upon exchange of Operating Partnership units owned by Mr. Galardi, (v) 4,168 shares of restricted stock granted May 8, 2007, 4,500 shares of restricted stock granted May 13, 2008, 4,500 shares of restricted stock granted May 8, 2009, 5,000 shares of restricted stock granted on May 12, 2010, 5,000 shares of restricted stock granted November 10, 2010 and 23,000 shares of restricted stock granted July 1, 2011, and (vi) 17,500 shares of Common Stock, which certain directors have the right to acquire upon the exercise of stock options within sixty days of February 29, 2011. Mr. Carden disclaims beneficial ownership of the shares and held by his spouse and trusts for his children. Does not include shares owned by Evergreen Income and Growth REIT, L.P.

(11)    Mr. Winfield's address is 820 Moraga Drive, Los Angeles, California 90049.

(12)    Evergreen Income & Growth REIT, LP's address is 7700 Irvine Center, Suite 780, Irvine, California 92618. Evergreen Income & Growth REIT, Inc. is the general partner of

Evergreen Income & Growth REIT, LP. Mr. Carden is the Chief Executive Officer and a director of Evergreen Income and Growth REIT, L.P.

(13)    Ms. Galardi's address is 3511 Race St., Portsmouth, Virginia, 23707.

In addition, Evergreen owns certain operating partnership units which are redeemable for an indeterminate number of shares or amount of cash. See Item #3.

## ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

### Certain Relationships and Related Transactions

In December 2011 John Galardi, a principal stockholder and director, loaned $0.25 million to the Company and pledged $0.4 million in certificates of deposit to additionally secure another loan of the Company.

In September 2010, the Company acquired two notes receivable, each with a face amount of $0.5 million, and interests in three apartment complexes (Centennial Park Investors, LLC, Town Center Investors, LLC and EP Investors LLC). and one student housing facility (Campus Court TIC 1, LLC). The acquisitions, which were acquired from American Spectrum REIT I, Inc. ("ASRI") for a total purchase price of $1.3 million, were funded by the issuance of 102,697 OP Units. The number of units have been adjusted to effect a two- for one- reverse split of all OP units. William J. Carden is a director and President of ASRI. Mr. Carden is Chief Executive Officer, Chairman of the Board, and a principal stockholder in the Company. The two $0.5 million notes bear interest at a rate of 12% per annum and are payable on demand from Evergreen Realty Group, LLC ("ERG").

In June 2010, the Company acquired a 55% interest in Sabo Road Acquisitions, LP, which owns a 57,850 square foot self-storage property located in Houston, Texas (A Plus Self Storage). The partnership interest acquired consists of the sole general partnership interest and a limited partnership interest. Also in June 2010, the Company acquired a 38.4% undivided interest in Loop 1604, a 178,595 square foot self-storage property located in San Antonio, Texas. The acquisitions were acquired from ASRI for a total purchase price of approximately $1.7 million, consisting of the 150,475 OP Units and cash of $0.1 million. In June 2010, the Company acquired two notes receivable ($1.0 million and $0.4 million each) and an account receivable of $0.4 million from Evergreen Income & Growth REIT, LP ("EIGRLP") with a total carrying value of $2.1 million, including $0.3 million of accrued and unpaid interest. The acquisition was funded by the issuance of 214,340 OP Units.

68

---

The note, in the amount of $1.0 million, has a stated interest rate of 12% per annum. The note and accrued interest is receivable on demand from Central Florida Self Storage Acquisitions, LLC, an entity in which the Company has a non-economic tenant in common interest. Accrued and unpaid interest on the note totaled approximately $0.2 million at December 31, 2011. The Company has not recognized interest income on the note since its acquisition. The note is secured by two properties in Florida. The Company has commenced foreclosure proceedings against these two properties. The note in the amount of $0.4 million, which was due from ASRI,

EXHIBIT "3"

bore interest at 10% per annum. This note and accrued interest of approximately $0.1 million, was paid to the Company in January 2011. The account receivable acquired, which totaled approximately $0.4 million, is due from ERG. The account receivable is related to organizational and offering costs paid in excess of the amounts established in EIGRI's 2008 private placement agreement.

In May 2010, the Company obtained financing for insurance premiums on both its owned and third party managed properties of which approximately $2.1 million was attributable to the Evergreen property portfolio. During 2010, the Company received approximately $2.0 million from these properties as payment on the premiums.

Mr. Carden is a director and President of Evergreen Income & Growth REIT, Inc. ("EIGRI"), the general partner of EIGRLP. The Company does not have an ownership interest in EIRGI or EIGRLP.

The Company pays a guarantee fee to Mr. Carden, Mr. Galardi and CGS Real Estate Company, Inc., a company owned indirectly by Messrs. Carden and Galardi ("the Guarantors"), in consideration for their guarantees of certain obligations of the Company. The Guarantors are paid an annual guarantee fee equal to between .25% and .75% (depending on the nature of the guarantee) of the outstanding balance as of December 31 of the guaranteed obligations ("Guarantee Fee"). The Guarantee Fee paid for the year ended December 31, 2010 was approximately $80,000. The Guarantee Fee paid for the year ended December 31, 2011 was approximately $165,000. The following property notes are being guaranteed: 800/888 Sam Houston Parkway, Beltway Industrial, 2620/2630 Fountain View, 2640/2650 Fountain View. There are also six corporate notes being guaranteed. These guaranteed notes total $32.1 million. See Note 11. Notes Payable.

During 2007, the Company entered into a lease agreement with Galardi Group as a tenant for 15,297 square feet of office space at the Company's 7700 Irvine Center property. Mr. Galardi is a principal stockholder, director and officer of Galardi Group. The lease commenced March 1, 2008 and has a five-year term. The annual base rent due to the Company pursuant to the lease was approximately $0.5 million over the term of the lease. 7700 Irvine Center Drive was sold in June 2011. During the same year, the Company subleased space back from the Galardi Group 2,396 square feet of office space. This sublease expires February 28, 2013. The annual base rent on this sublease is $79,000. As of December 31, 2011, $26,356 was due to the Galardi Group.

**Director Independence**

The Board has determined that each person who served as a director during 2011, other than Mr. Carden and Mr. Galardi, was and is "independent" under the standards of the NYSE Amex ("Exchange") applicable to the Company.

## ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

EEPB, P.C. has served as the Company's independent auditors since August 2010. Hein & Associates, LLP served as the Company's independent auditors from April 2006 to August 2010.

The Audit Committee reviewed and pre-approved all audit and permissible non-audit services performed by EEPB, P.C. and Hein & Associates, LLP, as well as the fees paid for such services. Fees billed by EEPB, P.C. and Hein & Associates, LLP in 2011 and 2010 were as follows:

Fees billed by EEPB, P.C.:

EXHIBIT "3"

| Year | Audit Fees | Audit-Related Fees | Tax Fees | All Other Fees |
|------|-----------|--------------------|----------|----------------|
| 2011 | $ 253,647 | -- | -- | -- |
| 2010 | $ 195,780 | -- | -- | -- |

69

Fees billed by Hein & Associates, LLP:

| Year | Audit Fees | Audit-Related Fees | Tax Fees | All Other Fees |
|------|-----------|--------------------|----------|----------------|
| 2011 | $ -- | -- | -- | -- |
| 2010 | $ 35,427 | -- | -- | -- |

**PART IV**

**ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES**

(a)    1. *Consolidated Financial Statements and Supplementary Data*

The following financial statements are included herein under Item 8 of this report:

|  | Page No. |
|--|----------|
|  | 2 |
| Report of Independent Registered Public Accounting Firm | 9 |
| Consolidated Balance Sheets at December 31, 2011 and 2010 | 30 |
| Consolidated Statements of Operations for the years ended December 31, 2011 and 2010 | 31 |
| Consolidated Statements of Equity (Deficit) for the years ended December 31, 2011 and 2010 | 32 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2011 and 2010 | 33 |
| Notes to Consolidated Financial Statements | 35 |
| (2) Financial Statement Schedules |  |
| Schedule II — Valuation and Qualifying Accounts | 71 |
| Schedule III — Real Estate Investments and Accumulated Depreciation | 72 |

EXHIBIT "3"

| (3) | Exhibits to Financial Statements |
| --- | --- |

| | On December 12, 2011, a report on Form 8-K was filed with respect to Item 8.01.<br>On November 15, 2011, a report on Form 8-K was filed with respect to Item 2.02.<br>On November 17, 2011, a report on Form 8-K was filed with respect to Item 5.02. |
| --- | --- |

| (b) | Exhibits |
| --- | --- |

| | The Exhibit Index attached hereto is hereby incorporated by reference to this Item. |
| --- | --- |

70

---

**AMERICAN SPECTRUM REALTY, INC.**
**SCHEDULE II – VALUATION AND QUALIFYING ACCOUNTS**
**(Dollars in thousands)**

| | Balance at Beginning of Period | Additions | Utilized | Balance at End of Period |
| --- | --- | --- | --- | --- |
| Allowance for Doubtful Accounts Year Ended: | | (in thousands) | | |
| December 31, 2011 | $ 421 | 1,583 | (998) | $ 1,006 |
| December 31, 2010 | $ 701 | 703 | (983) | $ 421 |

71

---

**NOTE TO SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIATION**

Changes in real estate investments and accumulated depreciation for the year ended December 31 were as follows:

| | Years ended, December 31, | |
| --- | --- | --- |
| | 2011 | 2010 |
| | (in thousands) | |

EXHIBIT "3"

***ASR owned properties***

**Rental Property:**

| | | | | |
|---|---|---:|---|---:|
| Balance at beginning of year | | $ | 264,901 | $ | 251,336 |
| Additions during year: | | | | | |
| Property acquisitions and additions | | | 4,175 | | 13,565 |
| Retirements | | | (84,553) | | - |
| Impairments | | | (2,527) | | - |
| **Balance at end of year** | | **$** | **181,996** | **$** | **264,901** |

**Accumulated Depreciation:**

| | | | | |
|---|---|---:|---|---:|
| Balance at beginning of year | | $ | 85,644 | $ | 72,404 |
| Additions during year: | | | | | |
| Depreciation | | | 11,267 | | 13,240 |
| Retirements | | | (37,738) | | - |
| **Balance at end of year** | | **$** | **59,173** | **$** | **85,644** |

***Variable Interest Entities***

**Rental Property:**

| | | | | |
|---|---|---:|---|---:|
| Balance at beginning of year | | $ | 381,354 | $ | - |
| Additions during year: | | | | | |
| Property acquisitions and additions | | | 32,231 | | 381,354 |
| Retirements | | | (74,740) | | - |
| **Balance at end of year** | | **$** | **338,845** | **$** | **381,354** |

**Accumulated Depreciation:**

| | | | | |
|---|---|---:|---|---:|
| Balance at beginning of year | | $ | 8,446 | $ | - |
| Additions during year: | | | | | |
| Depreciation | | | 18,011 | | 8,446 |
| Retirements | | | (3,973) | | - |
| **Balance at end of year** | | **$** | **22,484** | **$** | **8,446** |

72

## NOTE TO SCHEDULE III—REAL ESTATE INVESTMENTS AND ACCUMULATED DEPRECIATION

| | Initial cost (1) | | Gross amount carried at Dec. 31, 2011 (3) | | |
|---|---|---|---|---|---|
| | | Subsequent costs | | | |
| Perce | Bldg | | Bldg | | Date |

| Property Name | owned | Location | Encumb. | Land | s. & Impr ov. | capitalized(2) | Land | s. & Impr ov. | Total | Accum Depr | Constructed | Date Acq. | Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ***ASR Owned*** | | | | | | | | | | | | | |
| 11500 Northwest Freeway | 100% | Houston, TX | 4,217 | 2,278 | 3,602 | 654 | 2,278 | 4,256 | 6,534 | 1,990 | 1983 | 2004 | 40 |
| 1501 Mockingbird Lane | 100% | Victoria, TX | 3,135 | 1,000 | 3,583 | 84 | 1,000 | 3,667 | 4,667 | 1,224 | 1981 | 2006 | 40 |
| 2620-2630 Fountain View | 51% | Houston, TX | 5,350 | 5,300 | 1,868 | 16 | 5,300 | 1,884 | 7,184 | 75 | 1976 | 2010 | 40 |
| 2640-2650 Fountain View | 100% | Houston, TX | 13,014 | 6,900 | 9,575 | 529 | 6,900 | 10,104 | 17,004 | 2,480 | 1979 | 2008 | 40 |
| 2855 Mangum | 100% | Houston, TX | 3,850 | 2,134 | 3,119 | 339 | 2,134 | 3,458 | 5,592 | 1,957 | 1979 | 2006 | 40 |
| 5450 NW Central | 100% | Houston, TX | 2,536 | 854 | 2,412 | 1,002 | 854 | 3,412 | 4,266 | 1,864 | 1979 | 2003 | 40 |
| 800 & 888 Sam Houston Pkwy | 100% | Houston, TX | 4,411 | 1,500 | 1,335 | 1,910 | 1,500 | 3,245 | 4,745 | 2,185 | 1980 | 2004 | 40 |
| 8100 Washington | 100% | Houston, TX | 2,117 | 600 | 2,279 | 657 | 600 | 2,936 | 3,536 | 1,440 | 1980 | 2003 | 40 |
| 8300 Bissonnet | 100% | Houston, TX | 4,484 | 1,400 | 3,385 | 1,283 | 1,400 | 4,668 | 6,068 | 2,202 | 1981 | 2003 | 40 |
| Atrium 6420 | 100% | Houston, TX | 6,262 | 3,384 | 3,002 | 425 | 3,384 | 3,427 | 6,811 | 1,227 | 1979 | 2006 | 40 |
| Atrium 6430 | 100% | Houston, TX | 2,094 | 1,645 | 1,765 | 672 | 1,645 | 2,437 | 4,082 | 2,367 | 1974 | 2006 | 40 |
| Bristol Bay | 100% | Newport Beach, CA | 6,687 | 1,620 | 7,880 | 1,633 | 1,620 | 9,513 | 11,133 | 5,668 | 1988 | 2001 | 40 |
| FMC Technology | 100% | Houston, TX | 8,428 | 2,375 | 9,502 | 5 | 2,375 | 9,506 | 11,881 | 3,205 | 1996 | 2006 | 40 |
| Fountain View Office Tower | 51% | Houston, TX | 11,750 | 3,500 | 13,269 | 1,333 | 3,500 | 14,602 | 18,102 | 5,467 | 1980 | 2006 | 40 |
| Gray Falls Center & 12000 Westhe | 100% | Houston, TX | 7,173 | 2,548 | 4,350 | 1,913 | 2,548 | 6,263 | 8,811 | 3,318 | 1983 | 2006 | 40 |
| Pacific Spectrum | 100% | Phoenix, AZ | 5,191 | 1,460 | 6,880 | 1,807 | 1,460 | 8,687 | 10,147 | 5,322 | 1986 | 2001 | 40 |
| Park Ten Place I | 100% | Houston, TX | 4,791 | 1,174 | 5,324 | 695 | 1,174 | 6,019 | 7,193 | 3,524 | 1979 | 2002 | 40 |
| Park Ten Place II | 100% | Houston, TX | 3,753 | 900 | 4,148 | 964 | 900 | 5,112 | 6,012 | 2,924 | 1981 | 2002 | 40 |
| ***Office Properties*** | | | 99,243 | 40,572 | 87,276 | 15,920 | 40,572 | 103,196 | 143,768 | 48,439 | | | |
| Beltway Industrial Park | 100% | Houston, TX | 16,445 | 3,829 | 14,716 | 415 | 3,829 | 15,131 | 18,960 | 4,379 | 1999 | 2007 | 40 |

EXHIBIT "3"

| Property | Location | % | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Morenci Professional Park | Indianapolis, IN | 100% | 1,578 | 790 | 2,680 | 253 | 790 | 2,933 | 3,723 | 2,082 | 1975-1979 | 2001 | 40 |
| Sierra Southwest Pointe | Houston, TX | 100% | 2,620 | 1,800 | 1,483 | 613 | 1,800 | 2,096 | 3,896 | 1,277 | 1972 | 2001 | 40 |
| **Industrial/Commercial Properties** | | | 20,643 | 6,419 | 18,879 | 1,281 | 6,419 | 20,160 | 26,579 | 7,738 | | | |
| | | | | | | | | | | | | | |
| Northwest Spectrum Plaza | Houston, TX | 100% | 2,585 | 1,711 | 2,044 | 351 | 1,711 | 2,395 | 4,106 | 999 | 2004 | 2007 | 25 |
| Windrose Plaza | Spring, TX | 100% | 2,491 | 1,100 | 2,429 | 253 | 1,100 | 2,682 | 3,782 | 1,075 | 2005 | 2007 | 25 |
| **Retail Properties** | | | 5,076 | 2,811 | 4,473 | 604 | 2,811 | 5,077 | 7,888 | 2,074 | | | |
| | | | | | | | | | | | | | |
| Sabo Road Self Storage | Houston, TX | 55% | 1,911 | 535 | 1,696 | 743 | 535 | 2,439 | 2,974 | 356 | 2006 | 2010 | 39 |
| **Self-Storage Properties** | | | 1,911 | 535 | 1,696 | 743 | 535 | 2,439 | 2,974 | 356 | | | |
| | | | | | | | | | | | | | |
| Creekside | San Ramon, CA | N/A | - | 2,790 | 6,460 | (6,460) | - | - | - | - | 1984 | 2001 | 40 |
| 7700 Irvine Center | Irvine, CA | N/A | - | 9,150 | 40,390 | (40,390) | - | - | - | - | 1989 | 2001 | 40 |
| Northwest Corporate Center | St. Louis, MO | N/A | - | 1,550 | 5,230 | (5,230) | - | - | - | - | 1983-1987 | 2001 | 40 |
| Technology | Austin, TX | N/A | - | 580 | 9,360 | (9,360) | - | - | - | - | 1986 | 2001 | 40 |
| **Sold/Foreclosed Properties** | | | - | 14,070 | 61,440 | (61,440) | - | - | - | - | | | |
| | | | | | | | | | | | | | |
| ASR, Inc. | Irvine, CA | N/A | 19,873 | - | 129 | 658 | - | 787 | 787 | 566 | | | |
| **Corporate Properties** | | | 19,873 | - | 129 | 658 | - | 787 | 787 | 566 | | | |
| | | | | | | | | | | | | | |
| **Total ASR owned** | | | 146,746 | 64,407 | 173,893 | (42,234) | 50,337 | 131,659 | 181,996 | 59,173 | | | |

73

| Initial cost (1) | Gross amount carried at Dec. 31, 2011 (3) |
|---|---|

EXHIBIT "3"

| Property Name | Percentage owned | Location | Encumb. | Land | Bldgs. & Improv. | Subsequent costs capitalized(2) | Land | Bldgs. & Improv. | Total | Accum Depr | Date Constructed | Date Acq. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **_Variable Interest Entity_** | | | | | | | | | | | | |
| Commerce Distributions Center | 1% | Commerce, CA | 9,598 | 8,628 | 12,537 | 21 | 8,628 | 12,558 | 21,186 | 1,109 | 1957 | 2010 |
| Dixon & Logistics Center | 0% | Des Moines, IA | 17,686 | 3,628 | 19,128 | - | 3,682 | 19,128 | 22,810 | 1,683 | 1961 | 2010 |
| Fisher Indiana Distribution Center | 1% | Fishers, IN | 17,331 | 2,805 | 23,018 | - | 2,805 | 23,018 | 25,823 | 2,025 | 1993 | 2010 |
| Foxborough Business Park | 0% | Victorville, CA | 3,447 | 694 | - | 4,811 | 694 | 4,811 | 5,505 | 259 | 2010 | 2010 |
| Ohio Commerce Center | 0% | Strongsville, OH | 18,727 | 1,917 | 24,585 | - | 1,917 | 24,585 | 26,502 | 2,163 | 1968 | 2010 |
| Springs Commerce I | 0% | OK, GA,SC,VA, PA | 16,849 | 3,009 | 22,550 | - | 3,009 | 22,550 | 25,559 | 1,984 | 95',[64',93'],98',[98',99'],[00',02'] | 2010 |
| Springs Commerce II | 0% | GA, AL | 20,445 | 1,709 | 21,356 | 85 | 1,709 | 21,441 | 23,150 | 1,904 | 1964,1955,1973 | 2010 |
| Springs Office | 0% | Fort Mill/Lancaster,SC | 14,560 | 2,288 | 19,197 | - | 2,288 | 19,197 | 21,485 | 1,742 | 1971,1953,1998 | 2010 |
| Strongville Corporate Center | 2% | Strongsville, OH | 14,687 | 7,540 | 14,236 | 1 | 7,540 | 14,237 | 21,777 | 1,461 | 1989 | 2010 |
| **_Industrial/Commercial Properties_** | | | 133,330 | 32,272 | 156,607 | 4,918 | 32,272 | 1,525 | 193,797 | 14,330 | | |
| Campus Court Student Housing | 11% | Cedar Falls, IA | 4,684 | 320 | 7,056 | - | 320 | 7,056 | 7,376 | 429 | 1998 | 2010 |
| Muirwood Village | 0% | Zanesville, OH | 7,803 | 1,043 | - | 13,380 | 1,043 | 13,380 | 14,423 | 661 | 2010 | 2010 |
| Ohio II - Residences at Newark & Sheffield | 0% | Newark/Circleville, OH | 9,422 | 2,530 | 11,130 | 148 | 2,530 | 11,284 | 13,814 | 985 | 2010 | 2010 |
| College Park Student Apartments | 0% | Cedar Rapids, IA | 14,454 | 2,788 | 13,486 | 51 | 2,788 | 13,537 | 16,325 | 967 | 2002 | 2010 |
| University Fountains | 0% | Lubbock, | 21,154 | 7,975 | 23,737 | 147 | 7,975 | 23,8 | 31,852 | 2,058 | 2005 | 2010 |

EXHIBIT "3"

| Property | % | Location | | | | | | | | | Built | Acquired |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lubbock | | TX | 49 | 75 | 34 | | | 81 | 6 | | | |
| University Springs San Marcos | 0% | San Marcos, TX | 9,504 | 1,531 | 14,683 | 109 | 1,531 | 14,792 | 16,323 | 1,267 | 1998 | 2010 |
| ***Multi-Family/Student Housing Properties*** | | | 67,016 | 16,187 | 70,095 | 13,835 | 16,187 | 83,930 | 100,117 | 6,367 | | |
| | | | | | | | | | | | | |
| Loop 1604 Self Storage | 38% | San Antonio, TX | 4,320 | 4,897 | 3,132 | 393 | 4,897 | 3,525 | 8,422 | 233 | 1985 | 2010 |
| Aldine Westfield Self Storage | 0% | Houston, TX | 2,417 | 112 | 2,284 | 5 | 112 | 2,289 | 2,401 | 202 | 2006 | 2010 |
| Attic Space Self Storage - Blanco Rd | 0% | San Antonio, TX | 1,321 | 203 | 1,516 | - | 203 | 1,516 | 1,719 | 111 | 1982 | 2010 |
| Attic Space Self Storage - Laredo Road | 0% | San Antonio, TX | 1,758 | 455 | 2,903 | (1) | 455 | 2,902 | 3,357 | 213 | 1998 | 2010 |
| Charleston Blvd Self Storage | 0% | Las Vegas, NV | 2,526 | 524 | 1,575 | - | 524 | 1,575 | 2,099 | 115 | 1989 | 2010 |
| Florida 2 - Ocala Self Storage | 0% | Ocala, FL | 2,150 | 585 | 1,376 | - | 585 | 1,376 | 1,961 | 81 | 1989 | 2010 |
| Florida 2 - Tampa Self Storage | 0% | Tampa, FL | 2,424 | 669 | 1,575 | - | 669 | 1,575 | 2,244 | 92 | 1987 | 2010 |
| Ft. Worth Northwest Self Storage | 0% | Forth Worth, TX | 1,939 | 1,356 | 1,238 | - | 1,356 | 1,238 | 2,594 | 91 | 1985 | 2010 |
| Ft. Worth River Oaks Self Storage | 0% | River Oaks, TX | 2,156 | 355 | 2,273 | - | 355 | 2,273 | 2,628 | 167 | 1985 | 2010 |
| Grissom Road Self Storage | 0% | San Antonio, TX | 2,336 | 2,224 | 1,765 | - | 2,224 | 1,765 | 3,989 | 129 | 1985 | 2010 |
| Houston South Mason (Patrick's) | 0% | Katy, TX | 2,833 | 899 | 1,380 | - | 899 | 1,380 | 2,279 | 101 | 2000 | 2010 |
| San Antonio 3 | 0% | San Antonio, TX | 10,503 | 6,670 | - | 4,568 | 6,670 | 4,568 | 11,238 | 252 | 2010 | 2010 |
| ***Self-Storage Properties*** | | | 36,683 | 18,949 | 21,017 | 4,965 | 18,949 | 25,982 | 44,931 | 1,787 | | |
| | | | | | | | | | | | | |
| Rose Ct. | N/A | Phoenix, AZ | - | 909 | 3,591 | (3,591) | - | - | - | - | 1974 | 2010 |
| Redmond Commerce | N/A | Redmond, WA | - | 6,379 | 19,658 | (26,037) | 6,379 | (6,379) | - | - | 1981,1986 | 2010 |
| Centennial Park | N/A | Overland Park, KS | - | 2,589 | 13,132 | (15,721) | 2,589 | (2,589) | - | - | 1997 | 2010 |

| | | San | 3,1 | 25,0 | (28,12 | | (3,12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| University Heights | N/A | Marcos, TX | - 21 | 00 | 1) | 3,121 | 1) | - | - | 2005 | 2010 |
| **Sold/Foreclosed** | | | 12, | 61,3 | (73,47 | 12,08 | (12,0 | | | | |
| **Properties** | | | - 998 | 81 | 0) | 9 | 89) | - | - | | |
| | | | | | | | | | | | |
| Other | | | 247 | - | - | - | - | - | - | - | |
| **Corporate Properties** | | | 247 | - | - | - | - | - | - | - | |
| | | | | | | | | | | | |
| | | | 237, | 80, | 309, | (49,75 | 79,49 | 259, | 338,8 | 22,48 | |
| **Total VIE owned** | | | 276 | 406 | 100 | 2) | 7 | 348 | 45 | 4 | |
| | | | 146, | 64, | 173, | (42,23 | 50,33 | 131, | 181,9 | 59,17 | |
| Total ASR owned | | | 746 | 407 | 893 | 4) | 7 | 659 | 96 | 3 | |
| | | | 144 | | | | | | | | |
| **Total Consolidated** | | | 384, | ,81 | 482, | (91,98 | 129,8 | 391, | 520,8 | 81,65 | |
| **Properties** | | | 022 | 3 | 993 | 6) | 34 | 007 | 41 | 7 | |

_____

(1)    Initial cost and date acquired, where applicable.

(2)    Costs are offset by retirements and write-offs.

(3)    The aggregate cost for federal income tax purposes is $105,007.

(4)    Valuation allowance established in 2011 as the estimated fair value decline below book
       value; 2855 Mangum - $703, Atrium 6430 - $1,395 and Morenci Professional Park - $429.

74

---

**SIGNATURES**

Pursuant to the requirements of Section I3 or I5(d) of the Securities Exchange Act of I934, the
Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto
duly authorized.

**AMERICAN SPECTRUM REALTY INC**

By: American Spectrum Realty Inc.,

Date: March 30, 2012                    /s/ William J. Carden
                                        William J. Carden
                                        Chairman of the Board, President and
                                        Chief Executive Officer
                                        (Principal Executive Officer)

EXHIBIT "3"

Date: March 30, 2012                    /s/ G. Anthony Eppolito
                                        _____
                                        G. Anthony Eppolito
                                        Vice President, Chief Financial Officer
                                        (Principal Financial Officer)
                                        Treasurer and Secretary

Date: March 30, 2012                    /s/ Elisa Grainger
                                        _____
                                        Elisa Grainger
                                        Chief Accounting Officer
                                        (Principal Accounting Officer)


                                        /s/ David Brownell Wheless
                                        _____
                                        David Brownell Wheless
                                        Director

Date: March 30, 2012                    /s/ Presley E. Werlein, III
                                        _____
                                        Presley E. Werlein, III
                                        Director

Date: March 30, 2012                    /s/ John N. Galardi
                                        _____
                                        John N. Galardi
                                        Director


                                                                        75

---

**EXHIBIT INDEX**

| Exhibit No. | Exhibit Title |
|---|---|
| 3.1 | Form of Amended and Restated Articles of Incorporation of the Company (1) |
| 3.2 | Bylaws of the Company (1) |
| 3.3 | Amended and Restated Bylaws of the Company are incorporated herein by reference to Exhibit 3.01 to the Company's Form 10-Q for the quarter ended June 30, 2002 |
| 3.4 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003 |
| 3.5 | Articles of Amendment of the Company are incorporated herein by reference to the Company's Form 10-Q for the quarter ended March 31, 2006 |

EXHIBIT "3"

| 3.6 | Articles Supplementary for 15% Cumulative Preferred Stock, Series A of the Company dated December 30, 2008 are incorporated herein by reference to the Company's Form 8-K filed January 8, 2009 |
|---|---|
| 4.1 | Form of Stock Certificate (1) |
| 10.1 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund (1) |
| 10.2 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund II (1) |
| 10.3 | Form of Agreement and Plan of Merger of Sierra-Pacific Development Fund III (1) |
| 10.4 | Form of Agreement and Plan of Merger of Sierra Pacific Pension Investors '84 (1) |
| 10.5 | Form of Agreement and Plan of Merger of Sierra Pacific Institutional Properties V (1) |
| 10.6 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.7 | Form of Agreement and Plan of Merger of Nooney Income Fund Ltd., L.P. (1) |
| 10.8 | Form of Agreement and Plan of Merger of Nooney Real Property Investors – Two, L.P. (1) |
| 10.9 | Omnibus Stock Incentive Plan (1) |
| 10.10 | Agreement of Limited Partnership of American Spectrum Realty Operating Partnership, L.P. (1) |
| 10.11 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and CGS Properties (Mkt./Col.), L.P. (1) |
| 10.12 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Creekside/Riverside, L.L.C. (1) |
| 10.13 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and McDonnell Associates, L.L.C. (1) |
| 10.14 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pacific Spectrum, L.L.C. (1) |
| 10.15 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Pasadena Autumn Ridge L.P. (1) |

76

| 10.16 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Seventy Seven, L.L.C. (1) |
|---|---|

EXHIBIT "3"

| | |
|---|---|
| 10.17 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Villa Redondo L.L.C. (1) |
| 10.18 | Agreement and Plan of Merger, dated August 6, 2000, between the Company and Third Coast L.L.C. (1) |
| 10.19 | Agreement and Plan of Contribution, dated August 6, 2000, between the Company and No.-So., Inc. (1) |
| 10.20 | Form of Restricted Stock Agreement (1) |
| 10.21 | Form of Stock Option Agreement (Incentive Stock Options) (1) |
| 10.22 | Form of Stock Option Agreement (Directors) (1) |
| 10.23 | Form of Stock Option Agreement (Non-Qualified Options) (1) |
| 10.24 | Form of Indenture Relating to Notes (1) |
| 10.25 | Contribution Agreement, dated May 31, 2000, between the Company and CGS Real Estate Company, Inc. (1) |
| 10.26 | Contribution Agreement, dated May 31, 2000, between the Company and American Spectrum Real Estate Services, Inc. (1) |
| 10.27 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Lindbergh Boulevard Partners (Lindbergh), L.P. (1) |
| 10.28 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Nooney Rider Trail L.L.C. (1) |
| 10.29 | Agreement and Plan of Merger, dated May 31, 2001, between the Company and Back Bay L.L.C. (1) |
| 10.30 | Contribution Agreement, dated May 31, 2001, between American Spectrum Realty Management, Inc. and CGS Real Estate Company, Inc., American Spectrum — Midwest, American Spectrum — Arizona, American Spectrum — California and American Spectrum — Texas, Inc. (1) |
| 10.31 | Amendment of Agreement Plan of Merger between the Company and Villa Redondo L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.32 | Amendment of Agreement Plan of Merger between the Company and Pasadena Autumn Ridge, L.P. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |
| 10.33 | Amendment of Agreement Plan of Merger between the Company and Third Coast L.L.C. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001 |

EXHIBIT "3"

10.34   Registration Right's Agreement between the Company, the Operating Partnership, and other parties is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2001

10.35   Employment Agreement dated October 15, 2001 between the Company and Harry A. Mizrahi is incorporated herein by reference to Exhibit 10.01 to the Company's Form 10-Q for the quarter ended March 31, 2002

10.36   Employment Agreement dated April 3, 2002 between the Company and Paul E. Perkins is incorporated herein by reference to Exhibit 10.02 to the Company's Form 10-Q for the quarter ended March 31, 2002

77

---

10.37   Employment Agreement dated April 16, 2002 between the Company and Patricia A. Nooney is incorporated herein by reference to Exhibit 10.03 to the Company's Form 10-Q for the quarter ended March 31, 2002

10.38   Employment Agreement dated September 1, 2002 between the Company and Thomas N. Thurber is incorporated herein by reference to Exhibit 10.04 to the Company's Form 10-Q for the quarter ended June 30, 2002 (Exhibits pursuant to the Agreement have not been filed by the Company, who hereby undertakes to file such exhibits upon the request of the SEC)

10.39   Employment Agreement dated October 15, 2001 between the Company and William J. Carden is incorporated herein by reference to Exhibit 10.5 to the Company's Form 10-Q for the quarter ended September 30, 2002

10.40   Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.41   Letter Agreement dated February 25, 2003 between the Company and CGS Real Estate Company, Inc. is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.42   Letter Agreement dated February 25, 2003 between the Company and William J. Carden and John N. Galardi is incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2002

10.43   Amendment No. 1 to Employment Agreement dated October 6, 2003 between the Company and Patricia A. Nooney incorporated herein by reference to the Company's Annual Report on Form 10-K for the year ended December 31, 2003

10.44   Purchase Agreement dated December 15, 2009 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009

10.45   Letter Agreement to Purchase Agreement dated December 18, 2009 between the Company and Evergreen Parties (First Amendment to Purchase Agreement) incorporated herein by reference to the Company's Annual Report on Form 10-K/A

EXHIBIT "3"

| | for the year ended December 31, 2009 |
|---|---|
| 10.46 | Second Amendment to Purchase Agreement dated January 17, 2010 between the Company and Evergreen Parties incorporated herein by reference to the Company's Annual Report on Form 10-K/A for the year ended December 31, 2009 |
| 21 | Significant Subsidiaries of the Company |
| 23.1 | EEPB, PC Consent – Form 10-K |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| EX-101.INS | XBRL INSTANCE DOCUMENT |
| EX-101.SCH | XBRL TAXONOMY EXTENSION SCHEMA |
| EX-101.PRE | XBRL TAXONOMY EXTENSION PRESENTATION LINKBASE |
| EX-101.LAB | XBRL TAXONOMY EXTENSION LABEL LINKBASE |
| EX-101.CAL | XBRL TAXONOMY EXTENSION CALCULATION LINKBASE |
| EX-101.DEF | XBRL TAXONOMY EXTENSION DEFINITION LINKBASE |

_____

(1)   Incorporated herein by reference to the Company's Registration Statement on Form S-4 (Registration No. 333-43686), which became effective August 8, 2001.

78

---

**SUBSIDIARIES OF THE COMPANY**

| **Corporations** | **State of Organization** |
|---|---|
| American Spectrum Management Group, Inc. | Delaware |

**Limited Partnerships**

EXHIBIT "3"

| | |
|---|---|
| American Spectrum Realty Operating Partnership, L.P. | Delaware |
| ASR Park Ten 350, L.P. | Texas |
| ASR Park Ten 360, L.P. | Texas |
| ASR 2401 Fountainview, L.P | Delaware |
| ASR 2620-2630 Fountainview, LP | Delaware |
| ASR 5450 NW, L.P. | Delaware |
| ASR 5850 San Felipe, L.P. | Delaware |
| ASR 6677 Gessner, L.P. | Delaware |
| ASR 11500 NW, L.P. | Delaware |
| ASR Washington, L.P. | Texas |
| ASR-8 Centre, L.P. | Delaware |
| ASR-1501 Mockingbird, L.P. | Delaware |
| ASR-2855 Mangum, L.P. | Delaware |
| ASR-6420 Richmond Atrium, L.P. | Delaware |
| ASR-6430 Richmond Atrium, L.P. | Delaware |
| ASR-Beltway Industrial, L.P. | Delaware |
| ASR-Fountain View Place, L.P. | Delaware |
| ASR-Parkway One & Two, L.P. | Delaware |
| ASR-West Gray, L.P. | Delaware |
| ASR-Windrose, L.P. | Delaware |
| Nooney Rider Trail, L.P. | Delaware |
| Sierra Pacific Development Fund II, L.P. | Delaware |
| Sabo Road Acquisitions, LP | Delaware |
| | |
| **Limited Liability Companies** | |
| American Spectrum Holdings (Washington), LLC | Delaware |
| American Spectrum Investments, LLC | Delaware |
| American Spectrum Realty Advisors, LLC | Delaware |
| American Spectrum Realty Management, LLC | Delaware |
| American Spectrum Realty-1501 Mockingbird, LLC | Delaware |
| American Spectrum Realty-2855 Mangum, LLC | Delaware |
| American Spectrum Realty-6420 Richmond Atrium, LLC | Delaware |
| American Spectrum Realty-6430 Richmond Atrium, LLC | Delaware |
| American Spectrum Realty 5850 San Felipe, LLC | Delaware |
| American Spectrum Realty 5450 NW, LLC | Delaware |
| American Spectrum Realty 11500 NW, LLC | Delaware |
| American Spectrum Realty-8 Centre, LLC | Delaware |
| American Spectrum Realty-1501 Mockingbird, LLC | Delaware |
| American Spectrum Realty-6420 Richmond, LLC | Delaware |
| American Spectrum Realty-6430 Richmond, LLC | Delaware |
| American Spectrum Realty-Beltway Industrial, LLC | Delaware |
| American Spectrum Realty-Fountain View Place, LLC | Delaware |
| American Spectrum Realty-Parkway One & Two, LLC | Delaware |
| American Spectrum Realty-Windrose, LLC | Delaware |
| ASR 2401 Fountainview, LLC | Delaware |
| ASR 2620-2630 Fountainview GP, LLC | Delaware |

EXHIBIT "3"

| | |
|---|---|
| ASR 6677 Gessner, LLC | Delaware |
| ASR Centennial Park, LLC | Delaware |
| ASR-Newport, L.L.C. | Delaware |

79

| | |
|---|---|
| ASR NRT, LLC | Delaware |
| ASR-Risk Management, L.L.C. | Delaware |
| ASR-West Gray, LLC | Delaware |
| Back Bay, LLC | Delaware |
| Centennial Park Kansas, LLC | Delaware |
| McDonnell Associates, LLC | Delaware |
| Nooney Income Fund II, LLC | Delaware |
| Nooney Real Property Investors Two, LLC | Delaware |
| Pacific Spectrum, LLC | Arizona |
| Rooftop Spectrum, LLC | Delaware |
| Sabo Road Manager, LLC | Delaware |
| Seventy Seven, LLC | Delaware |
| Sierra Creekside, LLC | Delaware |
| Sierra Pacific Development Fund II, LLC | Delaware |
| Sierra Pacific Development Fund, LLC | Delaware |
| Sierra Southwest Pointe, LLC | Delaware |
| Solar Spectrum, LLC | Delaware |
| Tampa Ocala Acquisitions, LLC | Delaware |

**Partnerships**

| | |
|---|---|
| Sierra Creekside Partners | California |
| Sierra Mira Mesa Partners | California |

80

EXHIBIT "3"

8-K 1 a50984862.htm AMERICAN SPECTRUM REALTY, INC. 8-K

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C.  20549

# FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

### November 11, 2014
Date of Report (Date of earliest event reported)

# American Spectrum Realty, Inc.
### (Exact name of registrant as specified in its charter)

| Maryland | 001-16785 | 52-2258674 |
|---|---|---|
| (State or Other Jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

### 2401 Fountain View, Suite 750, Houston, Texas 77057

| (Address of principal executive offices) | (Zip Code) |
|---|---|

### (713) 706-6200
### (Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

EXHIBIT "4"

# EXHIBIT 4

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

## Item 4.01. Changes in Registrant's Certifying Accountant

American Spectrum Realty, Inc. (the "Company") was notified on November 11, 2014 by its independent registered accountants, EEPB, P.C. ("EEPB"), that they are declining to stand for re-election after completion of their audit of the Company's financial statements as of and for the year ended December 31, 2013. EEPB cited the Company's risk profile and the limitations on their internal resources as the reasons for their decision.

On October 30, 2014, EEPB issued an unqualified opinion on the Company's 2013 and 2012 financial statements, which the Company included in its Annual Report on Form 10-K as filed with the Securities and Exchange Commission on October 31, 2014. Following their opinion paragraph, EEPB included an explanatory paragraph indicating that in their opinion, "[T]he Company has recurring losses from continuing operations and relative low levels of cash and cash equivalents. These conditions raise substantial doubt about its ability to continue as a going concern." EEPB's explanatory paragraph contained a reference to Note 3 of the Company's financial statements, which included the following:

As of December 31, 2013, the Company had an equity deficit of $11.5 million and cash and cash equivalents of $2.6 million. Debt obligations that mature and come due in 2014 total $53.7 million. In addition, the Company has $22.2 million in vendor obligations and other accrued liabilities. These liquidity concerns create uncertainty about the Company's ability to meet its ongoing obligations in the normal course of business without the sale of real estate assets. To generate additional liquidity for maturing obligations, management has increased the pace of asset sales in 2014, and expects to continue the process into 2015.

Subsequent to the date of EEPB's unqualified opinion on November 7, 2014, EEPB informed the Company's Audit Committee of certain internal control deficiencies that were disclosed by the Company in its 2013 Annual Report on Form 10-K within Item 9A - Controls and Procedures.

During the past two fiscal years and the related interim reporting periods preceding the date of EEPB's November 11, 2014 notification, there have been no disagreements with EEPB on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure, which would have caused EEPB to make reference to such disagreements in connection with its reports.

EXHIBIT "4"

The Company's Audit Committee has accepted EEPB's resignation and is actively seeking to engage new independent auditors for its 2014 fiscal year that ends on December 31, 2014.

The Company provided EEPB with a copy of the disclosure made in this Current Report on Form 8-K and requested that EEPB furnish a letter addressed to the Securities and Exchange Commission stating whether or not it agrees with the disclosures. A copy of such letter, dated November 14, 2014, is filed as Exhibit 16.1 to this report.

### Item 8.01. Other Events

On November 14, 2014, American Spectrum Realty, Inc. issued a press release regarding Item 4.01, described above. A copy of the press release is filed as Exhibit 99.1 to this report.

### Item 9.01. Financial Statements and Exhibits.

(c)      Exhibits.

| Exhibits. | Description |
|---|---|
| 16.1 | EEPB letter to the SEC dated November 14, 2014 |
| 99.1 | Copy of Press Release issued by American Spectrum Realty, Inc. on November 14, 2014 |

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN SPECTRUM REALTY, INC.**

By: /s/ William J. Carden

William J. Carden
Chairman of the Board, President
and Chief Executive Officer

Date: November 14, 2014

EXHIBIT "4"

EX-16.1 2 a50984862ex16_1.htm EXHIBIT 16.1

**Exhibit 16.1**

**EEPB, P.C.**

CPAs and Business Advisors

2950 North Loop West, Suite 1200

Houston, TX 77092

November 14, 2014

Securities and Exchange Commission
100 F Street N.E.
Washington, D.C.  20549

We have been furnished with a copy of the response to Item 4.01 of Form 8-K for the event that occurred on November 11, 2014, to be filed by American Spectrum Realty, Inc.  We agree with the statements made in response to that Item insofar as they relate to our Firm.

Very truly yours,

_____ */s/ EEPB, P.C.* _____

EEPB, P.C.

EX-99.1 3 a50984862ex99_1.htm EXHIBIT 99.1

**Exhibit 99.1**

**American Spectrum Realty – Resignation of Independent Auditors**

HOUSTON--(BUSINESS WIRE)--November 14, 2014--American Spectrum Realty, Inc. (NYSE/MKT: AQQ) – a real estate investment management and leasing company – today announced that the Company was notified on November 11, 2014 by its independent registered accountants, EEPB, P.C. ("EEPB"), that they are declining to stand for re-election after completion of their audit of the Company's financial statements as of and for the year ended December 31, 2013. EEPB cited the Company's risk profile and the limitations on their internal resources as the reasons for their decision.

On October 30, 2014, EEPB issued an unqualified opinion on the Company's 2013 and 2012 financial statements, which the Company included in its Annual Report on Form 10-K as filed with the Securities and Exchange Commission on October 31, 2014. Following their opinion paragraph, EEPB included an explanatory paragraph indicating that in their opinion, "[T]he Company has recurring losses from continuing operations and relative low levels of cash and cash equivalents. These conditions raise substantial doubt about its ability to continue as a going concern." EEPB's explanatory paragraph contained a reference to Note 3 of the Company's financial statements, which included the following:

As of December 31, 2013, the Company had an equity deficit of $11.5 million and cash and cash equivalents of $2.6 million. Debt obligations that mature and come due in 2014 total $53.7 million. In addition, the Company has $22.2 million in vendor obligations and other accrued liabilities. These liquidity concerns create uncertainty about the Company's ability to meet its ongoing obligations in the normal course of business without the sale of real estate assets. To generate additional liquidity for maturing obligations, management has increased the pace of asset sales in 2014, and expects to continue the process into 2015.

Subsequent to the date of EEPB's unqualified opinion on November 7, 2014, EEPB informed the Company's Audit Committee of certain internal control deficiencies that were disclosed by the Company in its 2013 Annual Report on Form 10-K within Item 9A - Controls and Procedures.

During the past two fiscal years and the related interim reporting periods preceding the date of EEPB's November 11, 2014 notification, there have been no disagreements with EEPB on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure, which would have caused EEPB to make reference to such disagreements in connection with its reports.

EXHIBIT "4"

The Company's Audit Committee has accepted EEPB's resignation and is actively seeking to engage new independent auditors for its 2014 fiscal year, which ends on December 31, 2014.

**ABOUT AMERICAN SPECTRUM REALTY, INC.**

American Spectrum Realty, Inc. is a real estate investment company that owns, through an operating partnership, interests in office, industrial, retail, self-storage, RV parks, retail, multi-family properties and undeveloped land throughout the United States. American Spectrum Management Group, Inc., a wholly-owned subsidiary of the Company, manages and leases all properties owned by American Spectrum Realty, Inc. as well as for third-party clients, totaling 9 million square feet in multiple states. Website: www.asrmanagement.com

**FORWARD LOOKING STATEMENTS**

Certain matters discussed in this release are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those projected, including the risks and uncertainties of acquiring, owning, operating and disposing of real estate. Such risks and uncertainties are disclosed in the Company's past and current filings with the U.S. Securities and Exchange Commission.

CONTACT:
American Spectrum Realty, Inc.
James Hurn, (713) 706-6200
General Counsel
jhurn@americanspectrum.com

EXHIBIT "4"

# EXHIBIT 5

8-K 1 a50839738.htm AMERICAN SPECTRUM REALTY, INC. 8-K

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C.  20549

## FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

April 1, 2014

Date of Report (Date of earliest event reported)

## American Spectrum Realty, Inc.

(Exact name of registrant as specified in its charter)

| Maryland | 001-16785 | 52-2258674 |
|---|---|---|
| (State or Other Jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

2401 Fountain View, Suite 750, Houston, Texas 77057

(Address          (Zip Code)

of principal executive offices)

(713) 706-6200

(Registrant's telephone number, including area code)

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

EXHIBIT "5"

Item 5.02        **Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On April 1, 2014, Stacey Speier resigned as a director of American Spectrum Realty, Inc. (the "Company").  Mr. Speier was a member of the Audit, Nominating/Corporate Governance and Compensation Committees of the Board of Directors.  In connection with his resignation, Mr. Speier furnished the Company with a letter describing the reasons for his resignation.  The Company has separately responded to statements made in Mr. Speier's letter.

Item 9.01.        **Exhibits and Financial Statements**.

(a)        Exhibits.

Exhibits                Description

17.1        Letter from Mr. Stacey Speier dated April 1, 2014.

99.1        Company Responses to Mr. Stacey Speier letter.

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN SPECTRUM REALTY, INC.**

By:/s/ *William J. Carden*
        Name: William J. Carden
        Title: Chairman of the Board, President
                and Chief Executive Officer

Date:  April 7, 2014

EXHIBIT "5"

EX-17.1 2 a50839738ex17_1.htm EXHIBIT 17.1

**Exhibit 17.1**

April 1, 2014

Stacey Speier
6129 Edloe St
Houston, TX 77005

William Jay Carden
Chairman of the Board
American Spectrum Realty, Inc.
2401 Fountaminview, 7th Floor
Houston TX 77057

Dear Mr. Carden:

I am resigning my position on the Board of Directors of American Spectrum Realty (ASR). Below are some of the reasons for my resignation:

The personal use of the AMEX card by Jay Cardin and his family. The account has not been reconciled since 2011 per the prior CFO Elissa Grainger. The invoice prepared by the CFO on February 6, 2014 has remained unpaid and ignored.

Concern about the continuing losses being incurred and the inability of Management to provide accurate budget amounts. The last revised budget showed a projected loss of over $4,000,000.

Management has not been able to produce an accurate list of current judgments despite several requests.

Not being copied on all correspondence between Board members and Management

The lack of Management to institute the internal controls set forth in the Policies and Procedures Narratives of December 31, 2012,

The lack of maintaining accurate accounting records. The Board was notified February 22, 2014 that the General ledger was out of balance. To date this has not been resolved.

The taking of an undocumented $10,000 fee for the one year loan to ASR paid off by the Windrose sale. When questioned the CFO explained the fee was reasonable and would be recorded as interest.

Increasing loan guarantee fees to $50,000 per quarter without Board approval.

Sincerely,

/s/ Stacey Speier
Stacey Speier

EXHIBIT "5"

EX-99.1 3 a50839738ex99_1.htm EXHIBIT 99.1

**Exhibit 99.1**

April 7, 2014

**American Spectrum Realty, Inc.**

**Responses to Letter dated April 1, 2014 from Mr. Stacey Speier**

Mr. Speier's comment: "The personal use of the AMEX Card by Jay Carden and his family.  The account has not been reconciled since 2011 per the prior CFO Elisa Grainger.  The invoice prepared by the CFO on February 6, 2014 has remained unpaid and ignored."

The AMEX card Mr. Carden uses for payment of Company-related business expenses is his personal AMEX card; it is not an American Spectrum card.  The Company and certain employees frequently use Mr. Carden's personal card for payment of ASRI business-related expenses and routinely reimburses Mr. Carden for the payment of these expenses.  Mr. Carden has requested a complete reconciliation of his personal AMEX card bills.  In the event that personal items were paid for and not reconciled or offset against money due Mr. Carden, he has agreed to reimburse the Company.

The assertion by Company's former Chief Financial Officer that Mr. Carden's expense account has not been reconciled since 2011 has not been verified and is being reviewed in connection with the Company's current account reconciliation process.  The expense account review will be conducted under the supervision of the Company's Audit Committee Chairman.  The review will include the February 6, 2014 invoice.  While the invoice may remain unpaid, it is not being ignored.

Speier's comment:  "Concern about the continuing losses being incurred and the inability of Management to provide accurate budget amounts.  The last revised budget showed a projected loss of over $4,000,000."

The Company has recently experienced significant turnover in the Chief Financial Officer position.  As a result, the Company's 2014 budget has been subjected to a series of errors and associated corrections that have prolonged the normal budgeting process.  Management has informed the Board of Directors (the "Board") of certain necessary adjustments to the budget which will increase revenue substantially.  Management will provide the Board with the final adjusted 2014 annual budgets in the immediate future.

A recalibration of the 2014 projections has not been completed due to the need to account for management's decision to make fundamental changes in the assumptions used by the former Chief Financial Officer in the projections previously produced and presented to the Board.

Speier's comment:  "Management has not been able to produce an accurate list of current judgments despite several requests."

The Company's management engages multiple law firms in several states in order to accommodate its need for legal services.  Each of these firms provides periodic assessments of the anticipated outcome of any litigation in which it represents the Company and/or any affiliates.  Management is apprised by each law firm concerning the status of any litigation in which the Company is involved and when feasible, is given counsels' best effort estimates of the Company's potential financial exposure.  Management's  reports to the Board are designed to monitor the status of all litigation that involves the Company; to assess the

EXHIBIT "5"

financial risk associated with the litigation; and, to keep the Board informed of its assessment of the potential level of materiality of all existing and potential litigation.

**H O U S T O N / O R A N G E   C O U N T Y**
**AMERICAN SPECTRUM MANAGEMENT GROUP, INC. • 2401 FOUNTAIN VIEW, SUITE 750 •**
**HOUSTON, TX 77057**
**PH/ 713.706.6200 • FX/ 713.706.6201**
**www.ASRManagement.com**

---

Speier's comment:  "Not being copied on all correspondence between Board members and Management."

The Company's management attempts to keep all Board members informed regarding its ongoing operations; individual Board members also attempt to communicate frequently among themselves. A failure to include any Board member in correspondence is inadvertent and unintentional.  Mr. Speier is a valued colleague whose advice has been welcomed by management and all members of the Company's Board.

Speier's comments:  "The lack of Management to institute the internal controls set forth in the Policies and Procedures Narratives of December 31, 2012."

The Company's management and the Board are not clear as to the intent of this statement.  Management completed a formal document referred to as Policies and Process Narratives 404(b) Documents (the "Manual") that was approved by the Board on December 31, 2012.  In 2013 the outside consultant who guided the completion of the Manual was engaged by the Board to assist management with the implementation of the policies and processes contained in the Manual.  The Company's auditors – EEPB, P.C. – recognized the Company's progress toward instituting and implementing the internal controls necessary for the more effective operational control needed by the Company.

Management and the Board recognize the need for continuing improvement in the establishment of effective internal control mechanisms.  They have made a strategic commitment to establishing and maintaining policies and procedures necessary to produce effective control systems for the Company.

Speier's comment:  "The lack of maintaining accurate accounting records.  The Board was notified February 22, 2014 that the General ledger was out of balance.  To date this has not been resolved."

Commencing immediately after the notification, the Board authorized the engagement of consultants to analyze the various 'balance the general ledger' issues.  This analysis is in progress and is projected to be completed shortly.  The Board and management will address the issues that are identified and take appropriate action to resolve any problem areas.

Speier's comment:  "The taking of an undocumented $10,000 fee for the one year loan to ASR paid off by the Windrose sale.  When questioned the CFO explained the fee was reasonable and would be recorded as interest."

EXHIBIT "5"

Mr. Carden maintains that he authorized the former Chief Financial Officer to obtain Board approval for this loan fee.   Apparently the former Chief Financial Officer did not follow through with obtaining the requisite Board approval.  Mr. Carden has agreed to return the fee.

Mr. Speier's comment:   "Increasing loan guarantee fees to $50,000 per quarter without Board approval."

This claim is not factual.  Mr. Carden's loan fees have not been increased.  This would take Board approval and none has been given.  As a Board member, Mr. Speier would have been given an opportunity to vote on this issue.

/s/ James L. Hurn
James L. Hurn
V.P. and General Counsel
American Spectrum Realty, Inc.

**H O U S T O N / O R A N G E   C O U N T Y**
**AMERICAN SPECTRUM MANAGEMENT GROUP, INC. • 2401 FOUNTAIN VIEW, SUITE 750 •**
**HOUSTON, TX 77057**
**PH/ 713.706.6200 • FX/ 713.706.6201**
**www.ASRManagement.com**

EXHIBIT "5"

EX-17.1 2 a50839738ex17_1.htm EXHIBIT 17.1

**Exhibit 17.1**

April 1, 2014

Stacey Speier
6129 Edloe St
Houston, TX 77005

William Jay Carden
Chairman of the Board
American Spectrum Realty, Inc.
2401 Fountaminview, 7th Floor
Houston TX 77057

Dear Mr. Carden:

I am resigning my position on the Board of Directors of American Spectrum Realty (ASR). Below are some of the reasons for my resignation:

The personal use of the AMEX card by Jay Cardin and his family. The account has not been reconciled since 2011 per the prior CFO Elissa Grainger. The invoice prepared by the CFO on February 6, 2014 has remained unpaid and ignored.

Concern about the continuing losses being incurred and the inability of Management to provide accurate budget amounts. The last revised budget showed a projected loss of over $4,000,000.

Management has not been able to produce an accurate list of current judgments despite several requests.

Not being copied on all correspondence between Board members and Management

The lack of Management to institute the internal controls set forth in the Policies and Procedures Narratives of December 31, 2012,

The lack of maintaining accurate accounting records. The Board was notified February 22, 2014 that the General ledger was out of balance. To date this has not been resolved.

The taking of an undocumented $10,000 fee for the one year loan to ASR paid off by the Windrose sale. When questioned the CFO explained the fee was reasonable and would be recorded as interest.

Increasing loan guarantee fees to $50,000 per quarter without Board approval.

Sincerely,

/s/ Stacey Speier

EXHIBIT "5"

Stacey Speier

EXHIBIT "5"

EX-99.1 3 a50839738ex99_1.htm EXHIBIT 99.1

**Exhibit 99.1**

April 7, 2014

**American Spectrum Realty, Inc.**

**Responses to Letter dated April 1, 2014 from Mr. Stacey Speier**

Mr. Speier's comment: "The personal use of the AMEX Card by Jay Carden and his family.  The account has not been reconciled since 2011 per the prior CFO Elisa Grainger.  The invoice prepared by the CFO on February 6, 2014 has remained unpaid and ignored."

The AMEX card Mr. Carden uses for payment of Company-related business expenses is his personal AMEX card; it is not an American Spectrum card.  The Company and certain employees frequently use Mr. Carden's personal card for payment of ASRI business-related expenses and routinely reimburses Mr. Carden for the payment of these expenses.  Mr. Carden has requested a complete reconciliation of his personal AMEX card bills.  In the event that personal items were paid for and not reconciled or offset against money due Mr. Carden, he has agreed to reimburse the Company.

The assertion by Company's former Chief Financial Officer that Mr. Carden's expense account has not been reconciled since 2011 has not been verified and is being reviewed in connection with the Company's current account reconciliation process.  The expense account review will be conducted under the supervision of the Company's Audit Committee Chairman.  The review will include the February 6, 2014 invoice.  While the invoice may remain unpaid, it is not being ignored.

Speier's comment:  "Concern about the continuing losses being incurred and the inability of Management to provide accurate budget amounts.  The last revised budget showed a projected loss of over $4,000,000."

The Company has recently experienced significant turnover in the Chief Financial Officer position.  As a result, the Company's 2014 budget has been subjected to a series of errors and associated corrections that have prolonged the normal budgeting process.  Management has informed the Board of Directors (the "Board") of certain necessary adjustments to the budget which will increase revenue substantially.  Management will provide the Board with the final adjusted 2014 annual budgets in the immediate future.

A recalibration of the 2014 projections has not been completed due to the need to account for management's decision to make fundamental changes in the assumptions used by the former Chief Financial Officer in the projections previously produced and presented to the Board.

Speier's comment:  "Management has not been able to produce an accurate list of current judgments despite several requests."

The Company's management engages multiple law firms in several states in order to accommodate its need for legal services.  Each of these firms provides periodic assessments of the anticipated outcome of any litigation in which it represents the Company and/or any affiliates.  Management is apprised by each law firm concerning the status of any litigation in which the Company is involved and when feasible, is given counsels' best effort estimates of the Company's potential financial exposure.  Management's  reports to the Board are designed to monitor the status of all litigation that involves the Company; to assess the

financial risk associated with the litigation; and, to keep the Board informed of its assessment of the potential level of materiality of all existing and potential litigation.

**H O U S T O N / O R A N G E   C O U N T Y**
**AMERICAN SPECTRUM MANAGEMENT GROUP, INC. • 2401 FOUNTAIN VIEW, SUITE 750 •**
**HOUSTON, TX 77057**
**PH/ 713.706.6200 • FX/ 713.706.6201**
**www.ASRManagement.com**

Speier's comment:  "Not being copied on all correspondence between Board members and Management."

The Company's management attempts to keep all Board members informed regarding its ongoing operations; individual Board members also attempt to communicate frequently among themselves. A failure to include any Board member in correspondence is inadvertent and unintentional.  Mr. Speier is a valued colleague whose advice has been welcomed by management and all members of the Company's Board.

Speier's comments:  "The lack of Management to institute the internal controls set forth in the Policies and Procedures Narratives of December 31, 2012."

The Company's management and the Board are not clear as to the intent of this statement.  Management completed a formal document referred to as Policies and Process Narratives 404(b) Documents (the "Manual") that was approved by the Board on December 31, 2012.  In 2013 the outside consultant who guided the completion of the Manual was engaged by the Board to assist management with the implementation of the policies and processes contained in the Manual.  The Company's auditors – EEPB, P.C. – recognized the Company's progress toward instituting and implementing the internal controls necessary for the more effective operational control needed by the Company.

Management and the Board recognize the need for continuing improvement in the establishment of effective internal control mechanisms.  They have made a strategic commitment to establishing and maintaining policies and procedures necessary to produce effective control systems for the Company.

Speier's comment:  "The lack of maintaining accurate accounting records.  The Board was notified February 22, 2014 that the General ledger was out of balance.  To date this has not been resolved."

Commencing immediately after the notification, the Board authorized the engagement of consultants to analyze the various 'balance the general ledger' issues.  This analysis is in progress and is projected to be completed shortly.  The Board and management will address the issues that are identified and take appropriate action to resolve any problem areas.

Speier's comment:  "The taking of an undocumented $10,000 fee for the one year loan to ASR paid off by the Windrose sale.  When questioned the CFO explained the fee was reasonable and would be recorded as interest."

EXHIBIT "5"

Mr. Carden maintains that he authorized the former Chief Financial Officer to obtain Board approval for this loan fee.   Apparently the former Chief Financial Officer did not follow through with obtaining the requisite Board approval.  Mr. Carden has agreed to return the fee.

Mr. Speier's comment:   "Increasing loan guarantee fees to $50,000 per quarter without Board approval."

This claim is not factual.  Mr. Carden's loan fees have not been increased.  This would take Board approval and none has been given.  As a Board member, Mr. Speier would have been given an opportunity to vote on this issue.

/s/ James L. Hurn
James L. Hurn
V.P. and General Counsel
American Spectrum Realty, Inc.

**H O U S T O N / O R A N G E   C O U N T Y**
**AMERICAN SPECTRUM MANAGEMENT GROUP, INC. • 2401 FOUNTAIN VIEW, SUITE 750 •**
**HOUSTON, TX 77057**
**PH/ 713.706.6200 • FX/ 713.706.6201**
**www.ASRManagement.com**

EXHIBIT "5"

# EXHIBIT 6

8-K 1 a51039568.htm AMERICAN SPECTRUM REALTY, INC. 8-K

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C.  20549

## FORM 8-K

### CURRENT REPORT

### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

### December 30, 2014
### Date of Report
### (Date of earliest event reported)

## American Spectrum Realty, Inc.

**(Exact name of registrant as specified in its charter)**

| **Maryland** | **001-16785** | **52-2258674** |
|---|---|---|
| **(State or Other Jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**2401 Fountain View, Suite 750, Houston, Texas 77057**

**(Address of principal executive offices)     (Zip Code)**

**(713) 706-6200**

**(Registrant's telephone number, including area code)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

EXHIBIT "6"

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

---

### Item 2.04. Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.

<u>Default under Series B Articles Supplementary</u>

On December 1, 2014, American Spectrum Realty, Inc., a Maryland corporation (the "Company") failed to make a mandatory dividend payment  in the aggregate amount of $66,904 to the holders (the "Series B Holders") of the Company's 8% Cumulative Preferred Stock, Series B ("Series B Preferred Stock"), as required by the Company's Amended and Restated Articles Supplementary, Series B (the "Series B Articles Supplementary") and has not subsequently made any further monthly mandatory dividend payments.   The failure to make the mandatory dividend payment was not cured within 30 days of December 1, 2014 and has not been cured, which constitutes an "Event of Default" under the Series B Articles Supplementary.  Additionally, on December 1, 2014, the Company failed to make a redemption payment in the aggregate amount of $3,010,686  to the Series B Holders, as required by the Series B Articles Supplementary, which remains uncured and will constitute an "Event of Default" if not cured within 90 days of December 1, 2014.  The Company failed to make the mandatory dividend payments and redemption payments due to a lack of funds.

As a result of the Event of Default, the distribution rate on the Series B Preferred Stock increased from 8.0% per annum to 15.0% per annum and remains at such rate until the Event of Default is cured and the Series B Holders have the right, during the pendency of the Event of Default, to require the Company to redeem all (but not less than all) of the outstanding shares of Series B Preferred Stock.  In January 2015, the Company received a redemption notice from the Series B Holders.

As of February 1, 2015 the following amounts are required to redeem the Series B Preferred:

| | |
|---|---:|
| Series B Preferred Liquidation Value | $20,071,241 |
| Cumulative Deferred Dividends | 1,158,150 |
| Dividends in Arrears | 133,808 |
| Increased Dividends due to Default | 418,151 |
| February 1, 2015 Dividend Due | 200,712 |
| Total Redemption Obligation | $21,982,062 |

EXHIBIT "6"

Additionally, because the dividend payments and mandatory redemption payments, are in arrears by more than sixty (60) days, the Series B Holders (voting together as a single class) are entitled to vote for the election of a number of directors of the Company constituting a majority of the Board of Directors (the "Series B Directors") and the entire Board of Directors, as applicable, will be increased by the number of the Series B Directors.  The Series B Holders can effect such vote at a special meeting by requesting the Company to set a record date and call special meeting.  At any such annual or special meeting, the Series B Holders, by plurality vote, voting together as a single class will be entitled to elect a number of directors constituting a majority of the Board of Directors on the basis of one vote per share of Series B Preferred Stock.  On January 30, 2015, the Company received a notice from the Series B Holders requesting the Company, pursuant to the terms of the Series B Articles Supplementary, to call a special meeting.

Default under the Series C Articles Supplementary

Under the terms of the Company's Articles Supplementary, Series C (the "Series C Articles Supplementary"), if the Company fails to make any payments required by that certain Contribution Agreement dated as of December 2013 between the Company, Asset Managers, Inc., American Spectrum Realty Operating Partnership, L.P., American Spectrum Dunham Properties, LLC and the initial holders of Series B, as amended by the Settlement Agreement and Mutual Release dated June 3, 2014 (the "Contribution Agreement"), an Event of Default will be  deemed to have occurred.  The Contribution Agreement provides that, among other requirements, payments shall be due in accordance with the terms of the Series B Articles Supplementary.

---

As a result of the Event of Default, the distribution rate on the Series C Preferred Stock increased from 8.0% per annum to 15.0% per annum and remains at such rate until the Event of Default is cured and the Series C Holders have the right to require the Company to redeem (all but not less than all) the Series C Preferred Stock upon notice of redemption of the Series B Preferred Stock.

The Company could cure the Event of Default under the Series B Articles Supplementary and Series C Articles Supplementary by making the following dividend and redemption payments to Series B Holders:

| | |
|---|---:|
| December 1, 2014 Redemption Payment | $3,010,686 |
| Dividends in Arrears | 133,808 |
| Increased Dividends due to Default | 418,151 |
| February 1, 2015 Dividend Due | 200,712 |
| Total Amount Required to Cure | $3,763,357 |

EXHIBIT "6"

The occurrence of the Event of Default is related to the Company's lack of funds needed to pay the maturing obligations as they come due.  Although there can be no assurances, the Company's management is currently contesting the Event of Default and the calling of a special meeting and working to address these issues through negotiations with the Series B Holders.  Additionally, the Company continues to work on the sale of its portfolio of properties to raise additional funds to meet these and other maturing obligations. At this time, management is uncertain as to the outcome of its negotiations and cannot predict the ultimate proceeds for any asset sales or the timing of such sales with any certainty.

Forward-Looking Statements

The Company's statements contained in this Current Report on Form 8-K that are not historical facts are forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended. Actual results may differ materially from those included in the forward-looking statements. The Company intends those forward-looking statements to be covered by the safe-harbor provisions for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995, and the Company is including this statement for purposes of complying with those safe-harbor provisions. Forward-looking statements, which are based on certain assumptions and describe future plans, strategies, intentions and expectations, are generally identifiable by use of the words "expect," "project," "may," "will," "should," "could," "would," "intend," "plan," "propose," "anticipate," "estimate," "believe," "continue," "predict," "potential," or the negative of such terms and other comparable terminology. The Company's ability to predict results or the actual effect of future plans or strategies is inherently uncertain.

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**AMERICAN SPECTRUM REALTY, INC.**

By:    */s/ William J. Carden*

William J. Carden
Chairman of the Board, President
and Chief Executive Officer

Date: February 12, 2015

# EXHIBIT 7

Recording requested by (name):

Matthew Thornton

And when recorded, mail this deed and tax
statements to (name and address):

Matthew Thornton

19100 Von Karman Avenue, Suite 900

Irvine, California 92612

# QUITCLAIM DEED

APN: 5613-001-034

DOCUMENTARY TRANSFER TAX $ 10,175.00
EXEMPTION (R&T CODE) _____
EXPLANATION _____

Signature of Declarant or Agent determining tax

For a valuable consideration, receipt of which is hereby acknowledged,

American Spectrum Dunham Properties, LLC
(Disclaiming Party(ies))

hereby quitclaim(s) to Verdugo, LLC
(Property Owner(s))

the following real property  in the City of Glendale _____, County of

Los Angeles _____, California: (insert legal description)

EX OF ST LOTS 1 TO 4 AND EX OF STS LOT 5

M B 59-34-36 AND POR LOT 23 TR=1701

Date: 1/28/15

(Signature of declarant)

William J. CAADER
(Typed or written name of declarant)

Date: _____

(Signature of declarant)

(Typed or written name of declarant)

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to
which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of ~~California~~  TEXAS
County of  HARRIS

**NOTARY SEAL**

On 1-28, 2015, before me,
Christopher Burrell, a notary public, personally appeared
William J. Carder, who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are  subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of which the person(s) acted,
executed the instrument.

I certify under PENALTY OF PERJURY under the laws of
the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary

CHRISTOPHER BURRELL
Notary Public, State of Texas
My Commission Expires
January 23, 2016

EXHIBIT "7"

# EXHIBIT 8

B1 (Official Form 1) (4/13)

| United States Bankruptcy Court<br>**CENTRAL** DISTRICT OF **CALIFORNIA** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle)<br>*VERDUGO, LLC,*<br>*a Limited Liability Company* | Name of Joint Debtor (Spouse)(Last, First, Middle) |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names)<br>*NONE* | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names). |
| Last four digits of Soc Sec or Individual-Taxpayer I.D. (ITIN) No /Complete EIN<br>(if more than one, state all) *37-1751520* | Last four digits of Soc Sec or Individual-Taxpayer I.D. (ITIN) No /Complete EIN<br>(if more than one, state all) |
| Street Address of Debtor (No & Street, City, and State)<br>*19100 Von Karman Avenue*<br>*Suite 900*<br>*Irvine, CA*      ZIPCODE *92612* | Street Address of Joint Debtor (No & Street, City, and State)<br><br>ZIPCODE |
| County of Residence or of the<br>Principal Place of Business     *Orange* | County of Residence or of the<br>Principal Place of Business. |
| Mailing Address of Debtor (if different from street address)<br>*SAME*      ZIPCODE | Mailing Address of Joint Debtor (if different from street address)<br><br>ZIPCODE |
| Location of Principal Assets of Business Debtor<br>(if different from street address above) *3600 North Verdugo Boulevard, Glendale, CA*      ZIPCODE *91208* | |

| Type of Debtor (Form of organization)<br>(Check one box) | Nature of Business<br>(Check one box) | Chapter of Bankruptcy Code Under Which the Petition is Filed<br>(Check one box) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☒ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (if debtor is not one of the above entities, check this box and state type of entity below) | ☐ Health Care Business<br>☒ Single Asset Real Estate as defined in 11 U S C § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ☐ Chapter 7<br>☐ Chapter 9<br>☒ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13      ☐ Chapter 15 Petition for Recognition of a Foreign Main Proceeding<br>☐ Chapter 15 Petition for Recognition of a Foreign Nonmain Proceeding |

Nature of Debts (Check one box)

☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose"      ☒ Debts are primarily business debts

| Chapter 15 Debtors | Tax-Exempt Entity<br>(Check box, if applicable ) | Chapter 11 Debtors |
|---|---|---|
| Country of debtor's center of main interests<br><br>Each country in which a foreign proceeding by, regarding, or against debtor is pending. | ☐ Debtor is a tax-exempt organization under Title 26 of the United States Code (the Internal Revenue Code) | Check one box:<br>☐ Debtor is a small business as defined in 11 U S C § 101(51D)<br>☒ Debtor is not a small business debtor as defined in 11 U S C § 101(51D)<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,490,925 *(amount subject to adjustment on 4 01/16 and every three years thereafter)*<br>- - - - - - - - - - - - - - - - - - - - -<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U S C § 1126(b) |

Filing Fee (Check one box)

☒ Full Filing Fee attached

☐ Filing Fee to be paid in installments (applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments Rule 1006(b). See Official Form 3A

☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration See Official Form 3B.

---

**Statistical/Administrative Information**      THIS SPACE IS FOR COURT USE ONLY

☒ Debtor estimates that funds will be available for distribution to unsecured creditors

☒ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors

Estimated Number of Creditors

| ☒ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | Over 100,000 |

Estimated Assets

| ☐ | ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

EXHIBIT "8"

B1 (Official Form 1) (4/13)                                                                                    FORM B1, Page 2

| **Voluntary Petition**<br>*(This page must be completed and filed in every case)* | Name of Debtor(s)<br>*VERDUGO, LLC,*<br>*a Limited Liability Company* |
|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** | (If more than two, attach additional sheet) | |
|---|---|---|
| Location Where Filed·<br>*NONE* | Case Number· | Date Filed |
| Location Where Filed· | Case Number· | Date Filed |

| **Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor** | (If more than one, attach additional sheet) | |
|---|---|---|
| Name of Debtor<br>*NONE* | Case Number· | Date Filed |
| District | Relationship· | Judge |

| **Exhibit A**<br>(To be completed if debtor is required to file periodic reports<br>(e g , forms 10K and 10Q) with the Securities and Exchange<br>Commission pursuant to Section 13 or 15(d) of the Securities<br>Exchange Act of 1934 and is requesting relief under Chapter 11)<br><br><br>Exhibit A is attached and made a part of this petition | **Exhibit B**<br>(To be completed if debtor is an individual<br>whose debts are primarily consumer debts)<br>I, the attorney for the petitioner named in the foregoing petition, declare that I<br>have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12<br>or 13 of title 11, United States Code, and have explained the relief available under<br>each such chapter I further certify that I have delivered to the debtor the notice<br>required by 11 U S.C. §342(b)<br><br>**X** _____  *2/12/2015*<br>Signature of Attorney for Debtor(s)                    Date |
|---|---|

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health
or safety?

☐   Yes, and exhibit C is attached and made a part of this petition.
☒   No

**Exhibit D**

(To be completed by every individual debtor If a joint petition is filed, each spouse must complete and attach a separate Exhibit D )

Exhibit D, completed and signed by the debtor, is attached and made part of this petition.

If this is a joint petition

☐   Exhibit D also completed and signed by the joint debtor is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box)

☒   Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately
preceding the date of this petition or for a longer part of such 180 days than in any other District

☐   There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District

☐   Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no
principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or
the interests of the parties will be served in regard to the relief sought in this District

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes )

☐   Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following )

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐   Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the
entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐   Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day
period after the filing of the petition.

☐   Debtor certifies that he/she has served the Landlord with this certification (11 U S C § 362(l))

EXHIBIT "8"

B1 (Official Form 1) (4/13)                                                          FORM B1, Page 3

| **Voluntary Petition** | **Name of Debtor(s)** |
| *(This page must be completed and filed in every case)* | VERDUGO, LLC,<br>a Limited Liability Company |

## Signatures

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.

[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7

[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U S C §342(b)

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition

X _____
  Signature of Debtor

X _____
  Signature of Joint Debtor

_____
Telephone Number (if not represented by attorney)

_____
Date

### Signature of a Foreign Representative

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box )

☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U S C § 1515 are attached.

☐ Pursuant to 11 U S C § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached

X _____
  (Signature of Foreign Representative)

_____
(Printed name of Foreign Representative)

_____
(Date)

### Signature of Attorney*

X *Todd Ringstad* (signature)
Signature of Attorney for Debtor(s)

Todd C. Ringstad 97345
Printed Name of Attorney for Debtor(s)

Ringstad & Sanders LLP
Firm Name

2030 Main Street
Address

Suite 1600

Irvine, CA  92614

949 851-7450
Telephone Number

2/12/2015
Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor

The debtor requests the relief in accordance with the chapter of title 11 United States Code, specified in this petition

VERDUGO, LLC
By:    American Spectrum Dunham Properties, LLC
       Its Sole Member
   By:    American Spectrum Realty Operating Partnership, L.P.,
          Its Sole Member
      By:    American Spectrum Realty, Inc.
             Its General Partner
         By: *signature*
             James Hurn, Vice President
             *GENERAL COUNSEL, SECY*

### Signature of Non-Attorney Bankruptcy Petition Preparer

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U S C § 110, (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U S C §§ 110(b), 110 (h), and 342(b), and, (3) if rules or guidelines have been promulgated pursuant to 11 U S C § 110(h) setting a maximum fee for services bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section Official Form 19 is attached

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer ) (Required by 11 U S C § 110 )

_____
Address

X _____

_____
Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*

EXHIBIT "8"

| Attorney or Party Name, Address, Telephone & FAX Numbers, and California State Bar Number | FOR COURT USE ONLY |
|---|---|
| Todd C. Ringstad, SBN 97345   Email: todd@ringstadlaw.com<br>RINGSTAD & SANDERS LLP<br>2030 Main Street, Suite 1600   Telephone: 949 851-6926<br>Irvine, CA 92614   Fax: 949 851-6926<br><br>☒ *Attorney for:* Debtor | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| In re: VERDUGO, LLC. | CASE NO.: |
|---|---|
| | CHAPTER: 11 |
| Debtor(s) | ADV. NO.: |

### ELECTRONIC FILING DECLARATION
### (CORPORATION/PARTNERSHIP)

☒ Petition, statement of affairs, schedules or lists     Date Filed: February 12, 2015
☐ Amendments to the petition, statement of affairs, schedules or lists     Date Filed: _____
☐ Other: _____     Date Filed: _____

**PART I - DECLARATION OF AUTHORIZED SIGNATORY OF DEBTOR OR OTHER PARTY**

I, the undersigned, hereby declare under penalty of perjury that: (1) I have been authorized by the Debtor or other party on whose behalf the above-referenced document is being filed (Filing Party) to sign and to file, on behalf of the Filing Party, the above-referenced document being filed electronically (Filed Document); (2) I have read and understand the Filed Document; (3) the information provided in the Filed Document is true, correct and complete; (4) the "/s/," followed by my name, on the signature lines for the Filing Party in the Filed Document serves as my signature on behalf of the Filing Party and denotes the making of such declarations, requests, statements, verifications and certifications by me and by the Filing Party to the same extent and effect as my actual signature on such signature lines; (5) I have actually signed a true and correct hard copy of the Filed Document in such places on behalf of the Filing Party and provided the executed hard copy of the Filed Document to the Filing Party's attorney; and (6) I, on behalf of the Filing Party, have authorized the Filing Party's attorney to file the electronic version of the Filed Document and this *Declaration* with the United States Bankruptcy Court for the Central District of California.

VERDUGO, LLC
By:    American Spectrum Dunham Properties, LLC       February 12, 2015
     Its Sole Member                              Date
     By:    American Spectrum Realty Operating Partnership, L.P.,
         Its Sole Member
         By:    American Spectrum Realty, Inc.
                 Its General Partner
                 By: _____
                     James Hurn, Vice President

**PART II - DECLARATION OF ATTORNEY FOR FILING PARTY**

I, the undersigned Attorney for the Filing Party, hereby declare under penalty of perjury that: (1) the "/s/," followed by my name, on the signature lines for the Attorney for the Filing Party in the Filed Document serves as my signature and denotes the making of such declarations, requests, statements, verifications and certifications to the same extent and effect as my actual signature on such signature lines; (2) an authorized signatory of the Filing Party signed the *Declaration of Authorized Signatory of Debtor or Other Party* before I electronically submitted the Filed Document for filing with the United States Bankruptcy Court for the Central District of California; (3) I have actually signed a true and correct hard copy of the Filed Document in the locations that are indicated by "/s/," followed by my name, and have obtained the signature of the authorized signatory of the Filing Party in the locations that are indicated by "/s/," followed by the name of the Filing Party's authorized signatory, on the true and correct hard copy of the Filed Document; (4) I shall maintain the executed originals of this *Declaration*, the *Declaration of Authorized Signatory of Debtor or Other Party*, and the Filed Document for a period of five years after the closing of the case in which they are filed; and (5) I shall make the executed originals of this *Declaration*, the *Declaration of Authorized Signatory of Debtor or Other Party*, and the Filed Document available for review upon request of the Court or other parties.

_____       February 12, 2014
*Signature of Attorney for Filing Party*            Date

Todd C. Ringstad
*Printed Name of Attorney for Filing Party*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*November 2006*

EXHIBIT "8"

B4 (Official Form 4) (12/07)

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
## Santa Ana DIVISION

In re  *VERDUGO, LLC*
          *a California Corporation*

Case No.

Chapter  *11*

Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

Following is the list of the debtor's creditors holding the 20 largest unsecured claims. The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this chapter 11 [or chapter 9] case. The list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 20 largest unsecured claims. If a minor child is one of the creditors holding the 20 largest unsecured claims, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

| Name of Creditor and Complete Mailing Address Including Zip Code | Name, Telephone Number and Complete Mailing Address, Including Zip Code, of Employee, Agent, or Department of Creditor Familiar with Claim Who May Be Contacted | Nature of Claim (Trade Debt, Bank Loan, Government Contract, etc.) | Indicate if Claim is Contingent, Unliquidated, Disputed, or Subject to Setoff | Amount of Claim (If Secured Also State Value of Security) |
|---|---|---|---|---|
| 1<br><br>*Los Angeles County Tax Collector*<br>*PO Box 54018*<br>*Los Angeles Ca 90054-0018* | Phone: *888-807-2111*<br>*Los Angeles County Tax Collector*<br>*PO Box 54018*<br>*Los Angeles Ca 90054-0018* | *Property Tax* | | *$ 166,133.42* |
| 2<br><br>*City of Glendale/Finance*<br>*141 N. Glendale Rm 346*<br>*Glendale CA 91206* | Phone: *818 548-3300*<br>*City of Glendale/Finance*<br>*141 N. Glendale Avenue*<br>*Room 346*<br>*Glendale CA  91206* | *Utilities/Electric* | | *$ 23,697.99* |
| 3<br><br>*Kohl Building Maintenance*<br>*9538 Topanga Canyon Blvd*<br>*Chatsworth CA 91311* | Phone: *818 882-2600*<br>*Kohl Building Maintenance*<br>*Attn: Accts Receivable*<br>*9538 Topanga Canyon Blvd.*<br>*Chatsworth CA  91311* | *Trade Debt* | | *$ 7,664.62* |
| 4<br><br>*Rancho Janitorial Supplies*<br>*416 N. 9th Street*<br>*Modesto CA 95350* | Phone: *909 822-5449*<br>*Rancho Janitorial Supplies*<br>*Attn: C. Torres*<br>*416 N. 9th Street*<br>*Modesto CA  95350* | *Trade Debt* | | *$ 1,197.73* |
| 5<br><br>*David J. Oden*<br><br>*19100 Von Karman# 900*<br>*Irvine CA  92612* | Phone: *949 825-6401*<br>*David J. Oden*<br>*19100 Von Karman Avenue*<br>*Suite 900*<br>*Irvine CA  92612* | *Property Manager* | | *$ 1,046.70* |

EXHIBIT "8"

B4 (Official Form 4) (12/07)

_____
Debtor(s)

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

| Name of Creditor and Complete Mailing Address Including Zip Code | Name, Telephone Number and Complete Mailing Address, Including Zip Code, of Employee, Agent, or Department of Creditor Familiar with Claim Who May Be Contacted | Nature of Claim (Trade Debt, Bank Loan, Government Contract, etc.) | Indicate if Claim is Contingent, Unliquidated, Disputed, or Subject to Setoff | Amount of Claim (If Secured Also State Value of Security) |
|---|---|---|---|---|
| 6<br>Joe Reyes Landscape<br><br>PO Box 70383<br>Pasadena CA  91117 | Phone: 818 262-7499<br>Joe Reyes Landscape<br>Attn: Account Receivable<br>P.O. Box 70383<br>Pasadena CA  91117 | Trade Debt | | $ 778.26 |
| 7<br>LAw Offices of Kevin R. Michaels<br>888 W. Sam Houston Pkwy South<br>Houston TX 77042 | Phone: 281 496-9889<br>LAw Offices of Kevin R. Michaels<br>888 W. Sam Houston Pkwy South<br>Houston TX 77042 | Legal Fees | | $ 313.50 |
| 8<br>DBA JR Builders Hardware<br>2507 Honolulu Ave<br>Montrose CA 91020 | Phone: 818 249-6489<br>DBA JR Builders Hardware<br>Attn: Anthony Brucato<br>2507 Honolulu Avenue<br>Montrose CA  91020 | Trade Debt | | $ 301.92 |
| 9<br>Curcio Enterprises Inc.<br>8977 Glenoaks Blvd<br>Sun Valley CA 91352 | Phone: 818 771-1900<br>Curcio Enterprises Inc.<br>Attn:  Tina<br>8977 Glenoaks Blvd.<br>Sun Valley CA  91352 | Trade Debt | | $ 278.00 |
| 10<br>Universal Protection Services LP<br>PO Box 101034<br>Pasadena CA 91189 | Phone: 714 619-9700<br>Universal Protection<br>Attn: Mitch<br>P.O. Box 101034<br>Pasadena CA  91189 | Trade Debt | | $ 260.00 |
| 11<br>Arakelian Enterprises Inc.<br><br>14048 Valley Blvd.<br>City of Industry CA  91716 | Phone: 818 262-5931<br>Arakelian Enterprises Inc.<br>Attn: Accounts Receivable<br>14048 Valley Blvd.<br>City of Industry CA  91716 | Trash/Disposal | | $ 217.78 |
| 12<br>DFS Flooring Inc.<br>15651 Saticoy Street<br>Van Nuys CA 91406 | Phone: 714 493-9866<br>DFS Flooring Inc.<br>Attn: Jackie<br>15651 Saticoy Street<br>Van Nuys CA  91406 | Trade Debt | | $ 135.00 |

Page 2

EXHIBIT "8"

B4 (Official Form 4) (12/07)

_____
                    Debtor(s)                                        ,

## LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

| Name of Creditor and Complete Mailing Address Including Zip Code | Name, Telephone Number and Complete Mailing Address, Including Zip Code, of Employee, Agent, or Department of Creditor Familiar with Claim Who May Be Contacted | Nature of Claim (Trade Debt, Bank Loan, Government Contract, etc.) | Indicate if Claim is Contingent, Unliquidated, Disputed, or Subject to Setoff | Amount of Claim (if Secured Also State Value of Security) |
|---|---|---|---|---|
| 13<br><br>Harvard Business Services<br>16192 Coastal Highway<br>Lewes DE 19958 | Phone: 302 645-7400<br>Harvard Business Services<br>Attn: Accounts Receivable<br>16192 Coastal Highway<br>Lewes DE  19958 | Trade Debt | | $ 50.00 |

## DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION

I, _James Hurn_____, _Vice President_____ of the _Corporation_____ named
as debtor in this case, declare under penalty of perjury that I have read the foregoing List of Creditors Holding Twenty Largest Unsecured Claims and that
they are true and correct to the best of my knowledge, information and belief.


Date: _2/12/2015___          VERDUGO, LLC
                             By:   American Spectrum Dunham Properties, LLC
                                   Its Sole Member
                             By:       American Spectrum Realty Operating Partnership, L.P.,
                                       Its Sole Member
                                   By:     American Spectrum Realty, Inc.
                                           Its General Partner
                                       By:_____
                                              James Hurn, Vice President

EXHIBIT "8"

Verification of Creditor Mailing List - (Rev. 10/05)                                                2003 USBC, Central District of California

## MASTER MAILING LIST
## Verification Pursuant to Local Rule 1007-2(d)

Name _Todd C. Ringstad_

Address _2030 Main Street Suite 1600 Irvine, CA 92614_

Telephone_949 851-7450_

[X]    Attorney for Debtor(s)
[ ]    Debtor In Pro Per

---

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA

| List all names including trade names, used by Debtor(s) within last 8 years: | Case No. |
|---|---|
| In re   VERDUGO, LLC | Chapter 11 |

---

## VERIFICATION OF CREDITOR MAILING LIST

The above named debtor(s), or debtor's attorney if applicable, do hereby certify under penalty of perjury that the attached Master Mailing List of creditors, consisting of __4__ sheet(s) is complete, correct and consistent with the debtor's schedules pursuant to Local Rule 1007-2(d) and I/we assume all responsibility for errors and omissions.

Date: _2/12/2015_

Attorney: _Todd C. Ringstad_

VERDUGO, LLC
By:    American Spectrum Dunham Properties, LLC
       Its Sole Member
       By:    American Spectrum Realty Operating Partnership, L.P.,
              Its Sole Member
              By:    American Spectrum Realty, Inc.
                     Its General Partner
                     By: _____
                          James Hurn, Vice President + GENERAL
                          COUNSEL

EXHIBIT "8"

Todd C Ringstad
2030 Main Street
Suite 1600
Irvine CA 92614


VERDUGO LLC
19100 Von Karman Avenue
Suite 900
Irvine CA 92612

EXHIBIT "8"

Arakelian Enterprises Inc
dba Athens Services
14048 Valley Blvd
City of Industry  CA  91716


AT&T
P O Box 5025
Carol Stream  IL  60197-2355


Bank of Southern California
12265 El Camino Real
Suite 100
San Diego  CA  92130


City of Glendale/Finance
141 N Glendale Ave
Rm 346
Glendale  CA  91206


Curcio Enterprises Inc
8977 Glenoaks Blvd
Sun Valley  CA  91352


D&A Semi-Annual Mortgage Fund III
c/o Durham Mortgage Funds
10251 Vista Sorrento Pkwy #200
San Diego  CA  92121


DBA JR Builders Hardware
2507 Honolulu Ave
Montrose  CA  91020


DFS Flooring Inc
15651 Saticoy Street
Van Nuys  CA  91406


Franchise Tax Board
Bankruptcy Section MS A-340
P O Box 2952
Sacramento  CA  95812-2952

EXHIBIT "8"

Harvard Business Services
16192 Coastal Highway
Lewes DE 19958


Internal Revenue Service
P O Box 7346
Philadelphia PA 19101-7346


Joe Reyes Landscape
Green Landscaping Inc
PO Box 70383
Pasadena CA 91117


Kohl Building Maintenance
9538 Topanga Canyon Blvd
Chatsworth CA 91311


LAw Offices of Kevin R Michaels
888 W Sam Houston Pkwy South
Suite 226
Houston TX 77042


Los Angeles County Tax Collector
PO Box 54018
Los Angeles Ca 90054-0018


David J Oden
19100 Von Karman# 900
Irvine CA 92612


Rancho Janitorial Supplies
416 N 9th Street
Modesto CA 95350


Securities Exchange Commission
5670 Wilshire Boulevard
11th Floor
Los Angeles CA 90036


EXHIBIT "8"

United State Trustee
411 West Fourth Street
Suite 9041
Santa Ana  CA  92701-4593


Universal Protection Services LP
PO Box 101034
Pasadena  CA  91189

EXHIBIT "8"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**100 Spectrum Center Drive, Suite 600, Irvine, California 92618**

A true and correct copy of the foregoing document entitled (*specify*): **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PETITIONING CREDITORS' EMERGENCY MOTION FOR A COURT ORDER APPOINTING AN INTERIM CHAPTER 11 TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **February 13, 2015**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**INTERESTED PARTY:** United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐   Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) ***Not Applicable***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐   Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **February 13, 2015**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| **Judge's Copy – Via Personal Delivery** | **Alleged Debtor** | **Alleged Debtor** |
|---|---|---|
| Honorable Scott C. Clarkson<br>U.S. Bankruptcy Court<br>411 West Fourth Street<br>Bin beside 5th Floor Elevators<br>Santa Ana, CA 92701 | American Spectrum Realty, Inc.<br>Attn: William J. Carden,<br>Chairman of the Board, CEO and President<br>19100 Von Karman Avenue, Suite 900<br>Irvine, CA 92612 | American Spectrum Realty, Inc.<br>Attn: James Hurn, General Counsel<br>19100 Von Karman Avenue, Suite 900<br>Irvine, CA 92612 |
| **Registered Agent for Service of Process for the Alleged Debtor**<br>American Spectrum Realty, Inc.<br>1267 Willis Street, Suite 200<br>Redding, CA 96001 | | |

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 13, 2015 | Anne Marie Vernon | */s/ Anne Marie Vernon* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                     **F 9013-3.1.PROOF.SERVICE**