James C. Bastian, Jr. - Bar No. 175415
Melissa Davis Lowe – Bar No. 245521
**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Telephone:     (949) 340-3400
Facsimile:     (949) 340-3000
E-mail:         jbastian@shbllp.com; mlowe@shbllp.com

Attorneys for Petitioning Creditors D&A Daily
Mortgage Fund III, L.P.;D&A Semi-Annual Mortgage
Fund III, L.P.; and D&A Intermediate-Term Mortgage Fund III, L.P.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No.  8:15-bk-10721-SC |
| **AMERICAN SPECTRUM REALTY, INC.,** | Chapter  11 |
| Debtor. | **DECLARATION OF JEFFREY DUNHAM IN SUPPORT OF PETITIONING CREDITORS' EMERGENCY MOTION FOR A COURT ORDER APPOINTING AN INTERIM CHAPTER 11 TRUSTEE** |
| | **Hearing:** |
| | Date:    February 19, 2015 |
| | Time:    2:00 p.m. |
| | Place:   5C |
| |              Ronald Reagan Federal Building and United States Courthouse |
| |              411 West Fourth Street |
| |              Santa Ana, California 92701 |

**SHULMAN HODGES & BASTIAN LLP**
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\A-B\American Spectrum Realty\Pld\Appoint Trustee Mtn_Dunham Declaration_v2_Sig.doc
4936-000/56

## DECLARATION OF JEFFREY DUNHAM

I, Jeffrey Dunham, declare as follows:

1.      I am the President and CEO of Asset Managers, Inc., which is the general partner of D&A Daily Mortgage Fund III, L.P., D&A Semi-Annual Mortgage Fund III, L.P.; and D&A Intermediate-Term Mortgage Fund III, L.P., the Petitioning Creditors in the involuntary bankruptcy petition filed against American Spectrum Realty, Inc. ("Debtor" or "ASR").  The following facts are within my personal knowledge and if called to testify, I could and would competently testify thereto.

2.      I make this Declaration in support of the Petitioning Creditors' motion to appoint an interim Chapter 11 trustee ("Motion").  Unless otherwise noted, capitalized terms herein have the meaning as set forth in the Motion.

3.      In or about December 2013, the Petitioning Creditors and ASR entered into an agreement whereby the Petitioning Creditors contributed a real estate portfolio of 19 properties valued at approximately $84.8 million, which included the assumption of approximately $17.2 million of debt, to American Spectrum Dunham Properties, LLC, an affiliate of ASR, in exchange for ASR issuing to the Petitioning Creditors approximately $67.5 million worth of 8% Cumulative Preferred Stock, Series B.  The terms of the 8% Cumulative Preferred Stock, Series B, are set forth in the "Articles Supplementary," a true and correct copy of which is attached hereto as **Exhibit "16."**

4.      In or about June 2014, the Petitioning Creditors and ASR entered into a separate agreement whereby the Petitioning Creditors agreed to surrender approximately $47.4 million dollars' worth of 8% Cumulative Preferred Stock, Series B, in exchange for a return of 14 of the properties contributed by the Petitioning Creditors to ASR.  Following this transaction, the Petitioning Creditors owned approximately $20 million dollars in 8% Cumulative Preferred Stock, Series B.

5.      The Petitioning Creditors represent 100% of the Series B shareholders.

6.      The Articles Supplementary provide, in pertinent part, that the following constitutes a default thereunder: ASR fails to pay in full in cash any dividend on any applicable

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\A-B\American Spectrum Realty\Pld\Appoint Trustee Mtn_Dunham Declaration_v2_Sig.doc
4936-000/56

Dividend Payment Date (as defined under the Articles Supplementary) at the Preferred Distribution Rate (regardless of whether such dividend has been authorized by the Board of Directors and declared by the Corporation or whether the Corporation has legally available funds for the payment of such dividend) and fails to cure such breach within thirty days of the applicable Dividend Payment Date (§3(n)(v)).

7.    Under section 3(k) of the Articles Supplementary, dividend payments are due on the first day of each calendar month. On each of December 1, 2014 and January 1, 2015, dividend payments in the amount of $66,904.14 plus an additional default amount of $183,986.37 became due to the Petitioning Creditors. ASR did not make either payment as required. ASR did not cure this breach within thirty days, i.e., January 1, 2015 or February 1, 2015.

8.    Section 8(c)(i) of the Articles Supplementary provides that in the event of default where dividends on any shares of Series B have been in arrears by more than sixty days following the applicable Dividend Payment Date (i.e., December 1, 2014 and January 1, 2015), the holders of the shares of the Series B (i.e., the Petitioning Creditors) shall be entitled to vote for the election of a number of directors of ASR constituting a majority of the Board of Directors ("Preferred Directors").

9.    Section 8(c)(iii) of the Articles Supplementary further provides that once the Series B shareholders' voting rights have vested pursuant to section 8(c)(i) and upon written request of holders of record of at least 10% of the outstanding shares of Series B, a proper officer of ASR shall call, or cause to be called, a special meeting of the Series B shareholders by mailing, or causing to be mailed, to such holders a notice of such special meeting to be held between ten and twenty days after the date such notice is given.

10.    On January 30, 2015, the Petitioning Creditors submitted a written request to the Board for a special meeting of the Series B shareholders to appoint the Preferred Directors as provided under the Articles Supplementary. A true and correct copy of the request to James Hurn, the Debtor's General Counsel, and attached special meeting request is attached hereto as **Exhibit "17."** The Petitioning Creditors have not received notice from any of the Debtor's

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

Z:\A-B\American Spectrum Realty\Pld\Appoint Trustee Mtn_Dunham Declaration_v2_Sig.doc
4936-000/56

1  officers or the Board of Directors that a special meeting of the holders of Series B has been

2  called for purposes of electing and appointing the Preferred Directors.

3       11.    On February 10, 2015, I had a call with the Debtor's President and Chief

4  Executive Officer ("CEO"), William J. Carden ("Carden"), and Patrick D. Barrett ("Barrett"),

5  one of the Debtor's Directors.  At that time, I expressed my concerns about the Debtor's default

6  in dividend payments to the Petitioning Creditors and their plans to address such default.  Carden

7  and Barrett also advised me of the Debtor's current financial condition including its cash flow

8  issues.

9       12.    Based on my discussion with Carden and Barrett, it appears the Debtor's cash

10  flow is woefully inadequate to meet its monthly obligations, including payroll, and to maintain

11  operations.  I have serious concerns about Carden's ability to properly manage and operate the

12  Debtor's business and as such, it is my belief that Debtor's current management must be replaced

13  or controlled by a third party fiduciary.

14       13.    On February 12, 2015, I had a conference call with Carden and Barrett in which I

15  asked them to allow the Petitioning Creditors to appoint the Preferred Directors as provided for

16  in the Articles Supplementary and as we bargained for in order to protect our investment.

17       14.    I gave Carden until 11:00 a.m. on February 12, 2015 to respond.  He refused. As

18  such, the Petitioning Creditors felt they had no choice but to commence an involuntary

19  bankruptcy petition against the Debtor.

20       I declare under penalty of perjury under the laws of the United States of America that the

21  foregoing is true and correct.

22       Executed at The Ritz-Carlton, New Orleans, 921 Canal Street, New Orleans, Louisiana

23  70112 on February 13, 2015

24

25

26

27  _____
   Jeffrey Dunham

28

SHULMAN HODGES &
BASTIAN LLP
100 Spectrum Center Drive
Suite 600
Irvine, CA 92618

**Exhibit "16"**

EX-3.(I) 2 a50887132ex3_1i.htm EXHIBIT 3.1(I)

**Exhibit 3.1(i)**

**AMENDED AND RESTATED ARTICLES SUPPLEMENTARY**
**FOR**
**8% CUMULATIVE PREFERRED STOCK, SERIES B**
**OF**
**AMERICAN SPECTRUM REALTY, INC.**

**AMERICAN SPECTRUM REALTY, INC**., a corporation organized and existing under the Maryland General Corporation Law (the "**Corporation**"), in accordance with the provisions thereof, does hereby certify to the State Department of Assessments and Taxation of Maryland that:

FIRST: Under its power and authority contained in Section 2-208 of the Maryland General Corporation Law and Article VI of the charter of the Corporation (the "**Charter**"), the Board of Directors of the Corporation (the "**Board of Directors**") by a duly adopted resolution classified and designated 17,000,000 shares of authorized but unissued Preferred Stock (as defined in the Charter) as shares of 8% Cumulative Preferred Stock, Series B, par value $0.01 per share, and hereby amends and restates in its entirety the preferences, conversion and other rights, voting powers, restrictions, limitations as to dividends and other distributions, qualifications, and terms and conditions of redemption related to the Series B.

**Section 1.**          **Designation**. The distinctive serial designation of such series of Preferred Stock is "8% Cumulative Preferred Stock, Series B" ("**Series B**"). Each share of Series B shall be identical in all respects to every other share of Series B.

**Section 2.**          **Number of Shares**. The authorized number of shares of Series B shall be 17,000,000. Shares of Series B that are redeemed, purchased or otherwise acquired by the Corporation, or converted into another series of Preferred Stock, shall revert to authorized but unissued shares of Preferred Stock (provided that any such cancelled shares of Series B may be reissued only as shares of any series other than Series B).

**Section 3.**          **Definitions**. As used herein with respect to Series B:

(a)          "**Affiliate**" means, in respect of any Person, any other Person that is directly or indirectly controlling, controlled by, or under common control with such Person, and the term "control" (including the terms "controlled by" and "under common control with") means having, directly or indirectly, the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or by contract or otherwise, excluding any variable interest entity of which the Corporation or any of its Affiliates owns less than 10%.

(b)          "**Articles Supplementary**" means the Articles Supplementary relating to the Series B, as they may be amended from time to time.

(c)          "**Bankruptcy Law**" means Title 11, United States Bankruptcy Code of 1978, as amended, or any similar United States federal or state law relating to bankruptcy, insolvency, receivership, winding-up, liquidation, reorganization or relief of debtors or any amendment to, succession to or change in any such law.

(d)          "**Bylaws**" means the amended and restated bylaws of the Corporation, as they may be amended from time to time.

EXHIBIT "16"

(e)    "**Business Day**" means each day, other than a Saturday or a Sunday, which is not a day on which banking institutions in New York are authorized or required by law, regulation or executive order to close.

(f)    "**Change of Control**" means the occurrence of any of the following in one or a series of related transactions: (i) an acquisition after the Original Issue Date by any Person or "group" (as described in Rule 13d-5(b)(1) under the Exchange Act), of more than 19.9% of the voting rights or equity interests in the Corporation in a transaction approved by the Corporation's Board of Directors; (ii) a transaction after the Original Issue Date resulting in William J. Carden owning or controlling less than 19.9% of the voting rights or equity interests of the Corporation; (iii) a merger or consolidation of the Corporation or a sale of 19.9% or more of the assets of the Corporation in one or a series of related transactions, unless following such transaction or series of transactions, the holders of the Corporation's securities prior to the first such transaction continue to hold at least 80% of the voting rights and equity interests in the surviving entity or acquirer of such assets, as applicable; (iv) a recapitalization, reorganization or other transaction involving the Corporation that constitutes or could result in a transfer of more than 19.9% of the voting rights in the Corporation; (v) the sale, lease, exchange or other transfer in one or a series of related transactions of all or substantially all of the Corporation's total assets on a consolidated basis, as reported in the Corporation's consolidated financial statements, other than a sale or disposition by the Corporation of all or substantially all of the Corporation's assets to an entity at least 80% of the combined voting power of the voting securities of which are owned by Persons in substantially the same proportion as their ownership of the Corporation immediately prior to such sale; or (vi) the execution by the Corporation or its controlling stockholders of an agreement providing for or that will, upon consummation of the transactions contemplated thereby, result in any of the foregoing events. The issued and outstanding Series B and the Warrant Shares shall not be included in calculating the above percentages.

(g)    "**Charter**" means the charter of the Corporation, as it may be amended or restated from time to time, and shall include these Articles Supplementary.

(h)    "**Common Stock**" means the common stock of the Corporation.

(i)    "**Contribution Agreement**" means that certain Contribution Agreement dated as of December __, 2013 between the Corporation, Asset Managers, Inc., American Spectrum Realty Operating Partnership, L.P., American Spectrum Dunham Properties, LLC and the initial holders of Series B, as amended by the Settlement Agreement and Mutual Release dated June 3, 2014 (the "Settlement Agreement").

(j)    "**Default Rate**" means 15% per annum, non-compounded.

(k)    "**Dividend Payment Date**" means the first day of each calendar month commencing with February 1, 2014.

(l)    "**Dividend Period**" means each accrual period during which shares of the Series B are issued and outstanding (beginning on the first day of each calendar month and ending on the last day of such calendar month); provided, however, that, with respect to each share of Series B, (i) the initial "Dividend Period" shall commence on the Original Issue Date and end on January 31, 2014; and (ii) each other "Dividend Period" shall end on the first to occur of (A) the next last succeeding day of a calendar month or (B) with respect to a share of Series B that is redeemed, the date through and including the date on which such share is redeemed.

(m)    "**Dividend Record Date**" means, with respect to any Dividend Payment Date, the 15th calendar before such Dividend Payment Date.  Any such day that is a Dividend Record Date shall be a Dividend Record Date whether or not such day is a Business Day.

(n)    "**Event of Default**" shall mean that one or more of the following events has occurred and is continuing:

(i)    the Corporation has failed to perform any covenant, obligation or agreement under Section 3.3 of the Contribution Agreement and fails to cure such breach within thirty (30) days of the date on which the applicable payments set forth therein to the holders of the Series B Preferred are due and owing;

(ii)    the Corporation has failed to comply with the obligations under Section 3.4 of the Contribution Agreement and fails to cure such breach, to the extent it is capable of being cured, within ninety (90) days of the occurrence of such breach;

(iii)    the lender with respect to any Project (as defined in the Contribution Agreement) that is encumbered by a lien created by the Existing Financing (as defined in the Contribution Agreement) forecloses upon or otherwise acquires such Project;

-2-

(iv)    the Corporation has failed to redeem the required shares of Series B at any Redemption Date and fails to cure such breach within ninety (90) days of the applicable Redemption Date;

(v)    the Corporation fails to pay in full in cash any dividend on any applicable Dividend Payment Date at the Preferred Distribution Rate (regardless of whether such dividend has been authorized by the Board of Directors and declared by the Corporation or whether the Corporation has legally available funds for the payment of such dividend) and fails to cure such breach within thirty (30) days of the applicable Dividend Payment Date;

(vi)    the Corporation has failed to comply with the Series B Preferred Terms (other than as set forth in subclause (iv) and (v) of this definition) and fails to cure such breach, to the extent it is capable of being cured, within seventy-five (75) days of the occurrence of such breach; or

(vii)   (A) the Corporation has filed a voluntary petition in bankruptcy; (B) an involuntary petition in bankruptcy has been filed against the Corporation and is not dismissed or removed within 60 days; (C) the Corporation applies for, consents to, or acquiesces in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the assets or other property of any such Person, or makes an assignment for the benefit of creditors; (D) the Corporation has filed a petition or an answer seeking any reorganization, arrangement, dissolution, liquidation or similar relief under any law, statute or regulation; or (E) the Corporation takes any action authorizing, or in furtherance of, any of the foregoing.

(o)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(p)    "**Final Dividend Payment Date**" means December 1, 2015.

(q)    "**Final Redemption Date**" means December 1, 2015.

EXHIBIT "16"

(r)        "**First Redemption Date**" means December 1, 2014.

(s)        "**First Redemption Date Shares**" means a number of shares of Series B equal to the quotient of (i) the difference between (A) $3,010,686, less (B) all Sale Payments and Debt Payments actually received by the holders of the Series B on or prior to the First Redemption Date, divided by (ii) the Liquidation Preference calculated as of the First Redemption Date.

(t)        "**Junior Stock**" means the Common Stock, Series A and any other class or series of stock of the Corporation (other than Series B) that ranks junior to Series B either or both as to the payment of dividends and/or as to the distribution of assets on any liquidation, dissolution or winding up of the Corporation.

(u)        "**Liquidation Preference**" means (i) $4.00 per share of Series B less (ii) all Per Share Sale Payments and Per Share Debt Payments actually received by the holders of the Series B, in each case as adjusted for stock splits, stock dividends, reclassification and the like.

(v)        "**Original Issue Date**" means December 30, 2013.

(w)        "**Parity Stock**" means the Series B, Series C and any other class or series of stock of the Corporation which have been approved by the holders of the Series B that ranks equally with Series B both in the payment of dividends and in the distribution of assets on any liquidation, dissolution or winding up of the Corporation (in each case without regard to whether dividends accrue cumulatively or non-cumulatively).

(x)        "**Per Share Debt Payments**" shall mean all Debt Payments (as defined below) calculated on a per share basis with respect to each share of Series B held by such holder.

(y)        "**Per Share Sale Payments**" means all Sale Payments calculated on a per share basis with respect to each share of Series B held by such holder.

-3-

(z)        "**Person**" means any individual, partnership, limited partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or other entity.

(aa)       "**PIK Interest**" means interest accrued at the Preferred Distribution Rate on PIK Dividends from the date such dividends would have otherwise been payable but for part (ii) of Section 4(a) through the date on which the PIK Dividends are paid in full.

(bb)       "**Preferred Distribution Rate**" means: (i) 8% per annum, non-compounded, to, but excluding, the Rate Increase Date; and (ii) from and after the Rate Increase Date, 12.0% per annum, non-compounded; provided, however, that (A) in the event that the Corporation shall (i) fail to redeem any shares of Series B on any Redemption Date, or (ii) fail to make a dividend payment on any Dividend Payment Date, then from and after such date, until such time that the Event of Default has been remedied in full, the Preferred Distribution Rate then in effect shall be increased to the Default Rate; and (B) upon the occurrence of an Event of Default (other than as described in clause (A) above) which is not cured within 30 days, until such time that the Event of Default has been remedied in full, the Preferred Distribution Rate then in effect shall be increased to the Default Rate.

EXHIBIT "16"

(cc)    "**Preferred Stock**" means any and all series of preferred stock of the Corporation, including the Series B.

(dd)    "**Rate Increase Date**" means January 1, 2015.

(ee)    "**Redemption Date**" means each of the First Redemption Date, the Second Redemption Date, the Final Redemption Date and the Optional Redemption Date.

(ff)    "**Redemption Price**" means, with respect to each share of Series B, as of any date of determination, an amount equal to (i) the Liquidation Preference; (ii) plus an amount equal to all accrued and unpaid dividends (other than PIK Dividends on the First Redemption Date and the Second Redemption Date) with respect to such share.

(gg)    "**Sale Payments**" means the aggregate "Sale Payments" (including, for the avoidance of doubt, "Deficit Payments") received by holders of Series B pursuant to and as defined under the Contribution Agreement.

(hh)    "**Second Redemption Date**" means June 1, 2015.

(ii)    "**Second Redemption Date Shares**" means a number of shares of Series B equal to the quotient of (i) the difference between (A) $7,024,934, less (B) all Sale Payments and Debt Payments actually received by the holders of the Series B subsequent to the First Redemption Date and on or before the Second Redemption Date, divided by (ii) the Liquidation Preference calculated as of the Second Redemption Date.

(jj)    "**Senior Stock**" means, as the case may be, (i) any class or series of stock of the Corporation ranking senior to the Series B (and any Parity Stock) in respect of the right to receive dividends, (ii) any class or series of stock of the Corporation ranking senior to the Series B (and any Parity Stock) in respect of the right to participate in any distribution upon liquidation, dissolution or winding up of the affairs of the Corporation or (iii) any class or series of stock of the Corporation ranking senior to the Series B (and any Parity Stock) in respect of the right to redemption.

(kk)    "**Series A**" means the 15% Cumulative Preferred Stock, Series A of the Corporation.

(ll)    "**Series B Preferred Terms**" means the terms of the Series B Preferred as set forth herein.

(mm)    "**Series C**" means the 8% Cumulative Preferred Stock, Series C of the Corporation.

-4-

---

(nn)    "**Unredeemed Shares**" means any shares of Series B that the Corporation is obligated to redeem on any particular Redemption Date and in respect of which the Corporation has failed to deliver the Redemption Price in full on such Redemption Date.

(oo)    **"Warrant Shares"** means those shares of the Corporation's Common Stock subject to that certain Warrant to Purchase Common Stock of American Spectrum Realty, Inc., dated December __, 2013, issued by the Corporation to Dunham & Associates Holdings, Inc.

**Section 4.        Dividends**.

(a)        Subject to 4(d) below, the record holders of Series B shall be entitled to receive, when, as and if authorized by the Board of Directors and declared by the Corporation, out of funds legally available for the payment of dividends, on each outstanding share of Series B, cumulative cash dividends calculated at the Preferred Distribution Rate on the Liquidation Preference. Except as otherwise set forth below, dividends on each outstanding share of Series B shall accrue and be cumulative from and including the issuance date of such share and shall be payable monthly in arrears on each Dividend Payment Date. For dividends accruing during Dividend Periods ending before or on December 31, 2014, (i) 50% of such dividends shall be payable monthly in arrears on each Dividend Payment Date and (ii) 50% of such dividends ("**PIK Dividends**") plus PIK Interest accrued thereon shall be payable on the Final Dividend Payment Date. If any Dividend Payment Date is not a Business Day, then any dividend which would otherwise have been payable on such Dividend Payment Date shall be paid on the next succeeding Business Day. Dividends payable on the Series B in respect of any Dividend Period shall be computed on the basis of a 360-day year consisting of twelve 30-day months. The amount of dividends payable on the Series B for any partial period shall be computed on the basis of a 360-day year consisting of twelve 30-day months, and actual days elapsed over a 30-day month. Dividends will be payable to holders of record as they appear in the stockholder records of the Corporation at the close of business on the applicable Dividend Record Date. Notwithstanding the foregoing or any provisions in the Articles Supplementary to the contrary, from and after April 1, 2014 no dividends shall accrue and be payable on the Senior Preferred Stock tendered to the Corporation on the "Closing Date" under the Settlement Agreement (collectively, the "Exchange Preferred Stock"). For the avoidance of doubt, all dividends accrued and deferred on all shares of Series B through March 31, 2014 shall be payable when and as due.

(b)        Holders of Series B shall not be entitled to any dividends, whether payable in cash, securities or other property, other than dividends (if any) declared and payable on the Series B as specified in this Section 4 (subject to the other provisions of these Articles Supplementary).

(c)        So long as any share of Series B remains outstanding, no dividend shall be declared or paid on the Common Stock or any other shares of Junior Stock (other than a dividend payable solely in Junior Stock), and no Common Stock or any other shares of Junior Stock or Parity Stock shall be purchased, redeemed or otherwise acquired for consideration by the Corporation, directly or indirectly (other than as a result of a reclassification of Junior Stock for or into other Junior Stock or of Parity Stock for or into other Parity Stock (with the same or lesser aggregate liquidation amount) or Junior Stock, or the exchange or conversion of one share of Junior Stock for or into another share of Junior Stock or of one share of Parity Stock for or into another share of Parity Stock (with the same or lesser per share liquidation amount) or Junior Stock) during a Dividend Period, unless all accrued and unpaid dividends for all past Dividend Periods, including the latest completed Dividend Period (including, if applicable as provided in Section 4(a) above, dividends on such amount), on all outstanding shares of Series B have been declared and paid in full (or declared and a sum sufficient for the payment thereof has been set aside for the benefit of the holders of shares of Series B on the applicable record date) and the Corporation has established and funded a reserve for the projected dividends and mandatory redemption payments required pursuant to Section 5 hereof for the succeeding twelve (12) month period owing with respect to the Series B.

(d)        All dividends declared and paid upon Parity Stock, including the Series C and each other applicable class or series, shall be declared on all class or series of Parity Stock, including the Series B and Series C pro rata so that the amount of dividends declared and paid per share of Series B, Series C and such other class or series of Parity Stock shall in all cases bear to each other the same ratio that accrued dividends per share on the Series B and such other class or series of Parity Stock (which shall not include any accrual in respect of unpaid dividends on such other class or series of Parity Stock for prior Dividend Periods if such other class or series of Parity Stock does not have a cumulative dividend) bear to

EXHIBIT "16"

each other.  All dividends declared and paid upon the Series B shall be declared and paid in equal amounts on each such share outstanding at the close of business on the Dividend Record Date with respect to such dividend.

-5-

(e)        Subject to the foregoing and the provisions of Section 8(c), such dividends (payable in cash, securities or other property) as may be determined by the Board of Directors may be declared and paid on any securities, including Common Stock and other Junior Stock, from time to time out of any funds legally available for such payment, and the Series B shall not be entitled to participate in any such dividends.

**Section 5.        Liquidation Rights.**

(a)        In the event of any liquidation, dissolution or winding up of the affairs of the Corporation, whether voluntary or involuntary, holders of Series B shall be entitled to receive, for each share of Series B, out of the assets of the Corporation or proceeds thereof (whether capital or surplus) available for distribution to stockholders of the Corporation, and after satisfaction of all liabilities and obligations to creditors of the Corporation (other than amounts owing to the Corporation in connection with any loans or credit advances made to the Corporation after the Original Issue Date by (i) any Affiliate of the Corporation, or (ii) to any officer, director or shareholder of the Corporation (or any of their respective Affiliates) which amounts shall be expressly subordinate to the amounts payable to the Series B pursuant to this Section 5(a)), before any distribution of such assets or proceeds is made to or set aside for the holders of Junior Stock as to such distribution, payment in full in an amount equal to the sum of (A) the Liquidation Preference and (B) all accrued and unpaid dividends thereon, whether or not declared, to the date of payment.

(b)        In the event that, upon such voluntary or involuntary liquidation, dissolution or winding up, the available assets of the Corporation are insufficient to pay the amount of the liquidating distributions on all outstanding shares of Series B and the corresponding amounts payable on all shares of other classes or series of Parity Stock, including the Series C, then the holders of the Series B and each such other class or series of Parity Stock, including the Series C, shall share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

(c)        If the liquidating distributions described in this Section 5 have been paid in full to all holders of Series B, the holders of other stock of the Corporation shall be entitled to receive all remaining assets of the Corporation (or proceeds thereof) according to their respective rights and preferences.

(d)        For purposes of this Section 5, the merger or consolidation of the Corporation with or into any other corporation or other entity, including a merger or consolidation in which the holders of Series B receive cash, securities or other property for their shares, or the sale, lease or exchange (for cash, securities or other property) of all or substantially all of the assets of the Corporation, shall not constitute a liquidation, dissolution or winding up of the Corporation.

(e)        In determining whether a distribution (other than upon voluntary or involuntary liquidation), by dividend, redemption or other acquisition of shares of stock of the Corporation or otherwise, is permitted under the Maryland General Corporation Law, amounts that would be needed, if the Corporation were to be dissolved at the time of distribution, to satisfy the preferential rights upon dissolution of holders of shares of Series B shall not be added to the Corporation's total liabilities.

EXHIBIT "16"

**Section 6.**          **Redemption**.

(a)          **General**. Series B shall not be redeemable except as set forth in this Section 6.

(b)          **Mandatory Redemption**.

(i)          On the First Redemption Date, the Corporation shall redeem the First Redemption Date Shares pro rata from the record holders thereof for cash in an amount per share equal to the Redemption Price calculated as of the First Redemption Date.

-6-

(ii)          On the Second Redemption Date, the Corporation shall redeem the Second Redemption Date Shares pro rata from the record holders thereof for cash in an amount per share equal to the Redemption Price calculated as of the Second Redemption Date.

(iii)          On the Final Redemption Date, the Corporation shall redeem from the record holders thereof, all remaining issued and outstanding Series B for cash in an amount per share equal to the Redemption Price calculated as of the Final Redemption Date.

(c)          **Optional Redemption**. The holders of at least 75% of the then issued and outstanding Series B (the "**Majority Holders**") shall have the right (the "**Optional Redemption Right**"), which right may be exercised by delivering to the Corporation an Optional Redemption Notice during the pendency of an Event of Default, to require the Corporation to redeem all (but not less than all) of the outstanding shares of Series B.

(i)          Promptly, but in no event later than five (5) days following the occurrence of an Event of Default, the Corporation shall deliver to the holders of record of Series B at their addresses as they appear on the Corporation's stock transfer records a notice of occurrence of the Event of Default (the "**Event of Default Notice**"). Such notice shall state: (A) the events constituting the Event of Default; (B) the date on which the Event of Default occurred; (C) that, as a result of the Event of Default, the holders of Series B may exercise the Optional Redemption Right; and (iv) the procedure set forth below which the holders of Series B must follow in order to validly exercise the Optional Redemption Right.

(ii)          The Optional Redemption Right may be exercised by the Majority Holders delivering, at any time during the pendency of an Event of Default, to the Corporation a notice in writing (an "**Optional Redemption Notice**") stating the holders' election for the Corporation to redeem shares of Series B. An Optional Redemption Notice may not be withdrawn without the written consent of the Corporation. The Majority Holders may deliver the Optional Redemption Notice at any time following the occurrence of the Event of Default and whether or not the Corporation has delivered an Event of Default Notice pursuant to Section 6(c)(i).

(iii)          <u>Coordination with Parity Stock</u>.

(A)          Promptly, and in any event no later than five days, following any delivery by the Series B holders to the Corporation of an Optional Redemption Notice, the Corporation shall deliver to the holders of record of each other class or series of Parity Stock of which any shares are then outstanding a notice of receipt of the Optional Redemption Notice, together with a copy of the Optional Redemption Notice.

EXHIBIT "16"

(B)    Promptly, and in any event no later than five days, following any exercise by the holder or holders of any other class or series of Parity Stock, pursuant to the terms thereof, of the optional redemption right set forth therein corresponding to the Optional Redemption Right set forth herein (such right, a "**Parity Optional Redemption Right**" and such exercise, a "**Parity Optional Redemption Exercise**"), the Corporation shall deliver to the holders of record of Series B at their addresses as they appear on the Corporation's stock transfer records a notice of such Parity Optional Redemption Exercise, together with a copy of the exercise notice received by the Corporation relating thereto.

(iv)    Optional Redemption Date. If, during the pendency of an Event of Default, the Majority Holders exercise the Optional Redemption Right in accordance with this Section 6(c), the date of redemption of the Series B (the "**Optional Redemption Date**") shall be the date that is 30 days after the delivery of the Optional Redemption Notice by such Series B holders to the Corporation; provided, however, that, in the event of any Parity Optional Redemption Exercise occurring prior to the delivery of the Optional Redemption Notice by the Majority Holders to the Corporation, if the Majority Holders shall have delivered the Optional Redemption Notice no later than 10 days following delivery by the Corporation of the notice described in Section 6(c)(iii)(B) in respect of the earliest such Parity Optional Redemption Exercise, then the Optional Redemption Date shall be accelerated (but not deferred) to be the same as the date of redemption of the Parity Stock to which such Parity Optional Redemption Exercise relates; provided further, that, subject to the foregoing proviso, the Corporation, by written notice to the Majority Holders, may in its sole discretion elect to accelerate (but not to defer) the Optional Redemption Date to coincide with the redemption date relating to any Parity Optional Redemption Exercise.

-7-

(d)    **Redemption Payment**. For each share of Series B which is to be redeemed pursuant to this Section 6, the Corporation shall, on the applicable Redemption Date therefor or, if such Redemption Date is not a Business Day, on the first Business Day thereafter, pay to the holder thereof in full an amount in cash equal to the Redemption Price calculated as of such Redemption Date, to the same account or accounts that the Corporation pays dividends. Upon payment in full of the Redemption Price in accordance with this Section 6(d), such shares of Series B shall be deemed to be no longer issued and outstanding. In connection with any redemption of Series B, each holder of shares of Series B to be redeemed shall use reasonable efforts to surrender at the time of redemption at the Corporation's principal office a certificate representing the shares of Series B such holder is redeeming; provided, however, that the holder's right to have its shares of Series B redeemed shall not be contingent upon such holder returning its certificates to the Corporation.

(e)    **Insufficient Redemption Proceeds**. In the event that, in connection with any redemption obligation pursuant to this Section 6, on any Redemption Date the Corporation is unable to satisfy in full (i) its obligations with respect to all shares of Series B required to be redeemed pursuant to this Section 6 on such Redemption Date, and (ii) the corresponding redemption obligations with respect to all shares of other classes or series of Parity Stock required to be redeemed on such Redemption Date pursuant to the terms thereof, then, in each such case, on such Redemption Date, the Corporation shall redeem only such number of shares of Series B and such number of shares of other classes or series of Parity Stock that legally may be redeemed on such date, to the fullest extent permitted by law, pro rata (as nearly as practical without creating fractional shares), and the holders of the Series B and each such other class or series of Parity Stock shall share ratably the proceeds available for redemption in proportion to the aggregate Redemption Price payable on the shares of Series B required to be redeemed on such Redemption Date pursuant to this Section 6 and the aggregate redemption price payable on the shares of Parity Stock required to be redeemed on such date pursuant to the terms of such Parity Stock. Thereafter, as soon as the Corporation is legally permitted to do so under applicable law, the Corporation shall redeem

the Unredeemed Shares and the remaining unredeemed shares of such other classes or series of Parity Stock required to be redeemed, to the fullest extent permitted by law, pro rata (as nearly as practical without creating any fractional shares), calculated as set forth in the immediately preceding sentence, until the Corporation satisfies in full its redemption obligations with respect to all such Unredeemed Shares and such remaining shares of Parity Stock required to be redeemed. Unredeemed Shares shall continue to accrue dividends in accordance with the terms hereof up to but excluding the date on which the Corporation pays in full to the holders of such Unredeemed Shares in cash the Redemption Price (re-calculated as of such date).

      **Section 7.**      **Conversion**. Holders of Series B shares shall have no right to exchange or convert such shares into any other securities.

      **Section 8.**      **Voting Rights**.

      (a)      **General.** The holders of Series B shall not have any voting rights except as set forth below.

      (b)      **Voting as Separate Class.** On any matter in which the Series B may vote as a separate class (as expressly provided herein), each outstanding share of Series B shall be entitled to one vote.

      (c)      **Preferred Directors.**

      (i)      Whenever (a) dividends on any shares of Series B shall be in arrears by more than sixty (60) days following the applicable Dividend Payment Date (a "**Preferred Dividend Default**"), or (b) any redemption payment owing with respect to 6(b) or Section 6(c) shall be in arrears by more than sixty (60) days following the applicable Redemption Date (a "**Preferred Redemption Default**" and together with any Preferred Divided Default, a "**Preferred Default**") the holders of shares of the Series B (voting together as a single class) shall be entitled to vote for the election of a number of directors of the Corporation constituting a majority of the Board of Directors (the "**Series B Directors**") and the entire Board of Directors, as applicable, will be increased by the number of the Series B Directors.

      (ii)      In connection with the appointment of the Series B Directors, the independence requirements established under the Corporation's Charter and the rules of the principal national securities exchange on which the Corporation's securities are listed or admitted to trading must be satisfied. The Series B Director will be elected by a plurality of the votes cast in the election for a one-year term and each Preferred Director will serve until his or her successor is duly elected and qualified or until such Preferred Director's right to hold the office terminates, whichever occurs earlier, subject to such Preferred Director's earlier death, disqualification, resignation or removal. The election will take place at (A) either (I) a special meeting called in accordance with Section 8(c)(iii) below if the request is received more than 60 days before the date fixed for the Corporation's next annual or special meeting of stockholders or (II) the next annual or special meeting of stockholders if the request is received within 60 days of the date fixed for the Corporation's next annual or special meeting of stockholders, and (B) at each subsequent annual meeting of stockholders, or special meeting held in place thereof, until all dividends with respect to the Series B for all past Dividend Periods that have ended and all past redemption payments owing with respect to the Series B have been paid in full.

-8-

      (iii)      At any time when such voting rights shall have vested, a proper officer of the Corporation shall call or cause to be called, upon written request of holders of record of at least 10%

EXHIBIT "16"

of the outstanding shares of Series B, a special meeting of the holders of Series B by mailing or causing to be mailed to such holders a notice of such special meeting to be held not fewer than ten or more than 20 days after the date such notice is given. At any such annual or special meeting, all of the holders of the Series B, by plurality vote, voting together as a single class will be entitled to elect a number of directors constituting a majority of the Board of Directors on the basis of one vote per share of Series B. The holder or holders of one-third of the Series B then outstanding, present in person or by proxy, will constitute a quorum for the election of the Preferred Directors. Notice of all meetings at which holders of the Series B shall be entitled to vote will be given to such holders at their addresses as they appear in the stock transfer records. At any such meeting or adjournment thereof in the absence of a quorum, subject to the provisions of any applicable law, a majority of the holders of the Series B present in person or by proxy shall have the power to adjourn the meeting for the election of the Preferred Directors, without notice other than an announcement at the meeting, until a quorum is present. If a Preferred Default shall terminate after the notice of a special meeting has been given but before such special meeting has been held, the Corporation shall, as soon as practicable after such termination, mail or cause to be mailed notice of such termination to holders of the Series B that would have been entitled to vote at such special meeting.

(iv)    If and when all accumulated dividends on the Series B for the past Dividend Periods and all redemption payments not paid in full on a past Redemption Date shall have been fully paid or declared and a sum sufficient for the payment thereof is set apart for payment, the right of the holders of Series B to elect the Preferred Directors shall immediately cease (subject to re-vesting in the event of each and every Preferred Default), and the term of office of each Preferred Director so elected shall terminate and the entire Board of Directors shall be reduced accordingly. Any Preferred Director may be removed at any time with or without cause by the vote of, and shall not be removed otherwise than by the vote of, the holders of record of a majority of the outstanding shares of Series B. So long as a Preferred Default shall continue, any vacancy in the office of a Preferred Director may be filled by written consent of a majority of the Preferred Directors remaining in office, or if none remains in office, by a vote of the holders of record of a majority of the outstanding shares of Series B when they have the voting rights described above. Each of the Preferred Directors shall be entitled to one vote on any matter.

(v)    The procedures in this Section 8(c) for the calling of meetings and the election of the Preferred Directors will, to the extent permitted by law, supersede anything inconsistent contained in the Bylaws of the Corporation (including any provision calling for a classified board) and, without limitation to foregoing, the Bylaws of the Corporation will not be applicable to the election of directors by holders of Series B pursuant to this Section 8(c). Notwithstanding the Bylaws of the Corporation, the number of directors constituting the entire Board of Directors will be automatically increased to include the directors to be elected pursuant to this Section 8(c). The Corporation agrees to diligently and promptly cooperate in good faith with the holders of the Series B and to perform any and all actions requested by the holders of the Series B that are necessary in connection with the election of the Preferred Directors, including (A) executing and delivering any and all agreements, documents, resolutions or other instruments that may be required for the election of the Series B Directors, and (b) refraining from taking any action that would in any way restrict, limit or interfere with the election of the Preferred Directors.

-9-

(d)    **Protective Provisions**. So long as any shares of Series B are outstanding, in addition to any other vote or consent of stockholders of other classes or series of Preferred Stock required by the terms thereof, the vote or consent of the holders of at least a majority of the then outstanding shares of Series B given in person or by proxy, either in writing or by electronic transmission without a meeting (subject to the requirements of Section 2-505(b)(1) of the Maryland General Corporation Law, as the same may be amended or replaced from time to time) or by vote at any meeting called for the purpose, shall be necessary to:

EXHIBIT "16"

(i)    (A) authorize, create or issue, or increase the number of authorized or issued shares of, any class or series of Senior Stock or Parity Stock, or reclassify any authorized shares of capital stock into Senior Stock or Parity Stock, or create, authorize or issue any obligation or security convertible into or evidencing the right to purchase any Senior Stock or Parity Stock; (B) issue shares of Series B and Parity Stock to any Person; or (C) authorize, create or issue any class of Junior Stock that gives the holders thereof the right to participate in, interfere with or restrict the management or operations of the Corporation or prohibits the holders of the Series B from exercising their rights and remedies hereunder;

(ii)    amend, alter or repeal any provisions of the Series B Preferred Terms as set forth herein, whether by merger, consolidation, transfer or conveyance of all or substantially all of its assets or otherwise;

(iii)    amend, alter or repeal the provisions of these Articles Supplementary;

(iv)    amend, alter or repeal the provision of the Articles Supplementary with respect to the Series A or Series C;

(v)    amend, alter or repeal the provisions of the Charter (other than these Articles Supplementary) or the Bylaws, whether by merger, consolidation, transfer or conveyance of all or substantially all of its assets or otherwise, so as to adversely affect any right, preference, privilege, obligation or voting power of the Series B or holders thereof;

(vi)    incur any indebtedness or other obligations, or refinance any existing indebtedness, that would prohibit the Corporation from making the dividend or redemption payments attributable to the Series B and/or performing the terms and conditions of the Contribution Agreement;

(vii)    except as expressly set forth in the Contribution Agreement, exceed (or in the case of Affiliates, cause or permit such Affiliates to exceed) the Indebtedness Limit (as defined in the Contribution Agreement) with respect to any indebtedness securing or encumbering any of the properties contributed to the Corporation and its Affiliates pursuant to the Contribution Agreement (the **"Contributed Properties"**);

(viii)    increase (or in the case of Affiliates, cause or permit such Affiliates to increase) (A) the aggregate outstanding principal amount of any individual indebtedness of the Corporation and its Affiliates existing as of the Original Issue Date that is secured by real property by greater than $250,000 (excluding for purposes of this Section 8(d)(viii)(A) indebtedness authorized pursuant to the Contribution Agreement with respect to the Contributed Properties), such $250,000 being inclusive of any and all expenses, prepayment fees, defeasances, etc. associated with such increase; and (B) the aggregate outstanding principal amount of all unsecured indebtedness of the Corporation and its Affiliates existing as of the Original Issue Date by greater than $250,000, such $250,000 shall be inclusive of any and all expenses, prepayment fees, defeasances, etc. associated with such increase; provided, however, that in either instance, the Corporation may exceed such $250,000 limit if any and all amounts borrowed in excess of such $250,000 are paid to the holders of outstanding Series B and Series C pro rata and reduce the Liquidation Preference ("**Debt Payments**").  All Debt Payments shall be paid to the holders of the Series B and Series C, pro rata, as promptly as practicable (but in no event later than five (5) Business Days) following the closing of the applicable financing;

(ix)    redeem, repurchase or otherwise acquire for value any Junior Stock;

EXHIBIT "16"

-10-

(x)    declare and make any dividends to any Junior Stock unless the Corporation is current on all dividend and redemption payments owing to the Series B and has adequately funded a reserve in an amount necessary to make all dividend and redemption payments owing with respect to the Series B for the following 12 month period;

(xi)    incur any indebtedness after the Original Issue Date from (A) any Affiliate of the Corporation, or (B) any officer, director or shareholder of the Corporation (or any of their respective Affiliates);

(xii)    engage in any transaction (other than those described in subclause (xi) above) outside the ordinary course of business consistent with past practice between the Corporation and (A) any Affiliate of the Corporation, or (B) any officer, director or shareholder of the Corporation (or any of their respective Affiliates), in either case that would reasonably be expected to adversely affect the rights of the Series B;

(xiii)    take any corporate action in the furtherance of, or suffer to exist, any of the following:

(A)    the commencement by the Corporation of a voluntary case or proceeding under any applicable Bankruptcy Law or any other case or proceeding to be adjudicated bankrupt or insolvent;

(B)    the consent by the Corporation to the entry of a decree or order for relief in respect of the Corporation in an involuntary case or proceeding under any applicable Bankruptcy Law or to the commencement of any bankruptcy or insolvency case or proceeding against it;

(C)    the filing of a petition or answer or consent by the Corporation seeking reorganization or relief under any applicable federal or state law;

(D)    the Corporation:

(1)    consenting to the filing of such petition or the appointment of, or taking possession by, a custodian, receiver, liquidator, assignee, trustee, sequestrator or similar official of the Corporation or of any substantial part of its property;

(2)    making an assignment for the benefit of creditors; or

(3)    admitting in writing its inability to pay its debts generally as they become due.

(xiv)    enter into any transaction or take any corporate action which could reasonably be expected to result in, or suffer to exist, a Change of Control;

(xv)    declare or pay any distributions on the Junior Stock;

(xvi)    increase the size of the Corporation's Board of Directors (other than in connection with the exercise of the rights set forth in Section 8(c) hereof);

EXHIBIT "16"

(xvii)   amend, alter or repeal, directly or indirectly through American Spectrum Operating Partnership L.P., the provisions of the Limited Liability Company Agreement of American Spectrum Dunham Properties, LLC, so as to adversely affect any right, preference, privilege, obligation or voting power of the Series B or holders thereof;

(xviii)   undertake any liquidation, dissolution or winding up of the Corporation.

(xix)   declare or pay any dividends on any shares of Parity Stock that are not paid pro rata with the Series B in accordance with Section 4 hereof;

-11-

(xx)   declare or pay any liquidating distributions on any shares of Parity Stock that are not paid pro rata with the Series B, in accordance with Section 5 hereof, *provided* that Sale Payments and Participation Payments (as such terms are defined in the Contribution Agreement) shall not be considered liquidating distributions for purposes of these Articles Supplementary; or

(xxi)   redeem any shares of Parity Stock, including Series C, on a Redemption Date in which shares of Series B are to be redeemed pursuant to Section 6 hereof, unless (a) on the applicable Redemption Date, the Corporation is able to satisfy in full its obligations with respect to all shares of Series B required to be redeemed pursuant to Section 6 on such Redemption Date; or (b) in the event on such Redemption Date the Corporation is unable to satisfy in full (i) its redemption obligation with respect to all shares of Series B required to be redeemed pursuant to Section 6 hereof on such Redemption Date, and (ii) the corresponding redemption obligations with respect to all shares of other classes or series of Parity Stock required to be redeemed on such Redemption Date pursuant to the terms thereof, the Corporation redeems such number of shares of Series B and such number of shares of other classes or series of Parity Stock, including Series C, that legally may be redeemed on such date, to the fullest extent permitted by law, pro rata (as nearly as practical without creating fractional shares), and the holders of the Series B and each such other class or series of Parity Stock share ratably the proceeds available for redemption in proportion to the aggregate Redemption Price payable on the shares of Series B required to be redeemed on such Redemption Date pursuant to Section 6 and the aggregate redemption price payable on the shares of Parity Stock required to be redeemed on such Redemption Date pursuant to the terms of such Parity Stock. For the avoidance of doubt, no vote of the holders of the Series B shall be required for redemptions made pursuant to clause (a) or (b) in this Section 8(d)(xxi).

Section 9.      Common Voting Rights. The amendment, alteration or repealing of any provisions of the Series B Preferred Terms, including amendment of these Articles Supplementary, shall not be subject to the approval of the holders of Common Stock.

Section 10.      Record Holders. To the fullest extent permitted by applicable law, the Corporation and the transfer agent for the Series B may deem and treat the record holder of any share of Series B as the true and lawful owner thereof for all purposes, and neither the Corporation nor such transfer agent shall be affected by any notice to the contrary.

Section 11.      No Sinking Fund. No sinking fund has been established for the retirement or redemption of Series B.

Section 12.      Headings of Subdivisions. The headings of the various subdivisions hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

EXHIBIT "16"

**Section 13.**    **Severability of Provisions**. If any preferences or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications or terms or conditions of redemption of the Series B set forth in the Charter, including the Series B Preferred Terms, are invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other preferences or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications or terms or conditions of redemption of the Series B set forth in the Charter which can be given effect without the invalid, unlawful or unenforceable provision thereof shall, nevertheless, remain in full force and effect and no preferences or other rights, voting powers, restrictions, limitations as to dividends or other distributions, qualifications or terms or conditions of redemption of the Series B herein set forth shall be deemed dependent upon any other provision thereof unless so expressed therein.

**Section 14.**    **Notices**. All notices or communications in respect of Series B shall be sufficiently given if given in writing and delivered in person or by first class mail, postage prepaid, or if given in such other manner as may be permitted in these Articles Supplementary, in the Charter or Bylaws or by applicable law.

**Section 15.**    **No Preemptive Rights**. No share of Series B shall have any rights of preemption whatsoever as to any securities of the Corporation, or any warrants, rights or options issued or granted with respect thereto, regardless of how such securities, or such warrants, rights or options, may be designated, issued or granted.

-12-

**Section 16.**    **Replacement Certificates**. The Corporation shall replace any mutilated certificate at the holder's expense upon surrender of that certificate to the Corporation. The Corporation shall replace certificates that become destroyed, stolen or lost at the holder's expense upon delivery to the Corporation of reasonably satisfactory evidence that the certificate has been destroyed, stolen or lost, together with any indemnity that may be reasonably required by the Corporation.

**Section 17.**    **Other Rights**. The shares of Series B shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other than as set forth herein or in the Charter or as provided by applicable law.

SECOND: The shares of Series B have been classified and designated by the Board of Directors under the authority contained in the Maryland General Corporation Law and the Charter.

THIRD: These Articles Supplementary have been approved by the Board of Directors in the manner and by the vote required by law.

FOURTH: The undersigned acknowledges these Articles Supplementary to be the corporate act of the Corporation and, as to all matters or facts required to be verified under oath, the undersigned acknowledges that, to the best of his knowledge, information and belief, these matters and facts are true in all material respects and that this statement is made under the penalties of perjury.

* * * *

-13-

IN WITNESS WHEREOF, AMERICAN SPECTRUM REALTY, INC. has caused these Amended and Restated Articles Supplementary to be signed in its name and on its behalf by its President and attested by its Secretary, this 7th day of June, 2014.

**AMERICAN SPECTRUM REALTY, INC.**

By: /s/ William J. Carden
      Name:   William J. Carden
      President

**ATTEST:**

By: /s/ Wayne Reyes
      Name:   Wayne Reyes
      Assistant Secretary

-14-

EXHIBIT "16"

**Exhibit "17"**

**DUNHAM
MORTGAGE FUNDS**

January 30, 2015

**VIA REGISTERED MAIL, FEDERAL EXPRESS AND ELECTRONIC MAIL**

Mr. James L. Hurn
Secretary of American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Re:    Request for a Record Date and Calling of a Special Stockholder Meeting of American
         Spectrum Realty, Inc.

Dear Mr. Hurn,

Please be advised that American Spectrum Realty, Inc. (the "Company") is in arrears by more
than sixty (60) days on a dividend payment due December 1, 2014 and the first redemption
payment due December 1, 2014 to the holders of the 8% Cumulative Preferred Stock, Series B
("Series B Preferred Stock"), which constitutes an "Event of Default" as defined in Section
3(n)(v) of the Amended and Restated Articles Supplementary dated June 7th, 2014 (the "Articles
Supplementary") for Series B Preferred Stock of the Company.

Pursuant to Section 8(c)(iii) of the Articles Supplementary for Series B Preferred Stock of the
Company, as the holders of all of the outstanding Series B Preferred Stock, the D&A Daily
Mortgage Fund III, L.P. (the "Daily Fund"), D&A Semi-Annual Mortgage Fund III, L.P. (the
"Semi-Annual Fund") and D&A Intermediate-Term Mortgage Fund III, L.P. (the "Intermediate
Fund," and together with the Daily Fund and Semi-Annual Fund, the "Mortgage Funds") hereby
give notice and request that the Board of Directors of the Company fix a record date and call a
special stockholder meeting ("Special Meeting") as soon as possible, but no later than February
19, 2015 as required by the Articles Supplementary.  As the holders of all the outstanding Series
B Preferred Stock and the only shareholders entitled to vote on the matters described herein, the
Mortgage Funds hereby agree to and unanimously consent to hold the Special Meeting sooner
and waive any notice period contemplated by the Article Supplementary or the Company's by-
laws.  The purpose of the Special Meeting is to elect five (5) new Directors who will assume
office immediately upon election.

The Mortgage Funds are timely providing this notice in accordance with the Articles
Supplementary.

EXHIBIT "17"

Even though not required by Section 8(c)(v) of the Articles Supplementary, the Mortgage Funds and the nominees have voluntarily provided all of the information required to be included in this notice pursuant to the by-laws and is included as <u>Exhibit A</u>. Where information sought by Schedule 14A under the Securities Exchange Act of 1934, as amended, would be answered in the negative and no response would be required to be included in a proxy statement, a response may not be included below.

The Mortgage Funds represent that they are the holders of record of all of the Series B Preferred Stock, par value $0.01 per share (the "Shares"), of the Company entitled to vote at the Special Meeting and intend to appear in person or by proxy at such meeting to nominate the nominees. The Mortgage Funds are the beneficial and record owner of 5,017,811 Shares. Copies of the certificates (nos. 1 through 3) representing record ownership of such Shares are attached hereto as <u>Exhibit B</u>. The Mortgage Funds do not own any Shares of record that it does not also directly or indirectly beneficially own. The Mortgage Funds intend to remain the record owner of Shares as of the date of the Special Meeting. None of the Shares currently held of record by the Mortgage Funds are subject to margin credit or are pledged.

The address of the Mortgage Funds is 10251 Vista Sorrento Parkway, Suite 200, San Diego, California 92121.

Although the Mortgage Funds have endeavored to fully satisfy all requirements for this notice set forth in the Articles Supplementary and by-laws, please contact Joseph P. Kelly (858.964.0500) of Dunham & Associates Investment Counsel, Inc. or Theodore C. Peters (310.937.2066) of Edgerton & Weaver, LLP immediately should the Company require any additional information.

Sincerely,

Asset Managers, Inc. ("AMI")

By: _____
Name: Jeffrey A. Dunham
Title: President and CEO

D&A Daily Mortgage Fund III, L.P.

By: _____
Name: Jeffrey A. Dunham
Title: President, CEO and AMI General Partner

EXHIBIT "17"

D&A Semi-Annual Mortgage Fund, III, L.P.

By: _____

Name: Jeffrey A. Dunham

Title: President, CEO and AMI General Partner


D&A Intermediate-Term Mortgage Fund, III, L.P.

By: _____

Name: Jeffrey A. Dunham

Title: President, CEO and AMI General Partner


cc:    Patrick D. Barrett, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

William J. Carden, Chairman of the Board, Chief Executive Officer and President
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

D. Brownell Wheless, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Kenneth H. White, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Matthew J. Ertman, Partner
Allen Matkins
515 South Figueroa Street, 9th Floor
Los Angeles, California  90071-3309

EXHIBIT "17"

Corporate Actions & Market Watch Team
NYSE Euronext
11 Wall Street, 15th floor
New York, New York 10005

Theodore C. Peters, Partner
Edgerton & Weaver, LLP
2615 Pacific Coast Hwy, Suite 300
Hermosa Beach, California 90254

Kenneth D. Polin, Partner
Jones Day
12265 El Camino Real
Suite 200
San Diego, California 92130

EXHIBIT "17"

*Information Regarding the Proposal*

The Mortgage Funds nominate the nominees for election at the Special Meeting.

*Information Regarding the Nominees*

| Name, Address and Age | Position(s) Held with Company | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years | Other Directorships[1] Held by Director or Nominee |
|---|---|---|---|---|
| Thomas S. Gehring | N/A | N/A | Chief Executive Officer of the San Diego County Medical Society (a non-profit organization founded to promote the science and art of medicine) | None |

Business Address:
5575 Ruffin Road,
Suite 250, San Diego,
California 92123

Home Address:
3921 Liggett Drive
San Diego, CA 92106

Age: 61

[1] Other directorships are limited to: (i) publicly traded companies in the United States; (ii) companies that are otherwise subject to SEC reporting requirements and (iii) investment companies registered under the Investment Company Act of 1940.

1

EXHIBIT "17"

| Name, Address and Age | Position(s) Held with Company | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years | Other Directorships[1] Held by Director or Nominee |
|---|---|---|---|---|
| G. Michael Cox<br><br>Business Address:<br>754 N U.S. Highway 1<br>Tequesta, Florida<br>33469<br><br>Home Address:<br>1700 Juno Isles Boulevard<br>Juno Beach, Florida<br>33408<br><br>Age: 62 | N/A | N/A | President and CEO of Independent Tire Dealers Group, LLC (tires and tubes retailer) | None |

2

| Name, Address and Age | Position(s) Held with Company | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years | Other Directorships¹ Held by Director or Nominee |
|---|---|---|---|---|
| William Bart Ziegler | N/A | N/A | President of Southeast Drilling Services (well construction, vertical and submersible turbine pump service and general construction) | None |

Business Address:
10614 U.S. Highway
92 E
Tampa, Florida 33610

Home Address:

Age: 51

3

| Name, Address and Age | Position(s) Held with Company | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years | Other Directorships Held by Director or Nominee |
|---|---|---|---|---|
| Parker Hinshaw | N/A | N/A | Entrepreneur/business owner and private investor | None |

Business Address:

Home Address:
400 W. Ocean View
Avenue
Del Mar, California
92014

Age: 65

4

EXHIBIT "17"

| Name, Address and Age | Position(s) Held with Company | Term of Office and Length of Time Served | Principal Occupation(s) During Past 5 Years | Other Directorships[1] Held by Director or Nominee |
|---|---|---|---|---|
| Robert Moore | N/A | N/A | Entrepreneur/business owner and private investor | None |

Business Address:

Home Address:
3792 Ridge Road
Lockport, New York
14094

Age: 53

5

EXHIBIT "17"

**Dollar Range of Equity Securities Beneficially Owned by the Nominees**

| Name | Dollar Range of Equity Securities in the Company[1] |
|---|---|
| Thomas S. Gehring | None |
| G. Michael Cox | None |
| William Bart Ziegler | None |
| Parker Hinshaw | None |
| Robert Moore | None |

*Nominee Compensation*

None of the Nominees have received any compensation from the Company during 2014.

*Absence of Involvement in Certain Legal Proceedings*

During the past ten years:

(a) No petition under the Federal bankruptcy laws or any state insolvency law has been filed by or against, and no receiver, fiscal agent or similar officer has been appointed by a court for the business or property of, any Nominee, or any partnership in which any Nominee was a general partner at or within two years before the time of such filing, or any corporation or business association of which the Nominee was an executive officer at or within two years before the time of such filing;

(b) No Nominee has been convicted in a criminal proceeding or is a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses);

[1] As of December 31, 2014.

6

EXHIBIT "17"

(c) No Nominee has been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining such person from, or otherwise limiting, the following activities:

    (i) Acting as a futures commission merchant, introducing broker, commodity trading advisor, commodity pool operator, floor broker, leverage transaction merchant, any other person regulated by the Commodity Futures Trading Commission, or an associated person of any of the foregoing, or as an investment advisor, underwriter, broker or dealer in securities, or as an affiliated person, director or employee of any investment company, bank, savings and loan association or insurance company, or engaging in or continuing any conduct or practice in connection with such activity;

    (ii) Engaging in any type of business practice; or

    (iii) Engaging in any activity in connection with the purchase or sale of any security or commodity or in connection with any violation of Federal or State securities laws or Federal commodities laws;

(d) No Nominee has been the subject of any order, judgment or decree, not subsequently reversed, suspended or vacated, of any Federal or State authority barring, suspending or otherwise limiting for more than 60 days the right of such person to engage in any activity described in paragraph (c)(i) above, or to be associated with persons engaged in any such activity;

(e) No Nominee has been found by a court of competent jurisdiction in a civil action or by the Commission to have violated any Federal or State securities law, where the judgment in such civil action or finding by the Commission has not been subsequently reversed, suspended or vacated;

(f) No Nominee has been found by a court of competent jurisdiction in a civil action or by the Commodity Futures Trading Commission to have violated any Federal commodities law, where the judgment in such civil action or finding by the Commodity Futures Trading Commission has not been subsequently reversed, suspended or vacated;

(g) No Nominee has been the subject of, or a party to, any Federal or State judicial or administrative order, judgment, decree, or finding, not subsequently reversed, suspended or vacated, relating to an alleged violation of:

    (i) Any Federal or State securities or commodities law or regulation; or

    (ii) Any law or regulation respecting financial institutions or insurance companies including, but not limited to, a temporary or permanent injunction, order of disgorgement or restitution, civil money penalty or

EXHIBIT "17"

temporary or permanent cease-and-desist order, or removal or prohibition order; or

(iii) Any law or regulation prohibiting mail or wire fraud or fraud in connection with any business entity; and

(h) No Nominee has been the subject of, or a party to, any sanction or order, not subsequently reversed, suspended or vacated, of any self-regulatory organization (as defined in Section 3(a)(26) of the Exchange Act), any registered entity (as defined in Section 1(a)(29) of the Commodity Exchange Act), or any equivalent exchange, association, entity or organization that has disciplinary authority over its members or persons associated with a member.

## *Interest in and Relationships with the Company*

None of the Nominees have any previous interest in or relationship with the Company.

## *Section 16(a) of the Exchange Act*

Not Applicable.

## *Arrangements or Understandings*

None of the Nominees has any substantial interest, direct or indirect, by security holdings or otherwise, in any matter to be acted upon at the Special Meeting other than the interest of each Nominee in being elected to serve as a director of the Company and as otherwise described in this notice. Except as otherwise specified in this notice, including any exhibit hereto, (1) none of the Nominees own any shares of the Company, (2) none of the Nominees has purchased or sold any shares of the Company within the past two years, (3) none of the Nominees who are not or would not be an interested person and none of his or her immediate family members, is the beneficial or record owner of any securities in (i) an investment adviser, principal underwriter, or sponsoring insurance company of the Company or (ii) a person (other than a registered investment company) directly or indirectly controlling, controlled by, or under common control with an investment adviser, principal underwriter, or sponsoring insurance company of the Company.

The Nominees are not, and have not been within the past year, a party to any contract, arrangement or understanding with any person with respect to any securities of the Company, including, but not limited to, joint ventures, loan or option arrangements, puts or calls, guarantees against loss or guarantees of profits, division of losses or profits, or the giving or withholding of proxies. The Nominees do not beneficially own, directly or indirectly, any securities of any parent or subsidiary of the Company.

None of the Nominees has any arrangement or understanding with respect to future employment by the Company or any of its affiliates or with respect to any future transactions to which the Company or any of its affiliates will be or may be a party.

## *Consent of Each Nominee*

Each Nominee has consented to serve as a director of the Company, if so elected.

## *Material Proceedings Adverse to the Company*

There are no pending material proceedings to which any Nominee, or any of their respective affiliates, is a party adverse to the Company or any of its affiliated persons, or in which any of the Nominees or any of their affiliates has a material interest adverse to the Company or any of its affiliated persons.

EXHIBIT "17"

*General*

The Mortgage Funds reserve the right to nominate substitute and additional nominees for election to the Board for any reason. Shares represented by proxies given to the Mortgage Funds will be voted for any substitute or additional nominees. The Mortgage Funds reserve the right to nominate substitute persons for any reason, including if any of the Nominees become disqualified following the date hereof. Additionally, if any Nominee (or substitute thereof) is unable or unwilling to stand for election for any reason at the Special Meeting, the Mortgage Funds intend to nominate a person in the place of such Nominee (or substitute thereof). The Mortgage Funds' reservation of the foregoing rights, and any of the foregoing actions that may be taken by the Mortgage Funds, would be without prejudice to the issue of whether any action by the Company was valid under the circumstances and will not limit the Mortgage Funds' rights to challenge such actions.

The Mortgage Funds also reserve the right to make modifications to the foregoing proposals and make additional proposals for any reason. The Company is cautioned not to take any action that would adversely impact the Mortgage Funds' ability to effectuate a change in the majority of the Board.

The Mortgage Funds, in furnishing this notice, do not concede the validity or enforceability of any of the provisions of the by-laws or any other matter, including any provisions in the by-laws that purport to impose notice requirements or otherwise limit the right of any stockholder to present business for consideration at any meeting of the stockholders, and expressly reserves the right to challenge the validity, application and interpretation of any such provisions or any other matter.

9

EXHIBIT "17"



SEE LEGEND(S) ON REVERSE

EXHIBIT "17"

For Value Received, _____ hereby sell, assign and transfer

unto _____

Shares

represented by the within Certificate, and do hereby

irrevocably constitute and appoint

_____ Attorney

to transfer the said Shares on the books of the within named

Corporation with full power of substitution in the premises.

Dated _____

In presence of

NOTICE: THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.



**CERTIFICATE FOR** _____ **SHARES**

ISSUED TO

_____

DATED _____

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE COMPANY HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE, REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED.

THE CORPORATION IS AUTHORIZED TO ISSUES SHARES OF MORE THAN ONE CLASS OF STOCK OR MORE THAN ONE SERIES OF STOCK. THE CORPORATION WILL FURNISH A STATEMENT OF THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS, WITHOUT CHARGE, TO THE HOLDER OF THIS CERTIFICATE UPON RECEIPT BY THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE OF A WRITTEN REQUEST FROM THE HOLDER REQUESTING SUCH COPY.

EXHIBIT "17"



EXHIBIT "17"



THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT
BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL
REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE
COMPANY HAS RECEIVED AN OPINION OF COUNSEL, OR OTHER EVIDENCE, REASONABLY
SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT
REQUIRED.

THE CORPORATION IS AUTHORIZED TO ISSUES SHARES OF MORE THAN ONE CLASS OF STOCK OR
MORE THAN ONE SERIES OF STOCK. THE CORPORATION WILL FURNISH A STATEMENT OF THE
POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER
SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS,
LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS, WITHOUT CHARGE, TO
THE HOLDER OF THIS CERTIFICATE UPON RECEIPT BY THE CORPORATION AT ITS PRINCIPAL
PLACE OF BUSINESS OR REGISTERED OFFICE OF A WRITTEN REQUEST FROM THE HOLDER
REQUESTING SUCH COPY.

EXHIBIT "17"



INCORPORATED UNDER THE LAWS OF

THE STATE OF MARYLAND

NUMBER
3

SHARES
5,900,212

**AMERICAN SPECTRUM REALTY, INC.**

Authorized: 17,000,000 8% Cumulative Preferred Stock, Series B

This Certifies that

D&A INTERMEDIATE-TERM MORTGAGE FUND III, L.P.

registered holder of Five Million Nine Hundred Thousand Two Hundred Twelve (5,900,212) Shares

is the

transferable only on the books of the Corporation by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

IN WITNESS WHEREOF, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

this 30th day of December A.D. 2013

William J. Carden, President

James Hurn, Secretary

SEE LEGEND(S) ON REVERSE

EXHIBIT "17"

*For Value Received* _____ *hereby sell, assign and transfer*

unto _____

_____

*Shares*
*represented by the within Certificate, and do hereby*
*irrevocably constitute and appoint*

*Attorney*
*to transfer the said Shares on the books of the within named*
*Corporation with full power of substitution in the premises.*

*Dated* _____

*In presence of* _____

NOTICE THE SIGNATURE OF THIS ASSIGNMENT
MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE
FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT
ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER



THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE, AND MAY NOT
BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL
REGISTERED UNDER SUCH ACT AND/OR APPLICABLE STATE SECURITIES LAWS, OR UNLESS THE
COMPANY HAS RECEIVED AN OPINION OF COUNSEL OR OTHER EVIDENCE, REASONABLY
SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT
REQUIRED.

THE CORPORATION IS AUTHORIZED TO ISSUES SHARES OF MORE THAN ONE CLASS OF STOCK OR
MORE THAN ONE SERIES OF STOCK. THE CORPORATION WILL FURNISH A STATEMENT OF THE
POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE, PARTICIPATING, OPTIONAL OR OTHER
SPECIAL RIGHTS OF EACH CLASS OF STOCK OR SERIES THEREOF AND THE QUALIFICATIONS,
LIMITATIONS OR RESTRICTIONS OF SUCH PREFERENCES AND/OR RIGHTS, WITHOUT CHARGE, TO
THE HOLDER OF THIS CERTIFICATE UPON RECEIPT BY THE CORPORATION AT ITS PRINCIPAL
PLACE OF BUSINESS OR REGISTERED OFFICE OF A WRITTEN REQUEST FROM THE HOLDER
REQUESTING SUCH COPY.

EXHIBIT "17"

**DUNHAM**
**MORTGAGE FUNDS**

January 30, 2015

**VIA REGISTERED MAIL, FEDERAL EXPRESS AND ELECTRONIC MAIL**

Mr. James L. Hurn
Secretary of American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Re:    Optional Redemption Notice - 8% Cumulative Preferred Stock, Series B ("Series B
Preferred Stock") of American Spectrum Realty, Inc. (the "Company")

Dear Mr. Hurn,

This letter shall serve as written notice that as the holders of all the issued and outstanding Series
B Preferred Stock, the D&A Daily Mortgage Fund III, L.P., D&A Semi-Annual Mortgage Fund
III, L.P. and D&A Intermediate-Term Mortgage Fund III, L.P. elect to require the Company to
redeem all of the outstanding shares of Series B Preferred Stock pursuant to Section 6(c) of the
Amended and Restated Articles Supplementary dated June 7, 2014 (the "Articles
Supplementary") for Series B Preferred Stock of the Company. On December 1, 2014, the
Company did not pay in full in cash the dividend due to Series B Preferred Stock and failed to
cure such breach within thirty (30) days. As a result, an "Event of Default" (as defined in
Section 3(n)(v) of the Articles Supplementary) occurred on December 31, 2014. Please be
advised that pursuant to Section 6(c)(iv) of the Articles Supplementary, the Company will have
thirty (30) days from receipt of this notice to redeem the Series B Preferred Stock.

Sincerely,

Jeffrey A. Dunham
President and CEO
Asset Managers, Inc. ("AMI")

Jeffrey A. Dunham
President, CEO and AMI General Partner
D&A Daily Mortgage Fund III, L.P.
D&A Semi-Annual Mortgage Fund III, L.P.
D&A Intermediate-Term Mortgage Fund III,
L.P.

cc:    Patrick D. Barrett, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

EXHIBIT "17"

William J. Carden, Chairman of the Board, Chief Executive Officer and President
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

D. Brownell Wheless, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Kenneth H. White, Director
c/o American Spectrum Realty, Inc.
2401 Fountain View, Suite 750
Houston, Texas 77057

Matthew J. Ertman, Partner
Allen Matkins
515 South Figueroa Street, 9th Floor
Los Angeles, California 90071-3309

Theodore C. Peters, Partner
Edgerton & Weaver, LLP
2615 Pacific Coast Hwy, Suite 300
Hermosa Beach, California 90254

Kenneth D. Polin, Partner
Jones Day
12265 El Camino Real
Suite 200
San Diego, California 92130

EXHIBIT "17"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**100 Spectrum Center Drive, Suite 600, Irvine, California 92618**

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF JEFFREY DUNHAM IN SUPPORT OF PETITIONING CREDITORS' EMERGENCY MOTION FOR A COURT ORDER APPOINTING AN INTERIM CHAPTER 11 TRUSTEE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ***February 13, 2015***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**INTERESTED PARTY:** United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

☐    Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) ***Not Applicable***, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ***February 13, 2015***, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| **Judge's Copy – Via Personal Delivery** | **Alleged Debtor** | **Alleged Debtor** |
|---|---|---|
| Honorable Scott C. Clarkson<br>U.S. Bankruptcy Court<br>411 West Fourth Street<br>Bin beside 5th Floor Elevators<br>Santa Ana, CA 92701 | American Spectrum Realty, Inc.<br>Attn: William J. Carden,<br>Chairman of the Board, CEO and President<br>19100 Von Karman Avenue, Suite 900<br>Irvine, CA 92612 | American Spectrum Realty, Inc.<br>Attn: James Hurn, General Counsel<br>19100 Von Karman Avenue, Suite 900<br>Irvine, CA 92612 |
| **Registered Agent for Service of Process for the Alleged Debtor**<br>American Spectrum Realty, Inc.<br>1267 Willis Street, Suite 200<br>Redding, CA 96001 | | |

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| February 13, 2015 | Anne Marie Vernon | /s/ Anne Marie Vernon |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**